Sblend A. Sblendorio (SBN 109903)
sblend.sblendorio@hogefenton.com
HOGE, FENTON, JONES & APPEL, INC.
6801 Koll Center Parkway, Suite 210
Pleasanton, California 94566-7047
Phone: 925.224.7780
Fax: 925.224.7782

Matthew B. Hale (FBN 0110600)(Pro Hac Vice)
mhale@srbp.com
STICHTER, RIEDEL, BLAIN & POSTLER, P.A.
110 E. Madison St, Suite 200
Tampa, Florida 33602-4700
Phone: 813-229-0144
Fax:  813-229-1811

Attorneys for Creditor, WHR Holdings, LLC

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| In re | Case No. 25-30743 |
| AMERICAN TRASH MANAGEMENT, INC., | Chapter 11, Subchapter V |
| Debtor. | **DECLARATION OF CHARLTON GEORGE IN SUPPORT OF AMENDED OBJECTION TO DEBTOR'S SUBCHAPTER V ELIGIBILITY BY WHR HOLDINGS, LLC** |

I, Charlton George, hereby declare:

1.      I am employed by WHR Holdings, LLC ("WHR"), d/b/a Wilkinson Hi-Rise. I submit this declaration in support of the Objection to Debtor's Subchapter V Eligibility by WHR Holdings, LLC in the Chapter 11 case of American Trash Management, Inc. (the "Debtor"), Case No. 25-30743, in the United States Bankruptcy Court, Northern District of California, San Fransisco Division. I have personal knowledge of the matters set forth herein unless otherwise stated, and, if called to testify, would and could testify completely hereto.

2. WHR designs, manufactures, sells, installs, and services trash chute systems that are commonly installed in mid-rise and hi-rise buildings and is regarded as the industry leader in trash chute systems throughout North America and internationally. WHR also offers other products used in commercial, residential, and institutional buildings, including trash chutes, doors, compactors, linen chutes, doors, storage lockers, and mailboxes (collectively, the "Products").

3. WHR has commercial relationships with representatives/distributors in various states and foreign countries who sell, install, service, and/or maintain the Products in designated territories. WHR sells the Products and parts for service and repair to its distributors and also offers engineering services, product support, and training for distributors.

4. On October 1, 2007, WHR, the Debtor, and Scott Brown ("Brown") entered into a Sale, Assignment, Exclusive Manufacturer's Representative and Authorized Service Provider Agreement (the "Agreement"), pursuant to which WHR appointed the Debtor as WHR's exclusive manufacturer's representative and authorized service provider to sell and service WHR's Products in the Territory (defined in the Agreement to mean southern California south of Bakersfield, California) and as WHR's non-exclusive manufacturer's representative and authorized service provider to sell and service WHR's products north of Bakersfield, California. In the Agreement, the Debtor also agreed that WHR would be the exclusive supplier of the Products to the Debtor. A true and correct copy of the Agreement is attached as **Exhibit A** to this Declaration.

5. Under the Agreement, the Debtor, from time to time, would submit a purchase order to WHR for a specific job detailing the Products needed, the parties would agree on pricing for that job, and WHR would manufacture the Products and ship them to the Debtor with a corresponding invoice. Pursuant to Section 3(g) of the Agreement, the Debtor was required to pay WHR for the Products within thirty (30) days after shipment of the Products, and any invoices that were not paid within thirty (30) days after shipment of the Products were subject

GEORGE DECLARATION - OBJECTION TO DEBTOR'S SUBCHAPTER V ELIGIBILITY

to a service charge of 1.5% per month until such time as the invoice was paid in full. Section 3(i) of the Agreement further provides that any Product not rejected by the Debtor within thirty (30) days of receipt of that Product by the Debtor would be deemed accepted by the Debtor. The Debtor never provided any notice to WHR of its rejection of any specific Products within thirty (30) days of receipt of that Product.

6. Throughout WHR's relationship with the Debtor, the Debtor has consistently failed to timely pay WHR's invoices, often *years* after the due date on the invoice, and in many cases failed to pay at all.

7. In January 2024, WHR and the Debtor met in Florida in an attempt to resolve the past due amounts owed by the Debtor to WHR under the Agreement. On January 1, 2024, WHR and the Debtor, through Brown, its President, executed an agreement (the "January 2024 Agreement") whereby the parties confirmed that the then outstanding amount due and owing from the Debtor to WHR under the Agreement was $4.2 million, exclusive of newer receivables totaling approximately $1 million that were to be managed and collected separately from the note contemplated by the January 2024 Agreement. A true and correct copy of the January 2024 Agreement is attached as **Exhibit B** to this Declaration.

8. After efforts to finalize documentation on the agreed past-due balance failed, on July 5, 2024, WHR filed a complaint (the "Complaint") against the Debtor in the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida, for breach of the Agreement by the Debtor for failure to pay for Products shipped and delivered and invoiced by WHR to the Debtor and seeking collection of approximately $1.9 million for Products shipped and delivered and invoiced to the Debtor plus accrued and unpaid contractual interest permitted under the Agreement. A true and correct copy of the Complaint (without Exhibits) is attached as **Exhibit C** to this Declaration.

9. On July 22, 2025, WHR delivered a letter (the "July 22 Letter") to the Debtor and Brown terminating the Agreement for "Cause" (as that term is defined in the Agreement). In

the July 22 Letter, WHR also advised the Debtor and Brown that, as a result of the termination of the Agreement for Cause pursuant to Section 8(g)(iii) of the Agreement, the Debtor and Brown, individually, were subject to the noncompetition provisions set forth in Section 8(g) of the Agreement. To date, neither the Debtor nor Brown has objected to or disputed any of the statements in the July 22 Letter. A true and correct copy of the July 22 Letter. A true and correct copy of the July 22 Letter is attached as **Exhibit D** to this Declaration.

10. On August 25, 2025, in response to multiple statements from the Debtor that it intended to file for bankruptcy under Subchapter V, WHR delivered a letter (the "August 25 Letter") to the Debtor and Brown setting forth in detail the amount WHR asserted due by the Debtor under the Agreement as of August 1, 2025. The purpose of the August 25 Letter was to illustrate that the Debtor was not eligible for Subchapter V relief. The August 25 Letter attached a summary accounts receivable report that showed the detail for WHR's calculations of the invoiced amount due together with accrued and unpaid contractual interest. (*Id.*) To date, neither the Debtor nor Brown has objected to or disputed any of the statements in the August 25 Letter. (*Id.*) A copy of the August 25 Letter is attached as **Exhibit E** to this Declaration.

11. On November 5, 2025, WHR filed a proof of claim in the Debtor's Chapter 11 case, designated as Claim No. 19 in the claims register (the "Initial Claim"). In the Initial Claim, WHR asserted a claim amount of not less than $4,858,382.45. The Initial Claim consisted of $2,541,732.48 due and owing for Products shipped and delivered and invoiced to the Debtor and $2,316,649.97 of accrued and unpaid contractual interest.

12. On November 13, 2025, WHR filed its initial Objection to Debtor's Subchapter V Eligibility by WHR Holdings, LLC (Doc. No. 61) (the "Initial Objection"). At a status conference in this case on November 13, 2025, I understand that the Debtor made statements alluding to objections to the amount of WHR's Initial Claim based on issues relating to application of payments made by the Debtor to WHR. Following the November 13, 2025, status conference and the Debtor's statements, I instructed WHR to conduct an additional review of

GEORGE DECLARATION - OBJECTION TO DEBTOR'S SUBCHAPTER V ELIGIBILITY

its accounting of its invoices to the Debtor and the Debtor's payments.

13.     WHR's additional review of its accounting revealed an error in WHR's Initial Claim and the figures relied upon in the Initial Objection. Beginning in late 2023, after the Debtor's delinquent and late-payment issues continued to mount, WHR and the Debtor agreed to a deposit and joint check arrangement where the Debtor was required to deposit 50% of the applicable invoice amount when placing an order, and the remaining 50% would be paid by a joint check issued by the Debtor's customer jointly to the Debtor and WHR. This deviation from WHR's normal payment and accounting practices with respect to the Debtor resulted in errors surrounding WHR's application of deposits and/or joint checks to specific invoices in late 2023 and 2024.

14.     On December 23, 2025, WHR filed its amended proof of claim (the "Amended Claim"). Through its Amended Claim, WHR asserts a claim amount of not less than **$3,819,645.46** (the "Claim Amount"). The Amended Claim consists of $1,668,336.28 due and owing for Products shipped and delivered and invoiced to the Debtor and $2,151,309.18 of accrued and unpaid contractual interest. A copy of the Amended Claim is attached as **Exhibit F** to this Declaration.

15.     Attached as **Exhibit G** to this Declaration is a summary accounts receivable report that shows the detail for the calculation of the Claim Amount, including (i) the total amounts invoiced and collected for the period from 2010 to 2025, leaving the invoiced amount of $1,668,336.28 unpaid, and (ii) accrued contractual interest totaling $2,151,309.18. All of the invoices comprising the Claim Amount have been provided by WHR to the Debtor. The Claim Amount is fully liquidated as it is readily ascertainable pursuant to the express contractual terms in the Agreement. The Claim Amount does not include attorneys' fees and costs that WHR is entitled to collect from the Debtor under the Agreement. The Debtor has not disputed or objected to any of the invoiced amounts or any portion of the Claim Amount.

16.     The chart below summaries WHR's Amended Claim, as of the Petition Date,

broken down by amount owed year-by-year dating back to 2010:

| | Invoiced Amount | Collected | Unpaid Invoiced Amount (excludes interest) | Simple Contractual Interest Calculated to Date Invoice paid |
|---|---|---|---|---|
| 2010 | 56,793.61 | 56,793.61 | - | 13,718.12 |
| 2011 | 163,851.36 | 163,851.36 | - | 2,436.19 |
| 2012 | 368,452.79 | 368,452.79 | - | 4,662.22 |
| 2013 | 938,283.96 | 938,283.96 | | 34,982.90 |
| 2014 | 518,949.49 | 431,193.64 | 87,755.85 | 345,954.94 |
| 2015 | 1,116,249.84 | 1,085,507.89 | 30,741.95 | 143,991.51 |
| 2016 | 1,051,697.79 | 1,051,697.79 | - | 188,050.69 |
| 2017 | 726,740.49 | 726,740.49 | - | 96,554.56 |
| 2018 | 851,780.60 | 851,780.60 | - | 42,229.57 |
| 2019 | 1,455,346.80 | 1,455,346.80 | - | 55,486.75 |
| 2020 | 1,679,232.25 | 1,598,482.00 | 80,750.25 | 159,587.94 |
| 2021 | 2,072,736.85 | 1,641,036.00 | 431,700.85 | 461,099.64 |
| 2022 | 1,168,068.96 | 489,924.05 | 678,144.91 | 414,115.21 |
| 2023 | 1,482,412.28 | 1,166,030.93 | 316,381.35 | 173,195.00 |
| 2024 | 1,620,516.49 | 1,620,503.87 | 12.62 | 13,126.48 |
| 2025 | 322,222.95 | 279,374.45 | 42,848.50 | 2,117.44 |
| Totals: | 15,593,336.51 | 13,925,000.23 | 1,668,336.28 | 2,151,309.18 |
| | | Total Claim: | 3,819,645.46 | |

17.     In my capacity at WHR, I am familiar with WHR's invoicing and accounts receivable records pertaining to the Debtor and attest that the invoices and interest calculations supporting the Amended Claim are accurate based on WHR's business records kept in the ordinary course of business.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, to the best of my knowledge and belief after diligent inquiry.

Executed on this 23rd day of December 2025.

*[SIGNATURE PAGE FOLLOWS]*

6

Case: 25-30743   Doc# 80-1   Filed: 12/23/25   Entered: 12/23/25 15:58:39   Page 6 of 64
GEORGE DECLARATION - OBJECTION TO DEBTOR'S SUBCHAPTER V ELIGIBILITY

CHARLTON GEORGE

GEORGE DECLARATION - OBJECTION TO DEBTOR'S SUBCHAPTER V ELIGIBILITY

# EXHIBIT A

v. 11-FINAL

**SALE, ASSIGNMENT,**
**EXCLUSIVE MANUFACTURER'S REPRESENTATIVE AND**
**AUTHORIZED SERVICE PROVIDER AGREEMENT**

This Sale, Assignment, Exclusive Manufacturer's Representative and Authorized Service Provider Agreement ("Agreement") is entered into, as of October 1, 2007, between WHR HOLDINGS, LLC, a FLORIDA limited liability company with offices at 2821 Evans St, Hollywood, Florida 33020 (the "Company"), and AMERICAN TRASH MANAGEMENT, INC. with offices at 1388 Sutter Street, Suite 920, San Francisco, CA 94109 ("Manufacturer's Representative").

In consideration of the mutual promises contained herein, the parties agree as follows:

1. <u>DEFINITIONS</u>

(a) "Products" shall mean those products offered for sale by the Company from time to time to its Manufacturer's Representatives, currently encompassing trash chutes, doors, compactors, linen chutes, doors, storage lockers, and mail boxes. Products may be changed or abandoned by the Company, at its sole discretion, at any time. The Company shall be under no obligation to continue the production of any Product, except as provided herein. The Manufacturer's Representative shall use his best efforts to represent new product lines developed by the Company but is not obligated to do so.

(b) "Territory" shall mean Southern California as defined as being south of Bakersfield, California.

2. <u>APPOINTMENT AND AUTHORITY OF MANUFACTURER'S REPRESENTATIVE</u>

(a) <u>Appointment</u>. Subject to the terms and conditions set forth herein, the Company hereby appoints Manufacturer's Representative as the Company's exclusive manufacturer's representative and authorized service provider for the Products in the Territory, and Manufacturer's Representative hereby accepts such appointment. For so long as Manufacturer's Representative is performing in compliance with this Agreement, the Company shall not appoint any other manufacturer's representative or authorized service provider with responsibility for sale or service of the Products in the Territory.

Manufacturer's Representative shall also be an authorized but non exclusive manufacturer's representative in the Northern California area defined as north of Bakersfield, California. As the effective date of this agreement, the Company acknowledges that the Manufacturer Representative has orders pending in Nevada, Arizona and New Mexico. This acknowledgment does not grant an exclusive or non-exclusive authority in these areas. Any future sales outside of the authorized area would be mutual agreement between both parties.

Exclusive Supplier. Manufacturer's Representative agrees that the Company shall be the exclusive supplier to the Manufacturer's Representative trash and linen chute, related doors, lockers, mailboxes, bicycle racks or related products. Any exclusions from this right shall be obtained from the Company in writing only signed by an authorized representative of the Company.

(b) <u>Territorial Responsibility</u>. Manufacturer's Representative shall use its best efforts to pursue aggressive sales policies and procedures to realize the maximum sales potential for the Products in the Territory. Manufacturer's Representative shall service the Products in the Territory in a professional, workmanlike manner which enhances the reputation of both Manufacturer's

1

Representative and the Company. Manufacturer's Representative shall not sell, ship, install, maintain, service or advertise the Products outside the Territory without the prior written consent of the Company.

(c)     Conflict of Interest. During the term of this Agreement, Manufacturer's Representative shall not, without the Company's prior written consent, represent, promote or otherwise try to sell within the Territory any lines or products that, in the Company's judgment, compete with the Products covered by this Agreement. The Company acknowledges the Manufacturer's Representative currently manufactures or distributes a wide range of odor control, waste and recycling equipment and that some of this equipment competes directly with the Company's current odor control and compaction equipment offerings. The Company hereby grants its consent to the Manufacturers's Representative to continue to manufacture and distribute the odor control, compaction and recycling equipment and in no way does it intend these items to be covered under this agreement. However, as part of this agreement, the Manufacturer's Representative will utilize best efforts to sell the Company's compactors and recycling equipment.

(d)     Independent Contractors. The relationship of the Company and Manufacturer's Representative established by this Agreement is that of independent contractors, and nothing contained in this Agreement shall be construed to (i) give either party the power to direct and control the day-to-day activities of the other, (ii) constitute the parties as partners, joint venturers, co-owners or otherwise as participants in a joint or common undertaking or (iii) allow Manufacturer's Representative to create or assume any obligation on behalf of the Company for any purpose whatsoever except as specifically stated in Section 6. All financial obligations associated with Manufacturer's Representative's business are the sole responsibility of Manufacturer's Representative. All sales, service and other agreements between Manufacturer's Representative and its customers are Manufacturer's Representative's exclusive responsibility and shall have no effect on Manufacturer's Representative's obligations under this Agreement. Manufacturer's Representative shall be solely responsible for, and shall indemnify and hold the Company free and harmless from, any and all claims, damages or lawsuits (including the Company's attorneys' fees) arising out of the acts of Manufacturer's Representative, its employees or its agents (including, but not limited to, claims by Manufacturer's Representative's customers to the extent they exceed the Company's liability as limited by Section 9 below).

3.     TERMS   OF   PURCHASE   OF   PRODUCTS   BY   MANUFACTURER'S REPRESENTATIVE

(a)     Terms and Conditions.     All purchases of Products by Manufacturer's Representative from the Company during the term of this Agreement shall be subject to the terms and conditions of this Agreement.

(b)     Prices.     All prices are F.O.B. the Company's respective manufacturing or warehousing facilities.  The purchase price to Manufacturer's Representative for each of the Products ("Purchase Price") shall be as set forth in the Company's standard Manufacturer's Representative price lists.   The difference between Manufacturer's Representative's Purchase Price and Manufacturer's Representative's selling price to its customers shall be Manufacturer's Representative's sole remuneration for sale of the Products.  The Company has the right at any time to revise such standard Manufacturer's Representative price lists.  Such revisions shall apply to all orders accepted after the effective date of revision.

(c)     Taxes.  Manufacturer's Representative's Purchase Price does not include any federal, state, local or other taxes that may be applicable to the Products.  When the Company has the legal obligation to collect such taxes, the appropriate amount shall be added to Manufacturer's

Representative's invoice and paid by Manufacturer's Representative unless Manufacturer's Representative provides the Company with a valid tax exemption certificate authorized by the appropriate taxing authority.

       (d)   <u>Order and Acceptance</u>. All orders for Products submitted by Manufacturer's Representative shall be initiated by written purchase orders sent to the Company; provided, however, that an order may initially be placed orally or by fax or email if a confirmational written purchase order is received by the Company by facsimile transmission, email, mail or hand delivery within five days after said oral or fax or email order. To facilitate the Company's production scheduling, Manufacturer's Representative shall submit purchase orders to the Company at least 60 days prior to the day of the requested delivery. No order shall be binding upon the Company until accepted by the Company in writing, and the Company shall have no liability to Manufacturer's Representative with respect to pur-chase orders that are not accepted. The Company shall use its reasonable best efforts to notify Manufacturer's Representative of the acceptance or rejection of an order and of the assigned delivery date for accepted orders within 5 business days after receipt of the purchase order. No partial shipment of an order shall constitute the acceptance of the entire order, absent the written acceptance of such entire order. The Company shall use its reasonable best efforts to deliver Products at the times specified either in its quotation or in its written acceptance of Manufacturer's Representative's purchase orders.

       (e)   <u>Terms of Purchase Orders</u>. Manufacturer's Representative's purchase orders submitted to the Company from time to time with respect to Products to be purchased hereunder shall be governed by the terms of this Agreement, and nothing contained in any such purchase order shall in any way modify such terms of purchase or add any additional terms or conditions.

       (f)   <u>Change Orders</u>. Manufacturer's Representative may issue written change orders for orders that have not yet been shipped by the Company, subject to the following conditions:

          (i) The Company may delay delivery of any accepted order as reasonably necessary to accommodate such changes upon notification to Manufacturer's Representative.

          (ii) Manufacturer's Representative may be charged rescheduling or change order fees per Company policy and per prior disclosure to the Manufacturer's Representative, not to exceed 5% of the original order value.

          (iii) Manufacturer's Representative shall be subject to pay a 10% cancellation charge for any orders that are cancelled less than 30 days of the scheduled delivery date assigned by the Company. However, the Manufacturer's Representative may cancel Product orders without penalty prior to 30 days before the delivery date assigned by the Company. All order cancellations shall be made in writing and be transmitted to the Company via fax, email or regular mail. Verbal cancellation of orders will not be accepted.

       (g)   <u>Payment</u>. Full payment of Manufacturer's Representative's Purchase Price for the Products (including any freight, taxes or other applicable costs initially paid by the Company but to be borne by Manufacturer's Representative) shall be made by Manufacturer's Representative to the - Company within 30 days of the time of shipment. If paid before 30 days, a .5% discount shall be applied. Payment shall be in U.S. dollars and may be in cash or other method approved by the Company. Any invoiced amount not paid when due shall be subject to a service charge of 1.5% per month. Manufacturer's Representative shall pay all of the Company's costs and expenses (including reasonable attorneys' fees) to enforce and preserve the Company's rights under this Subsection.

(h)     Shipping. All Products delivered pursuant to the terms of this Agreement shall be suitably packed for shipment in the Company's standard shipping cartons, marked for shipment to the Manufacturer's Representative's address as set forth on the Manufactur's Representatives order, and delivered to Manufacturer's Representative or its carrier agent F.O.B. the Company's manufacturing plant, at which time (subject to Section 3(k) below) title to such Products and risk of loss shall pass to Manufacturer's Representative.     Unless otherwise instructed in writing by Manufacturer's Representative, the Company shall select the carrier. All freight, insurance and other shipping expenses, as well as any special packing expense, shall be paid by Manufacturer's Representative. Manufacturer's Representative shall also bear all applicable taxes, duties and similar charges that may be assessed against the Products after delivery to the carrier at the Company's plant.

(i)     Rejection of Products. Manufacturer's Representative shall inspect all Products promptly upon receipt thereof and may reject any Product that is materially defective so as to render it unusable.   Any Product not properly rejected within 30 days after receipt of that Product by Manufacturer's Representative ("Rejection Period") shall be deemed accepted.     To reject a Product, Manufacturer's Representative shall, within the Rejection Period, notify the Company in writing or by fax or email of its rejection and request a Material Return Authorization ("MRA") number. The Company shall use its best efforts to provide the MRA number in writing or by fax or email to Manufacturer's Representative within 15 days after receipt of the request. Within 10 days after receipt of the MRA number, Manufacturer's Representative shall return to the Company the rejected Product, freight prepaid, in its original shipping carton with the MRA number displayed on the outside of the carton.  Provided that the Company has complied with its obligations in this Subsection, the Company reserves the right to refuse to accept any rejected Products that do not bear an MRA number on the outside of the carton.  As promptly as possible but no later than 30 working days after receipt by the Company of properly rejected Products, the Company shall replace the Products. The Company shall pay the shipping charges back to Manufacturer's Representative for properly rejected Products; otherwise, Manufacturer's Representative shall be responsible for the shipping charges. The Company shall reimburse or credit the Manufacturer's Representative for all applicable shipping charges for properly rejected Product.

(j)     Return of Products after Rejection Period.    After the Rejection Period, Manufacturer's Representative may not return a Product to the Company for any reason without the Company's prior written consent.

4.     TRAINING, INSTALLATION, AND SERVICE

(a)     Services by Manufacturer's Representative. Manufacturer's Representative shall have the responsibility to market, sell, install and service the Products in the Territory. These services shall be performed only by properly trained Manufacturer's Representative personnel and shall be prompt and of the highest quality. All marketing and sales expenses in the Territory shall be paid by Manufacturer's Representative.

(b)     Warranty Work. Manufacturer's Representative shall not perform any repairs or services on Products under claims by customers pursuant to the Company's standard limited warranties, if any, without prior written approval (the "Warranty Work Notice") from the Company. The Company shall reimburse Manufacturer's Representative for any such authorized warranty repairs or service in accordance with the terms contained in the respective Warranty Work Notice.   So long as the remuneration specified in such notices substantially conforms with the Company's standard practices with respect to other Manufacturer's Representatives, Manufacturer's Representative agrees to promptly perform all warranty work requested or authorized by the Company in the Territory.

4

(c)  <u>Training by the Company</u>.  The Company shall provide such training to Manufacturer's Representative's personnel at such additional cost as mutually agreed by the parties.

5.  <u>WARRANTY TO MANUFACTURER'S REPRESENTATIVE'S CUSTOMERS</u>

(a)  <u>Standard Limited Warranties</u>.  Manufacturer's Representative shall pass on to its customers the Company's standard limited warranties, if any, for the Products as specified from time to time by the Company, including the limitations set forth in Sections 5(b) and 9 below.  These warranties are contingent upon proper use of a Product in the application for which it was intended and do not cover Products that were modified without the Company's approval or that were subjected by the customer to unusual physical conditions.  Manufacturer's Representative shall not give or pass on to its customers or, on the Company's behalf, grant to its customers any other warranties, express or implied, other than the Company's standard limited warranties, if any.

(b)  <u>No Other Warranty</u>.  EXCEPT FOR THE EXPRESS WARRANTY SET FORTH ABOVE, THE COMPANY DOES NOT GRANT TO MANUFACTURER'S REPRESENTATIVE, ITS CUSTOMERS OR ANY OTHER PARTY ANY OTHER WARRANTIES, EXPRESS OR IMPLIED, BY STATUTE OR OTHERWISE, REGARDING THE PRODUCTS, THEIR FITNESS FOR ANY PURPOSE, THEIR QUALITY, THEIR MERCHANTABILITY OR OTHERWISE.

6.  <u>ADDITIONAL OBLIGATIONS OF MANUFACTURER'S REPRESENTATIVE</u>

(a)  <u>Post Closing Support</u>.  - The Company and Manufacturer's Representative shall be bound by the terms of this agreement as of the Closing Date, expected to be start of business October 1, 2007.  In order to allow Manufacturer's Representative time to organize financial support functions for the office and Field personnel and other administrative functions, the transfer of payroll, billing and accounts payable will be delayed until shall be delayed until November 1, 2007 (Post Closing Adjustment Date).  In the interim, the Company shall on behalf of the Manufacturer's Representative pay employees, rent and utilities and any other responsibility of Manufacturer's Representative that the Company and Manufacturer's Representative agree is required to be paid before the Post Closing Adjustment Date.  Manufacturer's Representative shall reimburse the Company at the Post Closing Adjustment Date for any such expenditures.  Payroll, rent, utilities and other expenses shall be allocated based upon the Closing Date of end of business September 30, 2007.  Payments related to time before that date shall be the responsibility of the Company, after that date of Manufacturer's Representative.  The work accomplished by the employees before the Closing Date shall be included in the Assignment of Current Work report and retained as Accounts Receivable of the Company.  Work accomplished by the employees after the Closing Date shall be included in the Assignment of Current Work report and allocated to Accounts Receivable of the Manufacturer's Representative.

(b)  <u>Collection of Accounts Receivable</u> – The Company will pay the Manufacturer's Representative a collection fee equal to 7.5% of the amounts collecting of the outstanding accounts receivable of the Company's Southern California office.  The current value of the outstanding accounts receivable is $399,517.35.  EXHIBIT A provides a breakdown of this amount.  The collection fee will be paid to the Manufacturer's Representative within 15 days of the receipt of the accounts receivable.

(c)     Assignment of current back log of work – EXHIBIT B details the dollar amount of the existing contracts to supply and install chute in the Southern California market signed by the Company. Manufacturer's Representative agrees to assume the obligation to perform by the Company under these contracts and indemnify the Company for any liabilities that may result from the installation portion of the contracts assumed by the Manufacturer's Representative. For projects that have been started but not completed, the Manufacturer's Representative will be responsible for completing the projects, and will be paid in accordance to the % completion values detailed in Exhibit B . The payments for this completion work shall be paid as received by the Company and allocated to the parties in order of the work completed. The amount to be paid for the remaining 13 projects as of 9/30/07 is $100,483.00

(d)     Purchase of Existing Inventory – EXHIBIT C details the existing inventory in the Company's Southern California location. The Manufacturer's Representative shall purchase the HIGH turnover inventory listed in EXHIBIT C at closing. Payment for this inventory shall be 50% cash at closing, 50% on 45 day payment terms. The Company shall retain ownership of the SLOW or SPECIALTY Inventory. Manufacturer's Representative shall inform the Company promptly upon the use of any of the SLOW or SPECIALTY Inventory and shall pay the Company within 30 days of such use. The Company shall periodically review the use of the SLOW or SPECIALTY Inventory and determine whether to ship it to other Company locations or sell or otherwise dispose of the inventory. Manufacturer's Representative agrees to hold the inventory for 120 days before requesting the removal of the inventory. The current value of this inventory is $84,309.78 (HIGH $69,512.58; LOW $11,484.00; SPECIALTY $3,313.20)

(e)     Close out of Accounts between both Parties and related Back Charges. EXHIBIT D Accounts receivable between both parties shall be netted as of the Closing Date and paid at the Post Closing Adjustment Date. Any agreed to back charges between both parties for work provided to the other party shall be calculated at a total cost of $55 per labor hour.

(f)     Post Closing Payment – The Manufacturer's Representative shall pay a $50,000 deposit to the Company on October 15, 2007. On the Post Closing Adjustment Date, the Manufacturer's Representative will pay the difference between the amounts owed to the Company in Sections 6a, d and e and the deposit.

(g)     Annual Milestone Commitments. Manufacturer's Representative agrees to the milestone goals for the aggregate dollar amount of Products to be purchased by Manufacturer's Representative from the Company during each year of this Agreement ("Annual Milestone Commitments") as set forth on EXHIBIT E hereto. Throughout the term of this Agreement, if Manufacturer's Representative fails to purchase two-thirds (2/3) its Annual Milestone Commitment, then, without prejudice to the Company's other rights under this Agreement (including the right to terminate this Agreement pursuant to Section 8 below), the Company may appoint one or more additional Manufacturer's Representatives for sale of the Products in the Territory. Products returned to the Company under the provisions of Section 3 above shall not count towards the fulfillment of the Annual Milestone Commitments.

(h)     Promotion of the Products. Manufacturer's Representative shall, at its own expense, vigorously promote the sale of the Products within the Territory. Such promotion shall include but not be limited to preparing promotional materials, advertising the Products in trade publications within the Territory, and directly soliciting orders from customers for the Products.

6

(i)    <u>Representations</u>.  Manufacturer's Representative shall not make any false or misleading representations to customers or others regarding the Company or the Products. Manufacturer's Representative shall not make any representations, warranties or guarantees with respect to the specifications, features or capabilities of the Products that are not consistent with the Company's documentation accompanying the Products or the Company's literature describing the Products. Manufacturer's Representative shall not on the Company's behalf grant any warranties other than the Company's standard limited warranties, if any.

(j)    <u>Finances and Personnel</u>.  Manufacturer's Representative shall maintain a net worth and working capital sufficient, in the Company's reasonable judgment, to allow Manufacturer's Representative to perform fully and faithfully its obligations under this Agreement.  Manufacturer's Representative shall devote sufficient financial resources and technically qualified sales personnel to the Products to fulfill its responsibilities under this Agreement.

(h)    <u>Product Liability</u>.  Both the Company and the Manufacturer's Representative agree to name each other as additionally insured on their respective Product Liability insurance policies.

7.    <u>ADDITIONAL OBLIGATIONS OF THE COMPANY</u>

(a)    <u>Materials</u>.  The Company will provide Manufacturer's Representative with marketing and technical information concerning the Products as such information becomes generally available.  The Company will provide copies of brochures, instructional material, advertising literature and other Product data, with all such material printed in the English language, in such quantities and at such cost as the Company and Manufacturer's Representative mutually agree.

(b)    <u>Referral of Inquiries</u>.  The Company shall use commercially reasonable efforts to direct all inquiries, whether oral, written or electronic via the Company's website, concerning Products in the Territory to Manufacturer's Representative.

(c)    <u>Licensing of Phone and Fax number.</u>  The Company shall provide a license to the Manufacturer's Representative to use the Company's existing Southern California telephone number and fax number for their business operations.  Such use shall continue as long as the Manufacturer's Representative continues fulfilling their obligations under this Agreement.

8.    <u>TERM, TERMINATION AND NONCOMPETITION</u>

(a)    <u>Term</u>.  This Agreement shall continue in force for a fixed term of five (5) years from the date hereof unless terminated earlier under the provisions of this Section 8.  At the end of such five-year period, and at the end of successive renewal periods, this Agreement will renew for additional 2-year periods unless either party hereto notifies the other in writing of its intent not to renew prior to such renewal date.

(b)    <u>Termination by Manufacturer's Representative</u>.  Manufacturer's Representative may terminate this Agreement (i) for convenience upon 90 days written notice to the Company or (ii) for Good Reason.  For purposes of this Section 8, "Good Reason" means the habitual failure of the Company to deliver Products within 60 days of the time the order is accepted, other than such failures as are caused by events not within the reasonable control of the Company.  Any termination by Manufacturer's Representative other than for Good Reason shall be deemed to be for convenience.

(c)     <u>Termination by the Company for Cause</u>.   The Company may terminate this Agreement immediately upon written notice for Cause.   For purposes of this Agreement, "Cause" means (i) conviction of any of Manufacturer's Representatives officers or majority owners of a felony or any crime of moral turpitude, (ii) material breach of this Agreement by Manufacturer's Representative (including any breach of Subsections 2(b) and 2(c) of this Agreement), (iii) conduct by Manufacturer's Representative or its agents which the Company reasonably believes is or may be harmful to the Company's reputation, intellectual property rights or financial condition, or (iv) failure of Manufacturer's Representative to achieve at least 2/3 of any Annual Milestone Commitment.

(d)     <u>Termination for Insolvency</u>.   This Agreement shall terminate, without notice, (i) upon the institution by or against Manufacturer's Representative of insolvency, receivership or bankruptcy proceedings or any other proceedings for the settlement of Manufacturer's Representative's debts, (ii) upon Manufacturer's Representative's making an assignment for the benefit of creditors, or (iii) upon Manufacturer's Representative's dissolution or ceasing to do business (any of the above being termination for "Insolvency").

(e)     <u>Return of Materials</u>.   All trademarks, trade names, patents, copyrights, designs, drawings, formulas, other data, photographs, samples, literature and sales aids of every kind shall remain the property of the Company.   Within 30 days after the termination of this Agreement, Manufacturer's Representative shall prepare all such items in its possession for shipment to the Company, as the Company may direct, at the Company's expense.   Manufacturer's Representative shall not make, use, dispose of or retain any copies of any confidential items or information that may have been entrusted to it.   Effective upon the termination of this Agreement, Manufacturer's Representative shall cease to use all trademarks, marks and trade names of the Company.

(f)     <u>Limitation on Liability</u>.   In the event of termination by either party in accordance with any of the provisions of this Agreement, neither party shall be liable to the other, solely because of such termination, for compensation, reimbursement or damages on account of the loss of prospective profits or anticipated sales or on account of expenditures, inventory, investments, leases or commitments in connection with the business or goodwill of the Company or Manufacturer's Representative.   Termination shall not, however, relieve either party of obligations incurred prior to the termination.

(g)     <u>Noncompetition</u>.   In the event this Agreement is terminated (i) due to non-renewal by Manufacturer's Representative, (ii) by Manufacturer's Representative for convenience or (iii) by the Company for Cause (other than for failure of Manufacturer's Representative to achieve at least 2/3 of any Annual Milestone Commitment), Manufacturer's Representative and  Scott Brown, its majority shareholder, individually, agree that for a period of five (5) years from the date of termination of this Agreement they shall not, individually or collectively, directly or indirectly, within the United States of America, (a) engage in, manage, operate, control or supervise, or participate in the management, operation, control or supervision of, any business or entity which provides products or services competitive with those Manufacturer's Representative is authorized to distribute, sell, service, maintain or perform pursuant to this Agreement; or (b) have any ownership or financial interest, directly or indirectly, in any business or entity which provides products or services competitive with those Manufacturer's Representative is authorized to distribute, sell, service, maintain or perform pursuant to this Agreement, including, without limitation, as an individual, partner, shareholder (other than as a shareholder of a publicly-owned corporation in which such person owns less than 1% of the outstanding shares of such corporation), member, lender or otherwise.

(h)     <u>Survival of Certain Terms</u>.   The provisions of Sections 3(g), 5, 6(h), 8, 9, 10, 11, and 12 shall survive the termination of this Agreement for any reason.   All other rights and obligations of the parties shall cease upon termination of this Agreement.

8

9.     <u>LIMITATION ON LIABILITY</u>

THE COMPANY'S LIABILITY ARISING OUT OF THIS AGREEMENT AND/OR SALE OF THE PRODUCTS SHALL BE LIMITED TO THE AMOUNT PAID BY THE CUSTOMER FOR THE PRODUCTS. IN NO EVENT SHALL THE COMPANY BE LIABLE FOR COSTS OF PROCUREMENT OF SUBSTITUTE GOODS. IN NO EVENT SHALL THE COMPANY BE LIABLE TO MANUFACTURER'S REPRESENTATIVE OR ANY OTHER ENTITY FOR ANY SPECIAL, CONSEQUENTIAL, INCIDENTAL OR INDIRECT DAMAGES, HOWEVER CAUSED, ON ANY THEORY OF LIABILITY.

10.     <u>PROPERTY RIGHTS AND CONFIDENTIALITY</u>

(a)     <u>Property Rights</u>. Manufacturer's Representative agrees that the Company owns all right, title and interest in the product lines that include the Products and in all of the Company's patents, trademarks, trade names, inventions, copyrights, know-how and trade secrets. The use by Manufacturer's Representative of any of these property rights is authorized only for the purposes herein set forth, and upon termination of this Agreement for any reason such authorization shall cease.

(b)     <u>Sale Conveys no Right to Manufacture or Copy</u>. The Products are offered for sale and are sold by the Company subject in every case to the condition that such sale does not convey any license, expressly or by implication, to manufacture, duplicate or otherwise copy or reproduce any of the Products without the Company's prior written consent. Manufacturer's Representative shall take appropriate steps with its customers, as the Company may request, to inform them of and assure compliance with the restrictions contained in this Subsection.

(c)     <u>Confidentiality</u>. Manufacturer's Representative acknowledges that by reason of its relationship to the Company hereunder it will have access to certain information and materials concerning the Company's business, plans, customers, technology and products that are confidential and of substantial value to the Company, which value would be impaired if such information were disclosed to third parties. Manufacturer's Representative agrees that it will not use in any way for its own account or the account of any third party, nor disclose to any third party, any such confidential information revealed to it by the Company. Manufacturer's Representative shall take every reasonable precaution to protect the confidentiality of such information. Upon request by Manufacturer's Representative, the Company shall advise whether or not it considers any particular information or materials to be confidential. Manufacturer's Representative shall not publish any technical description of the Products beyond the description published by the Company. In the event of termination of this Agreement, there shall be no use or disclosure by Manufacturer's Representative of any confidential information of the Company, and Manufacturer's Representative shall not manufacture or have manufactured any devices, components or assemblies utilizing any of the Company's confidential information.

11.     <u>TRADEMARKS AND TRADE NAMES</u>

(a)     <u>Use</u>. During the term of this Agreement, Manufacturer's Representative shall have the right to indicate to the public that it is an authorized Manufacturer's Representative of the Company's Products and to advertise (within the Territory) such Products under the trademarks, marks and trade names that the Company may adopt from time to time (the "Trademarks"). Manufacturer's Representative shall not alter or remove any of the Trademarks applied to the Products at the factory. Except as set forth in this Section, nothing contained in this Agreement shall grant Manufacturer's Representative any right, title or interest in the Trademarks. At no time during or after the term of this

Agreement shall Manufacturer's Representative challenge or assist others to challenge the Trademarks or the registration thereof or attempt to register any trademarks, marks or trade names confusingly similar to those of the Company.

(b) <u>Approval of Labels and Representations</u>. To protect the Company's rights and to ensure consistency in style, design and quality, all labels and representations of the Trademarks that Manufacturer's Representative intends to use shall first be submitted to the Company for approval (which shall not be unreasonably withheld) of design, color and other details. If any of the Trademarks are to be used in conjunction with another trademark on or in relation to the Products, then the Trademark shall be presented equally legibly, equally prominently and of greater size than the other but nevertheless separated from the other so that each appears to be a mark in its own right, distinct from the other mark. Manufacturer's Representative shall be solely responsible for ensuring that all labels, directions for use of the Products and other information regarding the Products printed on or attached to the Products and/or its packages or otherwise fulfill all legal requirements in the Territory.

12. <u>GENERAL PROVISIONS</u>

(a) <u>Governing Law; Arbitration</u>. This Agreement will be governed by the laws of the State of Florida without regard to its conflicts of law provisions, provided that matters affecting copyrights, patents, trademarks and patents will be governed by U.S. federal law. Any dispute or claim arising out of, or in connection with, this Agreement shall be finally settled by binding arbitration in Broward County, Florida, in accordance with the Uniform Arbitration Act and the then-current rules and procedures of the American Arbitration Association by one (1) arbitrator appointed by the American Arbitration Association. The arbitrator shall apply the law of the State of Florida, without reference to rules of conflict of law or statutory rules of arbitration, to the merits of any dispute or claim. Judgment on the award rendered by the arbitrator may be entered in any Florida court of competent jurisdiction. The parties agree that, any provision of applicable law notwithstanding, they will not request, and the arbitrator shall have no authority to award punitive or exemplary damages against any party. The parties may apply to the state courts of the State of Florida for the County of Broward or the United States District Court for temporary or permanent injunctive relief, without breach of this Subsection 12(a) and without any abridgment of the powers of the arbitrator.

(b) <u>Entire Agreement</u>. This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter herein and merges all prior discussions between them. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing signed by the party to be charged.

(c) <u>Notices</u>. Any notice required or permitted by this Agreement shall be in writing and shall be sent by prepaid registered or certified mail, return receipt requested, addressed to the other party at the address shown at the beginning of this Agreement or at such other address for which such party gives notice hereunder. Such notice shall be deemed to have been given three days after deposit in the mail.

(d) <u>Force Majeure</u>. Nonperformance of either party shall be excused to the extent that performance is rendered impossible by strike, fire, flood, governmental acts or orders or restrictions, failure of suppliers, or any other reason where failure to perform is beyond the reasonable control of and is not caused by the negligence of the nonperforming party.

(e) <u>Nonassignability and Binding Effect</u>. A mutually agreed consideration for the Company's entering into this Agreement is the business acumen, reputation and standing already

10

**v. 11-FINAL**

honored and enjoyed by Scott Brown and, accordingly, Manufacturer's Representative agrees that its rights and obligations under this Agreement may not be transferred or assigned directly or indirectly by merger or a change of control without the prior written consent of the Company, which consent will not be unreasonably withheld. For purposes of this Subsection 12(e), a "change of control" shall occur at any time when Scott Brown ceases to (a) own more than 50% of the voting securities or membership interests of Manufacturer's Representative or (b) exercise operational control of Manufacturer's Representative. Subject to the foregoing sentence, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and assigns.

   (f) <u>Injunctive Relief</u>. Each party acknowledges that any violation by that party of its covenants in this Agreement could result in damage to the other party that is largely intangible but nonetheless real, and that is incapable of complete remedy by an award of damages. Accordingly, any such violation shall give the other party the right to a court-ordered injunction or other appropriate order to specifically enforce those covenants.

   (g) <u>Partial Invalidity</u>. If any provision of this Agreement is held to be invalid by a court of competent jurisdiction, then the remaining provisions shall nevertheless remain in full force and effect. The parties agree to renegotiate in good faith any term held invalid and to be bound by the mutually agreed substitute provision.

   (h) <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

**WHR HOLDINGS, LLC**

By: _____
  Charlton L. George
  CEO

**AMERICAN TRASH MANAGEMENT, INC.**

By: _____
Scott Brown, President

For purposes of Section 8.g. only:

_____
Scott Brown, individually

11

**v. 11-FINAL**

## EXHIBIT A

ACCOUNTS RECEIVABLE PER ATTACHED LIST DATED 09/27/07 TOTALING $399,517.35

# AC Chutes of California, Inc.
## Accounts Receivable

### Aged Invoice Detail - Open Item Customer Only

**All Open Invoices - Aged as of:** 9/27/2007

| Customer:/ Inv. Date | Invoice Number | Due Date | JobNumber | JobDescription | Balance | Current | 1 - 30 Days | 31 - 60 Days | 61 - 90 Days | Over 91 Days | Retention | Days Deliq |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Division: 00 NEW CONSTRUCTION** | | | | | | | | | | | | |
| **00-AME005** | **AMERICAN CONT./SERENADE** | | | | Phone: 714-377-1414 x | | | | | | | |
| 02/28/06 CA15059 -IN | | 04/14/06 | CA10165 | SERENADE PL. | 1,508.33 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,508.33 | 0 |
| 08/31/06 CA15313 -IN | | 10/15/06 | CA10165 | SERENADE PL. | 886.79 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 886.79 | 0 |
| 09/30/06 CA15335 -IN | | 11/14/06 | CA10165 | SERENADE PL. | 432.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 432.01 | 0 |
| 04/27/07 CA15455 -IN | | 06/11/07 | CA10165 | SERENADE PL. | 18.78 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 18.78 | 0 |
| 08/02/07 CA15499 -IN | | 09/16/07 | CA10165 | SERENADE PL. | 557.57 | 0.00 | 501.81 | 0.00 | 0.00 | 0.00 | 55.76 | 11 |
| | Customer | 00-AME005 | Totals: | | 3,403.48 | 0.00 | 501.81 | 0.00 | 0.00 | 0.00 | 2,901.67 | |
| **00-AME012** | **AMERICAN CONST/CAHUEGA UNIVERS** | | | | Phone: 714-377-1414 x | | | | | | | |
| 02/28/07 CA15400 -IN | | 04/14/07 | CA10236 | Cahuenga-Unive | 506.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 506.00 | 0 |
| | Customer | 00-AME012 | Totals: | | 506.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 506.00 | |
| **00-AME014** | **AMERICAN TRASH MANAGEMENT/STEV** | | | | Phone: (800) 488-7274 x | | | | | | | |
| 07/20/07 CA15495 -IN | | 09/03/07 | CA10285 | STEVE LEV | 2,867.00 | 0.00 | 2,867.00 | 0.00 | 0.00 | 0.00 | 0.00 | 24 |
| | Customer | 00-AME014 | Totals: | | 2,867.00 | 0.00 | 2,867.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| **00-BBI001** | **BBI CONST./SACRAMENTO SENIOR** | | | | Phone: 510/286-8200 x 149 | | | | | | | |
| 06/20/06 CA15245 -IN | | 08/04/06 | CA10190 | SACRAMENTC | 1,099.00 | 0.00 | 0.00 | 0.00 | 0.00 | 138.50 | 960.50 | 419 |
| | Customer | 00-BBI001 | Totals: | | 1,099.00 | 0.00 | 0.00 | 0.00 | 0.00 | 138.50 | 960.50 | |
| **00-BOS003** | **BOSA DEVELOPMENT/ELECTRA, THE** | | | | Phone: 604-294-0666 x | | | | | | | |
| 07/31/06 CA15284 -IN | | 09/14/06 | CA10173 | ELECTRA, THE | 1,068.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,068.50 | 0 |
| 11/30/06 CA15355 -IN | | 01/14/07 | CA10173 | ELECTRA, THE | 1,068.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,068.50 | 0 |
| 02/28/07 CA15402 -IN | | 04/14/07 | CA10173 | ELECTRA, THE | 2,460.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,460.00 | 0 |
| | Customer | 00-BOS003 | Totals: | | 4,597.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,597.00 | |
| **00-BOS005** | **BOSA DEVEL/LEGEND** | | | | Phone: (604) 294-0666 x | | | | | | | |
| 11/30/06 CA15352 -IN | | 01/14/07 | CA10225 | THE LEGEND | 1,380.30 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,380.30 | 0 |
| 02/28/07 CA15398 -IN | | 04/14/07 | CA10225 | THE LEGEND | 1,984.60 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,984.60 | 0 |
| | Customer | 00-BOS005 | Totals: | | 3,364.90 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,364.90 | |
| **00-BRA001** | **BRADY COMP/SHARP MEMORIAL** | | | | Phone: 619-462-2600 x | | | | | | | |
| 07/01/06 CA15275 -IN | | 08/15/06 | CA10166 | SHARP MEMOI | 2,092.60 | 0.00 | 0.00 | 0.00 | 0.00 | 531.90 | 1,560.70 | 408 |
| 06/11/07 CA15481 -IN | | 07/26/07 | CA10166 | SHARP MEMOI | 860.00 | 0.00 | 0.00 | 0.00 | 774.00 | 0.00 | 86.00 | 63 |
| | Customer | 00-BRA001 | Totals: | | 2,952.60 | 0.00 | 0.00 | 0.00 | 774.00 | 531.90 | 1,646.70 | |
| **00-CAL006** | **CALCONCONST/SHOREHAMVILLAS** | | | | Phone: 310-481-0099 x | | | | | | | |
| 06/30/06 CA15258 -IN | | 08/14/06 | CA10242 | SHOREHAM VI | 1,197.78 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,197.78 | 0 |
| | Customer | 00-CAL006 | Totals: | | 1,197.78 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,197.78 | |

RunDate 9/27/2007 11:09:42AM
ModuleDate

# AC Chutes of California, Inc.
## Accounts Receivable

**Aged Invoice Detail - Open Item Customer Only**

All Open Invoices - Aged as of:        9/27/2007

| Customer/ Inv. Date | Invoice Number Due Date | Invoice JobNumber | JobDescription | Balance | Current | 1 - 30 Days | 31 - 60 Days | 61 - 90 Days | Over 91 Days | Retention | Days Deliq |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **00-COU001** | **COURY ENTER/WHITESAILS** | | Phone: 818/591-0891 x | | | | | | | | |
| 11/30/06 CA15354 -IN | 01/14/07 CA10186 | | WHITESAILS | 52.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 52.10 | 0 |
| 08/30/07 CA15512 -CM | | | | -52.10 | -52.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| | Customer 00-COU001 | Totals: | | 0.00 | -52.10 | 0.00 | 0.00 | 0.00 | 0.00 | 52.10 | |
| **00-COU002** | **COURY/WHITESAILSLKRS** | | Phone: x | | | | | | | | |
| 10/30/06 CA15342 -IN | 12/14/06 CA10239 | | WhitesailsLocke | 702.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 702.10 | 0 |
| 08/30/07 CA15513 -CM | | | | -702.10 | -702.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| | Customer 00-COU002 | Totals: | | 0.00 | -702.10 | 0.00 | 0.00 | 0.00 | 0.00 | 702.10 | |
| **00-COU003** | **COURY/ELEMENT** | | Phone: x | | | | | | | | |
| 04/25/07 CA15453 -IN | 06/09/07 CA10241 | | ELEMENT | 5,490.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,941.00 | 549.00 | 110 |
| | Customer 00-COU003 | Totals: | | 5,490.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,941.00 | 549.00 | |
| **00-COV001** | **COVI CONCRETE/MAIN & JAMBOREE** | | Phone: 714-842-3185 x | | | | | | | | |
| 12/25/05 CA14979 -IN | 02/08/06 CA10174 | | MAIN & JAMB | 4,472.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,472.00 | 0 |
| | Customer 00-COV001 | Totals: | | 4,472.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,472.00 | |
| **00-DAL001** | **Dalah Construction** | | Phone: (310) 451-9175 x | | | | | | | | |
| 06/29/07 CA15487 -IN | 08/13/07 CA10284 | | 215 S. Merengo | 10,655.00 | 0.00 | 0.00 | 9,589.50 | 0.00 | 0.00 | 1,065.50 | 45 |
| | Customer 00-DAL001 | Totals: | | 10,655.00 | 0.00 | 0.00 | 9,589.50 | 0.00 | 0.00 | 1,065.50 | |
| **00-DRH001** | **D R Horton /Vista Terraza** | | Phone: 760/929-4600 x | | | | | | | | |
| 01/31/06 CA15051 -IN | 03/17/06 CA10221 | | VISTA TERRA | 2,048.48 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,048.48 | 0 |
| 11/30/06 CA15349 -IN | 01/14/07 CA10221 | | VISTA TERRA | 671.52 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 671.52 | 0 |
| | Customer 00-DRH001 | Totals: | | 2,720.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,720.00 | |
| **00-ESS001** | **ESSEX MARINA CITY/MARINA CITY** | | Phone: 858/614-7200 x | | | | | | | | |
| 10/25/05 CA14890 -IN | 12/09/05 CA10204 | | MARINA CITY | 1,500.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,500.00 | 0 |
| 11/25/05 CA14944 -IN | 01/09/06 CA10204 | | MARINA CITY | 1,500.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,500.00 | 0 |
| 12/25/05 CA14983 -IN | 02/08/06 CA10204 | | MARINA CITY | 1,500.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,500.00 | 0 |
| | Customer 00-ESS001 | Totals: | | 4,500.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,500.00 | |
| **00-FOR01** | **FORFRONT BUILDERS/SAN PEDRO L** | | Phone: 805/375-2440 x | | | | | | | | |
| 02/25/07 CA15457 -IN | 03/27/07 CA10191 | | SAN PEDRO B | 453.12 | 0.00 | 0.00 | 0.00 | 0.00 | 448.59 | 4.53 | 184 |
| | Customer 00-FOR01 | Totals: | | 453.12 | 0.00 | 0.00 | 0.00 | 0.00 | 448.59 | 4.53 | |
| **00-GAR001** | **Garden Communities** | | Phone: (858) 558-9573 x | | | | | | | | |
| 03/25/04 CA13557 -IN | 05/09/04 CA10083 | | LA JOLLA CRC | 674.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 674.00 | 0 |
| 07/25/04 CA13914 -IN | 09/08/04 CA10083 | | LA JOLLA CRC | 144.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 144.00 | 0 |
| 08/25/04 CA13988 -IN | 10/09/04 CA10083 | | LA JOLLA CRC | 1,290.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,290.00 | 0 |
| 09/25/04 CA14110 -IN | 11/09/04 CA10083 | | LA JOLLA CRC | 4,049.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,049.00 | 0 |

RunDate        9/27/2007        11:09:42AM
ModuleDate

# AC Chutes of California, Inc.
## Accounts Receivable

### Aged Invoice Detail - Open Item Customer Only
**All Open Invoices - Aged as of:** 9/27/2007

| Customer./ Inv. Date | Invoice Number | Invoice Due Date | JobNumber | JobDescription | Balance | Current | 1 - 30 Days | 31 - 60 Days | 61 - 90 Days | Over 91 Days | Retention | Days Deliq |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/25/04 | CA14251 -IN | 01/09/05 | CA10083 | LA JOLLA CRC | 1,752.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,752.00 | 0 |
| 09/25/05 | CA14862 -IN | 11/09/05 | CA10083 | LA JOLLA CRC | 842.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 842.10 | 0 |
| 10/25/05 | CA14887 -IN | 12/09/05 | CA10083 | LA JOLLA CRC | 673.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 673.50 | 0 |
| 02/25/06 | CA15065 -IN | 04/11/06 | CA10083 | LA JOLLA CRC | 193.20 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 193.20 | 0 |
| | Customer | 00-GAR001 | Totals: | | 9,617.80 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 9,617.80 | |
| 00-GOL001 | GOLD CONST/ST JOSEPH | | | | Phone: (985) 845-7901 x | | | | | | | |
| 10/31/03 | CA13085 -IN | 12/15/03 | CA10058 | ST JOSEPH'S H | 1,240.80 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,240.80 | 0 |
| 01/31/04 | CA13332 -IN | 03/16/04 | CA10058 | ST JOSEPH'S H | 1,332.80 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,332.80 | 0 |
| 05/31/04 | CA13760 -IN | 07/15/04 | CA10058 | ST JOSEPH'S H | 293.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 293.00 | 0 |
| 08/31/04 | CA13995 -IN | 10/15/04 | CA10058 | ST JOSEPH'S H | 75.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 75.00 | 0 |
| | Customer | 00-GOL001 | Totals: | | 2,941.60 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,941.60 | |
| 00-GRA005 | GRAY/TARSADIAHAMPTON INN | | | | Phone: 714-491-1317 x | | | | | | | |
| 06/29/07 | CA15486 -IN | 08/13/07 | CA10279 | TARSADIA HA | 502.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 502.00 | 0 |
| | Customer | 00-GRA005 | Totals: | | 502.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 502.00 | |
| 00-HAN002 | HANOCOMPAMY /CURRENT | | | | Phone: 619-338-9100 x | | | | | | | |
| 07/15/07 | CA15496 -IN | 08/29/07 | CA10238 | HANOVER APT | 3,735.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,735.00 | 0 |
| | Customer | 00-HAN002 | Totals: | | 3,735.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,735.00 | |
| 00-HAR001 | HARPER CON/TEMP LODGE | | | | Phone: 619-233-7900 x | | | | | | | |
| 05/09/07 | PP -PP | 05/09/07 | | | -25.50 | 0.00 | 0.00 | 0.00 | 0.00 | -25.50 | 0.00 | 0 |
| | Customer | 00-HAR001 | Totals: | | -25.50 | 0.00 | 0.00 | 0.00 | 0.00 | -25.50 | 0.00 | |
| 00-HEN002 | HENSEL PHELPS CONST/HILTONSAND | | | | Phone: 619-236-3360 x | | | | | | | |
| 08/20/07 | CA15516 -IN | 10/04/07 | CA10275 | HILTONSANDI | 30,812.53 | 27,731.28 | 0.00 | 0.00 | 0.00 | 0.00 | 3,081.25 | 0 |
| | Customer | 00-HEN002 | Totals: | | 30,812.53 | 27,731.28 | 0.00 | 0.00 | 0.00 | 0.00 | 3,081.25 | |
| 00-HER003 | HERITAGE/1271FEDERAL | | | | Phone: 310-207-9900 x | | | | | | | |
| 03/31/06 | CA15118 -IN | 05/15/06 | CA10252 | 1271 FEDERAL | 6,160.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5,544.00 | 616.00 | 500 |
| | Customer | 00-HER003 | Totals: | | 6,160.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5,544.00 | 616.00 | |
| 00-HIG002 | HIGHLAND PART/SOUTHBLOCK | | | | Phone: 619-515-2234 x | | | | | | | |
| 05/29/07 | CA15476 -IN | 06/28/07 | CA10282 | South Block | 1,466.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,466.00 | 0 |
| 07/20/07 | CA15494 -IN | 09/03/07 | CA10282 | South Block | 510.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 510.00 | 0 |
| | Customer | 00-HIG002 | Totals: | | 1,976.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,976.00 | |
| 00-HIL002 | HILL/INDIGO | | | | Phone: (310) 437-4268 x | | | | | | | |
| 03/28/07 | CA15439 -IN | 05/12/07 | CA10245 | INDIGO | 840.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 840.00 | 0 |
| | Customer | 00-HIL002 | Totals: | | 840.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 840.00 | |

RunDate 9/27/2007 11:09:42AM
ModuleDate

Case: 25-30743    Doc# 80-1    Filed: 12/23/25    Entered: 12/23/25 15:58:39    Page 23 of 64

# AC Chutes of California, Inc.
## Accounts Receivable

### Aged Invoice Detail - Open Item Customer Only

All Open Invoices - Aged as of: **9/27/2007**

| Customer:/ Inv. Date | Invoice Number | Due Date | JobNumber | JobDescription | Balance | Current | 1 - 30 Days | 31 - 60 Days | 61 - 90 Days | Over 91 Days | Retention | Days Deliq |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 00-IDE001 | IDEAL CO / JACKSON COURTYARD | | | Phone: 925/687-2380 x | | | | | | | | |
| 10/18/05 CA14897 -IN | 12/02/05 | CA10219 | JACKSON COU | 4,775.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,097.50 | 677.50 | 664 |
| | Customer | 00-IDE001 | Totals: | 4,775.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,097.50 | 677.50 | |
| 00-INT001 | INTERGULF DEV/LA VITA CONDOS | | | Phone: 604-683-2406 x | | | | | | | | |
| 04/26/04 CA13683 -IN | 06/10/04 | CA10046 | LA VITA CONI | 3,686.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,686.00 | 0 |
| 07/25/04 CA13910 -IN | 09/08/04 | CA10046 | LA VITA CONI | 780.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 780.00 | 0 |
| 08/25/04 CA14024 -IN | 10/09/04 | CA10046 | LA VITA CONI | 263.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 263.00 | 0 |
| 09/25/04 CA14101 -IN | 11/09/04 | CA10046 | LA VITA CONI | 200.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 200.00 | 0 |
| 10/26/04 CA14188 -IN | 12/10/04 | CA10046 | LA VITA CONI | 388.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 388.00 | 0 |
| 01/31/05 CA14393 -IN | 03/17/05 | CA10046 | LA VITA CONI | 45.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 45.00 | 0 |
| | Customer | 00-INT001 | Totals: | 5,362.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5,362.00 | |
| 00-JSM003 | JSM /11049 MCORMICK/IMPERIA | | | Phone: 818-508-4900 x | | | | | | | | |
| 02/28/07 CA15399 -IN | 04/14/07 | CA10197 | 11049 MCORM | 1,445.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,445.00 | 0 |
| | Customer | 00-JSM003 | Totals: | 1,445.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,445.00 | |
| 00-JSM005 | JSM CONST./LIDO MIX USE | | | Phone: (818) 508-4900 x | | | | | | | | |
| 03/09/07 CA15406 -IN | 04/23/07 | CA10226 | LIDO MIXED L | 1,665.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,665.00 | 0 |
| | Customer | 00-JSM005 | Totals: | 1,665.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,665.00 | |
| 00-JSM006 | JSM/POSITANO APT | | | Phone: (818) 508-4900 x | | | | | | | | |
| 04/10/07 CA15492 -IN | 05/25/07 | CA10230 | POSITANO AP | 517.60 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 517.60 | 0 |
| | Customer | 00-JSM006 | Totals: | 517.60 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 517.60 | |
| 00-JSM007 | JSM/FLORENTINE APTS | | | Phone: 818-508-4900 x | | | | | | | | |
| 12/31/05 CA14982 -IN | 02/14/06 | CA10168 | FLORENTINE | 3,889.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,889.50 | 0 |
| 03/31/06 CA15120 -IN | 05/15/06 | CA10168 | FLORENTINE | 712.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 712.00 | 0 |
| | Customer | 00-JSM007 | Totals: | 4,601.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,601.50 | |
| 00-KIMM002 | KIMMEL DEV/ BEST WESTERN | | | Phone: 310/413-9570 x | | | | | | | | |
| 07/29/05 CA14793 -IN | 09/12/05 | CA10184 | BEST WESTER | 4,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,600.00 | 400.00 | 745 |
| 11/30/05 CA14947 -IN | 01/14/06 | CA10184 | BEST WESTER | 550.00 | 0.00 | 0.00 | 0.00 | 0.00 | 495.00 | 55.00 | 621 |
| | Customer | 00-KIMM002 | Totals: | 4,095.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,095.00 | 455.00 | |
| 00-KRU003 | Krump Const./Monache | | | Phone: x | | | | | | | | |
| 02/28/07 CA15396 -IN | 04/14/07 | CA10234 | Monache | 1,594.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,594.25 | 0 |
| | Customer | 00-KRU003 | Totals: | 1,594.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,594.25 | |
| 00-LED002 | LEDCOR/ W. OCEAN TOWERS PH1 | | | Phone: 858/527-6400 x | | | | | | | | |
| 06/30/06 CA15260 -IN | 08/14/06 | CA10224 | WEST OCEAN | 3,575.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,575.00 | 0 |
| 07/31/06 CA15286 -IN | 09/14/06 | CA10224 | WEST OCEAN | 480.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 480.00 | 0 |

RunDate 9/27/2007 11:09:42AM
ModuleDate

Case: 25-30743    Doc# 80-1    Filed: 12/23/25    Entered: 12/23/25 15:58:39    Page 24 of 64

# AC Chutes of California, Inc.
## Accounts Receivable

**Aged Invoice Detail - Open Item Customer Only**

All Open Invoices - Aged as of:     9/27/2007

| Customer./ Inv. Date | Invoice Number | Invoice Due Date | JobNumber | JobDescription | Balance | Current | 1 - 30 Days | 31 - 60 Days | 61 - 90 Days | Over 91 Days | Retention | Days Deliq |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Customer | 00-LED002 | Totals: | 4,055.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,055.00 | |
| 00-LED003 | LEDCOR/WEST OCEAN TOWERS PH II | | | Phone: (858) 527-6400 x | | | | | | | | |
| 06/29/07 CA15489 -IN | | 08/13/07 | CA10283 | WEST OCEAN | 52,081.20 | 0.00 | 0.00 | 46,873.08 | 0.00 | 0.00 | 5,208.12 | 45 |
| | | Customer | 00-LED003 | Totals: | 52,081.20 | 0.00 | 0.00 | 46,873.08 | 0.00 | 0.00 | 5,208.12 | |
| 00-MID002 | MIDWEST GEN/DECA | | | Phone: (619) 330-6260 x | | | | | | | | |
| 02/28/07 CA15401 -IN | | 04/14/07 | CA10232 | DECA | 880.00 | 0.00 | 0.00 | 0.00 | 0.00 | 12.00 | 868.00 | 166 |
| | | Customer | 00-MID002 | Totals: | 880.00 | 0.00 | 0.00 | 0.00 | 0.00 | 12.00 | 868.00 | |
| 00-MID004 | MIDSTATE/USCB | | | Phone: 661-201-3002 x | | | | | | | | |
| 03/09/07 CA15405 -IN | | 03/09/07 | CA10272 | UCSB SAN CLE | 1,828.40 | 0.00 | 0.00 | 0.00 | 0.00 | 1,828.40 | 0.00 | 202 |
| | | Customer | 00-MID004 | Totals: | 1,828.40 | 0.00 | 0.00 | 0.00 | 0.00 | 1,828.40 | 0.00 | |
| 00-OLS001 | THE OLSON CO./ALHAMBRA129 | | | Phone: (562) 596-4770 x 347 | | | | | | | | |
| 02/28/06 CA15062 -IN | | 04/14/06 | CA10227 | ALHAMBRA 1: | 4,410.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,410.00 | 0 |
| | | Customer | 00-OLS001 | Totals: | 4,410.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,410.00 | |
| 00-PAN002 | PANAV DEVELOPMENT/EASTBORNE | | | Phone: 310-478-3700 x | | | | | | | | |
| 06/30/06 CA15259 -IN | | 08/14/06 | CA10164 | EASTBORNE V | 605.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 605.00 | 0 |
| | | Customer | 00-PAN002 | Totals: | 605.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 605.00 | |
| 00-PCL005 | PCL/CENTREST-LOFTS | | | Phone: (858) 657-3400 x | | | | | | | | |
| 07/31/06 CA15283 -IN | | 09/14/06 | CA10244 | CENTRESTREE | 1,239.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,239.50 | 0 |
| | | Customer | 00-PCL005 | Totals: | 1,239.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,239.50 | |
| 00-PCL006 | PCL CONST/ARIA | | | Phone: 858-6573400. x | | | | | | | | |
| 06/29/07 CA15490 -IN | | 08/13/07 | CA10276 | ARIA | 11,731.19 | 0.00 | 0.00 | 10,558.07 | 0.00 | 0.00 | 1,173.12 | 45 |
| 08/14/07 CA15515 -IN | | 09/28/07 | CA10276 | ARIA | 30,165.91 | 27,149.32 | 0.00 | 0.00 | 0.00 | 0.00 | 3,016.59 | 0 |
| | | Customer | 00-PCL006 | Totals: | 41,897.10 | 27,149.32 | 0.00 | 10,558.07 | 0.00 | 0.00 | 4,189.71 | |
| 00-PREM002 | PREMIER/HOLIDAYINNEX.SANDIEGO | | | Phone: (480) 635-0289 x | | | | | | | | |
| 08/31/06 CA15312 -IN | | 10/15/06 | CA10243 | HOLIDAY INN | 233.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 233.50 | 0 |
| 10/31/06 CA15346 -IN | | 12/15/06 | CA10243 | HOLIDAY INN | 60.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 60.00 | 0 |
| 03/23/07 CA15414 -IN | | 05/07/07 | CA10243 | HOLIDAY INN | 1,200.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,080.00 | 120.00 | 143 |
| | | Customer | 00-PREM002 | Totals: | 1,493.50 | 0.00 | 0.00 | 0.00 | 0.00 | 1,080.00 | 413.50 | |
| 00-PYR001 | PYRAMID BUILDERS/AVALON | | | Phone: 310-327-4970 x | | | | | | | | |
| 04/30/05 CA14568 -IN | | 06/14/05 | CA10141 | AVALON DEL | 180.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 180.00 | 0 |
| | | Customer | 00-PYR001 | Totals: | 180.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 180.00 | |
| 00-ROC001 | ROCKWALLCONST/HOLIDAYINNEXPRE | | | Phone: 909-598-0930 x | | | | | | | | |
| 05/22/07 CA15474 -IN | | 07/06/07 | CA10264 | HOLIDAY INN | 5,660.00 | 0.00 | 0.00 | 0.00 | 5,660.00 | 0.00 | 0.00 | 83 |

RunDate     9/27/2007     11:09:42AM
ModuleDate

# AC Chutes of California, Inc.
## Accounts Receivable

### Aged Invoice Detail - Open Item Customer Only

All Open Invoices - Aged as of:     9/27/2007

| Customer./ Inv. Date | Invoice Number | Invoice Due Date | JobNumber | JobDescription | Balance | Current | 1 - 30 Days | 31 - 60 Days | 61 - 90 Days | Over 91 Days | Retention | Days Deliq |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Customer | 00-ROC001 | Totals: | 5,660.00 | 0.00 | 0.00 | 0.00 | 5,660.00 | 0.00 | 0.00 | |
| 00-SUF002 | SUFFOLK CONST/VERMONT SR | | | Phone: 949/453-9400 x | | | | | | | | |
| 11/30/06 | CA15353 -IN | 01/14/07 | CA10217 | VERMONT SEI | 1,413.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,413.00 | 0 |
| 06/29/07 | CA15491 -IN | 08/13/07 | CA10217 | VERMONT SEI | 1,570.00 | 0.00 | 0.00 | 1,413.00 | 0.00 | 0.00 | 157.00 | 45 |
| | | Customer | 00-SUF002 | Totals: | 2,983.00 | 0.00 | 0.00 | 1,413.00 | 0.00 | 0.00 | 1,570.00 | |
| 00-SUN002 | SUN WEST/GC/HILTON GARDEN | | | Phone: 702-363-8060 x | | | | | | | | |
| 09/30/04 | CA14108 -IN | 11/14/04 | CA10135 | HILTON GARD | 510.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 510.00 | 0 |
| 03/23/07 | CA15419 -IN | 05/07/07 | CA10135 | HILTON GARD | 3,400.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,060.00 | 340.00 | 143 |
| | | Customer | 00-SUN002 | Totals: | 3,910.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,060.00 | 850.00 | |
| 00-SWI007 | SWINERTON/WORLDBYTRENDWEST | | | Phone: 949-622-7000 x | | | | | | | | |
| 05/29/07 | CA15475 -IN | 07/13/07 | CA10277 | WORLD BT TR | 7,791.45 | 0.00 | 0.00 | 0.00 | 7,012.30 | 0.00 | 779.15 | 76 |
| 06/29/07 | CA15488 -IN | 08/13/07 | CA10277 | WORLD BT TR | 9,739.32 | 0.00 | 0.00 | 8,765.39 | 0.00 | 0.00 | 973.93 | 45 |
| 07/20/07 | CA15493 -IN | 09/03/07 | CA10277 | WORLD BT TR | 12,985.76 | 0.00 | 11,687.18 | 0.00 | 0.00 | 0.00 | 1,298.58 | 24 |
| 08/20/07 | CA15514 -IN | 10/04/07 | CA10277 | WORLD BT TR | 26,833.47 | 24,150.12 | 0.00 | 0.00 | 0.00 | 0.00 | 2,683.35 | 0 |
| | | Customer | 00-SWI007 | Totals: | 57,350.00 | 24,150.12 | 11,687.18 | 8,765.39 | 7,012.30 | 0.00 | 5,735.01 | |
| 00-TAI002 | TAISEI/WILSHIRE/VERMONT | | | Phone: 213-739-2603 x | | | | | | | | |
| 10/31/06 | CA15345 -IN | 12/15/06 | CA10250 | WILSHIRE/VEI | 1,683.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,683.00 | 0 |
| 05/21/07 | CA15472 -IN | 07/05/07 | CA10250 | WILSHIRE/VEI | 11,220.00 | 0.00 | 0.00 | 0.00 | 10,098.00 | 0.00 | 1,122.00 | 84 |
| | | Customer | 00-TAI002 | Totals: | 12,903.00 | 0.00 | 0.00 | 0.00 | 10,098.00 | 0.00 | 2,805.00 | |
| 00-TUR004 | TURNER CONS/FAHRENHEIT | | | Phone: 858-320-4040 x | | | | | | | | |
| 11/01/05 | CA14952 -IN | 12/16/05 | CA10152 | CITYMARK FA | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.10 | 0 |
| | | Customer | 00-TUR004 | Totals: | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.10 | |
| 00-TUR007 | Turelk/Title Guarantee | | | Phone: (310) 835-3736 x | | | | | | | | |
| 12/25/06 | CA15386 -IN | 12/25/06 | CA10266 | Title Guarantee | 1,834.70 | 0.00 | 0.00 | 0.00 | 1,834.70 | 0.00 | 0.00 | 276 |
| | | Customer | 00-TUR007 | Totals: | 1,834.70 | 0.00 | 0.00 | 0.00 | 1,834.70 | 0.00 | 0.00 | |
| 00-UPA001 | UPA/Vill. Mammoth Lakes PhI | | | Phone: x | | | | | | | | |
| 01/28/04 | CA13360 -DM | 03/13/04 | CA10088 | VILLAGES MA | 3,536.70 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,536.70 | 0 |
| | | Customer | 00-UPA001 | Totals: | 3,536.70 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,536.70 | |
| 00-UPA002 | UPA RESORT/MONTE LAGO VILLAGE | | | Phone: (702) 731-6400 x | | | | | | | | |
| 02/09/04 | CA13432 -DM | 03/25/04 | CA10111 | MONTE LAGO | 990.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 990.00 | 0 |
| | | Customer | 00-UPA002 | Totals: | 990.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 990.00 | |
| 00-UPA003 | UPA CALIFORNIA/VILLAGE @ MAMM | | | Phone: 775-828-9300 x | | | | | | | | |
| 06/30/04 | CA13857 -IN | 08/14/04 | CA10077 | VILLAGE @ M | 338.70 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 338.70 | 0 |

RunDate     9/27/2007      11:09:42AM
ModuleDate

All Open Invoices - Aged as of:     9/27/2007

| Customer./ Inv. Date | Invoice Number | Due Date | JobNumber | JobDescription | Balance | Current | 1 - 30 Days | 31 - 60 Days | 61 - 90 Days | Over 91 Days | Retention | Days Deliq |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 08/31/04 | CA13977 -IN | 10/15/04 | CA10077 | VILLAGE @ M. | 555.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 555.50 | 0 |
| | Customer | 00-UPA003 | | Totals: | 894.20 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 894.20 | |
| **00-VIL001** | **VILLA DE ESTA, LLC /VILLA DE** | | | Phone: 323-353-6139 x | | | | | | | | |
| 02/28/05 | CA14444 -IN | 04/14/05 | CA10155 | VILLA DE EST. | 0.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.50 | 0 |
| 05/31/05 | CA14680 -IN | 07/15/05 | CA10155 | VILLA DE EST. | 1,030.00 | 0.00 | 0.00 | 0.00 | 0.00 | 927.00 | 103.00 | 804 |
| | Customer | 00-VIL001 | | Totals: | 1,030.50 | 0.00 | 0.00 | 0.00 | 0.00 | 927.00 | 103.50 | |
| **00-WAR001** | **WARMINGTON/PLAYAVISTA625** | | | Phone: (818) 707-3100 x | | | | | | | | |
| 10/31/06 | CA15344 -IN | 12/15/06 | CA10256 | PLAYAVISTA6 | 1,182.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,182.00 | 0 |
| | Customer | 00-WAR001 | | Totals: | 1,182.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,182.00 | |
| **00-WAR002** | **WARMINGTON HOMES/CATALINA** | | | Phone: 818-707-3100 x | | | | | | | | |
| 07/31/04 | CA13954 -IN | 09/14/04 | CA10124 | CATALINA PL | 637.20 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 637.20 | 0 |
| 02/28/05 | CA14472 -IN | 04/14/05 | CA10124 | CATALINA PL | 70.80 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 70.80 | 0 |
| 06/30/05 | CA14731 -IN | 08/14/05 | CA10124 | CATALINA PL | 8.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 8.09 | 0 |
| | Customer | 00-WAR002 | | Totals: | 716.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 716.09 | |
| **00-WAR003** | **WARMINGTON/PLAYA 700B** | | | Phone: 818-707-3100 x | | | | | | | | |
| 10/31/04 | CA14209 -IN | 12/15/04 | CA10126 | PLAYA VISTA | 1,303.86 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,303.86 | 0 |
| 12/25/04 | CA14308 -IN | 02/08/05 | CA10126 | PLAYA VISTA | 400.88 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 400.88 | 0 |
| 02/28/05 | CA14446 -IN | 04/14/05 | CA10126 | PLAYA VISTA | 219.69 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 219.69 | 0 |
| 06/30/05 | CA14728 -IN | 08/14/05 | CA10126 | PLAYA VISTA | 68.65 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 68.65 | 0 |
| | Customer | 00-WAR003 | | Totals: | 1,993.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,993.08 | |
| **00-WAR004** | **WARMINGTON/PLAYAVISTA325** | | | Phone: 818-707-3100 x | | | | | | | | |
| 08/08/07 | CA15518 -IN | 09/22/07 | CA10274 | PLAYAVISTA | 43,130.00 | 0.00 | 38,817.00 | 0.00 | 0.00 | 0.00 | 4,313.00 | 5 |
| | Customer | 00-WAR004 | | Totals: | 43,130.00 | 0.00 | 38,817.00 | 0.00 | 0.00 | 0.00 | 4,313.00 | |
| **00-WEB002** | **WEBCOR/MARINAPOINTII** | | | Phone: 213-239-2800 x | | | | | | | | |
| 02/28/06 | CA15067 -IN | 04/14/06 | CA10249 | MARINA POIN | 2,049.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,049.00 | 0 |
| 03/31/06 | CA15119 -IN | 05/15/06 | CA10249 | MARINA POIN | 900.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 900.00 | 0 |
| 04/30/06 | CA15194 -IN | 06/14/06 | CA10249 | MARINA POIN | 101.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 101.00 | 0 |
| | Customer | 00-WEB002 | | Totals: | 3,050.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,050.00 | |
| **00-WEI001** | **WEITZ COMPANY/LA PERLA** | | | Phone: (602) 225-0225 x | | | | | | | | |
| 01/30/04 | CA13403 -DM | 03/15/04 | CA10096 | LA PERLA | 2,835.75 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,835.75 | 0 |
| 04/01/04 | CA14552 -DM | 05/16/05 | CA10096 | LA PERLA | 164.66 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 164.66 | 0 |
| | Customer | 00-WEI001 | | Totals: | 3,000.41 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,000.41 | |
| **00-WER003** | **WERMERS MULTI-FAM/MARKET SQ** | | | Phone: (858) 535-1475 x | | | | | | | | |
| 01/28/04 | CA13353 -DM | 03/13/04 | CA10037 | MARKET SQU | 925.20 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 925.20 | 0 |

RunDate     9/27/2007     11:09:42AM
ModuleDate

# AC Chutes of California, Inc.
## Accounts Receivable

**Aged Invoice Detail - Open Item Customer Only**

All Open Invoices - Aged as of:  9/27/2007

| Customer/ Inv. Date | Invoice Number | Invoice Due Date | JobNumber | JobDescription | Balance | Current | 1 - 30 Days | 31 - 60 Days | 61 - 90 Days | Over 91 Days | Retention | Days Deliq |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Customer | 00-WER003 | Totals: | 925.20 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 925.20 | |
| 00-WES006 | WESTERN PAC/PARK WLKRS | | | Phone: 760-929-1600 x | | | | | | | | |
| 04/27/05 | CA14617 -IN | 06/11/05 | CA10160 | PARK WEST (L | 3,663.93 | 0.00 | 0.00 | 0.00 | 0.00 | 3,297.54 | 366.39 | 838 |
| | | Customer | 00-WES006 | Totals: | 3,663.93 | 0.00 | 0.00 | 0.00 | 0.00 | 3,297.54 | 366.39 | |
| 00-WES008 | WESTERNNAT/IRVSPE 1&2 | | | Phone: x | | | | | | | | |
| 06/30/06 | CA15269 -IN | 08/14/06 | CA10237 | IRVINE SPECT | 2,258.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,258.25 | 0 |
| | | Customer | 00-WES008 | Totals: | 2,258.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,258.25 | |
| 00-WEST001 | WEST BLDRS/GRANADA COURT | | | Phone: 626/585-1810 x | | | | | | | | |
| 11/30/05 | CA14940 -IN | 01/14/06 | CA10218 | GRANADA CO | 1,032.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,032.50 | 0 |
| 12/31/05 | CA14980 -IN | 02/14/06 | CA10218 | GRANADA CO | 295.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 295.00 | 0 |
| 01/20/07 | CA15360 -IN | 03/06/07 | CA10218 | GRANADA CO | 300.00 | 0.00 | 0.00 | 0.00 | 0.00 | 270.00 | 30.00 | 205 |
| | | Customer | 00-WEST001 | Totals: | 1,627.50 | 0.00 | 0.00 | 0.00 | 0.00 | 270.00 | 1,357.50 | |
| 00-ZRS001 | ZRS /RANCHO SANTA FE VILLAGE | | | Phone: 858/864-7265 x | | | | | | | | |
| 06/25/05 | CA14723 -IN | 08/09/05 | CA10199 | RANCHO SANT | 645.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 645.00 | 0 |
| 07/25/05 | CA14776 -IN | 09/08/05 | CA10199 | RANCHO SANT | 150.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 150.00 | 0 |
| | | Customer | 00-ZRS001 | Totals: | 795.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 795.00 | |
| Division 00 NEW CONSTRUCTION | | Totals: | | | 391,451.02 | 78,276.52 | 53,872.99 | 77,199.04 | 23,544.30 | 32,080.63 | 126,477.54 | |

Division: 01 SERVICE DIVISION

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01-AME002 | American Trash Management | | | Phone: 415-292-5400 x | | | | | | | | |
| 04/30/07 | CA15458 -IN | 05/30/07 | | | 78.00 | 0.00 | 0.00 | 0.00 | 0.00 | 78.00 | 0.00 | 120 |
| 05/08/07 | CA15469 -IN | 06/07/07 | | | 260.00 | 0.00 | 0.00 | 0.00 | 0.00 | 260.00 | 0.00 | 112 |
| | | Customer | 01-AME002 | Totals: | 338.00 | 0.00 | 0.00 | 0.00 | 0.00 | 338.00 | 0.00 | |
| 01-AVA003 | Avalon Playa Vista | | | Phone: (818) 892-5511 x | | | | | | | | |
| 01/25/07 | CA15392 -IN | 02/24/07 | | | 300.00 | 0.00 | 0.00 | 0.00 | 0.00 | 300.00 | 0.00 | 215 |
| | | Customer | 01-AVA003 | Totals: | 300.00 | 0.00 | 0.00 | 0.00 | 0.00 | 300.00 | 0.00 | |
| 01-FOO003 | Foothill Waste | | | Phone: (818) 908-8937 x | | | | | | | | |
| 01/25/07 | CA15390 -IN | 02/24/07 | | | 500.00 | 0.00 | 0.00 | 0.00 | 0.00 | 500.00 | 0.00 | 215 |
| | | Customer | 01-FOO003 | Totals: | 500.00 | 0.00 | 0.00 | 0.00 | 0.00 | 500.00 | 0.00 | |
| 01-MAD003 | Madison Corson | | | Phone: (949) 955-3771 x | | | | | | | | |
| 06/05/06 | CA15252 -IN | 07/05/06 | | | 833.00 | 0.00 | 0.00 | 0.00 | 0.00 | 833.00 | 0.00 | 449 |
| | | Customer | 01-MAD003 | Totals: | 833.00 | 0.00 | 0.00 | 0.00 | 0.00 | 833.00 | 0.00 | |
| 01-MIS001 | Mission Meridan | | | Phone: (626) 441-4073 x | | | | | | | | |

RunDate  9/27/2007  11:09:42AM
ModuleDate

# AC Chutes of California, Inc.
## Accounts Receivable
### Aged Invoice Detail - Open Item Customer Only

All Open Invoices - Aged as of:  9/27/2007

| Customer:/ Inv. Date | Invoice Number | Invoice Due Date | JobNumber | JobDescription | Balance | Current | 1 - 30 Days | 31 - 60 Days | 61 - 90 Days | Over 91 Days | Retention | Days Deliq |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 09/30/05 | CA14878 -IN | 10/30/05 | | | 979.75 | 0.00 | 0.00 | 0.00 | 0.00 | 979.75 | 0.00 | 697 |
| | | Customer | 01-MIS001 | Totals: | 979.75 | 0.00 | 0.00 | 0.00 | 0.00 | 979.75 | 0.00 | |
| 01-PAL005 | Palazzo East Apartments | | | Phone: (323) 937-5251 x | | | | | | | | |
| 04/09/07 | CA15468 -IN | 05/09/07 | | | 252.33 | 0.00 | 0.00 | 0.00 | 0.00 | 252.33 | 0.00 | 141 |
| | | Customer | 01-PAL005 | Totals: | 252.33 | 0.00 | 0.00 | 0.00 | 0.00 | 252.33 | 0.00 | |
| 01-PHO001 | Phoenix Reality Group | | | Phone: (310) 741-1886 x | | | | | | | | |
| 05/03/07 | CA15470 -IN | 06/02/07 | | | 3,672.75 | 0.00 | 0.00 | 0.00 | 0.00 | 3,672.75 | 0.00 | 117 |
| | | Customer | 01-PHO001 | Totals: | 3,672.75 | 0.00 | 0.00 | 0.00 | 0.00 | 3,672.75 | 0.00 | |
| 01-PLA005 | Playa Vista Crescent Walk | | | Phone: (562) 331-0694 x | | | | | | | | |
| 04/19/06 | CA15145 -IN | 05/19/06 | | | 550.00 | 0.00 | 0.00 | 0.00 | 0.00 | 550.00 | 0.00 | 496 |
| | | Customer | 01-PLA005 | Totals: | 550.00 | 0.00 | 0.00 | 0.00 | 0.00 | 550.00 | 0.00 | |
| 01-SAR001 | | | | Phone: (916) 854-2635 x | | | | | | | | |
| 05/20/05 | CA14663 -IN | 06/19/05 | | | 613.75 | 0.00 | 0.00 | 0.00 | 0.00 | 613.75 | 0.00 | 830 |
| | | Customer | 01-SAR001 | Totals: | 613.75 | 0.00 | 0.00 | 0.00 | 0.00 | 613.75 | 0.00 | |
| 01-SYL001 | Sylmar Garden Assoc. | | | Phone: (818) 509-8200 x | | | | | | | | |
| 05/11/07 | PP -PP | 05/11/07 | | | -100.00 | 0.00 | 0.00 | 0.00 | 0.00 | -100.00 | 0.00 | 0 |
| | | Customer | 01-SYL001 | Totals: | -100.00 | 0.00 | 0.00 | 0.00 | 0.00 | -100.00 | 0.00 | |
| 01-TIE001 | Tierra Del Ray | | | Phone: 310-306-7979 x | | | | | | | | |
| 06/01/06 | CA15251 -IN | 07/01/06 | | | -949.50 | 0.00 | 0.00 | 0.00 | 0.00 | -949.50 | 0.00 | 0 |
| 03/26/07 | CA15432 -IN | 04/25/07 | | | 370.00 | 0.00 | 0.00 | 0.00 | 0.00 | 370.00 | 0.00 | 155 |
| | | Customer | 01-TIE001 | Totals: | -579.50 | 0.00 | 0.00 | 0.00 | 0.00 | -579.50 | 0.00 | |
| 01-WES012 | West Coast | | | Phone: (661) 296-4548 x | | | | | | | | |
| 06/01/06 | CA15237 -IN | 06/01/06 | | | 541.25 | 0.00 | 0.00 | 0.00 | 0.00 | 541.25 | 0.00 | 483 |
| 06/01/06 | CA15250 -IN | 07/01/06 | | | 41.25 | 0.00 | 0.00 | 0.00 | 0.00 | 41.25 | 0.00 | 453 |
| 07/30/06 | CA15295 -IN | 07/30/06 | | | 123.75 | 0.00 | 0.00 | 0.00 | 0.00 | 123.75 | 0.00 | 424 |
| | | Customer | 01-WES012 | Totals: | 706.25 | 0.00 | 0.00 | 0.00 | 0.00 | 706.25 | 0.00 | |
| Division  01 SERVICE DIVISION | | | Totals: | | 8,066.33 | 0.00 | 0.00 | 0.00 | 0.00 | 8,066.33 | 0.00 | |
| | | | Report Totals: | | 399,517.35 | 78,276.52 | 53,872.99 | 77,199.04 | 23,544.30 | 40,146.96 | 126,477.54 | |

Case: 25-30743    Doc# 80-1    Filed: 12/23/25    Entered: 12/23/25 15:58:39    Page 29 of 64

**v. 11-FINAL**

## EXHIBIT B

Existing Contracts to perform work in the Southern California Market by the Company.

The 13 Contracts total $100,483.00 of installed prices including applicable tax. Of these 13 projects, 10 are partially completed and 3 no work has commenced at all. The following table details the breakdown of the amounts to be paid to both parties.

Exhibit B - Backlog

| | Contract Terms | | | Work to be Completed | | Value of Work Completed | | | | Value of Remaining Work | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Material including Profit and Sales Tax | Labor including Travel Costs & Profit on Labor | Total Price | Materials needed to complete job incl profit and Sales Tax | Labor percent of WORK COMPLETED | Materials | Labor | Total | % of Project | Materials | Labor | Total | % of Project |
| Example 1 (not in totals) | $ 38,000 | $ 8,000 | $ 46,000 | $ 5,000 | 70% | $ 33,000 | $ 5,600 | $ 38,600 | 84% | $ 5,000 | $ 2,400 | $ 7,400 | 16% |
| 16 Projects | | | | | | $ - | | | | | | | |
| **Partially Completed Projects** | | | | | | | | | | | | | |
| 1 Aria | 43,413 | 11,320 | $ 54,733 | 8,449 | 90% | $ 34,964 | $ 10,188 | $ 45,152 | 82% | $ 8,449 | $ 1,132 | $ 9,581 | 18% |
| 2 Playa Vista 325 | 30,964 | 12,166 | $ 43,130 * | 6,502 | 90% | $ 24,463 | $ 10,949 | $ 35,412 | 82% | $ 6,502 | $ 1,217 | $ 7,718 | 18% |
| 3 Element | 9,696 | 4,000 | $ 13,696 | 831 | 95% | $ 8,865 | $ 3,800 | $ 12,665 | 92% | $ 831 | $ 200 | $ 1,031 | 8% |
| 4 Hilton San Diego | 24,367 | 14,638 | $ 39,005 | 7,730 | 75% | $ 16,637 | $ 10,979 | $ 27,616 | 71% | $ 7,730 | $ 3,660 | $ 11,390 | 29% |
| 5 Lido | 12,732 | 3,900 | $ 16,632 | 6,137 | 90% | $ 6,595 | $ 3,510 | $ 10,105 | 61% | $ 6,137 | $ 390 | $ 6,527 | 39% |
| 6 Marina City Club Repairs | 4,500 | 10,000 | $ 14,500 | 2,600 | 65% | $ 1,900 | $ 6,500 | $ 8,400 | 58% | $ - | $ 3,500 | $ 3,500 | 24% |
| 7 San Pedro Loft | 8,973 | 3,000 | $ 11,973 | 5,140 | 33% | $ 3,833 | $ 990 | $ 4,823 | 40% | $ 5,140 | $ 2,010 | $ 7,150 | 60% |
| 9 World by Trenwest | 26,414 | 12,000 | $ 38,414 | 2,083 | 95% | $ 24,331 | $ 11,400 | $ 35,731 | 93% | $ 2,083 | $ 600 | $ 2,683 | 7% |
| 10 La Jolla village tower | 17,791 | 7,200 | $ 24,991 | 4,326 | 75% | $ 13,465 | $ 5,400 | $ 18,865 | 75% | $ 4,326 | $ 1,800 | $ 6,126 | 25% |
| 12 Palazzo Westwood | 10,560 | 15,880 | $ 26,440 | 2,640 | 75% | $ 7,920 | $ 11,910 | $ 19,830 | 75% | $ 2,640 | $ 3,970 | $ 6,610 | 25% |
| **Projects Not Started** | | | | | | | | | | | | | |
| 13 Postiano | 10,999 | 1,941 | $ 12,940 | | 0% | $ - | $ - | $ - | 0% | $ 10,999 | $ 1,941 | $ 12,940 | 100% |
| 14 Broadway Lofts | 16,327 | 2,400 | $ 18,727 | 16,327 | 0% | $ - | $ - | $ - | 0% | $ 16,327 | $ 2,400 | $ 18,727 | 100% |
| 15 UCSB (U of C - Santa Barbara) | 3,250 | 3,250 | 6,500 | 3,250 | 0% | $ - | $ - | $ - | 0% | $ 3,250 | $ 3,250 | 6,500 | 100% |
| | $ 178,850 | $ 78,224 | $ 257,074 | $ 43,798 | | $ 135,052 | $ 63,716 | $ 198,768 | 77% | $ 41,198 | $ 14,508 | $ 100,483 | 39% |
| | | | | | | | | | | | | | 39.1% |

Concept:  This calculates how much in allocated labor and materials still needs to be completed.

Process to settle; we split the AR AR in order of invoice and work completed on the basis of the above allocation.  This is logicial
since the party that did the work, will get paid in due course of business with the customer billing cycle.
Effectively, this is like selling the uncompleted portion of the projects to ATM and they will have the incentive to be efficient and maximize profit on their of the project.

As such, any labor or material take out of inventory / purchase from WHR or from outside vendors would be paid for under ordinary vendor terms.  ATM would get paid back
for when the AR is collected.

**v. 11-FINAL**

<u>EXHIBIT C</u>

CURRENT INVENTORY

Exhibit C-Inventory-Revised

WHR Holdings, LLC
California Inventory @ Distributor Price
Per Count Done 9/27/07

| Part Number | Description | Door & Acc. | Quantity | Original Inventory Price | Disc. Price | Value | Category | Specialty | Low | High |
|---|---|---|---|---|---|---|---|---|---|---|
| 2584NB | 15 x 18 BHDR | Discount | 23 | 225.00 | 168.75 | 3,881.25 | High | | | 3,881.25 |
| 2584NB | 15 x 18 BHDR | x | 44 | 225.00 | | 9,900.00 | High | | | 9,900.00 |
| 20015D | Discharge type A 24" | x | 39 | 260.00 | | 10,140.00 | High | | | 10,140.00 |
| 14211I | Intake 24" 20 Throat AL HM | | 23 | 185.00 | | 4,255.00 | High | | | 4,255.00 |
| 11-016BEA | Super Blocks | | 113 | 45.00 | | 5,085.00 | Specialty | 5,085.00 | | |
| 2584NA | 15 x 18 ADA Door | x | 7 | 750.00 | | 5,250.00 | High | | | 5,250.00 |
| 14412V | Full Dia Vent 24" AL | | 19 | 262.00 | | 4,978.00 | Low | | 4,978.00 | |
| 14311T | Chute 24" x 36" B Joint AL HM | | 30 | 78.00 | | 2,340.00 | High | | | 2,340.00 |
| 20015H | Discharge type H 24" x 30" AL | | 3 | 940.00 | | 2,820.00 | Low | | 2,820.00 | |
| 2YDFLDBSF | 2 yd Front Load Container | | | 1,200.00 | | - | Specialty | - | | |
| 14212I | Intake 24" 20 Throat AL | | 12 | 180.00 | | 2,160.00 | High | | | 2,160.00 |
| 91H001 | 8" Hydraulic Closure | | 110 | 21.50 | | 2,365.00 | High | | | 2,365.00 |
| 91H002 | 10" Hydraulic Closure | | 50 | 21.50 | | 1,075.00 | High | | | 1,075.00 |
| 91A002 | D&S unit assembly complete | | 9 | 115.00 | | 1,035.00 | High | | | 1,035.00 |
| 91A020 | Smoke Detector | | 12 | 145.00 | | 1,740.00 | Specialty | 1,740.00 | | |
| 2114NR | 21 x 21 RHDR | x | 24 | 260.00 | | 6,240.00 | High | | | 6,240.00 |
| 91A067 | 15 x 18 Rubbish Trim | Trim | | - | | - | High | | | |
| 91A068 | 15 x 18 Rubbish Trim | Trim | 150 | 12.00 | | 1,800.00 | High | | | 1,800.00 |
| 14042F | Floor Frames | | 45 | 17.00 | | 765.00 | High | | | 765.00 |
| 2554NC | 15 x15 B label access door | x | | 225.00 | | - | High | | | |
| 14111T | Chute Section 24x12 B Joint AL/Stl | x | 2 | 26.00 | | 52.00 | High | | | 52.00 |
| 2114NL | 21 x 21 LHDR | x | 10 | 260.00 | | 2,600.00 | High | | | 2,600.00 |
| 2884NL | 18 x 18 LHDR | x | 5 | 250.00 | | 1,250.00 | Low | | 1,250.00 | |
| 2114NE | El Doors 21" x 21" | x | | 410.00 | | - | High | | | |
| 91B002 | Mason Pad 2 x 2 | | 80 | 4.00 | | 320.00 | High | | | 320.00 |
| 2584NE | 15 x 18 El Door | x | | 375.00 | | - | Low | | | |
| 2884NR | 18 x 18 RHDR | x | 8 | 250.00 | | 2,000.00 | High | | | 2,000.00 |
| 14121T | Chute 24" x 12 B Joint SS HM | | | 100.00 | | - | Specialty | - | | |
| 2884NB | 18 x 18 BHDR | x | 4 | 250.00 | | 1,000.00 | High | | | 1,000.00 |
| 91F004 | 163 Pendant Brass Sprinklers | | 20 | 12.00 | | 240.00 | High | | | 240.00 |
| 91A055 | 21 x 21 Trim Soiled Linen | Trim | 30 | 15.00 | | 450.00 | Low | | 450.00 | |
| 91A056 | 21 x 21 Trim Soiled Linen | Trim | | - | | - | High | | | |
| 91A005 | 8 RH/LH Rot/Hyd Closure Conv | | 18 | 40.50 | | 729.00 | Low | | 729.00 | |
| 91E001 | Fusible Link | | 100 | 6.00 | | 600.00 | High | | | 600.00 |
| 91A071 | Compressor Air | | | 425.00 | | - | High | | | |
| 917120 | Sprinkler Shield R/L Hand | | 40 | 10.00 | | 400.00 | High | | | 400.00 |
| 34211H | Intake 24" Double Throat | | 1 | 360.00 | | 360.00 | Specialty | 360.00 | | |
| 14211O | Offset 24"24" AL HM | | 2 | 175.00 | | 350.00 | High | | | 350.00 |
| 915029 | Latch Trigger Assembly | | 70 | 5.00 | | 350.00 | High | | | 350.00 |
| 2444NR | 24 x 24 RHDR | x | 2 | 315.00 | | 630.00 | Specialty | 630.00 | | |
| 14312C | Full Dia Vent w/curb 24" AL | | 1 | 310.00 | | 310.00 | High | | | 310.00 |
| 14112Q | Top Cap 24"12" Al Stl | | 1 | 70.00 | | 70.00 | High | | | 70.00 |
| 2184NB | 21 x 18 BHDR | x | | 260.00 | | - | High | | | |
| 2584NW | 15 x 18 WLR | x | | 225.00 | | - | High | | | |
| 91A056 | 21 x 21 Trim Soiled Linen El | Trim | | 15.00 | | - | High | | | |
| 14312K | S1 24" x 36" AL | | 20 | 62.00 | | 1,240.00 | High | | | 1,240.00 |
| 14122T | Chute 24" x 12 B Joint SS | | | 90.00 | | - | Specialty | - | | |
| 14412K | S1 24" x 48" AL | | 15 | 84.00 | | 1,260.00 | High | | | 1,260.00 |
| 917115 | Cover Plate (El Light Assembly) | | 24 | 5.00 | | 120.00 | High | | | 120.00 |
| 914008 | Red Plastic Pipe Plug | | 73 | 2.00 | | 146.00 | High | | | 146.00 |
| 14112Z | Chute 24" 12 w/Flushing Head | | 2 | 70.00 | | 140.00 | High | | | 140.00 |
| 14212K | S1 24" x 24" AL | | 3 | 42.00 | | 126.00 | High | | | 126.00 |
| 917413 | Roof Pipe 3" | | 10 | 6.00 | | 60.00 | Low | | 60.00 | |
| 91A021 | BH Latch Assy Package | | 100 | 15.50 | | 1,550.00 | High | | | 1,550.00 |
| 14211T | Chute 24" x 24" B Joint AL HM | | 39 | 52.00 | | 2,028.00 | High | | | 2,028.00 |
| 14411T | Chute 24" x 48" B Joint AL HM | | 19 | 104.00 | | 1,976.00 | High | | | 1,976.00 |
| 91A034 | Pendant Door Wire w/speed nut | | 100 | 2.00 | | 200.00 | High | | | 200.00 |
| 22712T | 18 x 18 Through Wall Door | | 1 | 90.00 | | 90.00 | Specialty | 90.00 | | |
| 91F007 | Sprinkler Washer 2-9/16 x 7/8 | | 50 | 2.00 | | 100.00 | High | | | 100.00 |
| 14412T | Chute 24" x 48" B Joint AL | | | 80.00 | | - | High | | | |
| 14312T | Chute 24" x 36" B Joint AL | | | 60.00 | | - | High | | | |
| 915032 | Lever Latch Keeper | | 7 | 7.00 | | 49.00 | Low | | 49.00 | |
| 91D083 | Bottom Hinge Bar | | 12 | 3.00 | | 36.00 | Specialty | 36.00 | | |
| 915017 | Satin Chrome Handle | | 100 | 5.00 | | 500.00 | High | | | 500.00 |
| INE425 | Pedestal Support 4ft | | 6 | 26.00 | | 156.00 | Specialty | 156.00 | | |
| 91A045 | 18x 18 Trim Soiled Linen El | Trim | 8 | 13.00 | | 104.00 | Low | | 104.00 | |
| 915013 | Night Latch Keeper - Post | | | 9.00 | | - | High | | | |
| 91B007 | D&S Plastic Cap 89 MM | | | 2.00 | | - | Low | | - | |
| 1ED32J | Roof Jack | | | | | - | | | | |
| | hardware set | | | | | - | | | | |
| 91A038 | | | | | | - | | | | |
| 91A033 | Door baffles | | | | | - | | | | |
| 91A024 | Heat Detector | | | | | - | | | | |
| 91A038 | Smoke Detector | | | | | - | | | | |
| 91A032 | Latch Kit BH Door | | 100 | | | - | | | | |

| | | | | | | 87,421.25 | | 8,097.00 | 10,440.00 | 68,884.25 |

| | Specialty | Low | High | Total | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 8,097.00 | 10,440.00 | 68,884.25 | 87,421.25 | | | | | | |
| | 809.70 | 1,044.00 | 6,888.43 | 8,742.13 | Shipping costs - 10% | | | | | |
| | 8,906.70 | 11,484.00 | 75,772.68 | 96,163.38 | Totals | | | | | |

Due at Closing     $ 37,886.34

**v. 11-FINAL**

<u>EXHIBIT D</u>

List of Settled Accounts Receivable and Back Charges

**Wilkinson HI-Rise**
**Reconciliation with American Trash Management**
**August 27, 2007**

**Accounts Receivable owed to WHR ( excluding any potential credits)**

| | | Hours | Rate | Current | |
|---|---|---|---|---|---|
| Distributor | | | | $ | 114,723.80 |
| Un-invoiced labor for projects completed in CA | | | | | |
| Perinos Apts | | 58 | 55.00 | | 3,190.00 |
| Yucca Valley Hotel | | 27 | 55.00 | | 1,485.00 |
| Subtotal | | | | | 119,398.80 |
| | | | | | |
| **Credits to ATM for Material** | | | | | |
| City Heights | | 216 | 55.00 | | 11,880.00 |
| SAC Senior Homes | | 142 | 55.00 | | 7,810.00 |
| Sutter Roseville | | 136 | 55.00 | | 7,480.00 |
| Subtotal | | | | | 27,170.00 |
| | | | | | |
| *Net AR due from ATM to WHR* | | | | | *92,228.80* |
| | | | | | |
| **WHR AP to American Trash Management/Pilan** | | | | | |
| | | | | | |
| California | ATM | | | | 10,329.01 |
| California | Pilan | | | | 28,634.78 |
| WHR Holdings - DISTRIBUTOR | Pilan | | | | 28,280.15 |
| WHR Holdings | Pilan | | | | 8,956.96 |
| Subtotal | | | | | 76,200.90 |
| | | | | | |
| *AP due to American Trash Management/Pilan* | | | | | *76,200.90* |
| | | | | | |
| **Net WHR AR / ATM AP - DUE TO WHR** | | | | | 16,027.90 |

| Totals | | | | At Closing | |
|---|---|---|---|---|---|
| Net WHR AR / ATM AP - DUE TO WHR | | | | $ | 16,027.90 |
| Total due by ATM at closing | | | | *$* | *16,027.90* |

v. 11-FINAL

EXHIBIT E

Annual Milestone Commitments
For the Territory

| Year of Term | Annual Purchase of Products Goal |
|---|---|
| 2008 | $1,200,000 |
| 2009 | $1,500,000 |
| 2010 | $1,800,000 |
| 2011 | $2,100,000 |

Each year thereafter, the Annual Purchase of Products Goal shall equal $2,500,000

# EXHIBIT B

Agreement between WHR Holdings, LLC the supplier to and creditor of American Trash Management, Inc, (ATM) it's distributor.

Given the inability of ATM to pay WHR on a timely basis, and the diversion of Construction funds to other businesses of ATM, in return for WHR to forestall legal collection efforts against ATM, ATM and WHR hereby agree as follows:

1. ATM will sign a note and related security instruments exchanging the Parts Sales and oldest Project receivables totaling $1M plus the past due interest of $3.2M into a Senior Note (WHR Sr Note) Secured by a first position lien on all company assets and owners equity in ATM and their Owners Notes. The WHR Sr Note shall accrue interest at the rate of 12% per annum.
   a. While the face value of WHR Sr. Note shall be $4.2M (as adjusted for actual payables to WHR at closing), current ATM owners have the right to buy the note at a discounted price equal to $2M as of the restructuring date plus interest accruing at 8% going forward for a period of 24 months. This shall be referred to as the "Bargain Purchase Option".
   b. The note shall contain Covenants based upon the proper management of ATM, continued paydown of AP to WHR, and other profitability and cash flow hurdles to be agreed upon. Should covenants to be agreed to be violated, WHR has the right to convert the note into full ownership of ATM.
      i. A plan shall be developed by both parties to restructure, sell or close down any business unit that is not a cash flow contributor to ATM. WHR must agree to such plan under terms to be determined.
      ii. Current owners notes shall be frozen and no repayments or interest payments can be made until the WHR Sr. Note is paid off. All non salary compensation to owners shall be stopped until the WHR Sr. Note is paid off.
      iii. Until the WHR Sr. Note has be paid off, WHR has the right to install a chief restructuring officer (CRO) who would have control over the bank accounts of ATM and would need to approve all payments and monitor the cash flow of the business. That right exists as protection for WHR, the intention is to establish Covenants and protections for WHR's interests.
      iv. ATM management would agree not to divert any funds outside of authorized ATM bank accounts and agree that such an act would be defined as a fraud perpetrated on WHR were it to occur.
      v. All of these restrictions would be tied to the existence of the WHR Sr Note, and disappear upon the buyback of 100% of the note at the above price.
2. This term sheet shall be turned into a definitive agreement as soon as possible. This term sheet is a summary of the basic discussion points and does not contain all terms and conditions of a formal workout/restructuring agreement. Neither party waives any right or remedy by signing this term sheet until such time as a mutually acceptable workout/restructuring agreement is executed by the parties.

Agreed to:

Scott Brown, Owner ATM                    Date

Steve Seltzer, Owner ATM

Date

1/4/24

Charlton George, CEO, WHR Holdings LLC

Date

1/4/24

# EXHIBIT C

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

WHR HOLDINGS, LLC, a
Florida limited liability company,

      Plaintiff,                              CASE NO.:

v.

AMERICAN TRASH MANAGEMENT, INC.,
a California corporation

      Defendant.

_____/

## COMPLAINT

Plaintiff, WHR Holdings, LLC, sues Defendant, American Trash Management, Inc., and alleges as follows:

### PARTIES, JURISDICTION, AND VENUE

1.      This is an action for damages that exceeds $50,000.00, exclusive of interest, costs, and attorney fees.

2.      Plaintiff, WHR Holdings, LLC (hereinafter "WHR"), is a Florida limited liability company that maintains its principal place of business in Broward County, Florida.

3.      Defendant, American Trash Management, Inc., (hereinafter "ATM" or "Defendant"), is a corporation organized and existing under the laws of the state of California.

4.      Venue is appropriate in Broward County, Florida as (a) Plaintiff and Defendant entered into a contract wherein the parties agreed that jurisdiction and venue would lie only in Broward County, Florida; (b) Plaintiff and Defendant further agreed in the contract that Florida law governed any issue with the contract; and (c) at all times material hereto, Defendant's

1

performance was due in Broward County, Florida by way of payments owed to Plaintiff for purchases made and services provided.

5.     Defendant, ATM, subjected itself to personal jurisdiction in Florida pursuant to Florida's Long Arm Statute §48.193(1)(a)7 by failing to perform its obligations required by contract to be performed in the state of Florida.  Defendant's obligations include, but are not limited to, paying the amounts due Plaintiff in Florida.

**GENERAL ALLEGATIONS**

6.     Plaintiff designs, manufactures, sells, installs, and services trash chute systems that are commonly installed in mid-rise and hi-rise buildings. Plaintiff is regarded as the industry leader in trash chute systems throughout North America and internationally. Plaintiff also offers other products which are used in commercial, residential, and institutional buildings such as linen chutes, storage lockers, bicycle racks, mailboxes, and construction/debris chute systems (hereinafter referred to collectively as the "Products").

7.     Plaintiff's trash chute systems consist of an integrated and comprehensive system to handle, manage, and collect or consolidate the trash and waste generated by residents and occupants in multistory buildings.

8.     The trash chute system consists of a common vertical trash chute with access doors on each applicable floor of the building and disposed items are collected, sorted for recycling (where applicable), or compacted in a trash room located on or near the ground floor of a building.

9.     Plaintiff, WHR, has commercial relationships with representatives/distributors in various states and foreign countries who sell, install, service and/or maintain the Products in

2

designated territories. Plaintiff sells the Products and parts for service and repair and also offers engineering services, product support, and training for distributors.

10.     On October 1, 2007, Plaintiff, WHR, and Defendant, ATM, entered into an Exclusive Manufacturer's Representative and Authorized Service Provider Agreement (the "Agreement") whereby Defendant, ATM, agreed to be a manufacturer's representative within a defined territory in Southern California. A copy of the Agreement is attached hereto as **Exhibit "A"**.

11.     Pursuant to the Agreement, Plaintiff is the exclusive supplier to Defendant, ATM, for all (a) trash and linen chute systems, products, and repair parts; (b) storage lockers; (c) mailboxes; and (d) bicycle racks or related products. Defendant, ATM, was responsible for the marketing, sales and service of the Products within the exclusive and non-exclusive territories.

12.     Pursuant to the Agreement, Defendant, ATM, is required to pay Plaintiff for the Products within thirty (30) days after shipment. Invoices that are not paid within thirty (30) days after shipment are subject to a service charge of 1.5% per month until such time as the invoice is paid in full.

13.     At all times material hereto, ATM's performance of its contractual obligation to for the Products in Broward County, Florida, where Plaintiff maintains it principal place of business.

14.     All of Defendant's obligations under the Agreement were to be performed in Florida, including, but not limited to, paying the purchase price.

15.     Defendant, ATM, places orders for the Products Plaintiff fulfills the orders. However, Defendant, ATM, failed to pay for the Products in accordance with the terms of the Agreement.

3

16.     Defendant, ATM, presently owes Plaintiff the sum of $1,883,859.79 for the Products ordered and received from Plaintiff, excluding accrued interest.

## COUNT I
## BREACH OF CONTRACT

Plaintiff reavers the allegations in paragraphs 1 through 16 as if fully set forth herein and further alleges:

17.     This is an action for damages for breach of contract.

18.     Defendant, ATM, breached the Agreement by failing to pay the amounts owed Plaintiff for the Products purchased under the terms of the Agreement.

19.     Defendant, ATM, owes Plaintiff the sum of $1,883,859.79, plus interest thereon.

20.     Despite multiple demands on Defendant, ATM, failed and/or refused to pay the amounts owed.

21.     Defendant's failure to perform its obligations under the Agreement constitutes a material breach of contract. As a result of Defendant's breach of contract, Plaintiff has and continues to suffer damages.

22.     Pursuant to the terms of the Agreement, Plaintiff is entitled to recover the attorney fees and costs incurred in collecting the amounts owed from Defendant, ATM. Plaintiff retained the undersigned attorneys to represent it in this matter and is obligated to pay a reasonable fee for the services rendered.

23.     All conditions precedent to this action which are Plaintiff's obligation have occurred, were performed, or the obligation was waived.

4

WHEREFORE, Plaintiff, WHR Holdings, LLC, demands judgment against Defendant, American Trash Management, Inc., for damages, interest, attorney fees, costs, and such further relief as this Court deems just and proper under the circumstances.

## COUNT II
## PETITION TO COMPEL ARBITRATION

Plaintiff reavers the allegations in paragraphs 1 through 16 as if fully set forth herein and further alleges:

24. This is a petition to compel arbitration pursuant to the Revised Florida Arbitration Code set forth in Florida Statutes §§682.01, et seq.

25. Plaintiff and Defendant, ATM, agreed to submit certain disputes and claims arising under the Agreement to arbitration for resolution.

26. Defendant, ATM, has refused or ignored Plaintiff's efforts to resolve the breach of the Agreement due to Defendant's failure to pay the amounts owed to Plaintiff.

27. Florida Statute §682.03 provides the court may order the parties to arbitrate a dispute.

28. Plaintiff requests an order directing the parties to arbitrate the default under the Agreement and determine the amount owed to Plaintiff, WHR, by Defendant, ATM.

29. Pursuant to the Agreement, the parties agreed that a single arbitrator shall be appointed to preside over an arbitration. As such, Plaintiff requests the appointment of an arbitrator.

30. Plaintiff further demands that the court continue jurisdiction of this matter to enter such orders as necessary to confirm the arbitration award and enter a final judgment thereon in favor of the prevailing party.

5

31.     Pursuant to the terms of the Agreement, Plaintiff, WHR, is entitled to an award of attorney fees and costs incurred in and as part of the arbitration against Defendant, ATM.   Plaintiff retained the undersigned attorneys to represent it in this matter and is obligated to pay a reasonable fee for the services rendered.

32.     All conditions precedent to this action and an arbitration proceeding, which are Plaintiff's obligation, have occurred, were performed, or the obligation was waived.

WHEREFORE, Plaintiff, WHR Holdings, LLC, requests entry of an order directing the parties to arbitrate, confirm the arbitration award, enter final judgment thereon, and grant such further relief as this court deems just and proper under the circumstances.

Dated this <u>19th</u> day of June 2024.

Chapman Smith & Associates, PLC
*Attorneys for Plaintiff*
2699 Stirling Road, Suite A-201
Fort Lauderdale, FL 33312
Tel. 954.981.3249/Fax 954.981.3259
Csmith@csmithassoc.com - Primary
Service@csmithassoc.com - Secondary

BY:___/s/ Chapman Smith_____
        CHAPMAN SMITH, ESQ.
        Florida Bar No. 0002895

6

# EXHIBIT D

# CHAPMAN SMITH & ASSOCIATES, PLC

ATTORNEYS AT LAW
2699 Stirling Road
Suite A201
Ft. Lauderdale, Florida 33312
----------------------
Telephone: 954.981.3249
Facsimile: 954.981.3259

July 22, 2025

Scott Brown, President
American Trash Management, Inc.
1900 Powell Street, Suite 220
Emeryville, CA 94608

**Via Certified Mail & Federal Express**

Scott Brown
c/o American Trash Management, Inc.
1900 Powell Street, Suite 220
Emeryville, CA 94608

Re: Sale, Assignment, Exclusive Manufacturer's Representative and Authorized Service Provider Agreement dated as of October 1, 2007

Dear Mr. Brown:

This firm represents WHR Holdings, LLC d/b/a Wilkinson Hi Rise ("WHR"). This letter is sent in connection with that certain Sale, Assignment, Exclusive Manufacturer's Representative and Authorized Service Provider Agreement, dated as of October 1, 2007 (the "Agreement"), by and among WHR, American Trash Management, Inc. ("ATM"), and you, in your individual capacity, as to Section 8(g) of the Agreement. Unless otherwise defined herein, capitalized terms used in this letter shall have the meanings ascribed to such terms in the Agreement.

This letter shall serve to notify ATM and you individually that, pursuant to Sections 8(c)(ii), (iii), and (iv) of the Agreement, WHR is terminating the Agreement underline effective immediately for Cause. Under Section 8(c)(ii) of the Agreement, ATM has committed material breaches of the Agreement including, but not limited to, the following: (a) ATM's failure to pay for the Products purchased by ATM in accordance with Section 3 of the Agreement, (b) one or more violations by ATM of the exclusivity, conflicts of interest, and territorial restrictions and obligations under Section 2 of the Agreement, (c) ATM's failure to achieve the Annual Milestone Commitments and promotion of the Products pursuant to Sections 6(g) and (h) of the Agreement, and (d) ATM's violation of the confidentiality provisions contained in Section 10(c) of the Agreement. Under Section 8(c)(iii) of the Agreement, WHR reasonably believes that there has been conduct by ATM and its agents that is or may be harmful to WHR's reputation, intellectual property rights, or financial condition. Under Section 8(c)(iv) of the Agreement, ATM has failed to achieve at least 2/3 of the Annual

Milestone Commitment. Each of the foregoing matters, individually, constitutes Cause for the immediate termination of the Agreement by WHR. This letter is not an attempt to describe all of the events that permit a termination for Cause under the Agreement that may have occurred, and any reference to the events mentioned herein shall in no way constitute, or be construed to be, a waiver of any other event that permit a termination for Cause under the Agreement which may now exist or hereafter be discovered.

As a result of the termination of the Agreement for Cause pursuant to Section 8(g)(iii) of the Agreement, ATM and Scott Brown, individually, are subject to the noncompetition provisions set forth in Section 8(g) of the Agreement. In addition, pursuant to Section 8(h) of the Agreement, the provisions of Sections 3(g), 5, 6(h), 8, 9, 10, 11 and 12 of the Agreement expressly survive the termination of the Agreement. In the event any of the noncompetition provisions, or any other provisions that survive the termination of the Agreement, are violated, WHR will protect its interests and seek an injunction and damages against ATM and you individually in accordance with applicable Florida law.

As a result of the termination of the Agreement, ATM is required to comply with the provisions of Section 8(e) of the Agreement as to the return to WHR of all property of WHR and cease the use of all trademarks, marks and trade names of WHR.

This letter shall further advise you that the appointment of ATM as WHR's exclusive manufacturer representative and authorized service provider contained in Section 2 of the Agreement is no longer effective following this termination of the Agreement.

With respect to ATM's pending projects, while WHR is under no obligation to supply Products, WHR will fulfil the orders for Products ordered prior to the date of this letter for any ongoing projects under the terms of various joint check agreements. The fulfilment of these orders shall not operate as a reinstate of the Agreement or otherwise modify any of the terms, conditions, and restrictions that survive termination.

This letter also confirms that WHR reserves all rights and remedies against ATM and you under the Agreement and/or applicable law. Nothing contained in this letter or any delay or failure by WHR in exercising any rights or remedies under the Agreement or at law and/or in equity shall be deemed to: (i) constitute a waiver or amendment of any rights, claims, and/or remedies under the Agreement or at law and/or in equity, (ii) waive or modify any of the provisions of the Agreement, (iii) establish a custom or constitute a course of dealing among the parties, (iv) entitle ATM or you to any notice or demand whatsoever beyond those required by the Agreement, or (v) in any way modify, change, impair, affect, diminish or release any of ATM's or your obligations or liability under the Agreement or any other liability ATM or you may have to WHR. Additionally, the single or partial exercise of any right or remedy by WHR under the Agreement or at law and/or in equity

shall not preclude any later exercise of any other such right or remedy under the Agreement or at law and/or in equity.

All correspondence regarding this letter should be addressed and delivered to the undersigned counsel for WHR.  Please govern yourselves accordingly.

Sincerely,

Chapman Smith

cc:    Shayna Freyman, Esq.
       Michael Lesne, Esq.

# EXHIBIT E

# CHAPMAN SMITH & ASSOCIATES, PLC

ATTORNEYS AT LAW
2699 Stirling Road
Suite A201
Ft. Lauderdale, Florida 33312
----------------------
Telephone: 954.981.3249
Facsimile: 954.981.3259

August 25, 2025

Scott Brown, President
c/o Shayna Freyman, Esq.
American Trash Management, Inc.
1900 Powell Street, Suite 220
Emeryville, CA 94608

**Via Email**

Scott Brown
c/o American Trash Management, Inc.
1900 Powell Street, Suite 220
Emeryville, CA 94608

Re:     Settlement Communication

Dear Mr. Brown:

As you know, this firm represents WHR Holdings, LLC d/b/a Wilkinson Hi Rise ("WHR"). This letter is sent as a follow up to my July 22, 2025 letter (the "July 22 Letter") to American Trash Management, Inc. ("ATM") and Scott Brown, in his individual capacity, terminating the Sale, Assignment, Exclusive Manufacturer's Representative and Authorized Service Provider Agreement dated as of October 1, 2007 (the "Agreement").

Although our recent mediation did not produce an agreement between the parties, WHR is interested in reaching an amicable resolution with respect to (i) the disputes between WHR and ATM as to WHR's monetary and other claims against ATM under the Agreement, including claims brought by WHR against ATM in the lawsuit styled *WHR Holdings, LLC, a Florida Limited Liability Company, Plaintiff, v. American Trash Management, Inc., a California corporation, Defendant*, Case No.: CACE-24-009381 (the "Lawsuit"), pending in the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida (the "Circuit Court"), and (ii) any causes of action that WHR has or will have against Scott Brown, in his individual capacity, for breach of the noncompetition provisions set forth in the Agreement.

We have set forth our position below on the effect of the termination of the Agreement including the enforceability and enforcement of the noncompetition provisions contained therein, the amount of WHR's monetary claims against ATM, the status of the outstanding projects between WHR and

ATM, and our position on the notice received from your counsel as to a potential bankruptcy filing by ATM, followed by our proposal for the resolution of all pending disputes.

## Valid Termination of Agreement for Cause

In the July 22 Letter, I outlined the numerous events that permitted WHR to terminate the Agreement for "Cause" (as that term is defined in the Agreement). Under the express terms of the Agreement, a termination for Cause terminated the Agreement immediately upon notice to ATM. We have confirmed that ATM received actual notice of the July 22 Letter on July 23, 2025.

## Noncompetition Provisions

As a result of the termination of the Agreement for Cause pursuant to Section 8(g)(iii) of the Agreement, ATM and Scott Brown, in his individual capacity, are subject to and bound by the five (5) year noncompetition provisions set forth in Section 8(g) of the Agreement. Those provisions effectively prevent ATM and Scott Brown from continuing to operate in competition with WHR as we suspect ATM and you have been doing since July 23, 2025. As set forth in the July 22 Letter, in the event any of the noncompetition provisions have been or are violated, WHR will protect its interests and seek an injunction and damages against ATM and Scott Brown individually in accordance with applicable Florida law.

## WHR Claim Amount

As of August 1, 2025, the total amount due to WHR by ATM under the Agreement is $4,728,801.81 (the "Claim Amount"). The Claim Amount is comprised of $2,541,732.48 due and owing for product shipped and invoiced to ATM and $2,187,069.33 for accrued and unpaid interest on the unpaid amounts. I am attaching a summary accounts receivable report (the "AR Report") that shows the detail for the calculation of the Claim Amount, including (i) the total amounts invoiced and collected for the period from 2010 to 2025, leaving the invoiced amount of $2,541,732.48 unpaid, and (ii) the interest calculated on the unpaid amounts. The interest calculations are conservative as they include the least amount of accrued and unpaid interest due and owing from ATM based on a simple interest calculation on the unpaid invoiced amounts until the date such amounts were paid. WHR reserves all rights to assess additional accrued and unpaid interest that it believes is due and owing under the Agreement and applicable law in the event the disputes between the parties are not amicably resolved.

The Lawsuit is scheduled for trial in October 2025. WHR fully expects that the Circuit Court will enter a ruling in favor of WHR confirming the entire Claim Amount plus additional accrued interest after August 1, 2025 once WHR presents evidence of the overdue invoices and the accumulated interest that WHR is entitled to assess on the unpaid invoiced amounts. Once this ruling is entered, WHR will immediately commence collection efforts against ATM.

## Pending ATM Projects

The current projects with ATM fall into the following three (3) categories:

- Projects where the product has been shipped and that are now closed (the "Closed Projects"). On the Closed Projects, all deposits from ATM have been applied against the amounts due and owing and the remaining outstanding balance owed by ATM on the Closed Projects is included in the Claim Amount.
- Projects which have been released to production, but the product has not been shipped to ATM (the "Released Projects"). The Released Projects are detailed in Annex 1 attached to this letter. WHR is willing to finish the production and ship the product on a Released Project once WHR has received 100% of the payment due under the purchase order. On the Released Projects, WHR is currently holding deposits from ATM totaling $60,322.20 and the total amount due under the purchase orders is $115,413.70, leaving a balance due of $55,091.50. This balance due is not included in the Claim Amount.
- Projects where WHR has a purchase order from ATM, but the purchase order has not been released to production (the "Submitted Projects"). The Submitted Projects are detailed in Annex 1 attached to this letter. On the Submitted Projects, WHR requires that ATM make 100% of the payment due under the purchase order (less any deposit received by WHR for that purchase order) before releasing a Submitted Project into production. On the Submitted Projects, WHR is currently holding deposits from ATM totaling $98,304.26 and the total amount due under the purchase orders is $482,617.05, leaving a balance due of $384,312.79. This balance due is not included in the Claim Amount. If full payment is not made on a Submitted Project, then WHR intends to retain but not apply the deposit received from ATM for that Submitted Project until the disputes between the parties are resolved.

The handling of the projects as described above shall supersede any statements regarding the fulfillment of orders set forth in the July 22 Letter.

ATM Bankruptcy Filing

As you previously mentioned, ATM is considering filing a voluntary petition for relief under Chapter 11 in an attempt to avoid any recovery being sought by WHR as to the Claim Amount. Based on the draft petition and draft bankruptcy schedules provided to WHR, ATM will be seeking to file its bankruptcy case under Subchapter V. In order to be eligible to file a Subchapter V case, a debtor must have combined noncontingent, liquidated secured and unsecured debt of $3,424,000 or less. In reviewing the draft bankruptcy schedules, ATM has listed WHR's claim as being in the amount of $1,888,859.00 and as unliquidated and disputed. As you can see from the AR Report, the Claim Amount, by itself, exceeds the debt threshold for a Subchapter V case and the claim is fully liquidated as it is readily ascertainable per the contractual terms of the Agreement. Thus, ATM will be ineligible to file a Subchapter V case. To the extent that ATM seeks to "manufacture" a Subchapter V case by claiming that WHR's claim is well below the Claim Amount, WHR will immediately file an objection to eligibility. In addition, WHR will move to either dismiss the bankruptcy case for bad faith or convert the bankruptcy case to a Chapter 7 case based on ATM's inability to operate in competition with WHR. Since WHR will be the single largest creditor in the bankruptcy case, ATM will be unable to propose and confirm a plan of reorganization over WHR's objection and you will not be able to retain ownership of ATM. Furthermore, a Chapter 11 filing will be a very expensive prospect for ATM. WHR has engaged bankruptcy counsel to advise it on these matters.

<u>WHR Proposal</u>

While WHR's ideal structure is the one proposed in its previous forbearance documents, WHR believes that ATM is unlikely to be able to make any significant debt repayments over the next several years due to insignificant available cash flow from its business. WHR believes that there is an alternative path for ATM and you that avoids a bankruptcy and the attendant risks and costs, further legal fees, and any personal liability to Scott Brown. The proposal (the "<u>Proposal</u>") is that ATM will sell substantially all of its assets (including pre-closing accounts receivable and inventory) to WHR in consideration for the following: (i) the cancellation and satisfaction in full of the Claim Amount, (ii) the release of all claims against you individually, and (iii) ATM's retention of Smart Trash, which would include the full Smart Trash business (contracts, intellectual property, branding, etc.).

WHR believes that the above Proposal would enable ATM to continue its efforts with the Smart Trash business which was the primary focus for the duration of your ownership while leaving WHR responsible for the part of the business that WHR is familiar with running efficiently and profitably.

If the parties agree to the above Proposal, WHR will instruct its counsel to prepare an asset purchase agreement and any other necessary ancillary agreements. Upon the execution of definitive documentation, WHR will dismiss the Lawsuit with prejudice, and the parties will execute mutual releases on all pre-closing disputes.

This letter constitutes a confidential settlement communication under applicable Florida law, Rule 408 of the Federal Rules of Evidence and other applicable rules and shall be inadmissible in any actions or proceedings between the parties. The Proposal concept is valid for a period of fourteen (14) days from the date of this letter and may only be accepted in writing.


Sincerely,

Chapman Smith

cc:

    Michael Lesne, Esq.

## Annex 1

Released Projects:

| Job # | ATM PO # | Job Name | P.O. DATE | Total Job Price | Deposit | Remaining Balance |
|---|---|---|---|---|---|---|
| DI15879 | 2475 | 1650 Lincoln Galvanneal | 9/25/2023 | $ 12,470.00 | $ 11,821.00 | $ 649.00 |
| DI15879L2 | 2475 | 1650 Lincoln Bi-Sorter | 9/25/2023 | $ 34,814.00 | $ 11,821.00 | $ 22,993.00 |
| DI16022 | 2956 | Valley Pride - Bldg. J | 7/10/2024 | $ 18,973.50 | $ 9,488.00 | $ 9,485.50 |
| DI16072 | 3094 | The Grove at Woodlake | 10/22/2024 | $ 43,928.00 | $ 21,964.00 | $ 21,964.00 |
| DO3915 | 293 | 1430 Lincoln / Broadway | 7/3/2025 | $ 1,472.00 | $ 1,472.00 | $  - |
| DO3918 | 296 | Florence Ave | 7/10/2025 | $ 542.00 | $ 542.00 | $  - |
| DO3924 | 298 | 7th & H - Windsor - Stock | 7/17/2025 | $ 1,314.00 | $ 1,314.00 | $  - |
| DO3925 | 300 | Cobalt and Stock | 7/18/2025 | $ 1,900.20 | $ 1,900.20 | $  - |
| **Total** | | | | **$ 115,413.70** | **$60,322.20** | **$ 55,091.50** |

Submitted Projects:

| Job No | ATM PO # | Job Name | P.O. DATE | Total Job Price | Deposit | Remaining Balance |
|---|---|---|---|---|---|---|
| DI15885 | 2488 | 601 Beech | 10/4/2023 | $ 154,909.00 | $  - | $ 154,909.00 |
| DI16011 | 2902 | Aster Ave Bldg B West 24 | 6/12/2024 | $ 32,108.50 | $ 12,884.25 | $ 19,224.25 |
| DI16011L2 | 2902 | Aster Ave Bldg B West 30 | 6/12/2024 | $ 19,427.75 | $ 12,884.25 | $ 6,543.50 |
| DI16012 | 2903 | Aster Ave Bldg B East 24 | 6/12/2024 | $ 35,162.50 | $ 14,038.25 | $ 21,124.25 |
| DI16012L2 | 2903 | Aster Ave Bldg B East 30 | 6/12/2024 | $ 20,990.75 | $ 14,038.25 | $ 6,952.50 |
| DI16091 | 20 | AC Marriott | 11/26/2024 | $ 10,105.00 | $  - | $ 10,105.00 |
| DI16115 | 99 | 2550 Irving Street | 1/16/2025 | $ 56,687.50 | $  - | $ 56,687.50 |
| DI16125 | 117 | 4th & Ivy Bldg A | 2/4/2025 | $ 30,935.50 | $  - | $ 30,935.50 |
| DI16125L2 | 117 | 4th & Ivy Bldg B | 2/4/2025 | $ 30,935.50 | $  - | $ 30,935.50 |
| DI15935L2 | 2695 | Broadway Res Core "2" ONLY | 1/29/2024 | $ 45,574.75 | $ 22,229.63 | $ 23,345.12 |
| DI15935L4 | 2695 | Broadway Res Core "3" ONLY | 1/29/2024 | $ 40,595.50 | $ 22,229.63 | $ 18,365.87 |
| DO3926 | 311 | Door Po Ave One | 7/23/2025 | $ 5,184.80 | $  - | $ 5,184.80 |
| **Total** | | | | **$ 482,617.05** | **$98,304.26** | **$ 384,312.79** |

|  | A | B | C |
|---|---|---|---|
|  |  | 8/1/2025 |  |
|  |  |  | Simple Interest |
|  |  |  | Calculated to Date |
|  | Invoiced | Collected | Invoice paid |
| 2010 | 56,793.61 | 56,793.61 | 13,718.12 |
| 2011 | 163,851.36 | 163,851.36 | 2,436.19 |
| 2012 | 368,452.79 | 368,452.79 | 4,662.22 |
| 2013 | 938,283.96 | 938,283.96 | 34,982.90 |
| 2014 | 518,949.49 | 431,193.64 | 335,749.64 |
| 2015 | 1,116,249.84 | 1,085,507.89 | 143,324.16 |
| 2016 | 1,051,697.79 | 1,051,697.79 | 188,050.69 |
| 2017 | 726,740.49 | 726,740.49 | 96,554.56 |
| 2018 | 851,780.60 | 851,780.60 | 42,229.57 |
| 2019 | 1,455,346.80 | 1,455,346.80 | 55,486.75 |
| 2020 | 1,679,232.25 | 1,598,482.00 | 157,835.77 |
| 2021 | 2,072,736.85 | 1,641,036.00 | 451,732.32 |
| 2022 | 1,168,068.96 | 489,924.05 | 399,400.40 |
| 2023 | 1,482,412.28 | 1,073,201.68 | 178,949.34 |
| 2024 | 1,620,608.89 | 834,702.02 | 80,312.00 |
| 2025 | 304,860.95 | 267,339.75 | 1,644.70 |
|  |  |  |  |
| Total | 15,576,066.91 | 13,034,334.43 | 2,187,069.33 |
|  |  | A-B | A-B+C |
| Balance Owed |  | 2,541,732.48 | 4,728,801.81 |

# EXHIBIT F

| Fill in this information to identify the case: | |
| --- | --- |
| Debtor 1    American Trash Management, Inc. | |
| Debtor 2 <br> (Spouse, if filing) | |
| United States Bankruptcy Court    **California Northern Bankruptcy Court** | |
| Case number:   **25–30743** | |

FILED

**U.S. Bankruptcy Court**
**California Northern Bankruptcy Court**

12/23/2025

**Edward J. Emmons, Clerk**

Official Form 410
# Proof of Claim

04/25

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

## Part 1:   Identify the Claim

| | |
| --- | --- |
| **1. Who is the current creditor?** | WHR Holdings, LLC <br><br> Name of the current creditor (the person or entity to be paid for this claim) <br><br> Other names the creditor used with the debtor |
| **2. Has this claim been acquired from someone else?** | ☑ No <br> ☐ Yes. From whom? |

| **3. Where should notices and payments to the creditor be sent?** <br><br> Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?** <br><br> WHR Holdings, LLC <br> Name <br><br> 3402 Southwest 26th Terrace <br> Unit B–10 <br> Dania Beach, FL 33312 <br><br> Contact phone _____ <br><br> Contact email _____ <br><br> Uniform claim identifier (if you use one): <br> _____ | **Where should payments to the creditor be sent?** (if different) <br><br> Name <br><br><br><br> Contact phone _____ <br><br> Contact email _____ |

| **4. Does this claim amend one already filed?** | ☐ No <br> ☑ Yes. Claim number on court claims registry (if known)   19    Filed on   11/05/2025 <br>                                                       MM / DD / YYYY |
| **5. Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No <br> ☐ Yes. Who made the earlier filing? |

| | |
|---|---|
| 6. **Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____ |

| | |
|---|---|
| 7. **How much is the claim?** | $ _____3819645.46_____ **Does this amount include interest or other charges?**<br>☐ No<br>☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

| | |
|---|---|
| 8. **What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br>Limit disclosing information that is entitled to privacy, such as healthcare information.<br><br>_____See attachment_____ |

| | |
|---|---|
| 9. **Is all or part of the claim secured?** | ☑ No<br>☐ Yes. The claim is secured by a lien on property.<br>**Nature of property:**<br>☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410–A) with this *Proof of Claim.*<br>☐ Motor vehicle<br>☐ Other. Describe: _____<br><br>**Basis for perfection:** _____<br><br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>**Value of property:** $ _____<br>**Amount of the claim that is secured:** $ _____<br>**Amount of the claim that is unsecured:** $ _____ (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>**Amount necessary to cure any default as of the date of the petition:** $ _____<br><br>**Annual Interest Rate** (when case was filed) _____ %<br><br>☐ Fixed<br>☐ Variable |

| | |
|---|---|
| 10. **Is this claim based on a lease?** | ☑ No<br>☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $ _____ |

| | |
|---|---|
| 11. **Is this claim subject to a right of setoff?** | ☑ No<br>☐ Yes. Identify the property: _____ |

| 12. | Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No ☐ Yes. *Check all that apply:* | Amount entitled to priority |

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). $ _____

☐ Up to $3,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). $ _____

☐ Wages, salaries, or commissions (up to $17,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). $ _____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). $ _____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). $ _____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(_) that applies $ _____

\* Amounts are subject to adjustment on 4/01/28 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(3) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157 and 3571.**

Check the appropriate box:

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    12/23/2025
                    MM / DD / YYYY

/s/  Charlton George
Signature

Print the name of the person who is completing and signing this claim:

Name        Charlton George
            First name    Middle name    Last name

Title       Chief Executive Officer

Company     WHR Holdings, LLC
            Identify the corporate servicer as the company if the authorized agent is a servicer

Address     3406 SW 26th Terrace, Unit B−10
            Number   Street
            Dania Beach, FL 33312
            City   State   ZIP Code

Contact phone    860.306.6900    Email   cgeorge@whrise.com

Case 25-50743 Doc 80-19   Filed 12/23/25   Entered 12/23/25 15:58:39   Page 61 of 64

**<u>Claim 19 Exhibits</u>**

The exhibits accompanying Claim 19 are accessible via the Court's docket and have been excluded from this filing to prevent unnecessary duplication.

# EXHIBIT G

|  | A | B | C |
|---|---|---|---|
|  |  | 9/14/2025 |  |
|  |  |  | Simple Interest Calculated to Date |
|  | Invoiced | Collected | Net AR by Invoice Year | Invoice paid |
| 2010 | 56,793.61 | 56,793.61 | - | 13,718.12 |
| 2011 | 163,851.36 | 163,851.36 | - | 2,436.19 |
| 2012 | 368,452.79 | 368,452.79 | - | 4,662.22 |
| 2013 | 938,283.96 | 938,283.96 | - | 34,982.90 |
| 2014 | 518,949.49 | 431,193.64 | 87,755.85 | 345,954.94 |
| 2015 | 1,116,249.84 | 1,085,507.89 | 30,741.95 | 143,991.51 |
| 2016 | 1,051,697.79 | 1,051,697.79 |  | 188,050.69 |
| 2017 | 726,740.49 | 726,740.49 |  | 96,554.56 |
| 2018 | 851,780.60 | 851,780.60 | - | 42,229.57 |
| 2019 | 1,455,346.80 | 1,455,346.80 | - | 55,486.75 |
| 2020 | 1,679,232.25 | 1,598,482.00 | 80,750.25 | 159,587.94 |
| 2021 | 2,072,736.85 | 1,641,036.00 | 431,700.85 | 461,099.64 |
| 2022 | 1,168,068.96 | 489,924.05 | 678,144.91 | 414,115.21 |
| 2023 | 1,482,412.28 | 1,166,030.93 | 316,381.35 | 173,195.00 |
| 2024 | 1,620,516.49 | 1,620,503.87 | 12.62 | 13,126.48 |
| 2025 | 322,222.95 | 279,374.45 | 42,848.50 | 2,117.44 |

| | A | B | C | D |
|---|---|---|---|---|
| Total | 15,593,336.51 | 13,925,000.23 | 1,668,336.28 | 2,151,309.18 |
|  |  | A-B |  | A-B+C |
| Balance Owed |  | 1,668,336.28 |  | 3,819,645.46 |