Stephen D. Finestone (125675)
Jennifer C. Hayes (197252)
FINESTONE HAYES LLP
456 Montgomery Street, Suite 1300
San Francisco, CA 94104
Tel.: (415) 421-2624
Fax: (415) 398-2820
Email: sfinestone@fhlawllp.com
Email: jhayes@fhlawllp.com

Attorneys for American Trash Management, Inc.,
Debtor-in-Possession

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| In re<br><br>AMERICAN TRASH MANAGEMENT, INC.,<br><br>Debtor-in-Possession. | Case No. 25-30743-HLB<br><br>Chapter 11, Subchapter V<br><br>**DEBTOR'S RESPONSE TO WHR'S AMENDED OBJECTION TO DEBTOR'S SUBCHAPTER V ELIGIBILITY BY WHR HOLDINGS, LLC**<br><br>**Date:** January 22, 2026<br>**Time:** 10:00 a.m.<br>**Ctrm:** Via Zoom or In-Person, at<br>Courtroom 19, 450 Golden Gate Ave.<br>16th Floor, San Francisco, CA |

# **TABLE OF CONTENTS**

I.      SUMMARY OF ARGUMENT ................................................................................. 1

II.     FACTUAL BACKGROUND ................................................................................ 2

        A.      ATM and WHR Entered Into a "Manufacturer's Agreement" in 2007 ................. 2

        B.      The Parties' Changing Course of Conduct Over the Years Was Inconsistent with
        the Terms of the 2007 Contract, and Largely Ignored the Provisions of that Contract ...... 3

                1.      Payment Process from Mid-2023 to Mid-2025......................................... 4

                2.      Payment Process from Mid-2025 to Petition Date.................................... 5

        C.      Persistent Quality Issues in WHR Products Causing Material Payment Delays by
        the General Contractors to ATM Were an Additional Complicating Factor in Calculating
        Amounts Owed to WHR ................................................................................. 6

        D.      Given the Complexity of the Accounting, the Parties Became Unable to Agree on
        the Amount of the Outstanding Debt ................................................................. 7

        E.      Until 2024, When the Parties' Relationship Had Further Soured Due to Many
        Issues, Including the Persistent Quality Issues Plaguing WHR's Products, WHR Never
        Demanded Interest on Unpaid Amounts .............................................................. 8

        F.      The Parties Failed in Their Efforts to Negotiate a Resolution and WHR Filed a
        Lawsuit in Florida ....................................................................................... 8

        G.      ATM's Liquidated, Non-Insider Liabilities as of the Petition Date Total Under
        $3,424,000 ................................................................................................ 9

        H.      Even WHR Is Having Trouble Calculating the Amount It Was Owed as of the
        Petition Date............................................................................................... 9

III.    LAW................................................................................................................ 10

        A.      Debtors Such as ATM, with Less than $3,424,000 in Liquidated Noncontingent
        Secured and Unsecured Debts as of the Petition Date Are Eligible for SubChapter V .... 10

B.      Whether a Debt Is Liquidated Turns on Whether It Is Subject to Ready Determination and Precision in Computation of the Amount Due ................................... 11

C.      A Dispute Such as the Dispute at Issue Between ATM and WHR Renders a Debt Unliquidated If It Makes a Claim not "Readily Determinable." ...................................... 12

D.      Under the Uniform Commercial Code, the Parties' Course of Performance, Course of Dealing, and Usage of Trade Must Be Determined by a Trier of Fact to Determine ATM's Liability to WHR Under the 2007 Contract ...................................... 13

E.      The Court Should Strike All Improperly Filed and Inadmissible Evidence Regarding the Parties Settlement Discussions ................................................. 20

F.      WHR's Amendment of Its Objection to Change the Amount It Alleges Is Owed by ATM Further Proves the Unliquidated Nature of ATM's Debt to WHR ............ **Error! Bookmark not defined.**

IV.     CONCLUSION .................................................................................................. 20

**TABLE OF AUTHORITIES**

**Cases**

*Alessi Equip., Inc. v. Am. Piledriving Equip., Inc*., 2025 U.S. App. LEXIS 20500, 160 F.4th 38 (2d Cir. 2025)................................................................................................................ 17

*Allapattah Servs. v. Exxon Corp*., 188 F.R.D. 667 (S.D. Fla. 1999)................................ 14

*Allapattah Servs. v. Exxon Corp*., 61 F. Supp. 2d 1308 (S.D. Fla. 1999)........................ 18

*Beach Higher Power Corp. v. Granados*, 717 So. 2d 563 (Fla. Dist. Ct. App. 1998)........... 18, 19

*BMC Indus., Inc. v. Barth Indus., Inc*., 160 F.3d 1322 (11th Cir. 1998) ......................... 17

*Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 133 L. Ed. 2d 258, 116 S. Ct. 286 (1995).. 19

*Enkidin, LLC v. Weisbard*, 2024 Colo. App. LEXIS 1752 (Colo. Ct. App. June 20, 2024)......... 15

*Exim Brickell, LLC v. Bariven*, 2011 U.S. Dist. LEXIS 174564 (S.D. Fla. Aug. 16, 2011) .. 14, 17

*F.M.W. Props., Inc. v. Peoples First Fin. Sav. and Loan Ass'n*, 606 So. 2d 372 (Fla. 1st DCA 1992) ............................................................................................................... 19

*Farmers State Bank v. Farmland Foods, Inc*., 225 Neb. 1, 402 N.W.2d 277 (Neb. 1987) .......... 18

*Fountain v. Deutsche Bank Nat'l Tr. Co. (In re Fountain)*, 612 B.R. 743 (B.A.P. 9th Cir. 2020) ............................................................................................................. 12

*General Matters, Inc. v. Paramount Canning Co*., 382 So. 2d 1262 (Fla. Dist. Ct. App. 1980) . 14

*Glenn Distribs., Corp. v. Heckitt Benckiser, LLC*, 2015 Phila. Ct. Com. Pl. LEXIS 113 (Pa. Ct. Com. Pl. Apr. 27, 2015) ................................................................................ 17

*Ho v. Dowell (In re Ho)*, 274 B.R. 867 (B.A.P. 9th Cir. 2002) ....................................... 11, 12, 18

*In re Bay Point Corp*., 1 B.C.D. 1635 (D.N.J. 1975) .................................................. 11

*In re Fostvedt*, 823 F.2d 305 (9th Cir. 1987) ........................................................... 11, 12

*In re Hall*, 650 B.R. 595 (Bankr. M.D. Fla. 2023)..................................................... 12

*In re Hofmann*, 2025 Bankr. LEXIS 2153 (Bankr. E.D. Cal. Aug. 29, 2025)........................... 19

*In re Smith*, 2005 Bankr. LEXIS 3694 (Bankr. D. Ariz. Dec. 13, 2005) ............................... 18

*In re Wenberg*, 902 F.2d 768 (9th Cir. 1990)........................................................... 11, 13

*In re Wenberg*, 94 B.R. 631 (B.A.P. 9th Cir. 1988)..................................................... 11, 13

*Kiwanis Club v. De Kalaf*e, 723 So. 2d 838 (Fla. Dist. Ct. App. 1998) ............................... 15

Case: 25-30743   Doc# 81   Filed: 01/08/26   Entered: 01/08/26 22:17:41   Page 4 of 26

*Metal Seal Precision, Ltd. v. Good Time Outdoors, Inc.*, 2018-Ohio-5326, 128 N.E.3d 678 (Ohio Ct. App. 2018) .......................................................................................... 17

*Nanakuli Paving & Rock Co. v. Shell Oil Co., Inc.*, 664 F.2d 772 (9th Cir. 1981) ..................... 18

*Nicholes v. Johnny Appleseed (In re Nicholes)*, 184 B.R. 82 (B.A.P. 9th Cir. 1995)....... 11, 12, 13

*Reser's Fine Foods, Inc. v. Bob Evans Farms, Inc.*, 2016 U.S. Dist. LEXIS 90732 (D. Or. July 13, 2016) ................................................................................................................... 15

*Slack v. Wilshire Ins. Co. (In re Slack)*, 187 F.3d 1070 (9th Cir. 1999) ............................... 11, 12

*Sylvester v. Dow Jones & Co., Inc. (In re Sylvester)*, 19 B.R. 671 (B.A.P. 9th Cir. 1981) .... 11, 13

*White v. Ocean Bay Marina, Inc.*, 778 So. 2d 412 (Fla. Dist. Ct. App. 2001) ..................... 15, 19

*Wright v. State Farm Mut. Auto. Ins. Co.*, 223 Or. App. 357, 196 P.3d 1000 (Or. Ct. App. 2008) ........................................................................................................................... 16

**Statutes**

11 U.S.C. § 101(51D) ..................................................................................................... 10

11 U.S.C. § 109(e) ................................................................................................... 11, 12

11 U.S.C. § 1182 ............................................................................................................. 12

Cal. Comm. Code § 1303 ............................................................................................... 14

Cal. Comm. Code § 2201 ............................................................................................... 13

Cal. Evid. Code § 1152(a) ............................................................................................. 20

Fla. Stat. § 671.201(3) ............................................................................................. 14, 18

Fla. Stat. § 671.205 ................................................................................................. 14, 15

Fla. Stat. § 671.205(1) ................................................................................................... 16

Fla. Stat. § 671.205(5) ................................................................................................... 16

Fla. Stat. § 671.205(6) ................................................................................................... 16

Fla. Stat. § 672.201 ....................................................................................................... 13

Fla. Stat. § 672.209(2) ................................................................................................... 19

Fla. Stat. § 672.209(3) ................................................................................................... 19

Fla. Stat. § 672.209(4) ................................................................................................... 19

Fla. Stat. § 90.408 ......................................................................................................... 20

Case: 25-30743   Doc# 81   Filed: 01/08/26   Entered: 01/08/26 22:17:41   Page 5 of 26

UCC § 1-303 .................................................................................. 13, 17

**Rules**

Fed. R. Evid. 408(a) ........................................................................ 20

Case: 25-30743   Doc# 81   Filed: 01/08/26   Entered: 01/08/26 22:17:41   Page 6 of 26

Debtor-in-Possession American Trash Management, Inc. ("Debtor" or "ATM") hereby files its response to the Amended Objection filed by WHR Holdings, LLC ("WHR") to Debtor's SubChapter V Eligibility (ECF 80)[1] and in support thereof states as follows:

## I.  SUMMARY OF ARGUMENT

Because the ATM/WHR contract is for the sale of goods and governed by the Uniform Commercial Code, determining the amount of ATM's debt to WHR requires a trier of fact to determine the parties' course of performance, course of dealing, and usage of trade (collectively, the "Course of Conduct") over a period of more than 17 years, interpreted in the light of commercial practices and other surrounding circumstances, which may require expert testimony. A debt that is not readily determinable is not a liquidated debt for purposes of SubChapter V. Unless ATM's debt to WHR is a liquidated debt, which it is not, ATM qualifies for SubChapter V and WHR's amended objection should be overruled.

Tellingly, WHR itself cannot figure out the amount ATM owes.  WHR first filed its objection to the SubChapter V designation on November 13, 2025, stating unequivocally that ATM owes WHR $2,541,833.48 in unpaid invoices and $2,316,649.97 in unpaid interest.  Then, nearly six weeks later, on December 23, 2025, WHR filed an amended motion, now stating with certainty that the amounts owed are $1,668,336.28 in unpaid invoices and $2,151,309.18 in unpaid interest.  WHR's own inability to figure out the amount owing only further highlights the complexity of the accounting spanning many years, and the necessity of a trier of fact to determine the amount owed.

WHR confidently concludes that interest is owing on the unpaid invoices (whatever their total).  This has facial appeal, given the provision in the 2007 contract for interest on unpaid invoices.  However, what WHR does not disclose is that ATM never paid WHR within 30 days after shipment (per the 2007 contract), and yet WHR never charged interest on the unpaid invoices, even when they went unpaid for years.  This again highlights the need for a trier of fact

---

[1] Due to its own difficulties in calculating the confusing amount owed by ATM, WHR amended its objection to reduce the amount of its prepetition claim by $1,038,736.99, only further highlighting the unliquidated nature of ATM's debt to WHR.  (*Compare* ECF 61 *with* ECF 80).

DEBTOR'S RESPONSE TO AMENDED OBJ. TO SUBCHAPTER V                                        1

to determine the Course of Conduct from 2007 to 2025, interpreted in the light of commercial practices and other surrounding circumstances, which may require expert testimony. Did WHR modify the terms under which it can collect interest or, at a minimum, waive its right to interest by never charging it, by the Course of Conduct over a period of more than 17 years? ATM contends that the answer is yes. A trier of fact is required to make that determination and as such, the claim is unliquidated. WHR's amended objection should be overruled.

## II.   FACTUAL BACKGROUND

### A.   ATM and WHR Entered Into a "Manufacturer's Agreement" in 2007

On or about October 1, 2007, ATM and WHR signed a document titled *Sale, Assignment, Exclusive Manufacturer's Representative and Authorized Service Provider Agreement* (the "2007 Contract") (Declarations of Charlton George in Support of Objection and Amended Objection, ECF 62 (the "Original George Decl."), ECF 80-1 (the "Am. George Decl."), together, the Original George Decl. and the Am. George Decl. are defined as the "George Decls." Ex. A). The terms of purchase under the 2007 Contract and calculation of payment owing by ATM to WHR for each purchase order issued under the Contract are set forth in ten, interlocking subparagraphs (*Id.* ¶¶ 3(a)–3(j)).

The 2007 Contract served as the initial building block to the parties' relationship, whereby ATM effectively purchased WHR's Southern California operation. (George Decls. Ex. A, ¶ 6); Declaration of Scott Brown in Support of Opposition Brief ("Brown Decl." ¶ 2). Specifically, ATM paid $75,000 for the WHR inventory and assumed rental payments for the WHR facility in SoCal. (George Decls. Ex. A, ¶ 6; Brown Decl. ¶ 2). ATM hired WHR's employees and, on behalf of WHR, collected several hundred thousand dollars in accounts receivable owing to WHR. (Brown Decl. ¶ 2). ATM also assumed the obligations for thirteen WHR projects totaling approximately $100,483 and subsequently fulfilled these contracts. (*Id.*)

ATM could have found an alternative chute manufacturer to represent, without spending $75,000 for inventory, hiring WHR employees and helping WHR collect receivables and fulfill contracts. (Brown Decl. ¶ 3). ATM entered into the 2007 Contract, however, because it wanted to be part of WHR, given its product position in the California marketplace. (*Id.*) WHR, by

selling its Southern California business to ATM, was also making an investment, as illustrated by section 6(h) in the 2007 Contract, which provides for ATM's <u>vigorous promotion</u> of WHR's products – far more than a standard distributor would be required to undertake.  (*Id.*)

Other than joining ATM and WHR in a go-forward project, the parties did not hew to the terms of the 2007 Contract.  (Brown Decl. ¶ 4).  Instead, over the course of the parties' more than 17 years of doing business together, they followed a changing course of conduct, which must be determined by a trier of fact in order to determine the parties' obligations to one another and liquidate WHR's claim.  (*Id.*)

    B.    <u>The Parties' Changing Course of Conduct Over the Years Was Inconsistent with the Terms of the 2007 Contract, and Largely Ignored the Provisions of that Contract</u>

The terms of the 2007 Contract were largely ignored by the parties from its inception. (Brown Decl. ¶ 5).  An important example of this are the terms of ATM's payment obligation to WHR.  (*Id.*)  The 2007 Contract provides for payment within 30 days from the time of shipment. (George Decls. Ex. A, ¶ 3(g)).  However, this payment cycle was never followed.  (Brown Decl. ¶ 5; *accord* George Decls. ¶ 6 ("Throughout WHR's relationship with the Debtor, the Debtor has consistently failed to timely pay WHR's invoices, often *years* after the due date on the invoice, and in many cases failed to pay at all." (Emphasis in original)).

Going back to 2012, ATM was paying deposits against purchase orders it issued to WHR for jobs, despite that not being a requirement of the 2007 Contract.  (Brown Decl. ¶ 6).  After that, ATM was generally always behind in payments, due to multiple factors, including the nature of construction industry payments and a dysfunctional Chief Operating Officer ("COO"), who was failing in his job, unbeknownst to ATM until the COO suffered a personal tragedy in mid-2022, and the seriousness of the COO's work dysfunction came to light.  (*Id.*)

Several examples of the lengthy delays in payments over the years are as follows:

| | | |
|---|---|---|
| Check# 268384, dated 4/9/2020 in the sum of $62,782.80 | Paid more than 57 invoices dated in 2018 | No interest charged by WHR or paid by ATM. |
| Check# 269147 (1/20/2021) in the sum of $47,456.20 and Check#269240 (2/26/2021) in the sum of $47,456.50 | Paid WHR Invoice DI1536B dated 9/14/20; terms on this invoice were 45 days | No interest charged by WHR or paid by ATM. |

| Check# 269718 (7/20/2021) in the sum of $78,591.33 | Paid over 50 invoices dated in 2016 | No interest charged by WHR or paid by ATM. |
|---|---|---|
| Check# 270605, dated 4/07/2022 in the sum of $105,885.80 | Paid approx. 56 invoices dated in 2015 | No interest charged by WHR or paid by ATM. |
| ACH Pmt# 5643409 dated 3/17/2023 in the sum of $15,540.00 | Paid WHR Invoice DI16885 dated 11/19/21; terms on this invoice were 45 days | No interest charged by WHR or paid by ATM. |

(Brown Decl. ¶ 7; *accord* George Decls. ¶ 6).

Despite the lengthy payment delays spanning years, WHR never charged interest on the overdue amounts.  (Brown Decl. ¶ 8).

*1. Payment Process from Mid-2023 to Mid-2025*

The payment delays without interest charges, which was the Course of Conduct followed by the parties for many years, significantly changed in mid-2023.  (Brown Decl. ¶ 9).  On or about June 27, 2023, ATM and WHR agreed to a new payment program whereby all purchases of WHR equipment by ATM had to be made either with a (1) Joint Check Agreement ("JCA") in place; or (2) by prepayment (primarily for parts).  (*Id.*)  The complicated new JCA process adopted and followed by the parties beginning in June 2023 worked as follows:

1. ATM would be awarded a new project.

2. ATM would prepare the JCA and send it to the general contractor ("GC") for signature. Once signed, the JCA would be sent to WHR for execution.

3. ATM would request a 50% prepayment bill and a signed conditional progress waiver from WHR to submit to the GC for the 50% prepayment billing submission, as required by the GCs to process a joint check to WHR.

4. ATM would submit the 50% prepayment billing to the GC.

5. Payment of the 50% prepayment billing would be processed based on the GC's funding schedule.  Payment could be delayed due to external factors outside of ATM's control.  Examples include a project awaiting funding, which could range from 30-90 days; ownership holding funds due to the project's noncompliance with prevailing wage paperwork; or missing conditional/unconditional waivers (collectively, the "External Factors Payment Delays").

6. Once ATM received payment from the GC, ATM would send WHR its 50% prepayment.

7. ATM would request an unconditional progress waiver from WHR once WHR received its 50% prepayment, as required by the GC to issue any future payments to ATM.

8. Once material, which included WHR's products, was shipped to the project site, ATM would bill the remaining 50% balance to the GC.

9. ATM would then request from WHR the remaining 50% bill and a signed conditional final waiver. The 50% remaining bill, signed conditional final waiver, and signed, unconditional progress waiver was required by the GC to process a joint check to WHR.

10. Payment for the 50% remaining billing would be processed based on the GC's funding schedule. Payment could be delayed due to the External Factors Payment Delays.

11. Once payment was received from the GC, ATM would issue the final payment to WHR. If the GC sent payment via ACH, which sometimes happened despite there being a joint check agreement, then ATM would send WHR its final payment via ACH. If the GC made the final payment with a joint check, ATM would send the joint check to WHR.

12. ATM would then request an unconditional final waiver from WHR to close out the project order. The unconditional final progress waiver was required by the GC to issue ATM any future payments.

13. If WHR delayed signing the mandatory conditional waivers and unconditional waivers, that would then delay payment from the GC to ATM, as GCs would not process payments to ATM without the signed waivers.

(Brown Decl. ¶ 9). An authentic copy of the parties' June 27, 2023 agreement is attached as Exhibit A to the Brown Declaration. (Brown Decl. ¶ 10). Attached as Exhibit B to the Brown Declaration is an example of one of the JCAs agreed to by the parties after the June 27, 2023 agreement. (*Id.*)

> 2. *Payment Process from Mid-2025 to Petition Date*

In July 2025, the parties changed payment terms again, with WHR now requiring 100% prepayment before it would release product for fabrication and shipping. (Brown Decl. ¶ 11). This new requirement applied to jobs as to which ATM already held 50% prepayments agreements with WHR and the GC, and as to which WHR had already received 50% prepayment funds. (*Id.*) Contractually, ATM could not go back to the GCs and request an additional 50% prepayment on equipment the GC had not yet received. (*Id.*) This jeopardized ATM's contracts

due to the sudden change in terms imposed by WHR and delayed shipping, putting ATM in an even worse financial position. (*Id.*) The following projects were canceled by the general contractors since ATM could not commit to equipment delivery dates due to changes in payment terms by WHR. (Brown Decl. ¶ 11).

| 2023 Projects Canceled | General Contractor | Total Value of ATM Contract Lost |
|---|---|---|
| Tasman The Station | Johnstone Moyer | $207,419.16 |
| Maxwell North B | Johnstone Moyer | $150,605.02 |
| Maxwell South A | Johnstone Moyer | $150,613.14 |
| Napa Student Housing-Flex Bldg. | CBG | $127,259.89 |
| Napa Student Housing-Dorm Bldg. | CBG | $116,709.51 |
| Napa Student Housing-Apt Bldg. | CBG | $116,709.51 |
| | **Total** | $869,316.23 |

C.    <u>Persistent Quality Issues in WHR Products Causing Material Payment Delays by the General Contractors to ATM Were an Additional Complicating Factor in Calculating Amounts Owed to WHR</u>

Further complicating the parties' payment relationship and calculation of the amount owing from ATM to WHR is the fact that WHR's products were consistently defective and of poor and substandard quality, which resulted in extensive damage to ATM, including lost profits and opportunities, reputational harm, and which forced ATM to incur substantial out-of-pocket costs and expenses. (Brown Decl. ¶ 12).

As set forth in greater detail in Scott Brown's accompanying declaration, WHR's product-related breaches were extensive, years-long, continuing in nature, and include but are not limited to the following recent instances:

- February 2024 through June 2024, Job #SP07952, replacement trim and services required to correct defective through-wall trim with incorrect hole location;

- March 2024 through May 2024, Job #DI15611, replacement trim and services required to correct defective through-wall trim with incorrect hole location;

DEBTOR'S RESPONSE TO AMENDED OBJ. TO SUBCHAPTER V    6

- April 2024 through May 2024, Job #DI15465L2, replacement trim and services required to correct trim with incorrect keypad labels (several);

- May 2024 through June 2024, Job #DI15812, replacement part and services needed to correct faulty air solenoid;

- October 2024 through January 2025, Job #DI15668, replacement part and services needed to correct faulty through-wall door;

- October 2024, Job ID # DI1558-DI15581L2, replacement trim and services required to correct trim with incorrect keypad labels (approximately 38 doors affected);

- December 2024, Job ID# DI15932 L4,5,6, repair services for two D&S units required to fix leak caused by faulty units.

(Brown Decl. ¶ 13).

WHR failed to furnish non-defective, correct products in good working order and failed to adequately or timely respond to or address these issues, provide replacement products, or reimburse ATM for its costs associated with correcting these issues, causing ATM damages in excess of $400,000. (Brown Decl. ¶ 14). These persistent quality issues caused further complications in calculating the amounts due. (*Id*.) WHR may raise additional issues about contractual limitations on warranty-related claims, which the Court would need to determine, based on the parties' lengthy Course of Conduct, as discussed below. (*Id*.)

D.  <u>Given the Complexity of the Accounting, the Parties Became Unable to Agree on the Amount of the Outstanding Debt</u>

Given the complexity of the accounting issues, over time, the parties became unable to agree on the amount of the debt owed by ATM to WHR. In or around January 2024, ATM's CEO Scott Brown and Mr. Charlton George of WHR initiated an attempted reconciliation of outstanding obligations between the parties. (Brown Decl. ¶ 15). In parallel with this conversation, the accounting staff of ATM and WHR emailed back and forth regarding missing invoices, missing payment applications, and further clarifications regarding ATM's outstanding balance owing to WHR, which was frankly a confusing mess. (Declaration of Camille Cruz in Support of ATM's Response to Objection ("Cruz Decl."), ¶ 9).

E.      Until 2024, When the Parties' Relationship Had Further Soured Due to Many Issues, Including the Persistent Quality Issues Plaguing WHR's Products, WHR Never Demanded Interest on Unpaid Amounts

WHR sent numerous collection notices to ATM; however, none of these notices demanded interest accrued due to nonpayment.  (Cruz Decl. ¶ 4).  Nor did ATM ever receive a statement, invoice, or collection notice from WHR for interest.  (Brown Decl. ¶ 16).  It was not until 2024, when the parties' relationship had soured for various reasons, no small part of which were the persistent quality issues plaguing WHR's products, and ATM having had to cancel contracts totaling $869,316.23 due to WHR's refusal to ship products, that WHR started demanding interest for the first time in the parties' relationship.  (*Id.*)  This demand for interest came as a complete surprise to ATM, given WHR's failure to charge interest on past due amounts since 2007.  (*Id.*)

F.      The Parties Failed in Their Efforts to Negotiate a Resolution and WHR Filed a Lawsuit in Florida

The parties were unable to reach agreement regarding the amount ATM owed to WHR.  (Brown Decl. ¶ 17).  On July 5, 2024, WHR filed a lawsuit against ATM, alleging that the amount owing was $1,883,859.79 "plus interest."  (George Decls. Ex. C).  The disagreement between the parties regarding the amount owed by ATM to WHR was a driving force behind ATM's Chapter 11 filing.  (Brown Decl. ¶ 17; *accord* ECF 3, Brown Decl. ISO First Day Motions, ¶ 14).

While the parties reached an agreement in principle to settle their disputes during settlement negotiations (George Decls. Ex. B), that agreement was never formalized.  (Brown Decl. ¶ 18).  ATM never gave WHR permission to use protected settlement communications as evidence of ATM's debt to WHR, and ATM has never agreed with WHR's calculations of ATM's debt to WHR.  (*Id.*)

ATM disputes the unliquidated calculation of its alleged obligation to WHR.  (ECF 1, Schedule F, ECF p. 135); (Brown Decl. ¶ 19).  ATM calculates the total amount owing to WHR as of the petition date as $1,611,629.25 (Cruz Decl. ¶ 21).  It is ATM's position that no interest is

due on these unpaid invoices based on the parties' course of conduct, as evidenced by the fact that WHR did not ever require ATM to pay interest, despite years of ATM being late on its payments. (Brown Decl. ¶¶ 8, 16, 19); *see* Cruz Decl. ¶ 4 ("Notably, none of the collection notices sent from 2020 to 2025 from both Ms. Torres and Mr. Poveda [of WHR] reflect any interest or penalty fees accrued due to nonpayment.").

G.    ATM's Liquidated, Non-Insider Liabilities as of the Petition Date Total Under $3,424,000

The Debtor's *total* scheduled secured and unsecured debts as of the petition date are $3,376,123.35. (ECF 1, ECF p. 137). Excluding the liquidated debt to insider Scott Brown in the sum of $270,833.33 for deferred salary (ECF 1, ECF p. 122) and the debt scheduled to WHR as unliquidated and disputed in the sum of $1,883,859 (*i.e.* the amount in WHR's prepetition complaint, ECF 1, ECF p. 135), the Debtor's scheduled, aggregate liquidated debts to non-insiders as of the petition date total $1,221,431.02, well within the eligibility limit of $3,424,000.

H.    Even WHR Is Having Trouble Calculating the Amount It Was Owed as of the Petition Date

On November 13, 2025, WHR filed its original objection to ATM's SubChapter V eligibility, claiming that it was unequivocally owed $4,858.382.45 as of the petition date, comprised of unpaid invoices totaling $2,541,732.48 and interest totaling $2,316,649.97. (Original Obj., ECF 61, p. 1:24–28; Original George Decl., ECF 62, ¶ 13). These calculations were supported by the sworn testimony of WHR employee, Charlton George, who attested to these sums and further attested that "[i]n my capacity at WHR, I am familiar with WHR's invoicing and accounts receivable records pertaining to the Debtor and attest that the invoices and interest calculations supporting the Claim [comprised of unpaid invoices totaling $2,541,732.48 and interest totaling $2,316,649.97] are accurate based on WHR's business records kept in the ordinary course of business." (Original George Decl., ECF 62, ¶ 14).

Despite the precision to the penny of the claim amount in WHR's original moving papers, that amount has now changed, apparently because its calculation is so confusing that even WHR can calculate it accurately, based on its records. (ECF 80, ECF pp. 9:10–10:18). Mr.

George now attests to a new number with confidence and precision, claiming that WHR's own review of its accounting revealed an error its calculations, due to the parties' changes in payment process, beginning in "late 2023" (per WHR, although ATM contends that the change was in mid-2023) and that "[t]his deviation in WHR's normal payment and accounting practices with respect to the Debtor resulted in errors surrounding WHR's application of deposits and/or joint checks to specific invoices in later 2023 and 2024." (Am. George Decl., ECF 80-1, ¶ 13). Under its new calculations, according to WHR ATM now owes $3,819,645.46 (*Id.*, ¶ 14 and Ex. G), an eye popping $1,038,736.99 less than the amount claimed was owing as of the petition date in its first-filed objection on November 13, 2025.

## III.    SUMMARY OF THE LAW

ATM concedes that it bears the burden of proof of establishing its eligibility for SubChapter V by a preponderance of the evidence. ATM has met that burden.

### A.    Debtors Such as ATM, with Less than $3,424,000 in Liquidated Noncontingent Secured and Unsecured Debts as of the Petition Date Are Eligible for SubChapter V

The Bankruptcy Code limits SubChapter V eligibility to (51D), the term "small business debtor"—

> (A) subject to subparagraph (B), means a person engaged in commercial or business activities (including any affiliate of such person that is also a debtor under this title and excluding a person whose primary activity is the business of owning single asset real estate) that has aggregate noncontingent liquidated secured and unsecured debts **as of the date of the filing of the petition** or the date of the order for relief in an amount not more than $3,424,000 (excluding debts owed to 1 or more affiliates or insiders) not less than 50 percent of which arose from the commercial or business activities of the debtor.

11 U.S.C. §101(51D) (emphasis added). The definition of SubChapter V provides for calculation of the Debtor's aggregate noncontingent liquidated secured and unsecured debts "as of the date of the filing of the petition."

The Debtor's *total* scheduled secured and unsecured debts as of the petition date are $3,376,123.35. (ECF 1, ECF p. 137). Excluding the liquidated debt to insider Scott Brown in the sum of $270,833.33 for deferred salary (ECF 1, ECF p. 122) and the debt scheduled to WHR

as unliquidated and disputed in the sum of $1,883,859 (*i.e.* the amount in WHR's prepetition complaint, ECF p. 135), the Debtor's scheduled aggregate liquidated debts to noninsiders as of the petition date total $1,221,431.02, well within the eligibility limit of $3,424,000.

B.    Whether a Debt Is Liquidated Turns on Whether It Is Subject to Ready Determination and Precision in Computation of the Amount Due

WHR correctly cites *Slack v. Wilshire Ins. Co. (In re Slack)*, 187 F.3d 1070, 1074 (9th Cir. 1999), as the rule in the Ninth Circuit regarding the definition of a "liquidated" debt: "The question of whether a debt is liquidated 'turns on whether it is subject to ready determination and precision in computation of the amount due."[2] (Am. Obj., ECF 80, p. 8:8–10). This rule of "subject to ready determination and precision in computation in amount due" predates *Slack* and arose from cases interpreting "liquidated" for purposes of 11 U.S.C. § 109(e) eligibility for Chapter 13 relief. *See Sylvester v. Dow Jones & Co., Inc. (In re Sylvester)*, 19 B.R. 671, 673 (B.A.P. 9th Cir. 1981) (quoting *In re Bay Point Corp.*, 1 B.C.D. 1635 (D.N.J. 1975) ("The concept of liquidation has been variously expressed. The common thread … has been ready determination and precision in computation of the amount due …."); *In re Fostvedt*, 823 F.2d 305, 306 (9th Cir. 1987) (agreeing with *Sylvester*).

"The definition of 'ready determination' turns on the distinction between a simple hearing to determine the amount of a certain debt, and an extensive and contested evidentiary hearing in which substantial evidence may be necessary to establish amounts or liability." *Slack*, 187 F.3d at 1073–74 (quoting *In re Wenberg*, 94 B.R. 631, 633 (B.A.P. 9th Cir. 1988), *aff'd*, 902 F.2d 768 (9th Cir. 1990)); *see also Nicholes v. Johnny Appleseed (In re Nicholes)*, 184 B.R. 82, 89 (B.A.P. 9th Cir. 1995) ("The test for 'ready determination' is whether the amount due is fixed or certain or otherwise ascertainable by reference to an agreement or by a simple computation."). However, a finding of liability is not necessary for a debt to be liquidated. The law in the Ninth

---

[2] But note, in *Ho v. Dowell (In re Ho)*, 274 B.R. 867, 874 (B.A.P. 9th Cir. 2002), the BAP criticized the *Slack* court for omitting the last sentence of its discussion in quoting *Nicholes*, "which made it clear that a dispute about liability could, under certain circumstances, affect whether a debt is liquidated." The *Ho* panel clarified that *Slack* should not be read to remove issues of liability from the determination of whether a debt is liquidated or unliquidated. *Id.*

DEBTOR'S RESPONSE TO AMENDED OBJ. TO SUBCHAPTER V                                    11

Circuit is that a "debt is liquidated if the amount is readily ascertainable, notwithstanding the fact that the question of liability has not been finally decided." *Slack*, 187 F.3d at 1075. This is mostly consistent with Judge Bonapfel's Subchapter V Update (March 2024), pp. 48–49,[3] wherein he quotes the summary provided by *In re Hall*, 650 B.R. 595, 599 (Bankr. M.D. Fla. 2023) ("[C]ourts have generally held that a debt is liquidated if its amount is readily and precisely determinable, where the claim is determinable by reference to an agreement.").

WHR quotes *Hall* for the proposition that "[u]nder the plain language of 11 U.S.C. § 1182, disputed debts are not excluded from the [Subchapter V] debt limit." (Am. Obj., ECF 80, p. 6:21–22). However, the Ninth Circuit has found this reading of the statutory language too rigid, and it is not the standard as discussed below. Regardless, this is a red herring, because a debt can be *both* disputed and unliquidated, as here, because the amount of the debt between the parties requires extensive determinations by a trier of fact, as discussed below.

C.     A Dispute Such as the Dispute at Issue Between ATM and WHR Renders a Debt Unliquidated If It Makes a Claim not "Readily Determinable."

A disputed debt can also be (and here is) unliquidated. The Ninth Circuit Bankruptcy Appellate Panel ("BAP") has repeatedly observed that a dispute *can* render a debt unliquidated if it makes a claim not "readily determinable." *Nicholes*, 184 B.R. at 91 (considering § 109(e) eligibility, if "a debt is subject to ready determination and precision in computation of the amount due, then it is considered liquidated and included for eligibility purposes … regardless of any dispute. … [I]f the dispute itself makes the claim difficult to ascertain or prevents the ready determination of the amount due, the debt is unliquidated and excluded from … computation."); *Ho*, 274 B.R. at 874 ("a dispute about liability could, under certain circumstances, affect whether a debt is liquidated"); *Fountain v. Deutsche Bank Nat'l Tr. Co. (In re Fountain)*, 612 B.R. 743, 749 (B.A.P. 9th Cir. 2020) (quoting *Nicholes*). This is because the rule is "[a] debt is liquidated if it is capable of 'ready determination and precision in computation of the amount due.'" *Nicholes*, 184 B.R. at 89 (quoting *Fostvedt*, 823 F.2d at 306).

---

[3] https://www.flmb.uscourts.gov/judges/tampa/mcewen/SubchapterV.pdf

The BAP in *Nicholes* recognized that the term "disputed" is broad and can encompass either liquidated or unliquidated debts; and involve the liability for a claim, the amount of a claim, or both. 184 B.R. at 89. Surveying cases, *Nicholes* found courts are divided over whether a debt is unliquidated when there is a dispute as to liability or amount, with the cases generally following one of three views: (1) a dispute as to liability or amount renders a debt unliquidated; (2) a dispute over liability or amount does not render a debt unliquidated; and (3) a dispute *may* render a debt unliquidated if it prevents the ready determination of a claim. *Id*. at 89–90 (collecting cases). The BAP adopted this last view in *Wenberg*, 94 B.R. at 634–35, which the Ninth Circuit affirmed. 902 F.2d 768.

In *Wenberg*, the BAP analyzed the interplay between "disputed" debts and "unliquidated" debts in the context of *Sylvester*'s measure of "ready determination." 94 B.R. at 634–35. Ready determination turns on the distinction between a simple hearing to determine the amount of a certain debt, and an extensive and contested evidentiary hearing in which substantial evidence may be necessary to establish amounts or liability. *Id*. at 634. As the *Nicholes* panel put it, "it is the *nature* of the dispute, and not the *existence* of the dispute, that makes a claim unliquidated." 184 B.R. at 90 (emphasis added).

Here, the nature of the dispute between ATM and WHR makes WHR's claim unliquidated, because a trier of fact must determine the impact of the parties' Course of Conduct to interpret the 2007 Contract, which is governed by the Uniform Commercial Code, as discussed below.

>    D.    Under the Uniform Commercial Code, the Parties' Course of Performance,
>    Course of Dealing, and Usage of Trade Must Be Determined by a Trier of Fact to
>    Determine ATM's Liability to WHR Under the 2007 Contract

Contracts for the sale of goods, such as the 2007 Contract, are governed by the Uniform Commercial Code. *See* Fla. Stat. § 672.201; *accord* Cal. Comm. Code § 2201.[4] Under the

---

[4] The 2007 Contract provides for Florida as the governing law; however, both Florida and California have adopted the Uniform Commercial Code, including UCC § 1-303, and thus the state laws are consistent in this respect. Most states have also adopted the exact same provisions of the UCC within their own statutory codes, so case law interpreting the UCC is often uniform among various jurisdictions.

Uniform Commercial Code, the meaning of an agreement is to be determined by the language used by the parties _and_ by their actions, read and interpreted in the light of commercial practices and other surrounding circumstances. *See* Fla. Stat. § 671.201(3). The measure and background for interpretation are set by the commercial context, which may explain and supplement even the language of a formal or final writing, such as the 2007 Contract. Fla. Stat. § 671.205, Official Comment 1; *accord* Cal. Comm. Code § 1303. Specifically, the following definitions and rules apply to the interpretation of the 2007 Contract:

> (5) *Except as otherwise provided in subsection (6)*, the express terms of an agreement and any applicable course of performance, course of dealing, or usage of trade must be construed whenever reasonable as consistent with each other. If such a construction is unreasonable:
>
>> (a) Express terms prevail over course of performance, course of dealing, and usage of trade;
>>
>> (b) Course of performance prevails over course of dealing and usage of trade; and
>>
>> (c) Course of dealing prevails over usage of trade.
>
> (6) *A course of performance is relevant to show a waiver or modification of any term inconsistent with the course of performance*.
>
> (7) Evidence of a relevant usage of trade offered by one party is not admissible unless that party has given the other party notice that the court finds sufficient to prevent unfair surprise to the other party.

Fla. Stat. § 671.205; *accord* Cal. Comm. Code § 1303 (emphasis added).

The UCC defines course of performance, course of dealing, and usage of trade as follows:

> (1) A 'course of performance' is a sequence of conduct between the parties to a particular transaction that exists if:
>
>> (a) The agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and

---

*See Allapattah Servs. v. Exxon Corp.*, 188 F.R.D. 667, 671 (S.D. Fla. 1999). Accordingly, the Court is permitted to give persuasive weight to cases interpreting the UCC as it is adopted in states other than Florida. *Exim Brickell, LLC v. Bariven*, 2011 U.S. Dist. LEXIS 174564, at *50 (S.D. Fla. Aug. 16, 2011) (citing *General Matters, Inc. v. Paramount Canning Co.*, 382 So. 2d 1262, 1264 n.3 (Fla. Dist. Ct. App. 1980) (relying on Ninth Circuit case that interpreted Oregon's version of UCC because that statute was identical to Florida statute)).

DEBTOR'S RESPONSE TO AMENDED OBJ. TO SUBCHAPTER V                    14

(b) The other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection.

(2) A 'course of dealing' is a sequence of conduct concerning previous transactions between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

(3) A 'usage of trade' is any practice or method of dealing having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts. If it is established that such a usage is embodied in a written trade code or similar record, the interpretation of the record is a question of law.

(4) A course of performance or a course of dealing between the parties or usage of trade in the vocation or trade in which they are engaged or of which they are or should be aware is relevant in ascertaining the meaning of the parties' agreement, may give particular meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement. A usage of trade applicable in the place in which part of the performance under the agreement is to occur may be so utilized as to that part of the performance.

*Id.* In other words, a "course of dealing" looks at the parties' conduct before the contract, while the "course of performance" analyzes the parties' conduct after contract formation. *Enkidin, LLC v. Weisbard*, 2024 Colo. App. LEXIS 1752, at *9–27 (Colo. Ct. App. June 20, 2024) (finding genuine issues of material fact existed regarding whether a payment-on-delivery contract existed after a certain date where manufacturer did not enforce such requirement).

Under both the UCC and Florida contract law, whether a contract has been modified is a question of fact for the jury. *E.g.*, *Kiwanis Club v. De Kalafe*, 723 So. 2d 838, 841 (Fla. Dist. Ct. App. 1998) ("Whether a written contract has been modified by subsequent oral agreement or by course of dealing is a question of fact for the jury."); *White v. Ocean Bay Marina, Inc.*, 778 So. 2d 412 (Fla. Dist. Ct. App. 2001) (record demonstrated genuine issues of material fact remained regarding whether the parties orally modified lease making summary judgment improper); *see also Reser's Fine Foods, Inc. v. Bob Evans Farms, Inc.*, 2016 U.S. Dist. LEXIS 90732, at *18–19 (D. Or. July 13, 2016) (whether the parties' extended their agreement and waived its written modification requirement through their course of conduct "requires sifting through and weighing facts and testimony in the context of the parties' [] relationship, and that task is reserved to the

finder of fact"); *Wright v. State Farm Mut. Auto. Ins. Co.*, 223 Or. App. 357, 371–72, 196 P.3d 1000 (Or. Ct. App. 2008) (conduct arguably inconsistent with a written contract term raises issue of fact as to waiver of that term). Here, the Court is needed to determine the effect of the parties' Course of Conduct from October 2007 through the September 15, 2025 petition date, to determine the amount of ATM's liability to WHR under the 2007 Contract. There are many facts to be sifted through and weighed to arrive at a determination of ATM's liability over the course of many years, including the effect of the June 2023 JCA Agreement on the 2007 Contract and the wholly separate issue of whether WHR modified its contractual right to interest or waived that right to interest by never invoicing or otherwise billing for interest on past due amounts owed by ATM. Although the parties are now closer in their calculation of the unpaid invoices ($1,611,629.25, per ATM, versus $1,668,336.28, per WHR's revised, most recent calculations as of December 23, 2025), it is clear that the debt was not capable of ready determination and precision in computation of the amount due as of the petition date, even under WHR's own calculations.

In addition, although the express terms of a contract (here, interest) generally prevail over course of dealing, course of performance and usage of trade (Fla. Stat. § 671.205(5)), a "course of performance is relevant to show a waiver or modification of any term inconsistent with the course of performance." *Id*. at 671.205(6). A "course of performance" is a sequence of conduct between the parties to a particular transaction that exists if: (a) the agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and (b) the other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection. *Id*. at 671.205(1). Here, the course of performance between the parties involved repeated occasions for WHR to charge ATM interest but never doing so; ATM to pay WHR over numerous transactions spanning more than 17 years; and WHR, with knowledge of ATM's performance and opportunity for objection to it, accepting ATM's performance and acquiescing without objection, thus modifying or at a bare minimum waiving the section in the 2007 Contract providing for interest on payments made more than 30 days after delivery.

Due to the parties' prolonged and changing course of conduct, a trial is needed for the Court to determine the parties' Course of Conduct from October 2007 to September 15, 2025. These determinations must be made by a trier of fact, and they require extensive factual determinations. *E.g.*, *Exim Brickell, LLC v. Bariven*, 2011 U.S. Dist. LEXIS 174564, at *2, 119–20 (S.D. Fla. Aug. 16, 2011) (two-week bench trial and extensive pre- and post-trial submissions, including analyzing 22 shipments from seller to buyer and finding buyer had the right to pre-shipment inspection supervisions, it knew of that right, but repeated conduct for most of the installments under the contract demonstrated a clear intention to relinquish that right under Florida's UCC waiver doctrine);[5] *Metal Seal Precision, Ltd. v. Good Time Outdoors, Inc*., 2018-Ohio-5326, at P62–P65, 128 N.E.3d 678 (Ohio Ct. App. 2018) (upholding trial court's findings that the parties' course of performance under Ohio's version of UCC § 1-303 demonstrated a "flexible" relationship relevant to explain or supplement their agreement and to show a waiver or modification of any term inconsistent with the course of performance where the parties modified purchase order terms on an almost monthly basis; each party regularly failed to comply with purchase order terms due to their circumstances and market conditions; and each party acquiesced to the other's nonconforming performance); *Glenn Distribs., Corp. v. Heckitt Benckiser, LLC*, 2015 Phila. Ct. Com. Pl. LEXIS 113 (Pa. Ct. Com. Pl. Apr. 27, 2015) (analyzing a twelve year-long business relationship and finding the parties' contracts were modified by their course of performance where buyer never objected to receiving less product that it listed on its purchase orders, demanded fulfillment of those orders, or gave reasonable notice it was going to change the course of performance); *Alessi Equip., Inc. v. Am. Piledriving Equip., Inc*., 2025 U.S. App. LEXIS 20500, at *5 n.3, 6–8, 160 F.4th 38 (2d Cir. 2025) (district court correctly reserved issue whether buyer was entitled to a twenty-percent discount for a four-day damages trial where a jury heard witness testimony of course of conduct that showed the parties agreed to the

---

[5] The Eleventh Circuit has interpreted the waiver doctrine under Florida's UCC as requiring (1) the existence at the time of the waiver of a right, privilege, advantage, or benefit which may be waived; (2) the actual constructive knowledge thereof; and (3) an intention to relinquish such right, privilege, advantage, or benefit. *Exim Brickell, LLC*, 2011 U.S. Dist. LEXIS 174564, at *119 (citing *BMC Indus., Inc. v. Barth Indus., Inc*., 160 F.3d 1322, 1332- 33 (11th Cir. 1998)).

discount); *Farmers State Bank v. Farmland Foods, Inc.*, 225 Neb. 1, 4–6, 402 N.W.2d 277 (Neb. 1987) (refusing to disturb a jury's determination as to borrower's waiver defense where the bank, by its long course of conduct of not requiring borrower to obtain the bank's permission to sell collateral without its written consent on more than 130 occasions over a six-year period, had by implication consented to the sales and waived its rights in the collateral). "One basis for excluding a disputed debt may be where the nature of the dispute renders the debt unascertainable and, therefore, unliquidated." *In re Smith*, 2005 Bankr. LEXIS 3694, at *2–3 (Bankr. D. Ariz. Dec. 13, 2005) (citing *Ho*, 274 B.R. at 875).

The Course of Conduct cannot support WHR's charging of interest when it never charged interest on late paid invoices over a period going back many years. (*See* George Decls. Ex. G showing past due amounts beginning in 2014.) The parties' conduct diverged from their written agreement. To determine whether a writing constitutes the final expression of the parties, multiple factors should be considered including evidence of trade usage, course of dealing, and course of performance. *Allapattah Servs. v. Exxon Corp.*, 61 F. Supp. 2d 1308, 1315 (S.D. Fla. 1999) (citing *Nanakuli Paving & Rock Co. v. Shell Oil Co., Inc.*, 664 F.2d 772, 796–97 (9th Cir. 1981)). And of these factors under the UCC, actual performance provides the greatest weight to the parties' intentions and expectations because the parties themselves know best what they have meant by their words of agreement and their action under that agreement is the best indication of what that meaning was. *Id.* at 1315–16 (citation omitted in original).

In fact, the UCC's definition of "agreement" necessarily contemplates that the parties' obligations transcend the written words within the signed document and can arise by implication from other circumstances including course of dealing or usage of trade or course of performance. *Id.* at 1315; Fla. Stat. § 671.201(3). This is consistent with Florida law where "[t]he law has clearly been established that a written contract may be modified by a subsequent oral agreement or subsequent conduct of the parties, even though the written contract purports to prohibit such modification." *Beach Higher Power Corp. v. Granados*, 717 So. 2d 563, 565 (Fla. Dist. Ct. App. 1998). "[I]t is of no moment that the written agreement is unambiguous and, hence, cannot be rewritten by the court." *White*, 778 So. 2d at 412. "Evidence of a subsequent oral modification

is admissible even where the writing contains a merger clause." *Beach Higher Power Corp.*, 717 So. 2d at 565 (quoting *F.M.W. Props., Inc. v. Peoples First Fin. Sav. and Loan Ass'n*, 606 So. 2d 372, 375 (Fla. 1st DCA 1992)). Even where an attempt at modification or rescission does not satisfy the requirements of Florida Statute § 672.209(2) or (3), it can nonetheless operate as a waiver. Fla. Stat. § 672.209(4).

Although WHR seems to read the law wrong (*i.e.*, always counting disputed debts towards the Sub V limit), WHR's argument is that its claim (previously ~$4.86 million and now $3.83 million) "is subject to ready determination based upon a simple review of WHR's accounting records, the invoices, amounts paid to WHR by the Debtor, and calculation of simple interest." (Am. Obj., ECF 80, p. 10:8–10). This is simply wrong. Here, as explained in detail above, the calculation of the amount owing requires an analysis of the parties' Course of Conduct since 2007 because that ultimately affects whether a significant amount WHR alleges it is owed under the 2007 Contract exists at all.

WHR preemptively argues that the Debtor cannot use any claim of offset to render WHR's claim unliquidated. (Am. Obj., ECF 80, pp. 10:13–11:11). This misses the mark and ignores the effect of the parties' Course of Conduct since 2007 and its relevance to a determination of what amounts were owing as of the petition date. "The right of setoff … allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'" *In re Hofmann*, 2025 Bankr. LEXIS 2153, at *14 (Bankr. E.D. Cal. Aug. 29, 2025) (quoting *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 133 L. Ed. 2d 258, 116 S. Ct. 286, 289 (1995)). A trier of fact's determination of the parties' Course of Conduct is not to resolve a dispute over the existence, validity, or amount of a second and independent debt raised and asserted as an offset in an attempt to reduce the amount of the first debt. Setoff does not render the first debt unliquidated because the assertion of a second debt does not create any uncertainties with regard to the liability underlying the amount due upon the first debt. ATM does not argue any rights of setoff at this juncture. Rather, the parties' Course of Conduct raises uncertainty whether any interest is due at all and critically determines the amount due to WHR.

The *nature* of the dispute makes a claim unliquidated. The dispute must ultimately affect the amount owed, and not just the Debtor's liability for the debt. Here, the amount due cannot be computed by reference to invoices alone because the Court must consider the parties' Course of Conduct and the applicability of the terms of the 2007 Contract in that context.

E.    The Court Should Strike All Improperly Filed and Inadmissible Evidence Regarding the Parties Settlement Discussions

WHR improperly seeks to admit into evidence documents from the parties' settlement discussions. (George Decls. Ex. B). The Court should strike this evidence, because it cannot be used as evidence of liability. Fed. R. Evid. 408(a); *accord*, Fla. Stat. § 90.408 ("Compromise and offers to compromise.—Evidence of an offer to compromise a claim which was disputed as to validity or amount, as well as any relevant conduct or statements made in negotiations concerning a compromise, is inadmissible to prove liability or absence of liability for the claim or its value."); *accord* Cal. Evid. Code § 1152(a). Even if such evidence were admissible to prove liability – and it is not, regardless of whether the Court applies Federal, Florida, or California law – even WHR does not believe that the parties' settlement term sheet dated January 2024 reflected the correct amount of ATM's liability to WHR ($4.2M). WHR's lawsuit filed six months later in July 2024 alleged liability of $1,883,859.79 "plus interest," *i.e.* an unliquidated amount of interest, to be determined by a trier of fact. If WHR thought that ATM owed it $4,200,000 instead of $1,883,859.79, it could have alleged that amount, but it tellingly did not do so.

## IV.    CONCLUSION

For the reasons set forth above, ATM's debt to WHR is unliquidated. ATM does not exceed the debt limits for SubChapter V, and WHR's Objection should be denied.

Dated January 8, 2026                              FINESTONE HAYES LLP


                                                    /s/ Jennifer C. Hayes
                                                    Stephen D. Finestone
                                                    Jennifer C. Hayes
                                                    Attorneys for American Trash Management,
                                                    Inc., Debtor-in-Possession