1  Stephen D. Finestone (125675)
   Jennifer C. Hayes (197252)
2  FINESTONE HAYES LLP
   456 Montgomery Street, Suite 1300
3  San Francisco, CA 94104
   Tel.:   (415) 421-2624
4  Fax:    (415) 398-2820
   Email: sfinestone@fhlawllp.com
5  Email: jhayes@fhlawllp.com

6  Attorneys for American Trash Management, Inc.
   Debtor-in-Possession

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re<br><br>AMERICAN TRASH MANAGEMENT, INC.,<br><br>Debtor-in-Possession. | Case No. 25-30743-HLB<br><br>Chapter 11, Subchapter V<br><br>**DECLARATION OF SCOTT BROWN IN SUPPORT OF DEBTOR'S RESPONSE TO OBJECTION TO DEBTOR'S SUBCHAPTER V ELIGIBILITY BY WHR HOLDINGS, LLC**<br><br>Date:   January 22, 2026<br>Time:  10:00 a.m.<br>Ctrm:  Via Zoom or In-Person, at<br>         Courtroom 19, 450 Golden Gate Ave.<br>         16th Floor, San Francisco, CA |

I, Scott Brown, declare as follows:

1. I am the current Chief Executive Officer of American Trash Management, Inc. ("ATM" or the "Debtor"). I make this declaration in support of the Debtor's response to the Objection to Debtor's Subchapter V Eligibility by WHR Holdings, LLC (the "Objection"). All statements in this declaration are based on my own personal knowledge and observation, or upon information and belief based upon my review of the Debtor's business records in this case. If

called to testify on this matter, I could and would competently testify to the matters set forth herein.

***ATM and WHR Entered Into a "Manufacturer's Agreement" in 2007***

2. The 2007 Contract (as defined in the accompanying Opposition Brief) served as the initial building block to the parties' relationship, whereby ATM effectively purchased WHR's Southern California operation. Specifically, ATM paid $75,000 for the WHR inventory and assumed rental payments for the WHR facility in Southern California. ATM hired WHR's employees and, on behalf of WHR, collected several hundred thousand dollars in accounts receivable owing to WHR. ATM also assumed the obligations for thirteen WHR projects totaling approximately $100,483 and subsequently fulfilled these contracts.

3. ATM could have found an alternative chute manufacturer to represent, without spending $75,000 for inventory, hiring WHR employees and helping WHR collect receivables and fulfill contracts. ATM entered into the 2007 Contract, however, because it wanted to be part of WHR, given its product position in the California marketplace. WHR, by selling its Southern California business to ATM, was also making an investment, as illustrated by section 6(h) in the 2007 Contract, which provides for ATM's <u>vigorous promotion</u> of WHR's products - far more than a standard distributor would be required to undertake.

4. Other than joining ATM and WHR in a go-forward project, the parties did not adhere to the terms of the 2007 Contract. Instead, over the course of the parties' more than 17 years of doing business together, they followed a changing course of conduct.

***The Parties' Changing Course of Conduct Over the Years Was Inconsistent with the Terms of the 2007 Contract, and Largely Ignored the Provisions of that Contract***

5. The terms of the 2007 Contract were largely ignored by the parties from its inception. An important example of this were the terms of ATM's payment obligation to WHR. The 2007 Contract provides for payment in 30 days from the time of shipment. However, this payment cycle was never followed.

6. Going back to 2012, ATM was paying deposits against purchase orders it issued to WHR for jobs, despite deposits not being a required by the 2007 Contract. After that, ATM

was generally always behind in payments, due to multiple factors, including a dysfunctional Chief Operating Officer, who was failing in his job, unbeknownst to ATM until the COO suffered a personal tragedy in mid-2022, and the seriousness of the COO's work dysfunction came to light.

7. Several examples of the lengthy delays in payments over the years are as follows:

| Check#268384, dated 4/9/2020 in the sum of $62,782.80 | Paid more than 57 invoices dated in 2018 | No interest charged by WHR or paid by ATM. |
|---|---|---|
| Check# 269147 (1/20/2021) in the sum of $47,456.20 and Check#269240 (2/26/2021) in the sum of $47,456.50 | Paid WHR Invoice DI1536B dated 9/14/20; terms on this invoice were 45 days | No interest charged by WHR or paid by ATM. |
| Check# 269718 (7/20/2021) in the sum of $78,591.33 | Paid over 50 invoices dated in 2016 | No interest charged by WHR or paid by ATM. |
| Check# 270605, dated 4/07/2022 in the sum of $105,885.80 | Paid approx. 56 invoices dated in 2015 | No interest charged by WHR or paid by ATM. |
| ACH Pmt#5643409 dated 3/17/2023 in the sum of $15,540.00 | Paid WHR Invoice DI16885 dated 11/19/21; terms on this invoice were 45 days | No interest charged by WHR or paid by ATM. |

8. Despite the lengthy payment delays spanning years, WHR never charged interest on the overdue amounts.

***The Payment Process from Mid-2023 to Mid-2025***

9. The absence of interest charges, which was the course of conduct followed by the parties for many years, significantly changed in mid-2023. On or about June 27, 2023, ATM and WHR agreed to a new payment program whereby all of ATM's purchases of WHR equipment had to be made either with a (1) Joint Check Agreement ("JCA") in place; or (2) by prepayment (primarily for parts). The complicated new JCA process adopted and followed by the parties beginning in June 2023 worked as follows:

    i. ATM would be awarded a new project.

    ii. ATM would prepare the JCA and send it to the general contractor ("GC") for signature. Once signed, the JCA would be sent to WHR for execution.

iii. ATM would request a 50% prepayment bill and a signed conditional progress waiver from WHR to submit to the GC for the 50% prepayment billing submission. The 50% prepayment bill and signed conditional progress waiver was required by the GCs to process a joint check to WHR.

iv. ATM would submit the 50% prepayment billing to the GC.

v. Payment of the 50% prepayment billing would be processed based on the GC's funding schedule. Payment could be delayed due to external factors outside of ATM's control. Examples include a project awaiting funding, which could range from 30-90 days; ownership holding funds due to the project's noncompliance with prevailing wage paperwork; or missing conditional/unconditional waivers (collectively, the "External Factors Payment Delays").

vi. Once ATM received payment from the GC, ATM would send WHR its 50% prepayment.

vii. ATM would request an unconditional progress waiver from WHR once WHR received its 50% prepayment, as required by the GC to issue any future payments to ATM.

viii. Once material, which included WHR's products, was shipped to the project site, ATM would bill the remaining 50% balance to the GC.

ix. ATM would then request from WHR the remaining 50% bill and a signed conditional final waiver. The 50% remaining bill, signed conditional final waiver, and signed, unconditional progress waiver was required by the GC to process a joint check to WHR.

x. Payment for the 50% remaining billing would be processed based on the GC's funding schedule. Payment could be delayed due to the External Factors Payment Delays.

xi. Once payment was received from the GC, ATM would issue the final payment to WHR. If the GC sent payment via ACH, which sometimes

happened despite there being a joint check agreement, then ATM would send WHR its final payment via ACH. If the GC made the final payment with a joint check, ATM would send the joint check to WHR.

    xii.    ATM would then request an unconditional final waiver from WHR for the 50% remaining billing to close out the project order. The unconditional final progress waiver was required by the GC to issue ATM any future payments.

    xiii.    If WHR delayed signing the mandatory conditional waivers and unconditional waivers, that would then delay payment from the GC to ATM, as GCs will not process payments to ATM without the signed waivers.

10. An authentic copy of the parties' June 27, 2023 agreement is attached as Exhibit A. Attached as Exhibit B is an authentic copy of one of the JCAs agreed to by the parties after the June 27, 2023 agreement. The JCAs were materially consistent with Exhibit B.

***The Payment Process from Mid-2025 to the Petition Date***

11. In July 2025, the parties changed payment terms again, with WHR now requiring 100% prepayment before it would release product for fabrication and shipping. This new requirement applied to jobs as to which ATM already held 50% prepayments agreements with WHR and the GC, and as to which WHR had already received 50% prepayment funds. Contractually, ATM could not go back to the GCs and request an additional 50% prepayment on equipment the GC had not yet received. This jeopardized ATM's contracts due to the sudden change in terms imposed by WHR and delayed shipping, putting ATM in an even worse financial position. The following projects were canceled by the general contractors since ATM could not commit to equipment delivery dates due to WHR's unilateral changes in payment terms.

| 2023 Projects Canceled | General Contractor | Total Value of ATM Contract Lost |
|---|---|---|
| Tasman The Station | Johnstone Moyer | $207,419.16 |
| Maxwell North B | Johnstone Moyer | $150,605.02 |
| Maxwell South A | Johnstone Moyer | $150,613.14 |
| Napa Student Housing-Flex Bldg. | CBG | $127,259.89 |

| Napa Student Housing-Dorm Bldg. | CBG | $116,709.51 |
|---|---|---|
| Napa Student Housing-Apt Bldg. | CBG | $116,709.51 |
| | Total | $869,316.23 |

***Persistent Quality Issues in WHR Products Causing Material Payment Delays by the General Contractors to ATM Were an Additional Complicating Factor in Calculating Amounts Owed to WHR***

12. Further complicating the parties' payment relationship and calculation of the amount owing from ATM to WHR is the fact that WHR's products were consistently defective and of poor and substandard quality, which resulted in extensive damage to ATM, including lost profits and opportunities, and reputational harm, which forced ATM to incur substantial out-of-pocket costs and expenses.

13. The currently manufactured WHR chute intake doors lack the durability suitable for normal trash usage. ATM must regularly correct manufacturing defects during both the installation and warranty period because of these defective products. WHR door panels are very flimsy and can be flexed with bare hands. Their doors can easily be bent out of adjustment. This prevents the doors from completely closing. Additionally, the wings on the door panel that prevent the door from being opened past a certain point are also very flimsy. Even a little bit of pressure on the door panel will cause these wings to pop out of alignment, which causes the door to be stuck open. When this happens repeatedly, both the door panel and the hydraulic closure on door will fail. Like the door panels, the electrical interlocked components on the doors can also be easily knocked out of adjustment during the normal course of its usage. This causes the door to be stuck closed, and the interlock system will not work properly. Users will then try to force open the door, which can create further damage to the door. WHR door trim is incorrectly manufactured so it doesn't fit properly around the door. The trim pieces overlap the space between the door frame and the door panel, preventing the door from closing. When this happens, ATM must adjust and shift the door panel and redrill the holes from trim screws on trim

pieces since they are not drilled at the correct locations. If installed as is, the trim pieces will overlap the space between the door panel and the door frame. This doesn't happen on chute systems supplied by WHR competitors. Below are several examples of the ongoing warranty issues addressed by ATM on WHR chute projects. This is just a portion of the over 400 WHR chutes installed by ATM that required warranty work over the last several years. ATM has not been reimbursed for any of these warranty expenses, beyond receiving (in a few limited cases) replacement parts.

WHR's product-related breaches were extensive, years-long, continuing in nature, and include but are not limited to the following recent instances:

- February 2024 through June 2024, Job #SP07952, replacement trim and services required to correct defective through-wall trim with incorrect hole location;
- March 2024 through May 2024, Job #DI15611, replacement trim and services required to correct defective through-wall trim with incorrect hole location;
- April 2024 through May 2024, Job #DI15465L2, replacement trim and services required to correct trim with incorrect keypad labels (several);
- May 2024 through June 2024, Job #DI15812, replacement part and services needed to correct faulty air solenoid;
- October 2024 through January 2025, Job #DI15668, replacement part and services needed to correct faulty through-wall door;
- October 2024, Job ID # DI1558-DI15581L2, replacement trim and services required to correct trim with incorrect keypad labels (approximately 38 doors affected);
- December 2024, Job ID# DI15932 L4,5,6, repair services for two D&S units required to fix leak caused by faulty units.

14. WHR failed to furnish non-defective, correct products in good working order and failed to adequately or timely respond to or address these issues, provide replacement products, or reimburse ATM for its costs associated with correcting these issues, causing ATM damages in excess of $400,000. These persistent quality issues caused further complications in calculating the amounts due. WHR may raise issues about contractual limitations on warranty-related

claims, which the Court would need to determine, based on the parties' lengthy course of performance, course of conduct, and usage of trade, as discussed below.

***Given the Complexity of the Accounting, the Parties Became Unable to Agree on the Amount of the Outstanding Debt***

15. Given the complexity of the accounting issues, the parties were unable to agree on the amount of the debt owed by ATM to WHR. In or around January 2024, ATM's CEO Scott Brown and Mr. Charlton George of WHR began a conversation that initiated an attempted reconciliation of outstanding obligations between the parties.

***Until 2024, When the Parties' Relationship Had Further Soured Due to Many Issues, Including the Persistent Quality Issues Plaguing WHR's Products, WHR Never Demanded Interest on Unpaid Amounts***

16. WHR sent numerous collection notices to ATM; however, none of these notices demanded interest accrued due to nonpayment. Nor did ATM ever receive a statement, invoice, or collection notice from WHR for interest. It was not until 2024, when the parties' relationship had soured for various reasons, no small part of which were the persistent quality issues plaguing WHR's products, and ATM had customers cancel contracts totaling $869,316.23 due to WHR's refusal to ship products, that WHR started demanding interest for the first time in the parties' relationship. This demand for interest came as a complete surprise to ATM, given WHR's failure to charge interest on past due amounts, since the inception of the parties' relationship in 2007.

***The Parties Failed in Their Efforts to Negotiate a Resolution and WHR Filed a Lawsuit in Florida***

17. The parties were unable to reach agreement regarding the amount ATM owed to WHR. WHR then filed a lawsuit against ATM in July of 2024. The disagreement between the parties regarding the amount owed by ATM to WHR was a driving force behind ATM's chapter 11 filing.

18. While the parties reached an agreement in principle to settle their disputes during settlement negotiations (George Declaration, Exhibit B), that agreement was never formalized.

BROWN DECLARATION ISO RESPONSE TO OBJ. TO SUBCHAPTER V      8

Case: 25-30743    Doc# 82    Filed: 01/08/26    Entered: 01/08/26 22:18:39    Page 8 of 15

ATM never gave WHR permission to use protected settlement communications as evidence of ATM's debt to WHR, and ATM has never agreed with WHR's calculations of ATM's debt to WHR.

19. ATM disputes the unliquidated calculation of its alleged obligation to WHR. Instead, ATM calculates the amount owing to WHR as of the petition date (September 15, 2025) to be approximately $1,600,000, without interest, which interest ATM contends that WHR cannot collect, because it never exercised its now asserted rights under the 2007 Contract to add 1.5% to amounts paid after 30 days post-invoice. It is ATM's position that no interest is due on these unpaid invoices, because WHR did not ever require ATM to pay interest, despite years of ATM being late on its payments.

***ATM's Liquidated, Non-Insider Liabilities as of the Petition Date Total Under $3,424,000***

20. The Debtor's *total* scheduled secured and unsecured debts as of the petition date are $3,376,123.35. (ECF 1, ECF page 137). Excluding the liquidated debt to me for deferred salary in the sum of $270,833.33 (ECF 1, ECF page 122) and the debt scheduled to WHR as unliquidated and disputed in the sum of $1,883,859 (*i.e.* the amount in WHR's prepetition complaint, ECF 1, ECF page 135), the Debtor's scheduled, aggregate liquidated debts to non-insiders as of the petition date total $1,221,431.02, well within the eligibility limit of $3,424,000.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on January 8, 2026 in Emeryville, California.

                                                                _____
                                                                 Scott Brown

# Exhibit A



1900 Powell Street, Suite 220
Emeryville, CA 94608
(800) 488-7274 Toll Free USA
(415) 292-5400
(415) 292-5410 Fax
www.trashmanage.com

WHR/ATM Payment Agreement

1. All purchases of WHR equipment by ATM will be made either with (1) a Joint Check Agreement (JCA) in place or (2) by prepayment (primarily for parts).

2. On all current transactions with JCAs in place (see attached list) ATM will:

   a. Provide WHR with contract documentation showing the <u>full contract price for the trash chute & related WHR equipment</u>.
   b. Sign over to WHR the second (non-joint check) to WHR.
   c. Upon receipt by ATM, ATM will send both the joint check and the second check (signed over by ATM to WHR) to WHR.

3. On all new projects, ATM will share with WHR the full contract value of the trash chute and the related WHR equipment. ATM will obtain a JCA for an amount = **the full price for the equipment**, which includes both WHR's equipment price and ATM's markup. WHR will acknowledge the portion of the full contract price that includes ATM's project markup and that the subsequent JCA payment will consist of both a payment to WHR for its equipment + ATM's markup which is being assigned to WHR.

4. Upon completion of the trash chute phase of the project, ATM will receive a joint check for the full contract amount of the trash chute and related equipment. ATM will endorse and send the joint check to WHR.

5. On all projects in which (1) WHR is paid with a joint check + a second check assigned to it by ATM or (2) a single joint check which includes ATM's agreed-upon markup, **ATM will direct WHR to which open balance it should apply either the second check amount or the amount of ATM's markup which is included in the single joint check payment.**

6. WHR will provide all waivers to ATM/Customer which (1) are necessary for the release of a joint check or (2) on all projects which have been paid in full by ATM.

7. This agreement it will remain in effect until ATM has paid off its balance with WHR. ATM may, during the course of this Agreement, also make payments to WHR to reduce its balance.

# Exhibit B

# JOINT CHECK AGREEMENT

1. <u>The Parties</u>
   This Agreement is entered into by and between **Walton Construction, Inc.** ("Contractor"), **American Trash Management, Inc.** ("Subcontractor") and **WHR Holdings** ("Supplier").

2. <u>Recitals</u>
   As an accommodation to Subcontractor and Supplier, and in an effort to ensure that each party receives payment for work, labor or materials supplied to the work of improvement commonly known as **Valley Pride Bldg J** ("Project"), Contractor agrees to make certain payments by joint check payable to Subcontractor and Supplier subject to the terms, conditions and requirements of this Joint Check Agreement.

3. <u>Scope of Agreement</u>
   Nothing in this Joint Check Agreement shall be construed, interpreted or understood to modify, relinquish, waive, release or otherwise change any term or condition or requirement of Subcontractor to perform any duty, covenant, condition, term or requirement set forth in the Standard Form Subcontract executed by Subcontractor with respect to the Project. Said Subcontract shall remain in force and effect unless expressly modified in writing by Contractor and Subcontractor. Supplier understands and agrees that the Terms and Conditions of the Standard Form Subcontract shall control in the event of any inconsistency, ambiguity or misunderstanding with respect to this Joint Check Agreement. The parties understand and agree that nothing contained herein shall be deemed to make Supplier a party to the above-referenced Subcontract and except as expressly set forth herein, nothing contained herein shall impose or create any duty or right at law or in equity for Supplier to benefit from the terms of said Subcontract.

4. <u>Joint Check Payment and Payment Application Process</u>
   Contractor agrees to make payment for materials, equipment, and where applicable, labor, delivered to the above-referenced Project in the amount periodically authorized and requested by the Subcontractor. Such payments will be made in accordance with the normal monthly progress payments in accordance with the payment terms of the Subcontract. Such monthly progress payments will be considered partial payments to the Subcontractor in accordance with the Terms and Conditions of the Subcontract. The payment amounts shall not exceed the amount allocated for Subcontractor partial payment for any monthly progress payment.

A. Releases

Each monthly progress payment request shall be accompanied by a conditional or unconditional progress release. The retention or final payment request shall be accompanied by a conditional final or unconditional final release. Such releases are a condition precedent to Contractors issuance of any payment in accordance with this agreement and/or the Terms and Conditions of the Subcontract.

B. Invoice Copies

Subcontractor shall submit with its monthly progress payment request, copies of all invoices from Supplier. The invoices must establish that the material was delivered to the job site by the Supplier or common carrier under the control of Supplier. It is estimated that the aggregate amount of all materials, equipment and/or labor by supplier shall not exceed the sum of **$18,976.00** for the jobs duration.

C. Negotiation of Check

Negotiation of the joint check shall constitute a full release of Contractor, its surety and the owner to the full extent of any such joint check payment. Further, the negotiation of any joint check issued by Contractor hereunder shall be deemed to be irrefutable evidence that the undersigned parties and each of them, have been paid in the full amount set forth on any such joint check negotiated by either or both of the parties. And such shall be conclusive evidence that Contractor has no further obligation whatsoever with regard to the amount represented by such joint check to either Subcontractor and/or Supplier.

Joint checks will be issued for material purchases only and the Supplier shall not distribute any monies from said joint checks to Subcontractor. Upon the delivery of any joint check described herein to the parties hereto, each of them shall bear the full and complete responsibility for the negotiation and/or distribution of any funds represented by such joint check and that the negotiation of such joint check shall be done without reference to, or, reliance upon, any promise, statement, or representation made by or to Contractor whether said promise, statement or representation is explicit, implied or implied in fact.

5. Miscellaneous Provisions
    A. Contractor's sole responsibility hereunder shall be to deliver said joint checks to Subcontractor and that delivery to any party hereto shall be deemed full and complete performance by Contractor herein.
    B. The execution of this Joint Check Agreement does not relieve the Subcontractor of the primary obligation to pay the Supplier.
    C. Should Subcontractor refuse to endorse any joint check tendered by Contractor and upon demand by Supplier, Contractor may issue a single party check payable to Supplier.

6. <u>Entire Agreement</u>
   This document and the documents referred to herein constitute the entire understanding with respect to the subject matter hereof and parties hereto, and supersedes any and all prior written or verbal agreements.

**American Trash Management, Inc.** ("Subcontractor")

Signature: _[signed]_          Dated: 09/16/2024

Title: President – Scott Brown

**WHR Holdings** ("Supplier")

Signature: _Rick Horneck_          Dated: 9/19/2024

Title: Rick Horneck – Director NAS

**Walton Construction, Inc.** (Contractor")

Signature: _[signed]_          Dated: 9/16/24

Title: Rick Walker, CFO