Stephen D. Finestone (125675)
Jennifer C. Hayes (197252)
FINESTONE HAYES LLP
456 Montgomery Street, Suite 1300
San Francisco, CA 94104
Tel.:    (415) 421-2624
Fax:    (415) 398-2820
Email: sfinestone@fhlawllp.com
Email: jhayes@fhlawllp.com

Attorneys for American Trash Management, Inc.,
Debtor-in-Possession

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| In re<br><br>AMERICAN TRASH MANAGEMENT, INC.,<br><br>Debtor-in-Possession. | Case No. 25-30743-HLB<br><br>Chapter 11, Subchapter V<br><br>**APPENDIX OF AUTHORITIES IN SUPPORT OF DEBTOR'S RESPONSE TO OBJECTION TO DEBTOR'S SUBCHAPTER V ELIGIBILITY BY WHR HOLDINGS, LLC**<br><br>**Date:** January 22, 2026<br>**Time:** 10:00 a.m.<br>**Ctrm:** Via Zoom or In-Person, at<br>Courtroom 19, 450 Golden Gate Ave.<br>16th Floor, San Francisco, CA |

Debtor-in-Possession American Trash Management, Inc. ("Debtor" or "ATM") hereby files its Appendix of Authorities, in support of its response to the Objection filed by WHR Holdings, LLC ("WHR") to Debtor's SubChapter V Eligibility, to attach in alphabetical order out-of-state and out-of-Circuit legal authorities cited in Debtor's responsive brief.

**Exhibit 1:**     *Alessi Equip., Inc. v. Am. Piledriving Equip., Inc.*,
160 F.4th 38 (2d Cir. 2025).

**Exhibit 2:**     *Allapattah Servs. v. Exxon Corp.*,
188 F.R.D. 667 (S.D. Fla. 1999)

Case: 25-30743    Doc# 83    Filed: 01/08/26    Entered: 01/08/26 22:23:15    Page 1 of 261

| | | |
|---|---|---|
| **Exhibit 3:** | *Allapattah Servs. v. Exxon Corp.*, | |
| | 61 F. Supp. 2d 1308 (S.D. Fla. 1999) | |
| **Exhibit 4:** | *Beach Higher Power Corp. v. Granados*, | |
| | 717 So. 2d 563 (Fla. Dist. Ct. App. 1998) | |
| **Exhibit 5:** | *BMC Indus., Inc. v. Barth Indus., Inc.*, | |
| | 160 F.3d 1322 (11th Cir. 1998) | |
| **Exhibit 6:** | *Enkidin, LLC v. Weisbard*, | |
| | 2024 Colo. App. LEXIS 1752 (Colo. Ct. App. June 20, 2024) | |
| **Exhibit 7:** | *Exim Brickell, LLC v. Bariven*, | |
| | 2011 U.S. Dist. LEXIS 174564 (S.D. Fla. Aug. 16, 2011) | |
| **Exhibit 8:** | *F.M.W. Props., Inc. v. Peoples First Fin. Sav. and Loan Ass'n*, | |
| | 606 So. 2d 372 (Fla. 1st DCA 1992) | |
| **Exhibit 9:** | *Farmers State Bank v. Farmland Foods, Inc.*, | |
| | 225 Neb. 1, 402 N.W.2d 277 (Neb. 1987) | |
| **Exhibit 10:** | *General Matters, Inc. v. Paramount Canning Co.*, | |
| | 382 So. 2d 1262 (Fla. Dist. Ct. App. 1980) | |
| **Exhibit 11:** | *Glenn Distribs., Corp. v. Heckitt Benckiser, LLC*, | |
| | 2015 Phila. Ct. Com. Pl. LEXIS 113 (Pa. Ct. Com. Pl. Apr. 27, 2015) | |
| **Exhibit 12:** | *In re Hall*, | |
| | 650 B.R. 595 (Bankr. M.D. Fla. 2023) | |
| **Exhibit 13:** | *Kiwanis Club v. De Kalaf*e, | |
| | 723 So. 2d 838 (Fla. Dist. Ct. App. 1998) | |
| **Exhibit 14:** | *Metal Seal Precision, Ltd. v. Good Time Outdoors, Inc.*, | |
| | 2018-Ohio-5326, 128 N.E.3d 678 (Ohio Ct. App. 2018) | |
| **Exhibit 15:** | *Reser's Fine Foods, Inc. v. Bob Evans Farms, Inc.*, | |
| | 2016 U.S. Dist. LEXIS 90732 (D. Or. July 13, 2016) | |
| **Exhibit 16:** | *White v. Ocean Bay Marina, Inc.*, | |
| | 778 So. 2d 412 (Fla. Dist. Ct. App. 2001) | |
| **Exhibit 17:** | *Wright v. State Farm Mut. Auto. Ins. Co.*, | |
| | 223 Or. App. 357, 196 P.3d 1000 (Or. Ct. App. 2008) | |
| **Exhibit 18:** | Fla. Stat. § 671.201 | |

**Exhibit 19:**   Fla. Stat. § 671.205

**Exhibit 20:**   Fla. Stat. § 672.201

**Exhibit 21:**   Fla. Stat. § 672.209

**Exhibit 22:**   Fla. Stat. § 90.408

Dated January 8, 2026                    FINESTONE HAYES LLP

_/s/ Jennifer C. Hayes_
Jennifer C. Hayes
Attorneys for American Trash Management,
Inc., Debtor-in-Possession

# Exhibit 1

# *Alessi Equip., Inc. v. Am. Piledriving Equip., Inc.*

United States Court of Appeals for the Second Circuit

November 21, 2025, Decided

No. 22-2317

**Reporter**

2025 U.S. App. LEXIS 30500 *; 160 F.4th 38; 2025 LX 527059

ALESSI EQUIPMENT, INC., Plaintiff-Appellee, v. AMERICAN PILEDRIVING EQUIPMENT, INC., Defendant-Appellant.*

**Notice:** PLEASE REFER TO *FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1* GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**Prior History:** Appeal from a judgment of the United States District Court for the Southern District of New York (Judith C. McCarthy, Magistrate Judge). **[*1]** [1]

*Alessi Equip., Inc. v. Am. Piledriving Equip., Inc., 2022 U.S. Dist. LEXIS 159830, 2022 WL 4080663 (S.D.N.Y., Sept. 2, 2022)*
*Alessi Equip., Inc. v. Am. Piledriving Equip., Inc., 578 F. Supp. 3d 467, 2022 U.S. Dist. LEXIS 3110, 2022 WL 63165 (S.D.N.Y., Jan. 6, 2022)*

# Core Terms

ape, district court, discount, distributor, delivery, summary judgment, new trial, remittitur, default, invoice

# Case Summary

**Overview**
**Key Legal Holdings**

- The district court did not err in concluding as a matter of law that a 2012 Distributor Agreement constituted an enforceable contract, and that American Piledriving Equipment, Inc. (APE), breached the agreement by selling equipment covered therein to third parties in the Northeast.

- The jury's damages award of $920,846.70 to Alessi Equipment, Inc., was supported by sufficient evidence including testimony that Alessi was entitled to a twenty-percent discount on parts purchases and evidence of APE's direct sales to third parties in Alessi's exclusive territory.

- John White, APE's signatory to the 2012 Distributor Agreement, had actual authority to bind APE to the 2012 Distributor Agreement because he was still APE's President when he signed it, and negotiating distribution agreements was within the ordinary course of APE's business.

**Material Facts**

- Alessi and APE entered into a 2012 Distributor Agreement making Alessi the exclusive distributor of a vibratory hammer developed by APE.

- John White, APE's President, signed the agreement.

- Evidence showed Alessi was entitled to a twenty-percent discount on purchases from APE.

- The jury awarded Alessi $920,846.70 in damages, offset by $52,505.92 that Alessi owed to APE.

**Controlling Law**

- *New York Uniform Commercial Code (N.Y. U.C.C.) §§ 2-204(3)*, *2-305(1)*, 2-306(2), 2-308, 2-309(1).
- New York agency law regarding presidential

---

*The Clerk of Court is respectfully directed to amend the official case caption as set forth above.

[1] The parties consented to have the case heard by a magistrate judge pursuant to *28 U.S.C. § 636(c)*.

authority.

• New York law on damages calculation.

## Court Rationale

The 2012 Distributor Agreement was enforceable as the parties intended to make a binding contract and the N.Y. U.C.C. supplied missing terms. John White had actual authority to bind APE as he was still President when signing the agreement. The jury's damages award was supported by evidence of APE's failure to provide discounts and direct sales to third parties. The damages award did not materially deviate from reasonable compensation under *N.Y. C.P.L.R. § 5501(c)*.

## Outcome
## Procedural Outcome

The Second Circuit affirmed the district court's judgment.

# LexisNexis® Headnotes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

Civil Procedure > Judgments > Summary Judgment > Entitlement as Matter of Law

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Legal Entitlement

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Materiality of Facts

*HN1*[⬇] **Entitlement as Matter of Law, Appropriateness**

Summary judgment is appropriate only when, after examining the evidence in the light most favorable to, and drawing all inferences in favor of, the non-movant, there is no genuine issue as to any material fact and the

moving party is entitled to a judgment as a matter of law.

Business & Corporate Compliance > ... > Contract Formation > Offers > Definite Terms
Contracts Law > Contract Formation > Offers > Definite Terms

Commercial Law (UCC) > ... > Performance > Seller Duties & Rights > Cure, Delivery, Shipment & Tender

Commercial Law (UCC) > ... > Buyer Remedies > Damages > Damages for Nondelivery & Repudiation

Contracts Law > Contract Formation > Tender & Delivery
Business & Corporate Compliance > Contracts > Contract Formation > Tender & Delivery

*HN2*[⬇] **Offers, Definite Terms**

The New York Uniform Commercial Code, which governs exclusive distribution agreements, makes clear that even though one or more terms are left open, a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy. *N.Y. U.C.C. § 2-204(3)*. To this end, the N.Y. U.C.C. includes gap-filling provisions that supply a reasonable price at the time of delivery, a reasonable delivery location, and a reasonable time for shipment or delivery. *N.Y. UCC. §§ 2-305(1)* (default price standards), *2-308* (default delivery locations), 2-309(1) (default shipment terms). Thus, under the N.Y. U.C.C., an exclusive-dealing agreement need not contain explicit quantity terms, and instead automatically creates best-efforts obligations for a supplier to make the goods called for by the contract and for a buyer to promote sales of the goods. *N.Y. UCC § 2-306(2)* & cmt. 5.

Business & Corporate Law > ... > Authority to Act > Contracts & Conveyances > Enforcement & Execution

Business & Corporate Law > ... > Authority to Act > Actual Authority > Express Authority

Business & Corporate Law > ... > Authority to Act > Contracts & Conveyances > Liability of Principals

*HN3*[🔽] **Contracts & Conveyances, Enforcement & Execution**

Under New York law, an agent has actual authority if the principal has granted the agent the power to enter into contracts on the principal's behalf, subject to whatever limitations the principal places on this power, either explicitly or implicitly. New York cases, as well as federal cases applying New York law, have adopted the ordinary business rule, under which there is a presumption that a president's authority extends to transactions in the ordinary course of the company's business.

Civil Procedure > Trials > Judgment as Matter of Law > Alternative Motions for New Trials

Civil Procedure > Trials > Judgment as Matter of Law > Postverdict Judgment

Civil Procedure > Appeals > Standards of Review > De Novo Review

*HN4*[🔽] **Judgment as Matter of Law, Alternative Motions for New Trials**

An appellate court reviews a federal district court's denial of a *Fed. R. Civ. P. 50(b)* motion de novo.

Civil Procedure > Trials > Judgment as Matter of Law > Alternative Motions for New Trials

Civil Procedure > Trials > Judgment as Matter of Law > Postverdict Judgment

*HN5*[🔽] **Judgment as Matter of Law, Alternative Motions for New Trials**

A motion made pursuant to *Fed. R. Civ. P. 50(b)* may only be granted if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair[-]minded persons could not arrive at a verdict against it.

Evidence > Burdens of Proof > Allocation

*HN6*[🔽] **Burdens of Proof, Allocation**

Under New York law, the plaintiff need only show a stable foundation for a reasonable estimate of the damage incurred as a result of the breach.

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Civil Procedure > ... > Relief From Judgments > Additur & Remittitur > Remittiturs

Civil Procedure > Judgments > Relief From Judgments > Motions for New Trials

Civil Procedure > Judgments > Relief From Judgments > Altering & Amending Judgments

*HN7*[🔽] **Standards of Review, Abuse of Discretion**

An appellate court reviews a district court's denial of a *Fed. R. Civ. P. 59(a)* motion for new trial or remittitur for abuse of discretion.

Civil Procedure > Judgments > Relief From Judgments > Motions for New Trials

*HN8*[🔽] **Relief From Judgments, Motions for New Trials**

A district court ordinarily should not grant a new trial unless it is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.

Civil Procedure > ... > Relief From Judgments > Additur & Remittitur > Remittiturs

*HN9*[🔽] **Additur & Remittitur, Remittiturs**

Remittitur is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial. Where damages are issued based on state-law claims, a district court must review the award under state law to determine whether remittitur is warranted.

Civil
Procedure > Remedies > Damages > Compensatory Damages

_HN10_[⬇] **Damages, Compensatory Damages**

Under New York law, an award of damages must be reduced only if it deviates materially from what would be reasonable compensation. _N.Y. C.P.L.R. § 5501(c)_.

Civil
Procedure > Remedies > Damages > Compensatory Damages

_HN11_[⬇] **Damages, Compensatory Damages**

The burden of uncertainty as to the amount of damage is upon the wrongdoer.

**Counsel:** For Defendant-Appellant: BRIAN D. WALLER, Peckar & Abramson, P.C., New York, NY.

For Plaintiff-Appellee: KRISTOPHER M. DENNIS, The Law Office of Kristopher M. Dennis, New York, NY (Keith A. Lavalle, Lavallee Law Offices PLLC, Farmingdale, NY, on the brief).

**Judges:** PRESENT: JOHN M. WALKER, JR., REENA RAGGI, RICHARD J. SULLIVAN, Circuit Judges.

# Opinion

## SUMMARY ORDER

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the December 30, 2022 judgment of the district court is **AFFIRMED**.

Defendant American Piledriving Equipment, Inc. ("APE"), a manufacturer of heavy construction equipment, appeals from the district court's judgment awarding damages to APE's distributor, Alessi Equipment, Inc. ("Alessi"), for APE's breach of a distribution agreement entered by the parties in 2012 (the "2012 Distributor Agreement"). On appeal, APE challenges the district court's (1) grant of summary judgment against APE as to liability on Alessi's breach-of-contract claim; (2) denial of APE's post-trial motion for judgment as a matter of law pursuant to _Federal Rule of Civil Procedure 50(b)_, or in the alternative, **[*2]** for a

new trial or _remittitur_ pursuant to _Rule 59(a)_; and (3) award of prejudgment interest to Alessi. In a published opinion filed today, we reject the last of these arguments as meritless. We address all other arguments in this summary order and assume the parties' familiarity with the underlying facts, procedural history, and issues on appeal, to which we refer only as necessary to explain our decision to affirm.

**I. Grant of Summary Judgment for Alessi as to APE's Liability**

APE first challenges the district court's order granting summary judgment in favor of Alessi on APE's claim for breach of the 2012 Distributor Agreement. We review a district court's grant of summary judgment _de novo_. See _Lucente v. Int'l Bus. Machs. Corp., 310 F.3d 243, 253 (2d Cir. 2002)_. _HN1_[⬆] Summary judgment is appropriate only when, after "examin[ing] the evidence in the light most favorable to, and draw[ing] all inferences in favor of, the non-movant," "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." _Id._ (internal quotation marks omitted).

APE begins by arguing that the 2012 Distributor Agreement was not an enforceable contract because it lacked consideration and material terms. _HN2_[⬆] But the _New York Uniform Commercial Code_ (the "N.Y. U.C.C."), which governs exclusive distribution **[*3]** agreements like the one here,[2] makes clear that "[e]ven though one or more terms are left open[,] a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." _N.Y. U.C.C. § 2-204(3)_. To this end, the N.Y. U.C.C. includes "gap[-]filling" provisions that supply "a reasonable price at the time of delivery," a reasonable delivery location, and "a reasonable time" for shipment or delivery. _See id._ _§§ 2-305(1)_ (default price standards), _2-308_ (default delivery locations), _2-309(1)_ (default shipment terms). Thus, under the N.Y. U.C.C., an "exclusive[-]dealing" agreement need not contain explicit quantity terms, and instead automatically creates "best[-]efforts" obligations for a supplier to make the goods called for by the contract and for a buyer to promote sales of the goods. _See id. § 2-306(2)_ & cmt. 5.

---

[2] _See_ **N.Y. U.C.C. §§ 2-102, 2-106(1)**; _Bausch & Lomb Inc. v. Bressler, 977 F.2d 720, 726 (2d Cir. 1992)_; _Gerard v. Almouli, 746 F.2d 936, 939 (2d Cir. 1984)_.

Here, the record leaves no doubt that the parties intended to make a binding contract by entering into the 2012 Distributor Agreement. That agreement provided that: (1) Alessi would be the exclusive distributor of a vibratory hammer developed by APE — the Robovib — and other excavator-mounted equipment in the Northeast; (2) Alessi **[\*4]** would pay APE "a 2% commission on any APE[] Robovib or excavator[-]mounted equipment sold outside" the Northeast; (3) "in return," APE would "direct all Rob[o]vib and excavator rentals and sales to Alessi . . . as a first option"; (4) Alessi would provide "service and set up," or otherwise "pay APE's service department to provide services"; and (5) the contract would automatically renew each year "unless otherwise cancelled in writing," in which case a two-year cancellation period would apply. J. App'x at 1112.

Additionally, _section 2-306(2) of the N.Y. U.C.C._ supplied the contract's missing "quantity" term by requiring both parties to use "best efforts" in manufacturing and selling the equipment. The remaining material terms, including the price and manner of delivery, were also provided by the gap-filling measures of the N.Y. U.C.C.. See _N.Y. U.C.C. §§ 2-305(1)_, _2-306(2)_, _2-308_, _2-309(1)_; see also _Encomp, Inc. v. McCorhill Pub., Inc., 873 F.2d 536, 546 (2d Cir. 1989)_ ("Many a gap in terms can be filled, and should be filled, where it is clear that the parties intended to form a contract and to bind themselves to render a future performance.") (internal quotation marks and alterations omitted)). In light of these provisions, the district court did not err in concluding as a matter of law that the 2012 Distributor Agreement constituted **[\*5]** an enforceable contract — and that APE breached that agreement by selling equipment covered therein to third parties in the Northeast.[3]

APE also argues that John White, APE's signatory to the 2012 Distributor Agreement, lacked authority to bind APE — thus rendering the agreement unenforceable — because White "had already given notice" and "transitioned out of his role as president." APE Br. at 15-16. _HN3_[⬆] ] "Under New York law, an agent has actual authority if the principal has granted the agent the power to enter into contracts on the principal's behalf, subject to whatever limitations the principal places on this power, either explicitly or implicitly." _Highland Cap. Mgmt. LP v. Schneider, 607 F.3d 322, 327 (2d Cir. 2010)_. "New York cases, as well as federal cases applying New York law, have adopted the 'ordinary business rule,'" under which there is a "presumption" that a "president's authority extends . . . to transactions in the ordinary course of the company's business." _Sci. Holding Co. v. Plessey Inc., 510 F.2d 15, 23-24 (2d Cir. 1974)_; see also _Odell v. 704 Broadway Condo., 284 A.D.2d 52, 728 N.Y.S.2d 464, 468-69 (1st Dep't 2001)_.

Here, it is undisputed that White was still APE's President when he signed the 2012 Distributor Agreement and that this transaction was negotiated during the ordinary course of APE's business. Indeed, it was White who initially brokered the business arrangement between the **[\*6]** two companies in the mid-1990s, and it was White who later executed an agreement in 2004 that granted Alessi "the exclusive right to sell" the Robovib "in the Northeast USA" and the "non-exclusive right to sell [the product] anywhere else in the USA." J. App'x at 1097. The record contains no evidence suggesting that APE formally stripped White of his authority to negotiate such contracts prior to the execution of the 2012 Distributor Agreement. Accordingly, the district court did not err in concluding that no reasonable factfinder could have found that White lacked actual authority to enter into the agreement on behalf of APE.[4]

---

[3] APE also contends that the 2012 Distributor Agreement was not enforceable because it did not mention the twenty-percent discount that APE purportedly had been giving Alessi. The district court correctly reserved this issue for the damages trial, however, so that a jury could determine whether extrinsic evidence indicated that the parties agreed to the discount. See **N.Y. U.C.C. § 2-202** (providing that terms "may be explained or supplemented" by (1) "**course of performance**, **course of dealing**", or usage of trade" and (2) "evidence of consistent additional terms," so long as the parties did not "intend[]" the agreement to be "a complete and exclusive statement of the terms of the agreement"). After a four-day trial, the jury awarded $920,846.70 in damages to Alessi, offset by $52,505.92 that Alessi owed to APE under the 2016 rental agreement.

---

[4] We also agree with the district court that, in the alternative, there was no dispute of material fact that White had _apparent_ authority to conduct business on behalf of APE. This is because "[APE's] conduct create[d] the appearance that [its] agent ha[d] such authority," _Goldston v. Bandwidth Tech. Corp., 52 A.D.3d 360, 859 N.Y.S.2d 651, 655 (1st Dep't 2008)_ (citing _Hallock v. State of New York, 64 N.Y.2d 224, 474 N.E.2d 1178, 485 N.Y.S.2d 510, 513-14 (N.Y. 1984)_), and "[Alessi's] reliance on the appearance of authority in [White] was reasonable," given that nothing in the record suggests that Alessi had a duty to inquire about the scope of White's authority, **F.D.I.C. v. Providence Coll., 115 F.3d 136, 140-41 (2d Cir. 1997)**.

## II. Denial of APE's Rule 50(b) and Rule 59(a) Motions as to Alessi's Damages

APE next contends that the district court erred in denying its motion for judgment as a matter of law under *Federal Rule of Civil Procedure 50(b)* at the close of the damages trial. **HN4**[↑] We review a district court's denial of a *Rule 50(b)* motion *de novo*. *Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 133 (2d Cir. 2008)*. **HN5**[↑] Such a motion "may only be granted if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair[-]minded persons **[*7]** could not arrive at a verdict against it." *Id.* (internal quotation marks omitted and alterations accepted).

Here, APE argues that the evidence was insufficient to support the jury's award of damages for APE's failure to provide a discount on parts purchased by Alessi. We disagree. At trial, witnesses stated that APE failed to provide Alessi with a twenty-percent discount on its purchases of both equipment and parts. As the district court noted, Gerald Alessi, Alessi's owner, gave "unqualified testimony that he 'always' received a [twenty-percent] discount when he purchased from APE." Sp. App'x at 79. Mr. Alessi further testified that although some "invoices" from "2012 through 2017" "reflected the [twenty-]percent discount . . . for the parts," Alessi stopped receiving discounts "around 2013 [or] 2014" and had to "call[] about the discount" "[e]very time [twenty] percent wasn't on the invoice." J. App'x at 1694-95. Finally, Alessi introduced Plaintiff's Exhibit 9 ("PX-9"), which listed all of APE's transactions that included invoice numbers starting with a "P" but made no reference to any discounts. Based on this exhibit, along with testimony that it was APE's practice to use the "P" **[*8]** designation on invoices for parts, a reasonable jury could have inferred that Alessi had purchased parts without receiving the twenty percent discount from APE.

In light of this evidence, the jury reasonably concluded that all parts-related sales to Alessi listed on PX-9 should have included the agreed-to discount, but that Alessi stopped receiving that discount by 2013 or 2014. **HN6**[↑] *See Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d 89, 110-11 (2d Cir. 2007)* (explaining that, under New York law, "the plaintiff need only show a stable foundation for a reasonable estimate of the damage incurred as a result of the breach" (internal quotation marks omitted)). The district court

therefore did not err in denying APE's *Rule 50(b)* motion, since it cannot be said that - "with credibility assessments made against [APE] and all inferences drawn against [APE]" - "a reasonable juror" would have been "compelled to accept the view of [APE]." *Wiercinski v. Mangia 57, Inc., 787 F.3d 106, 112-13 (2d Cir. 2015)*.

APE further contends that the district court erred in denying APE's motion for a new trial or *remittitur* under *Rule 59(a)*. **HN7**[↑] We review a district court's denial of a *Rule 59(a)* motion for abuse of discretion. *See In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig., 725 F.3d 65, 112 n.34 (2d Cir. 2013)*. **HN8**[↑] A district court "ordinarily should not grant a new trial unless it is convinced that the jury has reached a seriously erroneous result or that the verdict **[*9]** is a miscarriage of justice." *Hygh v. Jacobs, 961 F.2d 359, 365 (2d Cir. 1992)* (internal quotation marks omitted). **HN9**[↑] Meanwhile, *remittitur* is "the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." *Earl v. Bouchard Transp. Co., 917 F.2d 1320, 1328 (2d Cir. 1990)* (internal quotation marks omitted). Where, as here, damages are issued based on state-law claims, a district court must review the award under state law to determine whether *remittitur* is warranted. *See Cross v. N.Y.C. Transit Auth., 417 F.3d 241, 258 (2d Cir. 2005)*. **HN10**[↑] Under New York law, an award of damages must be reduced only if it "deviates materially from what would be reasonable compensation." *N.Y. C.P.L.R. § 5501(c)*.

APE challenges the jury's damages award for APE's direct sales of equipment and parts to third parties, as well as for APE's failure to provide discounts on equipment and parts purchased by Alessi. We find no abuse of discretion in the district court's determination that the jury's award constituted "reasonable compensation" for APE's breach. *N.Y. C.P.L.R. § 5501(c)*. After reviewing PX-9, the district court concluded that "the maximum amount the jury could have awarded Alessi for damages related to parts" was $163,633.55. Sp. App'x at 93. This figure, when added to the district court's damages calculations for direct sales and withheld discounts on *equipment*, yielded **[*10]** a total damages figure of, at most, $1,022,830.31. J. App'x at 1990, 2214-16, 2166-88. This was not far from the jury's award of $920,846.70, and fell well below the $1.5 million that Alessi requested during its opening and summation.

To be sure, the district court noted that a different

method of calculating damages could have resulted in a figure closer to $825,876.06. But it was not the district court's place to substitute its judgment for the jury's, and we cannot say that the damages figure arrived at by the jury constitutes either a material deviation from "reasonable compensation," *N.Y. C.P.L.R. § 5501(c)*, or a "seriously erroneous result," *Hygh, 961 F.2d at 365*. This is especially true in light of APE's failure to introduce the actual invoices corresponding to the transactions at issue — and its failure to identify possible discrepancies for the jury — that would have permitted the jury to calculate damages with a more critical eye. **HN11**[⬆] *See Tractebel Energy Mktg., Inc., 487 F.3d at 110* ("The burden of uncertainty as to the amount of damage is upon the wrongdoer." (alterations accepted and internal quotation marks omitted)).

* * *

We have considered APE's remaining arguments and find them to be without merit. Accordingly, for the reasons set forth above and in our separately **[*11]** issued opinion, we **AFFIRM** the amended judgment of the district court.

**End of Document**

# Exhibit 2

## *Allapattah Servs. v. Exxon Corp.*

United States District Court for the Southern District of Florida

August 10, 1999, Decided ; August 10, 1999, Filed

CASE NO: 91-0986-CIV-GOLD

### Reporter

188 F.R.D. 667 *; 1999 U.S. Dist. LEXIS 13574 **

ALLAPATTAH SERVICES, INC., et al., Plaintiffs, vs. EXXON CORPORATION, Defendant.

**Subsequent History:** Judgment entered by, in part *Allapattah Servs. v. Exxon Corp., 157 F. Supp. 2d 1291, 2001 U.S. Dist. LEXIS 13317 (S.D. Fla., Aug. 7, 2001)*

**Prior History:** *Allapattah Servs. v. Exxon Corp., 61 F. Supp. 2d 1335, 1999 U.S. Dist. LEXIS 13561 (S.D. Fla., July 28, 1999)*

## Core Terms

fraudulent concealment, prejudgment interest, statute of limitations, cause of action, dealer, good faith, accrue, doctrine, class-wide, limitations period, tolling statute, conceal, general release, misrepresent, terminate, breach of contract, class action, contractual, equitable, convince, toll, affirmative defense, state law, fraudulent, settlement, accrual, clear and convincing evidence, preponderance of evidence, burden of proof, contract claim

## Case Summary

### Procedural Posture

This cause was before the court sua sponte. Defendant contended that for certain plaintiffs: (1) the statutes of limitations barred their action for breach of contract as untimely; and (2) releases affecting in excess of 5,000 dealer-members precluded the instant claim for breach of contract. Defendant further argued that attempts at avoiding these defenses by alleging fraudulent concealment could not be adjudicated on a class-wide basis.

### Overview

In response to plaintiffs' cause of action for breach of contract, defendant oil company raised two affirmative defenses, which it contended precluded a finding of liability as to, at least some of, plaintiffs' claims: (1) the statutes of limitations in the various jurisdictions barred plaintiffs' action as untimely; and (2) releases affecting in excess of 5,000 dealer-members precluded the instant claim for breach of contract. Defendant additionally argued that plaintiffs' attempt at avoiding these affirmative defenses by alleging fraudulent concealment could not be adjudicated on a class-wide basis, but must be resolved in thousands of separate post verdict jury trials. The court held that except for Ohio and Florida, the uniform statute of limitations of the U.C.C. did not preempt the states' laws on tolling the limitations period. The dichotomy created by the differing burdens did not create an insurmountable impediment to proceeding to trial as a class. The releases fell within the governing scope of the U.C.C. Thus plaintiffs' cause of action should proceed on a class-wide basis.

### Outcome

The court concluded that plaintiffs' cause of action for breach of contract should proceed on a class-wide basis. With respect to tolling of the statute of limitations, the factual disputes arising from the fraudulent concealment doctrine could be properly resolved on a class-wide basis by the jury in deciding the remaining class-wide issues, notwithstanding slight variations in state law as to how certain of the elements were described.

## LexisNexis® Headnotes

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > General Overview

Governments > Legislation > Statute of Limitations > General Overview

Page 2 of 21

188 F.R.D. 667, *667; 1999 U.S. Dist. LEXIS 13574, **13574

*HN1*[↓] See *Ohio Rev. Code Ann. § 1302.98(D)*.

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > General Overview

Civil Procedure > ... > Statute of Limitations > Tolling of Statute of Limitations > Amenability to Process

Governments > Legislation > Statute of Limitations > General Overview

Governments > Legislation > Statute of Limitations > Time Limitations

*HN2*[↓] Having qualified its limitations period for actions arising from contracts on goods, the statute may be tolled only if: (1) the defendant is out of the state, has absconded, or conceals himself; or (2) the action against whom the cause of action is directed is disabled, due to either minority status or mental incompetence. *Ohio Rev. Code Ann. §§ 2305.15*, *2305.16*.

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > General Overview

Civil Procedure > ... > Statute of Limitations > Tolling of Statute of Limitations > Discovery Rule

Civil Procedure > ... > Statute of Limitations > Tolling of Statute of Limitations > Fraud

Civil Procedure > ... > Statute of Limitations > Tolling of Statute of Limitations > Fraudulent Concealment

Governments > Legislation > Statute of Limitations > General Overview

Governments > Legislation > Statute of Limitations > Time Limitations

*HN3*[↓] Florida recognizes neither the discovery rule nor fraudulent concealment as vehicles for tolling the five-year limitations period for actions predicated on obligations imposed under a written instrument or contract.

Commercial Law (UCC) > Sales (Article 2) > General Overview

Commercial Law (UCC) > ... > Standards of Performance & Liability > Breach, Excuse & Repudiation > General Overview

Commercial Law (UCC) > ... > Remedies > Statute of Limitations > General Overview

Commercial Law (UCC) > ... > Remedies > Statute of Limitations > Tolling

Governments > Legislation > Statute of Limitations > General Overview

*HN4*[↓] Except for Florida and Ohio, the uniform statute of limitations does not preempt the states' laws on tolling the limitations period. *U.C.C. § 2-725(4)*.

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > General Overview

Civil Procedure > ... > Jury Trials > Jury Instructions > General Overview

Civil Procedure > ... > Jury Trials > Verdicts > General Overview

Civil Procedure > ... > Jury Trials > Verdicts > Special Verdicts

*HN5*[↓] A claim or defense can implicate common issues and be litigated collectively, despite the existence of state law variations, so long as the elements of the claim or defense are substantially similar and any differences fall into a limited number of predictable patterns which can be readily handled by special interrogatories or special verdict forms.

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > General Overview

*HN6*[↓] To allege a common course of conduct, plaintiffs must allege in detail the specific misstatement or omission contained in a document and contained in a subsequent document which most of the other class members received.

Civil Procedure > ... > Subject Matter Jurisdiction > Supplemental Jurisdiction > Pendent Claims

Civil Procedure > Special Proceedings > Class Actions > Certification of Classes

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > General Overview

*HN7*[↓] While oral misrepresentations have been held to be insufficiently similar to warrant class certification, written misrepresentations disseminated to all class members have often been found sufficiently similar.

Page 3 of 21

188 F.R.D. 667, *667; 1999 U.S. Dist. LEXIS 13574, **13574

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > General Overview

**HN8**[⬇] Courts have permitted actions for fraudulent concealment to proceed as a nationwide class if: convinced that individual actions by claimants would impose a strangling harness on the judiciary, as well as the parties, and separate actions would produce considerable duplication of effort, increase the cost of litigation, create the risk of inconsistent results for parties who are similarly situated, and consume judicial resources to wasteful levels (through duplication) throughout the country.

Contracts Law > Breach > Breach of Contract Actions > General Overview

Business & Corporate Compliance > Contracts > Breach > Continuing Breach

Contracts Law > Breach > Continuing Breach

Contracts Law > Breach > General Overview

**HN9**[⬇] Under the continuing breach doctrine, a cause of action for breach of a contract does not begin to accrue upon the initial breach; rather, on contracts providing serial performance by the parties, accrual of a breach of contract cause of action commences upon the occurrence of the last breach or upon termination of the contract.

Contracts Law > Breach > Breach of Contract Actions > General Overview

Contracts Law > Breach > General Overview

Contracts Law > Defenses > Affirmative Defenses > Statute of Limitations

Business & Corporate Compliance > Contracts > Types of Contracts > Divisible Contracts

Contracts Law > Types of Contracts > Divisible Contracts

Governments > Legislation > Statute of Limitations > General Overview

**HN10**[⬇] To decide the propriety of invoking the continuous breach doctrine for evaluating the time of accrual of a cause of action, the court must first determine whether the contract is continuous or severable in nature. Where the nature of the contract is continuous, statutes of limitations do not typically begin to run until termination of the entire contract. However, if the nature of the contract is severable, the statutes of limitations generally commence to run on each severable portion of the contract when a party breaches that portion of the contract.

Commercial Law (UCC) > General Provisions (Article 1) > Application & Construction > General Overview

Commercial Law (UCC) > General Provisions (Article 1) > Definitions & Interpretation > General Overview

Commercial Law (UCC) > Sales (Article 2) > General Overview

Commercial Law (UCC) > ... > Standards of Performance & Liability > Breach, Excuse & Repudiation > General Overview

Commercial Law (UCC) > ... > Subject Matter > Definitions > General Overview

Contracts Law > Contract Conditions & Provisions > Waivers > General Overview

**HN11**[⬇] Under Article 2 of the Uniform Commercial Code, the term "waiver" means an intentional relinquishment of a known right. The waiver of one or more contract provisions leaves the remaining terms in force.

Civil Procedure > Settlements > Releases From Liability > Interpretation of Releases

Contracts Law > Contract Interpretation > General Overview

**HN12**[⬇] Releases are a form of contract, and therefore, must be interpreted pursuant to contract law.

Civil Procedure > Settlements > Releases From Liability > General Overview

Commercial Law (UCC) > General Provisions (Article 1) > General Overview

Commercial Law (UCC) > General Provisions (Article 1) > General Provisions

Commercial Law (UCC) > General Provisions (Article 1) > Application & Construction > General Overview

Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment > Modifications, Rescissions & Waivers

**HN13**[⬇] Any claim or right arising out of an alleged breach can be discharged in whole or in part without

Page 4 of 21

188 F.R.D. 667, *667; 1999 U.S. Dist. LEXIS 13574, **13574

consideration by a written waiver or renunciation signed and delivered by the aggrieved party. *U.C.C. § 1-107*.

Commercial Law (UCC) > General Provisions (Article 1) > General Provisions

Commercial Law (UCC) > General Provisions (Article 1) > Application & Construction > General Overview

Commercial Law (UCC) > ... > Application & Construction > Contract Provisions > Implied Covenant of Good Faith

Commercial Law (UCC) > Sales (Article 2) > General Overview

Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment > General Overview

Contracts Law > Contract Interpretation > Good Faith & Fair Dealing

Contracts Law > Types of Contracts > Releases

Business & Corporate Compliance > Contracts > Types of Contracts > Releases

*HN14*[⤓] In construing the enforceability of a contractual release under the Uniform Commercial Code, the provisions of the release must be read in conjunction with the section imposing an obligation of good faith. *U.C.C. § 1-107*. This duty of good faith must be present throughout the entire formation, as well as the performance, of the contract. *U.C.C. § 2-209*.

Civil Procedure > Settlements > Releases From Liability > Interpretation of Releases

Commercial Law (UCC) > General Provisions (Article 1) > General Provisions

Contracts Law > Contract Interpretation > Good Faith & Fair Dealing

Contracts Law > Types of Contracts > Releases

Business & Corporate Compliance > Contracts > Types of Contracts > Releases

*HN15*[⤓] Like a contract, if the terms of a release are unambiguous, construction of the contract is a matter of law for the court to decide.

Civil Procedure > Settlements > Releases From Liability > General Overview

Civil Procedure > Settlements > Releases From

Liability > General Releases

Civil Procedure > Settlements > Releases From Liability > Interpretation of Releases

Contracts Law > Contract Interpretation > General Overview

Contracts Law > ... > Negotiable Instruments > Discharge & Payment > Discharge of Obligations of Parties

Business & Corporate Compliance > ... > Negotiable Instruments > Discharge & Payment > Discharge of Obligations of Parties

*HN16*[⤓] The interpretation of the effect of a release is based upon the intention of the parties to the instrument. In narrowly construing a general release, it is crucial that it be interpreted so that it discharges only those rights intended by the parties to be relinquished. Although courts favor the finality of settlements, claims or demands are not discharged unless expressly embraced in the release or falling within the fair import of the terms employed. A general release does not discharge liability for unknown damage already done. Thus, an intention to release a party from liability for unknown conduct must be clearly expressed in the release.

Civil Procedure > Settlements > Releases From Liability > General Overview

Civil Procedure > Settlements > Releases From Liability > General Releases

Civil Procedure > Settlements > Releases From Liability > Interpretation of Releases

Contracts Law > Contract Conditions & Provisions > Waivers > General Overview

*HN17*[⤓] The general rule is that a waiver must be made knowingly and voluntarily, and not every settlement that refers to post-settlement conduct necessarily results in a prospective waiver.

Civil Procedure > Settlements > Releases From Liability > General Overview

Civil Procedure > Settlements > Releases From Liability > General Releases

Contracts Law > Contract Interpretation > General Overview

*HN18*[⤓] Although general releases may be enforceable, it is commonly held that based on a realistic recognition that releases contain standardized,

Page 5 of 21

188 F.R.D. 667, *667; 1999 U.S. Dist. LEXIS 13574, **13574

even ritualistic, language and are given in circumstances where the parties are looking no further than the precise matter in dispute, ascertaining the underlying intent of the parties and their knowledge at the time of executing the release is crucial. Relevant to the inquiry is whether there has been a conscious and deliberate intention by the parties to release the claims which existed but were unknown to them at the time they entered into the release.

Civil Procedure > Settlements > Releases From Liability > General Overview

Contracts Law > Contract Interpretation > General Overview

Contracts Law > Types of Contracts > Releases

Business & Corporate Compliance > Contracts > Types of Contracts > Releases

**HN19**[🔽] A compromise and settlement of a bona fide controversy between the parties constitutes a valid and binding agreement. Thus, a release which clearly and unequivocally mentions the claim to be released acts as a complete bar concerning all matters covered by the release.

Contracts Law > ... > Measurement of Damages > Foreseeable Damages > General Overview

Contracts Law > ... > Damages > Types of Damages > Liquidated Damages

**HN20**[🔽] A claim is liquidated when it is subject to mathematical computation without reliance on opinion or discretion.

**Counsel:** **[**1]** For ALLAPATTAH SERVICES, INCORPORATED, ROBERT LEWIS, INC., JOHN PINDER, ROY PAGE, LEE-LANGLEY CORP., MARTIN I. COOK, DAVID WISE, GLEBE ROAD EXXON, INCORPORATED, WILLSTON CENTER AUTOCARE, INCORPORATED, RYLYNS ENTERPRISES, INCORPORATED, plaintiffs: Jay Howard Solowsky, Sidney Mark Pertnoy, Pertnoy Solowsky Allen & Haber, Miami, FL.

For ALLAPATTAH SERVICES, INCORPORATED, ROBERT LEWIS, INC., JOHN PINDER, ROY PAGE, LEE-LANGLEY CORP., MARTIN I. COOK, DAVID WISE, GLEBE ROAD EXXON, INCORPORATED, WILLSTON CENTER AUTOCARE, INCORPORATED, RYLYNS ENTERPRISES, INCORPORATED, plaintiffs:

Gerald M. Bowen, McLean, VA.

For ALLAPATTAH SERVICES, INCORPORATED, ROBERT LEWIS, INC., JOHN PINDER, ROY PAGE, LEE-LANGLEY CORP., MARTIN I. COOK, DAVID WISE, GLEBE ROAD EXXON, INCORPORATED, WILLSTON CENTER AUTOCARE, INCORPORATED, RYLYNS ENTERPRISES, INCORPORATED, plaintiffs: Sheldon E. Friedman, Allen R. Christy, McKenna & Cuneo LLP, Denver, CO.

For EXXON CORPORATION, defendant: J. Anthony Chaves, Tracy S. Treend, Katherine W. Haight, Robert G. Abrams, Robert J. Brookhiser, Martin F. Cunniff, Howrey & Simon, Washington, DC.

For EXXON CORPORATION, defendant: Rene J. Mouledoux, Robert Wallis, Exxon **[**2]** Corporation, Legal Department, Houston, TX.

For EXXON CORPORATION, defendant: Larry S. Stewart, Stewart Tilghman Fox & Bianchi, Miami, FL.

**Judges:** ALAN S. GOLD, UNITED STATES DISTRICT JUDGE. U.S. Magistrate Judge Simonton.

**Opinion by:** ALAN S. GOLD

# Opinion

**[*670] FINAL ORDER REGARDING EXXON'S AFFIRMATIVE DEFENSES AND PLAINTIFFS' ENTITLEMENT TO PREJUDGMENT INTEREST**

THIS CAUSE is before the Court *sua sponte*. [1] **[**4]** In response to Plaintiffs' cause of action for breach of contract, Exxon raised two affirmative defenses, [2]

---

[1] The Court has continued to exercise its pretrial duty to delineate and narrow the issues for trial and to eliminate improper issues. See *Johnson Enterprises, Inc. v. FPL Group, Inc., 162 F.3d 1290, 1332-22 (11th Cir. 1998)*. By prior orders, the late Judge Kehoe had denied Exxon's motions for summary judgment based on the grounds of: (1) statute of limitations [D.E. # 907]; and (2) release [D.E. # 911]. Since the issuance of the orders on summary judgment, the parties have focused on various other aspects of the case. However, in its pretrial orders, the Court has required the parties to further brief the defense issues. This Order endeavors to rule on the defense related issues and establish a procedure for post verdict procedures.

[2] By order issued April 21, 1998, Judge Kehoe denied Exxon's

Page 6 of 21

188 F.R.D. 667, *670; 1999 U.S. Dist. LEXIS 13574, **4

which, it contends, precludes a finding of liability as to, at least some of, Plaintiffs' claims: (1) the statutes of limitations in the various jurisdictions bar Plaintiffs' action as untimely [3]; and (2) releases affecting in excess of 5,000 dealer-members preclude the instant claim for breach of contract. Exxon additionally argues that Plaintiffs' attempt at avoiding these affirmative defenses by alleging fraudulent concealment cannot be adjudicated on a class-wide basis, but must be resolved in thousands of separate post verdict jury trials. [4] According to Exxon, a number of jurisdictions require Plaintiffs to prove the element of reliance in order to prevail on the [**3] fraudulent concealment claim, and, to the extent Plaintiffs are allowed to assert an avoidance, individualized issues of proof preclude resolution on a class-wide basis. Exxon also contends that some of the jurisdictions require Plaintiffs' fraudulent concealment claim to be proven by clear and convincing evidence, while others require only the standard civil burden of proof by a preponderance of the evidence. Exxon urges the Court to resolve its affirmative defenses on an individual basis, because class treatment in light of the jurisdictional variances would deprive Exxon of its right to meaningfully defend its position.

In contrast, although conceding that some jurisdictional differences exist, Plaintiffs contend that class-wide treatment [**5] of the common issues is appropriate. Plaintiffs aver that the common issues involved in their breach of contract claims out-number the differences; therefore, Plaintiffs should not be burdened at this stage of the proceedings with having to bring separate claims by the individual dealers. Plaintiffs have suggested [*671] alternatives to Exxon's decertification of the various issues, many utilized by courts which have

---

motion for partial summary judgment on the grounds of superseding contract [D.E. # 910]. Exxon has not included this ground in its statement of defenses for jury trial purposes. See Exxon's Response to Order on Status Conference [D.E. # 984] and its Supplemental Submission Regarding Affirmative Defenses [D.E. # 1149].

[3] Plaintiffs did not file this case until May 13, 1991. Exxon contends that dealer claims in thirty of the thirty-five states are time-barred for purchases before May 13, 1987.

[4] Exxon contends that: "With respect to those plaintiff's claims that are subject to an affirmative defense, separate proceedings for each plaintiff will be required to either allow the particular dealer to seek to 'avoid' the statutes of limitations or determine the intent of the parties to a release." Supplemental Submission of Defendant Exxon Corporation Regarding Affirmative Defense [D.E. # 1149], at 14.

previously addressed this situation.

The Court has reviewed the respective positions and arguments of the parties. Having considered the parties' concerns in light of the procedural history of this case and having conducted its own search of the law applicable in the relevant jurisdictions, the Court concludes that Plaintiffs' cause of action for breach of contract shall proceed on a class-wide basis in accordance with the following analysis and contingencies.

## DISCUSSION AND ANALYSIS

As a threshold matter, the Court recognizes the policies and principles which underlie the Uniform Commercial Code (the "UCC"). Drafted under the joint sponsorship of the American Law Institute ("ALI") and the National Conference of Commissioners on Uniform State Laws, the purpose of the [**6] UCC, including Article 2 thereof, is to "simplify, clarify and modernize the law governing commercial transactions" and "to *make uniform the law among the various jurisdictions.*" *UCC § 1-102(2)* (emphasis added). Except for Louisiana, all states have codified the pertinent sections of the UCC regarding the sale of goods. See *Pennzoil Co. v. Federal Energy Regulatory Comm'n, 789 F.2d 1128, 1142 (5th Cir. 1986).* Although some variance exists, it appears that the differences are minor and do not contravene the purpose, as stated by the drafters of the UCC.

### Statute of Limitations in Contracts for Sale

Article 2 of the UCC also provides procedural uniformity for bringing actions predicated on contractual relationships. See *UCC § 2-725.* [5] [**8] The ALI's

---

[5] The ALI version of *UCC § 2-725* [statute of limitations in contracts for sale] provides:

1. An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it.

2. A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must

Page 7 of 21

188 F.R.D. 667, *671; 1999 U.S. Dist. LEXIS 13574, **8

version, as well as those of most of the states, include an "official comment," announcing their purpose in adopting "a uniform statute of limitations for sales contracts":

> eliminating the jurisdictional variations and providing needed relief for concerns doing business on a nationwide scale whose contracts have heretofore been governed by several different periods of limitation depending upon the [**7] state in which the transaction occurred.

UCC § 2-725, cmt. Although most states have adhered to the four-year limitations period for actions on a contract for goods, a few states have opted for longer periods, while one state codified a shorter time in which to file contract claims. [6] Florida repealed its correlative UCC statute of limitations, requiring compliance with its general statute of limitations, under which actions on a contract are barred after the expiration of five years from the date the cause of action accrued. See Fla. Stat. Ann. § 95.11(2)(b).

Nearly all of the states have adopted language mirroring that of UCC § 2-725(4) drafted by the ALI. While discounting an aggrieved party's lack of knowledge of its cause of action as a basis for tolling or extending [*672] the statutory period, sometimes referred to as the "discovery rule," the subsection provides that it was not intended to "alter the law on tolling of the statute of limitations." UCC § 2-725(4). [7]

---

await the time of such performance the cause of action accrues when the breach is or should have been discovered.

3. Where an action commenced within the time limited by subsection (1) is so terminated as to leave available a remedy by another action for the same breach such other action may be commenced after the expiration of the time limited and within six months after the termination of the first action unless the termination resulted from voluntary discontinuance or from dismissal for failure or neglect to prosecute.

4. This section does not alter the law on tolling of the statute of limitations nor does it apply to causes of action which have accrued before this Article becomes effective.

[6] Of the jurisdictions relevant to this action, Mississippi and South Carolina opted for a six-year statute of limitations on breach of contract and warranty claims. See Miss. Code Ann. § 75-2-725; S.C. Code Ann. § 36-2-725. In Colorado, claims on contracts for the sale of goods are barred after three years. See Colo. Rev. Stat. Ann. §§ 4-2-725, 13-80-101.

[7] Under the UCC, the discovery rule can toll the statute of limitations on actions for breach of warranties under certain

## [**9] The Ohio Exception

Ohio is an exception to this general rule. [8] Ohio's "savings clause" identifies the activity necessary to toll the statute, specifying that: HN1[⬆] "This section does not alter sections 2305.15 and 2305.16 of the Revised Code on tolling of the statute of limitations." Ohio Rev. Code Ann. § 1302.98(D). HN2[⬆] Having qualified its limitations period for actions arising from contracts on goods, the statute may be tolled only if: (1) the defendant "is out of the state, has absconded, or conceals *himself*; or (2) the action against whom the cause of action is directed is disabled, due to either minority status or mental incompetence. Id. §§ 2305.15, 2305.16 (emphasis added). Since neither of these contingencies are present in the instant action, the four-year statute of limitations bars recovery of damages for the claims of Ohio Plaintiffs which accrued prior to May 13, 1987. This does not, however, preclude these Plaintiffs from recovering damages for Exxon's alleged breaches which occurred subsequent to that date.

## [**10] The Florida Exception

Analysis under Florida law is similarly unique, and adversely impacts on the recovery of damages for claims of Florida Plaintiffs that accrued prior to May 13, 1986. HN3[⬆] According to recent case law construing Florida's statute of limitations, Florida recognizes neither the discovery rule nor fraudulent concealment as vehicles for tolling the five-year limitations period for actions predicated on obligations imposed under a written instrument or contract. See Beck v. Lazard Freres & Co., LLC, 175 F.3d 913, 914 (11th Cir. 1999) (quoting Federal Ins. Co. v. Southwest Fla. Retirement Ctr., Inc., 707 So. 2d 1119, 1122 (Fla. 1998)); Fulton County Admin. v. Sullivan, 1997 Fla. LEXIS 1462, 22

---

circumstances. See UCC § 2-725(2).

[8] Plaintiffs have argued to the contrary, citing Standard Alliance Indus. Inc. v. Black Clawson Co., 587 F.2d 813, 820-23 (6th Cir. 1978). However, in that case, the court was deciding an action brought for breach of an express warranty and noted that the discovery rule within Ohio Rev. Code § 1302.98(2) applied to toll the statute of limitations. The relevant section of the Ohio Revised Code, § 1302.98, became effective as of July 1, 1962. Therefore, at all relevant times-throughout the Discount for Cash period--the doctrine of fraudulent concealment could not toll the running of the statute of limitations for a breach of contract action predicated on the sale of goods.

Page 8 of 21

188 F.R.D. 667, *672; 1999 U.S. Dist. LEXIS 13574, **10

*Fla. Law W. S 578*; 1997 WL 589312 (Fla. Sept. 25, 1997) (absent an expression of the Legislature that fraudulent concealment may act to toll the statute of limitations, courts are constrained to honor the statutory bar except for those circumstances enumerated in § 95.051). [9]

### [**11] Contingencies for Tolling the Statutes of Limitations

*HN4*[⬆] As previously articulated, except for Florida and Ohio, [10] the uniform statute of limitations **[*673]** does not preempt the states' laws on tolling the limitations period. See *UCC § 2-725(4)*. To preclude the harsh effects of their statute of limitations, several states recognize acts perpetrated by a defendant for which the defendant is estopped from using the statute of limitations as a bar to a suit for liability. See, e.g., *First Baptist Church of Citronelle v. Citronelle-Mobile Gathering, Inc., 409 So. 2d 727, 730 (Ala. 1981)* ("Tolling the statute of limitations in favor of the plaintiffs is not inconsistent with the function of the statute . . . [which is to] prevent revival of fraudulent or stale claims and prevent surprise after evidence is lost or

---

[9] Plaintiffs direct the Court's attention to the fact that Sullivan, an unpublished opinion of the Florida Supreme Court, is currently pending rehearing. See *Putnam Berkley Group, Inc. v. Dinin, 734 So. 2d 532, 1999 WL 333143*, at *1 n.8 (Fla. 4th DCA 1999). Therefore, Plaintiffs argue, that avoidance based on fraudulent concealment is unclear in Florida. However, Sullivan has since been cited with approval by the Florida Supreme Court. See *Federal Ins. Co. v. Southwest Fla. Retirement Center, Inc., 707 So. 2d 1119, 1122 (Fla. 1998)*. In turn, that case has been cited and relied upon by the Eleventh Circuit Court of Appeals. See *Beck v. Lazard Freres & Co., LLC, 175 F.3d 913 (11th Cir. 1999)*. Accordingly, Sullivan is binding on this Court at this time.

[10] Exxon maintains that New York is also an exception to the general rule that fraudulent concealment, if proven, tolls the statute of limitations for contract actions. However, research conducted by the Court reveals that New York does permit avoidance of a statute of limitations affirmative defense. See, e.g., *Cerulean Land Developers Corp. v. Colon Development Corp., 144 A.D.2d 615, 535 N.Y.S.2d 35, 37-38 (N.Y. App. Div. 1988)*; see also *Buttry v. General Signal Corp., 68 F.3d 1488, 1493 (2d Cir. 1995)*; *Salinger v. Projectavision, Inc., 972 F. Supp. 222, 232 (S.D.N.Y. 1997)*; *Netzer v. Continuity Graphic Assoc., Inc., 963 F. Supp. 1308, 1316 (S.D.N.Y. 1997)*; *Union Carbide Corp. v. Montell N.V., 944 F. Supp. 1119, 1139 (S.D.N.Y. 1996)*; *Johnson v. Nyack Hosp., 891 F. Supp. 155, 165 (S.D.N.Y. 1995)*.

---

obscured.") (citing U.S. Supreme Court precedent). Thus, the propriety of tolling the statute of limitations is based on equitable principles which underlie the laws of the respective states. See *Jafay v. Board of County Comm'rs of Boulder County, 848 P.2d 892, 903 (Colo. 1993)* (when a rigid application of the statute of limitations leads **[**12]** to an unjust result, courts may properly fashion an equitable exception to the limitations period); see also *Dean Witter Reynolds, Inc. v. Hartman, 911 P.2d 1094, 1096 (Colo. 1996)* ("equity may require a tolling of the statutory period where flexibility is required to accomplish the goals of justice"); *Brooks v. Southern Pacific Co., 105 Ariz. 442, 466 P.2d 736, 738 (Ariz. 1970)* ("The policy underlying the statute of limitations is primarily for the protection of the defendant, and the courts, from litigation of stale claims *where plaintiffs have slept on their rights* and evidence may have been lost or witnesses' memories faded. This policy is sound and necessary for the orderly administration of justice.") (emphasis added). These equitable principles remove the statutory bar for conduct that includes, but is not limited to, fraudulent concealment of the wrongful conduct and the concept of continuing breach. See, e.g., *Duell v. United Bank of Pueblo, N.A., 892 P.2d 336, 341 (Colo. Ct. App. 1994)* (where a defendant's wrongful actions have been the cause of a plaintiff's failure to institute a timely action, the defendant may be **[**13]** estopped from relying upon the resulting delay as a defense to the plaintiff's claim).

To avoid the statutory bar, **[**14]** Plaintiffs have alleged that Exxon fraudulently concealed the Plaintiffs' cause of action. Based on its review, the Court concludes that thirty-three of the thirty-five jurisdictions involved recognize the doctrine of fraudulent concealment as an avoidance to the statute of limitations. [11] **[**15]** Of these jurisdictions, twenty-nine states require Plaintiffs to prove the elements of fraudulent concealment by a preponderance of the evidence, whereas six states require Plaintiffs to establish fraudulent concealment by clear and convincing evidence. The elements of fraudulent concealment vary to some degree among the

---

[11] As will be discussed, the Court has found that, of the thirty-six jurisdictions involved, since there is no issue as to the statute of limitations with regard to Louisiana Plaintiffs, only thirty-five jurisdictions were relevant to the analysis. Additionally, of these thirty-five jurisdictions, Florida and Ohio are exceptions to the general rule. See discussions *supra. at pp. 6-7*, and *infra*. nn. 15 & 16.

Page 9 of 21

188 F.R.D. 667, *673; 1999 U.S. Dist. LEXIS 13574, **15

jurisdictions. From Exxon's prospective, *each plaintiff* has the burden of proving each one of the elements. [12] For reasons discussed more fully below, the Court respectfully disagrees, and concludes that the factual disputes arising from the fraudulent concealment doctrine can be properly resolved on a class-wide basis by the jury in deciding the remaining class-wide issues, notwithstanding slight variations in state law as to how certain of the elements are described.

*HN5*[↑] ] A claim or defense can implicate common issues and be litigated collectively, despite the existence of state law variations, so long as the elements of the claim or defense are substantially similar and any differences fall into a limited number of predictable patterns which can be readily handled by special interrogatories or special verdict forms. See, e.g., In re Prudential Ins. Co. of America **[*674]** *Sales Practices Litig.* 962 F. Supp. 450, 525 (D.N.J. 1997) ("a manageable **[**16]** number of jury instructions could be fashioned to comport with the elements of the common law claims in the many jurisdictions.").

While Exxon contends that Plaintiffs' fraudulent concealment avoidance in this case presents individual issues because of variations of state law in the thirty-three relevant jurisdictions, a number of federal courts considering such matters have determined that the fraudulent concealment doctrine presents common issues capable of being litigated collectively in the class context. See *Blackie v. Barrack, 524 F.2d 891, 902 (9th Cir. 1975)* ("The overwhelming weight of authority holds that repeated misrepresentations of the sort alleged here satisfy the common 'question' requirement. Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable, which is not defeated by slight differences in class members' positions, and that the issue may profitably be tried in

one suit."). The commonality requirement is satisfied **[**17]** when the alleged misrepresentations constitute a "common course of conduct," even if the statements made to each Plaintiff were not identical. [13] See *Kirkpatrick v. J.C. Bradford & Co., 827 F.2d 718, 724-25 (11th Cir. 1987)*; *Bresson v. Thomson McKinnon Sec. Inc, 118 F.R.D. 339, 343 (S.D.N.Y. 1988)*; *In re Victor Tech. Sec. Litig., 102 F.R.D. 53, 56 (N.D. Cal. 1984)*. "Although the communications to [the Plaintiff-Class] may not have been uniform, they allegedly were uniformly misleading. [Any] variations are therefore immaterial" and cannot defeat class treatment. *Bresson, 118 F.R.D. at 343*.

**[**18]** *HN7*[↑]

While oral misrepresentations have been held to be insufficiently similar to warrant class certification, written misrepresentations disseminated to all class members have often been found sufficiently similar. Compare *Kaser v. Swann, 141 F.R.D. 337, 339 (M.D. Fla. 1991)* with *Heastie v. Community Bank of Greater Peoria, 125 F.R.D. 669, 679 (N.D. Ill. 1989)*. Many cases predicated on securities violations have been certified as class actions with regard to pendent state law fraud claims. See, e.g., *In re Southeast Hotel Properties Ltd. Partnership Investor Litig., 151 F.R.D. 597 (W.D.N.C. 1993)*; *In re Seagate Tech. Sec. Litig., 115 F.R.D. 264 (N.D. Cal. 1987)*; *In re ORFA Sec. Litig., 654 F. Supp. 1449 (D.N.J. 1987)*; *In re Energy Sys. Equip. Leasing Sec. Litig., 642 F. Supp. 718 (E.D.N.Y. 1986)*.

Courts have also found that where there is a "common legal grievance," shared by the members of the class, "the benefit from the determination in a class action of the existence of a . . . common pattern of fraud outweighs the problems of individual actions involving such other issues as causation, **[**19]** reliance, and damages." In re Cadillac V8-6-4 Class Action, 93 N.J. 412, *461 A.2d 736, 745-47 (N.J. 1983)*. Where plaintiffs in a class action allege similar representations, the reliance issues may be presumed similar as well. See *Town of New Castle v. Yonkers Contracting Co., Inc.,*

---

[12] Exxon contends that each Plaintiff has the burden of proving that: (1) Exxon committed affirmative acts intended to conceal its alleged failure to file suit until May 13, 1991; (2) the individual dealer reasonably relied on those acts in deciding not to file suit until May 13, 1991; (3) the individual dealer exercised due diligence in investigating or trying to uncover the possible existence of a claim; and (4) the individual dealer did not know or suspect the concealed facts underlying his cause of action. See Supplemental Submission of Defendant Exxon Corporation Regarding Affirmative Defenses, at 4.

[13] *HN6*[↑] -

To allege a "common course of conduct," Plaintiffs must allege in detail the specific misrepresentation and "identify or isolate any particular misstatement or omission contained in a document and contained in a subsequent document which most of the other class members received." See *Blumenthal v. Great American Mortgage Investors, 74 F.R.D. 508, 513 (N.D. Ga. 1976)* (citation omitted).

Page 10 of 21

188 F.R.D. 667, *674; 1999 U.S. Dist. LEXIS 13574, **19

*131 F.R.D. 38, 43 (S.D.N.Y. 1990)* (common questions pervade fraudulent concealment inquiry); *Fisher Bros. v. Mueller Brass Co., 102 F.R.D. 570, 579 (E.D. Pa. 1984)* (same); *In re Screws Antitrust Litig., 91 F.R.D. 52, 55 (D. Mass. 1981)* (same); *In re Independent Gasoline Antitrust Litig., 79 F.R.D. 552, 559 (D. Md. 1978)* (same); *Reserve Life Ins. Co. v. Kirkland, 917 S.W.2d 836, 843 (Tex. Ct. App. 1996)*. HN8[↑] Consequently, courts have permitted actions for fraudulent concealment to proceed as a nationwide class if:

> convinced that individual actions by claimants would impose a strangling harness on the judiciary, as well as the parties. . . . [and] separate actions would produce considerable duplication of effort, increase the cost of litigation, create the risk of inconsistent results for parties who are **[*675]** similarly **[**20]** situated, and consume judicial resources to wasteful levels (through duplication) throughout the country.

*In re Catfish Antitrust Litig., 826 F. Supp. 1019, 1045 (N.D. Miss. 1993)*.

Here, the common questions arising from an assertion of the fraudulent concealment doctrine are: (1) Whether Exxon affirmatively concealed its breach from the dealer network; and (2) Whether the Dealer-Class, by exercising due diligence, could have determined that a breach occurred. [14] Both the evidence of Exxon's acts of concealment and the circumstances that would have triggered Plaintiffs' duty of due diligence would be common to the class. See *id. at 1044*.

 **[**21]** Nevertheless, Exxon argues that the diversity among the jurisdictions regarding the elements necessary for establishing fraudulent concealment and the discrepancies in the burdens of proof require

─────────────────────

[14] According to Plaintiffs, Exxon accomplished this concealment by repeatedly assuring Plaintiffs that Exxon was adhering to its promise of offsetting its wholesale price for fuel to Plaintiffs by an amount that was equal, "on average," to the 3% credit card processing charge first assessed in August 1981. Because the cost of fuel is volatile and any proof that the offset was not implemented was contained in proprietary documents maintained exclusively by Exxon, Plaintiffs were forced to rely on Exxon's assurances of contractual performance. Plaintiffs, although suspicious that Exxon was performing as promised, did not realize a breach had occurred until 1991, when an Exxon official purportedly represented that Exxon had failed to continue, but would resume, applying the offset. Immediately upon this revelation, Plaintiffs filed their breach of contract suit.

individual judicial attention. Thus, proof of the viability of Plaintiffs' avoidance is not conducive to class-wide management.

The Court is unpersuaded by Exxon's position that class-wide treatment of the relevant issues, which predominate, is inappropriate. In light of the overwhelming commonality and typicality of the issues and equitable concerns, the Court cannot "permit [Exxon] to contest the liability with each claimant in a single separate suit, [which] would, in many cases give [Exxon] an advantage which would be almost equivalent to closing the door of justice to all small claimants. This is what . . . the class suit practice was to prevent." *Weeks v. Bareco Oil Co., 125 F.2d 84, 90 (7th Cir. 1941)*; see also *Deposit Guar. Nat'l Bank v. Roper, 445 U.S. 326, 339, 100 S. Ct. 1166, 1174, 63 L. Ed. 2d 427 (1980)* ("Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits **[**22]** for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device."). [15]

**[**23]** *Fraudulent Concealment Avoids Statutory Time Bar*

Although some jurisdictional differences exist as to elements necessary to establish a claim of fraudulent

─────────────────────

[15] Exxon also argues that a single jury cannot address the claims of Florida and Ohio Plaintiffs, where fraudulent concealment cannot avoid a statute of limitations affirmative defense, in tandem with claims of Plaintiffs permitted to assert fraudulent concealment. However, the Court disagrees with Exxon's assessment and is not persuaded by the authorities cited by Exxon in support. *Bruton v. United States, 391 U.S. 123, 125, 88 S. Ct. 1620, 1622, 20 L. Ed. 2d 476 (1968)*, was a criminal case wherein the Supreme Court was dealing with prejudicial testimony of a co-conspirator. In *Wilson v. Gillis Advertising Co., 145 F.R.D. 578, 582 (N.D. Ala. 1993)*, the evidence precluded related to the net worth of the defendant, which the court found would improperly impact on the issue of the amount and propriety of awarding punitive damages. Here, there is no prejudice, because the Florida and Ohio Plaintiffs cannot avoid the statutory time-bar on grounds of fraudulent concealment. These Plaintiffs would "fall out" of the issue *if* the jury decides fraudulent concealment was practiced by Exxon. In other words, Florida and Ohio Plaintiffs cannot recover beyond the statutory period and will not benefit by a class-wide determination of fraudulent concealment. Conversely, Plaintiffs in the remaining jurisdictions will not be advantaged, because Plaintiffs from Florida and Ohio will be precluded from offering evidence substantiating fraudulent concealment.

Page 11 of 21

188 F.R.D. 667, *675; 1999 U.S. Dist. LEXIS 13574, **23

concealment that avoids an affirmative pleading of a statute of limitations, the differences are not insurmountable so as to require decertification of the issue. In fact, jurisdictions which recognize fraudulent concealment fall into only two categories: those that require proof of reliance and those that do not.

Of the relevant jurisdictions surveyed, the Court found that eleven of the **[*676]** thirty-three jurisdictions that permit tolling of the statute of limitations for fraudulent concealment contain a reliance element [16]: California, Colorado, Maine, Maryland, Montana, New Mexico, New York, South Carolina, Texas, Virginia, and Washington. See *Community Cause v. Boatwright, 124 Cal. App. 3d 888, 177 Cal. Rptr. 657, 664 (Cal. Ct. App. 1981)*; *Kopeikin v. Merchants Mortgage & Trust Corp., 679 P.2d 599, 602 (Colo. 1984)*; *Harkness v. Fitzgerald, 1997 ME 207, 701 A.2d 370, 372 (Me. 1997)*; *Edwards v. Demedis, 118 Md. App. 541, 703 A.2d 240, 251 (Md. Ct. App. 1997)*; **[**24]** *Poulsen v. Treasure State Indus., Inc., 192 Mont. 69, 626 P.2d 822, 827 (Mont. 1981)*; *Continental Potash, Inc. v. Freeport-McMoran, Inc., 115 N.M. 690, 858 P.2d 66, 74 (N.M. 1993)*; Banque Arabe et *Internationale d'Investissement v. Maryland Nat'l Bank, 57 F.3d 146, 153 (2d Cir. 1995)*; *Strong v. University of So. Carolina Sch. of Medicine, 316 S.C. 189, 447 S.E.2d 850, 852 (S.C. 1994)*; *Arabian Shield Dev. Co. v. Hunt, 808 S.W.2d 577, 584 (Tex. Ct. App. 1991)*; *Metrocall of Delaware, Inc. v. Continental Cellular Corp., 246 Va. 365, 437 S.E.2d 189, 193-94 (Va. 1993)*; *Crisman v. Crisman, 85 Wash. App. 15, 931 P.2d 163, 166 (Wash. Ct. App. 1997)*. The remaining jurisdictions require only proof of an affirmative act of concealment, while some jurisdictions also require a showing that the plaintiff was reasonably diligent in detecting the wrongful activity which gives rise to the cause of action. See, e.g., *Colonia Ins. Co. v. City National Bank, 13 F. Supp. 2d 891, 900 (W.D. Ark. 1998)*; *Resource Ventures, Inc. v. Resources*

*Management Int'l, Inc., 42 F. Supp. 2d 423, 436 (D. Del. 1999)*; **[**25]** *Richards v. Mileski, 213 U.S. App. D.C. 220, 662 F.2d 65, 70-71 (D.C. Cir. 1981)*; *Jim Walter Corp. v. Ward, 245 Ga. 355, 265 S.E.2d 7, 9 (Ga. 1980)*; *Ludwig v. Ford Motor Co., 510 N.E.2d 691, 697 (Ind. Ct. App. 1987)*; *Cunningham v. Massachusetts Mut. Life Ins. Co., 972 F. Supp. 1053, 1054 (N.D. Miss. 1997)*; Foodtown v. Sigma Marketing Sys., Inc., 518 F. Supp. 485, 488 (D.N.J. 1980); *Beauty Time, Inc. v. VU Skin Sys., Inc., 118 F.3d 140, 144 (3d Cir. 1997)*; *Dean Witter Reynolds, Inc. v. McCoy, 853 F. Supp. 1023, 1036 (E.D. Tenn. 1994)*. Due diligence is a question of fact within the province of the jury's responsibilities. See, e.g., *Texas v. Allan Const. Co., Inc., 851 F.2d 1526, 1533 (5th Cir. 1988)*; *Bradley v. Maryland Cas. Co., 563 F. Supp. 602, 607-08 (D. Del. 1983)*.

 **[**26]** As to those jurisdictions that require reliance, the essential issue is whether, under the circumstances of this class action, reliance on Exxon's purported deceit can be established on a class-wide basis. Considering the circumstances, the Court concludes that it can.

Several courts have found that the requirement that reliance must be justified in order to support recovery may be shown on a class basis. For instance, federal class action cases in which stockholders have alleged fraud on the basis of printed misrepresentations in a corporation's prospectus hold that individual proof may not be required to establish reliance by each stockholder. See, e.g., *Green v. Wolf Corp., 406 F.2d 291, 301 (2d Cir. 1968)*. [17]

_____

[16] Although Florida requires reliance be proven to prevail on a fraudulent concealment claim, such a claim cannot toll the statute of limitations. See Sullivan, 1997 WL 589312, at *2-3. Likewise, reliance is required for fraudulent concealment in Ohio, but its statute of limitations for contracts for goods does not provide tolling for fraudulent concealment. See *Ohio Rev. Code Ann. § 1302.98*. Moreover, while reliance is a prerequisite for proving fraudulent concealment under Louisiana law, Louisiana's statute of limitations for contract actions is ten years, negating the need to either plead or prove fraudulent concealment as to those Plaintiffs, since this action was filed within the ten-year time-frame. See *La. Civ. Code Ann. art. 3499*.

_____

[17] Other cases in which class treatment of reliance has been held viable include the following: In consolidated actions against an automobile manufacturer that allegedly fraudulently induced purchasers to buy vehicles with a known design defect, the court properly certified the statewide class of approximately 7,500 purchasers where the purchasers' causes of action embraced common legal and factual elements and where benefit from determining the existence of a common defect and common pattern of fraud outweighed problems of individual actions involving other issues such as causation, reliance, and damages. See In re Cadillac V8-6-4 Class Action, 93 N.J. 412, *461 A.2d 736 (N.J. 1983)*; in an action based upon an alleged breach of a retail installment sales contract for the purchase of a vacuum cleaner, the defendant was entitled to convert her counterclaim alleging fraud into a class action on behalf of all similarly situated purchasers of vacuum cleaners from the plaintiff, provided all prerequisites for class action status were met. Establishment of a common course of conduct by salesmen pursuant to training or "canned" techniques taught by the plaintiff would be a

Page 12 of 21

188 F.R.D. 667, *676; 1999 U.S. Dist. LEXIS 13574, **26

[**27] [*677]  The essential class-wide reliance issue for the jury is whether the Plaintiff-Class, through representatives, relied upon false representations by Exxon in delaying the filing of an action within the limitations periods. Evidence of such reliance may be proven by direct or circumstantial evidence. *See, e.g., Blackie, 524 F.2d at 902* (Ninth Circuit citing several jurisdictions in the Second, Ninth, and Tenth Circuits); *see also Poulsen v. Treasure State Indus., Inc., 192 Mont. 69, 626 P.2d 822, 827 (Mont. 1981)* ("An inference of reliance upon fraudulent representations may be drawn from circumstances surrounding the transaction which have been proven."); *Abramovitz v. Ahern, 96 F.R.D. 208, 218 (D. Conn. 1982).* [18] [**28] Moreover, "where there is [proof of] active concealment, Plaintiffs' due diligence is irrelevant." *Township of Susquehanna v. H&M, Inc., 98 F.R.D. 658, 668 (M.D. Pa. 1983)* (citing *Ohio v. Peterson, Lowry, Rall, Barber & Ross, 472 F. Supp. 402, 406-07 (D. Colo. 1979)).* [19]

Exxon proffers no evidence or argument which purports to demonstrate that access to information and data substantiating a cause of action for breach of Exxon's promise to offset the credit card processing fee were available to some, but not all, of the dealers. To the contrary, the evidence proffered has been that Exxon continuously assured Plaintiffs that the offset was being applied "on average" to all of Exxon's dealers. Exxon admitted as much in deposition testimony of its executive officers: The question of whether the offset was [**29] being applied was raised by the dealer representatives every time Exxon addressed its dealers at national conferences, and every time the dealer representatives were told that the offset was in force. *See* Deposition of Voller, at 304-05. Whether these dealer representatives reported this information to those they represented and whether this information was disseminated raises questions of fact to be proved or disproved, and subsequently, decided by the jury.

As the case law instructs, Plaintiffs will bear the burden of proving fraudulent concealment, either by clear and convincing evidence or by a preponderance thereof. Depending on whether an individual jurisdiction [*678] requires that reliance be proven to support the claim, the reliance element may not be altogether eliminated. *See Waters v. International Precious Metals Corp., 172 F.R.D. 479, 485-86 (S.D. Fla. 1996)* (in cases where "a course of business or a device, scheme or artifice operates as a fraud, as long as the plaintiffs are able to prove the materiality of the omitted facts, proof of reliance is not prerequisite to recovery."). [20]

_____

"common strand of misrepresentation" running through all the sales, sufficient to warrant granting class action status. *See Compact Electra Corp. v. Paul, 93 Misc. 2d 807, 403 N.Y.S.2d 611 (N.Y. App. Div. 1977)*; where a small number of purchasers had attempted to bring a class action claiming that the defendant vendor had falsely represented to them and others that if they made purchases of frozen food at half price for two years, they would each be given a freezer without cost, the court in held that, since the class was described as including persons who were tricked, deceived, and misled into believing that they would get a freezer without charge if they would buy frozen food at one-half the price, it would be difficult to imagine one member of the class electing to pay out his contract to the last penny. Even if one such person were found, stated the court, he would not be a part of the class represented by those whose names appeared in the caption of the complaint. *See Robnet v. Miller, 105 Ohio App. 540, 152 N.E.2d 763 (Ohio Ct. App. 1957)*; a class action was properly brought by car purchasers against a manufacturer for fraud and misrepresentation in advertising and selling Oldsmobile automobiles with engines manufactured by Chevrolet. Each class member did not have to prove exposure to advertising as the advertising was conducted through the mass media; nor did each class member have to prove reliance on the advertising if the class representative presented sufficient evidence to raise a presumption affecting the burden of going forward with evidence that all class members relied on the advertising. *See Amato v. General Motors Corp., 11 Ohio App. 3d 124, 463 N.E.2d 625 (Ohio Ct. App. 1982).*

[18] Although Exxon "must be given fair opportunity to contest the validity of individual claims and to present defenses unique to particular claims. . . . At the same time, consistent with judicial economy and access to judicial relief objections to class actions, 'class members should be able to secure the relief to which they are entitled without expending more money and effort than is necessary.'" Newberg on Class Actions § 9.63, at 9-172 (3d ed. 1992) (quoting source omitted).

_____

[19] The Court notes that some courts have reached contrary determinations. *See, e.g., Wolfson v. Artisans Savings Bank, 83 F.R.D. 547, 551-52 (D. Del. 1979)* (limiting certified class to exclude members seeking to avoid a statute of limitations bar by asserting fraudulent concealment); *Bill Minnielli Cement Contracting, Inc. v. Richter Concrete Corp., 62 F.R.D. 381, 390 (S.D. Ohio 1973)* ("the questions of exercise of due diligence and success of concealment would have to be answered on an individual basis for each class member.").

[20] As Plaintiffs assert, the Court may instruct a single jury as to the different burdens of proof applicable to fraudulent concealment. Such a practice will not be confusing or difficult. *See* Discussion at pp. 22-24, infra.; *see also Wildman v. Lerner Stores Corp., 771 F.2d 605, 609 (1st Cir. 1985)* ("The district court carefully and correctly explained the burden of proof applicable to the statutes and written interrogatories

Page 13 of 21

188 F.R.D. 667, *678; 1999 U.S. Dist. LEXIS 13574, **29

**[**30]** Correlatively, Exxon is entitled to rebut the reliance element. Although Exxon does not have "an unequivocal right to rebut the presumption of reliance on an individual basis," and its substantive trial rights will not suffer prejudice by placing limitations upon the amount of proof it may present, *172 F.R.D. at 486*, Exxon shall be given the opportunity to establish that any "misrepresentations in fact" did not induce a delay in filing a cause of action until after the statutes of limitations had run, or that dealers would not have filed a cause of action even if possessed with the knowledge that Exxon did not perform its promised contractual obligation. See, e.g., *Basic Inc. v. Levinson, 485 U.S. 224, 248, 108 S. Ct. 978, 992, 99 L. Ed. 2d 194 (1988)*. With this assumably disputed evidence, the parties may argue to the jury whether Plaintiffs met their respective burdens and whether the claim was successfully rebutted by Exxon.

### Statutes of Limitations Are Not a Complete Bar to Recovery

Even if the jury finds that fraudulent concealment was not proven, either by clear and convincing or a preponderance of evidence, Plaintiffs are not totally barred from recovering **[**31]** under their contract claims. Rather, the statute of limitations will only affect the extent to which respective Plaintiffs may recover. In other words, should the jury find that fraudulent concealment did not apply, then, depending on jurisdictional constraints, some class Plaintiffs' claims will be time-barred after either 1988, 1987, 1986, or 1985. However, Exxon has not, and indeed cannot, argue that any Plaintiffs are completely barred by any relevant statute of limitation.

### Differing Burdens of Proof Do Not Preclude Class-Wide Adjudication

The parties disagree as to which burden of proof for claims of fraudulent concealment is applicable in the relevant jurisdictions. They agree that state law requires proof by clear and convincing evidence in at least four states: Connecticut, Maryland, Pennsylvania, and Virginia. However, Exxon contends that twelve other states adhere to this heightened burden of proving fraudulent conduct.

The Court has reviewed the cases cited by Exxon in the twelve disputed jurisdictions. In two of these jurisdictions, the Court agrees the exacting standard of clear, unequivocal, and convincing evidence is necessary to prevail on a claim of fraudulent **[**32]** concealment: Vermont and Washington. See *Hughes v. Holt, 140 Vt. 38, 435 A.2d 687, 689 (Vt. 1981); Crisman v. Crisman, 85 Wash. App. 15, 931 P.2d 163, 166 (Wash. Ct. App. 1997)*. However, case law in the remaining jurisdictions illustrate no definitive inclination to subject Plaintiffs' avoidance of Exxon's statute of limitations affirmative defense based on claims of fraudulent *concealment* to a heightened standard of proof. In the absence of clear and convincing guidance from the respective state's courts, this Court will not imply a standard for proving fraudulent concealment other than by a preponderance of the evidence. [21]
**[*679]** Accordingly, Plaintiffs will be required to prove fraudulent concealment by clear and convincing evidence for their breach of contract claims governed by the law of the following jurisdictions: Connecticut, Maryland, Pennsylvania, Vermont, Virginia, and Washington.

**[**33]** As with Exxon's argument regarding decertification due to certain jurisdictional requirements for proving the element of reliance, the dichotomy created by the differing burdens does not create an insurmountable impediment to proceeding to trial as a class. To the contrary, although "application of the laws of multiple states to a common set of claims certainly has potential complexities, [] on analysis, procedures and litigation devices are available, in common usage, to render these tasks manifestly manageable for the court, the jury, and all the parties." Newberg on Class Actions § 9.68, at 9-184. These methods include carefully crafted jury instructions and special verdict forms. See id.

In the instant action, the discrepancy between the two standards of proof are amenable to the issue-structuring devices afforded by jury instructions and special verdict

---

were submitted to the jury for findings on each of the three statutes. We think that the instructions, to which there were no objections, were sufficient to enable the jury to cope with the different burdens of proof and apply them correctly."); *Bonilla v. Liquilux Gas Corp., 812 F. Supp. 286, 293 (D.P.R. 1993)* ("we find that the issue of different burdens of proof can be dealt with in the judge's instructions to the jury and need not lead to confusion.").

---

[21] Generally, unless stated otherwise, the burden of proof in civil trials is by a preponderance of evidence. See, e.g., *Gates Rubber Co. v. Bando Chemical Indus., Ltd., 167 F.3d 90, 108 (D. Colo. 1996)* ("The burden of proof under which a trial is governed is 'preponderance of the evidence.'").

Page 14 of 21

188 F.R.D. 667, *679; 1999 U.S. Dist. LEXIS 13574, **33

forms. For instance, a showing of fraudulent concealment by clear and convincing evidence necessarily satisfies the lesser burden of proof by a preponderance of the evidence. Should the jury find, through directives on the verdict form, that the evidence clearly and convincingly supports Plaintiffs' avoidance claim [**34] of fraudulent concealment, then the issue is resolved. On the other hand, should the jury determine that fraudulent concealment has not been clearly and convincingly proven, then Plaintiffs in the six enumerated jurisdictions will be barred from recovery on contractual damages which predated the applicable limitations periods. At that point, the jury will need to evaluate the evidence of fraudulent concealment pursuant to the preponderance of evidence standard. Should the jury find that the evidence satisfies this lesser standard, those Plaintiffs may recover from the time Exxon allegedly breached the Sales Agreements, regardless of the limitations applicable to those jurisdictions. However, if the jury finds neither burden has been met, then all Plaintiffs will be barred from recovering damages on breaches beyond their respectively applicable statute of limitations.

### Application of the Continuing Breach Doctrine

In addition to recognizing various theories to avoid the preclusive effect of a statutory time limitation, some jurisdictions have adopted a continuing breach doctrine. *HN9*[↑] Under this doctrine, a cause of action for breach of a contract does not begin to accrue upon [**35] the initial breach; rather, on contracts providing serial performance by the parties, accrual of a breach of contract cause of action commences upon the occurrence of the last breach or upon termination of the contract. See, e.g., *Local 194, Retail, Wholesale & Dep't Store Union v. Standard Brands, Inc., 85 F.R.D. 599, 610 (N.D. Ill. 1979)* (complaint alleged continuing violation that reached back past the limits of the applicable statutes).

Having reviewed the contractual practices involved in this litigation in the context of case law adopting and applying the continuous breach doctrine, the Court finds that the concept cannot be used by Plaintiffs to toll the statutes of limitations. Those jurisdictions which have recognized the doctrine as an alternative equitable resolution to avoid the harsh impact of statutory limitations, applied it to successive or continuous breaches which occurred during the term of a singular contract. See, e.g., *Construction Interior Sys., Inc. v. Donohoe Cos., Inc., 813 F. Supp. 29 (D.D.C. 1992)*;

*Magna Assocs. v. Torgrove, 585 F. Supp. 585 (D. Colo. 1984)*; *Mullins v. Rockwell Int'l Corp., 15 Cal. 4th 731, 936 P.2d 1246, 1250 (Cal. 1997)*; [**36] *Commercial Union Ins. Co. v. Porter Hayden Co., 116 Md. App. 605, 698 A.2d 1167, 1192 (Md. Ct. App. 1997)*; *AC, Inc. v. Baker, 622 So. 2d 331, 334 (Ala. 1993)* (for agreements constituting several, separate annual agreements, a breach of contract action accrues on each contract, individually, when performance under each contract is complete); *Intermedics, Inc. v. Grady, 683 S.W.2d 842 (Tex. Ct. App. 1984)*; *Cannell v. Bulicek, 8 Ohio App. 3d 331, 457 N.E.2d 891, 896 (Ohio Ct. App. 1983)*.

*HN10*[↑] [*680] To decide the propriety of invoking the continuous breach doctrine for evaluating the time of accrual of a cause of action, the Court must first determine whether the contract is continuous or severable in nature. See, e.g., *Burger v. Level End Dairy Investors, 125 B.R. 894, 901-02 (Bankr. D. Del. 1991)*. Where the nature of the contract is continuous, statutes of limitations do not typically begin to run until termination of the entire contract. See id. However, if the nature of the contract is severable, the statutes of limitations generally commence to run on each severable portion of the contract when a party [**37] breaches that portion of the contract. See *Worrel v. Farmers Bank of Del., 430 A.2d 469, 474-75 (Del. Super. Ct. 1981)*.

Here, Plaintiffs renewed their Sales Agreements with Exxon, if at all, every three years. Each Sales Agreement was, therefore, severable in nature, since performance of the parties, as to that Agreement, was presumed complete upon expiration of an express term of years. Although it may be argued that Exxon had a continuous duty to act in good faith in terminating the contract and renewing the relationships with its dealers in subsequent, successive contracts, performance under the Sales Agreements, in and of itself, was severable, giving rise to a cause of action for breach of contract based on nonperformance. Moreover, as previously set forth in prior orders of this Court, a contractual breach of the covenant of good faith cannot be divorced from the actual breach of contract claim. See *Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 617 (3d Cir. 1995)* (good faith is an interpretive tool to determine the parties' justified expectations, and is not to be used for enforcement of "an independent duty divorced from the [**38] specific clauses of the contract"); see also *UCC § 1-203*, cmt. (no independent cause of action exists for failure to perform in good faith).

Page 15 of 21

188 F.R.D. 667, *680; 1999 U.S. Dist. LEXIS 13574, **38

Plaintiffs have not persuaded the Court that each dealer's succession of Sales Agreements with Exxon constituted one, continuous contract that endured throughout the period of time the Discount for Cash program was in effect. Absent such evidence, or other unique circumstances which would distinguish the instant case from the factual scenarios of cases in which courts rejected the continuous breach doctrine for contracts severable in nature, the doctrine cannot be applied to toll the statute of limitations as codified by the relevant jurisdictions.

### Exxon's Affirmative Defense on Grounds of Release

### The Operative Language of the Releases

Exxon asserts as an affirmative defense that over 5,193 dealers who are members of the Plaintiff-Class executed standard Mutual Termination and Release Agreements ("Releases"). Except for a small number of Releases, [22] the standard form documents contain similar language. There are four standard versions of the Release provisions. The vast majority of the Releases include the following language, **[**39]** which defines the scope of the Release:

> Releasing each other, as of the date of this Agreement, from all claims or causes of action which each now has against each other (whether or not known to either) including but not limited to, those arising directly or indirectly under, out of or in connection with each terminated instrument, or any sales or deliveries of petroleum products, tires, batters, and/or accessories by EXXON to DEALER, *EXCEPTING, HOWEVER*, claims of each party against the other for *trade accounts*,. . . rental

payments, *reimbursements*, indemnification and/or obligations arising under promissory notes, amortization agreements, mortgages, **[*681]** and/or security agreements, and FURTHER EXCEPTING any claims of EXXON relating to real or personal property heretofore or now in DEALER'S possession.

(Emphasis added).

**[**40]** The second version of the Releases includes the exception for "trade accounts" but not "reimbursements" and the third version excepts "reimbursements" but not "trade accounts." A fourth version of the Releases (approximately 385 in number) contain neither exception. [23] The first appearance of this alteration in the record is reflected in a Release executed in 1993, after this litigation was filed.

Exxon contends that all four versions of the Releases cannot be construed under principles applicable to the UCC, and that the Releases unambiguously bar all claims and causes of action the parties thereto had, have, or will ever have, whether known or unknown at the time the Release was executed. Plaintiffs aver that the majority of the Releases contain language which expressly excepts the present cause of action **[**41]** from its otherwise broad preclusive effect. [24] Additionally, Plaintiffs submit that the Releases should be construed in conformance with UCC principles, as they are an indivisible and essential part of the course of performance and dealing between Exxon and its

---

[22] Plaintiffs concede that 385 of the 5,193 Releases do not contain qualifying language that would except the basis of Plaintiffs' breach of contract claim; that is, these Releases do not contain reference to exceptions for "trade accounts" or "reimbursements." As to these Releases, Plaintiffs urge the Court to find that these class members may bring a separate action against Exxon to void the Releases in the event Plaintiffs obtain a successful verdict against Exxon. The Court respectfully declines to address that issue. However, as noted *infra*, the Court concludes that, except in Delaware, even these Releases, **if entered into prior to Exxon's disclosure to the dealer-class of its breach,** are unenforceable if the jury finds breach of contract and fraudulent concealment **prior to the date the Releases were executed**.

[23] The Court has not undertaken a count of the Releases which fall into this category. However, the parties agree on this point: that no qualifying language is contained in 385 of the Releases in issue.

[24] Plaintiffs contend that the plain meaning of the terms "trade accounts" and "reimbursement," which appear in the vast majority of the Releases, unambiguously, and, as a matter of law, except Plaintiffs' claims from the Releases. Although the analysis set forth below does not primarily rely on these arguments, the Court concludes that Plaintiffs' arguments are well-founded as an alternative ground for finding the Releases unenforceable as applied to the specific facts of this case. The term "trade accounts" is defined by Exxon in the Releases as "including without limitation monies due and owing either party associated with motor fuel purchases or any other products purchased from Exxon by Dealer," a description that is readily applicable to this case. Similarly, Plaintiffs' claim is contemplated by the plain and ordinary definition of "reimbursement": "to pay back, to make restoration, to repay that expended; to indemnify, or make whole." Black's Law Dictionary (6th ed.).

Page 16 of 21

188 F.R.D. 667, *681; 1999 U.S. Dist. LEXIS 13574, **41

dealers. Finally, Plaintiffs question the validity of any Releases executed after certification of the class.

[**42] The Court concludes as a matter of law that the Releases do not relieve Exxon of its individual obligation, and class-wide obligation, of good faith under its Sales Agreements with its dealers. To the contrary, Exxon's duty of good faith under the original Sales Agreements was also applicable to its conduct in obtaining Releases from the dealer-class. If the jury determines, through special interrogatories, that Exxon breached its good faith obligation to its dealers under the Sales Agreements, and that such breach was fraudulently concealed from the class, then the Releases may not, in good faith, be uniformly enforced against an involuntary waiver of those rights. Here, Exxon does not contend that any dealer "voluntarily" and "knowingly" waived any rights with respect to the class claims at issue because, without dispute from Exxon, it met its obligations; however, if Exxon did knowingly "take back" the cost of credit adjustment, and, therefore, breached its good faith contractual obligation to its dealers, it would have contracted for the Releases in bad faith, by non-disclosure, thereby nullifying the Releases as to the instant claim. The Court further concludes that: (1) the [**43] Releases fall within the governing scope of the UCC; (2) general, all-encompassing releases must be narrowly construed, which dilutes their efficacy; and (3) Releases obtained post-certification may be invalid.

**Validity of Releases Under the UCC**

Contrary to Exxon's position, the Court finds that the UCC does provide the basic governing law for determining the validity of a release. _HN11_[⬆] Under Article 2 of the UCC, the term "waiver" means an intentional relinquishment of a known right. See _In re Humboldt Fir, Inc., 426 F. Supp. 292, 297 (N.D. Cal. 1977)_. The waiver of one or more contract provisions leaves the remaining terms in force. See id.; see also _V-M Corp. [*682] v. Bernard Dist. Co., 447 F.2d 864, 866 (7th Cir. 1971)_.

_HN12_[⬆] Releases are a form of contract, and therefore, must be interpreted pursuant to contract law. See, e.g., _Weingart v. Allen & O'Hara, 654 F.2d 1096, 1103 (5th Cir. 1981)_; _Gibbs v. Dodson, 229 Ga. App. 64, 492 S.E.2d 923, 926 (Ga. Ct. App. 1997)_; _Prall v. Indiana Nat'l Bank, 627 N.E.2d 1374, 1377 (Ind. Ct. App. 1994)_ ("A release is a species of contract. . . . The interpretation of [**44] a release, like any other

contract, is determined by the terms of the particular instrument, considered in light of all facts and circumstances."); _Ristau v. Wescold, Inc., 318 Ore. 383, 868 P.2d 1331, 1333 (Or. 1994)_ ("A release agreement is a contract subject to the rules of contract construction and interpretation."). Although state contract law must be applied, "the laws concerning the construction of a general release are more or less uniform among the states." _Coral Gables Imported Motorcars, Inc. v. Fiat Motors of No. America, Inc., 673 F.2d 1234, 1238 (11th Cir. 1982)_.

Since all of the Releases refer to the termination of the Sales Agreements and Automotive Credit Card Guide, the Releases and Agreements referenced therein are considered and construed in the aggregate. See, e.g., _New Life Corp. of America v. Thomas Nelson, Inc., 932 S.W.2d 921, 925 (Tenn. Ct. App. 1996)_ ("A contract must be construed with reference to the situation of the parties, the business to which the contract relates, and the subject matter as it appears from the words used."); _Anheuser-Busch Cos., Inc. v. Summit Coffee Co., 858 S.W.2d 928, 933 (Tex. Ct. App. 1993)_ [**45] ("When a release refers to a related document, the other document should be taken into consideration."). The Court, having determined that the Sales Agreements at issue come under the auspices of the UCC, finds that the Releases are amenable to UCC construction.

The UCC includes a section, entitled "Waiver or Renunciation of Claim or Right After Breach," which expressly covers the release of claims arising from UCC-governed contracts. See _UCC § 1-107_. _HN13_[⬆] The section provides:

> Any claim or right arising out of an alleged breach can be discharged in whole or in part without consideration by a written waiver or renunciation signed and delivered by the aggrieved party.

_UCC § 1-107_. The purpose of this section is to permit parties to renounce or waive "rights or claims arising out of an alleged breach of a commercial contract." _UCC § 1-107_, cmt. _HN14_[⬆] However, in construing the enforceability of a contractual release under the UCC, the provisions of the release "must be read in conjunction with the section imposing an obligation of good faith." Id. This duty of good faith must be present throughout the entire formation, as well as the performance, of the contract. [**46] See _UCC § 2-209_; cf. _Ipec Inc. v. International Lithographing Corp., 869 F.2d 1080, 1084 (7th Cir. 1989)_ ("Any modification or waiver as to the first contract, though it did not necessarily need to be supported by consideration, had

Page 17 of 21

188 F.R.D. 667, *682; 1999 U.S. Dist. LEXIS 13574, **46

to meet the test for good faith imposed by the Uniform Commercial Code.").

The duty of good faith incorporated into each contract, either express or implied, assures that neither party acts in a manner that destroys the rights or interests of the other party to the agreement. See *Savoca Masonry Co., Inc. v. Homes & Son Const. Co., Inc., 112 Ariz. 392, 542 P.2d 817, 821 (Ariz. 1975)*. As previous orders of this Court have held, whether Exxon breached its duty of good faith is a question of fact for the jury. See *Tonka Tours, Inc. v. Chadima, 372 N.W.2d 723, 728 (Minn. 1985)*. **HN15**[↑] However, like contracts, if the terms of the Release are unambiguous, construction of the contract is a matter of law for the Court to decide. See *Ristau, 868 P.2d at 1333*; *Hurt v. Leatherby Ins. Co., 380 So. 2d 432, 433 (Fla. 1980)* (when the language in a release is clear and unambiguous, courts **[**47]** cannot indulge in construction nor interpretation of its plain meaning).

### *Waiver of a Right Must Be Knowing and Voluntary*

**HN16**[↑] The interpretation of the effect of a release is based upon the intention of the parties to the instrument. See *Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 346-48, 91 S. Ct. 795, 810-11, 28 L. Ed. 2d 77* **[*683]** *(1971)*. In narrowly construing a general release, it is crucial that it be interpreted so that it discharges only those rights intended by the parties to be relinquished. See *Vaughn v. Didizian, 436 Pa. Super. 436, 648 A.2d 38, 40 (Pa. Super. Ct. 1994)*. Although courts favor "the finality of settlements," see, e.g., *Pettinelli v. Danzig, 722 F.2d 706, 710 (11th Cir. 1984)*, "claims or demands . . . are not discharged unless expressly embraced [in the release] or falling within the fair import of the terms employed." *Bilotti v. Accurate Forming Corp., 39 N.J. 184, 188 A.2d 24, 35 (N.J. 1963)*. A general release does not discharge liability for unknown damage already done. See *Gibbs v. Dodson, 229 Ga. App. 64, 492 S.E.2d 923, 926 (Ga. Ct. App. 1997)*. Thus, **[**48]** "an intention to release a party from liability for unknown conduct must be clearly expressed in the release." *492 S.E.2d at 926-27* (citation omitted).

### *Jurisdictional Survey*

**HN17**[↑] The majority of the jurisdictions relevant to the instant controversy adhere to the general rule that a waiver must be made knowingly and voluntarily, and

that "not every settlement that refers to post-settlement conduct necessarily results in a prospective waiver." *Adams, 67 F.3d 580 at 584* (construing a release under Kentucky law). [25] **[**50]** The laws of Delaware, have

---

[25] The Court finds that, except for Delaware, courts in the relevant jurisdictions concur. See, e.g., *People's Bank v. Pioneer Food Indus., Inc., 253 Ark. 277, 486 S.W.2d 24, 28 (Ark. 1972)* ("waiver" is a voluntary relinquishment of a known right); *Casey v. Proctor, 59 Cal. 2d 97, 378 P.2d 579, 584, 28 Cal. Rptr. 307 (Calif. 1963)* (general releases do not extend to claims which the releaser does not know or suspect to exist in his favor at the time of executing the release); *Scotten v. Landers, 190 Colo. 27, 543 P.2d 64, 66 (Colo. 1975)* ("equity will strike down without hesitation" any release which is not fairly and knowingly made); *Muldoon, 231 Conn. 469, 650 A.2d 1240 at 1245* (the Connecticut Supreme Court has held that "the general words in a release are limited always to that thing or those things which were specially in the contemplation of the parties at the time when the release was given. But a dispute that had not emerged, or a question which had not arisen at all, cannot be considered as bound and concluded by the anticipatory words of a general release."); *Columbus Hotel Corp. v. Hotel Management Co., 116 Fla. 464, 156 So. 893, 901-02 (Fla. 1934)* (release entered into between parties who had "been long engaged in attempting to adjust a highly complicated controversy" supported conclusion that parties were "fully apprised of all material matters affecting the settlement contract as executed"); *Conner v. Fisher, 136 Ind. App. 511, 202 N.E.2d 572, 575 (Ind. 1964)* ("waiver" is the voluntary yielding up of some existing right); *Bernstein v. Kapneck, 46 Md. App. 231, 417 A.2d 456, 464-65 (Md. Ct. App. 1980)* (a release does not bar existing but unknown damages "not within the contemplation of the parties at the time of contracting for such release"); *Kerr v. Small, 112 Mont. 490, 117 P.2d 271, 273 (Mont. 1941)* (equates "waive" with "acquiesce" in tax deed validity contest); *Gerbig v. Gerbig, 60 Nev. 292, 108 P.2d 317, 318 (Nev. 1940)* (equates "waiver" with "voluntary" acceptance); *Keelan v. Bell Comm. Research, 289 N.J. Super. 531, 674 A.2d 603, 609 (N.J. Super. 1996)* (a release executed by one "who is unaware of his rights is not a knowing or voluntary release"); *Beneficial Finance Co. of Jersey City, Inc. v. Norton, 76 N.J. Super. 577, 185 A.2d 218, 220 (N.J. Super. 1962)* ("waiver" is a voluntary, clear and decisive act, implying an election to forego some advantage which the waiving party might have insisted on); *Ed Black's Chevrolet Center, Inc. v. Melichar, 81 N.M. 602, 471 P.2d 172, 174 (N.M. 1970)* ("in no case will a waiver be presumed or implied, contrary to the intention of the party whose rights would be injuriously affected thereby"); *Vaughn, 648 A.2d at 40* ("The courts of Pennsylvania have . . . interpreted the release as covering only such matters as can fairly be said to have been within the contemplation of the parties when the release was given."); *New Life Corp. of America v. Thomas Nelson, Inc., 932 S.W.2d 921, 925 (Tenn. Ct. App. 1996)* ("a

Page 18 of 21

188 F.R.D. 667, *683; 1999 U.S. Dist. LEXIS 13574, **50

interpreted the concept of a general release as encompassing all claims between the parties, whether in the contemplation of the parties or in existence at the time the release was made. **[*684]** See *Hob Tea Room, Inc. v. Miller, 33 Del. Ch. 38, 89 A.2d 851, 856 (Del. 1952)* ("a general release, one which is intended to cover everything--what the parties presently have in mind, as well as what they do not have in mind, but what may, nevertheless, arise" is a "general and final settlement" of all claims of the parties). [26] Moreover, in Virginia, while there must be an intent to include a claim of unknown damages, the releaser **[**49]** must show mutual lack of intent by "clear, cogent and convincing evidence." *Marshall v. Cundiff, 211 Va. 673, 180 S.E.2d 229, 232 (Va. 1971)*.

*HN18*[↑] Although general releases may be enforceable, it is commonly held that "based on a realistic recognition that releases contain standardized, even ritualistic, language and are given in circumstances where the parties are looking no further than the precise matter in dispute," ascertaining the underlying intent of the parties and their knowledge at the time of executing the release is crucial. *Mangini v. McClurg, 24 N.Y.2d 556, 301 N.Y.S.2d 508, 513, 249 N.E.2d 386 (N.Y. App. Div. 1969)*. Relevant to the inquiry "is whether there has been a conscious and

---

demand of which a party was ignorant when the release was given is not as a rule . . . embraced therein"); *Panorama Residential Protective Ass'n v. Panorama Corp. of Wash., 97 Wash. 2d 23, 640 P.2d 1057, 1060 (Wash. 1982)* ("a waiver is an intentional and voluntary relinquishment of a known right'). The Court acknowledges that its jurisdictional analysis has rendered a result different from that of the parties. The Court concedes that the majority of the cases used in its jurisdictional survey did not involve underlying UCC contracts, but the analysis appears analogous to the Release circumstances at issue in the instant matter. Moreover, the Court found no authority to preclude the applicability of common law principles where they are not displaced by provisions of the UCC. See *Gorge Lumber Co. v. Brazier Lumber Co., 6 Wash. App. 327, 493 P.2d 782, 787 (Wash. Ct. App. 1972)* (construing release of claims arising from underlying UCC contract). Given these decisions, it can be logically concluded that releases interpreted under the UCC would receive the same analysis and result in similar conclusions.

[26] As to Delaware, the Court concludes that the Releases involved are not enforceable against the affected dealers that included the "exception" language referenced in footnote 24, supra. The Delaware Releases would be enforceable, if at all, against those dealers whose Releases contain no such qualifying language (i.e., the Category-four releases).

deliberate intention by the parties to release" the claims which existed but were unknown to them at the time they entered into the release. *LaFleur v. C.C. Pierce Co., Inc., 398 Mass. 254, 496 N.E.2d 827, 832 (Mass. 1986)*. **[**51]**

*HN19*[↑] Of course, a compromise and settlement of a *bona fide* controversy between the parties constitutes a valid and binding agreement. See *Ruble Forest Prods., Inc. v. Lancer Mobile Homes of Oregon, Inc., 269 Ore. 315, 524 P.2d 1204, 1206 (Or. 1974)*. Thus, a release which clearly and unequivocally mentions the claim to be released acts as a complete bar concerning all matters covered by the release. See *Victoria Bank & Trust Co. v. Brady, 811 S.W.2d 931, 938 (Tex. 1991)* (claims not clearly within the subject matter of the release are not discharged, even if they existed when the release was executed; the release must "mention" the claim to be released).

*Application of Jurisdictional Law to the Releases*

Viewing the Releases in the context of the applicable laws, there is no clear language that the parties intended the Releases to bar claims for Exxon's alleged breach of its promise to offset the credit card processing fee against its wholesale fuel price. As noted above, Exxon's own position, at least throughout these proceedings, belies any intent on its part to have included the instant breach of contract claim in the Release.

Exxon has repeatedly **[**52]** represented that it was not legally obligated to reduce its wholesale fuel price, however, it nonetheless did lower the price in an amount which "on average" offset the cost of credit card receipts submitted by its dealers. Exxon has steadfastly denied the validity of Plaintiffs' breach of contract claim. Since it was not clear to the parties that Plaintiffs even had a claim, there is no evidence to permit a reasonable inference that the parties agreed to extinguish the instant action. Moreover, the Sales Agreement explicitly states: "Termination of this contract by either party for any reason shall not relieve the parties of any obligation theretofore accrued under this contract." Sales Agreement, at P 18(g). This language, together with Exxon's own exceptions for "trade accounts" and "reimbursements," would tend to infer that rights already perfected under the respective Sales Agreement could not be waived. Given these circumstances and Exxon's position, the Court concludes, as a matter of law, assuming the jury finds breach of contract and

Page 19 of 21

188 F.R.D. 667, *684; 1999 U.S. Dist. LEXIS 13574, **52

fraudulent concealment, that the affected dealers did not [and could not] knowingly and voluntarily intend to waive damages resulting from [**53] a breach of the covenant of good faith in fixing the open price term when the Releases were executed.

### Validity of Releases Executed Post-Certification

The parties dispute the validity of the Releases entered into between Exxon and members [*685] of the Plaintiff-Class after the filing of the instant action and the issuance of the order certifying this case as a class action. Plaintiffs contend that the Releases are unenforceable as a bar to this action, because Exxon did not disclose the existence of the pending litigation or dispute, and therefore, these dealers did not knowingly and voluntarily release the claims involved in this suit. Plaintiffs additionally argue that these Releases should be set aside because ethical rules governing attorneys precludes a party from settling with individual class members in the absence of participation by counsel for the class. In response, Exxon urges that the Releases are valid and act to totally bar this action. [27]

[**54] The Court finds that the post-certification Releases are governed by the same principles of law and policy that govern the pre-certification Releases. That is, for the Releases to be valid, they must have been knowingly and voluntarily made and procured in good faith. See, e.g., Scotten v. Landers, 190 Colo. 27, 543 P.2d 64, 67 (Colo. 1975).

Having reviewed an exemplar of the Release executed post-certification, as supplied by the parties, the Court finds no express mention of the instant litigation. Because this action was pending at the time these

_____

[27] In support, Exxon cites to a prior order entered by Judge Kehoe in July 1992, which denied Plaintiffs' motion to enjoin Exxon from entering into the Releases. However, having reviewed Judge Kehoe's order entered July 1, 1992, the Court disagrees with Exxon's interpretation. Judge Kehoe found "no evidence . . . to suggest that [Exxon was] seeking out these potential class members for the purposes" of undermining the participation of dealers in the class action by "obtaining releases." Order [D.E. # 218], at 2-3. Because Judge Kehoe found that not allowing Exxon to inform the terminating dealers of the pending litigation, which was necessary for an informed waiver, placed Exxon in an untenable position, he specifically refused to enjoin Exxon's business practices of procuring a Release "when a dealer *chooses to end his relationship*." *Id. at 3* (emphasis added).

Releases were negotiated and executed, even if the affected Plaintiffs had constructive notice of the claims filed by the dealer-class, the Releases do not definitively demonstrate that the claim was intended by the parties thereto to be included in the general waiver of claims. See Victoria Bank & Trust Co., 811 S.W.2d at 938 (if the claims existed when the release was executed, the release must mention the claims to be discharged). Consequently, the Court concludes, as a matter of law, that the Releases executed after certification of the Plaintiff-Class cannot bar those Plaintiffs from participating [**55] in the litigation of this action. [28]

### ISSUES REGARDING PREJUDGMENT INTEREST

Plaintiffs have requested that any judgment entered in their favor include all interest which accrued prior to the rendered verdict. Exxon opposes Plaintiffs' contention that the issue of prejudgment interest can be handled on a class-wide basis. Rather, according to Exxon, the various jurisdictions differ as to the decision-maker of entitlement to prejudgment interest, the time from which prejudgment interest accrues, and the nature of the evidence relevant to deciding whether and to what extent Plaintiffs are entitled to prejudgment interest. Having reviewed the submissions of the parties and conducted an independent search of the laws in the relevant [**56] jurisdictions, the Court concludes as follows:

Prejudgment interest, pursuant to statute, is awarded as a matter of right in twenty-five jurisdictions, and accrues from the date on which the money was wrongfully withheld, in this case, from the date of the breach. [29] [**57] Those jurisdictions are: Alabama, [*686]

_____

[28] Having found that the post-certification Releases do not preclude those Plaintiffs from proceeding to a verdict, it is unnecessary for the Court to address whether the Releases obtained post-certification are voidable based on ethical rules regulating the practice of law.

[29] These jurisdictions require that the damages be liquidated in nature. HN20[↑] "A claim is liquidated when it is subject to mathematical computation without reliance on opinion or discretion." Aries v. Palmer Johnson, Inc., 153 Ariz. 250, 735 P.2d 1373, 1384 (Ariz. Ct. App. 1987). Based on the evidence in the record and the testimony of the parties' respective experts, the Court has determined that Plaintiffs breach of contract damages are liquidated. As trial progresses, should it become apparent that the damages are not calculable as to be "subject to mathematical computation," the Court shall amend its conclusion accordingly.

Page 20 of 21

188 F.R.D. 667, *686; 1999 U.S. Dist. LEXIS 13574, **57

California, Colorado, Delaware, District of Columbia, [30] [**58] Florida, Georgia, Kentucky, Louisiana, [31] Maryland, [32] Massachusetts, Montana, Nevada, New York, North Carolina, Ohio, Oregon, Pennsylvania, Rhode Island, South Carolina, Texas, Vermont, Washington, [33] [**59] West Virginia, and Wyoming. [34]

_____

[30] Two sections of the District of Columbia's Code regulate the allowance of interest on judgments. Under *D.C. Code § 15-108*, prejudgment interest is mandatory "to recover a liquidated debt on which interest is payable by contract or by law or usage." Pursuant to *D.C. Code § 15-109*, prejudgment interest is merely discretionary when the amount is unliquidated or is not provided by contract, law, or usage. See **Giant Food, Inc. v. Jack I. Bender & Sons, 399 A.2d 1293, 1305 (D.C. 1979)**. Under the circumstances, the Court finds that *§ 15-108* applies, permitting the award of prejudgment interest as a matter of right. Although the contracts at issue are silent as to the award of any interest, case law instructs that "where there has been a complete deprivation, pre-judgment interest is an element of complete compensation for the loss of use of [] money 'from the time the claim accrues until judgment is entered, thereby achieving full compensation for the injury those damages are intended to redress." *Nolen v. District of Columbia, 726 A.2d 182, 185 (D.C. 1999)* (quoting *Riggs Nat'l Bank v. District of Columbia, 581 A.2d 1229, 1253 (D.C. 1990)* and *West Virginia v. United States, 479 U.S. 305, 310-11 n.2, 107 S. Ct. 702, 706 n.2, 93 L. Ed. 2d 639 (1987))*.

[31] Louisiana has different accrual periods, depending on whether the claim is for a breach of a promise under the contract ("*ex contractu*"), for which interest begins accruing from the time of the breach, or whether damages are requested for a breach of a duty under a contract ("*ex delicto*"), for which interest accrues from the date of the judicial demand, or the filing of the complaint. Since the Court has repeatedly found that a breach of the duty of good faith cannot be a separate cause of action, the Court concludes that any prejudgment interest should accrue from the date of the breach.

[32] For entitlement to prejudgment interest as of right in Maryland, there must be an obligation to tender a certain sum upon a certain date. See *Crystal v. West & Callahan, Inc., 328 Md. 318, 614 A.2d 560, 572 (Md. 1992)* ("The ordinary rule in contract cases, if the contract requires payment of a sum certain on a date certain, is [that] prejudgment interest typically is allowed as a matter of right.").

[33] In Washington, although entitlement to prejudgment interest on liquidated claims is a matter of right, a trial court, in its discretion, may reduce or disallow such interest upon a finding that the plaintiff unreasonably delayed in prosecuting a claim. See *Colonial Imports v. Carlton Northwest, Inc., 83 Wash. App. 229, 921 P.2d 575, 583 (Wash. Ct. App. 1996)*

While three additional jurisdictions award prejudgment interest as a matter of right, interest is calculated as accruing from the date Plaintiffs made formal judicial demand, which would be the date the Complaint was filed on May 13, 1991. These jurisdictions are: Arizona, Maine, and New Hampshire.

In the remaining jurisdictions, entitlement to prejudgment interest is discretionary, requiring the presentation of evidence in support of such entitlement. Only one jurisdiction, Virginia, requires that the issue be decided by the fact finder. See *Va. Code Ann. § 8.01-382* ("In any action at law or suit in equity, the verdict of [**60] the jury, or if no jury the judgment or decree of the court, *may* provide for interest on any principal sum awarded, or any part thereof, and fix the period at which the interest shall commence.") (emphasis added); see also *Dairyland Ins. Co. v. Douthat, 248 Va. 627, 449 S.E.2d 799, 801 (Va. 1994)* ("This section provides for the discretionary award of prejudgment interest by the trier of fact, who 'may provide for' such interest and fix the time of its commencement. The accrual of postjudgment interest, however, is mandatory. . . ."). The Virginia Supreme Court has [*687] declared that "prejudgment interest is an element of compensatory damages." *Pulliam v. Coastal Emergency Servs. of Richmond, Inc., 257 Va. 1, 509 S.E.2d 307, 321 (Va. 1999)* (citation omitted).

While Virginia's statute clearly assigns the discretionary authority to award prejudgment interest to the jury, the proof necessary for deciding whether it is appropriate and from what date prejudgment interest should accrue is less defined. However, appellate decisions instruct that the touchstone is a sum that will fully and fairly

_____

("prejudgment interest on liquidated claims ordinarily is a matter of right, but . . . trial judges have discretion to disallow such interest during periods of unreasonable delay in completing litigation that is attributable to claimants.").

[34] Wyoming normally requires that a formal demand notifying the defendant that an amount is due be made before the accrual period for interest commences. See, e.g., *Northern Gas Co. v. Town of Sinclair, 592 P.2d 1138, 1143 (Wyo. 1979)*. However, the Wyoming Supreme Court has also recognized that when deprived of the beneficial use of money, a plaintiff should be compensated for the loss during the time of the deprivation. See *Goodwin v. Upper Crust of Wyoming, Inc., 624 P.2d 1192, 1198 (Wyo. 1981)* (the plaintiffs "were entitled to the use of the money they were to receive under the agreement from the date it became due. . . . [Therefore,] prejudgment interest should have been awarded in an attempt to compensate for that loss.").

Page 21 of 21

188 F.R.D. 667, *687; 1999 U.S. Dist. LEXIS 13574, **60

compensate Plaintiffs for the damages sustained for the delay **[\*\*61]** in the payment of money due. See, e.g., *Gill v. Rollins Protective Servs. Co., 836 F.2d 194, 198 (4th Cir. 1987)* (prejudgment interest is compensatory in nature "and is designed to compensate the plaintiff who has been without deserved relief for an extended period of time."); *City of Danville v. C & O Ry., 34 F. Supp. 620, 638 (W.D. Va. 1940)* (prejudgment interest is allowed when it "appears necessary to compensate the plaintiff adequately, i.e. to make him whole"); Coombs v. Summitt, 1996 WL 1065539, at \*5 & n.6 (Va. Cir. Ct. May 20, 1996) (providing Virginia Model Jury Instruction regarding damages and prejudgment interest in a negligence cause of action). [35]

**[\*\*62]** In six jurisdictions, the Court decides whether prejudgment interest should be awarded. Those jurisdictions are: Connecticut, Indiana, Mississippi, New Jersey, New Mexico, and Tennessee. See *Conn. Gen. Stat. Ann. § 37-3a*; *Brandewiede v. Emery Worldwide, 890 F. Supp. 79, 82 (D. Conn. 1994)* ("An award of prejudgment interest pursuant to *Section 37-3a* is an equitable determination within the discretion of the court."); *Ind. Code Ann. § 34-51-4-7*; *Miss. Code Ann. § 75-17-7*; *N.J. Stat. Ann. § 12A:2-710*; *Meshinsky v. Nichols Yacht Sales, Inc., 110 N.J. 464, 541 A.2d 1063, 1070 (N.J. 1988)* (prejudgment interest may be awarded on contract claims in the discretion of the court in accordance with equitable principles); *N.M. Stat. Ann. § 56-8-4*; *Tenn. Code Ann. § 47-14-123*. However, in Mississippi, accrual is not discretionary, and commences at the time the complaint was filed. See *Miss. Code Ann. § 75-17-7* (the judgment "shall bear interest at a per annum rate set by the judge hearing the complaint from a date determined by such judge to be fair but in no event prior to the filing of the complaint.").

---

[35] This Court does not have ready access to the Virginia Model Jury Instructions. Therefore, Plaintiffs' counsel shall be responsible for providing the relative instruction and to brief the Court as to the evidence they intend to proffer to assist the jury in determining: (1) the propriety of prejudgment interest for the Virginia Plaintiffs necessary to fully compensate for the loss of the use of any wrongfully withheld money by Exxon; and (2) the date from which prejudgment interest should accrue in order to effectuate complete relief. Recognizing that the proffer of this evidence is as to only the Virginia Plaintiffs might infer that either: (1) only Virginia Plaintiffs would be entitled to prejudgment interest; or (2) all other Plaintiffs will receive prejudgment interest in the event of a favorable verdict, the Court shall bifurcate that part of the proceedings to ensure the interests of the Virginia Plaintiffs, as well as Exxon, are equally considered and protected.

Similarly, while Indiana allows for some **[\*\*63]** judicial discretion, "the court shall determine the period during which prejudgment interest accrues. . . . However, the period may not exceed forty-eight (48) months." Ind. Code Ann. § 34-53-4-8. In Connecticut, New Jersey, New Mexico, and Tennessee, the Court is given full discretionary authority to determine the appropriate time from which prejudgment interest may be awarded. Nevertheless, the Court must recognize that "the equitable purpose of prejudgment interest is to compensate a party for lost earnings on a sum of money to which it was entitled, but which has been retained by another." *Sulcov v. 2100 Linwood Owners, Inc., 303 N.J. Super. 13, 696 A.2d 31, 39 (N.J. Super. Ct. App. Div. 1997)*; see also *Otis v. Cambridge Mut. Fire Ins. Co., 850 S.W.2d 439, 446 (Tenn. 1992)*. Factors which the Court may consider in reaching a determination include: whether the detention of the money was wrongful under the circumstances; whether the sum recovered was a liquidated amount; and whether Plaintiffs diligently presented their claim. See *Brandewiede, 890 F. Supp. at 82*.

The remaining issue necessary for resolution is the rate at which interest should accrue. **[\*\*64]** For instance, the New Mexico statutory rate of prejudgment interest becomes **[\*688]** fixed at the rate in effect at the time the action is filed. See *Grynberg v. Roberts, 102 N.M. 560, 698 P.2d 430, 433 (N.M. 1985)*. While in other jurisdictions, it will be necessary to determine the various rates to which prejudgment interest was subjected throughout the entitlement period--either from the date of breach or the date the complaint was filed. The parties will be required to supply such data to the Court. Otherwise, the entitlement and accrual periods of prejudgment interest shall be in accordance with the aforementioned conclusions.

DONE AND ORDERED in Chambers at Miami, Florida, this 10 day of August, 1999.

ALAN S. GOLD

UNITED STATES DISTRICT JUDGE

---

**End of Document**

# Exhibit 3

## *Allapattah Servs. v. Exxon Corp.*

United States District Court for the Southern District of Florida

July 6, 1999, Decided ; July 6, 1999, Filed

CASE NO: 91-0986-CIV-GOLD

### Reporter

61 F. Supp. 2d 1308 *; 1999 U.S. Dist. LEXIS 13616 **; 41 U.C.C. Rep. Serv. 2d (Callaghan) 118

ALLAPATTAH SERVICES, INC., et al., Plaintiffs, vs. EXXON CORPORATION, Defendant.

**Subsequent History:** Motion denied by *Allapattah Servs. v. Exxon Corp., 61 F. Supp. 2d 1326, 1999 U.S. Dist. LEXIS 13560 (S.D. Fla., July 20, 1999)*

**Prior History:** *Allapattah Servs. v. Exxon Corp., 61 F. Supp. 2d 1300, 1999 U.S. Dist. LEXIS 13559 (S.D. Fla., July 1, 1999)*

**Disposition: [**1]** Exxon's Renewed Motion for Summary Judgment on Count I [D.E. # 1027] DENIED.

## Core Terms

dealer, good faith, wholesale price, trade usage, credit card, modify, offset, commercially reasonable, integration clause, summary judgment, gasoline, covenant, fair dealing, discount, express terms, bad faith, duty of good faith, double, reasonable commercial standards, honesty, contractual obligation, reasonable expectation, fuel, discretionary authority, justified expectations, final expression, franchisee, nationwide, disclaim, merchant

## Case Summary

### Procedural Posture

Defendant gas supplier filed a renewed motion for summary judgment in a class action suit by plaintiff gas dealers which alleged that defendant overcharged wholesale gasoline prices.

### Overview

Plaintiff gas dealers sued defendant gasoline supplier for overcharging wholesale prices to them. Defendant moved for summary judgment and the court denied the motion because many factual disputes existed. The court ruled that the sales agreement between the parties did not permit defendant to act arbitrarily in setting the wholesale prices and defendant had a duty to act in good faith under *U.C.C. § 1-203*. The court held that defendant had to set its open price term in good faith and within the limits set by commercial reasonableness pursuant to *U.C.C. § 2-311*. The parties' intentions in setting an open price term, as well as the reasonableness of it, were questions of fact. The court also held that parol evidence was admissible to establish defendant's duty of good faith and the alleged breach of that duty. The integration and modification clauses did not negate the importance of trade usage and course of dealing in establishing price. To determine the parties' final expression as to their contractual obligations the court considered trade usage, course of dealing, and course of performance. Factual issues were raised by implicating the integration and modification clauses.

### Outcome

The court denied defendant's renewed motion for summary judgment because factual issues existed as to commercial reasonableness of the prices charged and whether defendant acted in good faith in setting the prices. The court also ruled that factual issues existed as to the parties' intentions by contracting and as to the integration and modification clauses.

## LexisNexis® Headnotes

Civil Procedure > Judgments > Relief From Judgments > Altering & Amending Judgments

**HN1[⬇]** The court is constrained to overturn a ruling by a predecessor judge, and may do so only under exceptional circumstances.

Page 2 of 23

61 F. Supp. 2d 1308, *1308; 1999 U.S. Dist. LEXIS 13616, **1

Civil Procedure > Judgments > Relief From Judgments > Altering & Amending Judgments

*HN2*[🔽] The Local Rules for the Southern District of Florida require reconsideration of a prior ruling only where the court determines that there exists a clear and obvious error, which in the interests of justice mandates correction. S.D. Fla. L. R. 7.1(f).

Commercial Law (UCC) > Sales (Article 2) > General Overview

Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment > General Overview

Commercial Law (UCC) > ... > Form, Formation & Readjustment > Parol Evidence Rule > General Overview

Commercial Law (UCC) > ... > Form, Formation & Readjustment > Parol Evidence Rule > Gap Filler Provisions

*HN3*[🔽] The Uniform Commercial Code provides that, even though words and terms in a writing intended to be the final expression of the agreement of the parties may not be contradicted by evidence of a prior or contemporaneous agreement, extrinsic evidence may be used to explain or supplement the writing, in the form of course of dealing, trade usage, and by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement. *U.C.C. § 2-202*.

Commercial Law (UCC) > Sales (Article 2) > General Overview

Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment > General Overview

Commercial Law (UCC) > ... > Form, Formation & Readjustment > Parol Evidence Rule > Gap Filler Provisions

Contracts Law > Contract Conditions & Provisions > Integration Clauses

Business & Corporate Compliance > Contracts > Contract Conditions & Provisions > Integration Clauses

Contracts Law > Contract Interpretation > Parol Evidence > General Overview

*HN4*[🔽] An integration clause which merely states that

the parties intend the writing to be a complete and exclusive statement of the terms of the agreement does not suffice to negate the importance of trade usage and course of dealing, because these are such an integral part of the contract that they are not normally disclaimed by general language in the merger clause. Unless carefully negated trade usage and course of dealing are an element of the meaning of the words used.

Commercial Law (UCC) > General Provisions (Article 1) > General Provisions

Commercial Law (UCC) > General Provisions (Article 1) > Definitions & Interpretation > General Overview

Commercial Law (UCC) > Sales (Article 2) > General Overview

Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment > General Overview

Commercial Law (UCC) > Sales (Article 2) > Subject Matter > General Overview

Commercial Law (UCC) > ... > Subject Matter > Definitions > General Overview

Commercial Law (UCC) > ... > Definitions > Collateral > General Overview

Contracts Law > Contract Conditions & Provisions > Integration Clauses

Business & Corporate Compliance > Contracts > Contract Conditions & Provisions > Integration Clauses

Contracts Law > Contract Interpretation > Parol Evidence > General Overview

Contracts Law > Contract Formation > Execution & Delivery

Business & Corporate Compliance > Contracts > Contract Formation > Execution & Delivery

*HN5*[🔽] Although merger or integration clauses have been considered strong evidence of finality, they are not conclusive on the issue of whether the writing encompasses the entire agreement of the parties. In fact, the Uniform Commercial Code's definition of agreement necessarily contemplates that the parties' obligations transcend the written words within the signed document: Agreement means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance. *U.C.C. § 1-201*.

Commercial Law (UCC) > ... > General

Page 3 of 23

61 F. Supp. 2d 1308, *1308; 1999 U.S. Dist. LEXIS 13616, **1

Provisions > Policies & Purposes > General Overview

Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment > General Overview

Contracts Law > Contract Interpretation > Parol Evidence > General Overview

*HN6*[↓] To determine whether the writing constitutes the final expression of the parties as to their obligations under a valid contract, multiple factors should be considered. These factors include evidence of trade usage, course of dealing, and course of performance. Trade usage is relevant to show that the expectation of the parties that a given usage will be observed is justified. Both parties need not be consciously aware of the particular trade usage at issue. It is enough if the trade usage is such as to justify an expectation of its observance. Parties to a contract are presumed to have intended the incorporation of trade usage in striking their bargain. Since the Uniform Commercial Code provides that the scope and existence of a trade usage must be established by factual proof, the extent to which trade usage affects the written expressions of contracting parties is a jury question.

Commercial Law (UCC) > General Provisions (Article 1) > Definitions & Interpretation > General Overview

Commercial Law (UCC) > ... > General Provisions > Policies & Purposes > General Overview

Commercial Law (UCC) > Sales (Article 2) > General Overview

Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment > General Overview

Commercial Law (UCC) > ... > Form, Formation & Readjustment > Parol Evidence Rule > Gap Filler Provisions

Contracts Law > Contract Interpretation > Parol Evidence > General Overview

*HN7*[↓] Course of dealing, like trade usage, gives meaning to and supplements or qualifies the terms of a written agreement. However, since course of dealing actually controls usage of trade, course of dealing is a more important factor for consideration. Course of dealing is determined by considering the language of the agreement, the actions of the parties, commercial standards, and other surrounding circumstances. Thus, the proper construction of contracts governed by the Uniform Commercial Code requires familiarity with the commercial context in which the agreement was formed.

Whether a course of dealing exists between parties to a transaction is a question of fact.

Commercial Law (UCC) > General Provisions (Article 1) > General Provisions

Commercial Law (UCC) > General Provisions (Article 1) > Definitions & Interpretation > General Overview

Commercial Law (UCC) > ... > General Provisions > Policies & Purposes > General Overview

Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment > General Overview

Contracts Law > Contract Interpretation > Parol Evidence > General Overview

*HN8*[↓] U.C.C. § 11-205 defines course of dealing as a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct. Usage of trade refers to any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question.

Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment > General Overview

Commercial Law (UCC) > ... > Subject Matter > Definitions > General Overview

Contracts Law > Contract Interpretation > Parol Evidence > General Overview

*HN9*[↓] Of the factors to be considered for determining the finality of a writing as enumerated in the Uniform Commercial Code, actual performance provides the greatest weight to the parties' intentions and expectations. The rationale for placing such importance on course of performance is obvious: The parties themselves know best what they have meant by their words of agreement and their action under that agreement is the best indication of what that meaning was.

Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment > General Overview

Commercial Law (UCC) > ... > Standards of Performance & Liability > Performance > General Overview

Page 4 of 23

61 F. Supp. 2d 1308, *1308; 1999 U.S. Dist. LEXIS 13616, **1

*HN10*[↓] Unlike trade usage and course of dealing, which involve implied agreements that are made prior to, or contemporaneous with, the writing, course of performance occurs after the writing is executed, and there, a writing may be contradicted by course of performance. As a result evidence as to the existence and meaning of terms supplied by course of performance should never be excluded.

Commercial Law (UCC) > General Provisions (Article 1) > Definitions & Interpretation > Inferences & Presumptions

Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment > General Overview

Contracts Law > Contract Conditions & Provisions > Integration Clauses

Business & Corporate Compliance > Contracts > Contract Conditions & Provisions > Integration Clauses

Contracts Law > Contract Interpretation > Parol Evidence > General Overview

*HN11*[↓] The Uniform Commercial Code does not presume that a written contract sets forth the parties' entire agreement. Instead the Uniform Commercial Code focuses on the intention of the parties to determine the efficacy of an integration clause.

Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment > General Overview

Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment > Modifications, Rescissions & Waivers

Contracts Law > Contract Conditions & Provisions > General Overview

Contracts Law > Contract Conditions & Provisions > Integration Clauses

Business & Corporate Compliance > Contracts > Contract Conditions & Provisions > Integration Clauses

Contracts Law > Contract Modifications > General Overview

*HN12*[↓] The Uniform Commercial Code does not rigidly enforce clauses which preclude modification in the absence of a writing assented to by both parties. The court is likewise reluctant to adhere to strict interpretations of an agreement's express terms when doing so will not serve the underlying purpose of the terms.

Commercial Law (UCC) > General Provisions (Article 1) > General Provisions

Commercial Law (UCC) > General Provisions (Article 1) > Application & Construction > General Overview

Commercial Law (UCC) > ... > Application & Construction > Contract Provisions > Implied Covenant of Good Faith

Commercial Law (UCC) > General Provisions (Article 1) > Definitions & Interpretation > General Overview

Commercial Law (UCC) > Sales (Article 2) > General Overview

Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment > General Overview

Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment > Modifications, Rescissions & Waivers

Contracts Law > Contract Interpretation > Good Faith & Fair Dealing

Contracts Law > Contract Modifications > General Overview

*HN13*[↓] Contracts controlled by the Uniform Commercial Code (UCC) do not require a modification to be supported by consideration. *U.C.C. § 2-209(1)*. Under the UCC, any contract, however made or evidenced, can be discharged or modified by subsequent agreement of the parties. *U.C.C. § 1-203(3)* does, however, impose a duty of good faith on all efforts to modify a contract.

Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment > General Overview

Contracts Law > Contract Modifications > General Overview

Contracts Law > Contract Formation > Execution & Delivery

Business & Corporate Compliance > Contracts > Contract Formation > Execution & Delivery

*HN14*[↓] Parties to a contract with an express term disclaiming the efficacy of a modification unless in writing can waive such an express term through their subsequent performance. Thus, while a written agreement may provide that it cannot be modified except by a writing signed by both parties, the agreement can be changed by a course of actual performance.

Page 5 of 23

61 F. Supp. 2d 1308, *1308; 1999 U.S. Dist. LEXIS 13616, **1

Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment > General Overview

Contracts Law > Contract Modifications > General Overview

*HN15*[↓] Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the contract.

Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment > General Overview

Contracts Law > Contract Modifications > General Overview

Contracts Law > Types of Contracts > Oral Agreements

Business & Corporate Compliance > Contracts > Types of Contracts > Oral Agreements

*HN16*[↓] Modifications can be effectuated by subsequent oral agreement or course of dealing with one another despite the requirement of a writing in order to modify.

Commercial Law (UCC) > General Provisions (Article 1) > Application & Construction > General Overview

Commercial Law (UCC) > Sales (Article 2) > General Overview

Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment > General Overview

Contracts Law > Contract Interpretation > Good Faith & Fair Dealing

Contracts Law > Contract Modifications > General Overview

*HN17*[↓] Modifications to contracts under the Uniform Commercial Code must meet the test of good faith. *U.C.C. § 2-209*. The effective use of bad faith to escape performance on the original contract terms is barred, and the extortion of a modification without legitimate commercial reason is ineffective as a violation of the duty of good faith.

Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment > General Overview

Contracts Law > Contract Modifications > General Overview

*HN18*[↓] Situations implicating integration and modification clauses raise factual issues important to determining the justifiable expectations of the parties.

Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment > General Overview

Contracts Law > Contract Interpretation > Parol Evidence > General Overview

*HN19*[↓] When a court interpreting a contract goes beyond the four corners of the contract and considers extrinsic evidence, the court's determination of the parties' intent is a finding of fact.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment > General Overview

Contracts Law > Contract Modifications > General Overview

*HN20*[↓] Since defendant's actions suggest that it waives the prohibition against unwritten modifications contained in the agreement, modification of the agreement's express terms becomes a triable issue of fact, not a matter for summary judgment.

Commercial Law (UCC) > ... > Application & Construction > Contract Provisions > Implied Covenant of Good Faith

Contracts Law > Breach > General Overview

Contracts Law > Contract Conditions & Provisions > Integration Clauses

Business & Corporate Compliance > Contracts > Contract Conditions & Provisions > Integration Clauses

Business & Corporate Compliance > Contracts > Types of Contracts > Covenants

Contracts Law > Types of Contracts > Covenants

Energy & Utilities Law > Oil, Gas & Mineral Interests > Implied Covenants > General Overview

*HN21*[↓] Parties cannot avoid the consequences of a breach of the implied covenant of good faith merely by including an integration clause in their agreement.

Commercial Law (UCC) > General Provisions (Article

Page 6 of 23

61 F. Supp. 2d 1308, *1308; 1999 U.S. Dist. LEXIS 13616, **1

1) > Application & Construction > General Overview

Commercial Law (UCC) > ... > Application & Construction > Contract Provisions > Implied Covenant of Good Faith

Commercial Law (UCC) > Sales (Article 2) > General Overview

Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment > General Overview

Commercial Law (UCC) > ... > Form, Formation & Readjustment > Parol Evidence Rule > General Overview

Contracts Law > Contract Interpretation > Good Faith & Fair Dealing

**HN22**[ ] The duty of good faith must be present throughout the entire formation and performance of the contract. *U.C.C. § 2-209*.

Commercial Law (UCC) > General Provisions (Article 1) > General Provisions

Commercial Law (UCC) > General Provisions (Article 1) > Application & Construction > General Overview

Commercial Law (UCC) > ... > Application & Construction > Contract Provisions > Implied Covenant of Good Faith

Commercial Law (UCC) > General Provisions (Article 1) > Definitions & Interpretation > General Overview

Commercial Law (UCC) > General Provisions (Article 1) > Definitions & Interpretation > Good Faith & Fair Dealing

Commercial Law (UCC) > Sales (Article 2) > General Overview

Commercial Law (UCC) > Sales (Article 2) > Subject Matter > General Overview

Commercial Law (UCC) > ... > Subject Matter > Definitions > General Overview

**HN23**[ ] Under *U.C.C. § 1-203*, every contract or duty within the Sales Act imposes an obligation of good faith in its performance and enforcement. The Uniform Commercial Code defines good faith as it relates to sales transactions as honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade. *U.C.C. § 2-103(1)(b)*. The official comment to this section states that good faith is a basic principal running throughout this Act, and that the concept is broad and general in its application, and is further implemented by *U.C.C. § 1-205* on course of dealing and usage of trade.

Commercial Law (UCC) > General Provisions (Article 1) > General Provisions

Commercial Law (UCC) > General Provisions (Article 1) > Application & Construction > General Overview

Commercial Law (UCC) > ... > Application & Construction > Contract Provisions > Implied Covenant of Good Faith

Commercial Law (UCC) > General Provisions (Article 1) > Definitions & Interpretation > General Overview

**HN24**[ ] The Uniform Commercial Code's obligation to contract in good faith simply states that: Every Contract or duty within this Act imposes an obligation of good faith in its performance and enforcement. *U.C.C. § 1-203*.

Commercial Law (UCC) > General Provisions (Article 1) > General Provisions

Commercial Law (UCC) > General Provisions (Article 1) > Application & Construction > General Overview

Commercial Law (UCC) > ... > Application & Construction > Contract Provisions > Implied Covenant of Good Faith

Commercial Law (UCC) > General Provisions (Article 1) > Definitions & Interpretation > General Overview

Commercial Law (UCC) > General Provisions (Article 1) > Definitions & Interpretation > Good Faith & Fair Dealing

Commercial Law (UCC) > General Provisions (Article 1) > Definitions & Interpretation > Reasonable Time & Seasonableness

Commercial Law (UCC) > Sales (Article 2) > General Overview

Commercial Law (UCC) > Sales (Article 2) > Subject Matter > General Overview

Commercial Law (UCC) > ... > Subject Matter > Definitions > General Overview

**HN25**[ ] *U.C.C. § 1-203*, Official Comment Note provides that under the Sales Article definition of good faith (*U.C.C. § 2-103*), contracts made by a merchant have incorporated in them the explicit standard not only of honesty in fact (*U.C.C. § 1-201*), but also of observance by the merchant of reasonable commercial standards of fair dealing in the trade.

Page 7 of 23

61 F. Supp. 2d 1308, *1308; 1999 U.S. Dist. LEXIS 13616, **1

Commercial Law (UCC) > ... > Application & Construction > Contract Provisions > Implied Covenant of Good Faith

**HN26**[⬇] The policy considerations underlying the good faith doctrine are generally to effectuate the intentions of the parties or to honor their reasonable expectations. Satisfaction of these considerations requires performance of contractual obligations faithfully as to an agreed common purpose and consistent with the justified expectations of the other party. Bad faith occurs when a party acts to exploit changing economic conditions to secure gains that exceed those reasonably expected at the time of contracting.

Commercial Law (UCC) > ... > Application & Construction > Contract Provisions > Implied Covenant of Good Faith

Contracts Law > Contract Interpretation > Good Faith & Fair Dealing

Business & Corporate Compliance > Contracts > Sales of Goods > Output, Exclusive & Requirements Agreements

Contracts Law > Types of Commercial Transactions > Sales of Goods > Output, Exclusive & Requirements Agreements

Business & Corporate Compliance > Contracts > Types of Contracts > Output & Requirements Contracts

Contracts Law > Types of Contracts > Output & Requirements Contracts

**HN27**[⬇] Bad faith occurs when a party acts to exploit changing economic conditions to secure gains that exceed those reasonably expected at the time of contracting.

Commercial Law (UCC) > ... > Application & Construction > Contract Provisions > Implied Covenant of Good Faith

Commercial Law (UCC) > ... > Contract Provisions > Contract Terms > General Overview

Contracts Law > Contract Interpretation > Good Faith & Fair Dealing

**HN28**[⬇] The duty of good faith is especially applicable in situations when the contract confers one party with the discretion to determine certain terms of a contract, such as an open price term agreed to be unilaterally set. The duty acts to preserve and to control opportunistic behavior, by requiring that the price be reasonable and

set pursuant to reasonable commercial standards of fair dealing in the trade. Consequently, although it may be agreed that one party has the discretionary authority to set an open price term, this discretion is circumscribed by the duty placed on the discretion-exercising party to set the price in good faith.

Commercial Law (UCC) > General Provisions (Article 1) > General Provisions

Commercial Law (UCC) > General Provisions (Article 1) > Application & Construction > General Overview

Commercial Law (UCC) > ... > Application & Construction > Contract Provisions > Implied Covenant of Good Faith

Commercial Law (UCC) > General Provisions (Article 1) > Definitions & Interpretation > General Overview

Commercial Law (UCC) > ... > General Provisions > Policies & Purposes > General Overview

Commercial Law (UCC) > ... > Contract Provisions > Contract Terms > General Overview

Business & Corporate Compliance > Contracts > Types of Contracts > Covenants

Contracts Law > Types of Contracts > Covenants

Energy & Utilities Law > Oil, Gas & Mineral Interests > Implied Covenants > General Overview

**HN29**[⬇] Case law interpreting the implied covenant under *U.C.C. § 1-203* support the obligation to act in good faith when determining terms to be implied in a contract where the terms are not expressly provided therein.

Commercial Law (UCC) > ... > Contract Provisions > Contract Terms > General Overview

Contracts Law > Breach > Breach of Contract Actions > General Overview

Contracts Law > Breach > General Overview

Business & Corporate Compliance > Contracts > Types of Contracts > Covenants

Contracts Law > Types of Contracts > Covenants

**HN30**[⬇] Breach of contract claim for breach of the covenant of good faith is permitted even though the conduct failed to violate the express terms of the contract.

Page 8 of 23

61 F. Supp. 2d 1308, *1308; 1999 U.S. Dist. LEXIS 13616, **1

Commercial Law (UCC) > ... > Application & Construction > Contract Provisions > Implied Covenant of Good Faith

Contracts Law > Contract Interpretation > Good Faith & Fair Dealing

*HN31*[⬇] The duty to act in good faith is directly correlative to the amount of discretionary authority delegated by the contract.

Commercial Law (UCC) > General Provisions (Article 1) > Application & Construction > General Overview

Commercial Law (UCC) > ... > Application & Construction > Contract Provisions > Implied Covenant of Good Faith

Commercial Law (UCC) > General Provisions (Article 1) > Definitions & Interpretation > Reasonable Time & Seasonableness

Commercial Law (UCC) > Sales (Article 2) > General Overview

Commercial Law (UCC) > ... > Contract Provisions > Contract Terms > General Overview

Commercial Law (UCC) > ... > Contract Terms > Gap Filler Provisions > General Overview

Commercial Law (UCC) > ... > Contract Terms > Gap Filler Provisions > Open Price

*HN32*[⬇] *U.C.C. § 2-311(1)* provides that where the particulars of performance are specified by one of the parties, any such specification must be made in good faith and within limits set by commercial reasonableness.

Commercial Law (UCC) > ... > Application & Construction > Contract Provisions > Implied Covenant of Good Faith

Commercial Law (UCC) > Sales (Article 2) > General Overview

Commercial Law (UCC) > ... > Contract Provisions > Contract Terms > General Overview

Commercial Law (UCC) > ... > Contract Terms > Gap Filler Provisions > General Overview

Commercial Law (UCC) > ... > Contract Terms > Gap Filler Provisions > Open Price

Commercial Law (UCC) > ... > Subject Matter > Definitions > General Overview

*HN33*[⬇] *U.C.C. § 2-305* establishes the standard for setting an open price term. The section explicitly states that: A price to be fixed by the seller or by the buyer means a price for him to fix in good faith.

Commercial Law (UCC) > General Provisions (Article 1) > Application & Construction > General Overview

Commercial Law (UCC) > ... > Application & Construction > Contract Provisions > Implied Covenant of Good Faith

Commercial Law (UCC) > Sales (Article 2) > General Overview

Commercial Law (UCC) > ... > Contract Provisions > Contract Terms > General Overview

*HN34*[⬇] In the normal case, a posted price or a future seller's or buyer's given price, price in effect, market price, or the like, satisfies the good faith requirement. *U.C.C. § 2-305*. However, the words "in the normal case" mean that, although a posted price will usually be satisfactory, it will not be so under all circumstances.

Commercial Law (UCC) > General Provisions (Article 1) > Application & Construction > General Overview

Commercial Law (UCC) > ... > Application & Construction > Contract Provisions > Implied Covenant of Good Faith

Commercial Law (UCC) > General Provisions (Article 1) > Definitions & Interpretation > Reasonable Time & Seasonableness

Commercial Law (UCC) > Sales (Article 2) > General Overview

Commercial Law (UCC) > Sales (Article 2) > Subject Matter > General Overview

Commercial Law (UCC) > ... > Subject Matter > Definitions > General Overview

*HN35*[⬇] Pursuant to the Uniform Commercial Code, as a merchant, defendant's duty of good faith to its dealers meant factual honesty and the observance of reasonable commercial standards of fair dealing in the trade. *U.C.C. § 2-103(b)*.

Commercial Law (UCC) > General Provisions (Article 1) > General Provisions

Commercial Law (UCC) > General Provisions (Article

Page 9 of 23

61 F. Supp. 2d 1308, *1308; 1999 U.S. Dist. LEXIS 13616, **1

1) > Application & Construction > General Overview

Commercial Law (UCC) > ... > Application & Construction > Contract Provisions > Implied Covenant of Good Faith

Commercial Law (UCC) > General Provisions (Article 1) > Definitions & Interpretation > General Overview

Commercial Law (UCC) > General Provisions (Article 1) > Definitions & Interpretation > Good Faith & Fair Dealing

Commercial Law (UCC) > Sales (Article 2) > General Overview

Commercial Law (UCC) > Sales (Article 2) > Subject Matter > General Overview

Commercial Law (UCC) > ... > Subject Matter > Definitions > General Overview

**HN36**[⬇] The Uniform Commercial Code employs two standards of good faith. *U.C.C. § 1-201(19)* states the generally applicable subjective (white heart and empty head) standard which concentrates on the actual state of mind of the party rather than on the state of mind a reasonable man would have had under the same circumstances. Thus, the section defines good faith as honest in fact in the conduct or transaction concerned. In the case of merchants, however, or at least those merchants governed by Article 2 on Sales, an objective element is added to their good faith duties. *U.C.C. § 2-103(1)(b)* provides that good faith in the case of a merchant means honest in fact and the observance of reasonable commercial standards of fair dealing in the trade. This definition imposes a duty on merchants to meet good faith requirements that are measured both subjectively and objectively.

Commercial Law (UCC) > General Provisions (Article 1) > General Provisions

Commercial Law (UCC) > General Provisions (Article 1) > Application & Construction > General Overview

Commercial Law (UCC) > ... > Application & Construction > Contract Provisions > Implied Covenant of Good Faith

Commercial Law (UCC) > General Provisions (Article 1) > Definitions & Interpretation > General Overview

Commercial Law (UCC) > General Provisions (Article 1) > Definitions & Interpretation > Good Faith & Fair Dealing

Commercial Law (UCC) > Sales (Article 2) > General Overview

Commercial Law (UCC) > Sales (Article 2) > Subject Matter > General Overview

Commercial Law (UCC) > ... > Subject Matter > Definitions > General Overview

**HN37**[⬇] The commentary to *U.C.C. § 1-201* provides that in *U.C.C. § 2-103*, good faith is expressly defined as including in the case of a merchant observance of reasonable commercial standards of fair dealing in the trade, so that throughout that Article wherever a merchant appears in the case an inquiry into his observance of such standards is necessary to determine his good faith.

Commercial Law (UCC) > ... > Application & Construction > Contract Provisions > Implied Covenant of Good Faith

Commercial Law (UCC) > General Provisions (Article 1) > Definitions & Interpretation > Reasonable Time & Seasonableness

**HN38**[⬇] The second component of the good faith analysis focuses on the objective commercial reasonableness of fixing the open price term. Commercial reasonableness acts as a guide for courts to determine whether a party acted in good faith. Because there is no precise definition of the term commercial reasonableness, the facts of the case will be determinative of whether conduct is commercially reasonable. All the factors are to be evaluated according to the standard of commercial reasonableness under the particular circumstances of the case.

Commercial Law (UCC) > General Provisions (Article 1) > Application & Construction > General Overview

Commercial Law (UCC) > ... > Application & Construction > Contract Provisions > Implied Covenant of Good Faith

Commercial Law (UCC) > General Provisions (Article 1) > Definitions & Interpretation > Reasonable Time & Seasonableness

**HN39**[⬇] A party is not required to prove the existence of a specific commercial standard or rule to prove a failure of reasonable commercial standards of fair dealing in the trade where the merchant's conduct is inconsistent with other related norms.

Civil Procedure > ... > Summary Judgment > Entitlement as

Page 10 of 23

61 F. Supp. 2d 1308, *1308; 1999 U.S. Dist. LEXIS 13616, **1

Matter of Law > General Overview

Commercial Law (UCC) > ... > Application & Construction > Contract Provisions > Implied Covenant of Good Faith

Commercial Law (UCC) > General Provisions (Article 1) > Definitions & Interpretation > Reasonable Time & Seasonableness

*HN40*[⬇️] The parties' intentions in setting an open price term, as well as the reasonableness of an open price term are questions for the trier of fact. The question of price then--whether it was reasonable as calculated--is a question for the jury to resolve upon the evidence.

**Counsel:** For PLAINTIFFS: EUGENE STEARNS, ESQ., MIAMI, FL.

For PLAINTIFFS: SIDNEY PERTNOY, ESQ., GERALD BOWEN, ESQ., MCLEAN, VIRGINIA.

For DEFENDANTS: LARRY STEWART, ESQ., MIAMI, FL.

For DEFENDANTS: ROBERT ABRAMS, ESQ., ROBERT BROOKHEISER, ESQ., STUART HARRIS, ESQ., DARREN B. BERNHARD, ESQ., ROBERT WALLIS, ESQ., EXXON COMPANY, U.S.A., HOUSTON, TEXAS.

**Judges:** Alan S. Gold, United States District Judge. U.S. Magistrate Judge Simonton.

**Opinion by:** Alan S. Gold

# Opinion

### [*1310] ORDER DENYING EXXON'S RENEWED MOTION FOR SUMMARY JUDGMENT ON COUNT I

THIS CAUSE is before the Court upon Exxon's Renewed Motion for Summary Judgment on Count I [D.E. # 1027]. Exxon's motion for summary judgment is predicated on two grounds: (1) Under applicable law and the undisputed facts in the record, there is no basis for Plaintiffs' claim that each class member's individual Sales Agreement gave rise to a "collective" contractual obligation to the "dealer class as a whole" to reduce wholesale prices by an amount that "on average, over time, across all markets," offset credit card processing fees charged to dealers over the twelve-year **[**2]** period of Exxon's Discount for Cash program; and (2) Even if such an obligation existed, the undisputed

evidence establishes that Exxon did, in fact, comply with that alleged obligation, by having reduced its wholesale prices in an amount that offset credit card processing fees.

The record supports the conclusion that Exxon had a legal obligation to each dealer and that the legal obligation extended to the dealer class, as a whole. Because genuine issues of material fact exist regarding whether Exxon met or breached its legal obligation, Exxon is not entitled to summary judgment.

### I. Factual and Procedural Background

As a threshold matter, *HN1*[⬆️] the Court is constrained to overturn a ruling by a predecessor judge, and may do so only under exceptional circumstances. *See, e.g., Stevenson v. Four Winds Travel, Inc., 462 F.2d 899, 904-05 (5th Cir. 1972).* To further the policy considerations underlying this restraint, *HN2*[⬆️] the Local Rules for the Southern District of Florida require reconsideration of a prior ruling only where the Court determines that there exists a "clear and obvious error," which in the "interests of justice" mandates correction. *See* **[**3]** R. 7.1(f); *American Home Assur. Co. v. Glenn Estess & Assoc., Inc., 763 F.2d 1237, 1239 (11th Cir. 1985).* Nevertheless, district courts "have the power and the duty" to delineate and narrow the issues to be tried. *See Johnson Enters. of Jacksonville, Inc. v. FPL Group, Inc., 162 F.3d 1290, 1333 (11th Cir. 1998).*

Judge Kehoe, who formerly presided over this action, entered an order denying Exxon's previous motion for summary judgment. Having found that Exxon's renewed motion raises no new issues, and having reviewed Judge Kehoe's order, the Court concurs with and adopts the ultimate conclusions of Judge Kehoe that: (1) the proper construction of the Sales Agreement did not permit Exxon to act arbitrarily in setting the wholesale prices it charged its dealers; (2) to determine the "agreement" assented to by the parties, the Sales Agreement must be read in conjunction with Exxon's Automotive Credit Card Guide and Agreement; (3) Exxon's duty to act in good faith precluded Exxon from double charging "on average" its dealers for credit card processing; and (4) parol evidence is admissible to establish Exxon's duty of good faith and the alleged breach of **[**4]** that duty.

However, because the duty of good faith is an express covenant in all contracts, and is implied in all contracts governed by the Uniform Commercial Code, the

Page 11 of 23

61 F. Supp. 2d 1308, *1310; 1999 U.S. Dist. LEXIS 13616, **4

undersigned does not adopt Judge Kehoe's conclusion that, to the extent that a duty to impose duplicative charges for the dealers for the cost of credit card processing does not arise from the express language of the contract, such a term may be implied as a matter of law. [1] Consequently, to assist [*1311] the parties in ascertaining this Court's understanding of the relevant issues, the following sets forth supplemental findings of fact and rationales for denying summary judgment, as well as frames the ultimate issues to be tried to the jury regarding the duty and breach of duty elements to a cause of action predicated on a contractual relationship.

[**5] The essential facts relative to the good faith issue are not in dispute. Exxon sells gasoline, as well as other motor fuel products, to each of its direct-served dealers pursuant to supply contracts, which are typically in effect for a three-year period (the "Sales Agreement"). Each dealer's separate Sales Agreement with Exxon governs, among other things, the price each dealer must pay for

---

[1] Contracts for the sale of fuel products, including gasoline supply contracts, have been held to constitute transactions for the sale of "goods" within the meaning of Article 2 of the Uniform Commercial Code. See 67 Am. Jur. 2d Sales § 53 (1985 & Supp. 1992); see also Etheridge Oil Co. v. Panciera, 818 F. Supp. 480, 483 n.1 (D.R.I. 1993). As represented by the parties, depending on the jurisdiction, courts construing contracts which include both goods, which are covered by Article 2 of the UCC, as well as services, which are not, apply either the "predominant factor" test or the "gravamen of the action" test. Under the former, the Court must decide whether the predominant purpose of the contract is to supply goods or services. See, e.g., Novamedix, Ltd. v. NDM Acquisition Corp., 166 F.3d 1177, 1182 (Fed. Cir. 1999). For the latter test, the Court must focus on which aspect of the contract the dispute arises. Only if the dispute relates to the "goods" aspect of the contract does the UCC apply. See, e.g., Delorise Brown, M.D., Inc. v. Allio, 86 Ohio App. 3d 359, 620 N.E.2d 1020 (Ohio App. Ct. 1993). In the instant action, Plaintiffs do not dispute that they were obligated to pay the 3% credit card fee, which, Exxon has argued, is a service charge for the use of credit purchasing. Rather, the dispute arises over the wholesale price of the fuel delivered, which was to have been calculated at a price 3% less than they were formerly charged, to offset the "service charge" for credit card usage. Since the wholesale, or DTT, price relates to the "goods" portion of the contract, the UCC is applicable under either test. Moreover, Exxon's practice of dealing in goods of the kind involved in the transactions at issue and having knowledge and skills peculiar to the relevant goods, conforms to the definition of a "merchant" under the UCC. See UCC § 2-104(1); DeWeldon, Ltd. v. McKean, 125 F.3d 24, 27 (1st Cir. 1997) (the UCC attaches an expansive definition to the term "merchant").

its gasoline delivered by Exxon. The Sales Agreements contain an open price term, which permits Exxon to adjust prices, higher or lower, in response to the commercial dynamics in each of its various distribution markets.

Although the Sales Agreement did not expressly restrict the dealers' choice to purchase from suppliers other than Exxon, the record contains numerous references which illustrate that it would have been commercially impractical for the dealers to exercise their prerogative to purchase gasoline from alternate suppliers. These practical limitations on the dealers impeded their ability to avoid the economic effects of Exxon's pricing strategy.

Prior to adopting and implementing its Discount for Cash ("DFC") program, Exxon's wholesale price to its dealers included a cost for credit [**6] card processing. Pursuant to standard language in all of its form Sales Agreements, Exxon's dealers were required to purchase certain minimum monthly volumes of graded gasoline throughout the duration of the contract. Regardless of how it was stated over time, the price charged to the dealers was an "open price," which was intended to fluctuate based on a number of factors in effect when loading commenced or upon delivery. [2] In their respective form contracts, the dealers acknowledged receipt of the Seller's Automotive Credit Card Guide and Agreement (the "Credit Card Agreement"), and agreed to be bound by all of the terms and conditions thereof, as may be amended by Exxon from time to time.

[**7] Additionally, each Sales Agreement, both before and during the DFC program, included express language to the effect that any breach of a provision by either party of a failure to carry out the contract provisions "in good faith" was conclusively deemed to be substantial. The Sales Agreements also contained an integration clause stating that the writing was "intended by the parties to be the final, complete [*1312] and exclusive statement of their agreement about the matters covered" therein. The clause further disclaimed the existence of any oral understandings,

---

[2] Each form Sales Agreement over the twelve years of the DFC program contained essentially the same provisions, which included provisions that the dealer would pay Exxon at: (1) "Seller's established price at the time and place of delivery for the particular product(s) involved"; (2) "Seller's established dealer price appropriate for the transaction and in effect at the time loading commences"; and (3) "Seller's price in effect at the time of loading of the delivery vehicle."

Page 12 of 23

61 F. Supp. 2d 1308, *1312; 1999 U.S. Dist. LEXIS 13616, **7

representations or warranties affecting the written terms. By separate paragraph, the Sales Agreement purported to cancel and supersede any prior contract between the parties relative to the purchases and sales at the identified premises of any of Exxon's petroleum products covered by the contract.

In August of 1982, following a trend in the oil distribution industry, Exxon instituted its DFC program. The DFC program was designed as a competitive response to "private branders," which were selling unbranded gasoline on a "cash only" basis at prices below those charged by Exxon's dealers. Major petroleum companies, including Exxon, **[**8]** were experiencing lower demands while realizing increased operating costs, including the cost of maintaining a credit card system. These factors merged to reduce Exxon's earnings for petroleum products. Exxon sought to accomplish its goal of inducing its dealers to be more competitive and to increase their retail gasoline sales through its DFC program by: (1) reducing the wholesale price of gasoline and diesel fuel, which on average, would offset the charge for credit card usage to the dealer; (2) encouraging dealers to implement a tiered cash/credit retail pricing structure; and (3) charging its dealers a three percent (3%) fee on all credit card receipts submitted to Exxon for processing. Without dispute, Exxon's DFC program was facially similar, if not identical, to other such programs adopted and implemented by some of its competitors around the same time period.

Exxon tested the efficacy and potential acceptance of the DFC program by initially implementing the program in four pilot markets. Upon determining its success, Exxon set the environment for a national expansion of the program. At that time, Exxon announced the implementation of the program to its dealers and to the public **[**9]** at large.

Although Exxon's dealers were permitted to individually decide whether or not to offer a discount for cash to their respective customers, the charge on credit card assignments applied to all dealers and distributors. Similarly, the wholesale price reductions applied to all dealers and distributors. By letter dated August 24, 1982, Exxon unilaterally amended its Credit Card Agreement. All Exxon dealers were notified that, effective August 24, 1982: "All purchases by Exxon of accounts receivable evidenced by credit sale tickets will be discounted at a rate equal to 3% of the face value of the tickets."

Although not required to, most Exxon dealers participated in the DFC program. Nevertheless, the record clearly illustrates that dealers could not opt out of Exxon's offset pricing scheme. <u>See</u> Discount for Cash: Questions & Answers (Updated 1/20/84), at P 7; April 30, 1990 Exxon Notice to Exxon Retailers. Without dispute, Exxon proceeded to collect the 3% credit card fee on receipt after August 1982.

Notwithstanding the clear implementation of Exxon's DFC program nationwide, the essence of Exxon's promises to its dealers and the legal effect of its commitment are hotly **[**10]** contested. [3] Exxon concedes that, at a minimum, it told its dealers that it would remove from the dealer transport truck ("DTT") price an amount that "on average" would offset the charge to dealers for credit card processing, resulting in a reduced DTT price for motor and diesel fuels. [4] Exxon's position in this **[*1313]** litigation, however, is that its statements about its proposed pricing modifications did not create a contractual obligation to individual dealers. Rather, it was a mere "marketing goal." Yet, Exxon also admits that it adhered to its representations throughout the twelve-year duration of its DFC program. Specifically, Exxon claims that an amount which "on average" offset the charge of credit card recovery fees was removed from the DTT price paid by its dealers. [5] In fact, in hearings before a Congressional Sub-Committee on December 2, 1982, Exxon testified that:

> we have implemented our Discount for Cash program on a nationwide basis to allow our dealers and distributors to be more competitive for this cash

---

[3] Plaintiffs contend that the record evidence establishes that Exxon used various labels to articulate its "commitment" to its dealers, such as: (a) to reduce the wholesale price of gasoline by 1.7 cents per gallon to offset separate credit card charges; (b) to "unbundle" or remove credit card charges from the wholesale price of its gasoline; (c) to charge a "cash" as opposed to a "credit" dealer transport truck price; and (d) to reduce the wholesale price of gasoline by an amount sufficient to offset the 3% credit cost recovery fee.

[4] The DTT price is merely another name for the wholesale price. The terms, as referred to in this Order, are interchangeable.

[5] Exxon does not contend it had an obligation to offset credit card recovery fees only one time--at the beginning of the DFC program. Rather, its position is that it did so throughout the twelve-year period. Plaintiffs contend that Exxon only made three such adjustments during the twelve years of the DFC program.

Page 13 of 23

61 F. Supp. 2d 1308, *1313; 1999 U.S. Dist. LEXIS 13616, **10

customer. **Under this program, we simultaneously instituted a 3 percent processing fee on credit card tickets submitted by dealers and jobbers and *cut our* [**11] *dealer and jobber buying price by an amount to offset, on average, the 3% fee.*** Statement of Exxon Company, U.S.A. Before the Energy, Environment & Safety Subcommittee of the Small Business Committee on Marketing Practices, at 2 (emphasis added).

[**12] In contrast, Plaintiffs have phrased the obligation differently. They contend that, in accordance with Exxon's own documents and pronouncements, Exxon was obligated to set wholesale motor fuel prices in a manner that, on average, over time, across all markets, would offset the separately imposed 3% credit cost recovery fee. [6] Plaintiffs further allege that Exxon not only failed to do as it promised, it also breached its obligation in bad faith, by secretly dividing its dealers into "keepers" and "non-keepers," while internally recognizing that its pricing practices were driving the "non-keepers" out of business. As Judge Kehoe noted:

> Thus, Plaintiffs contend the practice of double charging for credit cost recovery, once through a direct fee and again in the wholesale price, had the economic effect of advancing Exxon's strategy of closing down dealerships which did not meet its internal criteria. On this basis, Plaintiffs conclude, and the Court tends to agree, that a jury could accept Plaintiffs' view of the weight of the evidence.

[**13] Ultimately, what Exxon said, did, or failed to do, is a matter of fact to be resolved by the jury. However, the legal effect of Exxon's representations to its dealers is for the Court to determine.

## II. Discussion and Analysis

To substantiate its assertion that it cannot be held liable for breach of contract, Exxon directs the Court's attention to the integration clause contained in all of the Sales Agreements entered into with its dealers. Exxon contends that the integration clause precludes consideration of any terms or obligations not expressly

within the four corners of the Sales Agreement. Consequently, Exxon argues that, since the Sales Agreement explicitly provides that it had the contractual authority to set the wholesale price for gasoline distributed to its dealers, Exxon properly used this authority to unilaterally set the wholesale price, and therefore, its pricing methodology cannot be a basis for establishing a breach of the Sales Agreements. Exxon further argues that it did not breach its good faith obligation in setting its wholesale prices, because the covenant of good faith imposes only an obligation to set a reasonable price. Because Exxon's wholesale [**14] prices were comparable to its competitors, it complied with the reasonableness [*1314] standards for fixing its open price term. [7]

[**15] Exxon's arguments are flawed, however, in several respects. First, the integration clause does not exonerate Exxon as a matter of law. Second, even though Exxon had the discretionary authority concerning its wholesale pricing, that authority is expressly limited by its contractual obligation of "good faith," and further, by the UCC's requirement that the price be set in good faith. Third, merely setting a price comparable to its competitors, does not preclude a finding that Exxon's prices were reasonable for purposes of substantiating its good faith obligation. Because determinations of these issues require factual analysis, which underlying facts are disputed among the parties, summary judgment is inappropriate.

_____

[6] The record reflects that Exxon communicated its promise to offset the 3% credit card processing charge by an "on average" amount deducted from the wholesale price of fuel to its dealers, and that it represented to the dealers that it was, in fact, providing the offset. See, e.g., April 30, 1990 letter to Exxon Retailers.

_____

[7] Exxon has raised additional arguments: (1) since the Sales Agreements contain an integration clause, the Court is precluded from using extrinsic evidence to establish a breach of the agreement; and (2) Exxon's contractual obligations differed among its dealers, and therefore, Plaintiffs cannot establish a "collective" obligation necessary to proceed as a class action. As to the use of extrinsic evidence, the Court has determined that the UCC, which governs the Sales Agreement, condones the liberal use of parol evidence to explain and supplement the express terms of contractual provisions. This issue is further articulated in the Court's Order on Exxon's Motion to Exclude Extrinsic Evidence to Establish the Alleged Obligation Under the Written Contracts. With regard to Exxon's second additional argument, which has been addressed in several prior orders, Exxon's own documentation substantiates that, although the actual amount of the reduction might have varied from dealer to dealer, Exxon owed the same duty to all dealers: The duty to set the wholesale price in good faith, which incorporates the duty not to charge its dealers twice for the cost of credit card processing.

Page 14 of 23

61 F. Supp. 2d 1308, *1314; 1999 U.S. Dist. LEXIS 13616, **15

## A. Determining the Final Expression of Contracting Parties

Exxon correctly points out that each Sales Agreement contained an integration clause which provided, with minor variations, that the Sales Agreement was "the final, complete and exclusive statement of [the parties'] agreement about the matters covered therein," and that there were "no oral understandings, representations or warranties affecting [the agreement]." Exxon further correctly states that each **[**16]** Sales Agreement provided that modification could be accomplished "only by a writing signed by both of the parties or their duly authorized agents." However, case law applicable to interpreting the controlling effect of integration clauses and limiting modifications by subsequent oral agreement construe these as factual determinations, which cannot be decided as a matter of law.

### 1. *The Effect of Integration Clauses*

*HN3*[↑] The UCC provides that, even though words and terms in a writing intended to be the final expression of the agreement of the parties may not be contradicted by evidence of a prior or contemporaneous agreement, extrinsic evidence may be used to explain or supplement the writing, in the form of course of dealing, trade usage, and "by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement." *UCC § 2-202*. *HN4*[↑] An integration clause which merely states that the parties intend the writing to be a complete and exclusive statement of the terms of the agreement does not suffice to negate the importance of trade usage and course of dealing, "because these are such **[**17]** an integral part of the contract that they are not normally disclaimed by general language in the merger clause." Hawkland, Uniform Commercial Code Series § 2-202:03 (1984). Unless carefully negated [trade usage and course of dealing] have become an element of the meaning of the words used." [8] Id.*HN5*[↑]

**[*1315]** Although merger or integration clauses have

been considered strong evidence of finality, they are not conclusive on the issue of whether the writing encompasses the entire agreement of the parties. See, e.g., *Sierra Diesel Injection Service, Inc. v. Burroughs Corp., Inc., 890 F.2d 108, 112 (9th Cir. 1989)*. In fact, the UCC's definition of "agreement" necessarily contemplates that the parties' obligations transcend the written words within the signed document: "'Agreement' means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance." *UCC § 1-201*.

**[**18]** *HN6*[↑]

Thus, to determine whether the writing constitutes the final expression of the parties as to their obligations under a valid contract, multiple factors should be considered. See, e.g., *Nanakuli Paving & Rock Co. v. Shell Oil Co., Inc., 664 F.2d 772, 796-97 (9th Cir. 1981)*. These factors include evidence of trade usage, course of dealing, and course of performance. See *id. at 794*; *Transamerica Oil Corp. v. Lynes, Inc., 723 F.2d 758, 765 (10th Cir. 1983)*. Trade usage is "relevant to show that the expectation of the parties that a given usage would be observed was justified." *Nanakuli Paving & Rock Co., 664 F.2d at 785*. Both parties need not be consciously aware of the particular trade usage at issue. "It is enough if the trade usage is such as to 'justify an expectation' of its observance." *Id. at 792 n.28* (quoting White & Summers, Uniform Commercial Code § 3-3, at 84 (1972)). "Parties to a contract such as the one in issue are presumed to have intended the incorporation of trade usage in striking their bargain." *Nanakuli, 664 F.2d at 798 n.40*. Since the UCC provides that the scope **[**19]** and existence of a trade usage must be established by factual proof, the extent to which trade usage affects the written expressions of contracting parties is a jury question. See *id. at 792*.

*HN7*[↑] Course of dealing, like trade usage, gives meaning to and supplements or qualifies the terms of a written agreement. However, since course of dealing actually controls usage of trade, course of dealing is a more important factor for consideration. See *id. at 795*. [9] **[**20]** According to the Official Comment, [10] course of

---

[8] "It should be noted that the limiting effect of the integration clause . . . is reserved for situations covered by *section 2-202(b)*, namely those in which evidence other than trade usage, course of dealing, or course of performance is proffered to explain or supplement the terms of an integrated writing." Hawkland, Uniform Commercial Code Series § 2-202:03 (1984).

---

[9] *HN8*[↑] The UCC defines "course of dealing" as "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." *UCC § 1-205*. "Usage of

Page 15 of 23

61 F. Supp. 2d 1308, *1315; 1999 U.S. Dist. LEXIS 13616, **20

dealing is determined by considering the language of the agreement, the actions of the parties, commercial standards, "and other surrounding circumstances." Thus, the proper construction of contracts governed by the UCC requires familiarity with the commercial context in which the agreement was formed. See id.; see also 2 Anderson, Uniform Commercial Code § 2-202:13 (3d ed. 1982). Whether a course of dealing exists between parties to a transaction is a question of fact. See Gord Industrial Plastics, Inc. v. Aubrey Mfg., Inc., 103 Ill. App. 3d 380, 431 N.E.2d 445, 449, 59 Ill. Dec. 160 (Ill. App. Ct. 1982).

HN9[↑] Of the factors to be considered for determining the finality of a writing as enumerated in the UCC, actual performance provides the greatest weight to the parties' intentions and expectations. [11] [**21] See Nanakuli Paving & Rock Co., 664 F.2d at 795. [*1316] The rationale for placing such importance on course of performance is obvious: "The parties themselves know best what they have meant by their words of agreement and their action under that agreement is the best indication of what that meaning was." Id. (quoting source omitted). [12]

The majority of courts have utilized these factors in determining whether a writing was intended to be the final and exclusive expression of the parties' contractual obligations. See id. at 798-805 (citing several cases including Chase Manhattan Bank v. First Marion Bank, 437 F.2d 1040, 1048 (5th Cir. 1971) ("the use of such evidence 'simply places the court in the position of the parties when they made the contract, and enables it to appreciate the force of the words they used in reducing it to writing.'")). HN11[↑] The UCC does not presume that a written contract sets forth the parties' entire agreement. See Betaco, Inc. v. Cessna Aircraft Co., 32 F.3d 1126, [**22] 1132 (7th Cir. 1994). Instead, in addition to these factors, the UCC focuses on the intention of the parties to determine the efficacy of an integration clause. See Sierra Diesel Injection Service, 890 F.2d at 112.

## 2. The Effect of the No-Modification Clause

HN12[↑] As with the integration clause, the UCC does not rigidly enforce clauses which preclude modification in the absence of a writing assented to by both parties. [13] Courts have likewise been reluctant to adhere to strict

---

trade" refers to "any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question."

[10] Although not binding law, courts give deference to the UCC's Official Comments, and may use the commentary as persuasive guidance to assist in construing and applying the Code. See, e.g., Appeal of Copeland, 531 F.2d 1195 (3d Cir. 1976).

[11] Exxon has argued that no affirmative representations were made to several of the dealers in the Plaintiff-class. Therefore, according to Exxon, those dealers' expectations are not justifiable and cannot be considered. Nevertheless, even if this contention is correct, there is substantial evidence in the record, considered on summary judgment, that creates a genuine and material factual dispute regarding this issue. For instance, Exxon testified that, National Dealer Advisory Council meetings, the dealers repeatedly questioned whether Exxon was offsetting the 3% fee from the wholesale fuel price. Repeatedly, Exxon represented that it was. See Deposition of Morton Voller, at 304-05. Whether the regional dealer representatives disseminated this information in a manner that all dealers became aware of Exxon's obligation, and its affirmance of it, is a question to be determined based on factual proof. Thus, these facts, when developed at trial, will resolve the dispute over individual dealer's expectations.

[12] HN10[↑] Unlike trade usage and course of dealing, which

involve implied agreements that are made prior to, or contemporaneous with, the writing, course of performance occurs after the writing is executed, and there, a writing may be contradicted by course of performance. See Hawkland, supra. "As a result evidence as to the existence and meaning of terms supplied by course of performance should never be excluded." Id.

[13] HN13[↑] Contrary to Exxon's position, contracts controlled by the UCC do not require a modification to be supported by consideration. See UCC § 2-209(1). Under the UCC, "any contract, however made or evidenced, can be discharged or modified by subsequent agreement of the parties." Pepsi-Cola Co. v. Steak 'n Shake, Inc., 981 F. Supp. 1149, 1153-54 (S.D. Ind. 1997) (quoting 3 Corbin Corbin on Contracts § 574, at 371 (1960)); see also Roth Steel Prods. v. Sharon Steel Corp., 705 F.2d 134, 145 (6th Cir. 1983) (citations omitted). The Code does, however, impose a duty of good faith on all efforts to modify a contract. See UCC § 1-203(3); T&S Brass & Bronze Works, Inc. v. Pic-Air, Inc., 790 F.2d 1098, 1105 (4th Cir. 1986). Nevertheless, Exxon's obligation did not lack for consideration. All dealers suffered a detriment by having incurred a unilaterally imposed new 3% credit card fee. Exxon obtained a benefit through the anticipation of increased gasoline sales by its dealers as a result of the DFC program. The consideration on the part of the dealers was to continue to sell Exxon's gasoline products and to pay the 3% credit card processing fee in exchange for the offset in the wholesale price. See, e.g., Roth Steel Prods., 705 F.2d at 144-45. Exxon itself notes that the 3% processing fee was necessary in order

Page 16 of 23

61 F. Supp. 2d 1308, *1316; 1999 U.S. Dist. LEXIS 13616, **22

interpretations of an agreement's express terms "when doing so would not serve the underlying purpose of the terms." *Radiation Systems, Inc. v. Amplicon, Inc., 882 F. Supp. 1101, 1103 (D.D.C. 1995)* (citations omitted).

 **[**23]** *HN14*[↑]

Parties to a contract with an express term disclaiming the efficacy of a modification unless in writing can waive such an express term through their subsequent performance. See *id at 1105*. **[*1317]** Thus, while a written agreement may provide that it cannot be modified except by a writing signed by both parties, as the term exists in the Sales Agreements at issue, "the agreement can be changed by a course of actual performance." All- *Year Golf, Inc. v. Products Investors Corp., Ltd., 34 A.D.2d 246, 310 N.Y.S.2d 881, 885 (App. Div. 1970)*; see also *Nanakuli, 664 F.2d at 795* ("*HN15*[↑]] Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the contract."); nte 10, supra. *HN16*[↑] Modifications can also be effectuated "by subsequent oral agreement or course of dealing with one another despite the requirement of a writing in order to modify." *Linear Corp. v. Standard Hardware Co., 423 So. 2d 966, 968 (Fla. 1st DCA 1982)* **[**24]** (citations omitted). *HN17*[↑] Modifications to contracts under the UCC, however, must meet the test of good faith. See *UCC § 2-209*, cmt. 2. "The effective use of bad faith to escape performance on the original contract terms is barred, and the extortion of a 'modification' without legitimate commercial reason is ineffective as a violation of the duty of good faith. . . ." Id.

### 3. *Propriety of Summary Judgment on the Integration and Modification Issues*

Applying the relevant law to the instant action, the Court must consider several factors to determine whether the Sales Agreement is a writing expressing the final

---

to encourage its dealers to participate in the DFC program, because retailers had no incentive to discount for cash unless it was cost effective for them to do so. When Exxon unilaterally changed its good faith obligation of performance to encourage participation in the DFC program nationwide, and unilaterally amended the Credit Card Agreement, no additional reciprocal obligation was required from the dealers to cause Exxon to adhere to its good faith duty. See *T&S Brass & Bronze Works, Inc., 790 F.2d at 1105*.

---

agreement of the parties as to all of their respective obligations. *HN18*[↑] Situations implicating integration and modification clauses raise factual issues important to determining the justifiable expectations of the parties. Insofar as these determinations are dependent on Exxon's intentions in setting its wholesale prices, which frequently fluctuated, factual questions exist which preclude summary judgment. See *Betaco, Inc., 32 F.3d at 1131* (citations omitted). "*HN19*[↑] When a court interpreting a contract goes beyond the four corners of the contract and considers **[**25]** extrinsic evidence, the court's determination of the parties' intent is a finding of fact." See id. (quoting *In re Pearson Bros. Co., 787 F.2d 1157, 1161 (7th Cir. 1986))*.

Exxon admits that, for at least a period of time, it did offset the wholesale prices to its dealers by an amount equal to the 3% credit card recovery fee. [14] It has been further admitted that, in 1991, Exxon began showing a 1.5 cent per gallon line item credit fee discount on its dealer invoices. *HN20*[↑] Since Exxon's actions after the implementation of its DFC program suggest that it waived the prohibition against unwritten modifications contained in the Sales Agreement, "modification of the agreement's express terms becomes a triable issue of fact, not a matter for summary judgment." *Radiation Systems, Inc., 882 F. Supp. at 1103*.

 **[**26]** Moreover, any misrepresentations among the contracting parties "undermines the intentional adoption of an integrated writing ." *Latham & Assocs., Inc. v. William Raveis Real Estate, Inc., 218 Conn. 297, 589 A.2d 337, 343 (Conn. 1991)*. *HN21*[↑] Thus, parties cannot avoid the consequences of a breach of the implied covenant of good faith merely by including an integration clause in their agreement. See *Amoco Oil Co. v. Ervin, 908 P.2d 493, 499 (Colo. 1995)* **[*1318]** ("The merger and integration clauses do not permit

---

[14] Exxon also makes admissions that it adhered to the offset pricing scheme throughout the entire year duration of its DFC program. In papers filed in this action, admissions were made that: "On the first day of the program, Exxon reduced its wholesale gasoline prices by 1.7 cents per gallon in each of its markets. . . . Exxon continued to adjust its prices in this manner until the DFC program was discontinued in August 1994." Exxon's Fuel Pricing Coordinator also testified that every time the issue was raised by the dealers, they were told that Exxon was offsetting the credit cost recovery fee. Record evidence indicates that similar adjustments were made in 1986, 1990, and 1992. In so acting, Exxon has interjected a genuine issue of fact as to a modification through a course of performance.

Page 17 of 23

61 F. Supp. 2d 1308, *1318; 1999 U.S. Dist. LEXIS 13616, **26

Amoco to breach the implied covenant of good faith and fair dealing by duplicate charging.").

HN22[⬆️] In sum, the duty of good faith must be present throughout the entire formation and performance of the contract. See *UCC § 2-209*. Whether Exxon modified the Sales Agreement or whether the Sales Agreement constituted a final expression of the parties' intentions and justifiable expectations are disputed issues for the jury to decide. See *Allied Chemical Corp. v. DeHaven, 752 S.W.2d 155, 159 (Tex. App. Ct. 1988)*. Resolution of these issues will necessarily depend upon whether Exxon performed its obligations under the Sales Agreements in good faith, **[\*\*27]** which is also very much in dispute. [15]

**[\*\*28] B. Establishing the Legal Duty of Good Faith**

Exxon points out that it had four different open price terms in effect during the course of its DFC program, and that none of those terms refers to: (1) the DFC program; (2) any price reduction, deduction or offset in the price of gasoline; and (3) any formula or method for establishing Exxon's wholesale prices to its dealers. Exxon correctly avers that the 3% fee amendment to its Credit Card Agreement did not refer to the DFC program or any reduction or offset to its wholesale prices. Nevertheless, Exxon's averments do not, as a matter of law, reconcile its alleged conduct with the considerations applicable under the UCC for determining whether contractual obligations have been

---

[15] Exxon also argues that the Sales Agreement included a paragraph that a subsequent three-year contract entered into by the parties would cancel and supersede all prior contracts between the parties for the transactions covered therein. See Sales Agreement, at P 27. However, a superseding contract does not always rescind prior contractual obligations. See, e.g., *Latham & Assocs., Inc., 218 Conn. at 304-05*. In fact, the Sales Agreement states that: "Termination of this contract by either party for any reason shall not relieve the parties of any obligation theretofore accrued under this contract." Sales Agreement, at P 21(g). Thus, another jury issue has been raised as to the survivability of Plaintiffs' cause of action upon execution of a subsequent Sales Agreement, and whether the parties intended for subsequent agreements to discharge the obligations previously assumed by the parties in the prior, expired Sales Agreement, which intentions, again, will need to be viewed in light of the duty to contract in good faith. See also *UCC § 2-106(3)* ("On 'termination' all obligations which are still executory on both sides are discharged *but any right based on prior breach or performance survives*.") (emphasis added).

performed in good faith. [16]

**[\*\*29] 1. *The UCC's Obligation of Good Faith***

HN23[⬆️] ] Under the UCC, every contract or duty within the Sales Act imposes an obligation of good faith in its performance and enforcement. See *UCC § 1-203*. [17] The UCC defines good faith as it relates to sales transactions as "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." *UCC § 2-103(1)(b)*. [18] The Official Comments **[\*1319]** to this section state that good faith is "a basic principal running throughout this Act," and that the concept is broad and general in its application, and "is further implemented by *Section 1-205* on course of dealing and usage of trade." Thus, because there is no exact formula to apply, courts have looked at the ambiguities inherent in the UCC's definition to define the concept within the context of the agreement. [19] The

---

[16] Every state in the union, except Louisiana, has adopted, by statute, almost verbatim versions of the UCC. See *Pennzoil Co. v. Federal Energy Regulatory Comm'n, 789 F.2d 1128, 1142 (5th Cir. 1986)* (since "all states except Louisiana have adopted the UCC, variations between state law and general principles are likely to be few"). In 1975, Louisiana incorporated part of the UCC into its revised statutes. See *Brill v. Catfish Shaks of America, Inc., 727 F. Supp. 1035, 1041 & n.10 (E.D. La. 1989)*. However, regarding the definition of "good faith," Louisiana adopted only the subjective--"honesty in fact"--not the objective--"commercial reasonableness"--standard for determining good faith. See *id. at 1041*. "There is no provision in Louisiana law to support application of an objective standard of good faith." Id.

[17] HN24[⬆️] ] The UCC's obligation to contract in good faith simply states that: "Every Contract or duty within this Act imposes an obligation of good faith in its performance and enforcement." *UCC § 1-203*.

[18] HN25[⬆️] ] *UCC Section 1-203*, Official Comment Note provides that "… under the Sales Article definition of good faith (*Section 2-103*), contracts made by a merchant have incorporated in them the explicit standard not only of honesty in fact (*Section 1-201*), but also of observance by the merchant of reasonable commercial standards of fair dealing in the trade."

[19] "Part of the strength of such general concepts as "good faith" and "commercial reasonableness" lies in an elasticity and lack of precision that permits them to be, in the language of the Code's own comment, 'developed by the courts in light of unforeseen and new circumstances and practices.'" Farnsworth, Good Faith Performance, 30 Univ. Chi. L. Rev. 666, 676 (1963).

Page 18 of 23

61 F. Supp. 2d 1308, *1319; 1999 U.S. Dist. LEXIS 13616, **29

Comment disclaims any provision of an additional cause of action for failure to act in good faith. See also *Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 617 (3d Cir. 1995)* (good faith is an interpretive tool to determine the parties' justified expectations, and is not to be used for enforcement of "an independent duty **[\*\*30]** divorced from the specific clauses of the contract"). Rather, the doctrine merely directs courts toward "interpreting contracts within the commercial context in which they are created, performed, and enforced." *UCC § 1-203*, Official Comment.

**[\*\*31] HN26[↑]**

The policy considerations underlying the good faith doctrine are generally "to effectuate the intentions of the parties or to honor their reasonable expectations." *Amoco Oil Co., 908 P.2d at 497*. Satisfaction of these considerations requires performance of contractual obligations faithfully as to "an agreed common purpose and consistent with the justified expectations of the other party." Id. **HN27[↑]** Bad faith occurs when a party acts to exploit changing economic conditions to secure gains that exceed those reasonably expected at the time of contracting. See, e.g., *Orange & Rockland Utils., Inc. v. Amerada Hess Corp., 59 A.D.2d 110, 397 N.Y.S.2d 814, 818 (App. Div. 1977)*. The implied duty of good faith and fair dealing is most commonly raised as an issue in output and requirements contracts, wherein the price and quantity terms are left open. See, e.g., *Ervin v. Amoco Oil Co., 885 P.2d 246, 250 (Colo. App. Ct. 1994)*.

**HN28[↑]** The duty of good faith is especially applicable in situations when the contract confers one party with the discretion to determine certain terms of a contract, such as an open price term agreed to be unilaterally set. **[\*\*32]** See id. (citing *Hubbard Chevrolet Co. v. General Motors Corp., 873 F.2d 873, 876 (5th Cir. 1989)*. The duty acts to preserve and to control opportunistic behavior, by requiring that the price be "reasonable and set pursuant to reasonable commercial standards of fair dealing in the trade." *TCP Industries, Inc. v. Uniroyal, Inc., 661 F.2d 542, 548 (6th Cir. 1981)*. Consequently, although it may be agreed that one party has the discretionary authority to set an open price term, this discretion is circumscribed by the duty placed on the discretion-exercising party to set the price in good faith. See id.

**HN29[↑]** Case law interpreting this implied covenant under *UCC § 1-203*, support this obligation to act in good faith when determining terms to be implied in a contract where the terms are not expressly provided therein. See *L.C. Williams Oil Co. v. Exxon Corp., 625 F. Supp. 477, 481 (M.D.N.C. 1985)*; see also *United Air Lines, Inc. v. ALG, Inc., 912 F. Supp. 353 (N.D. Ill. 1995)* (the duty requires that parties act in good faith when exercising discretion afforded by the contractual relationship and to act in a manner consistent **[\*\*33]** with the reasonable expectations of the parties); *Garrett v. BankWest, Inc., 459 N.W.2d 833 (S.D. 1990)* (**HN30[↑]** breach of contract claim for breach of the covenant of good faith is permitted even though the conduct failed to violate the express terms of the contract); *Einhorn v. Ceran Corp., 177 N.J. Super. 442, 426 A.2d 1076 (N.J. Super. 1980)* (where fairness and justice require, courts may impose a duty required to effectuate **[\*1320]** the implicit covenant of good faith and fair dealing necessarily involved in the parties' contractual relations); *Nora Springs Co-Op Co. v. Brandau, 247 N.W.2d 744 (Iowa 1976)* ("good faith" refers to honesty in fact in the conduct or transaction concerned). **HN31[↑]** Moreover, it appears that the duty to act in good faith is directly correlative to the amount of discretionary authority delegated by the contract. See *Melso v. Texaco, Inc., 532 F. Supp. 1280, 1297 (E.D. Pa. 1982)*. [20]

**[\*\*34] 2. *Exxon's Compliance With Its Good Faith Obligations***

In the instant case, every Sales Agreement in effect or entered into by Exxon and its dealers between August 1982 and August 1994 contained an open price term, imposing a concurrent express duty to carry out the

---

[20] For instance, when the dispute involves a contract of adhesion, the court must review its terms for fairness. See *Melso v. Texaco, Inc., 532 F. Supp. 1280, 1297 (E.D. Pa. 1982)* (citing Corbin on Contracts). A contract of adhesion is one in which the terms are not negotiable, requiring one party to "take-it-or-leave-it." See id. For a contract of adhesion to be fair, it "must not give one party all the benefits while giving the other party all of the burdens of the contract." *Id. at 1298* (citing Corbin on Contracts). Moreover, it is a basic tenet of contract law, especially in the context of adhesion contracts, that ambiguities are interpreted against the party that drafted the contract. Plaintiffs have, on occasion, inferred that Exxon's Sales Agreement constitutes a contract of adhesion. The Court does not reach this determination. The analogy of the subject Sales Agreements to the legal theories applicable to adhesion contracts is merely illustrative of the incremental scrutiny in which courts are instructed to engage when addressing issues predicated on contracts conferring discretion-exercising authority on one party to ensure that that party does not overreach its discretionary authority.

Page 19 of 23

61 F. Supp. 2d 1308, *1320; 1999 U.S. Dist. LEXIS 13616, **34

provisions of each Sales Agreement in good faith. Accordingly, under § 2-305 of the UCC, [21] [**35] as well as under the express terms of its Sales Agreement, Exxon was required to fix the price charged to each of its dealers in good faith. [22] HN32[↑] Similarly, the UCC's § 2-311 provides that where the particulars of performance are specified by one of the parties, "any such specification must be made in good faith and within limits set by commercial reasonableness." UCC § 2.311(1). [23] Thus, Exxon had a duty to each dealer to set its open price term in good faith and within the limits set by commercial reasonableness. This duty was part of each Sales Agreement and was independent of any subsequent amendment or modification..

HN34[↑] Moreover, "in the 'normal case,' a 'posted price' or a future seller's or buyer's 'given price,' 'price in effect,' 'market price,' or the like, satisfies the good faith requirement." UCC § 2-305, cmt. 3. "However, the words "in the normal [**36] case" mean that, although a posted price will usually be satisfactory, it will not be so under all circumstances." Nanakuli Paving & Rock Co., 664 F.2d at 805.

Exxon contends that its "price in effect" is, by definition, a price set in good faith. To support its contention, Exxon asserts [*1321] that "courts have uniformly rejected claims that open price terms in gasoline supply contracts require specific pricing obligations based on oral statements, written representations or marketing

programs." However, based on the reasons given by the courts in Exxon's cited cases, which addressed issues surrounding similar DFC programs, the Court finds that the facts and allegations in the instant case are distinguishable.

For instance, in Wayman, service station franchisees sued their franchisor for breach of contract for failing to set its dealer buying price for gasoline in good faith and in a commercially reasonable manner as required by the UCC. See Wayman v. Amoco Oil Co., 923 F. Supp. 1322 (D. Kan. 1996). The franchisees had signed contracts with Amoco providing that they would purchase their gasoline from Amoco at its "dealer buying price." See id. at 1332. [**37] The franchisees alleged, however, that this price was higher than the price at which independent marketers could purchase their fuel, placing Amoco franchisees at a competitive disadvantage. See id. at 1334. The court found that, according to the commentary, UCC § 2-305 was designed "to prevent discriminatory pricing--i.e., to prevent suppliers from charging two buyers with identical pricing provisions in their respective contracts different prices for arbitrary or discriminatory reasons." Id. at 1347. Because all Amoco franchisees paid the same dealer buying price, there was no discriminatory pricing and, therefore, no UCC violation. See id. Significantly, the district court made a specific finding that the basis of the plaintiffs' claims was that the fuel supplier charged a wholesale price higher than the dealers thought reasonable. See id. at 1338.

Another example offered by Exxon is based on an Illinois appellate decision that reached the same conclusion when interpreting the plaintiffs' claim of over charging. See Abbott v. Amoco Oil Co., 249 Ill. App. 3d 774, 619 N.E.2d 789, 794, 189 Ill. Dec. 88 (Ill. App. Ct. 1993). [**38] In Abbott, the dealers claimed that Amoco had agreed to discount its wholesale prices to offset credit card processing fees Amoco began charging for credit purchases. See id. at 780. However, the dealers felt that Amoco's discounts were not "realistic" and "meaningful." Id. In effect, "the dealers thought that Amoco's gas was still priced too high, even after the application of the discount." Id. (emphasis added). Thus, the court determined that the gravamen of the dealers' complaints was that "Amoco charged too much for its gasoline." Id. According to the court, "allegations of an unexpectedly high price, without more, do not state a claim for breach of the implied covenant of good faith and fair dealing in light of the contractual terms at issue in this case." Id. at 783.

---

[21] HN33[↑] Section 2-305 of the UCC establishes the standard for setting an open price term. The section explicitly states that: "A price to be fixed by the seller or by the buyer means a price for him to fix in good faith."

[22] There is no issue of law or fact as to whether Exxon owed a duty of good faith to each of its dealers. Exxon agrees that it owed such a duty both pursuant to the express terms of its Sales Agreement and under the UCC. The dispute, however, concerns what this duty means and how it applies under the circumstances.

[23] The commentary to this section provides that:

The party to whom the agreement gives power to specify the missing details is required to exercise good faith and to act in accordance with commercial standards so that there is no surprise and the range of permissible variation is limited by what is commercially reasonable. The "agreement" which permits one party so to specify may be found as well in a course of dealing, usage of trade, or implication from circumstances as in explicit language used by the parties.

UCC § 2-311, cmt. 1.

Page 20 of 23

61 F. Supp. 2d 1308, *1321; 1999 U.S. Dist. LEXIS 13616, **38

In Remus, a dealer alleged that Amoco violated a state statute by adopting a DFC that applied to all dealers. See *Remus v. Amoco Oil Co., 794 F.2d 1238, 1239 (7th Cir. 1986)*. Because most of the dealer's sales were for credit, the dealer complained that Amoco's unilateral action constituted a substantial change in the competitive circumstances **[**39]** of his dealership agreement. See *id. at 1239-40*. The court found that, since the DFC policy was system-wide, Amoco was not discriminating. More importantly, the court actually determined that Amoco had "unbundled" the cost of credit card processing from the wholesale price of gasoline. See *id. at 1241*. Thus, these courts reached the conclusion that the plaintiffs had not established bad faith on the part of the oil suppliers.

In contrast, and more on point, is *Amoco Oil Co. v. Ervin, 908 P.2d 493 (Colo. 1995)*, in which the Colorado Supreme Court determined that, "by duplicate charging, Amoco did not perform the contracts in accordance with the dealers' reasonable expectations." *Id. at 499*. Accordingly, the court upheld the jury verdict which found that Amoco had breached the covenant of good faith and fair dealing. See id.

 **[*1322]** Significantly, two of the cases relied upon by Exxon discuss the situation whereby there is a presumption of bad faith when a merchant acts in a manner intended to drive a franchisee out of business. In Remus, the Seventh Circuit, in addition to finding that Amoco had "unbundled" as promised **[**40]** and implemented its DFC to affect all dealers, the court determined that "there [was not] a shred of evidence that Amoco has ever wanted to drive Remus out of business." *Remus, 794 F.2d at 1240-41*. Similarly, in Wayman, the district court stressed that in the absence of allegations of double-charging and excessive pricing designed to drive dealers out of business, the dealers failed to raise a triable issue of a breach of good faith. See *Wayman, 923 F. Supp. at 1347, 1352-53* & n.23. Both of these allegations--double charging and intent to drive dealers out of business--have been raised in the instant case. Moreover, Plaintiffs have adduced enough evidence to raise a triable jury issue on these allegations.

As to Exxon's price-setting practices prior to implementing its DFC program, the Court concurs with Exxon's representation. Plaintiffs do not claim that Exxon's wholesale prices were discriminatory or outside the range of prices charged by other major oil companies. Rather, Plaintiffs argue, and Judge Kehoe determined, that this case deserves special treatment

because it is not a "normal case" as contemplated by *§ 2-305*. As concluded by Judge **[**41]** Kehoe:

> It would not be the normal case for Exxon to double charge for credit cost recovery through its price to people lacking the means to know it was happening, or to tell its dealers for twelve years who lacked the means to know otherwise that its price was net of credit costs when it was not, or to use its pricing discretion to eliminate dealers as alleged here.

Because the parties' dispute is not over the actual amount of the price Exxon charged for its wholesale gasoline to its dealers, but rather over the manner in which the wholesale price was calculated without considering the doubled charge for credit card processing, the instant action is not the "normal" case. See id. Accordingly, I concur with Judge Kehoe's conclusion, albeit with some supplementation.

**HN35**] Pursuant to the UCC, as a merchant, Exxon's duty of good faith to its dealers meant factual honesty *and* the observance of reasonable commercial standards of fair dealing in the trade. *UCC § 2-103(b)*. Thus, good faith consists of two separate components, both of which must be satisfied. [24]

 **[**42]** a. *Honesty in Fact*

As to the first element, the record evidence shows that Exxon adopted and implemented a nationwide standard

---

[24] An oft cited treatise on the UCC explains that:

**HN36**[ ]

The Code employs two standards of good faith. *Section 1-201(19)* states the generally applicable "subjective" ("white heart and empty head") standard which concentrates on the actual state of mind of the party rather than on the state of mind a reasonable man would have had under the same circumstances. Thus, the section defines good faith as "honest in fact in the conduct or transaction concerned." In the case of merchants, however, or at least those merchants governed by Article 2 on Sales, an objective element is added to their good faith duties. *Section 2-103(1)(b)* provides that "'good faith' in the case of a merchant means honest in fact and the observance of reasonable commercial standards of fair dealing in the trade." This definition imposes a duty on merchants to meet good faith requirements that are measured both subjectively and objectively.

2 Anderson, *Uniform Commercial Code § 1-203*:1.

Page 21 of 23

61 F. Supp. 2d 1308, *1322; 1999 U.S. Dist. LEXIS 13616, **42

of performance to fix its open wholesale prices in a manner that would not "double charge" the dealers "on average" for credit card processing fees. By virtue of the express terms of their individual contracts, Exxon's good faith performance obligation extended to each dealer. This same good faith obligation was extended collectively, as well, to all its dealers nationwide, because Exxon's wholesale price reduction was for [*1323] an amount, which "on average," would offset the charge for credit.

In the Court's view, Exxon misstates the nature of Plaintiffs' claim. Plaintiffs have adduced evidence from Exxon's own documents, which indicates that dealers did not have a choice on whether or not they wished to participate in the offset arrangement. Although they could decline to offer their customers discounts for using cash, the charge on credit card assignments was to apply to all dealers, "regardless of their decisions on whether to offer cash discounts. Similarly, the product price reductions applied to all dealers and distributors." Exhibit N to Respondents' [**43] Appendix in Support of Response to Petition for Writ of Mandamus. Thus, it is clear that the dealers, at least those whose contracts were in effect as of August 24, 1982, had no choice in Exxon's decision to implement its wholesale/credit offset plan.

Consequently, while each class member asserts his or her individual claim based on their respective Sales Agreement with Exxon, Exxon owed the same duty of good faith performance to each and every dealer, and thereby, to the collective class as a whole. Specifically, Exxon's good faith performance obligation was to offset on average among all its dealers from which the collective class of dealers nationwide would benefit. By adopting and implementing its program, a duty arose to carry it out "honestly in fact" in favor of each dealer, and all dealers nationally, to accomplish the "on average" reduction. [25]

[**44] As Judge Kehoe concluded, if Exxon did, in fact, double charge in its pricing decisions, it would not have acted "honestly in fact" in regard to its transactions with

its dealers. How each dealer was to benefit "on average" is a matter of fact and proof. The mere fact that the benefit was "on average," does not excuse Exxon from its good faith performance obligation to each dealer to act according to the representations made to all its dealers.

b. *Commercial Reasonableness*

[HN38↑] The second component of the good faith analysis focuses on the objective "commercial reasonableness" of fixing the open price term. Commercial reasonableness acts as a guide for courts to determine whether a party acted in good faith. Because there is no precise definition of the term "commercial reasonableness," the facts of the case will be determinative of whether conduct is commercially reasonable. See *Colorado Interstate Gas Co. v. Natural Gas Pipeline Co., 661 F. Supp. 1448, 1476 (D. Wyo. 1987).* "All the factors are to be evaluated according to the standard of commercial reasonableness under the particular circumstances of the case." *S&S, Inc. v. Meyer, 478 N.W.2d 857, 863 (Iowa App. Ct. 1991).* [**45] Departures from customary usages and commercial practice, flushed out through expert testimony, strongly indicate that the merchant's conduct is unreasonable. Mantese, The UCC and Keeping the (Good) Faith, 70 Mich. Bar J. 270, 274 (March 1991) ([HN39↑] a party is not required to prove the existence of a specific commercial standard or rule to prove a failure of reasonable commercial standards of fair dealing in the trade where the merchant's conduct is inconsistent with other related norms).

For instance, in *Nanakuli Paving & Rock Co. v. Shell Oil Co., 664 F.2d 772 (9th Cir. 1981),* the Ninth Circuit held that a jury could reasonably have concluded that the supplier's manner of carrying out the price increase did not conform with commercially reasonable standards. In another case, a district court found that, to be commercially reasonable, an oil company's pricing "must maintain a [DTT] price which will permit the [] dealers to remain competitive with other dealers and earn a profit [*1324] margin that will enable them to remain in business." See *Melso, 532 F. Supp. at 1286.*

The commercially reasonable factor must be regarded as conceded by Exxon. For instance, [**46] Exxon claims that it adjusted its wholesale prices in favor of its dealers during the entire twelve-year existence of the DFC program. Its commitment was not illusory. Exxon acknowledges it fully understood the representations made to the dealers and manner in which it would

---

[25] [HN37↑] The commentary to *UCC § 1-201* provides that "… in the Article on sales, *Section 2-103,* good faith is expressly defined as including in the case of a merchant observance of reasonable commercial standards of fair dealing in the trade, so that throughout that Article wherever a merchant appears in the case an inquiry into his observance of such standards is necessary to determine his good faith." *UCC Section 1-201,* cmt. 19 (emphasis added).

Page 22 of 23

61 F. Supp. 2d 1308, *1324; 1999 U.S. Dist. LEXIS 13616, **46

accomplish the underlying commitments on a nationwide basis: "Following the onset of the Discount for Cash Program in August of 1982, Exxon utilized a pricing methodology that provided a wholesale price reduction to its dealers in an amount which, on average, offset the charge for credit to its dealers." [26] According to Exxon, its actions were consistent with DFC programs implemented by its competitors, both before and after the initiation of its own DFC program. For summary judgment purposes, the Court concludes that it was, therefore, also consistent with fair dealing in the trade based on custom or usage.

In sum, the court respectfully rejects Exxon's argument [**47] that, notwithstanding Exxon's conduct in doing as it said it would do, its commitment leads to a number of commercially unreasonable consequences, and therefore, it should be viewed as having made no commitment with any legal effect. Exxon's own expert testified that he thought "it was possible for Exxon to remove an amount from the DTT that on average would be sufficient to offset the credit card cost." From the evidence considered on summary judgment, the Court does not regard Exxon's commitment as being so vague as to be unenforceable on the basis of indefiniteness or impracticality.

Moreover, Plaintiffs specifically claim that Exxon exercised bad faith based on Exxon's plan to double charge for the purpose of running the "non-keeper" dealers out of business. Courts have considered whether a contracting party implemented a policy as an underhanded attempt to drive an individual dealer out of business to determine if that party acted in bad faith contrary to well-established tenets of contract law. See, e.g., *East Bay Running Store, Inc. v. Nike, Inc., 890 F.2d 996, 1000 (7th Cir. 1989)*.

### 2. *Propriety of Summary Judgment on the Issue of Good Faith*

Exxon [**48] urges the Court to accept its assertion that it acted in good faith in setting its wholesale price, since its prices were not unreasonable and were comparable to, and at times below, prices charged by other major oil companies in the pertinent areas and were wholly within the terms of the Sales Agreements. *HN40*[↑] However, the parties' intentions in setting an open price term, as well as the reasonableness of an open price term are questions for the trier of fact. See *TCP Industries, Inc.,*

*661 F.2d at 548*. The question of price then--whether it was reasonable as calculated--is a question for the jury to resolve upon the evidence.

Additionally, in light of the alleged agreement between the parties, which is ascertained in conjunction with oral statements and representations and the literature disseminated by Exxon to implement and explain its DFC program, which it encouraged dealers to implement by promising to reduce its wholesale price of gas in the amount it had been formerly charged to cover the cost of credit [*1325] card processing and charging such fee only as to credit card receipts actually submitted, there is a question of fact as to whether Exxon breached the contract. [**49] Although Exxon was given discretionary authority to set its wholesale price, it was required to set the price in good faith. Good faith means honesty in fact and in conformity with reasonably commercial standards. A jury could find that Exxon breached its duty to act in good faith, thereby breaching its legal obligations under the contract, by charging dealers twice for the cost of credit card processing and by concealing this conduct from the dealers, who lowered prices in reliance on Exxon's promises. [27]

In sum, ample record evidence creates issues of fact for the jury as to what Exxon did or did not do during the twelve years of its DFC program, and whether it performed its obligations under the Sales Agreements throughout that period in good faith. The evidence reflects that Exxon had superior [**50] knowledge of the market price of gasoline and the cost of credit card processing. Therefore, according to Plaintiffs, they relied upon Exxon's representations that they were purchasing their requirements from Exxon at a price arrived at in good faith. Determining what constitutes good faith necessarily involves factual findings. It is the responsibility of the trier of fact to evaluate the credibility of Plaintiffs' claim of "honesty in fact." See, e.g., *Tonka Tours, Inc. v. Chadima, 372 N.W.2d 723, 728 (Minn. 1985)*. Moreover, the record exposes issues of fact from which a jury may reasonably find that Exxon's pricing scheme during the DFC program was not commercially reasonable and lacked good faith.

### III. Conclusion

---

[26] Plaintiffs claim that Exxon did not perform other than in 1982 and 1991.

[27] As to damages, it is equally reasonable to conclude that by lowering its cash price, while receiving no decrease in the wholesale price, the dealers were duped into losing profits, and consequently, suffered damages.

Page 23 of 23

61 F. Supp. 2d 1308, *1325; 1999 U.S. Dist. LEXIS 13616, **50

The basic tenet of contract law instructs that "a contract consists of a binding promise or set of promises, [therefore,] a breach of contract is a failure, without legal excuse, to perform any promise which forms the whole or part of a contract." *Montgomery v. Amoco Oil Co., 804 F.2d 1000, 1003 n.6 (7th Cir. 1986)* (quoting Williston on Contracts). Whether Exxon performed under the Agreement is disputed.

While it is **[**51]** true that there are some matters over which there is no disagreement, it is equally true that other matters are very much disputed. Exxon, for example, denies that it exercised bad faith in adjusting its wholesale price to dealers in a manner that double charged them for the cost of credit card processing. In fact, Exxon declares that, since it was not legally obligated to adjust its prices in conformity with its dealers' choices, there was no contract under which a covenant of good faith could be breached.

Whether Exxon breached its duty of good faith to its dealers is a question of fact for the jury. See *Tonka Tours, Inc., 372 N.W.2d at 728*. Although there is evidence to support Exxon's position, there is more than a scintilla of evidence that infers Exxon did not act in a manner consistent with the UCC's requirement of honesty in fact when it refused to offset the wholesale price of its fuel by an amount comparable to its 3% credit card recovery charge. There are also disputed issues regarding what Exxon said to its dealers, or what the dealers came to know, over the course of the DFC program that led them to expect the wholesale price reduction. Thus, there are **[**52]** definite evidentiary conflicts that cannot be summarily adjudicated. Since the Court finds that significant and genuine issues of material fact exist in the record to preclude summary judgment, it is accordingly

**ORDERED AND ADJUDGED** that Exxon's Renewed Motion for Summary Judgment on Count I [D.E. # 1027] is DENIED.

**ORDERED** this 6th day of July, 1999.

Alan S. Gold

United States District Judge

**End of Document**

# Exhibit 4

# *Beach Higher Power Corp. v. Granados*

Court of Appeal of Florida, Third District

July 29, 1998, Opinion Filed

CASE NO. 98-189

**Reporter**
717 So. 2d 563 *; 1998 Fla. App. LEXIS 9558 **; 23 Fla. L. Weekly D 1763

BEACH HIGHER POWER CORP., Appellant, vs. ROBERTO GRANADOS, Appellee.

**Subsequent History:** [**1] Rehearing Denied September 23, 1998. Released for Publication September 23, 1998.

**Prior History:** An appeal from the Circuit Court for Dade County, Steve Levine, Judge. LOWER TRIBUNAL NO. 97-17271.

**Disposition:** Reversed.

## Core Terms

summary judgment, condominium, partial

## Case Summary

### Procedural Posture
Defendant real estate seller appealed from the Circuit Court for Dade County (Florida), which entered a partial summary judgment in favor of plaintiff real estate buyer on a condominium sales contract. Defendant appealed the entry of a final summary judgment on the breach of contract claim prior to the filing of its answer.

### Overview
Plaintiff entered into a contract to purchase a condominium from defendant real estate developer. Plaintiff claimed that he had paid the full purchase price and that defendant failed to settle or convey title to him. Defendant claimed that plaintiff agreed to delay settlement and to permit defendant to occupy and use the condominium until all other units had been sold. Plaintiff filed suit for breach of contract and specific performance and moved for a partial summary judgment on his breach of contract claim even before defendant had answered the complaint. The trial court granted the motion and defendant seller appealed. The court

reversed, holding that it was error to grant summary judgment before an answer was filed unless the movant could prove on the record before the court that no issue of genuine fact could be raised as a defense to the claim. The court noted that even though the contract purported to prohibit oral modification, courts do allow evidence of oral modification which was consistent with defendant's theory and defense.

### Outcome
The court reversed the order granting summary judgment to plaintiff buyer because even though the contract purported to prohibit oral modification, defendant could have presented a defense and raised factual issues in an answer to the complaint that would preclude summary judgment.

## LexisNexis® Headnotes

Civil Procedure > Pleading & Practice > Pleadings > Answers

Governments > Legislation > Statute of Limitations > Time Limitations

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Civil Procedure > ... > Summary Judgment > Motions for Summary Judgment > Timing of Motions & Responses

*HN1*[⬇] **Pleadings, Answers**

*Fla. R. Civ. P. 1.510(a)* permits a plaintiff to move for summary judgment twenty days after suit has been filed, even if the defendant has not filed an answer. The burden for such a movant however, is extremely heavy in that the movant must demonstrate conclusively and to a certainty from the record that the defendant cannot plead or otherwise raise a genuine issue of material fact.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

Civil Procedure > ... > Summary Judgment > Motions for Summary Judgment > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Materiality of Facts

*HN2*[⬇] **Entitlement as Matter of Law, Appropriateness**

When a trial court has for consideration a plaintiff's motion for summary judgment before the defendant has answered, the summary judgment should not be granted unless it is clear that an issue of material fact can not be presented.

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

*HN3*[⬇] **Summary Judgment, Burdens of Proof**

A court must not grant a summary judgment upon motion therefor tendered before the service of an answer, unless in the situation presented, it appears to a certainty that no answer which the adverse party might properly serve could present a genuine issue of fact.

Contracts Law > Types of Contracts > Oral Agreements
Business & Corporate Compliance > Contracts > Types of Contracts > Oral Agreements

Contracts Law > Contract Modifications > General Overview

Business & Corporate Compliance > Contracts > Contract Modifications > Oral Modifications

Contracts Law > Contract Modifications > Oral Modifications

*HN4*[⬇] **Types of Contracts, Oral Agreements**

A written contract may be modified by a subsequent oral agreement or subsequent conduct of the parties, even though the written contract purports to prohibit such modification.

**Counsel:** Neustein & Neustein and Charles L. Neustein, for appellant.

Clifford A. Kornfield, for appellee.

**Judges:** Before JORGENSON, LEVY, and GREEN, JJ.

**Opinion by:** GREEN

# Opinion

[*564] GREEN, J.

Beach Higher Power Corp. ("Beach"), a real estate developer and the defendant below, appeals the entry of a partial final summary judgment on a breach of contract claim prior to the filing of its answer. We agree that summary judgment was improvidently entered and reverse.

Roberto Granados filed a five count complaint against Beach and its principals for breach of contract, fraud, unjust enrichment, conversion and civil theft. According to the allegations contained in the breach of contract count, on or about March 3, 1996, Granados executed a written sales contract with Beach for the purchase of a condominium unit at the Prince Michael Condominium. [1]

---

[1] In the record on appeal, this property is also referred to as

According to the terms of the contract, the unit was to be accepted by Granados in an "as is" condition. The agreement also provided that its terms could not be **[**2]** changed or terminated orally by the parties. Contemporaneous with the execution of the contract, Granados alleged that he paid Beach the full contract price of $ 70,500 and that the contract required a closing within thirty to sixty days. Granados further alleged that despite the passage of over fifteen months, Beach had refused to transfer title to the condominium to him and had in fact, used the condominium for its own purposes and damaged the same in the process. Granados therefore sought to recover damages for Beach's breach of contract and for specific performance.

In response, Beach filed a motion to dismiss the complaint on various grounds. Prior to a hearing and ruling on this motion, however, Granados moved for partial summary judgment on the breach of contract claim. In his sworn affidavit in support of the motion, Granados averred that contemporaneous with the execution of the contract, he paid the full purchase **[**3]** price in cash and that despite his repeated requests for a closing and transfer of title, Beach had failed to comply with the written terms of the contract. Granados also averred that during most of the relevant time period, Beach had in fact used the condominium as a model/sales office and had caused damage to the unit. Granados' affidavit also incorporated by reference a letter from Beach's counsel which stated that the unit had been sold to Granados at a discounted price because of Granados' agreement to allow Beach to use the apartment as a model/sales office pending the completion of the project. Granados then goes on to specifically deny in his affidavit that he was ever told of a discounted sales price for the unit or that he agreed to a delivery date other than the one specified in the written contract.

In opposition to the motion for partial summary judgment, Beach filed the affidavit of its vice-president and chief operating officer. In the affidavit, it was averred that Beach and Granados orally agreed that as consideration for the sale of the unit at a discounted price, Beach would have the right to use same as a sales office until all of the condominiums were sold at **[**4]** the Prince Michael Condominium; thus, Beach had not breached its agreement with Granados. The trial court granted Granados' motion for partial final summary judgment on the breach of contract count and entered final judgment in his favor for $ 70,500 plus

the "Prince Michael Hotel".

costs, prejudgment interests and attorney's fees. The court later denied Beach's motion for rehearing and this appeal followed.

We conclude that the entry of partial final summary judgment in this cause prior to the filing of an answer was premature and erroneous where: (1) the appellee's motion did not negate every possible defense which could have legally been raised by way **[*565]** of an answer; and (2) the existence of disputed issues of fact appeared on the face of the motion and supporting exhibits. *HN1[⬆] Rule 1.510(a) of the Florida Rules of Civil Procedure* certainly permits a plaintiff to move for summary judgment twenty days after suit has been filed, even if the defendant has not filed an answer. The burden for such a movant however, is extremely heavy in that "the movant must demonstrate conclusively and to a certainty from the record that the defendant cannot plead or otherwise raise a genuine issue of material fact." *Hodkin v. Ledbetter, [**5] 487 So. 2d 1214, 1217 (Fla. 4th DCA 1986); see also Rodriguez v. Tri-Square Constr., Inc., 635 So. 2d 125, 126 (Fla. 3d DCA 1994); Midway Shopping Mall, Inc. v. Corky Corp., 257 So. 2d 905, 906 (Fla. 3d DCA 1972).* As this court has explained:

*HN2[⬆]* When a trial court has for consideration a plaintiff's motion for summary judgment before the defendant has answered, the summary judgment should not be granted unless it is clear that an issue of material fact can not be presented.

In dealing with such a question under the equivalent Federal Rule 56, 28 U.S.C.A., this point was elaborated on in *Stuart Inv. Co. v. Westinghouse Electric Corp., D.C. Neb., 11 F.R.D. 277, 280,* as follows:

" * * * * But although a motion by a claimant for summary judgment, served before the service of answer to his complaint may not be denied on the ground that it is necessarily and inevitably tendered too early, the general

cautions against the allowance of such motions mentioned in the preceding paragraph must be kept in view. And within their teaching, *HN3*[⬆] a court must not grant a summary judgment upon motion therefor tendered before the service of an answer, unless in the situation presented, it appears **[**6]** to a certainty that no answer which the adverse party might properly serve could present a genuine issue of fact.

In the present circumstances, the court cannot with assurance and certainty reach that conclusion. On the contrary, without suggestively identifying them, the court can perceive more than one issue which the defendant in the instant case might tender by answer. And it will not abruptly and rashly intercept the presentation of any such defensive matter through the entry of a summary judgment."

*Olin's Inc. v. Avis Rental Car Sys. of Fla., Inc., 105 So. 2d 497, 498-99 (Fla. 3d DCA 1958)*(citations omitted); *see also Burch v. Kibler, 643 So. 2d 1120, 1122 (Fla. 4th DCA 1994)*; *Jackson v. Stelco Employees' Credit Union, Ltd., 178 So. 2d 58, 60-61 (Fla. 2d DCA 1965)*.

We agree with Beach that this case was particularly ill-suited for a summary judgment prior to answer where Granados' motion did not negate every possible defense to this action. For example, Beach correctly points out that it may legally defend this action on the grounds that the parties orally modified the terms of their written agreement, notwithstanding the prescription to the contrary in the **[**7]** agreement. The law has clearly been established that *HN4*[⬆] a written contract may be modified by a subsequent oral agreement or subsequent conduct of the parties, even though the written contract purports to prohibit such modification. *See Pan Am. Eng'g Co., Inc. v. Poncho's Constr. Co., 387 So. 2d 1052, 1053 (Fla. 5th DCA 1980)*; *Barile Excavating & Pipeline Co., Inc. v. Vacuum Under-Drain, Inc., 362 So. 2d 117, 119 (Fla. 1st DCA 1978)*; *Vitra-Spray of Fla., Inc. v. Gumenick, 144 So. 2d 533, 534 (Fla. 3d DCA 1962)*; *see also F.M.W. Properties, Inc. v. Peoples First Fin. Sav. and Loan Ass'n, 606 So. 2d 372, 375 (Fla. 1st DCA 1992)*("Evidence of a subsequent oral modification is admissible even where the writing contains a merger clause."). Moreover, we note that, on its face, Granados' very own affidavit which incorporates a letter from defense counsel, reveals the existence of a genuine factual dispute between these partes as to whether there was an agreement for Beach to use Granados' unit as a model/sales office pending the sale of all of the remaining units. Given these circumstances, the entry of summary judgment in Granados' favor was error.

**[*566]** For all of these reasons, we **[**8]** reverse the summary judgment and remand for further proceedings.

Reversed.

___

**End of Document**

# Exhibit 5

# BMC Indus. v. Barth Indus.

United States Court of Appeals for the Eleventh Circuit

November 18, 1998, Decided

Nos. 95-5137, 95-5338.

**Reporter**
160 F.3d 1322 *; 1998 U.S. App. LEXIS 29005 **; 37 U.C.C. Rep. Serv. 2d (Callaghan) 63

BMC INDUSTRIES, INC., Plaintiff-Appellee, v. BARTH INDUSTRIES, INC., Nesco, Inc., f.k.a. Nesco Management, Inc., Barth Industries Co. Limited Partnership, BIC Corporation, Nesco Holdings, Inc., f.k.a. Nesco, Inc., Defendants-Appellants.

**Subsequent History: [**1]** As Amended December 11, 1998.

Certiorari Denied May 24, 1999, Reported at: *1999 U.S. LEXIS 3483*.

**Prior History:** Appeals from the United States District Court for the Southern District of Florida. (No. 89-6443-CIV-KMM), K. Michael Moore, Judge.

**Disposition:** VACATED the district court's judgment against Nesco and REMANDED the case to the district court and instruct it to enter judgment for Nesco.

## Core Terms

date of delivery, waived, promise, automated, district court, manufactured, delivery, breach of contract, parties, detrimental reliance, promissory estoppel, statute of frauds, machines, assembly, terms of the contract, matter of law, installation, modification, damages, deliver, Pulp, default, movable, courts, terminate a contract, obligations, retract, waivers, contract price, counterclaimed

## Case Summary

### Procedural Posture

Defendant parent company and subsidiary sought review of judgments in favor of plaintiff company from the United States District Court for the Southern District of Florida on plaintiff's promissory estoppel claim against defendant parent company and its breach of contract claim against defendant subsidiary.

### Overview

After the delivery date specified in a contract for the design, manufacture, and installation of equipment, plaintiff company filed suit against defendant subsidiary for breach of contract and against defendant parent company for promissory estoppel. Following a jury verdict against defendants, the district court denied defendants' motions for judgment as a matter of law and for a new trial and rendered judgment for plaintiff. On appeal, the court vacated the judgment against defendants and remanded the case for a retrial of the claim against defendant subsidiary and with directions to dismiss defendant parent company from the case. Contrary to the district court's ruling, the U.C.C. applied to the contract because it was predominantly a transaction in goods as evidenced by the contractual language, the surrounding circumstances, and nature of the goods. Further, after holding that waiver under the U.C.C. did not require detrimental reliance, the court concluded that plaintiff waived the delivery date as a matter of law but that a triable issue of fact remained as to whether defendant subsidiary tendered the equipment within a reasonable time under the circumstances.

### Outcome

The court vacated the judgments against defendant parent company and subsidiary and remanded the case with instructions for the entry of a judgment for defendant parent company but for a retrial on the issue of whether defendant subsidiary's tender was within a reasonable time. The court held that the contract was predominantly for the sale of goods and that plaintiff company waived the delivery date as a matter of law.

## LexisNexis® Headnotes

Commercial Law (UCC) > ... > Subject Matter > Goods > Definition of Goods

Commercial Law (UCC) > Sales (Article 2) > General Overview

Commercial Law (UCC) > ... > Standards of Performance & Liability > Breach, Excuse & Repudiation > General Overview

Commercial Law (UCC) > Sales (Article 2) > Subject Matter > General Overview

Commercial Law (UCC) > ... > Subject Matter > Definitions > General Overview

Commercial Law (UCC) > ... > Subject Matter > Goods > General Overview

### HN1[⬇] Goods, Definition of Goods

Article 2 of the Uniform Commercial Code applies to "transactions in goods" only. Fla. Stat. ch. 672-102 (1997). Goods are defined as all things, including specially manufactured goods, which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities and things in action. *Fla. Stat. ch. 672.105(1)* (1997). A contract that is exclusively for services, therefore, is not governed by Article 2.

Commercial Law (UCC) > ... > Subject Matter > Goods > Hybrid Transactions

Commercial Law (UCC) > Sales (Article 2) > General Overview

Commercial Law (UCC) > Sales (Article 2) > Subject Matter > General Overview

Commercial Law (UCC) > ... > Subject Matter > Goods > General Overview

### HN2[⬇] Goods, Hybrid Transactions

Most courts follow the "predominant factor" test to determine whether hybrid contracts are transactions in goods and therefore covered by the Uniform Commercial Code or transactions in services and therefore excluded. Under this test, a court determines whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved or is a transaction of sale, with labor incidentally involved.

Commercial Law (UCC) > Sales (Article 2) > Subject Matter > General Overview

### HN3[⬇] Sales (Article 2), Subject Matter

See *Fla. Stat. ch. 672.501(1)(b)* (1997).

Business & Corporate Compliance > ... > Sales of Goods > Performance > Insurable Interest & Identification
Contracts Law > ... > Sales of Goods > Performance > Insurable Interest & Identification

Commercial Law (UCC) > ... > Subject Matter > Goods > Hybrid Transactions

Commercial Law (UCC) > Sales (Article 2) > Subject Matter > General Overview

Business & Corporate Compliance > Contracts > Sales of Goods > General Overview
Contracts Law > Types of Commercial Transactions > Sales of Goods > General Overview

Business & Corporate Compliance > ... > Sales of Goods > Performance > General Overview
Contracts Law > ... > Sales of Goods > Performance > General Overview

### HN4[⬇] Performance, Insurable Interest & Identification

Although courts generally do not find any single factor determinative in classifying a hybrid contract as one for goods or services, courts find several aspects of a contract particularly significant. First, the language of the contract itself provides insight into whether the parties believed the goods or services were the more important element of their agreement. Contractual language that refers to the transaction as a "purchase," for example, or identifies the parties as the "buyer" and "seller," indicates that the transaction is for goods rather than services. Courts also examine the manner in which the transaction was billed; when the contract price does not include the cost of services, or the charge for goods

exceeds that for services, the contract is more likely to be for goods. Movable goods is another hallmark of a contract for goods rather than services.

Commercial Law (UCC) > ... > Subject Matter > Goods > Definition of Goods

Commercial Law (UCC) > General Provisions (Article 1) > Definitions & Interpretation > General Overview

Commercial Law (UCC) > Sales (Article 2) > General Overview

Commercial Law (UCC) > ... > Standards of Performance & Liability > Breach, Excuse & Repudiation > General Overview

Commercial Law (UCC) > Sales (Article 2) > Subject Matter > General Overview

Commercial Law (UCC) > ... > Subject Matter > Definitions > General Overview

Commercial Law (UCC) > ... > Subject Matter > Goods > General Overview

Commercial Law (UCC) > ... > Collateral > Goods > General Overview

**HN5[⬇]** **Goods, Definition of Goods**

Movable goods is a hallmark of a contract for goods rather than services. The definition of goods, *Fla. Stat. ch. 672.105(1)* (1997), makes clear the importance of mobility in determining whether a contract is for goods; the goods are all things, including specially manufactured goods, which are movable at the time of identification to the contract for sale.

Commercial Law (UCC) > General Provisions (Article 1) > Definitions & Interpretation > General Overview

Commercial Law (UCC) > Sales (Article 2) > General Overview

Commercial Law (UCC) > ... > Standards of Performance & Liability > Breach, Excuse & Repudiation > General Overview

Commercial Law (UCC) > Sales (Article 2) > Subject Matter > General Overview

Commercial Law (UCC) > ... > Subject Matter > Definitions > General Overview

Commercial Law (UCC) > ... > Subject Matter > Goods > General Overview

**HN6[⬇]** **General Provisions (Article 1), Definitions & Interpretation**

Mobility is measured as of the time the goods are identified to the contract rather than after the contract is completed. Consequently, equipment or materials that were movable, but were installed and became immobile fixtures as part of the contract, are still "movable" within the meaning of the Uniform Commercial Code.

Commercial Law (UCC) > Sales (Article 2) > Subject Matter > General Overview

**HN7[⬇]** **Sales (Article 2), Subject Matter**

The question whether a contract is predominantly for goods or services is generally one of fact.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

**HN8[⬇]** **Summary Judgment, Entitlement as Matter of Law**

When there is no genuine issue of material fact concerning a contract's provisions, a court may determine the issue as a matter of law.

Civil Procedure > Appeals > Standards of Review > De Novo Review

**HN9[⬇]** **Standards of Review, De Novo Review**

Appellate courts review questions of law de novo.

Commercial Law (UCC) > ... > Standards of Performance & Liability > Breach, Excuse & Repudiation > General Overview

Commercial Law (UCC) > General Provisions (Article 1) > Application & Construction > General Overview

Commercial Law (UCC) > Sales (Article 2) > General Overview

Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment > General Overview

Commercial Law (UCC) > ... > Subject Matter > Definitions > General Overview

*HN10*[⬇]  **Standards of Performance & Liability, Breach, Excuse & Repudiation**

See *Fla. Stat. ch. 672.209* (1997).

Commercial Law (UCC) > General Provisions (Article 1) > Application & Construction > General Overview

Contracts Law > Contract Conditions & Provisions > Waivers > General Overview

*HN11*[⬇] **General Provisions (Article 1), Application & Construction**

Waiver requires: (1) the existence at the time of the waiver of a right, privilege, advantage, or benefit that may be waived; (2) the actual constructive knowledge thereof; and (3) an intention to relinquish such right, privilege, advantage, or benefit.

Contracts Law > Contract Conditions & Provisions > Waivers > General Overview

*HN12*[⬇]  **Contract Conditions & Provisions, Waivers**

Conduct may constitute waiver of a contract term, but such an implied waiver must be demonstrated by clear evidence.

Contracts Law > Contract Conditions & Provisions > Waivers > General Overview

*HN13*[⬇]  **Contract Conditions & Provisions, Waivers**

Waiver may be implied when a party's actions are inconsistent with continued retention of the right.

Contracts Law > Contract Formation > Consideration > Detrimental Reliance Business & Corporate Compliance > ... > Contract Formation > Consideration > Detrimental Reliance

Commercial Law (UCC) > General Provisions (Article 1) > Application & Construction > General Overview

Contracts Law > ... > Consideration > Enforcement of Promises > Detriment to Promisee

Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment > General Overview

Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment > Modifications, Rescissions & Waivers

Contracts Law > Contract Formation > Consideration > General Overview

Contracts Law > ... > Consideration > Enforcement of Promises > General Overview

*HN14*[⬇]  **Consideration, Detrimental Reliance**

The Uniform Commercial Code does not require consideration or detrimental reliance for waiver of a contract term.

Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment > General Overview

Contracts Law > ... > Consideration > Enforcement of Promises > General Overview

Contracts Law > Contract Formation > Consideration > General Overview

*HN15*[⬇]  **Sales (Article 2), Form, Formation & Readjustment**

While *Fla. Stat. ch. 672.209(4)* (1997) states that an attempted modification that fails may still constitute a waiver, *Fla. Stat. ch. 672.209(5)* (1997) provides that the waiver may be retracted unless the non-waiving party relies on the waiver. Consequently, the statute

recognizes that waivers may exist in the absence of detrimental reliance; these are the retractable waivers referred to in ch. 672.209(5).

Contracts Law > Contract
Formation > Consideration > Detrimental Reliance
Business & Corporate Compliance > ... > Contract
Formation > Consideration > Detrimental Reliance

Commercial Law (UCC) > General Provisions
(Article 1) > Application & Construction > General
Overview

Contracts Law > ... > Consideration > Enforcement
of Promises > General Overview

Commercial Law (UCC) > General Provisions
(Article 1) > Definitions & Interpretation > General
Overview

Commercial Law (UCC) > Sales (Article 2) > Form,
Formation & Readjustment > General Overview

Contracts Law > Contract
Formation > Consideration > General Overview

_HN16_[⬇] **Consideration, Detrimental Reliance**

Waiver under the Uniform Commercial Code does not require detrimental reliance.

Commercial Law (UCC) > ... > Standards of
Performance & Liability > Breach, Excuse &
Repudiation > General Overview

Contracts Law > Breach > General Overview

_HN17_[⬇] **Standards of Performance & Liability, Breach, Excuse & Repudiation**

When a delivery date passes without a seller's delivery, a buyer must object within a reasonable time and warn the seller that it is in breach.

Commercial Law (UCC) > ... > Contract
Terms > Gap Filler Provisions > General Overview

Commercial Law (UCC) > ... > Contract
Provisions > Contract Terms > General Overview

_HN18_[⬇] **Contract Terms, Gap Filler Provisions**

When a contractual delivery date is waived, delivery must be made within a reasonable time. _Fla. Stat. ch. 672.309(1)_ (1997).

Contracts Law > Statute of Frauds > General
Overview

_HN19_[⬇] **Contracts Law, Statute of Frauds**

See _Fla. Stat. ch. 725.01_ (1997).

Contracts Law > Statute of Frauds > General
Overview

_HN20_[⬇] **Contracts Law, Statute of Frauds**

Under the statute of frauds, where the main purpose of the guarantor is to obtain some benefit or serve some interest of its own rather than to gain some advantage for the beneficiary, that promise is considered "direct," and remains beyond the reach of the _Fla. Stat. ch. 725.01_ (1997).

**Counsel:** ATTORNEY(S) FOR APPELLANTS(S), (95-5137): Arthur J. England, Jr., GREENBERG, TRAURIG, HOFFMAN, LIPOFF, ROSEN & QUENTEL, P.A., Miami, FL.

ATTORNEY(S) FOR APPELLEE(S), (95-5137): John R. Hargrove, HEINRICH GORDON HARGROVE WEIHE & JAMES, Ft. Lauderdale, FL.

ATTORNEY(S) FOR APPELLANT(S), (95-5338): Arthur J. England, Jr., John G. Crabtree, GREENBERG, TRAURIG, HOFFMAN, LIPOFF, ROSEN & QUENTEL, P.A., Miami, FL.

ATTORNEY(S) FOR APPELLEE(S), (95-5338): John R. Hargrove, HEINRICH, GORDON, HARGROVE, WEIHE & JAMES, Ft. Lauderdale, FL.

**Judges:** Before TJOFLAT and BARKETT, Circuit Judges, and GODBOLD, Senior Circuit Judge.

**Opinion by:** TJOFLAT

# Opinion

[*1324] TJOFLAT, Circuit Judge:

This appeal arises from a contract entered into between BMC Industries, Inc., and Barth Industries, [**2] Inc., for the design, manufacture, and installation of equipment to automate BMC's production line for unfinished eyeglass lenses. Eighteen months after the delivery date set out in the contract had passed, BMC filed suit against Barth for breach of contract. [1] Barth, in turn, counterclaimed for breach of contract. BMC's suit also included a claim against Barth's parent company, Nesco, Inc. [2] According to BMC, Nesco had orally promised to ensure Barth's [*1325] completion of the contract, and therefore was liable under the theory of promissory estoppel for Barth's nonperformance.

[**3] A jury resolved the breach of contract and promissory estoppel issues in favor of BMC, and returned a verdict of $ 3 million against Barth and $ 2.1 million against Nesco. After denying Barth's and Nesco's alternative motions for judgment as a matter of law and for a new trial, the district court rendered judgment in accordance with the jury's verdicts, and Barth and Nesco appealed. We affirm the district court's decision denying Barth judgment as a matter of law. We conclude, however, that the court erroneously instructed the jury on the contract issues, and therefore vacate the judgment against Barth and remand the case for a new trial on these issues. As for Nesco, we conclude that the

_____

[1] As indicated in the text, *infra,* in addition to suing for breach of contract, BMC sought judgment against Barth on a variety of legal theories. All stemmed from the parties' contractual relationship.

[2] After BMC and Barth entered into the contract in question here, Barth reorganized its corporate structure. Barth Industries, LP, a limited partnership, was formed and received all of the assets and liabilities of Barth Industries, Inc. Barth Industries, Inc., then dissolved. Additionally, Nesco, Inc., which was the sole shareholder of Barth Industries, Inc., changed its name to Nesco Holdings, Inc., and became a limited partner of Barth Industries, LP, holding a 99% interest in the partnership. The remaining one percent interest was acquired by BIC Corporation, the limited partnership's general partner.

In its suit against Barth Industries, Inc., and Nesco, Inc., BMC named seven other parties, including Barth Industries, LP, and BIC Corporation, as defendants. By the time of trial, BMC had dismissed five of the seven from the case. The final judgment in this case was entered against Barth Industries, Inc. and Nesco Holdings, Inc. For ease of discussion, we refer to the Barth entities collectively as "Barth," and the Nesco entities collectively as "Nesco."

court should have granted Nesco judgment as a matter of law, and thus direct the district court to dismiss Nesco from this case.

I.

A.

BMC, through its Vision-Ease division, manufactures semi-finished polymer opthalmic lenses that are used in the production of eyeglasses. These lenses are created by an assembly-line process. First, an employee fills a mold assembly with a monomer fluid, and places the mold assembly on a conveyor. Next, the assembly is inspected and then heated and cured until [**4] the monomer solidifies into a plastic lens. Finally, the lens is removed from the mold assembly through a process called "de-clipping and de-gasketing"; an employee removes the spring clip holding the mold assembly together and slices open the rubber gasket that holds the lens. The lens is then packaged and sold to a finished eyeglass retailer.

In order to decrease labor costs, and thereby remain competitive with other lens manufacturers who were utilizing cheaper foreign labor, BMC decided to become the first company to automate portions of its lens manufacturing process. Consequently, in early 1986, BMC commissioned Barth to complete a preliminary design and feasibility study. Barth's subcontractor, Komech, finished the study in June 1986. Based on this study, Barth and BMC entered into a contract (the "Contract") which provided that Barth would "design, fabricate, debug/test and supervise field installation and start up of equipment to automate the operations of mold assembly declipping, clip transport, mold assembly clipping, and mold filling." The Contract, which stated that it was governed by Florida law, listed a price of $ 515,200 and provided for delivery of four automated [**5] production lines by June 1987. The Contract also stated that time was of the essence.

On November 4, 1986, Barth and BMC executed a written amendment to the Contract, extending the delivery date by one month. In February 1987, Barth terminated Komech as design subcontractor, and hired another engineering company, Belcan, in its place. Belcan subsequently redesigned the automation equipment, which delayed Barth's progress and led the parties to execute the second (and last) written amendment, which extended the delivery date to "October 1987."

After this *second amendment*, Barth continued to

experience technical problems and design difficulties that caused repeated delays. The parties did not extend the delivery date beyond October 1987 to accommodate these delays, however. Instead, Barth and BMC each demonstrated a willingness to continue performance under the Contract.

One such delay, for example, occurred in June 1987, when Belcan decided that the equipment design posed a risk of explosion because of the proximity of certain chemicals to electrical components. Although BMC **[*1326]** perceived no such risk, it told Barth and Belcan to "go ahead" and redesign the equipment. Barth **[**6]** revised its estimated delivery schedule to account for the resulting delay, listing December 1987 as the new delivery deadline. It sent this schedule to BMC with a cover letter that stated: "Please look over the attached & let me know what you think." BMC's response, if any, is not contained in the record.

This design problem was only one of many technical difficulties that developed; other problems arose with the filling nozzles and mold assembly springs, among other components. Consequently, by October 1987, the amended Contract's delivery deadline, Barth estimated that it could not deliver the equipment until April 1988. BMC executives were still anxious, however, to continue the automation project. Thus, during the spring of 1988, although they protested Barth's failure to deliver the equipment on time, these executives encouraged Barth to continue working on the project.

In June 1988, Barth completed the four automated de-clip/de-gasket machines and delivered them to BMC. Without the entire automated system, however, BMC could not fully test these machines; the whole production line had to be in place.

By August 1988, BMC's mounting apprehension about Barth's ability to perform **[**7]** led it to seek assurance that Barth would be able to complete performance under the Contract. In an effort to obtain such assurance, BMC executives met with Robert Tomsich, a Barth officer (and director) who also served as Nesco's president. [3] According to these executives, Tomsich ensured them that Barth would perform the Contract, that Nesco's resources were committed to the project, and that, in the future, BMC should deal directly with Nesco.

Although BMC had considered terminating the Contract

and suing Barth for breach, BMC took neither step. [4] Instead, it continued to lead Barth and Nesco to believe that it was determined to finish the project; BMC collaborated with Barth's engineers to overcome difficulties, suggested design changes, and asked Barth whether more money (presumably provided by BMC) would help it complete the equipment in less time.

**[**8]** By January 1989, Barth still had not produced a functioning automation system. Due to time and cost overruns, Barth had invested over $ 1 million of its own money in the project. BMC previously had agreed to compensate Barth for these additional expenses; consequently, during that month, Tomsich asked BMC for $ 250,000 to cover some of Barth's cost overruns. One month later, BMC responded with a $ 100,000 payment, along with a letter stating that BMC was "insisting on Barth's adherence to the projected schedule," and was "not waiving any rights or remedies" for any breach, including "Barth's failure to meet the delivery dates specified in the contract." Barth's latest schedule called for delivery in June 1989.

Barth's delays and setbacks continued throughout the spring of 1989; but while BMC encouraged Barth to carry on, and continued to cooperate with Barth's engineers to solve problems, BMC also became increasingly impatient. In March, and again in April 1989, BMC pointed out Barth's unacceptable failure to meet deadlines.

Near the end of May 1989, Barth notified BMC that it had finally completed the mold assembly filling machine and that it would deliver the equipment F.O.B. **[**9]** Barth's dock in accordance with the Contract. BMC refused delivery of the mold assembly filler, and instead filed this lawsuit on June 5, 1989.

B.

BMC's complaint [5] contained fourteen counts. [6] **[**10]**

---

[3] In addition, Tomsich was the chairman and sole shareholder of Nesco.

[4] At trial, BMC offered the deposition testimony of its corporate general counsel, who stated that BMC was unwilling to continue the project unless Nesco ensured that the project would be completed.

[5] Throughout this opinion, our references to BMC's complaint indicate BMC's Second Amended Complaint.

[6] Our description of BMC's claims is hindered by the manner in which it pled its complaint. The complaint contains 154 paragraphs, the first 60 of which narrate the representations made by the parties prior to the formation of the Contract and what transpired between BMC and Barth, and BMC and

Seven of the counts were based on **[*1327]** representations made by Barth and Nesco both prior to the formation of the Contract and during its performance, six of the counts sought to impose liability on Barth's and Nesco's successors in interest, [7] and one count sought recovery against Barth's directors under the Delaware Corporate Code. By the time of the final pretrial conference, BMC's complaint had been reduced to three claims: breach of contract against Barth (count I), fraudulent misrepresentation against

Nesco, thereafter. Each of the 14 counts incorporates by reference these 60 paragraphs, regardless of whether the allegations thereof have any bearing on the legal theory (or theories) of recovery on which the count purports to be based. Moreover, each successive count incorporates by reference all of the allegations of the previous count; thus, count XIV incorporates verbatim counts I through XIII.

Among the theories of recovery BMC advanced in its case against Barth were breach of contract (count I); fraudulent misrepresentation (which induced BMC to enter into the Contract) (count II); false advertising, in violation of *Fla. Stat. ch. 817.41* (count III); violation of Florida's Deceptive and Unfair Trade Practices Act, *Fla. Stat. ch. 501.204* (count IV); and "Revocation of Acceptance" (count V). Although BMC's case against Nesco based on its involvement in Barth's performance of the Contract (count VIII) was labeled "Equitable and Promissory Estoppel," we conclude that BMC's assertion is legally equivalent to a claim that in August 1988 Nesco guaranteed Barth's performance of the Contract after Barth breached the Contract by failing to meet its October 1987 deadline (according to BMC's breach of contract claim in count I).

BMC's complaint is a quintessential example of what we and other courts have characterized as "shotgun pleading." *See, e.g.,* *Cramer v. Florida, 117 F.3d 1258, 1263 (11th Cir.1997)*; *Mason v. Allen (In re Allen ), 150 B.R. 21, 22 (Bankr.E.D.Va.1993)*. Barth and Nesco responded in kind, rather than seeking a more definite statement or moving the district court to strike the immaterial allegations of the complaint. Given the defendants' willingness to answer the complaint as pled, the district court should have intervened on its own initiative and required the plaintiff to replead its case.

[7] The counts that BMC lodged against Barth's and Nesco's successors in interest were premature in that they assumed that BMC had recovered money judgments against Barth (on one or more theories of liability asserted against Barth) and Nesco, and that these successors, having acquired Barth's and Nesco's assets, had rendered Barth and Nesco incapable of satisfying its judgment.

Barth (count II), and promissory estoppel against Nesco (count VIII).

BMC's breach of contract count alleged that the second written amendment to the Contract established October 1987 as the deadline for Barth's performance. Because Barth failed to deliver the automated equipment by that date, Barth was in default of its contractual obligations. BMC sought damages for Barth's breach in the sum of $ 6.4 million. Two separate injuries suffered by BMC comprised this measure of damages. First, BMC sought to recover the labor costs that it would have saved had it been able to use the automated equipment rather than pay employees to produce the lenses manually. Because BMC executives predicted that the automated equipment would have a useful life of ten years, BMC sought these lost labor savings **[**11]** for the ten year period from October 1987 until October 1997. Second, BMC sought compensation for what it termed the "working capital effect." This effect is an estimate of the money BMC lost because its capital was tied up paying higher labor costs rather than being used for investment or being used to pay off the company's debt (and thus reducing the interest BMC paid to its creditors).

As an affirmative defense to BMC's breach of contract claim, Barth asserted that BMC's conduct after the October 1987 delivery date had passed amounted to a waiver of the delivery date under Article 2 of the Uniform Commercial Code ("UCC"). [8] Although Barth failed to deliver the machines by October 1987, Barth argued, BMC executives urged Barth to keep working, BMC engineers continued to assist Barth in overcoming technical problems, and BMC executives agreed to increase the purchase price. Therefore, Barth claimed, BMC waived its entitlement to delivery of the machines in October 1987.

**[**12]** Additionally, Barth counterclaimed against BMC for breach of contract. Barth repeated its argument that BMC's conduct amounted to a waiver of the October 1987 delivery date, **[*1328]** and asserted that the delivery deadline therefore became indefinite. Because Barth tendered the machines within a reasonable amount of time, Barth substantially performed its contractual obligations. Consequently, Barth claimed,

[8] Florida has adopted its own version of the UCC. *See* Fla. Stat. chs. 670.101-680.111 (1997). For purposes of this opinion, "UCC" refers to Florida's version of the code. Florida's version of UCC's Article 2 is enacted as *Fla. Stat. ch. 672.101-724* (1997). This opinion refers to the UCC and Article 2 interchangeably.

BMC's refusal to accept delivery of the machines in May 1989 constituted breach of the Contract. Barth sought damages totaling $ 1.13 million, which consisted of the original purchase price of $ 515,200 specified in the Contract, plus Barth's cost overruns that BMC had agreed to reimburse.

BMC's fraudulent misrepresentation count alleged that Barth induced BMC into signing the Contract by making several false representations. Among them were Barth's statements that it had experience in designing and manufacturing custom machinery similar to the automated equipment BMC sought to purchase, that it had the ability to design and manufacture the automated equipment, and that the equipment would function according to the specifications in the Contract. BMC sought judgment on this [**13] claim for compensatory damages in the sum of $ 6.4 million, as well as punitive damages.

As an affirmative defense, Barth responded that BMC fraudulently failed to inform Barth of problems BMC was unable to solve in its manual lens production process, and that BMC misrepresented that problems experienced by the automated equipment did not occur when BMC produced lenses manually. Barth claimed that it would not have entered into the Contract had BMC not made these misrepresentations; BMC's own fraud, therefore, barred BMC from recovery on its claims against Barth. Barth also counterclaimed against BMC for fraud, and sought both compensatory and punitive damages.

BMC's promissory estoppel count against Nesco alleged that in August 1988 (after Barth was already in breach for failure to deliver the equipment by the October 1987 delivery date), Nesco promised to commit its resources to the project and become jointly responsible with Barth for its completion. BMC alleged that it was prepared to terminate the contract and sue Barth for breach, but Nesco's promise induced BMC to delay from taking either step in order to allow Barth and Nesco additional time to perform. Consequently, BMC [**14] claimed, Nesco was liable for Barth's breach of the Contract.

In response, Nesco argued that BMC's promissory estoppel claim was barred by Florida's statute of frauds. Nesco asserted that BMC's claim was equivalent to a claim that Nesco orally guaranteed Barth's performance after that performance was already past due. Because a guarantee of a past-due debt is unenforceable unless it is reduced to writing, Nesco claimed, the statute of frauds barred BMC's claim.

At the pretrial conference, the district court concluded that the Contract was predominantly a transaction in services rather than goods, and therefore held that Article 2 of the UCC did not apply. Instead, Florida common law would govern the Contract. That law does not recognize a waiver of a contract term unless the waiver is supported by detrimental reliance or consideration. Consequently, in order to establish a waiver of the October 1987 delivery date, Barth would have to show that it detrimentally relied on, or gave consideration for, BMC's waiver of the delivery date.

The case proceeded to trial on the breach of contract, fraudulent misrepresentation, and promissory estoppel issues. At the close of evidence, the district [**15] court concluded that there was insufficient evidence of fraudulent misrepresentation by either BMC or Barth, and therefore dismissed each side's fraud claims.

The court submitted the remaining issues to the jury using a special verdict form that contained eight interrogatories. In response to the first interrogatory, which asked, "Did Barth breach its contract with BMC?" the jury answered affirmatively, and awarded BMC $ 3,001,879 in damages. The jury also answered "Yes" to the third interrogatory, which asked, "Is Nesco liable to BMC on the basis of promissory estoppel?" and awarded BMC an additional $ 2,137,453 in damages. The jury responded "No" to the remaining interrogatories, which asked whether BMC was liable on Barth's counterclaims.

C.

On appeal, Barth contends that the district court erred when it concluded that the [*1329] UCC did not apply to the Contract, and thus did not govern the waiver issue. Had the court applied the UCC, Barth argues, it would have concluded that BMC waived the October 1987 delivery date, and therefore breached the Contract by refusing to accept delivery in May 1989. [9] Having reached that conclusion, the court would have granted Barth's [**16] motion for judgment as a matter of law on the breach of contract issues, and awarded Barth damages in the sum of $ 1.13 million. Assuming a dispute of material fact on the waiver issue, Barth contends alternatively that BMC's judgment on the breach of contract count should be vacated, and the case remanded for a new trial on that count and its

---

[9] Barth argues that BMC's rejection of the machines constitutes a breach because BMC failed to provide reasonable notice of termination as required by the UCC.

breach of contract counterclaim.

Nesco contends that BMC's promissory estoppel claim is nothing more than a suit on an oral guarantee of a past-due obligation and, as such, is barred by the statute of frauds. Accordingly, the district court erred in denying its motion for judgment as a matter of law, and the case should be remanded with instruction that the court dismiss it from the case. [10]

[**17] In part II.A of this opinion, we consider whether the Contract was predominantly a transaction in goods (and thus governed by the UCC) or in services (and thus governed by the common law), and conclude that it was a transaction in goods. In part II.B we examine whether BMC waived the October 1987 delivery date through its conduct after the delivery date had passed. We conclude that BMC waived the delivery date as a matter of law, but that a triable issue of fact remains as to whether Barth tendered the equipment (which BMC rejected) within a reasonable time under the circumstances. We therefore vacate the judgment entered against Barth, and remand the case for a new trial on the reasonableness issue. [11] Finally, in part III we determine whether BMC's promissory estoppel claim against Nesco is barred by the statute of frauds. We conclude that it is barred, and therefore direct the district court to grant judgment for Nesco.

[**18] II.

A.

The district court held that the Contract was predominantly for services rather than goods, and that the UCC was therefore inapplicable. We disagree.

**HN1**[↑] The UCC's Article 2 only applies to "transactions in goods." Fla. Stat. ch. 672-102 (1997). Goods are defined as "all things (including specially

---

[10] Nesco also claims that: (1) the evidence was insufficient to support BMC's claim against Nesco, and (2) even if Nesco is liable, its liability can only be joint and several with Barth's because of a pre-verdict stipulation entered into by the parties, as well as statements by BMC that it sought only joint and several liability. Given our disposition, it is unnecessary to discuss these points.

[11] In remanding the case for a new trial, we necessarily affirm the district court's denial of Barth's motion for judgment as a matter of law on the breach of contract claims (brought by BMC and Barth).

manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (chapter 678) and things in action." *Fla. Stat. ch. 672.105(1)* (1997). [12] A contract that is exclusively for services, therefore, is not governed by Article 2. Courts are frequently faced, however, with contracts involving both goods and services--so-called "hybrid" contracts. **HN2**[↑] Most courts follow the "predominant factor" test to determine whether such hybrid contracts are transactions in goods, and therefore covered by the UCC, or transactions in services, and therefore excluded. [13] [**20] *See Bonebrake v. Cox, 499 F.2d 951, 960 (8th Cir.1974)*. Under this [*1330] test, the court determines "whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, [**19] with goods incidentally involved (e.g., contract with artist for painting) or is a transaction of sale, with labor incidentally involved (e.g., installation of a water heater in a bathroom)." [14] *Id.* (footnotes omitted). At least one Florida court has implicitly adopted the predominant factor test. *See United States Fidelity & Guar. Co. v. North Am. Steel Corp., 335 So. 2d 18, 21 (Fla. 2d DCA 1976)* ("Since the predominate nature of the transaction was the furnishing of a product rather than services, we believe that the fabricated pipe could properly be characterized as goods.").

**HN4**[↑] Although courts generally have not found any single factor determinative in classifying a hybrid contract as one for goods or services, courts find several aspects of a contract particularly significant.

---

[12] "**HN3**[↑] Identification to the contract" occurs "when goods are shipped, marked or otherwise designated by the seller as goods to which the contract refers." *Fla. Stat. ch. 672.501(1)(b)* (1997) (discussing identification in the context of receiving an insurable interest in goods).

[13] A few courts do not categorize hybrid contracts as either transactions in goods or services, but rather apply the UCC only to the sale of goods elements of the contract. *See, e.g., Foster v. Colorado Radio Corp., 381 F.2d 222, 226 (10th Cir.1967)*.

[14] We note that at least some courts believe the trend is to apply Article 2 to hybrid contracts. *See Cambridge Plating Co. v. Napco, Inc., 991 F.2d 21, 24 (1st Cir.1993)* ("The general trend [is] to view such mixed contracts as governed by the UCC."); *United States ex rel. Union Bldg. Materials Corp. v. Haas & Haynie Corp., 577 F.2d 568, 572 n. 2 (9th Cir.1978)* ("The modern trend is to apply Article 2 to such mixed sales/services contracts.").

First, the language of the contract itself provides insight into whether the parties believed the goods or services were the more important element of their agreement. Contractual language that refers to the transaction as a "purchase," for example, or identifies the parties as the "buyer" and "seller," indicates that the transaction is for goods rather than services. See *Bonebrake, 499 F.2d at 958* [**21] (stating that language referring to "equipment" is peculiar to goods rather than services); *Bailey v. Montgomery Ward & Co., 690 P.2d 1280, 1282 (Colo.Ct.App.1984)* (holding that a contract that identifies the transaction as a "purchase" and one of the parties as the "customer" signals a transaction in goods); *Meeker v. Hamilton Grain Elevator Co., 110 Ill. App. 3d 668, 442 N.E.2d 921, 923, 66 Ill. Dec. 360 (Ill. App. Ct. 1982)* (stating that a contract that calls the parties "seller" and "purchaser" indicates a contract for goods).

Courts also examine the manner in which the transaction was billed; when the contract price does not include the cost of services, or the charge for goods exceeds that for services, the contract is more likely to be for goods. See *Triangle Underwriters, Inc. v. Honeywell, Inc., 604 F.2d 737, 743 (2d Cir.1979)* (stating that a bill that does not include services indicates a contract for goods); *Lincoln Pulp & Paper Co. v. Dravo Corp., 436 F. Supp. 262, 275 & n. 15 (D.Me.1977)* (holding that the contract at issue was for services after noting that the bill did not allocate costs between [**22] services and goods, and the evidence showed that the cost of the goods was less than half of the contract price).

*HN5*[↑] Movable goods is another hallmark of a contract for goods rather than services. The UCC's definition of goods makes clear the importance of mobility in determining whether a contract is for goods; the UCC states that goods are "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale." *Fla. Stat. ch. 672.105(1)* (1997). Noting the importance of mobility, one Florida court held that a contract to edit and publish printed materials was a contract for goods after stating that "the items allegedly furnished by the appellant were specially produced or manufactured and were movable." [15] *Lake Wales Publ'g Co. v. Florida*

---

[15] *HN6*[↑] Mobility is measured as of the time the goods are identified to the contract rather than after the contract is completed. Consequently, equipment or materials that were movable, but were installed and became immobile fixtures as

*Visitor, Inc., 335 So. 2d 335, 336 (Fla. 2d DCA 1976)*; see also *Smith v. Union Supply Co., 675 P.2d 333, 334 (Colo.Ct.App.1983)* **[*1331]** (holding that a contract to provide the materials and labor for installation of a new roof was a contract for goods because "the materials to be installed … were "movable at the time of identification to the contract **[**23]** for sale' " (quoting Colorado's version of the UCC)).

In this case, the district court **[**24]** relied primarily on *Lincoln Pulp & Paper* for its conclusion that the contract was for services rather than goods. The contract at issue in *Lincoln Pulp & Paper* involved the design and construction of a heat and chemical recovery unit in a pulp mill. The district court noted that, similar to *Lincoln Pulp & Paper*, the Contract obligated Barth to design, manufacture, test, and construct equipment, and also that the Contract's price did not allocate expenses between services and materials. The district court concluded that this case was sufficiently analogous to *Lincoln Pulp & Paper* to warrant the same result: a determination that the Contract was for services rather than goods.

*HN7*[↑] The question whether a contract is predominantly for goods or services is generally one of fact. See *Allmand Assocs., Inc. v. Hercules Inc., 960 F. Supp. 1216, 1223 (E.D.Mich.1997)*. *HN8*[↑] When there is no genuine issue of material fact concerning the contract's provisions, however, a court may determine the issue as a matter of law. See id. Concluding that there are no material issues of fact as to the terms of the contract, the district court decided as a matter of law that the **[**25]** contract was for services. *HN9*[↑] We review questions of law de novo. See *Preserve Endangered Areas of Cobb's History, Inc. v. United States Army Corps of Eng'rs, 87 F.3d 1242, 1246 (11th Cir.1996)*.

Applying the "predominant factor" test to the Contract, we conclude that it was predominantly a transaction in

---

part of the contract, are still "movable" within the UCC's meaning. See *Bonebrake, 499 F.2d at 959 n. 12*. Thus, for example, contracts for the sale and installation of equipment are frequently (but not always) held to be transactions in goods. Construction contracts, however, such as those for construction of a swimming pool or house, are usually held to be transactions in services. Although construction contracts typically involve materials that qualify as goods (such as concrete or roofing tiles, for example), the services element of such contracts is usually held to be dominant. See 1 James J. White & Robert S. Summers, *Uniform Commercial Code* § 9-2 (4th ed.1995).

goods. We reach this conclusion based on the contractual language, the circumstances surrounding the Contract, and the nature of the goods at issue.

Our starting point is the language of the Contract itself, which provides a number of indicia that the parties intended a contract for goods rather than services. First, the Contract is titled "PURCHASE ORDER," a reference that is used repeatedly throughout the document. This title is most instructive, as the parties have chosen to identify their agreement with a name that is almost exclusively used for transactions in goods. Second, the parties refer to themselves in the Contract as the "Buyer" and "Seller." Third, the Contract states that it is a purchase order "for the fabrication and installation of automated *equipment.*" (emphasis added). All of this contractual language is "peculiar to goods, not services," **[\*\*26]** *Bonebrake, 499 F.2d at 958*, and indicates that the parties had a contract for goods in mind.

Additionally, the Contract involves movable goods. Barth designed and fabricated the automated equipment in its own facilities, and planned to move the equipment to BMC's plant only once it was completed. Barth's original offer, which was incorporated into the Contract, included the term "F.O.B. Barth dock," meaning that the equipment was tendered to BMC once it was delivered to Barth's loading dock. Consequently, although Barth was still obligated to install and debug the equipment, it was clearly movable at the time it was identified to the Contract. [16]

**[\*\*27]** *Lincoln Pulp & Paper* is distinguishable from this case. The district court stated that the Contract price, similar to *Lincoln Pulp & Paper,* does not allocate costs between services and goods. The district court failed to note, however, that the Contract allocates payments according to delivery of automated equipment; the

---

[16] BMC correctly points out that the mere involvement of movable goods in a contract does not mean it is a transaction in goods rather than services. *See Whitmer v. Bell Telephone Co., 361 Pa. Super. 282, 522 A.2d 584, 587 (1987).* In fact some movable goods must be involved in order for the contract to be labeled a "hybrid"; otherwise, the contract would clearly be a transaction in services, and the UCC would not apply. What is significant, however, is that the goods at issue here were movable when completed, unlike some contracts that only involve movable materials, which are subsequently used to construct an immovable fixture (such as a house or swimming pool). While the mobility of the completed goods is not dispositive, it is one factor to be considered.

Contract's payment schedule calls for the delivery and acceptance of each **[\*1332]** automated equipment line to be met by a $ 70,050 payment from BMC. If the Contract price were being paid predominantly for Barth's design and engineering services as BMC claims, then the parties would have pegged payments to completion of the engineering and design services, not to the delivery of equipment. Furthermore, while the cost of services made up over half of the contract price in *Lincoln Pulp & Paper,* the opposite appears to be true in this case. A total of $ 280,200, which is over half of the contract price, is pegged to the delivery of equipment.

Finally, we note that the court in *Lincoln Pulp & Paper* stated that "[a] sale of equipment is not removed from the scope of Article 2 merely because the equipment was specially designed and manufactured before **[\*\*28]** delivery or installed by the supplier." *436 F. Supp. at 276 n. 16.* In fact, it is not surprising that the Barth-BMC Contract included such a significant services element (i.e., design and manufacturing). Because no other company had successfully automated its eyeglass lens production, Barth had to spend considerable time designing this first-of-its-kind machinery. This necessary services element, however, does not remove the Contract from the category of agreements for specially designed and manufactured equipment to which Article 2 applies.

The other two cases on which BMC relies are also inapposite. Both cases involved parties that clearly contemplated a contract for services. The first case, *Wells v. 10-X Mfg. Co., 609 F.2d 248 (6th Cir.1979)*, involved the production of cloth hunting shirts. In that case, however, the buyer provided all of the materials (except thread) that the manufacturer used to produce the clothing. *Id. at 252*. Consequently, the manufacturer did not sell goods, only the service of turning the materials into a finished product.

The other case BMC cites, *Inhabitants of the City of Saco v. General Elec. Co., 779 F. Supp. 186 (D.Me.1991)*, **[\*\*29]** involved a contract for the design and construction of a solid waste disposal facility. That case is also distinguishable because it involved a typical construction contract for a non-movable product--the disposal facility. The only movable goods were the materials that were used to construct the immobile structure. Even more significantly, the contractual language in that case clearly identified the contract as a transaction in services. The contract stated that its purpose was "for the furnishing of *services* in Phase I of the project, and "to establish the conditions on which

*Contractor* [GE] will propose to furnish *services* under Phase II'." *Id. at 197* (first and second emphases added). Not only did the language state that the contract was for services, it also referred to one of the parties as the "Contractor," a term typically used in services transactions.

**B.**

Having determined that the UCC governs this case, we must next apply Article 2's waiver provision to the Contract. **HN10**[⬆] The UCC waiver provision states in relevant part:

> (2) A signed agreement which excludes modification or recission except by a signed writing cannot be otherwise modified **[**30]** or rescinded….
>
> ….
>
> (4) Although an attempt at modification or recission does not satisfy the requirements of subsection (2) or (3) [regarding the statute of frauds] it can operate as a *waiver*.
>
> (5) A party who has made a waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver.

*Fla. Stat. ch. 672.209* (1997) (emphasis added). [17]

**1.**

Although the UCC does not specifically lay out the elements of waiver, we have stated that **HN11**[⬆] waiver requires "(1) the existence at the time of the waiver a right, **[**31]** privilege, advantage, or benefit which may be waived; (2) the actual constructive knowledge thereof; **[*1333]** and (3) an intention to relinquish such right, privilege, advantage, or benefit." *Dooley v. Weil (In re Garfinkle), 672 F.2d 1340, 1347 (11th Cir.1982).* **HN12**[⬆] Conduct may constitute waiver of a contract term, but such an implied waiver must be demonstrated by clear evidence. *See American Somax Ventures v. Touma, 547 So. 2d 1266, 1268 (Fla.*

*4th DCA 1989).* **HN13**[⬆] Waiver may be implied when a party's actions are inconsistent with continued retention of the right. *See First Pa. Bank, N.A. v. Oreck, 357 So. 2d 743, 744 (Fla. 4th DCA 1978).*

As an initial matter, we must determine whether, under the UCC, waiver must be accompanied by detrimental reliance. Although it is settled that waiver under Florida common law must be supported by valid consideration or detrimental reliance, *see Masser v. London Operating Co., 106 Fla. 474, 145 So. 72 (1932),* courts disagree on whether the UCC retains this requirement. We conclude, however, that **HN14**[⬆] the UCC does not require consideration or detrimental reliance for waiver of a contract **[**32]** term.

Our conclusion follows from the plain language of subsections 672.209(4) and (5). **HN15**[⬆] While subsection (4) states that an attempted modification that fails may still constitute a waiver, subsection (5) provides that the waiver may be retracted *unless* the non-waiving party relies on the waiver. Consequently, the statute recognizes that waivers may exist in the absence of detrimental reliance--these are the retractable waivers referred to in subsection (5). Only this interpretation renders meaning to subsection (5), because reading subsection (4) to require detrimental reliance for all waivers means that waivers would *never* be retractable. *See Wisconsin Knife Works v. National Metal Crafters, 781 F.2d 1280, 1291 (7th Cir.1986)* (Easterbrook, J., dissenting) (noting that reading a detrimental reliance requirement into the UCC would eliminate the distinction between subsections (4) and (5)). Subsection (5) would therefore be meaningless.

At least one Florida court implicitly agrees with this conclusion; in *Linear Corp. v. Standard Hardware Co., 423 So. 2d 966 (Fla. 1st DCA 1982),* the court held that a contract term had been waived despite **[**33]** the absence of any facts showing detrimental reliance. The court in *Linear* addressed a contract between a manufacturer and a retailer for the sale of electronic security devices. The contract included a provision stating that the manufacturer would not repurchase any devices the retailer was unable to sell, and another term providing that contract modifications must be in writing. Despite this contractual language, the retailer filed suit claiming that the manufacturer subsequently made an oral agreement to repurchase unsold devices, but failed to adhere to this oral agreement.

Citing chapter 672.209(4), the court concluded that the parties' conduct demonstrated that they had waived the

---

[17] The Contract included a provision requiring all modifications to be in writing. Although the parties therefore did not successfully modify the Contract, we apply chapter 672.209 to determine whether BMC's conduct constituted a waiver of the October 1987 delivery date.

requirement that modifications be in writing, and therefore gave effect to the oral modification. *See id. at 968*. The court recognized this waiver despite the apparent absence of any detrimental reliance by the retailer [18] --in fact the court never even mentioned any reliance requirement for waiver under the UCC. Consequently, the court implicitly held that a contract term could be waived without the existence of detrimental reliance by the non-waiving party.

[**34] Although other courts have held that waiver requires reliance under the UCC, those courts have ignored the UCC's plain language. The leading case espousing this view of waiver is *Wisconsin Knife Works v. National Metal Crafters, 781 F.2d 1280 (7th Cir.1986)* (addressing section 2-209 of the model version of the UCC, from which Florida adopted *section 672.209* verbatim), in which a panel of the Seventh Circuit addressed a contract that included a term prohibiting oral modifications, and considered whether an attempted oral modification could instead constitute a waiver. Writing for the [*1334] majority, Judge Posner concluded that the UCC's subsection (2), which gives effect to "no oral modification" provisions, would become superfluous if contract terms could be waived without detrimental reliance. Judge Posner reasoned that if attempted oral modifications that were unenforceable because of subsection (2) were nevertheless enforced as waivers under subsection (4), then subsection (2) is "very nearly a dead letter." *Id. at 1286*. According to Judge Posner, there must be some difference between modification and waiver in order for both subsections [**35] (2) and (4) to have meaning. This difference is waiver's detrimental reliance requirement. [19]

[**36] Judge Posner, however, ignores a fundamental difference between modifications and waivers: while a party that has agreed to a contract modification cannot cancel the modification without giving consideration for the cancellation, a party may unilaterally retract its waiver of a contract term provided it gives reasonable notice. The fact that waivers may unilaterally be retracted provides the difference between subsections (2) and (4) that allows both to have meaning. We therefore conclude that *HN16*[⬆] waiver under the UCC does not require detrimental reliance. Consequently, without reaching the issue of detrimental reliance, we consider whether BMC waived the Contract's October 1987 delivery date.

2.

Applying the elements of waiver to the facts before us, we hold as a matter of law that BMC waived the October 1987 delivery date. The October 1987 delivery date was a waivable contract right, of which BMC had actual knowledge. We also conclude that BMC's conduct impliedly demonstrated an intent to relinquish that right.

The most cogent evidence of this waiver is BMC's own representation of its relationship with Nesco. Throughout this litigation, BMC has maintained that Nesco, beginning in [**37] August 1988, "stepped in and promised to complete the project. In doing so, Nesco expressly represented that all of its resources were committed to the project, and instructed BMC to deal solely with Nesco." According to BMC, therefore, Nesco voluntarily became liable, in the fall of 1988, for Barth's completion of the project. By that time, however, the October 1987 delivery date had already passed. If, as BMC claims, the contract was already breached, then Nesco could never have performed its obligations; Nesco was in breach of its promise as soon as that promise was made, and could have been sued by BMC

---

[18] The retailer also claimed that the manufacturer orally agreed to repurchase unsold units contemporaneous with signing the contract. Thus it may appear that the manufacturer's oral agreement lulled the retailer into signing the written contract, and therefore that the waiver was supported by detrimental reliance. The court, however, held that evidence of this contemporaneous oral agreement was barred by the parol evidence rule. *See Linear Corp., 423 So. 2d at 968*. Consequently, the court could not have used this contemporaneous oral agreement to satisfy any reliance requirement for waiver.

[19] Contrary to our reasoning above, Judge Posner claims that reading a reliance requirement into waiver under subsection (4) is not inconsistent with subsection (5). According to Judge Posner, subsection (5) is broader than subsection (4), covering waivers other than mere attempts at oral

modification. Judge Posner argues as an example that subsection (5) covers express waivers that are written and signed. *See id. at 1287*. In dissent, however, as Judge Easterbrook convincingly dissects this argument. As Judge Easterbrook explains, subsection (5) is narrower than subsection (4)--limiting the effect of waivers that are not detrimentally relied upon--not the reverse as Judge Posner claims. Furthermore, Judge Easterbrook demonstrates that subsection (5) cannot cover express written and signed waivers because such writings are not waivers, but rather effective written modifications under subsection (2). *See id. at 1291* (Easterbrook, J., dissenting).

the next day. For Nesco's promise to have meaning, [20] BMC must have given Barth and Nesco additional time to perform--in other words, BMC must have waived the October 1987 delivery date.

BMC argues, however, that while it agreed to *delay* enforcing its rights against Barth in return for Nesco's promise, it did not *waive* those rights. BMC's argument [**38] defies logic. According to this theory, BMC could sue Barth and Nesco at its whim. Consequently, Nesco miraculously could have completed the project the day after its promise, and still have been fully liable to BMC for Barth's breach of contract. Nesco had nothing to gain and everything to lose from such an agreement.

BMC's own complaint buttresses our conclusion that BMC waived the October 1987 delivery date. According to BMC's complaint, Nesco promised "that Barth would *meet dates,* performance and reliability criteria under the agreement, as amended," and that Nesco "ensured that the equipment was *timely* completed and delivered to BMC **[*1335]** in Florida." (emphasis added). Because the October 1987 delivery date had already passed, however, Barth could not "meet dates" or "timely" complete the equipment unless the delivery date had been extended.

Furthermore, BMC's course of dealing with Barth evidenced BMC's waiver of the October 1987 delivery date, because BMC failed timely to demand compliance with that contract term or terminate the Contract and file suit. **HN17[↑]** When a delivery date passes without the seller's delivery, the buyer must object within a reasonable time [**39] and warn the seller that it is in breach. *See KLT Indus., Inc. v. Eaton Corp., 505 F. Supp. 1072, 1079 (E.D.Mich.1981); see also Harrison v. City of Tampa, 247 F. 569, 572 (S.D.Fla.1918)* ("I do not recognize any principle by which one party to a contract, after a breach by the other party, may continue acting under such contract to some future time, and then abrogate the contract by reason of such former breach."). [21]

---

[20] We address Nesco's promise in part III, *infra.*

[21] *Cf. Green Constr. Co. v. First Indem. of Am. Ins. Co., 735 F. Supp. 1254, 1262 (D.N.J.1990)* (holding that the delivery date was not waived because the buyer warned the seller to comply with the delivery schedule immediately after the first delivery date had passed, and therefore indicated an intent to hold seller to the contract terms).

Although BMC maintained at trial that Barth breached the contract as of October 1987, BMC did not tell Barth it intended to terminate the contract and hold Barth liable for the breach until May 1989. **[**40]** In fact, the earliest indication from BMC that it was considering termination was August 1988, when BMC executives met with Tomsich to seek assurance that Barth would perform. As we have already stated, however, the result of that meeting was a waiver of the October 1987 delivery date, not a timely exercise of BMC's right to terminate the Contract. BMC did not warn Barth in earnest of its intent to terminate until February 1989, when BMC sent Barth a letter along with $ 100,000 of the $ 250,000 payment Tomsich had requested at the August 1988 meeting. This letter warned Barth that BMC was not waiving its rights and remedies for Barth's failure to meet contractual delivery dates. BMC warned Barth again in March when it sent a letter advising of its intent to "hold [Barth] responsible, both for the initial breach and for all failures to meet subsequently promised dates."

Until 1989, however, BMC continued to act as though both parties were bound by the Contract and that Barth was not in default of its obligations: the October 1987 delivery date passed without comment from BMC; engineers from BMC frequently provided advice or assistance to help Barth personnel overcome technical problems; **[**41]** BMC executives frequently visited Barth's production facilities and encouraged Barth to continue working to complete the equipment; BMC even continued to spend money on the project--in December 1987, over one month after the October 1987 delivery date had passed, BMC purchased an additional $ 71,075 worth of springs and tooling for the machines. In sum, rather than terminating the Contract, or at least warning Barth that it was in breach after the October 1987 delivery date passed, BMC continued to act as though the Contract remained in effect.

This is not to say that BMC never complained that Barth had missed deadlines; BMC executives frequently expressed their concern and disappointment that the project was so far behind schedule. On April 5, 1988, for example, the Chairman, President, and CEO of BMC sent a letter to Barth in which he stated: "The project is well behind schedule, and each day of delay represents lost savings for Vision-Ease. I hope that Barth will exert every effort to ensure the speedy completion and installation of the equipment and avoid any further delay." But while BMC complained of delays, it never declared Barth in default or terminated the contract-- instead, **[**42]** BMC told Barth to keep working. After

Barth had spent an additional eighteen months of time and money and, according to Barth, was prepared to deliver the machines, however, BMC suddenly decided to terminate the Contract. This BMC could not do. [22]

The UCC states that *HN18*[⬆] when a contractual delivery date is waived, delivery **[*1336]** must be made within a reasonable time. *See Fla. Stat. ch. 672.309(1)* (1997); *KLT Indus., Inc. v. Eaton Corp., 505 F. Supp. 1072, 1079 (E.D.Mich.1981)*. Consequently, because BMC waived the October 1987 delivery date, Barth was only obligated to deliver the machines within a reasonable time period. We remand this case to the district court for a new trial on the question of whether Barth tendered the machines within **[**43]** a reasonable time period. [23]

III.

BMC's promissory estoppel claim against Nesco is based on Tomsich's representation to BMC executives, in August 1988, that Nesco would commit its own resources to the project and that Barth would complete its performance under the Contract. [24] **[**44]** Tomsich made this representation in response to the executives' statement that BMC was prepared to terminate the Contract and sue Barth for breach. [25] BMC accepted Tomsich's assurance, and decided to withhold suit.

Nesco contends that this claim is barred by the statute

---

Without explanation, the district court ignored this aspect of BMC's promissory estoppel claim, and focused only on Tomsich's August 1988 representation when it presented that claim to the jury. We conclude, however, that the court rightly excluded Nesco's alleged 1986 promise from its presentation of BMC's claim to the jury, because the evidence of any Nesco promise made before the Contract was signed is insufficient as a matter of law. As for the statement by Barth personnel that Nesco was supporting Barth, this evidence reveals no promise actually made by Nesco. It was Barth, not Nesco, that promised Nesco's support for the project before the Contract was signed. Nesco cannot be held liable for failing to deliver on a promise that it did not make.

Nor do the Nesco brochures contain any promise made by Nesco. At trial, BMC presented language from the brochures to demonstrate a promise, such as the following: "All together, these [Nesco-owned] companies offer a full spectrum of services required by all industries, large and small: Engineering and product design." BMC contends that such language constituted a promise that Nesco would back up the projects undertaken by its subsidiaries. BMC's contention is frivolous; the brochures were merely pamphlets designed to provide information about the services offered by Nesco's subsidiaries. Furthermore, it was Barth, not Nesco, that provided these brochures to BMC.

BMC also pointed out that, among other subsidiaries (including Barth) presented in the brochures, the pamphlets discussed the Nesco Design Group, Inc. BMC contended at trial that its executives interpreted the brochures to mean that while Barth would manufacture the machines, Nesco would assist Barth in creating the machines' design. The brochures, however, draw no connection between Barth and Nesco Design Group, or any other Nesco company, aside from the fact that they are all owned by Nesco. We fail to understand how a brochure that describes the abilities of a corporation's subsidiaries could lead anyone to believe that the subsidiaries would pool their resources and experience on every contract. In sum, the evidence was insufficient to establish *any* representation, much less a promise, by Nesco to BMC prior to the execution of the Contract.

---

[22] Although Barth contends on appeal that several district court jury instructions were erroneous and prejudicial, we need not reach this question given our holding that BMC waived the October 1987 delivery date and our consequent remand for retrial.

[23] On remand, if the jury concludes that Barth did not deliver the machines within a reasonable time period, then BMC will prevail on its breach of contract claim against Barth. BMC's damages should then be calculated according to *Fla. Stat. ch. 672.713* (1997). If instead, however, the jury finds that BMC terminated the contract *before* a reasonable time had passed, then Barth will prevail on its counterclaim. BMC has stipulated that Barth is entitled to recover $ 1.13 million if it prevails.

[24] In addition to Tomsich's August 1988 representation, BMC's claim is based on a promise allegedly made by Nesco in 1986, before the Contract was signed. According to BMC, Nesco promised in 1986 to support Barth's work on the project in order to induce BMC to sign the Contract. To support this assertion, BMC offered promotional materials about Nesco that Barth gave to BMC before the Contract was signed. These brochures emphasized Nesco's engineering abilities and experience and discussed each of Nesco's subsidiaries, including Barth. Along with these brochures, BMC claimed, Barth personnel assured BMC that "Barth was not a stand alone, it was backed up by the Nesco group." BMC contended at trial that it relied on Barth's affiliation with Nesco, as presented in these brochures and by Barth personnel, when it signed the Contract.

[25] At trial, BMC introduced Tomsich's representation through the deposition testimony of BMC's corporate general counsel, who stated that Robert Tomsich assured BMC, in August 1988, that "all of Nesco's resources were committed to this project in seeing it go, that all of the engineering talents in the Nesco organization were available as necessary to help Barth."

of frauds. A guarantee of a past-due debt is void under the statute of frauds in the absence of a writing; [*1337] according to Nesco, BMC's claim, while labeled "promissory estoppel," is legally equivalent to a claim that Nesco *guaranteed* Barth's performance *after* Barth was already in default. BMC cannot deny this fact, Nesco argues, because (1) the evidence showed that Tomsich's promise was made nine months after Barth had breached the Contract, and (2) BMC's legal position throughout this litigation has been that Tomsich's promise was made after Barth had breached the Contract. By taking the legal position that Barth breached the Contract when it failed to deliver [**45] the equipment in October 1987 and that BMC never waived that breach, BMC impliedly adopted the position that Nesco's August 1988 promise amounted to a guarantee. We agree.

In light of the jury's verdict on the promissory estoppel claim, we must assume that, in August 1988, Tomsich promised BMC that Nesco would ensure Barth's performance of the Contract, and that, relying on this promise, BMC postponed its suit against Barth for breach of contract. Because Tomsich wore two hats--as an officer of Barth and of Nesco--when he met with BMC's executives and made the promise, this scenario yields three legal possibilities: (1) a new three-party agreement replaced the original Contract, with BMC on one side and Barth and Nesco jointly on the other; (2) a novation occurred, whereby Nesco replaced Barth (and assumed Barth's liability) under the original Contract; or (3) Nesco guaranteed Barth's past-due performance. [26] Under the first two possibilities, Barth would have been released from liability for its breach of the Contract. [27] [**47] BMC eschewed these possibilities, however,

when it sued Barth for breach. Although BMC disavows that Nesco's promise constituted a guarantee, that is the only [**46] remaining legal possibility. In short, we adhere to the time-tested adage: if it walks like a duck, quacks like a duck, and looks like a duck, then it's a duck. [28]

Because a guarantee to answer for the debt of another (including a debt past due) is void under Florida law unless in writing, Nesco's oral guarantee is unenforceable. [29] Consequently, BMC's claim against Nesco is barred. [30]

---

releasing Barth from liability. This option, however, is too implausible to be credible. Under this option, Barth would remain liable for its breach of the original Contract, but would still be obligated (together with Nesco this time) to complete the project under the new three-way contract. Particularly in light of the incessant technical problems that Barth experienced while trying to perform under the original Contract, it is highly unlikely that Barth and Nesco would assume the risk of becoming liable under a second contract, while Barth remained liable under the first. Barth and Nesco would have had nothing to gain from entering into a new contract unless BMC released Barth from liability under the original Contract.

[28] The "duck test" has received wide support from the courts. *See, e.g.,* ***Hurston v. Director, Office of Workers Compensation Programs, 989 F.2d 1547, 1549 (9th Cir.1993)***; *Psarianos v. Kikis, 941 F. Supp. 79, 80 (E.D.Tex.1996)*; *Loudermilk v. Loudermilk, 183 W. Va. 616, 397 S.E.2d 905, 907 (W.Va.1990)*.

[29] *HN19*[↑] Florida's statute of frauds provides:

No action shall be brought … whereby to charge the defendant upon any special promise to answer for the debt, default or miscarriage of another person … unless the agreement or promise upon which such action shall be brought, or some note or memorandum thereof shall be in writing and signed by the party to be charged therewith….

*Fla. Stat. ch. 725.01* (1997).

[30] We are not *converting* BMC's promissory estoppel claim into a contractual guarantee claim. Instead, we note that the essence of BMC's claim--regardless of the label affixed to it--is that Nesco promised to become liable for the debt of another (Barth), *after* that debt had already become due. If there had been adequate consideration, BMC would have labeled its claim a contractual "guarantee." In the absence of consideration, however, BMC has called its claim "promissory estoppel." Our point is this: a promise to become liable for the past-due debt of another is invalid unless in writing. The likelihood that someone would assume liability for an obligation that was already in default is too minute to permit

---

[26] Although we concluded in part II.B.2, *supra,* that BMC waived the October 1987 delivery date, we treat the delivery date as if it were in effect in analyzing BMC's claim against Nesco. BMC's legal position was, and continues to be, that Barth was in default when Tomsich made the August 1988 promise. BMC is therefore bound by that characterization in its suit against Nesco.

[27] If the parties created a new three-way contract, then Barth would have been released from liability for its breach because the parties would have intended the new contract to *replace* the original Contract. Although BMC would therefore be voluntarily relinquishing its claim against Barth, BMC might agree to do so as consideration for Nesco's assumption of liability under the second contract.

The parties could have created a new three-way contract without replacing the original Contract, and therefore without

**[**48] [*1338]** BMC attempts to escape from the grasp of the statute of frauds by claiming that Nesco's promise was "direct" rather than "collateral." _HN20_[↑] Under the statute of frauds, where the main purpose of the guarantor is to obtain some benefit or serve some interest of its own rather than to gain some advantage for the beneficiary, that promise is considered "direct," and remains beyond the reach of the statute. _See Al Booth's, Inc. v. Boyd-Scarp Enters., Inc., 518 So. 2d 422, 423-24 (Fla. 5th DCA 1988)_ (referring to this principle as the "leading object" rule). Consequently, if Nesco's main purpose in making the guarantee was to achieve some benefit for itself rather than for Barth, the statute of frauds would not apply, and BMC's claim would not be barred.

BMC's argument, however, ignores the fact that Nesco could not reasonably hope to gain any benefit for itself by guaranteeing Barth's overdue performance; because (according to BMC's legal position) Barth was already in

---

such a promise to be enforced absent a writing to prove its existence.

    Although we discuss Nesco's promise as if BMC labeled it a guarantee, our conclusion is equally sound if we instead apply promissory estoppel rules to BMC's claim. Promissory estoppel requires "a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance"; such a promise is "binding if injustice can be avoided only by enforcement of the promise." _W.R. Grace & Co. v. Geodata Servs., Inc., 547 So. 2d 919, 924 (Fla.1989)_. The promisee must also show that such reliance was to its detriment. _See Crown Life Ins. Co. v. McBride, 517 So. 2d 660, 662 (Fla.1987)_.

BMC's claim fails under promissory estoppel rules because it was unreasonable for BMC to rely on Nesco's promise absent a writing. BMC claimed at trial that it suffered $ 6.4 million in damages because of Barth's default on its performance, and that Nesco assumed full liability for that performance after the default. Again, it is so unlikely that someone would assume liability for a past-due debt that it is unreasonable to rely on such a promise if it is not reduced to a writing; this principle is particularly true when the liability totals $ 6.4 million.

Alternatively, BMC's claim fails under promissory estoppel rules because BMC did not detrimentally rely on Nesco's promise. Although BMC delayed filing suit for nine months and paid Barth an additional $ 100,000 in reliance on Tomsich's promise, BMC has the right to collect these additional costs from Barth (in fact, BMC included these costs in its calculation of damages against Barth at trial). Consequently, BMC did not incur any detriment because of Nesco's promise.

default, and BMC never waived that default, BMC could have sued Barth and Nesco for breach immediately after Nesco made the guarantee. Nesco's only incentive to guarantee Barth's defaulted performance **[**49]** was the mere hope that BMC would refrain from filing suit if the equipment was delivered in the near future. This hope, however, does not constitute any reasonable expectation of benefit. Consequently, Nesco's guarantee was not "direct," and is governed by the statute of frauds.

Because the statute of frauds applies to Nesco's promise, BMC's claim against Nesco fails in the absence of a writing evidencing the guarantee. Consequently, we vacate the judgment against Nesco and remand the case to the district court with the instruction that it enter judgment for Nesco.

IV.

For the foregoing reasons, we hold that the district court erred in concluding that the UCC did not apply to the Contract. Furthermore, we conclude that BMC waived the October 1987 delivery date. We therefore VACATE the district court's judgment against Barth and REMAND the case to the district court for retrial of BMC's claims against Barth as well as Barth's counterclaims in accordance with the UCC. Furthermore, we hold that BMC's claim that Nesco guaranteed Barth's performance is void in the absence of any writing, because (according to BMC's legal position) Barth's obligation was already in default when the purported **[**50]** guarantee was made. Consequently, we VACATE the district court's judgment against Nesco and REMAND the case to the district court and instruct it to enter judgment for Nesco.

SO ORDERED.

---

End of Document

# Exhibit 6


Neutral
As of: December 23, 2025 7:11 PM Z

# *Enkidin, LLC v. Weisbard*

Court of Appeals of Colorado, Division Five

June 20, 2024, Decided

Court of Appeals No. 23CA0845

**Reporter**
2024 Colo. App. LEXIS 1752 *; 2024 LX 102212

Enkidin, LLC, d/b/a Re-Creations Dental Studios, d/b/a Re-Creations Dental, d/b/a Recreations, Plaintiff-Appellant, v. Lee Amy Weisbard, a/k/a Lee Weisbard D.D.S. d/b/a Weisbard Dental, Defendant-Appellee.

**Notice:** NOT PUBLISHED PURSUANT TO *C.A.R. 35(e)*

**Prior History:** **[*1]** Arapahoe County District Court No. 21CV31502. Honorable Ben L. Leutwyler III, Judge.

*Enkidin, LLC v. Weisbard, 2024 Colo. App. LEXIS 772, 2024 WL 3978464 (Colo. Ct. App., June 20, 2024)*

**Disposition:** JUDGMENT REVERSED AND CASE REMANDED WITH DIRECTIONS.

# Core Terms

recreation, invoice, past due, statute of limitations, delivery, genuine issue of material fact, accrue, summary judgment, district court, delivery contract, statute of frauds, new order, email, moving party, outstand, column, personal knowledge, nonmoving party, sales contract, sequence, lawsuit, liquidated, undisputed, ascertain

# Case Summary

## Overview
## Key Legal Holdings

- The district court erred in granting summary judgment for Weisbard because genuine issues of material fact existed regarding whether there was a payment-on-delivery contract after June 2011, whether Weisbard paid in full for goods received after June 2011, and how Recreations

applied payments to the account, all of which affected when the six-year statute of limitations began to accrue.

- The court found that Weisbard's checks did not identify which invoices they were intended to pay, creating a disputed issue of material fact as to whether Recreations was free to apply Weisbard's payments to her past debt rather than to new orders.

## Material Facts

- Recreations and Weisbard had a business relationship from 2008-2019 where Weisbard purchased dental prosthetics.

- By June 2011, Weisbard had accrued substantial past due debt.

- Weisbard claims that after June 2011, all orders were on a payment-on-delivery basis.

- In October 2012, Recreations offered to accept $22,000 of $27,254.47 past due if paid by December 2012.

- Weisbard made only 9 of the agreed 22 monthly $1,000 payments.

- Invoices showed Weisbard consistently underpaid for new orders after June 2011.

- Recreations filed suit on August 31, 2021.

## Controlling Law

- Colorado's six-year statute of limitations for liquidated debt claims (§13-80-103.5(1)(a)).

- Summary judgment standard under C.R.C.P. 56(c).

- UCC provisions on contract formation (§4-2-

Jennifer Hayes

204(1)), statute of frauds (§4-2-201), and course of dealing/performance (§4-1-303).

• Colorado law on application of payments to debts (when a debtor directs application of payment, creditor must apply as directed; if no direction, creditor may apply as desired).

## Court Rationale

Whether a payment-on-delivery contract existed after June 2011 was disputed by evidence showing Recreations did not enforce such requirement. Invoices showed Weisbard consistently underpaid for new orders and Recreations applied new payments to past debt. Weisbard's checks did not specify which invoices they were intended to pay. Whether Weisbard objected to monthly invoices showing past due amounts was disputed. These factual disputes directly affected when the statute of limitations began to accrue.

## Outcome
## Procedural Outcome

The Colorado Court of Appeals reversed the district court's grant of summary judgment in favor of Weisbard and remanded the case for further proceedings consistent with its opinion.

# LexisNexis® Headnotes

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil Procedure > ... > Summary Judgment > Appellate Review > Standards of Review

### HN1[⬇] Standards of Review, De Novo Review

An appellate court reviews de novo a district court's order granting summary judgment.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

Civil Procedure > Judgments > Summary Judgment > Burdens of Proof

Civil Procedure > Judgments > Summary Judgment > Entitlement as Matter of Law

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

### HN2[⬇] Entitlement as Matter of Law, Appropriateness

Summary judgment is a drastic remedy that is appropriate only if the pleadings and supporting documents show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. The party moving for summary judgment bears the initial burden of showing the nonexistence of any genuine issue of material fact, and all doubts as to the existence of such an issue must be resolved against the moving party.

Civil Procedure > Judgments > Summary Judgment > Burdens of Proof

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

### HN3[⬇] Summary Judgment, Burdens of Proof

If the moving party establishes the absence of record evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to show a genuine issue of material fact. In responding to a properly supported summary judgment motion, however, the nonmoving party may not rest on its mere allegations or denials of the opposing party's pleadings but must provide specific facts demonstrating a genuine issue for trial. The task on review is to determine whether a genuine issue of material fact existed and whether the district court correctly applied the law.

Civil Procedure > Appeals > Standards of Review > De Novo Review

Governments > Legislation > Statute of Limitations > Judicial Review

Governments > Legislation > Statute of Limitations > Time Limitations

Civil Procedure > Appeals > Standards of Review > Questions of Fact & Law

### HN4[⬇] Standards of Review, De Novo Review

The interpretation of when a claim accrues under a statute of limitations is an issue of law that courts review de novo. But whether the statute of limitations bars a particular claim because a court finds certain circumstances exist is usually a fact question.

Contracts Law > Standards of Performance > Creditors & Debtors
Business & Corporate Compliance > Contracts > Standards of Performance > Creditors & Debtors

Governments > Legislation > Statute of Limitations > Time Limitations

Commercial Law (UCC) > ... > Remedies > Statute of Limitations > Time Limitations

### HN5[⬇] Standards of Performance, Creditors & Debtors

The Colorado statute of limitations for a breach of contract claim under the Uniform Commercial Code (UCC) is generally three years. Colo. Rev. Stat. § 13-80-101(1)(a). If the claim is for liquidated debt, however, the six-year statute of limitations in Colo. Rev. Stat. § 13-80-103.5(1)(a) applies. A debt is liquidated if the amount due is capable of ascertainment by reference to an agreement or by simple computation.

Contracts Law > Types of Contracts > Oral Agreements
Business & Corporate Compliance > Contracts > Types of Contracts > Oral Agreements

Commercial Law (UCC) > ... > Form, Formation & Readjustment > Statute of Frauds > Formal Requirements

Contracts Law > Statute of Frauds > Requirements > Signatures

Contracts Law > Statute of Frauds > Requirements > Writings

### HN6[⬇] Types of Contracts, Oral Agreements

The UCC, as adopted in Colorado, applies to contracts for the sale or lease of goods. Under the UCC, a contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract. Colo. Rev. Stat. § 4-2-204(1). The UCC's statute of frauds, however, bars the enforcement of oral contracts for the sale of goods for the price of $500 or more. Colo. Rev. Stat. § 4-2-201(1). Compliance with the statute of frauds requires a sufficient record to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought.

Contracts Law > Types of Contracts > Oral Agreements
Business & Corporate Compliance > Contracts > Types of Contracts > Oral Agreements

Contracts Law > ... > Affirmative Defenses > Estoppel > Statute of Frauds

Contracts Law > Statute of Frauds > Requirements > Writings

### HN7[⬇] Types of Contracts, Oral Agreements

Colo. Rev. Stat. § 4-2-201(2) creates a limited exception to the statute of frauds; the exception authorizes an oral contract if it is later memorialized in an unsigned writing and if both parties are merchants and the receiving party knows of the writing's contents and does not object within ten days after it is received.

Commercial Law (UCC) > ... > Application & Construction > Contract Provisions > Gap Filler Provisions

Contracts Law > Contract Interpretation > Parol Evidence > Course of Dealing

Commercial Law (UCC) > ... > Form, Formation & Readjustment > Parol Evidence Rule > Gap Filler Provisions

### HN8[⤓] Contract Provisions, Gap Filler Provisions

Under Colorado law, the course of dealing between the parties and course of performance under a contract are relevant in ascertaining the meaning of the parties' agreement, may give particular meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement. Colo. Rev. Stat. § 4-1-303. A course of dealing is a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct. Colo. Rev. Stat. § 4-1-303(b). A course of performance is a sequence of conduct between the parties to a particular transaction that exists if two conditions are satisfied. Colo. Rev. Stat. § 4-1-303(a). First, the agreement of the parties with respect to the transaction involves repeated occasions for performance by a party. Colo. Rev. Stat. § 4-1-303. Second, the other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection. Colo. Rev. Stat. § 4-1-303.

Commercial Law (UCC) > ... > Form, Formation & Readjustment > Parol Evidence Rule > Gap Filler Provisions

Contracts Law > Contract Interpretation > Parol Evidence > Course of Dealing

### HN9[⤓] Parol Evidence Rule, Gap Filler Provisions

A course of dealing looks at the parties' conduct before the contract, while the course of performance analyzes the parties' conduct after contract formation. Colo. Rev. Stat. § 4-1-303 cmt. 2.

Commercial Law (UCC) > ... > Form, Formation & Readjustment > Parol Evidence Rule > Gap Filler Provisions

Contracts Law > Contract Interpretation > Parol

Evidence > Course of Dealing

Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment > Modifications, Rescissions & Waivers

### HN10[⤓] Parol Evidence Rule, Gap Filler Provisions

When the express terms of a contract conflict with the parties' course of dealing or performance, the express terms will prevail. Colo. Rev. Stat. § 4-1-303. Indeed, *course of performance*, *course of dealing*, and trade usage may be relevant to show a waiver or modification of the agreement.

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

Evidence > Inferences & Presumptions > Inferences

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

### HN11[⤓] Burdens of Proof, Movant Persuasion & Proof

All doubts must be resolved against the moving party; at the same time, the nonmoving party must receive the benefit of all favorable inferences that may be reasonably drawn from the undisputed facts.

Civil Procedure > ... > Summary Judgment > Opposing Materials > Accompanying Documentation

Evidence > Types of Evidence > Documentary Evidence > Affidavits

Civil Procedure > ... > Summary Judgment > Supporting Materials > Affidavits

### HN12[⤓] Opposing Materials, Accompanying Documentation

If affidavits are submitted as part of summary judgment, C.R.C.P. 56(e) requires such affidavits shall be made on personal knowledge.

Contracts Law > Standards of Performance > Creditors & Debtors

Business & Corporate Compliance > Contracts > Standards of Performance > Creditors & Debtors

Evidence > Weight & Sufficiency

HN13[↴] **Standards of Performance, Creditors & Debtors**

Whether invoices are accurate is a question that goes to the weight of the evidence, not its admissibility. Even if the identity of a person whose firsthand knowledge is the basis of a particular entry in a business record cannot be established, the record custodian's knowledge is adequate and such records are admissible. A custodian's lack of personal knowledge concerning the accuracy of information contained in business records would affect only the weight of evidence, not its admissibility.

Contracts Law > Standards of Performance > Creditors & Debtors

Business & Corporate Compliance > Contracts > Standards of Performance > Creditors & Debtors

Evidence > Inferences & Presumptions > Presumptions > Creation

HN14[↴] **Standards of Performance, Creditors & Debtors**

In the absence of direction or expression by the debtor of his intent as to how payment should be applied, the presumption is that the debtor thereby assents to such application of the funds as the creditor may desire to make. The creditor is allowed to make the appropriation in a way most advantageous for himself.

Contracts Law > Standards of Performance > Creditors & Debtors

Business & Corporate Compliance > Contracts > Standards of Performance > Creditors & Debtors

HN15[↴] **Standards of Performance, Creditors & Debtors**

If the debtor does not direct how the payment is to be applied, then the creditor generally may apply the payment in any way that the creditor desires. If neither the debtor nor the creditor exercises its right to direct application of a payment, then the payment is applied by law in order of time to the earliest matured debts.

**Counsel:** Miller Cohen Peterson Young P.C., Bill Peterson, Sarah Young, Jonathan Lebsack, Colin Ksobiech, Longmont, Colorado, for Plaintiff-Appellant.

Pitler and Associates, P.C., Robert L. Pitler, Aurora, Colorado, for Defendant-Appellee.

**Judges:** Opinion by JUDGE JOHNSON. Freyre and Brown, JJ., concur.

**Opinion by:** JOHNSON

# Opinion

[P1] Plaintiff, Enkidin LLC, d/b/a, Re-Creations Dental Studios (Recreations),[1] appeals the district court's grant of summary judgment in favor of defendant, Lee Amy Weisbard (Weisbard). We reverse.

I. Background

[P2] Recreations was owned and operated by Carlos Puga (Carlos). Carlos' daughter, Cassandra Puga (Cassandra), took over the business after her father passed away.[2] At all times relevant, Recreations manufactured dental prosthetics.

[P3] Weisbard is a dentist who regularly purchased custom dental products from Recreations from March 2008 to August 2019. For the first three and a half years of the business relationship, Weisbard purchased the products on credit. By June 2011, Weisbard had accrued a substantial past due amount. According to Weisbard, beginning in **[*2]** June 2011 and continuing through the end of the parties' contractual relationship, Recreations required her to pay by check at the time of delivery because she consistently had unpaid invoices.

---

[1] Enkidin LLC does business under the trade names of Re-Creations Dental Studios, d/b/a, Re-Creations Dental, d/b/a Recreations. The parties and district court refer to Recreations both with and without a hyphen ("Recreations" and "Re-creations"). We use "Recreations," as this is how the entity is identified in the court caption.

[2] Since Carlos and Cassandra share the same last name, we refer to both by their first names. No disrespect is intended.

[P4] By October 2012, Recreations sent Weisbard a demand letter in which it would agree to accept $22,000 of the $27,254.47 past due amount if Weisbard paid the $22,000 by December 2012. According to Weisbard, in November 2012, she and Carlos orally agreed that the credit debt would be satisfied by twenty-two monthly payments of $1,000.

[P5] Although Weisbard asserted that the parties established a payment on delivery requirement beginning in June 2011, the parties' course of performance suggests otherwise. Instead, it appears that — rather inconsistently — Weisbard would (1) write a check when an order was delivered, usually not for the proper amount of the invoice, and then tell a Recreations representative at a later date when to cash the check; or (2) at least on one occasion, not provide a check at all. But Recreations took no action to recall the deliveries.

[P6] Carlos died sometime in 2013, and Cassandra assumed management of Recreations. Between December 2012 and February 2014, Weisbard **[*3]** made nine of the twenty-two $1,000 payments (some months were missed), which left an outstanding balance of $13,000 (excluding $5,254.47 that Recreations had indicated it would waive if she made all the payments). But Weisbard continued to accrue additional past due amounts because the payment on delivery contract did not appear to be enforced by Recreations.

[P7] In January 2017, Cassandra sent an email on behalf of Recreations informing Weisbard that she had an outstanding past due balance of $34,682.03. The email did not delineate between past due amounts accrued before the November 2012 agreement between Recreations and Weisbard and past due amounts accrued after June 2011 for the delivery of products that had not been paid in full. The email asked whether Weisbard could make monthly payments toward the past due amount, but it did not specify a monthly payment amount.

[P8] Sometime after January 2017, Cassandra sold Recreations to Geoff Abadee (Abadee). While Abadee controlled Recreations, Weisbard and Recreations purportedly continued business with payment on delivery transactions, although again, this agreement did not appear to be enforced by Recreations. In August 2019, Abadee **[*4]** sold the assets of Recreations to Furat Al Hassani (Hassani), who continued business under the trade name Recreations. Hassani was made aware of Weisbard's past due balance and assumed all accounts receivable when he purchased Recreations.

Weisbard discontinued business with Recreations after it was sold to Hassani.

[P9] On August 31, 2021, Recreations filed this lawsuit to recover Weisbard's past due debts. At a hearing in November 2022, the district court ordered Weisbard to submit a motion for summary judgment to address the statute of limitations. Weisbard complied, arguing that since 2011, all orders were paid for by check on delivery, the past due amount accrued prior to 2011, and therefore, the statute of limitations had expired on any debt recovery claim. The district court agreed, concluding that the six-year statute of limitations barred Hassani on behalf of Recreations from recovering Weisbard's debt.

[P10] Recreations appeals, contending that disputed issues of material fact exist as to (1) whether Weisbard was on a payment on delivery basis beginning in June 2011; (2) whether Weisbard paid in full for all goods received after June 2011; (3) whether Recreations correctly **[*5]** applied the payments to the account; (4) whether the monthly statements delivered to Weisbard were accepted absent written objection; and (5) when the six-year statute of limitations began to accrue. Recreations also contends that the district court erred by concluding that the statute of frauds did not require the contract terms, specifically whether Weisbard was on a payment on delivery arrangement, to be in writing.

[P11] Weisbard contends that any claim to collect the past due debt based on the agreement between her and Carlos accrued on June 30, 2011; thus, the last date Recreations could file its lawsuit was June 30, 2017. But Recreations contends that Weisbard's breach may have occurred on September 29, 2019, when she ceased making payments on past due amounts, meaning Recreations' lawsuit was timely filed as to the entire outstanding balance.

[P12] All of the contentions raised by Recreations are interrelated; consequently, when the statute of limitations accrued to collect on Weisbard's debt hinges on resolution of the issues collectively.

II. Summary Judgment

[P13] We conclude that there are genuine issues of material fact as to when the statute of limitations began to accrue, **[*6]** and therefore, the district court erred by granting summary judgment in favor of Weisbard.

A. Standard of Review and Applicable Law

*HN1*[⬆️] [P14] We review de novo a district court's order

granting summary judgment. *Rocky Mt. Planned Parenthood, Inc. v. Wagner, 2020 CO 51, ¶ 19, 467 P.3d 287.*

*HN2*[↑] [P15] Summary judgment is a drastic remedy that is appropriate only if the pleadings and supporting documents "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id. at ¶ 19* (quoting *C.R.C.P. 56(c)*). The party moving for summary judgment bears the initial burden of showing the nonexistence of any genuine issue of material fact, "and all doubts as to the existence of such an issue must be resolved against the moving party." *Stanczyk v. Poudre Sch. Dist. R-1, 2020 COA 27M, ¶ 51, 490 P.3d 582* (quoting *Churchey v. Adolph Coors Co., 759 P.2d 1336, 1340 (Colo. 1988)), aff'd on other grounds, 2021 CO 57, 489 P.3d 743.*

*HN3*[↑] [P16] If the moving party establishes the absence of record evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to show a genuine issue of material fact. *Id.* "In responding to a properly supported summary judgment motion, however, the nonmoving party may not rest on its mere allegations or denials of the opposing party's pleadings but must provide specific facts demonstrating a genuine issue for trial." *City of Fort Collins v. Colo. Oil, 2016 CO 28, ¶ 8, 369 P.3d 586; see also C.R.C.P. 56(e).* "Our task on review **[*7]** 'is to determine whether a genuine issue of material fact existed and whether the district court correctly applied the law.'" *Stanczyk, ¶ 53* (quoting *Colo. Oil, ¶ 9*).

*HN4*[↑] [P17] The interpretation of when a claim accrues under a statute of limitations is an issue of law that we review de novo. *Rider v. State Farm Mut. Auto. Ins. Co., 205 P.3d 519, 521 (Colo. App. 2009).* But whether the statute of limitations bars a particular claim because a court finds certain circumstances exist is usually a fact question. *Sulca v. Allstate Ins. Co., 77 P.3d 897, 899 (Colo. App. 2003).*

B. Analysis

[P18] The district court granted summary judgment in favor of Weisbard, concluding that Recreations' claims were barred by the six-year statute of limitations in *section 13-80-103.5(1)(a), C.R.S. 2023,* which the court determined began to run in June 2011. The court reasoned that "the undisputed material facts presented in this case show that Weisbard did not incur any new, unpaid debt with Recreations after June[] 2011," and the course of performance showed that "all products sold to

her by [Recreations] after that date were on a payment on delivery basis."

[P19] Based on *sections 4-2-204(1)* and *4-2-208, C.R.S. 2023,* the court determined that there were two contracts between the parties — one for Weisbard to make twenty-two $1,000 payments toward past debt and a separate contract for all new orders to be paid for at the time of delivery. From there, **[*8]** the court reasoned that Recreations' lawsuit — filed August 31, 2021 — was commenced "two months after the expiration of the statute of limitations." We are unable to ascertain how the district court determined that the statute of limitations expired on June 30, 2021.[3]

[P20] We first turn to the law on the statute of limitations and then address the genuine issues of material fact.

1. Applicable Law on Statute of Limitations

*HN5*[↑] [P21] The Colorado statute of limitations for a breach of contract claim under the Uniform Commercial Code (UCC) is generally three years. *§ 13-80-101(1)(a), C.R.S. 2023.* If the claim is for liquidated debt, however, the six-year statute of limitations in *section 13-80-103.5(1)(a)* applies. "A debt is 'liquidated' if the amount due 'is capable of ascertainment by reference to an agreement or by simple computation.'" *Portercare Adventist Health Sys. v. Lego, 2012 CO 58, ¶ 15, 286 P.3d 525* (quoting *Rotenberg v. Richards, 899 P.2d 365, 367 (Colo. App. 1995)*).

[P22] Here, Recreations kept records of monthly invoice statements detailing Weisbard's order totals and the amounts she paid. The amount of the claimed debt can be calculated by adding together the itemized charges on each invoice and deducting Weisbard's payments. *Id. at ¶ 22* ("By adding the itemized charges together" and deducting "the amount of the total bill covered by insurance," the hospital bill was **[*9]** considered a liquidated debt.). Neither party disputes that Recreations' claim is governed by the six-year statute of limitations in *section 13-80-103.5.* What is hotly contested, however, is when that six-year period began to run. As we discuss below, many of the facts the court relied on to reach the conclusion that the statute of

---

[3] Based on the district court's conclusion that the June 2011 agreements were separate contracts, it seems the statute of limitations should have expired on an earlier date, either six years after June 2011 (when the parties purportedly entered into the payment on delivery contract) or six years after February 2014 (the date of Weisbard's last payment on the past debt contract).

limitations accrued in June 2011 are in dispute. Because genuine issues of material fact are in dispute, so too may be the court's statute of limitations conclusion.

### 2. Payment on Delivery Term

[P23] There is a genuine issue of material fact as to whether Recreations and Weisbard had, in fact, agreed to a payment on delivery contract. Weisbard claims the payment on delivery contract satisfied the statute of frauds because a patient's prescription would initiate the order, and she would tender a check for the invoiced amount when the order was delivered. Recreations claims no such agreement existed but that, to the extent there was a payment on delivery agreement negotiated between Weisbard and Carlos, it was not expressly provided for in a written contract and thus did not satisfy the statute of frauds.

[P24] The parties' positions suggest that genuine issues of material fact **[*10]** exist as to whether a payment on delivery contract existed. And even if there was such an agreement, there are also genuine issues of material fact as to whether the parties' conduct was consistent with enforcement of that agreement. Consequently, we must look at whether the district court properly determined that, based on the parties' course of performance (among other evidence), the parties undisputedly established a payment on delivery contract from June 2011 onward. This also requires us to address whether the parties had a payment on delivery or credit agreement in relation to Recreations' statute of frauds contention.

*HN6*[⬆] [P25] The UCC, as adopted in Colorado, applies to contracts for the sale or lease of goods. Under the UCC, "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." *§ 4-2-204(1)*. The UCC's statute of frauds, however, bars the enforcement of oral contracts for the sale of goods for the price of $500 or more. *§ 4-2-201(1), C.R.S. 2023*. Compliance with the statute of frauds requires a sufficient record to "indicate that a contract for sale has been made between the parties and signed by **[*11]** the party against whom enforcement is sought."

*HN7*[⬆] [P26] *Subsection (2) of section 4-2-201*, however, creates a limited exception to the statute of frauds; the exception authorizes an oral contract if it is later memorialized in an unsigned writing and if both parties are merchants and the receiving party knows of

the writing's contents and does not object within ten days after it is received.

*HN8*[⬆] [P27] Under Colorado law, the "course of dealing" between the parties and "course of performance" under a contract are "relevant in ascertaining the meaning of the parties' agreement, may give particular meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement." *§ 4-1-303(d), C.R.S. 2023*. A "course of dealing" is "a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." *§ 4-1-303(b)*. A "course of performance" is "a sequence of conduct between the parties to a particular transaction that exists if" two conditions are satisfied. *§ 4-1-303(a)*. First, "the agreement of the parties with respect to the transaction involves repeated occasions for performance by a party." **[*12]** *§ 4-1-303(a)(1)*. Second, "the other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection." *§ 4-1-303(a)(2)*. *HN9*[⬆] In other words, a "course of dealing" looks at the parties' conduct before the contract, while the "course of performance" analyzes the parties' conduct after contract formation. *§ 4-1-303 cmt. 2* (Course of dealing is "restricted, literally, to a sequence of conduct between the parties previous to the agreement," and course of performance is "[a] sequence of conduct after or under the agreement.").

*HN10*[⬆] [P28] When the express terms of a contract conflict with the parties' course of dealing or performance, the express terms will prevail. *§ 4-1-303(e)(1); see also Great W. Sugar Co. v. N. Nat. Gas Co., 661 P.2d 684, 691 (Colo. App. 1982)* ("Evidence of course of dealing . . . is admissible if it does not directly contradict the terms of a written agreement, but merely explains or supplements it."), *aff'd sub nom. KN Energy, Inc. v. Great W. Sugar Co., 698 P.2d 769 (Colo. 1985)*. Indeed, **course of performance**, **course of dealing**, and trade usage may be "relevant to show a waiver or modification of the agreement." *Morgan Cnty. Feeders, Inc. v. McCormick, 836 P.2d 1051, 1054-55 (Colo. App. 1992)*.

[P29] The district court concluded that "[Recreations] presented no evidence to dispute that after May 2011, all sales by [Recreations] to Weisbard were on a payment of delivery **[*13]** basis." Under *sections 4-2-204(1)* and *4-2-201(1)-(2)*, an oral agreement between

Recreations and Weisbard may be sufficient to establish a payment on delivery contract for all future orders starting in June 2011. Consequently, it could be, as the court concluded, that the statute of limitations accrued in June 2011 because Recreations' payment on delivery contract meant that Weisbard's payments for future orders could not be applied to her past debt. *See* § 4-2-204(1)-(3); § 4-2-201(2); *see also Briargate at Seventeenth Ave. Owners Ass'n v. Nelson, 2021 COA 78M, ¶ 37, 494 P.3d 1149* ("If a debtor directs the application of a payment, the duty is thereby imposed on the creditor, regardless of whether he does or does not agree or consent to the debtor's request, to apply the money as directed ...." (quoting *Mumm v. Taylor, 121 Colo. 157, 163, 213 P.2d 836, 840 (1950)*)); *Jackson v. A.B.Z. Lumber Co., 155 Colo. 33, 37, 392 P.2d 288, 290 (1964)* (when a debtor owes more than one debt to the creditor, the debtor has a right to specify in writing to which debt the payment should be applied).

[P30] But there is also evidence in the record of three other alternatives: (1) to the extent there was a payment on delivery contract, the agreement was not enforced by Recreations; (2) to the extent there was a payment on delivery contract, Weisbard did not object to the invoices that applied current payments to past due amounts; or (3) there was no oral payment on delivery contract **[*14]** between Weisbard and Carlos (who is now deceased), and the parties continued to operate under a credit system. These possibilities are supported in three ways.

[P31] First, according to Weisbard's affidavit attached to her motion for summary judgment, she said, "There were times [that she] would ask [Recreations] to hold a previously tendered check until the patient made the payment." In other words, although a check payment might have been physically tendered to Recreations at the time of delivery, Weisbard requested and Recreations knew and allowed Weisbard's checks to be placed on hold until Recreations was notified by Weisbard that the checks could be deposited.

[P32] Second, Weisbard's affidavit statement appears to be corroborated by documents in the record. For example, a February 14, 2018 email from Recreations concerning four of Weisbard's checks for recent orders said, "I was just assuming that these needed to be *held as usual*." (Emphasis added.) This statement could be read as Recreations' tacit acknowledgement that it was not enforcing its payment on delivery requirement or that there was no such payment on delivery oral agreement.

[P33] Third, the invoices suggest that most **[*15]** of the

time following June 2011, Weisbard did not make payment on delivery in full or at all, suggesting more of a credit payment arrangement.

[P34] For example, the October 2017 invoice shows Weisbard's current charges totaling $7,000.02 and that she made no payments during the applicable billing cycle. The June 2, 2016 invoice shows Weisbard's current charges totaling $9,039.61 and that she made payments of $742.00; thus, she underpaid by $8,297.61. The same goes for the December 2016 invoice, which shows the current charges totaling $12,636.99 and that Weisbard made payments of $8,893.91; thus, she underpaid $3,743.08.

[P35] Weisbard stated in her affidavit that between 2017 and 2018, she called Recreations and disputed the past due amounts reflected on the invoices, but she provided no contemporaneous documentary evidence to corroborate her affidavit statement. And because Recreations submitted invoices that consistently show a past due amount, whether Weisbard objected to those amounts (orally or in writing) is also in dispute.

[P36] Therefore, there is a genuine issue of material fact as to whether the parties had a contract for payment on delivery, as argued by Weisbard and concluded **[*16]** by the district court, or whether the contract permitted credit payments, as the course of dealing demonstrates that Weisbard consistently purchased dental products on credit before June 2011 and that such practice was known and allowed to continue by Recreations after June 2011. *See* § 4-2-208(2); § 4-1-303(b).

[P37] The type of contract is material to the party's lawsuit and, as explained, is in dispute because the record also supports that Weisbard made nine payments toward the past due amount identified in Carlos' October 2012 letter, her last payment dated February 2014. The district court concluded that all past due debt before June 2011 was under a separate "credit" contract, and new orders after June 2011 were paid on delivery in full. But if Recreations can prove that after June 2011, the parties continued operating on a credit basis, which, as discussed, evidence produced by Recreations seems to suggest, it is possible that Weisbard breached the parties' contract when she ceased making *any* payments to Recreations after August 2019, not June 2011, as the district court concluded. *Cf. Neuromonitoring Assocs. v. Centura Health Corp., 2012 COA 136, ¶ 36, 2012 COA 136, ¶ 36, 351 P.3d 486* ("In circumstances where a contract contains this type of 'continuing duty to perform, generally a new claim accrues **[*17]** for each separate

breach' and the plaintiff 'may assert a claim for damages from the date of the first breach within the period of limitation.'" (quoting *Noonan v. Nw. Mut. Life Ins. Co., 2004 WI App 154, ¶ 32, 276 Wis. 2d 33, 687 N.W.2d 254*)); *see also § 4-2-709(1)(a), C.R.S. 2023* (the seller may recover the cost of goods when the buyer accepts the goods but fails to pay within a commercially reasonable time).

[P38] Indeed, as we discuss in more detail below, Recreations submitted evidence that it applied Weisbard's new payments, after June 2011, to past debt, meaning that Weisbard may have continued to pay off her old debt that accrued prior to June 2011, while accruing additional debt for new orders until she ceased doing business with the company.

3. Weisbard's Payment of Goods and Recreations' Application of Payments to New Orders

[P39] We next analyze the district court's conclusion that Recreations failed to present any evidence showing "that Re-creations intended to apply and did apply [Weisbard's payments] to the earliest debt." We address Recreations' second and third contentions together because they are interrelated.

[P40] We acknowledge that the parties did not make it easy for the district court to discern how payments were applied for past due amounts and new orders, nor did they provide **[*18]** any summary to assist the court in its review of the voluminous invoices and other records attached to the summary judgment briefing. But a deeper review of the invoices suggests that there could exist a contrary conclusion from the one made by the district court. *See Westin Operator, LLC v. Groh, 2015 CO 25, ¶ 20, 347 P.3d 606 HN11*[↑] ("All doubts must be resolved against the moving party; at the same time, the nonmoving party 'must receive the benefit of all favorable inferences that may be reasonably drawn from the undisputed facts.'" (quoting *Tapley v. Golden Big O Tires, 676 P.2d 676, 678 (Colo.1983)*)). Specifically, we conclude that there are at least four genuine issues of material fact in dispute to show that Recreations did apply new payments to Weisbard's earliest debt.

[P41] First, Recreations' invoices consistently depict new balances that were supposedly paid in full by Weisbard on delivery then shifted from the "0-30" days late column to the "31-60" column to the "61-90" column and then finally the "91+" column. For example, on the September 2016 invoice, Recreations charged Weisbard $4,700 for new orders, and Weisbard paid $4,797 during that billing cycle. But the $4,700 balance

appears in the 0-30 days late column on that invoice. On the October 2016 invoice, the $4,700 appears in the 31-60 days **[*19]** late column. On the November 2016 invoice, the $4,700 appears in the 61-90 days late column. And in the December 2016 invoice, the $4,700 disappears into the larger running balance in the 91+ day column. The 91+ balance constantly fluctuates due to the recently incurred but unpaid charges and Recreations' application of current payments to past debt. Thus, contrary to the district court's determination, the invoices create a genuine issue of material fact as to whether Recreations was applying Weisbard's new payments to past due balances.

[P42] We acknowledge that Weisbard contends that Hassani purchased Recreations without any warranty that the accounting was accurate. As a result, Weisbard argues that Hassani has no personal knowledge of the accuracy of the invoices submitted in response to the motion for summary judgment, and thus such documents were not competent evidence for the court to determine whether genuine issues of material fact existed. But this argument misses the point.

*HN12*[↑] [P43] True, if affidavits are submitted as part of summary judgment, *C.R.C.P. 56(e)* requires such affidavits "shall be made on personal knowledge." But as the new owner of Recreations, Hassani may be able to establish **[*20]** that the invoices are the documents he received from the prior owner. *HN13*[↑] Whether such invoices are accurate, however, is a question that goes to the weight of the evidence, not its admissibility. *See In re Estate of Fritzler, 2017 COA 4, ¶ 9, 413 P.3d 163* ("[E]ven if the identity of a person whose firsthand knowledge is the basis of a particular entry in a business record cannot be established, the record custodian's knowledge is adequate and such records are admissible. And a custodian's lack of personal knowledge concerning the accuracy of information contained in business records would affect only the weight of evidence, not its admissibility.").

[P44] Moreover, Weisbard attached to the summary judgment briefing invoices she received from Recreations and the checks she paid when she made $1,000 payments toward the past debt, outstanding as of June 2011 — some of which are reflected on the invoices — and she does not claim that her submitted invoices are inaccurate. Indeed, the invoices Weisbard and Hassani submitted appear to be identical in format. And Weisbard's claim that the invoices submitted by Recreations are inaccurate for lack of personal knowledge underscores the fact that genuine issues of

material fact exist.

[P45] Second, Recreations **[*21]** disputes that it created a different "bucket" or account for the $27,254.47 past due balance identified in Carlos' October 2012 letter. They also dispute a different "bucket" was created following November 2012, when she and Carlos purportedly entered into an oral agreement to make twenty-two $1,000 monthly payments in to satisfy debt. Recreations points to language in Carlos' letter indicating that he would forgive $5,254.47 of the past due balance "if" Weisbard paid $22,000 by December 2012. Recreations notes that the district court heavily relied on the fact that some of the invoices dated from January 2012 to February 2014 separately denote Recreations' receipt of Weisbard's $1,000 payments on past debt from her other payments for new orders. But Recreations still disputes that it considered the remaining $13,000 past debt to be distinct from newly accrued debt for orders following June 2011.[4] This is because Recreations argues that nothing in Carlos' letter indicated that a different account *was* established.

[P46] In the absence of any express language of a "separate" account or debt for balances due prior to June 2011, the court's inference only makes sense if (1) the parties **[*22]** no longer had a credit arrangement, which we already discussed above is disputed; or (2) Weisbard can prove that she specifically indicated in writing to Recreations which debt she wanted her payments to be directed, which is not supported by any of the summary judgment evidence. *See Jackson, 155 Colo. at 36-37, 392 P.2d at 290 HN14*[⬆] ("In the absence of direction or expression by the debtor of his intent as to how payment should be applied, the presumption is that [the debtor] thereby assents to such application of the funds as the creditor may desire to make. The creditor is allowed to make the appropriation in a way most advantageous for himself.").

[P47] Recreations also points to Cassandra's email to Weisbard in January 2017 to further suggest there are disputed issues as to whether separate accounts were established for debt Weisbard owed before June 2011 and debt accrued later. In the January 2017 email, Cassandra identified Weisbard's existing past due balance to be $34,692.03. Cassandra, like Carlos, did

not delineate that the past due amount for the remaining $13,000 out of $22,000 was distinct from past due amounts for goods Weisbard purchased subsequent to Carlos' October 2012 letter.

[P48] Third, as discussed above, the **[*23]** record includes some of Weisbard's checks that represent payment for invoices after June 2011, when Carlos and Recreations purportedly required Weisbard to pay on delivery. The record contains only eight checks, the latest dated May 29, 2018. None of the checks identify the invoice number or patient information sufficiently to direct Recreations as to how it should apply the payment. *HN15*[⬆] "If the debtor does not direct how the payment is to be applied, then the creditor generally may apply the payment in any way that the creditor desires." *Weston Grp., Inc. v. A.B. Hirschfeld Press, Inc., 845 P.2d 1162, 1166 (Colo. 1993)* (also stating "[i]f neither the debtor nor the creditor exercises its right to direct application of a payment, then the payment is applied by law in order of time to the earliest matured debts"). Depending on whether the evidence proves that there was a payment on delivery contract, that Weisbard objected to the invoices, or that Weisbard directed in writing which payments should be applied to which invoices, there is a disputed issue of material fact as to whether Recreations was free to apply Weisbard's payments to her past debt. *See Jackson, 155 Colo. at 36-37, 392 P.2d at 290*.

[P49] Finally, even assuming the statute of limitations has passed for the debt that had accrued before Carlos' October **[*24]** 2012 letter, the court did not consider whether there are genuine issues of material fact as to whether Weisbard paid in full on all new orders after August 2015 (six years before the filing of the lawsuit). The same disputed facts as to whether there was a payment on delivery contract, whether it was enforced, whether the parties continued the course of dealing under a credit arrangement, and the method in which Recreations applied payments are relevant to determining whether any claim for Weisbard's breach of her contract to pay Recreations from August 2015 or later would be time barred.

[P50] If the district court's primary rationale is correct — that there are no genuine issues of material fact because Weisbard paid for each new order upon delivery and Recreations was not retroactively applying her new payments to past debts — there should be no difference between what Recreations charged and what Weisbard paid since August 2015. Yet as we discussed, there appears to be a multi-thousand-dollar difference.

---

[4] Following Weisbard's nine payments, $13,000 remained of the $22,000 dollar past debt. Because Weisbard did not pay the $22,000 in full, however, the previously accrued debt now likely also includes the additional $5,254.47 that Carlos contemplated forgiving, even under Weisbard's view of the agreement.

Indeed, adding up all the invoices and payments from August 2015 to September 2019 shows Weisbard underpaid approximately $11,400 on new orders. Therefore, whether Weisbard paid **[*25]** "for the exact cost of those specific goods" is disputed, and the district court's conclusion that "the undisputed facts presented in this case show that Weisbard did not incur any new, unpaid debt with [Recreations] after June 2011" also appears to be disputed given the contradictory evidence.

4. Weisbard's Objections to the Invoices

[P51] Finally, although Recreations acknowledges that the court quoted *section 4-2-201(2)* to arrive at its conclusion, it argues the court applied the provisions in a manner that ignored the existence of genuine issues of material fact. That provision, as a reminder, is the exception to the statute of frauds writing requirement for a contract, which allows for oral contracts for the sale of goods between merchants if the agreement is later memorialized and the receiving party fails to timely object within ten days of receipt of the goods.

[P52] Recreations claims that between June 2011, when Weisbard was purportedly subject to a payment on delivery contract, and September 2019, when she ceased doing business, she had 102 opportunities to object to the monthly invoices that identified outstanding past due amounts. Recreations again relies on Cassandra's January 2017 email, **[*26]** which identified the outstanding past due amount, and Weisbard's acknowledgement of or lack of disagreement with that amount being past due. Weisbard's response to Cassandra's email said, "I am sorry but I haven't collected that much money yet this year .... I will have you cash it as soon as possible .... I am sorry I am having a very difficult time .... I will keep you posted .... Thank you for your patience."

[P53] Recreations characterizes Weisbard's response to be a far cry from an objection, and suggests Weisbard had notice of, acknowledged, and indicated she would make future payments toward the outstanding balance. Recreations notes this outstanding balance is also reflected in the January 4, 2017 invoice, less a charge of $250, which correlated with the $34,692.03 figure identified in Cassandra's email. Yet, Weisbard claims in her deposition that she called Recreations monthly and objected to the invoiced amounts.

[P54] At bottom, whether Weisbard adequately objected to the past due amounts for some, all, or none of the invoices under *section 4-2-201(2)*, appears to be in dispute given this documentary evidence and Weisbard's testimony, if credited, and would affect when the statute of limitations **[*27]** began to run.

[P55] Therefore, given the numerous genuine issues of material fact in dispute, the court erred by granting summary judgment in favor of Weisbard by concluding that the six-year statute of limitations accrued in June 2011.

III. Conclusion

[P56] The judgment is reversed, and the case is remanded to the district court to conduct further proceedings consistent with this opinion.

JUDGE FREYRE and JUDGE BROWN concur.

End of Document

# Exhibit 7



Neutral
As of: January 7, 2026 5:24 AM Z

## *Exim Brickell, LLC v. Bariven*

United States District Court for the Southern District of Florida

August 16, 2011, Decided; August 16, 2011, Entered on Docket

CASE No. 09-cv-20915-GOLD

**Reporter**
2011 U.S. Dist. LEXIS 174564 *; 2011 WL 13131263

EXIM BRICKELL, LLC, Plaintiff-Counterclaim Defendant, v. BARIVEN, S.A., Defendant-Counterclaim Plaintiff.

**Prior History:** *Brickell v. Bariven, S.A., 2010 U.S. Dist. LEXIS 147901 (S.D. Fla., May 19, 2010)*

## Core Terms

milk, shipment, buyer, installment, melamine, inspect, cancel, notice, revocation, seller, contamination, repudiate, email, nonconformity, warranty, revoke, aggrieve, arrive, rice, test result, remainder, substantial impairment, supplier, contractual, anticipatory, delivery, alert, powder, undisputed, onward

**Counsel:** **[*1]** For Exim Brickell LLC, a Florida limited liability company, Plaintiff: Jose Manuel Ferrer, LEAD ATTORNEY, Bilzin, Sumberg, Baena, Price & Axelrod, LLP, Miami, FL; George Volsky, Akerman LLP, Miami, FL; Luis Miguel O'Naghten, Baker & McKenzie LLP, Miami, FL; Michael Sayre, Akerman Senterfitt, Miami, FL.

For PDVSA Services Inc, a Delaware corporation, Bariven S.A., a Venezuelan business entity, Defendants: Brian Mark Silverio, LEAD ATTORNEY, Silverio & Hall, Miami, FL; Anthony D. Mirenda, K. Neil Austin, Thomas R. Ayres, Thomas J. Bone, PRO HAC VICE, Foley Hoag, Boston, MA; Ronald E.M. Goodman, PRO HAC VICE, Foley Hoag LLP, Washington, DC.

For Bariven S.A., a Venezuelan business entity, Counter Claimant: Brian Mark Silverio, LEAD ATTORNEY, Silverio & Hall, Miami, FL; Anthony D. Mirenda, K. Neil Austin, Thomas R. Ayres, Thomas J. Bone, Foley Hoag, Boston, MA; Ronald E.M. Goodman, Foley Hoag LLP, Washington, DC.

For Exim Brickell LLC, a Florida limited liability company, Counter Defendant: Donald John Hayden, LEAD ATTORNEY, Berger Singerman, LLC, Miami, FL; Jose Manuel Ferrer, LEAD ATTORNEY, Bilzin,

Sumberg, Baena, Price & Axelrod, LLP, Miami, FL.

**Judges:** HONORABLE ALAN S. GOLD, UNITED STATES DISTRICT **[*2]** JUDGE.

**Opinion by:** ALAN S. GOLD

## Opinion

### FINDINGS OF FACT AND CONCLUSIONS OF LAW; CLOSING CASE

THIS CAUSE comes before the Court following a two-week bench trial and extensive pre-and post-trial submissions from the Parties.[1] The case concerns a series of commercial installment contracts relating to the exchange of thousands of metric tons of rice and powdered milk sent from Brazil and China to Venezuela. Both Parties have asserted several causes of action against each other. The Plaintiff seeks $56.6 million in damages from the Defendant, and the Defendant has asked for $74.1 million in damages from the Plaintiff. Having carefully considered the trial testimony, the Parties' numerous pleadings, motions, and briefs, scores of interlocking law-fact issues, and difficult legal questions under the Uniform Commercial Code ("UCC"), I make the following findings of fact and conclusions of law pursuant to *Federal Rule of Civil Procedure 52(a)(1)*.[2]

---

[1] Because of the voluminous record before me, this Opinion is quite lengthy. To assist me in reviewing it, a Table of Contents is attached to the Opinion as Appendix A.

[2] Counsel for both Parties should be commended for their hard work and cooperation in carrying out a difficult trial with the utmost professionalism and diligence.

## I. **FINDINGS OF FACT**[3]

Before trial, the Parties filed cross-motions for summary judgment, which I denied because a wide variety of material disputes of fact precluded affirmative judgment at that stage. [ECF No. 136]. The Summary Judgment Order provides a **[*3]** lengthy recitation of the underlying issues in this case. I now revisit those issues in more detail having had the benefit of reviewing all of the evidence presented by the Parties during their trial.

### A. The Parties

Exim Brickell, LLC ("Exim") is a Florida corporation that buys and sells food. [PT Stip., V(1)].[4] Bariven, S.A. ("Bariven") is an agency or instrumentality of the Government of Venezuela and a wholly owned subsidiary of Petróleos de Venezuela, S.A. ("PDVSA"). Before this lawsuit, Bariven and Exim had a good commercial relationship going back many years. [Trial Tr. Mar. 14, 2011, at 112:11-14, 115:6-116:6]. In 2007, Bariven began purchasing large amounts of food commodities on the international market to deal with a food shortage within the Venezuelan population. [Trial Tr. Mar. 16, 2011, at 154:6-25]. It carried out these transactions through its wholly owned subsidiary in Texas, PDVSA Services, Inc. ("PSI"). [PT Stip., V(2)]. As part of this effort, Bariven entered into two installment contracts with Exim: the Milk Contract (or the "Milk Agreement") and the Rice Contract (or the "Rice Agreement"). I will discuss each in turn.

---

[3] To the extent any factual findings appear under the "Conclusions of Law" heading or *vice versa*, the pertinent facts or conclusions shall be construed appropriately and shall not be constrained by the heading under which they appear. Although courts typically enumerate their findings of fact and conclusions of law, I have opted against following that tradition in this case. A reading of the Federal Rules of Civil Procedure makes clear that formal findings of fact and conclusions of law need not be entered in numbered sequence. *See FED. R. CIV. P. 52(a)*; *see also Travelers Indem. Co. v. SS "Ever Glory", Case No. 89-cv-5255, 1991 U.S. Dist. LEXIS 7678, 1991 WL 107814, at *1 (S.D.N.Y. June 7, 1991)* ("[Findings of Fact and Conclusions of Law"] may appear in narrative style and be just as effective.").

[4] I will cite certain documents using the following abbreviations: Joint Pretrial Stipulation [ECF No. 139] ("PT Stip."); Joint Exhibit ("JTX"); Exim Exhibit ("Exim Exh."); Bariven Exhibit ("Bariven Exh."). Sentences without citations refer to undisputed facts agreed upon by the Parties.

### B. The Milk Contract

On March 26, 2008, Bariven **[*4]** and PSI issued a purchase order to Exim for 26,000 metric tons of powdered milk to be delivered to Venezuela in eight monthly installments of 3,250 metric tons per month from May 2008 to December 2008 for a total price of $124,410,000. [JTX 5].[5] The Milk Contract contained several important provisions. Among other things, the product had to be "free of preservatives, neutralizers, toxic substances or any strange matter"; it could only come from China or India; it had to maintain a minimum protein level of 24.5 percent; and it could not leave the seller's location until agents for the buyer had certified that it passed a "field inspection requirement." [*Id.* at 3, 4, 11]. The last provision did not provide specific details about what exact "inspection" the buyer would be permitted to conduct—it only stated that a "qualified inspector will inspect the equipment for compliance to quote, purchase order, and any other applicable industry standard or specification." [*Id.* at 11]. For its part, Exim was obligated to notify Bariven's inspection agents before shipping each milk installment in order to provide them with the inspection location and the contact name of the project manager at that location. [*Id.*; Trial Tr. **[*5]** Mar. 14, 2011, at 144:4-145:2].

Both parties entered into agreements with other business entities to help them carry out their obligations under the Milk Contract. Exim contracted with three Chinese manufacturers to produce the milk—Qingdao Dairygold Industry Co., Ltd. ("Dairygold"); Qingdao Suncare Nutritional Technology Co, Ltd. ("Suncare"); and Beijing Reward International Trade Co., Ltd. ("Reward"). [JTX 10, 11]. Bariven also entered into an arrangement with Girobank, B.V. in Curaçao. Although the Milk Contract required Bariven to advance a payment worth 10 percent of the contract value to Exim, the Parties agreed that Bariven could secure its payments by way of a $12.4 million standby letter of credit issued in favor of Exim by Girobank, B.V. [PT Stip., V(5)].

Each of the Parties also hired companies pursuant to the Milk Agreement's field inspection provision. Bariven (through PSI) contracted with a company called SGS North America, Inc. ("SGS-NA") to perform the inspections on its behalf. [JTX 8 at BVN001225-26].

---

[5] Several of the early communications concerning the Milk Contract refer to it by two different purchase order numbers: PO 5100062310 and PO 5100061258. [JTX 8 at BVN001204].

Notably, SGS-NA agreed that it would conduct "[n]o laboratory analysis" or any other type of chemical tests on Exim's milk, but instead arranged to "[v]erify or witness **[\*6]** final performance or functional testing." [*Id.* at BVN001226]. As may be clear from the geographic qualification within its corporate name, SGS-North America belongs to a broad, worldwide organization called SGS Group with offices across the globe. [Trial Tr. Mar. 14, 2011, at 81:21, 149:3-4; Trial Tr. Mar. 31, 2011, at 121:25-122:2]. Bariven probably selected SGS-NA to assist with the Milk Agreement because SGS-NA maintains offices in Houston, Texas (near PSI's headquarters).

Exim independently hired SGS-China, the Chinese branch of the SGS group and an affiliate of SGS-NA, to prepare loading reports and laboratory tests on Exim's milk before it left China. [JTX 29; Trial Tr. Mar. 14, 2011, at 163]. This fact is noteworthy for three reasons. First, it is undisputed that Exim was under no obligation to hire anybody pursuant to the field inspection provision of the Milk Agreement. As noted above, Exim was merely required to provide Bariven with location and contact information for each shipment before it left China. Second, Exim not only exceeded its duties under the Milk Agreement by hiring SGS-China, it also included milk powder *sampling and testing* among the scope of SGS-China's obligations **[\*7]** in its contract with SGS-China—something SGS-NA had not agreed to do for Bariven. [JTX 29 at EX004966].

Third, the documents in the record indicate that it was unclear early in the Milk Contract as to which SGS branch would be responsible for undertaking the field inspection. For example, on March 26, 2008, an SGS-NA official emailed Exim to advise that "SGS [without further description] is assigned the inspection" and "SGS will need to issue a Release Note for every shipment to PDVSA based on inspection findings." [JTX 4 at EX001759]. Likewise, the Girobank letter of credit provided that Exim, as beneficiary to the instrument, could collect up to $12.4 million if it had performed certain obligations under the Milk Agreement, including, for each shipment, a "Certificate of Inspection issued and signed by an authorized officer of SGS Group." [JTX 13 at EX001353].

### i. Exim Begins Milk Shipments

In keeping with the contract requirements, Exim sent an email to PSI on May 20, 2008, informing PSI that the first shipment of milk was ready for the field inspection

and providing the contact information for Exim's project manager in China. [JTX 17]. Neither Bariven, nor PSI, nor SGS-NA contacted **[\*8]** that manager, and SGS-NA did not conduct a field inspection. [Trial Tr. Mar. 14, 2011, at 145:1-146:10]. This would become a sign of the future as neither Bariven, nor PSI, nor SGS-NA ever conducted a single field inspection in China throughout the life of the Milk Contract. [JTX 148; Trial Tr. Mar. 15, 2011, at 162:13-163:11].

On June 22, 2008, Exim shipped its first milk installment with product manufactured by Suncare, which arrived in Venezuela on August 3, 2008. [JTX 194]. Thereafter, Exim shipped fifteen additional installments leaving China between July 3 and September 10, 2008, and arriving in Venezuela between September 7 and November 10, 2008. [*Id.*]. Bariven paid a total of $45,361,800 by wire transfer for milk shipments 1-16, and it issued forms for each order in which it used the words "received, reviewed, confirmed and accepted." [Alvarez Dep., Exh. 1].[6] Each payment was made while the associated shipment was in transit and before it reached Venezuela. [JTX 194].

### ii. The Chinese Melamine Alert

In mid-September 2008, after the first sixteen milk shipments had left China, the international media reported that infant milk formula from certain Chinese manufacturers was contaminated **[\*9]** with melamine. The Chinese government also began an investigation and temporarily suspended all exports of powdered milk. [Trial Tr. Mar. 16, 2011 at 165:12-15; Trial Tr. Mar. 14, 2011, at 181:24-182:9]. Melamine (also known as cyanuramide) is a synthetic substance that does not occur naturally in milk or any other food, and it can be dangerous or even lethal when consumed by humans. [Trial Tr. Mar. 16, 2011, at 120:10-121:24]. Cyanuric acid is an analog of melamine that is also toxic. [*Id.* at 119:5-9]. Milk manufacturers sometimes add these substances to their product to alter its chemical composition and make the milk appear to have a higher level of protein than it actually does. [*Id.* at 88:19-24].

Bariven presented expert testimony at trial on the general health effects of melamine, which I found quite

---

[6] The Summary Judgment Order states that Girobank made these payments, but Bariven made the payments directly to Exim.

credible. [*Id.* at 112:10-137:9].[7] According to that testimony, common medical problems associated with melamine consumption include kidney stones and other forms of acute kidney injury, as well as urinary tract injury. [*Id.* at 120:10-121:24]. Relatively small amounts of melamine and cyanuric acid can be injurious to human health; a tolerable concentration of melamine in dairy products **[*10]** to be ingested by humans could be as high as 2.5 parts per million ("ppm") but is probably closer to 0.324 ppm. [*Id.* at 122:17-123:22].[8] For example, a typical 18-month old child would surpass the level of melamine deemed "tolerable" on a daily basis by consuming approximately three ounces of milk contaminated at 1 ppm. [*Id.* at 126:1-127:8]. In the early fall of 2008, these health concerns had taken hold in China in a very real way as thousands of children experienced negative health effects from melamine and some children even died. [*Id.* at 116:3-18].

Bearing in mind the critical public safety concerns posed by the melamine alert, I turn now to examine how the Parties conducted themselves in relation to that emergency. The record reveals that both parties made poor decisions, which ultimately plagued their relationship and triggered the lawsuit now before me.

### iii. Exim's Initial Conduct in Relation to the Melamine Alert

The evidence presented at trial indicates that Exim had certain early hints of melamine contamination before the alert but chose not to share all of its information with

---

[7] In particular, Bariven relied on testimony from Dr. Michael Somers, a well-regarded pediatric nephrologist. Exim presented testimony from its own expert, Professor Robert Bradley. But as discussed in a pre-trial *Daubert* Order that I issued concerning Professor Bradley, his expertise is more suited to milk testing techniques—not to the health effects of melamine. [ECF No. 148]. As such, I give more weight to the testimony of Dr. Somers as it relates to the health effects of melamine.

[8] Exim argues that I should adopt the 2.5 ppm standard because the FDA referred to that standard in a November 2008 study. [ECF No. 174, p. 15]. Although I would generally defer to the governmental standard, Dr. Somers testified that the FDA study was published as part of an interim—not a final—report based on preliminary data and analysis, and it did not account for the more recent research conducted in light of the Chinese melamine scandal. [Trial Tr. Mar. 16, 2011, at 127:17-131:1, 141:18-142:6]. I find this testimony credible and accept 0.324 ppm as the appropriate standard.

Bariven. As early as several days after entering into the Milk Contract, Exim asked Bariven **[*11]** if the agreement permitted Exim's milk to include preservatives or foreign substances, or if the milk could consist of 15 percent protein (a deviation from the contractual terms requiring 24.5 percent). [JTX 6 at EX003305-06]. Exim probably asked Bariven these questions because it knew that one of its main suppliers, Dairygold, regularly produced milk with a protein level of 22.8 percent and would have to "reformulate" its milk to meet the provisions of the Milk Agreement. [Trial Tr. Mar. 15, 2011, at 64:2-67:7; Trial Tr. Mar. 29, 2011, at 90:8-11].

Exim also chose not to tell Bariven that a Dairygold factory audit from May 2008 revealed certain violations, including an "immediate health hazard" and "food safety risk." [JTX 15 at EX004745-46; Trial Tr. Mar. 15, 2011, at 72:4-77:6]. Exim's President, Rogelio Salges, explained at trial that he did not pass this information on to Bariven because, despite the alarming language used in the audit, Dairygold had still received an overall passing score of above 81 percent. [Trial Tr. Mar. 15, 2011, at 76:15-19]. Dairygold also had two and a half months to correct any violations from the time of the audit until Exim would send the first shipment **[*12]** of its milk to Venezuela. [JTX 194].

The evidence from after the melamine alert was issued in mid-September indicates that Exim could have been more diligent in disclosing certain information to Bariven. Among other things, in late September after Exim had already shipped 7,450 metric tons of Suncare-manufactured milk to Bariven, Exim learned that Suncare had been forced to stop production. [JTX 34 at EX005083-84]. Exim also internally circulated press reports that Suncare was "recalling their products after melamine was found in their milk powder." [JTX 35, 37; Trial Tr. Mar. 15, 2011, at 82:5-83:19].

Exim chose not to inform Bariven about Suncare's predicament, but internal Exim emails indicate that Exim was taking measures on its own to verify the quality of Suncare's milk and to implement a reliable plan for its future relations with Suncare. For example, after circulating the press release that Suncare had been named in the melamine alert, Exim immediately sought to make arrangements with SGS-China to test Suncare's milk, and Exim demanded a "formal and responsible explanation" from Suncare to ensure that the "milk they produced for us faced [no] kind of exposure to melamine." [JTX **[*13]** 40]. Suncare's prompt response disclosed to Exim that Suncare was in

fact being investigated but that the only melamine found in their milk came from infant formula at a "very low level." [JTX 43]. Exim also sent a company representative to hold a "long meeting" with Suncare to verify the quality of the milk already sent to Venezuela and to avoid any future melamine problems. [JTX 37].

The Parties officially touched base for the first time about the melamine alert on September 19, 2008, when Bariven wrote to Exim to get "comments" about the recent news and to inquire about what measures Exim was taking to "preserve the quality and reliability" of its milk. [JTX 36 at EX001364; Trial Tr. Mar. 15, 2011, at 78:17-81:16]. Exim responded on September 23 with several statements: the melamine scare was limited to infant formula milk (not industrial milk) produced by a single company called Mengniu Dairy (not one of Exim's providers) during a single month (January 2008), and officers from China's Inspection and Quarantine office ("CIQ") would begin performing "obligatory" exams at all Chinese milk plants for melamine. [JTX 36; Trial Tr. Mar .15, 2011, at 78:17-81:16]. As it turned out, Exim **[*14]** must have known at the time of that email or found out immediately thereafter that at least part of this message was incorrect. In particular, Exim was simultaneously corresponding with Suncare and became aware that Chinese state officials had found melamine in their infant formula milk powder. [JTX 43]. Yet Exim did not share this information with Bariven.

On October 1, 2008, Exim also emailed four negative melamine test reports to Bariven and stated that the test results came from milk samples that had already been shipped to Venezuela, which SGS-China "still has in its records." [JTX 45, 46]. At trial, Mr. Salges admitted that this email was a "mistake" because those samples were not actually taken from milk retained by SGS-China from previous shipments. [Trial Tr. Mar. 15, 2011, 83:20-85:1]. Exim made a further mistake in that email by failing to associate the four melamine test reports with any specific shipments, and it failed to correct that mistake. [JTX 45, 46].[9]

Because these last two pieces of evidence raise important issues that relate to some of Bariven's claims

about deception, I pause to make several observations about this evidence in my capacity as fact finder. Undoubtedly, **[*15]** Exim was in a position of power vis-à-vis Bariven during the early stages of the melamine emergency because it had more direct access than Bariven to the sources of contamination in China. It is also undeniable that Exim withheld or failed to correct certain faulty information conveyed to Bariven—most importantly, the role of its own suppliers in the scandal and the mismatched milk samples that appeared to verify the quality of Exim's previous shipments. Even so, this evidence does not suffice to show that Exim's focus was on misleading Bariven, nor does it demonstrate that Exim itself had anything close to perfect information about the contamination.

For example, although Exim did not follow up with Bariven after September 23, 2008 to tell Bariven that its own suppliers had also been listed among the other melamine-using manufacturers, Exim's decision to directly perform its own investigation of the suppliers was responsible and sensible. If anything, the record indicates that Exim failed to reinitiate this topic with Bariven because Exim itself was no longer on edge after receiving messages from Suncare and Dairygold that the only problematic milk to come from their plants was infant **[*16]** milk, not the industrial milk that had gone to Bariven. [JTX 41; Trial Tr. Mar. 15, 2011, at 145:15-146:14 ("That's why we had a piece [sic] of mind because we were not exporting baby formula.")]. As for the mismatched melamine test reports sent on October 1, 2008, Exim sent the results of its own accord, and there is no indication from any internal emails that Exim deliberately provided false information to Bariven. In fact, contemporaneous emails demonstrate that everyone at Exim believed that SGS chose the samples because they reflected the quality of milk retained from previous shipments. [JTX 37]

Viewing all of this evidence together, I can only conclude that Exim, like Bariven, was taken by surprise when the emergency first broke, it initially scrambled to assess the gravity of the situation, and it never anticipated the profound impact that the emergency would have on its own economic health or on its contractual relationship with Bariven. [Trial Tr. Mar. 15, 2011, at 80:24-81 ("We were talking [right after the alert] with people in China to know what the crisis was, which nobody in the world knew what the crisis was, not only Exim Brickell or Bariven or nobody. The magnitude **[*17]** of the crisis, nobody knew what [it]

---

[9] In its post-trial submissions, Bariven goes into great detail about the discrepancies in the four test reports. [ECF No. 172, pp. 12-13]. Given Mr. Salges's concession that the email contained inaccurate information, I decline to include all of those details here other than to say that I find it unlikely that the test reports sent by Exim on October 1 actually matched up with the batches of milk that Exim initially claimed they did.

was.")].[10]

### iv. Bariven's Initial Conduct in Relation to the Melamine Alert

After the melamine alert, Bariven began to seek information from its suppliers regarding the milk it was importing from China, and it halted its milk distribution. [Trial Tr. Mar. 29, 2011, at 91:21-93:16; Trial Tr. Mar. 16, 2011, at 154:7-13]. The company's witnesses also testified that, despite the tests and assurances they received from Exim, they made a decision to test all of the Exim milk for melamine when it arrived in Venezuela. [Trial Tr. Mar. 17, 2011, at 21:14-18, 25:2-3 ("[W]e had to be sure of the quality of the product that we had in port.")]. In fact, on October 2, 2008, shortly after Exim provided the four milk tests discussed above, Bariven directed that, notwithstanding these assurances, it would need to sample and test all of Exim's milk. [JTX 48]. Bariven's Procurement Superintendent in Food Products confirmed that "Bariven did not . . . rely or did not consider adequate [Exim's] comments . . . assuring that the milk was fine." [J. Parra Dep., p. 10:10-13].

Both Parties acknowledge that powdered milk is perishable with a shelf life of up to one year,[11] so [*18]

---

[10] Bariven also presented evidence at trial that Exim hired an official from the Chinese Chamber of International Commerce as a consultant to communicate with the Chinese governmental officials who were conducting melamine tests of Chinese milk plants. [Rivero Dep., pp. 138:17-141:25]. Bariven points to testimony that Exim, without Bariven's knowledge, wired the consultant $3,000 after the consultant hinted that bribery might motivate the relevant Chinese officials in one way or another. [*Id.* at 142:18-147:7; JTX 53; Trial Tr. Mar. 15, 2011, at 174:13-22]. At first blush, this isolated piece of evidence does not reflect well upon Exim, but Bariven has presented no evidence that the $3,000 actually went to any Chinese officials, nor has Bariven come forward with any other evidence of this nature. Exim also presented credible testimony that its relations with the consultant lasted no more than six months, during which time Exim only paid the consultant legitimate fees of $1,000 per month. [Trial Tr. Mar. 15, 2011, at 151:24-152:1].

[11] Exim relies on testimony from Professor Bradley that powdered milk has a shelf life of six months and that the milk here may have expired even more quickly if it was shipped or stored in hot and humid conditions. [Trial Tr. Mar. 16, 2011, at 60:13-61:20]. Although I found this testimony credible, Exim's counsel conceded that the bags containing Exim's milk stated

Bariven had a significant interest in testing the milk quickly. Bariven's interest was magnified even more so because the whole reason it had entered into the Milk Agreement to begin with was to resolve an urgent food-shortage crisis within the Venezuelan population. [Trial Tr. Mar. 16, 2011, at 153:21-154:25]. During September and October of 2008, Bariven began testing samples of milk from another of its milk suppliers called Absolute Trading. [Trial Tr. Mar. 29, 2011, at 93:17-95:2; Trial Tr. Mar. 16, 2011, at 164:14-165:11]. But Bariven waited four months to begin testing Exim's milk and then only tested milk from two installments (shipments 7 and 8). [Trial Tr. Mar. 17, 2011, at 21:14-22:7; JTX 130; PT Stip., V(11).]. In the meantime, Bariven stored Exim's milk in warehouses in Venezuela.[12]

Bariven's witnesses provided several justifications for this delay during trial: (i) Exim's milk was located three hours away from Caracas in Puerto Cabello; (ii) Exim's milk containers were difficult to find; (iii) Bariven preferred to test the milk from Absolute Trading because that milk was older; and (iv) half of the month of December was "dead" because of holidays. [Trial Tr. Mar. **[*19]** 17, 2011, at 21:14-22:7; Trial Tr. Mar. 30, 2011, at 9:21-24]. The evidence indicates that Bariven could have begun its testing and received its results more quickly than it did. Although Venezuela did not have laboratories available, Bariven could have brought all the equipment it needed for melamine tests to Venezuela and had its results within eleven weeks. [Trial Tr. Mar. 30, 2011, at 92:24-93:20; Trial Tr. Mar. 29, 2011, at 101:4-102:4; Trial Tr. Mar. 16, 2011, at 166:7-11]. Having decided to conduct its testing abroad, Bariven also could have obtained results in a more timely manner. The evidence demonstrates that it only took three days to send milk samples from Venezuela to

---

that the product would expire one year from the date of manufacture. [Trial Tr. Mar. 31, 2011, at 31:2-33:3; *see also* Trial Tr. Mar. 29, 2011, at 131:11-132:7]. It would be unfair to judge Bariven's actions by a six-month standard where Exim's own packaging labels state otherwise. Thus, I accept one year as the proper shelf life period. I also note that Exim's arguments about the milk's exposure to heat while in Venezuela probably had no effect on the toxicity of the product in subsequent tests. [Trial Tr. Mar. 16, 2011, at 75:23-76:11].

[12] The Parties disagree on whether Bariven actually put shipment 1 into commerce or kept it in storage along with the other shipments. [Trial Tr. Mar. 14, 2011, at 31:6-10, 58:17-59:6; Trial Tr. Mar. 29, 2011, at 133:1-134:16]. I need not decide this issue because, as discussed below, I find that Bariven may not recover for this shipment on any of its claims regardless of whether the milk was stored or distributed.

Houston, and Bariven received its test results within ten to twenty-one days. [JTX 135; Trial Tr. Mar. 30, 2011, at 10:19-11:16].

Nevertheless, Bariven's delay in testing shipments 7 and 8 was not entirely unreasonable given the ongoing and developing nature of the melamine situation following the initial alert in mid-September. As Bariven's counsel explained, "the whole melamine issue in the industry was evolving since September 2009. Before September 2009, no one even knew to look or test for it." [Trial **[*20]** Tr. Mar. 14, 2011, at 99:4-6]. On the other hand, Bariven waited significantly longer to test the remaining installments—which constituted the vast majority—of the milk from shipments 1-16. As discussed in greater detail below, I find Bariven's decision to delay testing on those shipments was unjustified and unreasonable.

### v. Exim Restarts Milk Shipments

Considering that the melamine crisis originated in China and that the Chinese government had placed a hold on exporting all powdered milk after the alert, the Parties explored the possibility of using milk from other countries for the remainder of their contract installments. In a letter dated October 27, 2008, Exim suggested that Bariven consider milk from Argentina, New Zealand, Brazil, or Uruguay, and PSI responded by requesting more information. [JTX 59; JTX 60 at EX004779-80; JTX 5, p. 4; Trial Tr. Mar. 14, 2011, at 207:24]. On November 13, 2008, Exim followed up on this idea, informing Bariven that it intended to ship the next milk installment from India, the other country specifically named in the Milk Agreement. [JTX 69]. But this alternative plan never came to fruition because the Chinese government lifted its milk embargo shortly **[*21]** thereafter in early December, so Exim could resume sending milk from its original suppliers.[13] [JTX 194; Trial Tr. Mar. 14, 2011, at 211:19-23].[14]

---

[13] According to the evidence presented at trial, Exim would have faced additional hurdles in obtaining milk from India if the Chinese milk embargo had not been lifted. Specifically, Exim's factory auditors concluded that the Indian milk suppliers were unsanitary, and Exim never asked those suppliers if they would even have the capacity to fulfill the remaining installments under the Milk Agreement. [Trial Tr. Mar. 16, 2011, at 5:15-8:8; Trial Tr. Mar. 14, 2011, at 207:22-208:2].

[14] By lifting the ban, the Chinese government confirmed that it had investigated and cleared all of Exim's milk manufacturers. [Chen Gang Dep., pp. 12:4-13:20].

To prepare for the new Chinese milk shipments, Exim took extra measures to ensure that the product would not contain melamine. Up until this point, SGS-China had complied with its contractual arrangement to test Exim's milk before it left China for certain chemical properties, but it had not actually tested for the presence of melamine. [JTX 29 at EX004966]. Exim now directed SGS-China to add a melamine test for all future milk shipments to Bariven. [JTX 40; Trial Tr. Mar. 15, 2011, at 153:14-17]. In addition, Bariven and PSI officials, who had failed to ever send SGS-NA personnel to China as of that time, also decided to adopt a more active stance on their contractual right to oversee the pre-shipment process. On November 17, 2008, PSI sent an email to Exim insisting on strict compliance with the field inspection requirements going forward and threatening that Bariven would not accept any product arriving in Venezuela without an inspection release form. [JTX 72].

Because the November 17 email plays a critical role in the Parties' legal arguments **[*22]** addressed below, it is necessary to delve a bit deeper into the factual context surrounding that communication. A copy of the email itself reveals that it makes no specific mention of Exim or of the Milk Contract in question. [*Id.*]. Exim's Mr. Salges testified at trial that he was convinced upon first reading the communication that it was a meaningless form email that did not apply to Exim. He explained that he reacted that way because, at the time of the email, he was having ongoing conversations with PSI and Bariven personnel on an almost daily basis, and they never once mentioned the issue of pre-shipment inspections. [Trial Tr. Mar. 14, 2011, at 204:10-21]. Instead, they told him that they did not have the manpower to perform pre-shipment inspections on all of their incoming food products even if they wanted to. [*Id.* at 203:1-3]. When Salges directly raised the November 17 email to PSI officials and asked if it applied to Exim, two different people confirmed that it did not, saying: "Rogelio, don't worry. It's not for you." [*Id.* at 203:15-24].[15] At the same time, one of the PSI employees who Salges spoke about subsequently took the stand at trial and denied that he ever told Salges **[*23]** the November 17 email did not apply to Exim. [Trial Tr. Mar. 17, 2011, at 48:20-49:1]. In fact, the same PSI employee refuted that he ever even spoke

---

[15] Salges also testified that the email was sent by a PSI employee who was new to the department and may have been unfamiliar with the course of dealing between the parties. [Trial Tr. Mar. 14, 2011, at 201:9-25].

with Salges about the Milk Contract at all. [*Id.*].[16]

Given this conflicting testimony, I look beyond the Parties' words to their conduct in search of their true intentions at that time. Exim recommenced its powdered milk installments by sending shipment 17 to Bariven on December 11, 2008. [JTX 194]. Notably, Exim did not invite PSI or SGS-NA to conduct field inspections before sending the shipment. [Trial Tr. Mar. 15, 2011, at 153:14-22]. Even though Exim released shipment 17 without heeding the warning provided in the November 17 email, Bariven reverted back to the same practices it had followed for shipments 1-16 and immediately disbursed $1.4 million to Exim for installment 17 on December 11. [JTX 194]. Six days later, Bariven also sent an email to its suppliers, including Exim, expressing its deep gratitude for their service and asking them to continue sending shipments as of mid-January. [JTX 82 ("We appreciate your support in order to reinitiate the food shipments . . . [and w]e are very grateful for your attention.")].

Without any [*24] further guidance from Bariven, Exim went forward with the contract, dispatching five more shipments (numbers 18-22) between December 13, 2008, and January 16, 2009, without inviting PSI or SGS-NA to coordinate pre-shipment inspections. [PT Stip., V(9); JTX 194; Trial Tr. Mar. 14, 2011, at 213:5-23]. Exim did continue to follow its own internal safety procedures, with SGS-China inspecting its shipments and Exim forwarding those inspection reports (including negative melamine test results) to Bariven. [Trial Tr. Mar. 15, 2011, at 152:25-158:15].[17]

Meanwhile, Bariven began taking steps in the other direction. On December 12, Bariven's Treasurer suspended all payments to Exim under the Milk Agreement, but it did not notify Exim or its customs broker Clover of the same. [JTX 77, 78, 94; Alvarez Dep., pp. 55:25-56:15; Trial Tr. Mar. 14, 2011, at 218:9-22; Trial Tr. Mar. 29, 2011, at 49:14-23]. Thus, Exim's shipments, which continued to arrive in Venezuela, piled

up at the port of entry. [JTX 82]. Starting in January 2009, PSI renewed its complaint to Exim concerning the field inspection requirement, informing Exim on January 9 that it rejected Exim's product because Exim's own inspection reports [*25] failed to comply with the requirement that PSI or SGS-NA coordinate inspections. [JTX 89]. Then on January 20, PSI sent Exim a formal claim notice, stating that "any recent sending of this product without PSI's supervision is rejected because it is in violation to what is established . . . effective as of November 17, 2008." [JTX 99, 114].

Exim officials testified at trial that they were shocked by the January correspondence from Bariven. According to Salges, nobody from Bariven or PSI had ever told him before then that his own SGS-China pre-shipment inspections were improper. [Trial Tr. Mar. 15, 2011, at 14:20-15:3]. An Exim accounting official also corroborated Mr. Salges's testimony, stating that she was quite surprised to receive the January 9 communication because Exim had already dispatched shipments 1-20 at that point. [Trial Tr. Mar. 15, 2011, at 160:14-161:8]. In her mind, Exim had complied with the field inspection "in every sense" by independently hiring SGS-China. [*Id.*].

Upon receiving the communications, Exim did not contact Bariven to inquire about the meaning of Bariven's "rejection" or what Bariven actually intended to do with milk shipments 17-22 (which were still in [*26] transport at sea) when they arrived in Venezuela. Nor did Exim ask why Bariven had not yet paid for shipments 18-22 as was Bariven's usual custom shortly after the milk left China. Instead, Exim moved on to the next shipment in the contract and took Bariven at its word, reinstating the original field inspection procedures agreed to by the Parties. On January 15 and again on February 13, Exim notified PSI that it had milk that was "ready to be shipped" and instructed PSI to contact its personnel about inspections. [JTX 108, 141]. Bariven never responded or sent inspectors to China, and the milk installments between Exim and Bariven came to a halt with shipment 22, which left China on January 16, 2009. [JTX 194].

### vi. The January 21 Meeting

Although Bariven and Exim officials were in regular communication during the months following the melamine alert, they did not actually meet to discuss the status of their relationship until January 21, 2009—the day after Bariven sent its final claim form rejecting

---

[16] The other PSI employee neither corroborated nor refuted Salges's statement during her deposition.

[17] As Bariven points out, there are discrepancies between those reports and the actual milk provided. [ECF No. 172, pp. 19-20]. As such, I admitted the corresponding exhibits as evidence that certain documents were sent from Exim's milk suppliers to PSI in relation to milk shipments 17-22, but I did not admit them as evidence of proper links between the individual shipments and the tests. [Trial Tr. Mar. 15, 2011, at 158:7-15].

Exim's recent installments. Bariven had previously suggested a meeting in early December, but Exim's representative Mr. Salges came down with pneumonia and postponed that meeting until January. **[*27]** [JTX 69 at EX003890-93; Trial Tr. Mar. 15, 2011, at 24:15-17]. Present at the meeting in Caracas were Mr. Salges, Bariven President Georges Kabboul, Bariven Food Coordinator Sulfani Azocar, and Bariven Technical Analyst Dubraska Rodriguez. [PT Stip., V(10); JTX 117].

Testimony from the witnesses who spoke about the meeting differs, but both sides agree on certain things. Bariven's President, Mr. Kabboul, asked for Exim's assistance in resolving the problems posed by the Venezuelan Health Ministry, which refused to issue the permits necessary to import Exim's milk. [Trial Tr. Mar. 15, 2011, at 26:7-12; Trial Tr. Mar. 17, 2011, at 8:19-23; Trial Tr. Mar. 29, 2011, at 111:14-21]. Exim offered to collaborate in that effort. [Trial Tr. Mar. 15, 2011, at 26:13-16, 95:3-23; JTX 117 at 4027-28]. Exim agreed to Bariven's request that Exim suspend shipments for 30 days while the Parties awaited direction from the Venezuelan authorities. [JTX 117 at 4028; Trial Tr. Mar. 15, 2011, at 28:9-18, 103:4-17]. Bariven also promised to extend the Girobank letter of credit in favor of Exim for an additional sixty days, which it did on January 27, 2009. [JTX 122 at 15349; JTX 126; Trial Tr. Mar. 17, 2011, **[*28]** at 13:9-13, 33:2-7].

The Parties disagree on several other aspects of the January 21 meeting. Bariven officials insist that they told Exim that all milk would be tested for melamine and that Exim would have to replace any contaminated product. [Trial Tr. Mar. 17, 2011, at 9:3-11; JTX 116]. But Salges explained that he never agreed to replace any of the milk, and he subsequently refused to sign Bariven's version of the meeting minutes, which referred to the re-exportation of milk in the event that it would not be accepted by the Venezuelan authorities. [Trial Tr. Mar. 15, 2011, at 50:11-51:7, 31:4-32:11, 100:10-101:3; JTX 117 at 4028]. Bariven also contends that it brought up Exim's failure to permit PSI-coordinated inspections of the milk in China. [Trial Tr. Mar. 29, 2011, at 114:3-17; Trial Tr. Mar. 17, 2011, at 8:24-9:7]. But according to Salges, the tenor of the meeting was a positive one in which Bariven primarily congratulated Exim for all of its successful deliveries to Venezuela. [Trial Tr. Mar. 15, 2011, at 25:21-30:10 ("I felt like I was the king of the town.")].

Mr. Salges also testified that he again proposed to source the milk from other countries (besides China or India) **[*29]** at the meeting. [Trial Tr. Mar. 14, 2011, at 210:10-211:6]. Bariven officials denied that they discussed this issue and instead maintain that all milk under their agreement had to come from China or India, because changing the terms of the contract might violate Venezuelan law and would be unfair to other suppliers who had participated in the bidding process for the Milk Agreement. [ECF No. 172, p. 15; Trial Tr. Mar. 14, 2011, 210:10-211:6; Trial Tr. Mar. 16, 2011, at 169:1-7].

I found Mr. Salges's trial testimony generally quite credible, including his testimony regarding the January 21 meeting. In contrast, I found the testimony from Bariven's officials somewhat contradictory. For example, they insisted that they raised the field inspection requirements during the meeting as a basis for their refusal to pay for milk shipments 18-22, yet they extended the Girobank letter of credit for Exim's benefit on the Milk Contract only six days after that meeting. [JTX 122 at 15349; JTX 126; Trial Tr. Mar. 17, 2011, at 13:9-13]. This extension, which is undisputed, greatly discredits Bariven officials' testimony that they viewed the pre-shipment inspections as a critical component of their contractual **[*30]** arrangement with Exim.

In addition, whereas the Bariven representatives consistently maintained that their overarching focus throughout the life of the Milk Contract was to provide healthy milk to the Venezuelan population on an expedient basis, their reluctance to consider Mr. Salges's offer to obtain milk from alternative countries in the face of an international health crisis simply makes no sense.[18] Even assuming Bariven's strict deference to the terms of the Milk Contract was based in good faith, it is undisputed that Bariven had already sought Exim's cooperation in modifying those contractual terms by relying on the Girobank letter of credit (instead of providing a deposit) and by deviating from the set delivery schedule because of difficulties imposed by the Venezuelan nationalization process.[19]

---

[18] Bariven officials said they refused to consider Exim's alternative options in order to preserve the integrity and transparency of the closed-bid system used to enter into the Milk Contract. [Trial Tr. Mar. 16, 2011, at 168:8-169:7]. They insisted that accepting Exim's offer would have been unfair to other suppliers. [*Id.*]. Yet the evidence shows that at this same time in late 2008 and early 2009, Bariven was entering into new purchase orders with other suppliers to receive powdered milk from Portugal and Uruguay. [Trial Tr. Mar. 17, 2011, at 17:15-18].

[19] In any event, Exim has not put forth significant evidence that it took concrete steps toward actually manufacturing milk

The evidence presented about the January 21 meeting also sheds some valuable light on what must have been the proverbial "elephant in the room" during the January 21 gathering—namely, how contaminated were the thousands of tons of Exim milk that had already arrived in Venezuela and were sitting dormant in storage? It is undisputed that Bariven had not tested a single sample of Exim's milk [*31] as of that date, so Bariven made no clear demands during the meeting that Exim return any funds that Bariven had used to pay for those shipments. Witnesses from both sides testified that the meeting participants were focused less on the chemical status of the milk itself and more on joining forces to overcome the political hurdles posed by Venezuela's Ministry of Agriculture. [Trial Tr. Mar. 15, 2011, at 29:11-13].

An evenhanded interpretation of this evidence indicates that Bariven officials avoided direct discussions about Exim's milk quality because they only had suspicions of melamine as of that date, and Salges avoided the discussion because he feared that the milk from shipments 1-16 may have been contaminated in which case Exim would face grave consequences. In any event, relations between Exim and Bariven began to further unravel shortly after the January 21 meeting. The very next day, Exim made a claim to Girobank under the letter of credit for payment of $9.6 million for shipments 18-22. [JTX 118; Trial Tr. Mar. 14, 2011, at 36:14-37:6]. A court in Curaçao eventually entered judgment on that letter of credit in favor of Exim on September 16, 2009, obligating Girobank to pay [*32] Exim $9.6 million. [JTX 172, p. 6].[20]

---

outside of China. Perhaps this is because Exim would have still owed its Chinese suppliers even if it could have obtained new milk going forward from other suppliers. The only evidence of any return policy from a Chinese supplier was from Suncare whose representative testified that it would accept returns up to at most one month after the date of manufacture. [Chen Dep., p. 11:3-14]. Under this scenario, Exim had no real possibility of returning the milk already shipped because those shipments took 6-8 weeks to reach Venezuela from China. [JTX 194].

[20] Exim and Girobank were direct parties to the Curaçao action, and Bariven was an intervening party. The following passage from the Curaçao court's opinion provides that that judgment should not have any *res judicata* effect on the issues currently before me:

Although Isla and Bariven stated with reason and well substantiated, that earlier deliveries of powdered milk by Brickell contained an unacceptable amount of melamine content, Brickell has contested such vigorously. Within the scope of these proceedings that as mentioned before is

### vii. Bariven's Melamine Tests

Following the January 21 meeting and Exim's claim against the Girobank letter of credit, Bariven finally decided to begin testing Exim's milk in earnest, ordering its initial tests on shipments 7 and 8 in late January 2009. The first rounds of test results, which Bariven received in late February, were mixed, showing both non-toxic as well as toxic levels of melamine. [Trial Tr. Mar. 29, 2011, at 117:4-11; Bariven Exh. W; PTX 52; JTX 192].[21] Accordingly, Bariven ordered follow-up tests on the same two installments from new laboratories, and results of the new tests, which arrived on March 20, 2009, showed widespread melamine and cyanuric acid contamination. [Trial Tr. Mar. 29, 2011, at 117:18-118:11; JTX 156, 192].

### a. The Reliability of the Sampling and Testing

That the first round of testing produced inconsistent results creates some initial doubt about the level of melamine that actually existed in milk shipments 7 and 8. Bariven's witnesses explained that this discrepancy stemmed from the different testing methodologies used by the laboratories that conducted those initial tests. [Trial Tr. Mar. 29, 2011, at 117:18-118:2; Trial Tr. Mar. 30, 2011, [*34] at 38:9-39:6]. In particular, the two labs that conducted the first round of testing, SGS-NA and Siliker, followed ELISA and LC-PDA extraction and

---

primarily concerned with the documents and not the merchandise, *no judgment can be passed on this*. However, it is important that to date, even after these interlocutory relief proceedings have been postponed of almost half a year, no real evidence exists (only reasoned guesses) that the cargo related to the claim under the documentary credit is not sound. Isla and Bariven have not presented any (loss) assessments of this cargo, while Brickell has stated, which was not contradicted, that it has always been willing to cooperate with any further quality inspections of that powdered milk. *It is possible that Brickell in one or more points under the agreement was in breach of contract in respect of Bariven, as well as the reverse for that matter, but that is not decisive for the payment under the documentary credit, which is at issue here.*

[JTX 172, p. 5 (emphasis [*33] added)].

Exim's counsel also conceded that the Curaçao judgment has no preclusive effect on this case. [Trial Tr. Mar. 14, 2011, at 22:17].

[21] Bariven's exhibit W was received into evidence during trial. [Trial Tr. Mar. 30, 2011, at 36:4].

analytical methods. [Trial Tr. Mar. 30, 2011, at 38:9-39:6]. In contrast, Certified Laboratories ("Certified Labs"), which conducted the second round of tests and all of the remaining tests in this case,[22] followed the "FDA Laboratory Information Bulletin" or "LIB 4122" method. [*Id.* at 96:10-16]. Bariven provided expert testimony at trial describing this method as the "gold standard" of laboratory analysis and attesting to the competency of Certified Labs as an institution generally. [*Id.* at 47:6-13, 77:3-24, 96:10-13]. I found this testimony credible and thus dismiss my initial doubts caused by the first round of inconclusive test results conducted by SGS-NA and Siliker.

Given the reliability of the testing methods engaged by Certified Labs, I find by a preponderance of the evidence that Bariven has established that the test results of samples from shipments 2-16 demonstrate melamine or cyanuric acid levels above 0.324 ppm in samples from each of those shipments.[23] Those samples were certainly contaminated.[24] Because of the human health risks [*35] imposed by melamine and cyanuric acid, I consider the evidence that led to this finding deeply troubling and unsettling.

But my analysis as to the reliability of all of Bariven's melamine tests does not end there. Exim's expert, Professor Bradley, provided testimony concerning Bariven's sampling techniques, which warrants further discussion.[25] Professor Bradley testified that Certified

---

[22] Another company called Midwest also conducted tests as part of the second round. Because Bariven relies on the tests from Certified Labs, I will focus on that company.

[23] Although up until this point, Bariven had only tested milk shipments 7 and 8, my discussion here about the reliability of Bariven's procedures applies to *all* of the milk tests ordered by Bariven.

[24] I also find that Exim's arguments about the reliability of the testing break down when taking into account that Exim had observers present for the February 2010 testing and chose not to use different methodology at that time. Perhaps because of this, Exim has filed a Motion in Limine, seeking to exclude all evidence of the February 2010 test results. [ECF No. 150]. As discussed below, I deny that Motion and consider the results of those tests along with all of the other tests conducted.

[25] For clarity, I conclude as a result of the testimony described in the last paragraphs that the *testing procedures* used by Certified Labs in the United States to detect melamine in Exim's milk were reliable. I now turn to address the *sampling procedures* employed in Venezuela before the tests to select the actual grains of powdered milk, which Certified Labs

Labs' test results were divergent. [Trial Tr. Mar. 16, 2011, at 67:6-70:21]. Upon independent review of the evidence, I agree with him.[26] According to Professor Bradley, the methods employed in Venezuela to extract the powder samples used for testing were flawed, thus explaining the varied test results. [*Id.* at 70:5-71:5]. Specifically, Professor Bradley testified that Bariven's samplers made a mistake by using a scoop to take samples from Exim's bags of milk instead of using a coring device or "thief." [*Id.* at 70:22-72:18]. The primary difference between the two: a scoop only takes powder from the top of the bag whereas a thief is inserted deeper into the bag to obtain a sample more representative of the entire bag. [*Id.* at 107:17-21]. No witness in this case testified about when or how Exim's Chinese [*36] milk manufacturers actually added melamine to their product (*i.e.*, when the milk was still in liquid form or as powder after the drying process). In Professor Bradley's words, the risk posed by Bariven's sampling technique would occur in the following scenario:

> If we don't know the location when [the melamine] was added, we have to take what is termed the proper sample and that would be with a coring device, otherwise we're going to miss it with a scoop potentially; *or we could get all of it if it, for example, if that melamine was added dry to the full bag of milk powder, added on top.* We don't know where it was added.

[*Id.* at 91:9-15 (emphasis added)].

Bariven has challenged Professor Bradley's qualifications and testimony on a number of different grounds.[27] But on this particular point, I find Professor Bradley's testimony somewhat persuasive. Faced with a scenario where the nature of the melamine-contamination process is unknown and where the tests produced extremely divergent results, it would comport

---

eventually tested.

[26] The evidence shows that the test results within each shipment were divergent (ranging from 0 ppm to 1274 ppm), and the results within discrete "batches" that made up the shipments were equally varied (ranging from <.25 ppm to 725 ppm). [JTX 192; ECF No. 174, pp. 14-15].

[27] For example, Bariven points out that Professor Bradley conceded that he was a contributing author to a well-known book, which provides that scoops may be used for dry powder sampling. [Trial Tr. Mar. 16, 2011, at 104:2-106:5]. I discussed several of Bariven's other challenges in a pretrial *Daubert* Order. [ECF No. 148].

with common sense that the melamine could have been unequally disbursed throughout Exim's milk powder.

Yet I must dispel any doubts created **[*37]** by Professor Bradley's testimony about Bariven's sampling techniques and the contamination level found within the untested portions of the milk. Bariven's sampling procedures, while imperfect under one possible scenario cited by Professor Bradley, are otherwise well-respected and quite standard among the industry. The scoops Bariven used to extract its samples were large enough (500 gram capacity) to obtain a generous sample size even if only taken from the top of the bag. [*Id.* at 106:2-3; Trial Tr. Mar. 29, 2011, at 129:16-18; JTX 187 at EX-VS00975].[28] Despite Professor Bradley's testimony, the evidence of contamination presented by Bariven from shipments 2-16 is both overwhelming and consistent throughout the installments.

After carefully considering all of these facts, I conclude that Bariven's samples were sufficiently representative to prove by a preponderance of the evidence that the majority of the untested milk from shipments 2-16 contained melamine levels above 0.324 ppm. Even if that contamination came in clumps, there was enough consistency of melamine presence among the tests to show that those infected concentrations were probably pervasive throughout most of the milk powder. **[*38]**

One last point remains in this analysis. Bariven suggests that the evidence of contamination from installments 2-16 leads to an inference that shipment 1 was also contaminated. [ECF No. 172, p. 32]. It notes that Suncare, which provided the milk for eleven of the shipments that I have now determined were contaminated, also provided the milk for shipment 1. [JTX 192]. Assuming that Suncare followed the same manufacturing procedures for shipment 1, the argument goes, the milk from that shipment must likewise be contaminated. This inference is reasonable under these circumstances. Thus, I find that shipment 1 was also contaminated.

**b. The Timing of Bariven's Tests**

Returning to my analysis of Bariven's conduct in relation to the melamine experiments, I note that by March 20, 2009, the test results that Bariven received would have

caused any company in its position major concern. Under these alarming circumstances, a reasonable company would immediately order tests on the other twenty shipments of Exim's milk that had already arrived in Venezuela. By doing so, Bariven would have complied with the strict internal policy that it had imposed upon itself almost six months earlier on October 2, **[*39]** 2008, when it made the decision to test all Exim milk for melamine upon arrival.

But the evidence presented at trial shows that Bariven continued to let the vast majority of Exim's milk sit, untested, in storage containers in Venezuela even while litigation loomed on the horizon. On March 19, 2009, counsel for Exim sent a formal demand letter to PSI, asking for assurances that Bariven would continue to make payments under the Milk Contract. [JTX 155]. Bariven responded on March 27, 2009, requesting a meeting to discuss the status of the Milk Contract. [JTX 157]. In the letter, Bariven President Mr. Kabboul invited Exim to attend an "urgent meeting" but also confirmed that the Parties would "be able to establish the mechanisms that will make the nationalization possible, as well as the subsequent payment of all shipments that are fit for human consumption." [*Id.*]. At the same time, Bariven also agreed to a second extension of the Girobank letter of credit. [Trial Tr. Mar. 15, 2011, at 103:18-104:21].

By April 2, 2009, Bariven changed its tone toward Exim. Having certainly realized by this time that the first melamine test results from Certified Labs showed significant levels of contamination, **[*40]** Mr. Kabboul sent Exim another letter, in which he again requested an "urgent meeting." [JTX 160]. But he now explicitly demanded a discussion concerning the melamine test results that Bariven had in hand. [*Id.*]. He also commanded Exim to respond within 48 hours and made it clear that Bariven was ready to resort to "legal action." [*Id.*]. Exim preempted Bariven's threat and filed this lawsuit on April 7, 2009. [PT Stip., V(12)].

Following the initiation of this action, Bariven finally renewed its efforts to test more of Exim's milk. Between April 30, 2009, and May 5, 2009, Bariven ordered tests on Exim's milk shipments 3, 5, and 16. The product being tested had been sitting dormant in Venezuela at this time for the better part of a year (the records show that it had left China in July and September of 2008). [*Id.* at V(13); JTX 164]. Bariven received the test results in June 2009, and the results again showed widespread contamination of melamine and cyanuric acid. [JTX 166, 192; Trial Tr. Mar. 29, 2011, at 120:22-121:2]. At this

---

[28] By comparison, the evidence indicates that very small concentrations of melamine were added—probably less than a teaspoon. [Trial Tr. Mar. 16, 2011, at 89:8-18].

point, Bariven had only tested five of the twenty-two shipments it had received from Exim. Bariven waited an additional month before filing its counterclaims in **[\*41]** this action on July 6, 2009.

As for the remaining—and vast majority of—Exim's milk that had arrived in Venezuela, Bariven waited another nine months until February 2010 at which time it ordered tests on ten more shipments. [Bariven Exh. G; Trial Tr. Mar. 29, 2011, at 121:18-131:25].[29] Those test results, which Bariven obtained in March and April of 2010, also showed widespread contamination of melamine or cyanuric acid. [Bariven Exh. F; Trial Tr. Mar. 29, 2011, at 132:1-7; JTX 192].[30] Bariven never tested the remaining milk shipments from Exim (*i.e.*, shipments 1 and 17-22). For reference, a chart showing the relevant dates for each shipment, melamine test, and payment in this dispute is attached to the Opinion as Appendix B.[31]

Because Bariven's decision to delay testing has significant legal implications on this case, the evidence presented on this issue warrants slightly more detailed observations and fact findings. Bariven insists that its delays in testing Exim's milk were reasonable on the grounds that a buyer under the UCC must be permitted to "double-check[]" and "triple-check[]" the quality its goods before rushing into litigation. [ECF No. 172, pp. 24-25]. In its view, the circumstances **[\*42]** of this case provide additional excuses justifying a certain level of flexibility in its testing schedule. Among other things: the unprecedented nature of the melamine contamination, uncertainties surrounding the most appropriate testing methodologies, the involvement of multiple government ministries, and serious consequences that could have followed from a testing mistake. [Trial Tr. Mar. 16, 2011, at 162:8-164:13; Trial Tr. Mar. 29, 2011, at 101:4-105:6; Trial Tr. Mar. 30, 2011, at 106:23-107:12].

I give a certain level of deference to these concerns, and as described above, I find that although Bariven was slow to test shipments 7 and 8, its decision to begin testing those shipments in January 2009 was ultimately acceptable under the circumstances. On the other hand, I can only conclude that Bariven's delay in testing the

remainder of the milk was illogical, unfair, and irresponsible. Even though Bariven had good reason to request meetings with Exim and to try to find a mutual solution for the remainder of the Milk Contract, the evidence shows that Bariven should have been more vigilant about establishing its own record of Exim's breach where it had access to the milk in question **[\*43]** and where it had already been conducting tests since the fall of 2008, albeit on milk from another supplier (Absolute Trading). By ignoring its own internal protocols to test as established by the October 2, 2008 email and by waiting for litigation to unfold before testing the vast majority of Exim's milk, Bariven has nobody to blame but itself. By the time Bariven even took its first samples of most of Exim's milk in February 2010, that milk had expired by all accounts.

Bariven argues that Exim never asked it to test the milk more quickly, but this point is meaningless in light of several undisputed facts. First, Exim had no reason to urge Bariven to test milk that Exim had already been paid for, regardless if payment came directly from Bariven or via the Girobank letter of credit. That litigation was brewing while Bariven waited to test the milk should have provided Exim with even less incentive to request prompt testing because Bariven's continuing delay would probably only help Exim's position in court. More importantly, Bariven's own domestic food crisis—which was ongoing while Exim's milk sat in Bariven's storage—should have provided Bariven **[\*44]** with sufficient independent reason to verify the quality of its food backlog so that it could discard bad products and distribute good products.[32] Given these circumstances, any reasonable buyer in Bariven's position would have felt compelled to test all of Exim's incoming milk on an expedited basis. Instead, the evidence presented at trial leaves the distinct impression that Bariven sat complacent and waited for directions from the Venezuelan government while Exim's milk spoiled.

After carefully reviewing this evidence, I conclude that Bariven's delays for testing all of Exim's milk other than installments 7 and 8 were unreasonable. Even worse, Bariven's failure to perform any tests at all on shipments 1 and 17-22 was beyond unreasonable and completely unjustified.[33]

---

[29] Specifically, Bariven ordered tests on shipments 2, 4, 6, 9, 10, 11, 12, 13, 14 and 15 in February 2010. Bariven Exhibit G was received into evidence during trial. [Trial Tr. Mar. 29, 2011, at 125:21].

[30] Bariven Exhibit F was received into evidence during trial. [*Id.* at 132:23].

[31] The chart is an adaption of JTX 194.

---

[32] As one of Bariven's coordinators conceded at trial, the food shortage in Venezuela made time of the essence. [Trial Tr., Mar. 16, 2011, at 156:21-25].

[33] When asked why Bariven never tested milk shipments 17-22, Bariven's coordinator responded, "I do not have an answer

## C. The Rice Contract

On June 12, 2008, PSI issued a purchase order requiring Exim to deliver 19,200 metric tons of white rice for $19,603,200. [JTX 24]. To supply the rice, Exim contracted with a rice supplier located in Brazil called Zaeli Alimentos, Ltda. ("Zaeli"). [PT Stip., V(17)]. The Rice Contract contained the delivery terms "CIF Puerto Cabello / La Guaira, VE" and provided that "Original Export documentation . . . for all ocean shipments are required **[*45]** to be in possession of Bariven-Aduanas seven (07) working days prior to the arrival of the freight at the first Venezuelan Port." [JTX 24, pp. 1, 7].

### i. Performance of the Rice Contract

From August to December 2008, each Party performed its role under the Rice Contract and things ran quite smoothly. Exim dispatched 16,200 metric tons of rice to Venezuela, and Bariven paid Exim a total of $16,540,200 for these shipments, with PSI authorizing each payment while the shipment was in transit. [PT Stip., V(18); JTX 195; Trial Tr. Mar. 15, 2011, at 107:9-13].[34] Throughout this time, Exim (via Zaeli) occasionally delivered the original export documents one or two weeks after the arrival of the rice itself in Venezuela. [Trial Tr. Mar. 29, 2011, at 29:9-12]. In those instances, the customs unit of the Venezuelan government decided to nationalize the rice by using a procedure called "legal abandonment" despite the tardy documents because the delay was "reasonable" and "acceptable." [Id. at 28:4-29:25, 52:25-53:1].

But according to an official from Bariven's Customs Department, this process was reserved for "exceptional circumstances," and Bariven played "no part in that decision"; it was all up to **[*46]** Ceniat, the Venezuelan customs agency. [Id. at 28:4-29:25]. If Bariven itself wanted to urge the government to nationalize certain goods without export documents, Bariven had the option of sending Ceniat a *carta de compromisso* or "letter of commitment," making that request as a formal matter. [Id. at 31:4-32:16].

### ii. Exim Fails To Send Original Export Documents

Predictably, things started to unravel between the Parties under the Rice Contract at the same time that they did under the Milk Contract. In January 2009, three of Exim's rice shipments (numbers 21, 23 and 24) arrived in Venezuela without original export documentation as required under the terms of their agreement. [JTX 195; Trial Tr. Mar. 15, 2011, at 107:23-108:2, 110:23-111:17; Trial Tr. Mar. 17, 2011, at 43:17-44:1; Trial Tr. Mar. 29, 2011, at 29:17-31:3].[35] Bariven requested the original documents from Exim numerous times over the next several weeks. [JTX 102, 104; Trial Tr. Mar. 17, 2011, at 44:18-46:20].[36] But Exim was unable to provide Bariven with these original records because it had not paid its Brazilian supplier, Zaeli, for the rice. [Trial Tr. Mar. 15, 2011, at 107:9-108:4; Trial Tr. Mar. 16, 2011, at 17:5-20; JTX 151]. **[*47]** Bariven did not clear the rice from these three shipments through Venezuelan customs without the original documents. [Trial Tr. Mar. 29, 2011, at 26:24-32:16]. In addition to asking for the original shipping documents beginning in

At trial, Exim President Mr. Salges claimed that Exim withheld payment to Zaeli for shipments 21, 23, and 24 because Bariven had failed to pay Exim for Shipments 18-22 under the *Milk Contract*. [Trial Tr. Mar. 15, 2011, 109:7-110:1]. But this testimony does not match up with the chronology of payments between the Parties. Rice Shipments 21, 23, and 24 were dispatched in late November and Bariven paid Exim for each installment within two days of receiving Exim's invoices in mid-December. [JTX 195]. Putting aside the Parties' parallel difficulties under the Milk Agreement during this time, Exim had funds in hand from Bariven pursuant to the

---

to that; I do not know." [Trial Tr. Mar. 17, 2011, at 25:21-26:2].

[34] The Summary Judgment Order states that Exim made 23 separate shipments of rice to Venezuela, totaling 16,200 tons, but the Parties agree that Exim provided the 16,200 tons in 26 shipments of rice to Venezuela, and Bariven paid for all 26 shipments. [ECF No. 136, p. 10; PT Stip., V(18)].

[35] The record is slightly unclear about which three shipments did not come with original export documents. Bariven's counsel cross-examined Mr. Salges about shipments 22, 25, and 26, and Joint Exhibit 195 shows that these three shipments never arrived in Venezuela. [Trial Tr. Mar. 15, 2011, at 107:14-108:4; JTX 195]. On the other hand, Bariven's post-trial brief refers to shipments 21, 23, and 24. [ECF No. 172, p. 33]. Because the exhibits relating to Bariven's damages for demurrage and storage fees refer to the bills of lading from shipments 21, 23, and 24, I will refer to those as the relevant shipments. [Bariven Exh. I].

[36] Bariven's emails only referenced the bill of lading for one of the shipments in its requests. [JTX 102-05, 143-44]. But Exim understood that Bariven was requesting documentation for all three shipments. [Trial Tr. Mar. 16, 2011, at 13:24-14:3].

Rice Contract that it should have used to pay Zaeli. January, Bariven also informed Exim that it was incurring costs because of the missing documents. [JTX 102-05, 143-44; Trial Tr. Mar. 17, 2011, at 44:18-46:20; Trial Tr. Mar. 29, 2011, at 33:1-8; Trial Tr. Mar. 16, 2011, at 13:24-17:20]. For example, on February 20, 2009, **[*48]** Bariven informed Exim that the delay "could lead to additional costs." [JTX 105]. Exim responded that it had contacted Zaeli but because Brazil was "practically paralyzed by the Carnival season, there was a delay in receiving the documents." [JTX 104]. I find this excuse unpersuasive because Bariven had already paid for those shipments two months earlier and had been awaiting the arrival of the documents since that time. [JTX 195].

In October 2009, ten months after the rice arrived in Venezuela, Exim finally paid Zaeli for these three shipments at which point Bariven received the original export documents in Venezuela. [Trial Tr. Mar. 16, 2011, at 17:5-20]. In the meantime, Bariven had incurred significant storage and demurrage costs for this rice. [Bariven Exh. I; Trial Tr. Mar. 29, 2011, at 33:1-35:8]. Those charges were invoiced to Bariven's affiliate, PDVSA Petroleos, S.A. [Bariven Exh. I].[37]

### iii. The Last Three Rice Shipments

With respect to the last 3,000 metric tons of rice (with a contract price of $3,063,000) remaining under the Rice Contract, PSI sought to inspect the product at Exim's supplier in Brazil before shipment, but Zaeli did not permit PSI's inspection because Exim had **[*49]** not yet paid Zaeli for this rice. [JTX 196; Trial Tr. Mar. 17, 2011, at 46:21-48:5]. Despite this, Exim requested assurances from Bariven that it would perform on the Rice Contract on April 8, 2009. [JTX 163].

## II. CONCLUSIONS OF LAW

### A. Jurisdiction and Governing Law

Both Parties agree that this Court may exercise diversity jurisdiction over this dispute pursuant to 28 U.S.C. § 1332.[38] It is also undisputed that the Uniform

Commercial Code as adopted under Florida law shall govern all relevant legal matters before me. Given the unique and novel issues of UCC interpretation presented by this case, I briefly review the role of a U.S. District Court faced with a diversity case such as this one.

I am obligated first and foremost to follow the position that Florida courts would take on the disputed issues. *Erie R.R. v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938)*. Specifically, I am bound by the decisions of the Florida Supreme Court and, where that court has not issued an opinion on point, I am guided by the decisions of the Florida District Courts of Appeal. *Bravo v. United States, 577 F.3d 1324, 1326 (11th Cir. 2009)*; *Employers' Fire Ins. Co. v. Canal Ins. Co., 788 F.2d 1522, 1523 (11th Cir. 1986)*. Florida courts generally begin their analysis of any state statute, including the UCC, by considering the plain meaning of the statutory text, so I must do the same. *See E.A.R. v. State, 4 So. 3d 614, 629 (Fla. 2009)*.

Where the UCC text and comments are **[*50]** inconclusive on a certain issue and where the Florida state courts have not shed further light on that issue, I must "make an educated guess as to how the state supreme court would rule." *Nobs Chemical, U.S.A., Inc. v. Koppers Co., Inc., 616 F.2d 212, 214 (5th Cir. 1980)* (internal quotation marks omitted). Because a significant amount of jurisprudence interpreting the Florida UCC comes from federal courts sitting in diversity jurisdiction, I may consider the opinions of those courts as persuasive. *State Farm Fire & Cas. Co. v. Steinberg, 393 F.3d 1226, 1231 (11th Cir. 2004)*. Thus, I will look to decisions concerning the Florida UCC from the Florida courts, the Eleventh Circuit, the Fifth Circuit before October 1, 1981,[39] and the U.S. District Courts within Florida.

Most states have also adopted the exact same provisions of the UCC within their own statutory codes, so case law interpreting the UCC is often uniform among various jurisdictions. *See Allapattah Servs. v. Exxon Corp., 188 F.R.D. 667, 671 (S.D. Fla. 1999)*. As such, I am permitted to give persuasive weight to cases

---

[37] Bariven Exhibit I was received into evidence during trial. [Trial Tr. Mar. 29, 2011, at 32:24].

[38] Because Bariven is an agency or instrumentality of the

government of Venezuela, this Court also has original jurisdiction under 28 U.S.C. § 1330. [PT Stip., II].

[39] In *Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981)* (en banc), the Eleventh Circuit adopted as binding precedent all decisions handed down by the former Fifth Circuit before October 1, 1981.

interpreting the UCC as it is adopted in states other than Florida. *See, e.g., General Matters, Inc. v. Paramount Canning Co., 382 So. 2d 1262, 1264 n.3 (Fla. Dist. Ct. App. 1980)* (relying on Ninth Circuit case that interpreted Oregon version of UCC because that statute was identical to Florida statute). Likewise, I may consider well-known treatises such as JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE (5th ed. 2006). *See, e.g.,* **[*51]** *Nobs, 616 F.2d at 215* (looking to White & Summers where there was no law directly on point or where the relevant UCC section was not the "most lucid or best-drafted"); *E. Cement v. Halliburton Co., 600 So. 2d 469, 471 (Fla. Dist Ct. App. 1992)* (calling White & Summers "authoritative" and adopting its views).

**B. Claims by the Parties**

In total, there are seven claims pending before this Court—five relating to the Milk Contract and two relating to the Rice Contract. Bariven seeks relief on five counts: (1) breach of the Milk Contract, (2) breach of the Milk Contract's implied warranty of merchantability, (3) breach of the Milk Contract's implied covenant of good faith and fair dealing, (4) violation of the *Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")*, and (5) breach of the Rice Contract. Exim seeks relief on two counts: (1) anticipatory repudiation of the Milk Contract and (2) anticipatory repudiation of the Rice Contract. The Court's tasks now delineated, I begin my analysis.

**C. The Milk Contract**

**i. Bariven's Arguments Under *Fla. Stat. § 672.612(3)***

Before analyzing each of the Parties' counts under the Milk Agreement, I first address a critical threshold argument by Bariven that Exim breached the Milk Agreement *as a whole* by providing at least fifteen shipments of nonconforming product. [ECF **[*52]** No. 172, p. 50]. Invoking *Section 672.612(3) of the Florida Statutes*, Bariven asserts that this statutory provision provides it with a right to relief on the whole contract independent of any other theories of recovery. [*Id.* at 56]. That statute relates specifically to installment contracts, and Bariven relies on the first sentence of the statute, which provides: "Whenever nonconformity or default with respect to one or more installments substantially impairs the value of the whole contract

there is a breach of the whole." *Fla. Stat. § 672.612(3)*. However, the first sentence of the statute is limited and narrowed by the remainder of the statute, which provides: "But the aggrieved party reinstates the contract if she or he accepts a nonconforming installment without seasonably notifying of cancellation or if she or he brings an action with respect only to past installments or demands performance as to future installments." *Id.*[40]

In support of its position, Bariven cites very little case law. In fact, Bariven candidly conceded in its Summary Judgment submissions that it was "unable to find *any cases* interpreting [the Florida statute]" on this point.[41] [ECF No. 84, p. 14 n.10 (emphasis added)]. Considering the significance of this issue, which relates to the validity **[*53]** of *the entire* Milk Agreement, I must look to cases from other jurisdictions for guidance. I do so in keeping with my general duty to make an educated guess how the Florida Supreme Court would resolve this issue. *See Conklin v. Hurley, 428 So. 2d 654, 657 & n.2 (Fla. 1983)* (recognizing "the passage by virtually every state of the Uniform Commercial Code" and surveying decisions of various other states concerning certain UCC provisions).

As with Florida case law, judicial opinions from state and federal courts across the country interpreting *UCC § 2-612(3)* are scarce.[42] *See Glennville Elevators, Inc. v. Beard, 284 S.C. 335, 326 S.E.2d 185, 187 n.5 (S.C. Ct. App. 1985)* ("We have been unable to locate a case from any jurisdiction that clearly defines 'substantial impairment' [under *§ 2-612(3) of the UCC*]."). Nevertheless, the Court has conducted its own review of the existing decisions from other jurisdictions, which provide enough guidance concerning this UCC provision to resolve Bariven's claim under the statute.

Case law demonstrates that aggrieved buyers who seek

---

[40] I further discuss these limitations on pages 54-63 of this Opinion.

[41] Bariven's submission actually states that it found no cases interpreting "*Fla. Stat. § 267.612*." [ECF No. 84, p. 14 n.10]. Because no Florida statute exists with this number and because Bariven made this statement in the context of its argument about *§ 672.612(3)*, I assume that this was a simple typo.

[42] *UCC § 2-612(3)* is identical with *Fla. Stat. § 672.612(3)*. Because I rely on case law from various jurisdictions, I refer to the two interchangeably in this portion of the Opinion.

protection under *UCC § 2-612(3)* almost always do so by invoking the doctrine of rejection. *See Arkla Energy Res., A Div. of Arkla, Inc. v. Roye Realty & Dev., Inc., 9 F.3d 855, 860-61 (10th Cir. 1993)* ("In the typical situation covered by *section 2-612*, the seller ships the goods to the buyer who then discovers their non-conformity and must decide whether it may reject them under *section 2-612*."). Most often, this occurs early in the life of the relevant **[*54]** installment contract where a buyer discovers that one or more initial installments are flawed upon their arrival. *E.g., Traynor v. Walters, 342 F. Supp. 455, 457-61 (M.D. Pa. 1972).* The aggrieved buyer will normally reject the newly tendered (but defective) installments by refusing to accept and pay for them. *See, e.g., Design Plus Store Fixtures, Inc. v. Citro Corp., 131 N.C. App. 581, 508 S.E.2d 825, 827-30 (N.C. Ct. App. 1998); Bodine Sewer, Inc. v. E. Ill. Precast, Inc., 143 Ill. App. 3d 920, 493 N.E.2d 705, 711, 97 Ill. Dec. 898 (Ill. App. Ct. 1986).*

When engaging those rejection procedures, the buyer must quickly decide if the gravity of the breach is so extreme as to justify canceling the remainder of the future installments. *Midwest Mobile Diagnostic Imaging, L.L.C. v. Dynamics Corp. of Am., 965 F. Supp. 1003, 1006, 1016 (W.D. Mich. 1997); Traynor, 342 F. Supp. at 460; Design Plus, 508 S.E.2d at 830; Bodine, 493 N.E.2d at 711-14.* If so, the UCC requires the aggrieved buyer to cancel the remainder of the installment contract as a matter of law in order to recover under *§ 2-612(3)*. Not only must the aggrieved buyer provide "overt" and "seasonable" notice of cancellation to the seller, but he must also refrain from any future conduct that would "reinstate" the contract. *Fla. Stat. § 672.612(3)* & cmt. 6. If the buyer accepts additional defective installments or fails to cancel in a proper manner, that buyer is barred from claiming any relief under *§ 672.612(3)*.

Where a buyer has already accepted installments and subsequently discovers not only that those installments were nonconforming but also that they substantially impaired the value of his whole contract, the law is less clear if that buyer may recover for **[*55]** the entire contract under *UCC § 2-612(3)*. Such a buyer would be prohibited from following the traditional means under the statute of rejecting or canceling those installments because the time for doing so would have passed. *Fla. Stat. § 672.607(2)* ("Acceptance of goods by the buyer precludes rejection of the goods accepted."); *Quaker Alloy Casting Co. v. Gulfco Indus., Inc., 686 F. Supp. 1319, 1349 (N.D. Ill. 1988)* (noting that under *UCC § 2-612(3)* a nonconformity that "substantially impairs the value of the entire contract justifies *cancellation of future*

deliveries*") (emphasis added). The buyer could try to revoke his acceptance of the installments on an individual basis pursuant to *Fla. Stat. § 672.608*. But because *Fla. Stat. § 672.612* makes no mention of revocation (as it specifically does with rejection and cancellation), that begs the question whether the buyer's revocation of past installments would trigger any rights vis-à-vis the entire contract, including the remaining installments.

To answer this question, I look to other provisions of the UCC for guidance. *See Tipton v. Woodbury, 616 F.2d 170, 177 (11th Cir. 1980)* ("The Uniform Commercial Code is an integrated comprehensive treatment of a single body of law, and the text of each section should be read in light of the purpose and policy of the Code as a whole. The Code must be considered as a whole, and each section should be read in conjunction with **[*56]** others in order to ascertain the intent of the legislature."); *Arnold Matheny & Eagan, P.A. v. First Am. Holdings, Inc., 982 So. 2d 628, 633-35 (Fla. 2008)* (analyzing the use of certain UCC terms in other statutory provisions for indications as to their meaning). Looking beyond *Fla. Stat. § 672.612* to other provisions of the UCC, I note that *Fla. Stat. § 672.711* provides that where a "buyer rightfully rejects or justifiably revokes acceptance then with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract (*s. 672.612*), the buyer may cancel [the remainder of the contract]." Reading these two statutory provisions together, I conclude that a buyer must invoke the doctrine of revocation to recover for an entire contract on the basis of a substantial breach found within goods that he has already accepted. Of course, any such buyer would still have to satisfy the additional statutory requirement of canceling the remainder of the contract in order to receive any right to relief for the whole contract. *Fla. Stat. § 672.612(3)* & cmt. 6.

The limited case law on revocation and breach of the whole contract indicates that this scenario is rare. Upon surveying cases from across the country, the Court has only located one unpublished decision where an aggrieved buyer could revoke its acceptance of all **[*57]** of the goods it had received under an installment contract pursuant to *UCC § 2-612(3)*. *See Automated Controls, Inc. v. Mic Enter., Inc., 1978 U.S. Dist. LEXIS 16260, 1978 WL 23448, at *7, 9-12 (D. Neb. July 31, 1978)* (holding that buyer successfully established right to revoke in conjunction with *UCC § 2-612(3)* where the circumstances presented it with "no choice" but to accept seller's faulty goods in part because it was "impossible" for buyer to test goods on its own and

acceptance was explicitly "premised on reasonable cure [by the seller]"). Other buyers have been less successful when declining to reject goods and then trying to subsequently revoke all previously accepted installments. *See United States Use of Whitaker's, Inc. v. C.B.C. Enters., 820 F. Supp. 242, 246-48 (E.D. Va. 1993)* (holding that aggrieved buyer could *not* revoke its acceptance of faulty goods and recover under *UCC § 2-612(3)* because it knew or should have known that the defects "were of such a nature that they could not be 'seasonably cured'").

Considering this framework of *UCC § 2-612(3)* as set forth above, an aggrieved buyer such as Bariven could certainly seek relief if Exim breached the entire Milk Agreement. Under the traditional scenario, Bariven would have inspected and tested the goods upon arrival, learned of the melamine contamination and determined that it was so pervasive as to establish a breach of the entire agreement, rejected those goods right after discovering the [*58] nonconformity, refused to accept any more milk, and immediately cancelled the remainder of the contract. When Bariven contacted Exim, it could have provided an "overt" communication by informing Exim that its goods were unfit for human consumption and that it would refuse to pay for any more milk.

Given that the melamine alert occurred in mid-September 2008 after Bariven had already accepted several shipments of Exim's product, Bariven would have been required to follow the less traditional scenario under *UCC § 2-612(3)* and revoke its acceptance of the installments it had already accepted. Although case law provides few examples as guidance, it is conceivable that Bariven still could have recovered under *UCC § 2-612(3)* by promptly testing all of the milk that had already arrived in Venezuela, informing Exim that its goods were unfit for human consumption immediately after receiving those tests and revoking its acceptance of those shipments based on the test results, demanding reimbursement for the payments it had already made, refusing to accept any more shipments, and canceling all future installments that had yet to leave China.

Bariven could have accomplished all of these things in the first few months following [*59] the melamine alert. Even under the most forgiving scenario, Bariven should have started testing *all* of Exim's milk that it had in its possession, shipments 1-16, by late January 2009 as it actually did with shipments 7 and 8. If Bariven needed to conduct two rounds of testing on all of that milk (also

as it did for shipments 7 and 8), it could have had complete evidence of widespread contamination in hand by mid-March. Bariven could have refused to accept Exim's incoming shipments arriving during that same time, shipments 17-22, and promptly inspected and tested those shipments, so that it would also have those test results by mid-March. Using all of the evidence showing contamination as a basis, Bariven could have then revoked its acceptance of shipments 1-16, rejected shipments 17-22, and cancelled the remainder of the contract. There is no reason why Bariven could not have completed each of these actions at the very latest by the first week of April 2009.

These hypothetical scenarios do not reflect what actually occurred in this case. Not only did Bariven deviate from the traditional methods of buyers invoking relief under *UCC § 2-612(3)*, but Bariven failed to act in a timely manner in discovering [*60] the total gravity of Exim's breach and now ignores all temporal responsibilities of aggrieved parties under this UCC provision. Despite this, Bariven urges the Court to distort the rubric of the UCC and grant it a windfall recovery on the basis of retrospective proof. I decline to grant this recovery. Because my determinations concerning *Fla. Stat. § 672.612(3)* relate to several other legal conclusions below, I will go into more detail to explain the exact reasoning for my decision on this point.

My inquiry is two-fold: First, has Bariven established that Exim's tainted milk shipments "substantially impaired" the value of the entire Milk Agreement? Second, did Bariven establish rights to affirmative relief under *Fla. Stat. § 672.612(3)*? I discuss each question in turn.

### a. "Substantial Impairment" of the Milk Agreement

Again, Bariven cites very little case law to support its position that Exim's milk substantially impaired the value of the entire Milk Agreement.[43] As discussed above, there is no Florida case law on the topic. A pre-*Bonner*

---

[43] Two of the cases Bariven cites are Florida cases that interpret the term "substantial impairment" but only as it is used in *Fla. Stat. § 672.608(1)*, which sets forth the standards for revocation outside of the context where a party argues breach of an *entire installment agreement. See Winterbotham v. Computer Corps., Inc., 490 So. 2d 1282, 1282-83 (Fla. Dist. Ct. App. 1986)*; *Barrington Homes of Fla. v. Kelley, 320 So. 2d 841, 842-43 (Fla. Dist. Ct. App. 1975)*.

case from the Fifth Circuit interprets the Alabama UCC provision containing the same text as *Fla. Stat. § 672.612(3)*. See *Kirkwood Agri-rade v. Frosty Land Foods Int'l, Inc., 650 F.2d 602, 604-05 (5th Cir. 1981)* (determining that seller's failure to provide a single installment of a year-long installment contract **[*61]** was not a breach of the whole contract but seller's later confession that it would produce no goods at all was a breach of the entire contract). In addition, a recent Eleventh Circuit case also interprets Georgia's version of *§ 672.612(3)*. See *Advanced Bodycare Solutions, LLC v. Thione Int'l, Inc., 615 F.3d 1352, 1360-61 (11th Cir. 2010)* (holding that a reasonable jury could find that one order of impaired goods worth 0.458 percent of the total contract value did not breach the contract as a whole).

A review of case law from other jurisdictions provides more analysis of this UCC provision. Courts from across the country uniformly agree that whether a party to an installment contract has substantially impaired the value of that entire agreement presents a question of fact. *E.g., Bill's Coal Co., Inc. v. Bd. of Pub. Util. of Springfield, Mo., 887 F.2d 242, 247 (10th Cir. 1989)*; *Emanuel Law Outlines, Inc. v. Multi-State Legal Studies, Inc., 899 F. Supp. 1081, 1087 (S.D.N.Y. 1995)*; *Cranesville Block Co. v. Goodyear Tire & Rubber Co., 208 A.D.2d 1157, 1159, 617 N.Y.S.2d 951 (N.Y. App. Div. 1994)*; *Cargill, Inc. v. Storms Agri Enters., 46 Ark. App. 237, 878 S.W.2d 786, 789 (Ark. Ct. App. 1994)*. The purpose of the "substantial impairment" requirement is to preclude a party from canceling an ongoing installment contract for "trivial defects." *Emanuel, 899 F. Supp. at 1088*.

Courts focus on different tests before ultimately deciding if a party has breached a whole installment contract. One useful inquiry is whether "material inconvenience or injustice" has resulted from the breach. *Cargill, 878 S.W.2d at 789*. Likewise, the "common law concept of 'material breach' is at least a first cousin to the concept of 'substantial nonconformity,' **[*62]** and it offers a fruitful analogy to one who seeks to determine whether seller's performance substantially fails to conform." JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 8-3 at 547-48 (5th ed. 2006). Courts also devote particular attention to the aggrieved buyer's needs in relation to the relevant breach. *Quaker Alloy Casting Co. v. Gulfco Indus., Inc., 686 F. Supp. 1319, 1349 n.56 (N.D. Ill. 1988)*.

Case law from other jurisdictions also provides concrete examples from a variety of contexts where contractual

parties have breached their entire contract through improper performance of individual installments. See *Midwest, 965 F. Supp. at 1016* (concluding that aggrieved buyer could cancel the relevant contract where impairment of one in four installments would have a "substantial negative impact" on buyer); *United States Use of Whitaker's, Inc. v. C.B.C. Enters., 820 F. Supp. 242, 246 (E.D. Va. 1993)* ("Given that the [seller's] first installment of cabinets were clearly nonconforming and could not be cured in the field, [the buyer] was entitled to reject all nineteen (19) units."); *Cont'l Forest Prod., Inc. v. White Lumber Sales, Inc., 256 Ore. 466, 474 P.2d 1, 3-4 (Or. 1970)* (noting that variance of four per cent below the acceptable grade of plywood for first installment did not impair the value of the entire contract where nonconformity could be cured and where second installment was conforming; *Cargill, 878 S.W.2d at 790* ("[I]t cannot be seriously argued that appellee's repudiation of fourteen out of **[*63]** seventeen loads of cottonseed that it allegedly agreed to purchase did not substantially affect the value of the whole contract . . . ."); *Design Plus, 508 S.E.2d at 830* (permitting aggrieved buyer to cancel contract where first installments, which were tables, "were impossible to assemble," "not usable," and were delivered late); *Graulich Caterer Inc. v. Hans Holterbosch, Inc., 101 N.J. Super. 61, 243 A.2d 253, 262 (N.J. Super. Ct. App. Div. 1968)* (holding that buyer who received first two installments of unsatisfactory food, including dry meat and "gooey" gravy, was justified in canceling entire contract).

## 1. Exim's Motion in Limine

Before applying these legal standards to the facts of this case to see if Exim's milk shipments 1-16 substantially impaired the value of the entire Milk Agreement, I must first determine which evidence I may rely on to arrive at that conclusion. Exim has namely filed a Motion in Limine to exclude the evidence of Bariven's melamine test results from February 2010 on the basis that those results are irrelevant to the Court's analysis. [ECF No. 150, pp. 2-3].[44] If Bariven claims that it revoked,

---

[44] Exim's motion specifically argues that the evidence is irrelevant to the inquiry whether Bariven properly revoked its acceptance of shipments 1-16 under *Fla. Stat. § 672.608*. Although I address the merits of the motion in the context of discussing *Fla. Stat. § 672.612(3)*, my reasoning and conclusion apply equally in the context of both *§ 672.608* and *§ 672.612(3)*.

rejected, or cancelled all of Exim's milk shipments by July 6, 2009 (when it filed its counterclaims), then it must follow that Bariven could not have relied on the February 2010 tests as its basis for those actions [*64] because the test results did not yet exist at that time. Thus, Exim asserts that Bariven's attempt to develop a good faith basis for those actions after the fact must fail. [*Id.* at 3]. Exim also insists that, by considering the February 2010 tests, the Court would waste valuable judicial resources and create needless confusion. [*Id.*].

Although I agree with Exim that Bariven must have had a legitimate basis (*i.e.*, test results showing melamine) to revoke, reject, or cancel any of Exim's milk at the time that Bariven claimed that it did in fact take that action, I must deny Exim's motion for several reasons. First, Exim's objection really goes to the issue of notice rather than to the issue of substantial impairment. Because the contamination revealed by Bariven's test results, including those results obtained in February 2010, relates to how nonconforming Exim's milk was, I will consider all of that evidence strictly as it relates to the issue of substantial impairment. I will then later consider and properly weigh the timing of that same evidence as it relates to Bariven's notice requirements under the doctrines of revocation, rejection, and cancellation.

Second, even if I did not consider the [*65] February 2010 test results under *§ 672.612(3)*, I would do so when analyzing Bariven's other claims for breach of warranty, implied covenant of good faith and fair dealing, and FDUTPA. Third, the Parties conducted a bench trial, so any concerns of confusing the fact finder are greatly diminished. Fourth, Exim filed this motion on the eve of trial,[45] providing Bariven little time to prepare a response. Fifth, Exim's agents were permitted to observe the melamine tests performed in February 2010—a factor that adds to the reliability of those test results. [Trial Tr. Mar. 14, 2011, at 31:1-2, 102:10-18]. For all of these reasons, Exim's Motion in Limine is denied.

## 2. Bariven's Melamine Tests

Relying on my factual findings about all of Bariven's melamine tests set forth above, Bariven has established by a preponderance of the evidence that most of Exim's milk from shipments 1-16 was contaminated. Not only was that contamination spread across fifteen separate

shipments, but it was also pervasive throughout each of those installments. Despite the doubts raised by Professor Bradley, the Parties have presented no evidence that Bariven could have somehow salvaged the untainted portions of the milk powder from [*66] those installments where the melamine had not yet migrated. As such, it is undisputed that most of the milk from shipments 1-16 was useless to Bariven.

Bariven urges the Court to find that Exim breached the entire milk agreement under *§ 672.612(3)* because the fifteen tested shipments made up, in terms of tonnage, 35 percent of the total amount of milk to be supplied under the Parties' agreement. [ECF No. 172, p. 32].[46] Considering the legal standards set forth above, the contamination found in Exim's milk was certainly not a "trivial defect." *Emanuel, 899 F. Supp. at 1088*. Had Bariven distributed that milk to the Venezuelan population, it would have totally frustrated Bariven's needs, *Quaker, 686 F. Supp. at 1349 n.56*, because it was completely unusable. *Design Plus, 508 S.E.2d at 830*. Thus, I conclude that those tests establish that shipments 2-16 "substantially impaired" the value of the entire Milk Agreement pursuant to *Fla. Stat. § 672.612(3)*.

## b. Bariven's Right to Affirmative Relief Under *Fla. Stat. § 672.612(3)*

Although the evidence in the record establishes that Exim breached the entire Milk Agreement, that breach, in and of itself, does not entitle Bariven to any particular rights vis-à-vis the whole contract without satisfying the additional express requirements of *Fla. Stat. § 672.612(3)*. Bariven asserts that the provision does "not include an [*67] explicit notification requirement," [ECF No. 172, p. 53-54], but this analysis is incorrect. As previously mentioned, the plain text of *Fla. Stat. § 672.612(3)* provides that "the aggrieved party reinstates the contract if she or he accepts a nonconforming installment *without seasonably notifying of cancellation* or if she or he brings an action with respect only to past installments or demands performance as to future installments." (emphasis added). The comments to the provision dispel any doubt about this requirement by providing that "[s]ubsection (3) is designed to further the

---

[45] Exim filed the motion on Friday, March 11, 2011, and trial began Monday, March 14, 2011.

[46] Including the milk from shipment 1 raises the total tonnage up 1 percentage (*i.e.*, the contaminated shipments would constitute 36 percent of the total contract volume). [ECF No. 172, p. 51].

continuance of the contract *in the absence of an overt cancellation.*" *Id.* cmt. 6 (emphasis added).

Case law from around the country uniformly confirms that these statutory requirements always play a critical role in a buyer's right to recover under *UCC § 2-612(3).* That case law provides that in order to properly effect cancellation, Bariven had to do two things: It had to send Exim notice of cancellation that was both explicit as well as timely, and it had to refrain from conduct that would reinstate the contract.

In particular, courts require aggrieved buyers to *directly communicate* their cancellation to sellers. *E.g., Quaker, 686 F. Supp. at 1349* (concluding that aggrieved [*68] buyer's letter to seller, which "expressly rejected further deliveries," was "sufficient to satisfy *UCC § 2-612(3)*"); *Automated Controls, Inc. v. Mic Enter., Inc., 1978 U.S. Dist. LEXIS 16260, 1978 WL 23448, at *6 (D. Neb. July 31, 1978)* (noting that when aggrieved buyer cancelled the remainder of its order, it "refused to make any more payments"); *Design Plus, 508 S.E.2d at 827, 830* (permitting aggrieved buyer to recover under *§ 612(3)* where buyer promptly notified seller of significant nonconformities and, after seller made no offer to cure defects, buyer specifically refused to pay for goods 11 days later and "immediately cancel[led] the whole contract").

Where an aggrieved buyer has failed to clearly communicate its cancellation notice to the seller, courts will view the contract as reinstated. *E.g., Holiday Mfg. Co. v. B.A.S.F. Sys., Inc., 380 F. Supp. 1096, 1102 (D. Neb. 1974)* (holding that aggrieved buyer was not justified in canceling an entire installment contract where that party "evidenced no protest or even serious displeasure concerning [the seller's breach]"); *Bodine Sewer, Inc. v. E. Ill. Precast, Inc., 143 Ill. App. 3d 920, 493 N.E.2d 705, 713, 97 Ill. Dec. 898 (Ill. App. Ct. 1986)* ("Where, as here, defective deliveries pursuant to an installment contract are consistently corrected, and the purchaser, during the time for the contract's performance, voices no concerns to the seller with respect to delays occasioned by the defective deliveries, the nonconforming deliveries do not substantially impair the value of the entire contract.").[47]

Case law further confirms that aggrieved buyers are held to high standards in providing breaching sellers with *prompt and timely* notice of cancellation. *E.g., Plastic Moldings Corp. v. Park Sherman Co., 606 F.2d 117, 119-20 & n.6 (6th Cir. 1979)* (citing *§ 612(3)* and noting that aggrieved buyer "preserved all of its remedies under the Code" where it had "immediately notified" the breaching seller of problems with the relevant goods and "refused to take any more deliveries" so that the seller was "at all times on notice that its performance was unsatisfactory"); *Cities Service Helex, Inc. v. United States, 543 F.2d 1306, 1317 n.30, 211 Ct. Cl. 222 (Ct. Cl. 1976)* (same); *Midwest, 965 F. Supp. at 1009, 1016* (permitting aggrieved buyer to recover under *§ 2-612(3)* where buyer acted in "good faith" and advised breaching seller in writing within five days of discovering nonconformity that contract was cancelled); *USX Corp. v. Union Pac. Res. Co., 753 S.W.2d 845, 847-48 (Tex. App. 1988)* (determining that aggrieved buyer could recover for breach of entire installment contract where buyer repeatedly warned seller shortly after breach that contract would be cancelled and then sent written confirmation of cancellation); *AD Specialties Unlimited v. Tate Mfg. Co.*, Case No. 72-734, 1975 WL 169910, at *2 (R.I. Super. Ct. 1975) (determining that aggrieved buyer's contentions about defective goods "los[t] credibility" where last shipment).[48]

Likewise, courts will not hesitate to reinstate a breached

---

aggrieved seller to succeed under *§ 612(3)* where it was "clear in this case that the seller intended, as the buyer well knew, to bring this contract to an end because of the buyer's breach"); *Flood v. M.P. Clark, Inc., 319 F. Supp. 1043, 1045-46 (E.D. Pa. 1970)* (holding that there was "no evidence as to any act . . . [that] would give rise to the right of cancellation" by an aggrieved seller where the seller went so far as to inform the buyer that it would make "no further deliveries" until the buyer made payment); *Gulf Chem. & Metallurgical Corp. v. Sylvan Chem. Corp., 122 N.J. Super. 499, 300 A.2d 878, 881 (N.J. Super. Ct. 1973)* ("[T]here was never an overt cancellation of the entire contract by the seller. Therefore [the seller] is liable to [the buyer] for nondelivery of [the relevant contract goods].").

[48] Again, aggrieved sellers who try to cancel the remainder of an installment contract under *§ 2-612(3)* are held to the same timeliness standards as aggrieved buyers. *E.g., Magic Valley Foods, Inc. v. Sun Valley Potatoes, Inc., 134 Idaho 785, 10 P.3d 734, 738 (Idaho 2000)* ("Sun Valley then timely notified Magic Valley of its intent to cancel by informing Magic Valley's representative that it would not make any more deliveries absent payment.").

---

[47] By way of comparison, aggrieved sellers who try to cancel the remainder of an installment contract under *§ 612(3)* are held to the same notification standards as aggrieved buyers. *E.g.,* [*69] *Cherwell-Ralli, Inc. v. Rytman Grain Co., Inc., 180 Conn. 714, 433 A.2d 984, 987 (Conn. 1980)* (permitting

installment contract if the aggrieved buyer fails to treat the contract as breached. **[*70]** *E.g.*, *Mextel, Inc. v. Air-Shields, Inc., Case No. 01-cv-7308, 2005 U.S. Dist. LEXIS 1281, 2005 WL 226112, at *25 (E.D. Pa. Jan. 31, 2005)* ("[The non-breaching buyer's] argument fails as a matter of law. Regardless of whether the earlier deliveries of controllers were non-conforming and regardless of whether they impaired the value of the Agreement as a whole, thereby giving [the buyer] the right to treat the earlier nonconforming deliveries as complete breach, [the buyer's] post-delivery conduct consistently reinstated the terms of the Agreement . . . ."); *Merwin v. Ziebarth, 252 N.W.2d 193, 199 (N.D. 1977)* (same); *Traynor v. Walters, 342 F. Supp. 455, 461 (M.D. Pa. 1972)* ("Assuming, without deciding, that the nonconforming parts of the first two deliveries impaired the value of the whole contract and gave the buyer the right to treat the earlier non-conforming deliveries as a breach of the whole contract, the buyer reinstated the contract . . . by demanding delivery in future installments of yet undelivered [goods].").[49]

Applying this case law to the facts before me, it is quite apparent that Bariven did not effectively cancel the remainder of the Milk Agreement based on Exim's material breach. The record is void of any explicit cancellation notice at least until Bariven filed its counterclaims on July 6, 2009.[50] Bariven appears to

---

[49] Once more, aggrieved sellers are vulnerable to the same risks as aggrieved buyers. *Valley Timber Sales, Inc. v. Midway Forest Prod., Inc., 563 So. 2d 612, 614 (Ala. Civ. App. 1990)* ("Under *[§ 612(3)]*, when [the aggrieved seller and the breaching buyer] continued to perform (even after the payment default by [the buyer]), the entire contract was 'reinstated' and continued as modified. Obviously, [the aggrieved seller] did not consider the payment default as a 'substantial impairment' of the value of the whole contract, and we find that [the seller's] conduct supports this conclusion.").

[50] In contrast, I find below that the email that Bariven sent to Exim on April 2, 2009, provided sufficient notice for Bariven to revoke its acceptance of shipments 7 and 8. My conclusion here is entirely consistent with that determination. The content requirements for notice in the revocation and breach-of-warranty context are less demanding than they are in the cancellation context. In particular, notice for revocation and warranty claims must merely "open the way for settlement" and bring to the seller's attention that the buyer considers him to be in breach. See *E. Air Lines, Inc. v. McDonnell Douglas Corp., 532 F.2d 957, 972 (5th Cir. 1976)*. Otherwise, there is no set formula for notice in those contexts (*i.e.*, the communication need not even use the word "breach" or

assert that it provided Exim with such notice during the January 21 **[*71]** meeting. [ECF No. 179, p. 12]. But Bariven did not even have proof of the melamine contamination at that time, and there is no evidence of anything close to an "overt" notice of cancellation during the meeting. This failure to provide prompt and adequate cancelation is, in and of itself, sufficient to determine that Bariven reinstated the Milk Agreement as a matter of law. *Holford USA Ltd. v. Cherokee, Inc., 864 F. Supp. 364, 372 (S.D.N.Y. 1994)*; *see also* Elizabeth Patterson, *UCC Section 2-612(3): Breach of an Installment Contract and a Hobson's Choice for the Aggrieved Party, 48 Ohio St. L.J. 177, 189 n.61 (1987)* ("The reinstatement provision [in *UCC § 2-612(3)*] governs situations where an aggrieved party has failed to make an overt cancellation.").

The undisputed record is replete with conduct by Bariven representatives that indicate that they did not stop viewing the contract as ongoing long after Exim's tainted milk arrived in Venezuela. Among other things, Bariven paid for shipment 17 as late as December 11, 2008; it asked Exim to continue sending shipments on December 17, 2008; it extended the letter of credit on January 27, 2009 (after the January 21 meeting); its President declared that Exim's milk was clean as late as March 2009; and its officials explicitly stated on the record that the Milk Agreement was **[*72]** not cancelled after litigation already started. [JTX 194, 82, 189, 122, 154; Camacho Dep., p. 44:1-25; Gravina Dep., p. 97:1-25; Pulido Dep., pp. 23:25-28:25]. All of this conduct supports Exim's theory that Bariven intended to reinstate the contract despite Exim's breach.[51]

---

include an "assertion of legal rights"). *T.J. Stevenson & Co., Inc. v. 81,193 Bags of Flour, 629 F.2d 338, 359 (5th Cir. 1980)*. Simply put, revocation and warranty notice provides breaching sellers with a clear "first warning" of breach. Quite the opposite, notice of cancellation puts a definitive end to the entire remainder of the parties' contractual relations. Thus, it is only logical that the cancellation standards are more demanding and must be "overt." *Fla. Stat. § 672.612(3)* & cmt. 6 In any event, I find that the April 2 email satisfies the lower requirements for notice in the revocation and breach-of-warranty context, but it does not satisfy the more demanding standards for cancellation set forth above.

[51] As discussed below, I find that Exim's decision to file this action on April 7, 2009, ultimately terminated the Milk Agreement. To be clear, I find that the subsequent comments made by Bariven officials (that they had never cancelled the contract) *could have* reinstated the contract, but they did not do so because Exim filed this action.

Bariven defends its conduct as covered by comment 7 to *Fla. Stat. § 672.612*, which provides that a "reasonable time for notifying of cancellation . . . extends of course to include the time covered by any reasonable negotiations in good faith." I find this argument unpersuasive. Bariven's discussions and meetings with Exim before April 2009 could hardly have constituted "negotiations" concerning the melamine found in Exim's milk because Bariven never had any proof of that contamination until late March 2009. Bariven's conduct before that time indicates that it had no intention to cancel the agreement. One court's analysis of a similar factual scenario under *UCC § 2-612(3)* is particularly on point:

> Defendant points to twenty-one occasions where plaintiff was late delivering the nitrogen. Yet, defendant continued to accept delivery, without "seasonably" notifying plaintiff of its decision to cancel the contract. In fact, it was not until well **[*73]** after the twenty-one allegedly late deliveries that defendant told plaintiff of its intention to cancel the contract. Even after notifying plaintiff of the problems, and meeting with plaintiff in July 1998, defendant continued to accept nitrogen from plaintiff. In other words, even if plaintiff's late deliveries were deemed to substantially impair the contract, by continuing to accept the deliveries, defendant reinstated the contract. Its argument that plaintiff's repeated late deliveries permitted cancellation is therefore without merit.

> *BOC Grp., Inc. v. Chevron Chem. Co., LLC, 359 N.J. Super. 135, 819 A.2d 431, 440 (Super. Ct. N.J. App. Div. 2003).*

Like that court, I find Bariven's arguments about cancellation without merit and therefore Bariven may not assert any affirmative rights due to Exim's breach of the whole Milk Agreement.

Even if Bariven had followed the correct procedures to cancel the Milk Agreement and avoid reinstating it, Bariven still would be unable to recover for the whole contract because it has failed to invoke the doctrines of rejection or revocation in conjunction with its arguments under *UCC § 2-612(3)*. As established by the case law surveyed above, litigants may not rely on this UCC provision in isolation. Aggrieved buyers traditionally do so by rejecting initially nonconforming installments **[*74]** and by canceling the remaining installments; in rare instances they may revoke acceptance of defective installments and then cancel the rest of the agreement. Simply put, no definitive rights are vested for an

aggrieved party under *UCC § 2-612(3)* merely upon proving that the other contractual party has breached the entire agreement.

Despite this legal framework, Bariven insists that its arguments concerning rejection and revocation have nothing to do with its arguments under *UCC § 2-612(3)*. Even as recently as in its post-trial submissions, Bariven refers to rejection and revocation as "alternative" arguments to its principal position based on Exim's breach of the whole Milk Agreement:

> [If] the Court finds for Bariven on the basis of substantial impairment [under *Fla. Stat. § 672.612(3)*], it need not address other theories of recovery, including whether Bariven rightfully revoked or rejected acceptance of the contaminated milk installments. However, were the Court to address Bariven's alternative arguments, it would find that Bariven revoked its acceptance of Shipments 1-16 and rejected Shipments 17-22.
> [ECF No. 172, pp. 56-57].

In keeping with this view of the law, Bariven only invokes the doctrines of rejection and revocation as to individual **[*75]** installments, and not as to the entire Milk Agreement.

Finally, I note that even if Bariven had effectively cancelled the Milk Agreement (which it did not) and even if Bariven had tried to engage the procedures of rejection and revocation in asserting its rights under *Fla. Stat. § 672.612(3)* (which it did not), Bariven still would be unable to claim relief for breach of the whole agreement. In particular, Bariven bases all of its claims concerning breach of the whole contract on its *collective evidence* of contamination from shipments 2-16, which made up 35 percent of the milk contracted for between the parties. But Bariven only obtained proof of the vast majority of this evidence as of March and April 2010 when it received its final batch of melamine test results. As such (and as discussed in more detail in my revocation analysis below), any revocation based on *that entire volume of evidence* would have been untimely and ineffective. No case law exists that would permit a buyer like Bariven such a windfall recovery based on such retrospective proof of breach.

Similarly, Bariven's only claims of rejection under the Milk Agreement relate to shipments 17-22, but Bariven has offered no proof that any of those shipments **[*76]**

was contaminated.[52] More importantly, Bariven was very clear in its letters to Exim that melamine contamination had nothing to do with Bariven's attempted rejection of those shipments. Instead, the January 2009 communications provided that "the product is rejected *as it was not inspected by PSI supervision.*" [JTX 114 (emphasis added); *see also* JTX 99]. This is unsurprising given that Bariven's rejection communications came in January 2009, long before Bariven received definitive proof of melamine contamination. *See* Fla. Stat. § 672.605 (requiring a buyer to state "a particular defect" in connection with a rejection).

For all of these reasons, I find that Bariven may not seek relief on the basis of Exim's breach of the entire Milk Agreement under *Fla. Stat. § 672.612(3)*. My conclusion here does not address Bariven's "alternative" arguments concerning rejection and revocation specifically on an individual installment basis. Before turning to those arguments, I note that both Parties have divided all of their other claims and counts about the individual milk shipments into three groups, which each trigger different legal arguments: shipments 1-16, shipments 17-22, and shipments 23 onward. In accordance with the Parties' decision **[*77]** to deal with these groups of shipments separately, I do the same.

## ii. Milk Shipments 1-16

Only Bariven has brought action with respect to Exim's milk shipments 1-16. Bariven's four claims concerning these installments are for (1) breach of contract, (2) breach of implied warranty of merchantability, (3) breach of implied covenant of good faith and fair dealing, and (4) FDUTPA. Because the Parties have devoted most of their attention to the breach-of-contract claim, I begin with that claim.[53]

### a. Bariven's Claim for Breach of Contract

Before determining which installments to analyze under the doctrine of revocation, I must first decide which installments Bariven "accepted" under the Florida UCC. The relevant statutory provision provides that a buyer accepts goods when he or she does the following:

> (a) After a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that the buyer will take or retain them in spite of their nonconformity; or
>
> (b) Fails to make an effective rejection (s. 672.602(1)), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or
>
> (c) Does any act inconsistent with the seller's ownership; **[*78]** but if such act is wrongful as against the seller it is an acceptance only if ratified by her or him.

Fla. Stat. § 672.606(1).

The evidence presented by the Parties demonstrates that Bariven accepted shipments 1-16 under this test. Bariven had a reasonable opportunity to inspect the milk—both pursuant to its contractual pre-shipment supervision right and also after its arrival in Venezuela. In addition, Bariven signified to Exim that the goods were conforming because Bariven paid for milk shipments 1-16, and it issued forms for each order in which it used the words "received, reviewed, confirmed and *accepted.*" [Alvarez Dep., p. 15:14-15 (emphasis added)]. Thus, I conclude that Bariven accepted shipments 1-16, and I must examine Bariven's rights vis-à-vis these installments in the context of a revocation analysis.[54]

To meet the test for revocation under *Fla. Stat. § 672.608*, Bariven must prove (1) a nonconformity

---

[52] Neither of Bariven's rejection letters from January 2009 specifically state that they apply to shipments 17-22. [JTX 99, 114]. Instead, they purport to reject "any recent sending of [milk]." [JTX 114]. Because the last of Exim's shipments before 17-22 departed China several months earlier on September 10, 2008, those shipments were not "recent" and were not covered by Bariven's communications in January. [JTX 194]. Bariven confirms the same by addressing its arguments on rejection in its post-trial briefs to shipments 17-22. [ECF No. 172, pp. 60-64].

[53] At some point between summary judgment and closing arguments at trial, Bariven switched gears and began relying on its breach-of-warranty claim as its primary right to relief for

shipments 1-16. [Trial Tr. Mar. 31, 2011, at 60:8-18]. Bariven probably flipped its tactical priorities because the notice requirements—which play a central role in this dispute—are more slightly more forgiving in the breach-of-warranty context. As discussed further below, those differences in notice requirements do not alter the outcome of this case. Thus, I focus first on the Parties' arguments concerning Bariven's claim for breach of contract and then turn to its claim for breach of warranty.

[54] Bariven concedes that it accepted shipments 1-16, and I previously arrived at the same conclusion in the Summary Judgment Order. [ECF No. 136, p. 16].

substantially impaired the value of the milk; (2) it was induced to accept the goods because it would have been difficult to discover the nonconformity before acceptance or because of assurances from the seller; and (3) revocation occurred within a reasonable time after the buyer discovered or should have discovered the **[*79]** nonconformity and before any substantial change in the condition of the goods. I discuss each sub-part of this test separately.[55]

### 1. Substantial Nonconformity

I find that Bariven meets the first prong of this inquiry for milk shipments 2-16 on the basis of the melamine found in those shipments.[56] Referring to my factual finding that shipment 1 was probably also contaminated, I also find that Bariven satisfies this prong of the test for that

―――――――――――――――――――――

[55] It is well established that this area of the law is quite complex. *See* JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 8-4 at 564 (5th ed. 2006) ("The road to revocation for the lawyer in advising a revoking buyer may not be easy. . . . A search for that rare form of certainty which soothes the student's anxiety and warms the heart of the corporate lawyer is fruitless here. We can do little more than footnote some of the relevant cases and advise the lawyer dealing with 2-608 to charge a handsome fee.").

[56] Bariven also initially argued that Exim breached as to shipments 1-16 by denying it the opportunity to supervise product inspections. But, as Bariven has conceded in its post-trial briefs, this argument fails for installments 1-16 on the basis that Bariven waived its right to inspect those shipments. [ECF No. 174, p. 16]. Because the details of this waiver will be relevant to my later analysis of shipments 17-22, I briefly explain why Bariven's conduct triggered the waiver doctrine. The Eleventh Circuit has interpreted waiver under Florida's UCC as requiring (1) the existence at the time of the waiver of a right, privilege, advantage, or benefit which may be waived; (2) the actual constructive knowledge thereof; and (3) an intention to relinquish such right, privilege, advantage, or benefit. *See BMC Indus., Inc. v. Barth Indus., Inc., 160 F.3d 1322, 1332-33 (11th Cir. 1998)*. Here, it is undisputed that Bariven had the right to pre-shipment inspection supervisions, and it knew of that right. Yet neither Bariven, nor PSI, nor SGS-NA responded to Exim's pre-shipment emails to contact Exim personnel in China regarding inspections. This repeated conduct for each of the first sixteen installments under the contract demonstrated an intention to relinquish that right. *See Fla. Stat. § 672.208(1); BMC Indus., 160 F.3d at 1333*. Internal email correspondence between Bariven officials also acknowledge that the company knew that "the first shipments for this same order have *already been accepted without PSI inspection.*" [JTX 115 (emphasis added)].

installment. Exim indirectly concedes that Bariven meets the "substantial impairment" inquiry within the revocation analysis; in its first post-trial brief, Exim devotes no attention to this inquiry and instead "concentrates on the second and third prongs." [ECF No. 174, p. 26].

Florida case law supports my conclusion. *E.g., Winterbotham, 490 So. 2d at 1283* (holding that farm owners who bought computer to automate their records were entitled to revoke their acceptance of that computer because computer software, which formed necessary component of business solution, was defective thus substantially impairing value of the goods); *Barrington Homes, 320 So. 2d at 843* (holding that if the "essential purpose to be **[*80]** served by the buyer's purchase of goods in the first place" is "substantially frustrated or interfered with by 'non-conformities,'" then the value of the goods has been "substantially impaired" so as to permit revocation under *§ 672.608*). Based on my factual determination that most of Exim's milk from installments 1-16 was contaminated, I have little hesitation deciding that that milk substantially frustrated the essential purpose of shipments 1-16 from Bariven's perspective under the standards of *Winterbotham* and *Barrington*.

### 2. Difficulty of Discovery & Exim's Assurances

Bariven makes the following arguments about the second prong of the revocation analysis: (1) Bariven was induced to accept the milk from shipments 1-16 because it would have been difficult to discover the nonconformity before acceptance; and (2) Bariven was induced to accept that milk because of assurances from Exim. [ECF No. 172, pp. 9-12, 57].

As to shipments 1-5, I agree with Bariven that its acceptance was reasonably induced by the difficulty of discovering melamine because Bariven had no reason to suspect melamine would be found in Exim's milk before the Chinese governmental alert in mid-September of 2008. Referring to the **[*81]** chart attached to this Opinion as Appendix B, Bariven accepted all of the first five shipments when they arrived in Venezuela between August 3 and September 12, 2008. Even if Bariven had not waived its pre-shipment inspection rights for shipments 1-16, the evidence in the record indicates that nobody would have tested the milk specifically for melamine in China before those goods left for Venezuela. Thus, I find that Bariven was induced to accept installments 1-5 by difficulty of discovery.

As to Bariven's argument about assurances from Exim,

Bariven cites correspondence from Exim dated September 23 and October 1, 2008, in which Exim officials sent four negative melamine test results and stated that their milk was "fine" because the melamine outbreak was limited to milk produced by other suppliers before their own milk. [*Id.* at 9-12].[57] Having thoroughly reviewed this evidence, I find that Bariven was induced as a matter of law to accept Exim's milk shipments 6-8, which arrived in Venezuela between September 24 and October 2, 2008, as a result of Exim's assurances.

An internal Bariven email sent out the same day changes this analysis going forward. On October 2, PSI official Sulfani Azocar sent an [*82] email to several Bariven and PSI officials, demanding that all of Exim's milk be tested after arrival in Venezuela. [JTX 48]. The Parties have raised certain issues concerning the translation of that email. [Trial Tr. Mar. 14, 2011, at 24:19-25]. It is unnecessary to resolve those questions because deposition testimony from Bariven officials confirms the main point of the email: Bariven insisted on conducting their own tests despite Exim's assurances. Ms. Azocar herself admitted the following during her deposition.

Q. So roughly a week later you sent this e-mail saying we have to test Exim milk just like Absolute milk.
A. That is correct.
. . .
Q. So you were going to go ahead, despite Mr. Salges' e-mail you were going to go ahead and test anyway?

A. Yes, at that time *we had to clarify any possible doubt* because it was quite a sensitive situation and the best that could happen and what we were expecting was that the milk be clean and that it would comply with all of the standards and requirements.
Q. So you were going to sample the Absolute and Exim milk to assure that it is clean and in compliance?

A. Not only take examples but also we needed to review all of the documents and all of the [*83]

certificates that all the suppliers had sent.
[Azocar Dep., pp. 28:13-29:9 (emphasis added)].
Bariven's Procurement Superintendent confirmed the company's decision:

Q. Now, that is a series of e-mails. The first e-mail at the top of the first page is a, an email from Sulfani to you and Jose Orlando Camacho, correct?
A. Yes, that is correct.
Q. And it is dated October the 2nd of 2008, is that correct?
A. Yes, that is correct.
Q. And that is after the September 23rd e-mail that you had received from Mr. Salges, is that correct?
A. Yes.
Q. Now, in this e-mail is Sulfani saying that we have to check the Exim milk like the Absolute Trading milk to make sure that it is free of melamine?
A. Yes.
Q. Is it fair to say that Sulfani and Bariven did not, were not going to rely or did not consider adequate Mr. Salges' comments in his email assuring that the milk was fine?
[Bariven's counsel objecting to the form of the question]
[A] The information or the e-mail sent by Mr. Salges was simply information, but we needed to confirm and assure the quality assurance for this product.
. . .

Q. *So Mr. Salges' communication wasn't adequate assurance as to the quality of the product?*

A. *Yes, that is correct.*

[Parra Dep., [*84] p. 9:18-10:25 (emphasis added)].[58]

This evidence leaves me with the firm impression that Bariven made an institutional decision as of October 2, 2008, to refuse to rely on any further assurances made by Exim and instead to test all of Exim's milk upon arrival. Thus, Bariven's acceptance of all Exim milk shipments starting on October 3, 2008, was not induced by assurances from Exim. The undisputed evidence

---

[57] Bariven points out not only that it relied on these assurances, but also that the assurances were false. For purposes of the revocation analysis, I focus on Bariven's reliance and will address the accuracy of the communications below as part of the analysis for Bariven's claims of breach of implied covenant of good faith and fair dealing as well as under FDUTPA.

---

[58] Upon independently reviewing Mr. Parra's deposition transcript, I do not find a basis to sustain the objection raised by Bariven's counsel. The question posed by Exim's counsel may have caused Mr. Parra to speculate about how other Bariven officials reacted upon receiving Mr. Salges's email. But Mr. Parra's response is still admissible because his testimony reveals that he, in his own capacity as a Bariven employee, did not rely on any assurances made by Mr. Salges.

shows that the next shipments to land in Venezuela began arriving on October 20, several weeks after Bariven committed itself to conducting its own melamine tests. [JTX 194].[59] Thus, in the case of each of shipments 9-16, which arrived in Venezuela between October 20 and November 6, 2008, Bariven was no longer induced to accept Exim's milk for any reason other than its failure to follow its own internal procedures.

As such, I find that Bariven meets the second prong of the revocation analysis for shipments 1-8, but fails that prong for shipments 9-16.

### 3. Notice of Revocation

The Parties have devoted significant attention to the issue of Bariven's notice of revocation. As such, I do the same.

### (A). Differences in Notice Standards Between Revocation and Warranty

I first address a preliminary **[*85]** issue that has been the subject of much debate and confusion between the Parties, and one that will resurface again below in my analysis of Bariven's claim for breach of warranty. The issue: whether a buyer's obligation to provide a seller with notice of breach differs between the revocation context and the breach-of-warranty context. This inquiry breaks down further into two sub-issues: First, do the two notice provisions have different timing requirements? Second, do the two notice provisions have different standards as to substantive content?

The text of the UCC provides our starting point for the first issue. A buyer must revoke acceptance "within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects." _Fla. Stat. § 672.608(2)_. Similarly, a buyer must "within a reasonable time after he or she discovers or should have discovered any breach [of warranty] notify the seller of breach or be barred from any remedy." _Id. § 672.607(3)(a)_.[60] Looking at the plain meaning of these two statutory provisions, they provide closely related standards. Simply put, notice must occur within a reasonable time **[*86]** after the buyer discovered or should have discovered the breach in both cases. The only difference is that a revocation notice—in addition to occurring within a reasonable time—must also take place before the relevant goods deteriorate.[61]

Case law confirms my analysis. _See Royal Typewriter Co. v. Xerographic Supplies Corp., 719 F.2d 1092, 1102, 1106-07 (11th Cir. 1983)_ (holding in case governed by Florida UCC that buyer presented sufficient evidence from which jury could infer that notice for breach-of-warranty action was proper and timely but revocation was not effective because buyer tried to revoke after a substantial change in condition of the relevant goods); _B.P. Dev. & Mgmt. Corp. v. P. Lafer Enter., Inc., 538 So. 2d 1379, 1381 (Fla. Dist. Ct. App. 1989)_ ("Under the Uniform Commercial Code, the failure to reject goods or revoke acceptance will affect a buyer's remedies but it does not necessarily preclude him from making a claim for breach of warranty."); _Cent. Fla. Antenna Serv. v. Crabtree, 503 So. 2d 1351, 1353-54 (Fla. Dist. Ct. App. 1987)_ (holding that same buyer who "clearly did not act within a reasonable time" for purposes of revocation "may [still] be entitled to a money judgment" on a claim for breach of warranty); _see also Fla. Stat. § 672.714_ cmt. 1 ("This section [concerning breach of warranty] deals with the remedies available to the buyer after the goods have been accepted and the time for revocation of acceptance has gone by."). White & Summers provides a concrete **[*87]** example justifying why in certain instances a buyer should be permitted to pursue a claim for breach of

---

[59] I note that Bariven paid for each of the milk shipments 1-16 while the goods were on the high seas. [JTX 194]. This does not alter my analysis. Bariven's acceptance became complete when it obtained physical possession of the milk shipments upon their arrival in Venezuela. It was at that time that Bariven had a reasonable opportunity to inspect the goods and signify to Exim whether the goods were conforming. _Fla. Stat. § 672.606(1)-(2)_; _see also T.J. Stevenson, 629 F.2d at 358_ ("[T]he point of acceptance turns on the buyer's right to inspect the goods.").

---

[60] Yet another notification standard applies to buyers who reject the goods provided to them. _See Fla. Stat. § 672.605(1)_ ("Rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller."). The Parties only raise the doctrine of rejection as it relates to shipments 17-22, so this standard is only included here for comparison.

[61] Exim's counsel also conceded that the notice requirement for a breach-of-warranty claim is more forgiving than the requirement under a revocation analysis. [Trial Tr. Mar. 31, 2011, at 57:4-16].

warranty even when his or her opportunity to revoke has already expired. *See* JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 8-4 at 571 (5th ed. 2006) ("If a buyer makes a reasonable inspection and does not discover a defect, then effects a substantial change to the goods unwittingly, revocation may not be available, but the buyer may still have a valid breach of warranty claim.").

Aside from the additional requirement for a revocation notice relating to deteriorating goods, the timing requirements in both the revocation and the breach-of-warranty contexts are identical. They stem from the same underlying concerns. In particular, a buyer must notify the seller of the seller's breach in a timely manner for the following important reasons: to provide the seller with "early warning" of potential legal action; to protect the seller against "stale claims arising out of transactions which a buyer has led him to believe were closed"; to permit the seller to "investigate the claim while the facts are fresh, avoid the defect in the future, minimize his damages, or perhaps assert a **[*88]** timely claim of his own against third parties"; and finally to "open the way for settlement." *E. Air Lines, Inc. v. McDonnell Douglas Corp., 532 F.2d 957, 972 (5th Cir. 1976).*[62] The critical inquiry in both contexts boils down to a question of whether the buyer's decision to wait before providing the seller with notice of breach was motivated by "commercial good faith." *T.J. Stevenson & Co., Inc. v. 81,193 Bags of Flour, 629 F.2d 338, 364 (5th Cir. 1980).*[63]

Under both *§ 672.607* and *§ 672.608*, this inquiry presents a highly fact-based question to be resolved on a case-by-case basis. *See Royal Typewriter, 719 F.2d at 1102; E. Portland Cement Corp. v. F.L. Smith, Inc., Case No. 08-cv-637, 2009 U.S. Dist. LEXIS 84056, 2009 WL 3010820, at *5 (M.D. Fla. Sept. 16, 2009)* (determining in the context of a dispute over rescission that "whether . . . notice was given with reasonable promptness is generally a question of fact"); *Arnold, Matheny & Eagan, P.A. v. First Am. Holdings, Inc., 982 So. 2d 628, 635 n.3 (Fla. 2008)* ("Under the UCC, a reasonable time for any action depends on the nature, purpose and circumstances of that action."); *Crabtree, 503 So. 2d at 1353* ("In most cases the reasonableness

of the delay [for an aggrieved buyer to revoke] is a fact question.").

I turn now to the second inquiry concerning the content of the required notice. One comment following *§ 672.608* indicates that a buyer's notice of revocation must meet a slightly higher substantive threshold than his or her notice on a claim for breach of warranty. That comment provides: "More will generally be necessary **[*89]** than the mere notification of breach required under the preceding section." *Fla. Stat. § 672.608* cmt 5. On the other hand, that comment also notes that the substantive content of a revocation notice is governed by the same underlying principles found throughout the UCC: "The content of the notice under *subsection (2)* is to be determined in this case as in others by considerations of good faith, prevention of surprise, and reasonable adjustment." *Id.*

A review of the pertinent case law reveals that there is very little difference, if at all, between the content required in a notice of revocation and that required in a notice for breach of warranty.[64] The "critical question" in breach-of-warranty actions is whether the buyer has properly informed the seller that *the buyer considers him to be in breach. E. Air Lines, 532 F.2d at 972.* In other words, the notice required should not be a notice of the relevant "facts, which the seller presumably knows quite as well as, if not better than, the buyer, but of buyer's claim that they constitute a breach." *Id.* But there is no set formula that a notice must conform to in warranty cases. The notification may directly inform the seller that the "buyer regards the contract as breached"; but it need not use "any **[*90]** particular words," including the word "breach"; it must not be written; it may derive from a single communication or many; it need not include a "clear statement of all the objections"; and it need not be a "specific claim for damages or an assertion of legal rights." *T.J. Stevenson, 629 F.2d at 359* (internal quotation marks omitted). Ultimately, the buyer is simply obligated to bring the relevant problems and complaints in some objectively reasonable manner to the attention of the seller. *Royal Typewriter, 719 F.2d at 1102.* For example, if a car buyer had his car towed to the seller's place of business and informed the seller's employees

---

[62] *Eastern Air Lines* was a diversity action governed by the UCC as adopted in California.

[63] *T.J. Stevenson* was also a diversity action governed by the UCC as adopted in Illinois.

[64] In fact, some courts have analyzed the sufficiency of notice under both *§ 672.607(3)* and *§ 672.608(2)* simultaneously without distinguishing between the two statutes. *E.g., Nebula Glass Int'l, Inc. v. Reichhold, Inc., Case No. 02-cv-60703, 2004 U.S. Dist. LEXIS 29982, 2004 WL 4946483, at *5-*6 (S.D. Fla. Apr. 27, 2004).*

that the car was in need of major repairs, that would constitute sufficient notice of a breach of warranty. *T.J. Stevenson, 629 F.2d at 361*.[65]

Case law interpreting *Fla. Stat. § 672.608(2)* concerning the adequacy of a revocation notice provides standards that are very similar to those from the warranty context. To give a seller suitable notice, a buyer who wants to revoke his acceptance of certain goods must simply communicate, in some objective way, his dissatisfaction with the **[*91]** quality of the seller's goods. *See, e.g., Nebula Glass Int'l, Inc. v. Reichhold, Inc., Case No. 02-cv-60703, 2004 U.S. Dist. LEXIS 29982, 2004 WL 4946483, at *6 (S.D. Fla. Apr. 27, 2004)* (determining that where buyer did not present any evidence that it "complained about" seller's goods, there was no adequate notice of breach); *Bair v. A.E.G.I.S. Corp., 523 So. 2d 1186, 1188-89 (Fla. Dist. Ct. App. 1988)* (holding that buyer who waited two years to officially revoke his acceptance of a boat did not wait an unreasonable amount of time because he promptly advised the seller of leakage problem and "continually complained"); *Hikes v. McNamara Pontiac, Inc., 510 So. 2d 1212, 1214 (Fla. Dist. Ct. App. 1987)* (Cowart, J., dissenting) ("Here, all the [car] buyer had to do [to revoke her acceptance of the car] was to drive the car onto the seller's car lot and leave it there with the keys in it (or throw the keys at the

seller while communicating attitude and intent).").[66] Ultimately, the question of whether a buyer's revocation notice was substantively adequate is again a fact-specific inquiry that is usually decided on a case-by-case basis. *Royal Typewriter, 719 F.2d at 1102*.

**(B). Bariven's Notice of Revocation**

I now turn to apply these standards to the facts of this case. As discussed above, Bariven conducted its milk tests in three rounds—one in January 2009, one in April and May of 2009, **[*92]** and one in February 2010. I will analyze Bariven's notice of revocation based on each of these three rounds separately. Before doing so, I will quickly address shipment 1, which Bariven never tested.

**(i) Shipment 1**

To determine if Bariven provided proper notice of revocation for all of Exim's milk shipments 1-8, I will analyze the timing and content aspects of the notice requirement simultaneously while answering the following questions: When did Bariven discover the nonconformity and should Bariven have discovered that nonconformity earlier than it did? When did Bariven provide Exim with adequate notice of revocation based on that nonconformity? Did that revocation occur within a reasonable time after the discovery and before there was a substantial change in the condition of the goods?

Answering these questions for milk shipment 1, I must conclude that Bariven did not provide proper notice of revocation. Bariven never discovered the nonconformity in shipment 1 because it never tested the milk from that installment. Bariven never provided adequate notice as to that shipment because it never sent Exim any

---

[65] Both Parties seize upon a small discrepancy between *Eastern Air Lines* (a pre-*Bonner* Fifth Circuit decision) and *Royal Typewriter* (a published Eleventh Circuit decision). [ECF No. 172, p. 44 & n.18; ECF No. 174, pp. 48-49; ECF No. 180, pp. 12-13]. In short, the *Eastern Airlines* court criticized the Eighth Circuit for relying on a comment following *UCC § 2-607*, which states that the content of a warranty notification must only "be sufficient to let the seller know that the transaction is still troublesome and must be watched," but the *Royal Typewriter* court cited that same comment approvingly. *See Royal Typewriter Co. v. Xerographic Supplies Corp., 719 F.2d 1092, 1102 (11th Cir. 1983)*; *E. Air Lines, Inc. v. McDonnell Douglas Corp., 532 F.2d 957, 975-76 (5th Cir. 1976)*. This jurisprudential wrinkle does not create a prior panel precedent issue because the *Royal Typewriter* court did not reject *Eastern Air Lines*, but in fact it specifically cited and relied on that case. *See Royal Typewriter, 719 F.2d at 1102*. In other words, both cases are consistent and stand for the same general standards about warranty notification requirements set forth above. Even if the two cases were in direct tension, they would not constitute a prior panel precedent issue in the traditional sense because *Eastern Air Lines* interpreted the UCC as adopted in California, and *Royal Typewriter* interpreted the UCC as adopted in Florida.

[66] The relevant quote from *Hikes* is taken from the dissenting opinion in that case. Nevertheless, the dissent's imaginative interpretation of the revocation doctrine is helpful in forming an opinion about how a Florida court would decide the present case. In fact, that dissent is more persuasive than a normal dissent because the majority in *Hikes* did not necessarily disagree with the dissent's legal analysis concerning revocation but only disagreed about whether the underlying factual issue had been decided by a jury below. *Hikes v. McNamara Pontiac, Inc., 510 So. 2d 1212, 1213 (Fla. Dist. Ct. App. 1987)* ("The dissent is predicated on the contention that Hikes's revocation of her acceptance of the DeLorean was legally insufficient. But that issue was submitted to the jury, decided adversely to McNamara, *and is not challenged by McNamara on cross-appeal*.") (emphasis in original).

communications of dissatisfaction about that shipment, which would have impossible **[*93]** given that Bariven never had a basis for dissatisfaction (*i.e.*, test results). Thus, revocation *never* occurred for shipment 1, so of course it did not occur within a reasonable time after discovery and before there was a substantial change in the condition of the goods.

**(ii). January 2009 Tests**

I address the same line of questions for shipments 7 and 8, which Bariven initially tested in January 2009. Bariven did not discover that those shipments were contaminated with melamine until it received the test results from Certified Labs on March 20, 2009. [JTX 156, 192]. As discussed in my factual findings above, Bariven certainly *could have* discovered this nonconformity earlier than March 2009, but the ongoing nature of the melamine problem and the lag time that accrued while Bariven ordered a second round of tests on those shipments provided Bariven with sufficient grounds for first discovering the contamination in March. Thus, I do not find that Bariven should have discovered the melamine earlier than it did as a matter of law.

As to when Bariven actually provided notice of breach to Exim based on its discovery, I must return to the factual record. Throughout the course of these proceedings, **[*94]** Bariven has been somewhat elusive in articulating when it officially gave Exim notice of breach. [Trial Tr. Mar. 31, 2011, at 58:6-60:1]. Instead, it has primarily taken the position that, if all else fails, it provided formal notice "no later than July 6, 2009, when it filed its counterclaims." [ECF No. 172, p. 59]. Having thoroughly reviewed the trial record, I do not find that Bariven provided notice sufficient to satisfy the content standards listed above in the early stages of the melamine crisis. Bariven refers to the email it sent on September 19, 2008, immediately after the melamine alert went out. But that email does not communicate dissatisfaction to Exim at all. Instead, it merely requests Exim's "comments concerning the plants that are used for our deliveries and additional measures that are being taken to preserve the quality and reliability of the shipments." [JTX 36]. Likewise, Bariven's follow-up emails over the course of the next several months seeking to meet with Exim and discuss the Milk Agreement are evidence of good faith commercial intentions from Bariven, but they again fail to convey any sort of complaints to Exim. [JTX 69; Trial Tr. Mar. 31, 2011, at 53:5-21]. **[*95]** This comes as no surprise considering that at that time Bariven had no concrete

basis for dissatisfaction because it had yet to test a single grain of Exim's milk powder for melamine.

When the Parties did eventually meet on January 21, 2009, they discussed the difficulties posed by the Venezuelan Health Ministry in clearing Exim's milk through customs. It is equally clear that the Venezuelan government had imposed those bureaucratic obstacles (*i.e.*, delayed permits) because of the melamine outbreak and to ensure that no tainted milk made its way to the general population. Thus, even if the Parties were not yet directly at loggerheads about the chemical content of Exim's milk shipments, both Parties must have been contemplating the possibility and potential fall out that would result if the milk was in fact contaminated. That possibility became a reality as to installments 7 and 8 on March 20, 2009, when Bariven received conclusive test results indicating widespread contamination of Exim's milk.

Less than two weeks later, on April 2, 2009, Bariven sent Exim a letter calling for an "urgent meeting . . . in light of the results obtained on the melamine test performed on [Exim's milk]." [JTX **[*96]** 160]. Bariven further demanded a response within 48 hours and "reserve[d] the right to take legal action in order to defend our legitimate interests." [*Id.*]. This letter satisfies the notice standards described above.

First, the timing of the notice was sensible. I defer to my factual findings that Bariven's delayed testing of shipments 7 and 8 was neither ideal nor entirely unreasonable under the circumstances. Despite that delay, Bariven exercised sound judgment by contacting Exim within two weeks of receiving reliable evidence of actual melamine contamination. Thus, this notice occurred both within a reasonable time after Bariven discovered and should have discovered the nonconformity pursuant to *§ 672.608(2)*. Because this is a revocation analysis, I also must decide if the notice occurred before any substantial change in the condition of the goods. Referring again to my factual finding that Exim's milk would expire after one year, I note that milk shipments 7 and 8 left China in August 2008, and Bariven's notice came in early April—four months before the milk expired. As such, the notice did not trigger a "stale claim." *See E. Air Lines, 532 F.2d at 972*.

Second, I find that the content of Bariven's April 2 correspondence **[*97]** satisfies the content standards set forth above. The letter did not use the word "breach," nor did it explain the details of the recent milk tests which generated the communication. But the

message was straight-forward: Bariven had melamine test results in hand, it required an urgent meeting as well as an urgent response, and Bariven reserved the right to bring legal action as a result of the milk tests. It would be apparent to any seller in Exim's position at that moment that Bariven considered Exim to be in breach of the Milk Agreement, particularly in light of the previous communications and the January 21 meeting leading up to the April 2 letter. In line with the cases cited above, the content of Bariven's notice sufficiently brought the melamine problems with shipments 7 and 8 to Exim's attention. Exim's reaction to the letter—this lawsuit, which it filed five days later—only confirms that Exim was on notice of its breach and decided to take affirmative measures rather than to await Bariven's legal recourse.

For all of these reasons, I hold that Bariven satisfied the third part of the revocation test, thus completing the prerequisites needed for it to revoke its acceptance of milk [*98] shipments 7 and 8 as a matter of law.[67]

Before shifting focus to analyze the adequacy of Bariven's revocation notice for the other milk installments, I find it necessary to clarify why my legal conclusions about shipments 7 and 8 contained in this section are limited to those two shipments.[68] Relying on the text of the relevant UCC provisions, it is significant that under installment contracts, like the Milk Agreement here, "each delivery is a separate contract or its equivalent," and a buyer who revokes his or her acceptance of certain goods generally does so only for a specific "lot or commercial unit." *Fla. Stat. §§ 672.608(1)*, *672.612(1)* (internal quotation marks omitted);[69] *see also* JAMES J. WHITE & ROBERT S.

_____

[67] Bariven's post-revocation rights and obligations as to the milk from shipments 7 and 8 relate to the Parties' claims for damages and are covered in that section below.

[68] In forming their arguments about revocation, both of the Parties have namely analyzed the issues on an all-or-nothing basis. That is, Exim asserts that Bariven did not properly revoke *any* of the shipments, and Bariven asserts that it revoked *all* of the shipments. Unlike the Parties, I conclude that I must analyze each of the shipments and tests independently based on the nuanced factual record before me.

[69] *See St. Petersburg Bank & Tr. Co. v. Hamm, 414 So. 2d 1071, 1073 (Fla. 1982)* ("While legislative intent controls construction of statutes in Florida, that intent is determined primarily from the language of the statute. The plain meaning of the statutory language is the first consideration.").

SUMMERS, UNIFORM COMMERCIAL CODE § 8-3 at 544 (5th ed. 2006) ("[A] buyer need not reject or revoke an entire amount but may confine such remedies to parts of the whole constituting 'any commercial unit or units.'"). It is undisputed that Bariven did not refer to any particular milk shipments in its letter to Exim of April 2, 2009. But it is equally clear that Bariven could have only been referring to installments 7 and 8 because those were the only two shipments for which Bariven had melamine test results when it sent [*99] the letter. As such, Bariven had no basis to revoke any other shipments as of that time.

It is also critical that I briefly return to my analysis of *Fla. Stat. § 672.612(3)* and reaffirm that my legal conclusions here do not alter any of the conclusions set forth above that Bariven has no right to relief for the entire Milk Agreement under that statutory provision. As discussed *supra*, I agree with Bariven that because Exim breached the Milk Agreement as a whole, the evidence of all of Bariven's melamine tests could have hypothetically provided it with a potential right—which it failed to execute—to cancel the contract and revoke its acceptance of *all* of Exim's milk shipments 1-16. That conclusion does *not* compel me to find that Bariven's April 2 email actually did revoke Bariven's acceptance of all of those shipments for several reasons.

To begin with, my conclusions above were based on the premise that Bariven *eventually* proved that 35 percent of the total contractual milk volume was tainted. In contrast, Bariven's April 2 email did not relate to that entire amount of proof, but was only based on the proof of contamination from shipments 7 and 8, which made up just 5 percent of the total contract [*100] volume. [ECF No. 194]. I do not find that this amount of milk alone, which constituted a much smaller portion of the whole, could have "substantially impaired" the value of the entire agreement. Even if it did impair the entire contract, Bariven did not take the essential procedural step required under *Fla. Stat. § 672.612(3)* to cancel the remainder of the agreement by early April 2009. As discussed above, the evidence overwhelmingly demonstrates that Bariven failed to cancel the remainder of the contract at least until July 2009, so it was barred from recovering under the plain text of the statute. Furthermore, Bariven has not even argued that it should be permitted to recover for the whole agreement under *§ 672.612(3) by means of revocation*, but has only invoked the doctrine of revocation for individual installments. Bariven views all of its arguments concerning revocation as "alternative" arguments to those under *§ 672.612(3).* [ECF NO. 172,

Case: 25-30743   Doc# 83   Filed: 01/08/26   Entered: 01/08/26 22:23:15   Page 126 of 261

pp. 54-57].

Even if Bariven had properly effected cancellation and even if it had argued that it could claim protection for Exim's breach of the entire Milk Agreement in conjunction with the doctrine of revocation, none of the cases covered in my broad survey above would provide Bariven with [*101] a means of relief. The Court has only located one case (an unpublished decision) from any jurisdiction in the United States where an aggrieved buyer was permitted to recover under *UCC § 2-612(3)* after it had already accepted defective goods, and that buyer had "no choice" but to accept the seller's faulty goods in part because it was "impossible" for buyer to test goods on its own and acceptance was explicitly "premised on reasonable cure [by the seller]." *See Automated Controls, Inc. v. Mic Enter., Inc., 1978 U.S. Dist. LEXIS 16260, 1978 WL 23448, at *9-12 (D. Neb. July 31, 1978)*. Bariven did not face such circumstances.

Thus, Bariven may properly revoke shipments 7 and 8 as individual installments, but that relief does not expand its rights under *UCC § 2-612(3)*.

**(iii). April & May 2009 Tests**

Bariven's next round of testing took place in late April and early May of 2009 when it ordered tests on milk from Exim's shipments 3, 5, and 16. I have already determined that Bariven did not properly revoke shipment 16 because it failed to establish that it was induced to accept that shipment by difficulty of discovery or by assurances from Exim. Thus, I limit my analysis concerning the notice requirements to shipments 3 and 5, and I begin by asking the same questions that I asked with respect to shipments 7 and 8 above: When did Bariven discover [*102] the nonconformity and should Bariven have discovered that nonconformity earlier than it did? When did Bariven provide Exim with adequate notice of revocation based on that nonconformity? Did that revocation occur within a reasonable time after the discovery and before there was a substantial change in the condition of the goods?

Bariven discovered that the milk from shipments 3 and 5 was nonconforming on June 4, 2009, when it received from Certified Labs the test results taken from samples of those installments. [JTX 166]. In light of the factual findings set forth above, Bariven should have discovered this nonconformity earlier. As soon as Bariven received the indicative test results from

shipments 7 and 8 on March 20, it should have sent all of Exim's remaining milk for immediate testing. Instead, it waited almost another month and a half to request new tests on April 30 and May 5. Thus, Bariven should have discovered the nonconformity earlier than it actually did.

Even if Bariven had discovered the contamination in a timely manner, it failed to revoke its acceptance of shipments 3 and 5 within a reasonable period *after* that discovery. The record contains no revocation notice from [*103] Bariven to Exim before July 6, when Bariven filed its counterclaims in this lawsuit. But Certified Labs' test results came back on June 4, which means that Bariven waited another full month to inform Exim of those results. Considering the case law above requiring buyers to provide "early warning" of breach to sellers so as to avoid "stale claims," I can only conclude that Bariven's revocation of shipments 3 and 5 did not occur within a reasonable amount of time after Bariven discovered the nonconformity. *E. Air Lines, 532 F.2d at 972*.[70]

To avoid confusion about how my reasoning here relates to the analysis of Bariven's claims for breach of good faith and fair dealing below, I hold that Bariven failed to provide Exim with timely notice of breach without even considering the perishable nature of the milk. That the milk would expire after one year only serves to reinforce this conclusion. Both milk shipments 3 and 5 left China in mid-July of 2008, so by the time Bariven filed its counterclaims on July 6, 2009, all of the milk from those installments would have deteriorated.[71]

---

[70] Of course, Bariven's counterclaims filed with this Court would satisfy the content requirements of notice, but this is of little help to Bariven when it failed to provide that notice on a timely basis.

[71] As discussed above, Bariven's revocation as to the milk from shipment 16 was deficient because Bariven failed to meet prong two of the revocation analysis for that milk. That milk left China on September 10, 2009, so it had probably not yet expired when Bariven filed its counterclaims on July 6, 2009. Nevertheless, Bariven's failure to provide Exim with notice that it intended to revoke installment 16 until July 2009 would have provided independent grounds for barring Bariven from revoking its acceptance of that milk. *Section 672.608(2)* obligates a buyer to revoke within a reasonable time and *additionally* provides that the relevant goods must not have changed condition, but it does not require a court to permit a buyer to revoke simply on the basis that the goods had not yet deteriorated. Here, Bariven's delayed revocation notice was unreasonable even if the milk was still fresh.

**(iv). February 2010 Tests**

Bariven's final round of testing took place in February 2010 when it ordered tests on the vast majority of Exim's **[*104]** remaining milk, including shipments 2, 4, 6, 9, 10, 11, 12, 13, 14, and 15. Of those installments, Bariven independently failed to revoke shipments 9-15 on the basis that it did not establish that it was induced to accept those shipments by difficulty of discovery or because of assurances from Exim. Thus, I limit my analysis concerning the notice requirements to shipments 2, 4, and 6.

Based on my factual findings about Bariven's delay in testing shipments 2, 4, and 6, it should come as no surprise that I conclude as a matter of law that Bariven failed to provide Exim with timely notice of revocation for those shipments. Again, Bariven asserts that it provided that notice as part of filing its counterclaims in July 2009, but that argument defies logic. The text of *§ 672.608(2)* provides that revocation must occur "within a reasonable time *after* the buyer discovers or should have discovered the ground for it." (emphasis added). Bariven claims to have revoked its acceptance of shipments 2, 4, and 6 in July 2009 *before* it ever discovered the grounds that would justify that revocation.[72]

In the event Bariven's position is that it revoked within a reasonable time after it should have—but actually did not—discover(ed) **[*105]** the contamination, Bariven is precluded from succeeding under that theory for the same reasons set forth in my analysis of shipments 3 and 5. Specifically, Bariven should have sent all of Exim's remaining milk for immediate testing following the first signs of widespread contamination with the results obtained on March 20, 2009. Bariven should have then discovered the contamination by April or even early May of 2009 at the latest, and it should have provided Exim with notice within a reasonable time after that. Instead, Bariven waited until July 6.

This delay precludes Bariven from successfully invoking the doctrine of revocation as to shipments 2, 4, and 6 as a matter of law. It also provides additional grounds for

prohibiting Bariven from revoking shipments 9-15 as a matter of law. The milk from shipments 2, 4, 6, and 9-15 left China between July and early September 2009, so all of it had either expired or was within two months of expiring at the time Bariven claims to have triggered revocation on July 6, 2009. Because I find that the late date of Bariven's revocation alone provides sufficient grounds for denying it the right to revoke all of shipments 2, 4, 6, and 9-15, any milk **[*106]** that had already spoiled from those shipments would simply provide additional grounds for my conclusion. Thus, I decline to examine the exact state of deterioration for each of those milk shipments.

For all of these reasons, I conclude that Bariven properly revoked its acceptance of milk shipments 7 and 8, but Bariven did not properly revoke its acceptance of milk shipments 1-6 and 9-16.

**b. Bariven's Claim for Breach of the Implied Warranty of Merchantability**

Under the UCC, goods sold by a merchant such as Exim contain an implied warranty of merchantability. *Fla. Stat. § 672.314*. Bariven argues that Exim has failed to satisfy this implied warranty because Exim has not provided goods that were "fit for the ordinary purposes for which [they] are used." *Id. § 672.314(2)(c)*. To succeed on its claim, Bariven must establish the following elements: (1) facts in respect to the sale of the goods; (2) type of warranty created; (3) facts in respect to the creation of that particular type of warranty; (4) facts of the breach of warranty; (5) notice to seller of breach; and (6) injuries sustained by buyer as a result of the breach of warranty. *Dunham-Bush, Inc. v. Thermo-Air Serv., Inc., 351 So. 2d 351, 352 (Fla. Dist. Ct. App. 1977)*. The Parties' dispute centers on the fourth and fifth elements of this test.[73]

Because this **[*107]** claim involves an analysis of the exact same facts and very similar legal standards as Bariven's count for breach of contract, my legal

---

[72] For example, Bariven argues in its Opposition to Exim's Motion in Limine that the February 2010 test results "confirm" the non-conformity of the milk. [ECF No. 159, p. 3]. But nothing about *§ 672.608(2)* implies that a buyer may revoke its acceptance of certain goods based on a hunch only to confirm that hunch almost a year later.

[73] Exim devotes no attention to the other four elements of the test. [ECF No. 174, p. 48]. This makes sense because Bariven easily satisfies those elements. In short: (1) Exim sold milk, a good, to Bariven; (2) a warranty of merchantability is implied in the Milk Contract by operation of Florida law, *Fla. Stat. § 672.314*; (3) Exim is a merchant in the kind of goods (milk) provided under the contract; and (6) Bariven sustained injuries as a result of Exim's breach by spending money on milk shipments 1-16.

conclusions here will reflect those set forth in the revocation analysis above. As to the fourth element of the warranty test ("facts of the breach of warranty"), I must determine if Exim's product met the threshold standards found within the milk industry. *See Royal Typewriter, 719 F.2d at 1099* ("The tests of merchantability [under Florida law] are standards of minimal quality measured in accordance with the standards of the trade."). Exim does not go into great detail in contesting this issue, but instead relies once more on Professor Bradley's testimony that Bariven's sampling techniques were flawed and thus cast doubt about the reliability of the relevant melamine tests. As covered in my factual conclusions, I find Professor Bradley's testimony credible and persuasive to a certain degree. Nevertheless, I cannot ignore the abundance of evidence from Bariven that the majority of Exim's milk from shipments 2-16 (and shipment 1 by inference) was contaminated with melamine and cyanuric acid at levels that were harmful to humans. Wisely, Exim does not argue that contaminated milk should **[*108]** meet the minimal standards of the dairy industry. Thus, Bariven has proved by a preponderance of the evidence that the milk from shipments 1-16 was unfit for human consumption.

Moving on to the fifth aspect of the warranty analysis ("notice to seller of breach"), I refer to the detailed analysis above concerning the timing and content requirements for a buyer's notice of breach contained in the revocation analysis of this Opinion. Reviewing the same facts discussed above now in the context of an action for breach of warranty, I again determine that Bariven provided adequate notice to Exim for shipments 7 and 8, but that it failed to do so for the remainder of the milk installments (numbers 1-6 and 9-16). None of the differences in the timing or content notice standards between this cause of action and that one provide reason to alter my analysis. With regard to timing, my conclusions above were not dependant upon the expiration of the milk—the only distinction between the two standards. Put another way, even ignoring the deterioration dates of the milk, Bariven should have provided earlier notice to Exim for shipments 1-6 and 9-16.

Likewise, my review of the case law above concerning **[*109]** the content requirements for a notice of breach demonstrates that, other than one UCC comment suggesting a lower standard for notice in warranty actions, courts have generally interpreted the standards similarly for the two causes of actions. In any event, the minor differences between the two standards

are immaterial under the facts of this case where Bariven's letter of April 2, 2009, satisfied the higher standards for revocation as to shipments 7 and 8, so, by definition, it must also meet the lower standards for a warranty action. In addition, I need not look to the content of Bariven's notice for milk shipments 2-6 and 9-16, because the notice for those shipments was untimely anyway.

For all of these reasons, I hold that Bariven has established that Exim breached its implied warranty of merchantability for milk shipments 7 and 8, but Bariven failed to establish the same for milk shipments 1-6 and 9-16.

### c. Bariven's Claim for Breach of Implied Covenant of Good Faith & Fair Dealing

The implied covenant of good faith and fair dealing exists under Florida law to ensure that parties to a contract will not do anything to injure the rights of the other contractual parties or prevent those **[*110]** other parties from receiving the benefits of a contract. *County of Brevard v. Miorelli Eng'g, Inc., 703 So. 2d 1049, 1050 (Fla. 1997)*. The rule is aimed at protecting the reasonable or justifiable expectations of the contracting parties in light of their express agreement. *Cox v. CSX Intermodal, Inc., 732 So. 2d 1092, 1097 (Fla. Dist. Ct. App. 1999)*.

To succeed on a claim for breach of this duty under Florida law, a plaintiff must establish that a specific contractual provision was breached, causing it damages. *Ament v. One Las Olas, Ltd., 898 So. 2d 147, 149 (Fla. Dist. Ct. App. 2005)*. Moreover, the failure must not be by an "honest mistake, bad judgment or negligence; but, rather by a conscious and deliberate act." *Mount Sinai Med. Ctr. of Greater Miami, Inc. v. Heidrick & Struggles, Inc., 329 F. Supp. 2d 1309, 1312 (S.D. Fla. 2004)*. Even if a contractual party exercised poor judgment, they will not have violated this duty "unless no reasonable party . . . would have made the same discretionary decision." *Sepe v. City of Safe Harbor, 761 So. 2d 1182, 1185 (Fla. Dist. Ct. App. 2000)*. Just what conduct will meet this criteria must be determined a case-by-case basis and will depend on the contractual purposes and reasonably justified expectations of the parties. *Shibata v. Lim*, Case No. 99-cv-984, *133 F. Supp. 2d 1311, 2000 U.S. Dist. Lexis 20053, at *12 (M.D. Fla. Nov. 14, 2000)*.

Turning to the facts of this case, Bariven has

established that Exim breached a specific contractual provision (that the milk be "free of . . . toxic substances") and caused it damages. Yet the great weight of the evidence presented at trial does not support Bariven's position that Exim's breach was the result **[*111]** of "conscious and deliberate acts." *Heidrick & Struggles, 329 F. Supp. 2d at 1312*. While the levels of contamination found within the majority of Exim's early milk shipments was, by all means, deeply troubling, the record contains insufficient proof that Exim truly knew the danger posed by that milk after the shipments had left China, let alone that Exim purposefully mislead Bariven about it.

Bariven tries to impute this knowledge onto Exim based on Exim's early inquiries to Bariven about the protein levels permitted by the Milk Contract. [JTX 6 at EX003305-06]. It is uncontested that Exim did know that one of its suppliers, Dairygold, had been subject to certain health violations during a May 2008 inspection (two and half months before Exim sent any of Dairygold's milk to Bariven); and Exim also knew during that time that Dairygold would have to reformulate its milk because its protein level hovered at 22.8 percent rather than at 24.5 percent as required by the Milk Agreement. [Trial Tr. Mar. 15, 2011, at 64:2-67:7; Trial Tr. Mar. 29, 2011, at 90:8-11; JTX 15]. But this record is insufficient to show that Exim knew Dairygold was adding melamine, a toxic substance, to its milk. At most, the evidence shows that Exim knew Dairygold **[*112]** faced certain challenges in reforming its milk and responding to the audit, but it does not show that Exim acted completely unreasonably as a matter of law. *Sepe, 761 So. 2d at 1185*. In fact, Bariven's own counsel conceded that before the mid-September contamination alert "no one even knew to look or test for [melamine]." [Trial Tr. Mar. 14, 2011, at 99:4-6].

As for Exim's conduct in the wake of the melamine alert, Exim should have corrected two misstatements it made to Bariven while the facts surrounding the melamine panic were coming to light. It should have told Bariven that the four negative melamine tests it sent to Venezuela did not come from milk retained from shipments 1-16, and it should have informed Bariven that the melamine investigation included its biggest supplier, Suncare, along with over twenty other manufacturers. But referring to my factual findings above, Exim's real mistake in both of these instances amounted to nothing more than communication shortcomings and did not indicate a more sinister motive to mislead. With the exception of the field inspections discussed below, Exim's behavior toward shipments 17

onward show that it was willing to take on significant extra-contractual obligations **[*113]** in a particularly *good faith effort* to ensure that future milk shipments to Bariven would not contain melamine; for example, Exim engaged SGS-China to conduct melamine tests and it explored the possibility of obtaining milk from other countries.

Under Florida case law, Exim's conduct constituted, at most, honest mistakes or poor judgment—not conscious and deliberate acts. *Heidrick & Struggles, 329 F. Supp. 2d at 1312*. As such, Exim's conduct is not covered by the narrow rights conferred under an action for violation of the implied covenant of good faith and fair dealing. *See Burger King Corp. v. Weaver, 169 F.3d 1310, 1316 (11th Cir. 1999)* ("The Florida District Courts of Appeal have held unequivocally that the rights conferred by the implied covenant of good faith and fair dealing are limited.").[74]

### d. Bariven's Claim for Violation of FDUTPA

The elements for a claim under FDUTPA are (1) a deceptive act or unfair practice, (2) causation, and (3) actual damages. *Rollins, Inc. v. Butland, 951 So. 2d 860, 869 (Fla. Dist. Ct. App. 2006)*. Florida case law provides that the overall purpose of FDUTPA is to protect not only the rights of litigants, but also the rights of the consuming public at large. *Davis v. Powertel, Inc., 776 So. 2d 971, 975 (Fla. Dist. Ct. App. 2000)*.

The Parties here disagree over whether Bariven has satisfied the first element of the test above. The Florida Supreme Court has shed light on this element, **[*114]** defining a "deceptive act" as one that is likely to mislead consumers, and defining an "unfair practice" as one that "offends established public policy" or is "immoral,

---

[74] Even if Exim's conduct met this test, I would dismiss relief under this cause of action because it is based on the exact same allegations as Bariven's action for breach of contract and is thus duplicative and redundant. *See Shibata v. Lim, Case No. 99-cv-984, 133 F. Supp. 2d 1311, 2000 U.S. Dist. Lexis 20053, at *19 (M.D. Fla. Nov. 14, 2000)* ("[A] party can maintain a claim for breach of the implied duty only if it is based on allegations different than those underlying the accompanying breach of contract claim. If the allegations do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated.").

unethical, oppressive, unscrupulous or substantially injurious to consumers." *PNR, Inc. v. Beacon Prop. Mgmt., Inc., 842 So. 2d 773, 777 n.2 (Fla. 2003)* (internal quotation marks omitted). Unlike claims of breach of warranty, FDUTPA claims are not defined by the express terms of a contract, but instead encompass general unfair and deceptive business practices. *Siever v. BW Gaskets, Inc., 669 F. Supp. 2d 1286, 1293 (M.D. Fla. 2009)*. A FDUTPA claim "does not operate to convert every breach of contract . . . case into a claim under the Act . . . [because FDUTPA claims] only reach[] conduct that is unfair or deceptive." *PNR, 842 So. 2d at 777 n.2*. For example, "[m]ere allegations of intentional breach of contract are insufficient to state a claim under the statute." *Hache v. Damon Corp., Case No. 07-1248, 2008 U.S. Dist. LEXIS 30368, 2008 WL 912434, at *2 (M.D. Fla. Apr. 1, 2008)*.

Given the similarity between these standards and those for a breach of implied warranty of good faith and fair dealing, I conclude that Bariven has not established a right to relief under FDUTPA. Again, I exercise great deference to the factual findings set forth above concerning Exim's reaction to the melamine alert. *See Siever, 669 F. Supp. 2d at 1293* ("Whether particular conduct constitutes . . . unfair or deceptive trade practice is a question of fact."). **[*115]** While the evidence definitively shows that Exim breached the milk contract by supplying defective goods, there is no evidence that that breach was intentional, much less any factual support that Exim engaged in immoral, unethical, oppressive, or unscrupulous behavior. Thus, I deny Bariven's claim under FDUTPA as it relates to shipments 1-16.

### iii. Milk Shipments 17-22

Exim originally brought an action for breach of contract against Bariven based on Bariven's failure to pay for shipments 17-22 and on Bariven's attempts to prevent Exim from drawing on the Girobank letter of credit to receive payment for the same. [ECF No. 24 ¶ 26]. Since filing its Second Amended Complaint, Exim has obtained judgment from a court in Curaçao, and it has received payment for shipments 17-22. [JTX 194].[75] Thus, Exim no longer maintains any claims before this Court relating to those installments.

Bariven brings the same four counts against Exim with

respect to milk shipments 17-22 as it did for installments 1-16. In sum: (1) breach of contract, (2) breach of implied warranty of merchantability, (3) breach of implied covenant of good faith and fair dealing, and (4) FDUTPA. Because the Parties have again **[*116]** devoted most of their attention to the breach-of-contract claim, I start my discussion with that claim.

### a. Bariven's Claim for Breach of Contract

To determine if I should analyze shipments 17-22 under the doctrine of rejection or revocation, I must first decide if Bariven "accepted" the goods in those installments. Florida law provides that acceptance under the UCC occurs when, after a reasonable opportunity to inspect the goods, a buyer "signifies to the seller that the goods are conforming or that the buyer will take or retain them in spite of their nonconformity." *Fla. Stat. § 672.606(1)(a)*. Bariven sent Exim emails on January 9 and January 20, 2009—before the first of shipments 17-22 began arriving on January 22, 2009—stating that "the product has been rejected." [JTX 89, 114]. Thus, unlike shipments 1-16, Bariven did not signify to Exim that installments 17-22 were conforming before their arrival in Venezuela.

Bariven did pay Exim for shipment 17 immediately after that milk left China on December 11, 2008, and the comments following *§ 672.606* provide that "payment made after tender is always one circumstance tending to signify acceptance of the goods." *Fla. Stat. § 672.606* cmt. 3. Nevertheless, the UCC comments also provide that payment **[*117]** "in itself can never be more than one circumstance and is not conclusive." *Id.* Because the Parties both analyze shipment 17 along with shipments 18-22, I conclude that Bariven did not accept any of installments 17-22, and Bariven is thus not precluded from invoking the doctrine of rejection as to those shipments. *See Fla. Stat. § 672.607(2)* ("Acceptance of goods by the buyer precludes rejection of the goods accepted.").

### 1. Grounds for Rejection

The pertinent standards for rejection of goods in an installment contract are provided in *Fla. Stat. § 672.612(2)*: "The buyer may reject any installment which is nonconforming if the nonconformity substantially impairs the value of that installment and cannot be cured or if the nonconformity is a defect in the required

---

[75] As described above, that judgment has no *res judicata* effect on these proceedings.

documents."[76] Bariven asserts that two nonconformities substantially impaired the value of each of shipments 17-22. It argues that Exim breached the Milk Agreement first by tendering defective goods (*i.e.* contaminated milk) and second by denying it the opportunity to supervise product inspections.[77]

As discussed in detail above, Bariven is precluded from making the former argument because Bariven never conducted *any* melamine tests on shipments 17-22, so there is no evidence in [*118] the record that these shipments were actually contaminated. In addition, Bariven did not invoke the doctrine of rejection in conjunction with its claim for breach of the whole contract under *Fla. Stat. § 672.612(3)*. Nor did Bariven ever send Exim formal notice of rejection explicitly based on melamine contamination as required by the UCC. *See Fla. Stat. § 672.605* (requiring a buyer to state "a particular defect" in connection with a rejection). On the other hand, Exim did not invite PSI or SGS-NA to supervise inspections of shipments 17-22 before they left China, and Bariven meets the "particular defect" test under *§ 672.605* as to rejection on the basis of field inspections because its letters of January 2009 provided that "the product is rejected *as it was not inspected by PSI supervision.*" [JTX 114 (emphasis added); *see also* JTX 99].

Exim counters with two arguments that Bariven has not successfully rejected shipments 17-22 on the basis of the field inspection provision. First, it asserts that Bariven waived the right to conduct field inspections. Alternatively, Exim contends that Bariven's inspection-supervision right was not substantial enough to create a nonconformity impairing the value of installments 17-22. I discuss each issue [*119] separately.

## 2. Waiver

---

[76] As discussed above, *subsection (3)* of this UCC provision deals with breach of an entire installment contract. I address *subsection (2)* of the provision which concerns a buyer's rejection of an individual installment where the seller's breach substantially impaired the value of that particular installment.

[77] To properly reject goods, buyers must also notify sellers in a timely manner. *See Fla. Stat. § 672.605(1)* ("Rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller."). Given Bariven's rejection communications on January 9 and January 20, 2009, it is undisputed that Bariven's notification was timely.

The Eleventh Circuit has interpreted the waiver doctrine under Florida's UCC as requiring (1) the existence at the time of the waiver of a right, privilege, advantage, or benefit which may be waived; (2) the actual constructive knowledge thereof; and (3) an intention to relinquish such right, privilege, advantage, or benefit. *See BMC Indus., Inc. v. Barth Indus., Inc., 160 F.3d 1322, 1332-33 (11th Cir. 1998)*. Exim bears the burden of proving this affirmative defense. *See Fed. R. Civ. P. 8(c)*; *Legrande v. Emmanuel, 889 So. 2d 991, 996 (Fla. Dist. Ct. App. 2004)*. Here, it is undisputed that Bariven had the right to pre-shipment inspection supervisions, and it knew of that right. Neither Bariven, nor PSI, nor SGS-NA responded to Exim's pre-shipment emails to contact Exim personnel in China regarding inspections for shipments 1-16.

This repeated conduct for each of the first sixteen installments under the contract demonstrated a clear intention to relinquish that right. *See Fla. Stat. § 672.208(1)* ("Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement."). Thus, as discussed above, I find that Bariven [*120] waived its right to conduct field inspections of shipments 1-16. [ECF No. 126, p. 9 n.8].[78]

Whether that waiver also extended to cover shipments 17-22 requires additional analysis. Under Florida law, a party may retract a waiver in the following manner:

> A party who has made a waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver.

> *Fla. Stat. § 672.209*.

Bariven argues that its email to Exim dated November 17, 2008, retracted the waiver and reinstated Bariven's right to conduct field inspections under the Milk Contract. At first glance, this would appear to be true.

---

[78] As Bariven's counsel admitted during closing argument, PSI and SGS-NA allowed Bariven's right to conduct field inspections "slip[] through the cracks" for shipments 1-16. [Trial Tr. Mar. 31, 2011, at 105:20-106:2].

The communication notified Exim that "[e]ffective immediately, all food suppliers must have an inspection release document issued by the inspector or the inspection agency assigned by PSI and under its supervision." [JTX 72]. It further warned that the "product will not be accepted . . . without the signed Release Notice Form." [*Id*.]. In other words, Bariven was insisting on strict performance of a previously **[*121]** waived contractual term, and it gave this notice well over a month before Exim began sending shipments 17-22 to Venezuela, so Exim had sufficient time to change any position that it had taken in reliance on the waiver.

But Exim President Mr. Salges was convinced that the November 17 email was a form letter that did not apply to Exim because it made no mention of Exim or the Milk Contract and because two PSI employees confirmed that the email did not relate to Exim. [Trial Tr. Mar. 14, 2011, at 203:1-204:21]. At least one of those PSI witnesses denied this statement at trial and noted that he had never even spoken to Salges about the Milk Contract. [Trial Tr. Mar. 17, 2011, at 48:20-49:1]. Given this directly conflicting testimony, I look to the other evidence surrounding the November 17 email for indications concerning the ongoing validity of Bariven's waiver as a matter of law.

Two undisputed events from that time establish that, despite the appearance of the November 17 email, Bariven had no actual intent to retract its waiver concerning the field inspection requirement. First, Bariven paid for shipment 17 the same day that it left China on December 11, 2008. At that point, three months **[*122]** had passed since the melamine alert and one month had passed since Bariven sent the November 17 email, so Bariven had more than ample time to form a plan in the event that Exim sent any more milk without first giving PSI or SGS-NA officials an opportunity to conduct field inspections in China. Instead, Bariven immediately remitted payment—$1.4 million dollars no less—for that installment. [JTX 194]. Under these circumstances, I weigh this evidence very heavily against Bariven's theory that it retracted its waiver. Bariven's counsel similarly conceded during closing argument that "the fact that Number 17 was paid for in the routine is a factor here." [Trial Tr. Mar. 31, 2011, at 109:5-6].[79]

Second, Bariven sent a follow-up email to Exim (and other suppliers) six days after paying for installment 17, in which it thanked Exim for its ongoing support and asked Exim to resume further shipments in mid-January. [JTX 82]. Notably, Bariven never mentioned the field inspection requirement or the November 17 email in this follow-up communication. [*Id*.]. Bariven then waited almost another month until January 9, 2009, before complaining that Exim should have invited PSI or SGS-NA to conduct pre-shipment **[*123]** inspections of Exim's milk in China. [JTX 89]. At that point, shipments 17-20 had already left China, and shipments 21-22 were set to follow within the next week. [JTX 194].[80]

Bariven's payment, taken in conjunction with its follow-up email and delay in re-raising the field inspection requirement, provides sufficient evidence to establish that the November 17 email did not retract Bariven's waiver under Florida law. *See Fla. Stat. § 672.208(1)*; *BMC, 160 F.3d at 1332-33*.[81] Instead, I find that that waiver was still in effect at least until January 9, 2009, when Bariven tried to officially reject Exim's shipments for not having been inspected under PSI supervision. [JTX 89]. Assuming that the email sent on January 9 finally retracted Bariven's waiver, that leaves open the possibility that Bariven could still successfully reject

_____

clarify this issue before sending shipment 17 to Venezuela. But once Exim released that shipment from China and Bariven immediately responded with payment, Exim had no reason to think anything other than that the November 17 email was meaningless.

[80] Bariven argues that the evidence does not show that it was on notice that more of Exim's milk was incoming during this time because Exim delayed sending its SGS-China tests and other accompanying documents for shipments 18-22 until March 2009. [Exim Exh. 30-35; Trial Tr. Mar. 31, 2011, at 112:14-113:2]. But the evidence shows that Exim sent Bariven invoices for shipments 18-22 simultaneously or within days of departure from China. [JTX 194]. More importantly, Bariven of its own accord directed Exim to continue sending milk on December 17, 2008. [JTX 82].

[81] One other aspect of the November 17 email, which I raised at trial, is quite puzzling. [Trial Tr. Mar. 31, 2011, at 107:15-24]. Assuming that Bariven did specifically intend for the email to apply to Exim, it makes no sense that Bariven merely invoked its rights to send PSI or SGS-NA officials to *observe or coordinate* inspections in November 2008. At that point in time, Bariven was well aware of the danger posed by the melamine alert. Given the broad terms of the field inspection provision in the Milk Contract, it could have, and certainly should have, invoked a right to send people to China to actually *test* the milk on-site before it ever left for Venezuela.

_____

[79] At the same time, Bariven argues that the burden was on Exim to come forward and officially inform Bariven after November 17 that Exim did not believe it was covered by the November 17 email. [Trial Tr. Mar. 31, 2011, at 110:1-9]. Undoubtedly, it would have been more prudent for Exim to

Case: 25-30743   Doc# 83   Filed: 01/08/26   Entered: 01/08/26 22:23:15   Page 133 of 261

shipments 21 and 22, which had not yet left China as of that date. But, as discussed below, this is of no consequence because I agree with Exim's alternative argument that Exim's failure to comply with the field inspection requirement did not constitute a "substantial impairment" pursuant to § 672.612(2) for any of shipments 17-22.

### 3. Substantial Impairment

To understand the parameters of "substantial **[*124]** impairment" in the rejection context, I look first to the comments following § 672.612(2) of the UCC that provide that a substantial impairment, which justifies rejection of an installment, "can turn not only on the quality of the goods but also on such factors as time, quantity, assortment, and the like." *Fla. Stat. § 672.612(2)* & cmt. 4. Case law on the subject is limited. Like the "substantial impairment" standard that a buyer must meet to establish breach of a whole installment contract under § 672.612(3), the purpose of the "substantial impairment" needed to reject individual installments ultimately comes down to a question of fact to be decided on a case-by-case basis. *Id.* at 451; *Hays Merchandise, Inc. v. Dewey, 78 Wn.2d 343, 474 P.2d 270, 273 (Wash. 1970)*.

A thorough review of the facts presented before me at trial reveals that Exim's failure to invite PSI or SGS-NA to conduct field inspections in China did not constitute a nonconformity that substantially impaired the value of any installment under § 672.612(2). To begin with, SGS-NA never had an obligation to perform any meaningful duties in relation to the Exim milk deal.[82] The agreement between PSI and SGS-NA only required SGS-NA to "[v]erify or witness final performance or functional testing" in China but conduct "[n]o laboratory analysis." [JTX 8 at BVN001225-26]. **[*125]** [83] These

limited duties are also reflected in the minutes of a meeting held between Bariven, PSI, and SGS-NA where "it was noted that if [SGS-NA] had performed the inspection ordered by PSI [of Exim's milk], the laboratory tests would not have been done because they do not fall within the scope of work contracted with SGS." [JTX 134]. SGS-NA's Project Manager further confirmed during his deposition that SGS-NA's only duties entailed "coordination of inspection[s]," "visual inspection," and "document review." [Cisneros Dep. p. 17:1-10].

Bariven asserts that SGS-NA and PSI were not "frozen" or "handcuffed" to the original terms of their agreement and could have expanded SGS-NA's role to include actual chemical analysis. [Trial Tr. Mar. 31, 2011, at 106:3-107:1]. Bariven further insists that any discussions concerning the limited scope of the agreement with SGS-NA related backwards in time to the summer of 2008 and were not a reflection of SGS-NA's capacity after the melamine alert. [*Id.*]. I find these arguments unpersuasive. Naturally, SGS-NA and PSI could have amended their contract to provide SGS-NA with greater responsibilities, but there is no evidence in the record that they ever actually **[*126]** did so. Further, the meeting during which SGS-NA reminded Bariven that lab tests did not fall within their scope of work occurred on *February 5, 2009.* [JTX 134]. The participants of that meeting specified in their minutes that they were not only talking about Exim's shipments from the past summer; they were discussing a "set of problems" with the milk that left China "between June and December of 2008." [*Id.* (emphasis added)].[84]

Even if SGS-NA was obligated under its agreement with PSI to perform lab tests, it would have probably relied on SGS-China (Exim's contractual partner) to do the work. SGS-NA considered SGS-China, which belonged to the same corporate network, to be its agent and partner on-site in China. Mr. Cisneros referred to SGS-China as his "counterpart" in Shanghai and his "primary

---

[82] Neither PSI nor Bariven themselves had any ability to carry out pre-shipment chemical inspections of Exim's milk. [JTX 142]. Nonetheless, I refer to PSI and Bariven in my analysis because the Parties typically expected Exim to notify PSI or Bariven when a milk shipment was ready for inspection, and PSI or Bariven would (or should have) then directed SGS-NA to actually conduct the field inspection.

[83] As stated earlier, the terms of the Milk Contract's field inspection provision are broad enough that Bariven could have hired SGS-NA to perform more rigorous duties, including actual chemical testing. [JTX 5 ("[A] qualified inspector will inspect the equipment for compliance to quote, purchase order, and any other applicable industry standard or

specification.")]. The evidence indicates that the Parties did not put much thought into the implications of the field inspection clause at the time of entering into the Milk Agreement. Exim's President, Rogelio Salges, explained at trial that the field inspection provision referred to "equipment," rather than "milk" or "food," because the Parties had borrowed this contractual clause from other purchase order agreements relating to industrial equipment such as steel plates and valves. [Trial Tr. Mar. 14, 2011, at 142:20-143:4].

[84] Mr. Cisneros's deposition, which corroborates this point was taken on May 19, 2010.

link" there. [Cisneros Dep., p. 23:6-10]. In early communications to Exim, SGS-NA also stated that "SGS" (without any further geographic description) would be assigned to fulfill the field inspection. [JTX 4; *see also* Trial Tr. Mar. 15, 2011, at 155:11-15; Trial Tr. Mar. 16, 2011, at 179:11-20]. In addition, Mr. Salges testified that Bariven officials had told him that neither SGS-NA nor PSI had **[*127]** the time or capacity to go to China to supervise inspections, which again suggests that SGS-NA would have probably relied on SGS-China to perform the inspections. [Trial Tr. Mar. 15, 2011, at 97:6-18].[85]

Bariven argues that its right to have SGS-NA, and not SGS-China, supervise inspections was fundamental because SGS-NA was the only SGS entity that would be loyal to Bariven over Exim. [Trial Tr. Mar. 31, 2011, at 94:16-96:6]. To illustrate, Bariven notes that in September 2009 Mr. Salges instructed SGS-China to deny any requests for information from Bariven's representatives while they visited China to discuss the melamine issue. [JTX 169-70; Trial Tr. Mar. 15, 2011, at 116:1-117:11]. But this incident happened after the Parties had already started litigation, and Bariven has presented no evidence that SGS-China would have refused to work with SGS-NA, PSI, Bariven, or anybody else while relations were still amicable between the Parties. [Trial Tr. Mar. 31, 2011, at 95:22-24]. To the contrary, the evidence indicates that relations were quite collegial between Bariven's agents and SGS-China before that point. [Cisneros Dep., p. 23:6-10].

In fact, if the Parties had called upon SGS-NA to **[*128]** perform the field inspection and if SGS-NA had further asked SGS-China to act on its behalf, Bariven would have received more than it had bargained for. The reports generated by SGS-China contained all the material information that SGS-NA would have produced and more because they would have included lab tests for melamine which Bariven had never obligated PSI or SGS-NA to undertake. [JTX 134]. Bariven does raise a valid argument that some of SGS-China's melamine reports were ultimately ineffective in that the test documents did not match up with the actual milk shipped. [Trial Tr. Mar. 15, 2011, at 158:7-15]. But, viewed in its proper context, this error is practically harmless because Bariven would not have received any melamine tests—mismatched or otherwise—if SGS-NA

had been on-site performing pre-shipment inspections instead of SGS-China. Bariven committed itself to retest all of Exim's milk anyway as of October 3, 2008.

Stepping back from this volume of evidence to reassess it globally, I must agree with Exim's position that Bariven simply raised the document inspections as a pretext to escape its obligations under the Milk Agreement because the bureaucratic difficulties posed **[*129]** by the Venezuelan government rendered Bariven helpless in carrying out the remainder of the agreement. Several pieces of evidence support this theory. Among the most persuasive is an internal Bariven email in which one company representative informed another that "[t]he milk from China that is being sent by [Exim] is a *product that is not in conformity because the Health Ministry did not grant the permission for its nationalization*, therefore, the reason why we should not pay for it." [JTX 101 (emphasis added)]. The same Bariven employee confirmed as a witness at trial that Bariven did not pay Exim for shipments 18-22 not because of any pre-shipment inspections, but rather because "the nationalization certificate had not been obtained." [Trial Tr. Mar. 17, 2011, at 31:1-5]. The deposition testimony of a different Bariven official provides further proof that the company would have distributed Exim's milk "without any problem" as long as the Venezuelan government granted the necessary permits. [Parra Dep. pp. 23:4-26:4].[86]

In light of these concessions, it makes perfect sense that Bariven's President would focus during the January 21 meeting on encouraging Mr. Salges to help him overcome **[*130]** the real obstacle plaguing the Milk Agreement: the Venezuelan Health Ministry's red tape. Bariven would not have extended the Girobank letter of credit right after that meeting unless it did not truly believe in its pretextual claim that Exim had breached

---

[85] Evidence from the spring of 2008 suggests that even Bariven may have seen SGS-China as its own agent. In particular, the Girobank letter of credit only referred to "SGS" without further description. [JTX 13].

---

[86] Bariven's Counsel objected to certain questions posed by Exim on this point during Mr. Parra's deposition. Upon independent review of the transcript, I do not find a basis to sustain those objections. Because the witness was not an agent of the Venezuelan Health Ministry, he did not have sufficient personal knowledge to answer any questions about the likelihood that those authorities would grant the necessary permits. But Exim's line inquiry did not concern that particular likelihood. Instead, the relevant question was "assuming the permit had been granted would the milk at issue have been transferred to PDVAL [and distributed]?" [Parra Dep., p. 24:17-19]. Mr. Parra's 23 years of experience as PDVSA's Procurement Superintendent should have provided him with sufficient knowledge to answer that question. [*Id.* at 4:18-6:6].

the Milk Agreement's field inspection provision. In the words of one Bariven witness, the company extended the letter of credit because it needed to "guarantee" that Exim got paid. [Trial Tr. Mar. 17, 2011, at 33:2-7]. Bariven went to great lengths to create the appearance of dissatisfaction over the field inspections when it just needed clearance from that Venezuelan government that Exim's milk was clean and could be nationalized and distributed.

This last point brings us back to the real issue behind this whole lawsuit: the melamine found in Exim's milk. Bariven has done the best that it could trying to now recover for shipments 17-22 when it never tested that milk and has no other proof that any of it was contaminated. Working from this limited position, Bariven has transformed the peripheral issue of field inspections into the focal point of its legal analysis concerning shipments 17-22. Despite these efforts, the evidence speaks [*131] for itself: SGS-NA's failure to supervise inspections in China did not substantially impair the value of shipments 17-22. Bariven's true concerns did not relate to *procedures of inspecting the documents* that would accompany shipments 17-22, they concerned the *chemical content of the milk itself*. Bariven should have simply tested that milk on its own and then urged the government to nationalize if the product was safe or brought a proper claim for breach based on contamination if that was the case.[87] Thus,

_____

[87] Bariven also argues that Exim had a duty to offer to cure. [Trial Tr. Mar. 31, 2011, at 129:2-12]. It is true that under the UCC where a buyer rightfully rejects certain nonconforming goods, "the seller may seasonably notify the buyer of his or her intention to cure and . . . make a conforming delivery." *Fla. Stat. § 672.508(1)*; *see also id.* *§ 672.612(2)*. But even assuming that Exim's violation of the field inspection clause substantially impaired installments 17-22 (which it did not), Bariven's argument is inapposite. In that scenario, the actual "defect" to be cured would not involve the goods themselves but rather the preparation process that preceded their shipment. The breach would have occurred the moment Exim shipped installments 17-22 from China to Venezuela without PSI or SGS-China having issued the inspection release form. Therefore, nothing Exim could do would "cure" this defect because Exim could not rewind the clock and invite Bariven's agents to monitor the inspection procedures in China once the product had already been shipped. Put another way, the "time for performance" for the contractual duty of pre-shipment inspections expired when the shipments left China, so it would not be possible for Exim to offer a cure under *§ 672.508(1)*. To avoid this conundrum, Bariven of course could have addressed its real concerns about the quality of the product by

Exim's failure to permit PSI of SGS-NA to perform the field inspection requirement did not "substantially impair" the value of any of the milk shipments 17-22 under the meaning of *§ 672.612(2)*.

For all of these reasons, I conclude that Bariven has not established a right to reject shipments 17-22.

### b. Bariven's Claim for Breach of Implied Warranty of Merchantability

Bariven's claim for breach of implied warranty of merchantability must fail under Florida law.[88] As with its count for breach of contract, Bariven's decision not to test the milk from shipments 17-22 is fatal to its legal theory under this cause of action. Without any proof of melamine found within shipments 17-22, Bariven has [*132] not established by a preponderance of the evidence that the milk from those installments was not "fit for the ordinary purposes for which [it is] used." Fla. Sta. *§ 672.314(2)(c)*.[89] Further, Bariven has no evidence that it ever provided Exim with proper and timely notice of such breach based on that proof. Faced with these facts, I must conclude that Bariven has not established a right to relief for breach of warranty as to shipments 17-22.

### c. Bariven's Claims Under FDUTPA and Implied Covenant of Good Faith & Fair Dealing

Bariven faces the same obstacle in relation to its claims under FDUTPA and for breach of Florida's implied covenant of good faith and fair dealing.[90] Absent any real evidence that Exim's milk from installments 17-22 contained melamine, Bariven fails to prove that Exim engaged in any "conscious and deliberate acts" thereby breaching the implied covenant of good faith and fair dealing. *See Mount Sinai Med. Ctr. of Greater Miami,*

_____

simply testing the milk after it arrived in Venezuela.

[88] The full legal standards for this cause of action are set forth above in my analysis of Bariven's claims under this same theory relating to shipments 1-16.

[89] Nor does Bariven argue that Exim's protocol of sending the milk without having SGS-NA or PSI supervise inspections could somehow establish that the goods were unfit for human consumption.

[90] Again, the full legal standards for these causes of action are set forth above in my analysis of Bariven's claims under these theories relating to shipments 1-16.

*Inc. v. Heidrick & Struggles, Inc., 329 F. Supp. 2d 1309, 1312 (S.D. Fla. 2004)*. Similarly, Bariven's lack of evidence precludes it from establishing that Exim "offend[ed] established public policy" or behaved in a way that was "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *PNR, Inc. v. Beacon Prop. Mgmt., Inc., 842 So. 2d 773, 777 n.2 (Fla. 2003)* (internal quotation marks omitted). Nor does Bariven ask the Court **[*133]** to find that Exim's failure to give PSI and SGS-NA inspection rights in China should provide Bariven with a right to relief under these causes of action.

Bariven did argue that Exim deceived it by "mixing and matching" the melamine test reports conducted by SGS-China on milk shipments 17-22. [Trial Tr. Mar. 31, 2011, at 115:12-19]. It is undisputed that SGS-China's test results and the shipping documents relating to those results do not match up. Without any further proof that Exim actually intended to mislead Bariven though, I can only infer that this mix-up resulted from Exim's negligence, not from a conscious or deliberate act. In any event, Exim should not be penalized for taking on extra-contractual duties and performing those duties inconsistently or without total clarity. [*Id.* at 116:10-14].

For all of these reasons, Bariven's claims under FDUTPA and for breach of Florida's implied covenant of good faith and fair dealing must fail.

### iii. Remainder of the Milk Contract (Shipments 23 Onward)

Between the two Parties, Exim is the only one to bring action relating to the unperformed remainder of the Milk Contract—its single request for affirmative relief under the Milk Contract.

### a. Legal **[*134]** Standard for Anticipatory Repudiation

Like all aspects of the UCC discussed in this opinion, the general framework for a claim of anticipatory repudiation is provided by statute. In particular, the Florida code sets forth the following tests.

> When reasonable grounds for insecurity arise with respect to the performance of either the other may in writing demand adequate assurances of due performance and until he or she receives such assurance may if commercially reasonable suspend any performance for which he or she has not already received the agreed return. . . . After receipt

of a justified demand failure to provide within a reasonable time not exceeding 30 days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract.

*Fla. Stat. § 672.609*.

When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may:
(1) For a commercially reasonable time await performance by the repudiating party; or
(2) Resort to any remedy for breach . . . .

*Fla. Stat. § 672.610*.

In other words, if Exim had reasonable grounds for insecurity that Bariven would **[*135]** continue to perform under the Milk Agreement, Exim could demand assurances from Bariven, and Bariven would be liable for anticipatory repudiation unless it gave Exim adequate assurances within a reasonable time after receiving that demand. In a recent, unpublished opinion interpreting the Florida UCC, the Eleventh Circuit noted that it is generally a question of fact whether a party has reasonable grounds for insecurity and whether any assurances are adequate under *§ 672.609*. *Validsa, Inc. v. PDVSA Servs., 424 Fed. Appx. 862, 2011 WL 1519116, at *8 (11th Cir. 2011)* (holding that seller had reasonable grounds for insecurity and made a proper written demand for adequate assurances where seller had received internal email from buyer directing employees to suspend all payments for ongoing contract).[91]

To see if a contractual party has repudiated the relevant agreement, a court should look to that party's response to the other party's request for assurances. *Ford Motor Credit Co v. Alachua Trading Co., Inc., 531 So. 2d 982, 984 (Fla. Dist. Ct. App. 1988)* ("If a demand is made and adequate assurance is not forthcoming the aggrieved party may then treat the contract as breached by repudiation."). Repudiation must not take any particular form of communication and "may be evidenced by

---

[91] The Defendant in this case, Bariven, was also a defendant in *Validsa*. Aside from that similarity, *Validsa* does not have any more bearing on this Court than any other unpublished Eleventh Circuit opinion. That case was also procedurally distinguishable from the present dispute because the Eleventh Circuit partially reversed summary judgment in *Validsa* on the basis of disputed material facts.

words or voluntary [*136] acts but the refusal must be distinct, unequivocal, and absolute." *Mori v. Matsushita Elect. Corp. of Am., 380 So. 2d 461, 463 (Fla. Dist. Ct. App. 1980)*; *see also Am. Cyanamid Co. v. Miss. Chem. Corp., 817 F.2d 91, 93 (11th Cir. 1987)* ("[A] statement by a party that he will not or cannot perform in accordance with the agreement creates an anticipatory breach."). Even if one party to a contract has in fact repudiated, the other party must prove that he or she was ready to perform in order to recover for the repudiation. *See Mori, 380 So. 2d at 465* ("When the doctrine of anticipatory repudiation is properly invoked, the promissory need not actually perform under the agreement but need only be ready and willing to perform.") (citing *Slaughter v. Barnett, 114 Fla. 352, 154 So. 134 (1934))*.

Turning to the facts of this case, it is apparent that Exim had grounds for insecurity and thus a right to request adequate assurances from Bariven about the Milk Contract as of mid-January 2009. Bariven's failure to pay for shipments 18-22, and its refusal to send any personnel from SGS-NA or PSI to conduct field inspections on shipment 23 provided Exim with reasonable grounds for insecurity that Bariven would not perform the remainder of the contract.[92] The record

---

[92] Exim also included a short argument in its post-trial briefs that Bariven anticipatorily repudiated the Milk Agreement by failing to allow Exim to fulfill the remainder of the contract with milk from countries other than China and India. [ECF No. 174, pp. 64-65]. Exim probably did so because I posed several questions about this topic during closing argument. [Trial Tr. Mar. 31, 2011, at 10:5-15:13]. My hypothetical inquiries made Exim, Exim has not established that this potential argument could form an actual basis for a claim of anticipatory repudiation. For one thing, Exim's counsel candidly admitted in response to my question at closing that he "hadn't thought of [Exim's claim for anticipatory repudiation] in that way" and clarified that Exim's claim was really based on Bariven's failure to pay for shipments 18-22 and for its failure to conduct inspections. [*Id.* at 11:3-11]. The actual count in Exim's Second Amended Complaint confirms that Exim only envisioned two grounds for its argument of anticipatory repudiation: payment and inspections. [ECF No. 24 ¶ 27]. Exim noted that the wording from the Second Amended Complaint may have been broad enough to include an argument about milk from other countries but conceded that "[t]here's no doubt that it was not pled as a separate reason." [Trial Tr. Mar. 31, 2011, at 13:16-17, 15:11-12]. Indeed, the evidentiary record further confirms that Exim stopped exploring the possibility of sourcing milk outside of China once the Chinese government cleared its suppliers for reshipping in December 2008—long before Exim began making preparations for shipments 23 onward, which

reveals that Exim requested that Bariven send inspectors for shipment 23 on January 15 and again on February 13, 2009. [JTX 108, 141]. On March 19, 2009, Exim followed up [*137] those communications with a formal demand letter from its counsel to PSI, insisting that PSI "honor its contractual obligations to receive and pay for the 13,220 metric tons of powdered milk that remain to be shipped under the [Milk] Agreement." [JTX 155].

### b. Exim's Prior Breach and the *Advanced Bodycare Case*

Bariven argues that even if the March 19 letter appears to be a demand for adequate assurances, Exim had no right to request such assurances as of that date because Exim was already in breach of the Milk Agreement for providing contaminated milk. In support of that argument, Bariven cites recent Eleventh Circuit case law. *See Advanced Bodycare Solutions, LLC v. Thione Int'l, Inc., 615 F.3d 1352, 1361 (11th Cir. 2010)* ("By January 1, 2005, [the buyer] was in breach of the Licensing Agreement because it had not met the minimum purchasing requirement of the last quarter of 2004. Therefore, [the buyer] would have had to make a valid demand for adequate assurances before that date.").

But, as discussed above, even though Exim was in breach of the entire Milk Agreement, Bariven failed to take the necessary steps to recover for Exim's breach and cancel the remainder of the contract. As Exim correctly points out in its post-trial submissions, [ECF No. 174, pp. 56-58], Bariven's [*138] failure to cancel the contract upon occurrence of a breach by the seller, reinstated the contract and therefore effectively constituted a waiver by Bariven to assert the prior breach as a defense to Exim's claim for breach of contract. *See Holford USA Ltd., Inc. v. Cherokee, 864 F. Supp. 364, 372 (S.D.N.Y. 1994)*; *Merwin v. Ziebarth, 252 N.W.2d 193, 199 (N.D. 1977)*; *BOC Grp., Inc. v. Chevron Chem. Co., LLC, 359 N.J. Super. 135, 819 A.2d 431, 440 (N.J. Super. Ct. App. Div. 2003)*; *see also* Elizabeth Patterson, *UCC Section 2-612(3): Breach of an Installment Contract and a Hobson's Choice for the Aggrieved Party, 48 Ohio St. L.J. 177, 189 n.61 (1987)*.

Furthermore, a close reading of *Advanced Bodycare*

---

are the only relevant installments for the claim of anticipatory repudiation. [*Id.* at 13:16-15:1]. Thus, I decline to consider this potential argument any further.

confirms that Exim should not have been prohibited from requesting assurances from Bariven in March 2009. The seller in that case, like Exim, initially breached the relevant installment contract by providing defective goods as part of an early shipment. *Advanced Bodycare, 615 F.3d at 1356*. The Eleventh Circuit determined that the seller in that case did not breach the installment contract as a whole. *Id. at 1360-61*.[93] The seller subsequently worked with the buyer to correct the manufacturing mistake, replace the defective goods, and continue shipping proper goods as required under the contract. *Id. at 1357*. Nevertheless, the buyer suspended payments and filed suit for breach of contract. *Id.* The Eleventh Circuit went on to note that by the time the buyer requested assurances from the seller, the buyer had already fallen behind in its payments, **[*139]** thus breaching the contract on its own and precluding its right to demand assurances about the remainder of the contract. *Id. at 1361*.

Our facts are very similar. Exim initially breached the entire contract, which distinguishes this case from *Advanced Bodycare*, but that aspect is irrelevant here where Bariven failed to cancel the Milk Agreement and thus reinstated the contract following that breach. For Exim's own part after its material breach, it instituted measures to make sure that the future installments would not be defective by requiring SGS-China to conduct melamine tests on the milk for shipments 17 onward. Bariven has come forward with no evidence that shipments 17-22 were contaminated, and I have already determined that Bariven may not recover from Exim for shipments 17-22 on the basis of the field inspection requirement. As such, Exim was in the exact same position as the seller in *Advanced Bodycare* when Bariven breached the agreement on its own by suspending payments for Exim's post-breach installments. Under *Advanced Bodycare*, only Bariven as the breaching buyer would have been precluded from requesting Exim's assurances in March 2009, but Exim was not precluded from doing the same. **[*140]** Therefore, I find that Exim was legally entitled to send its March 19 demand letter, and I now shift focus to Bariven's conduct to determine if Bariven responded to

Exim's requests with adequate assurances of performance.

**c. Shipment 23**

Of the unshipped milk remaining under the contract as of March 2009, the Parties have provided the most detailed testimony concerning shipment 23. Thus, I examine Exim's claim for anticipatory repudiation on that installment first before reviewing the evidence of shipments 24 onward.

It is undisputed that Exim began requesting Bariven's performance on shipment 23 starting in January 2009 when it invited PSI and SGS-NA several times to conduct pre-shipment field inspections on the milk from that installment. Bariven never responded by indicating that it would perform. Instead, in an email dated February 17, 2009, Bariven directly stated, "We cannot perform inspections on this product."[94] [JTX 142].[95] Eventually, Exim resorted to more formal means and had its counsel send an official letter on March 19, 2009, demanding Bariven's performance on shipment 23. Bariven never sent anybody to conduct field inspections of shipment 23, it never paid for shipment **[*141]** 23, it never told Exim that it intended to accept Exim's field inspection invitation on any specific date, it never suggested a specific date to inspect shipment 23, and it never made any other arrangements that would indicate to Exim that Bariven intended to go forward with that shipment.

This evidence of Bariven's response (or lack thereof) to Exim's communications provides me with a sufficient basis to find a "distinct, unequivocal, and absolute" repudiation by Bariven as to shipment 23 as a matter of law. *Mori, 380 So. 2d at 463*; *see also Fla. Stat. § 672.610* cmt. 2 ("Repudiation can result from action which reasonably indicates a rejection of the continuing

---

[93] Because the Eleventh Circuit was reviewing the trial court's decision on a motion for judgment as a matter of law after a jury trial, the court specifically held that a reasonable jury could find that one defective order worth $41,250 within a $9 million contract did not breach the contract as a whole. *Advanced Bodycare Solutions, LLC v. Thione Int'l, Inc., 615 F.3d 1352, 1360-61 (11th Cir. 2010)*.

---

[94] Bariven points to other language from the same email in which it told Exim that it was "awaiting instructions from Venezuela to proceed." [JTX 142]. This vague piece of information does not change my interpretation of the email because Bariven never followed up with more specific plans or a date on which it would actually conduct the field inspection.

[95] The Parties did not provide a translated version of this exhibit before trial, but they agreed to have an interpreter translate the email during the trial. [Trial Tr. Mar. 15, 2011, at 162:19-163:6].

obligation.").[96] As such, I find that Exim has met its burden of proof in showing that Bariven repudiated shipment 23. *Ford Motor Credit Co., 531 So. 2d at 984* ("If a demand is made and adequate assurance is not forthcoming the aggrieved party may then treat the contract as breached by repudiation.").[97]

Bariven argues that Exim should not be allowed to recover for anticipatory repudiation because Exim sent its demand letter on March 19, 2009, and it filed this action on April 7, 2009, before giving Bariven 30 days to provide adequate assurances as provided by *Fla. Stat. § 672.609(4)*. This argument is unpersuasive as [*142] it relates to shipment 23 for two reasons. First, according to the plain text of *§ 672.609(4)*, Exim was required to give Bariven "a reasonable time" to respond to its demand, and that "reasonable time" could "not exceed[] 30 days." *Fla. Stat. § 672.609(4)*. In other words, the statutory reference to 30 days is not a litmus test dictating what period of time a non-breaching party must give to a breaching party in order to provide

adequate assurances under the statute. Instead, it provides an *outside limit* reference point within which a breaching party must either react or else face automatic liability for anticipatory breach. *See Fla. Stat. § 672.610* cmt. 2 ("[A] repudiation *automatically results* under the preceding section on insecurity when a party fails to provide adequate assurance of due future performance within thirty days after justifiable demand therefore has been made.").[98] Thus, Exim was not necessarily required to wait 30 days.

Second, Bariven should have provided assurances for shipment 23 long before the 30-day window would have passed in mid-April because Exim had sent it several emails months earlier in January and February notifying Bariven that the milk for its next installment was ready for field inspections. Given these [*143] earlier communications, the formal March 19 letter was merely the last in a long line of communications from Exim demanding that Bariven take its contractual rights at face value and actually send inspectors for shipment 23.

The evidence also demonstrates that Exim satisfied the final prerequisite to obtaining relief for anticipatory repudiation as to installment 23. In particular, Exim was ready, willing, and able to perform its obligations for shipment 23 as required by Florida law. *Mori, 380 So. 2d at 465*. Not only had Exim sent Bariven repeated letters that it was ready to ship the milk for installment 23, but Exim President Mr. Salges also provided unrebutted testimony that Exim paid over $1 million dollars to its Chinese suppliers to have the milk ready for shipment. [Trial Tr. Mar. 15, 2011 at 39:23-41:21; Trial Tr. Mar. 31, 2011, at 148:17-153:19]. For all of these reasons, I find that Exim has met its burden in proving that Bariven repudiated installment 23 of the Milk Contract.

### d. Shipments 24 Onward

On the other hand, Exim has not met its burden in proving that Bariven repudiated *the entire remainder of the Milk Agreement following shipment 23*. Exim's letter to Bariven of March 19 served as a demand [*144] letter for shipment 23 as well as for shipments 24 onward. In particular, that letter provided that "Exim Brickell hereby demands: . . . that Ψ honor its

---

[96] In fact, Bariven even indirectly conceded that Exim had a basis to argue repudiation during the period of February to April. [ECF No. 179, p. 21 ("[T]he only timeframe in which Exim can argue Bariven repudiated the Milk Contract runs from the end of February (at the expiration of the 30-day period) to April 7 when Exim filed suit.")].

[97] One may view Bariven's decision to extend the Girobank letter of credit in 2009 as an indication that Bariven actually intended to perform under the Milk Agreement. Under this line of reasoning, the extension takes on extra significance because Bariven's duty to pay Exim (either directly or via the letter of credit) was a true contractual *obligation*, whereas the field inspection provision only provided Bariven with a contractual *right*. I find this position unpersuasive. Regardless of its characterization as an obligation or as a right, the field inspection process served as a means through which Bariven could block Exim's performance of the Milk Agreement. In other words, Bariven's failure to have anyone from SGS-NA or PSI inspect shipment 23 frustrated Exim's good faith attempts to perform its part of the contract and release the installment 23 from China as Exim already knew that Bariven would reject that milk without pre-shipment inspections. The law is clear that Bariven was not permitted to obstruct Exim's performance in such a manner. *See Peck v. Peck, 102 U.S. 64, 65, 26 L. Ed. 46, 15 Ct. Cl. 622 (1880)* ("[T]he conduct of one party to a contract which prevents the other from performing his part is an excuse for non-performance."); *Sharp v. Williams, 141 Fla. 1, 192 So. 476, 480 (Fla. 1940)* ("Prevention or hindrance by a party to a contract of any occurrence or performance requisite under the contract for the creation or continuance of a right in favor of the other party, or the discharge of duty by him, is a breach of contract.").

[98] Nor is it significant that Bariven asked Exim to suspend performance under the Milk Agreement for 30 days after the January 21 meeting because that period had long expired by the time Exim sent its March 19 demand letter.

contractual obligations to receive and pay for the 13,220 metric tons of powdered milk that remain to be shipped under the agreement." [JTX 155]. But, unlike with shipment 23, Exim failed to perfect its claim for anticipatory repudiation of shipments 24 onward because it did not satisfy the statutory requirement of providing Bariven with a "reasonable time" to respond to its March 19 demand letter as to those shipments after installment 23. By filing the instant action on April 7, 2009, Exim improperly cut off Bariven's time to respond to the letter, and Exim defeated its own claim for anticipatory repudiation.

My analysis concerning shipments 24 onward differs from that of shipment 23 on this point because of several undisputed facts in the record. Most importantly, Exim did not send Bariven any communications demanding its performance on shipments 24 onward before its official March 19 letter. Specifically, Exim's long chain of emails urging Bariven to perform pre-shipment inspections stemming back to January 2009 only related to [*145] shipment 23. Thus, Bariven's failure to send inspectors or otherwise adequately respond to those communications only support Exim's claim for anticipatory repudiation *as to shipment 23*. Furthermore, Exim's request for relief for shipments 24 onward concern a significantly larger volume of milk and much more money than just for shipment 23.

With this factual backdrop, I find that Exim should have given Bariven the full statutory period of 30 days to respond to its demand letter concerning the entire remainder of the contract after shipment 23. By preempting Bariven's response and filing this action before the expiration of that period, Exim did not give Bariven a "reasonable" time to provide assurances that it would perform on shipments 24 forward as required by *Fla. Stat. § 672.609(4)*. In arriving at this conclusion, I note that an aggrieved party's obligation to give the breaching party a "reasonable" amount of time to respond to its demand is not simply a perfunctory or mechanical gesture, but rather it is a critical statutory requirement that may carry great meaning or drastic consequences for contractual parties in certain circumstances such as these.

For example, it is conceivable that a party like Bariven [*146] could have decided to respond to Exim's demand letter toward the end of the 30-day period perhaps after consulting with its counsel or after simply realizing that it might face a much greater risk of liability and higher damages without doing so. One short communication sent from Bariven could then entirely change the legal dynamic between the Parties. Let us assume that Exim did not file suit on April 7 and instead that Bariven sent Exim a letter on April 14 in which Bariven told Exim that, despite the Parties' contractual difficulties to date, Bariven had no intention of refusing payment for future milk shipments as long as the milk from those shipments would be clean. Let us further assume that the letter went on to assure Exim that Bariven specifically planned on sending PSI or SGS-NA officials to China by April 20 to conduct field inspections on the next several milk shipments and that it could set dates for the next inspections after that time. Under those facts, Exim's claim for anticipatory repudiation as to shipments 24 onward would certainly fail.

That Bariven officials had already decided to suspend payments on the Exim milk account as far back as December 2008 does not alter [*147] this analysis. The plain text of *Fla. Stat. § 672.609(4)* focuses exclusively on *external* communications between contractual parties and not on *internal* decisions or communications made by or within the breaching party. The relevant question is whether Exim gave Bariven a reasonable time to provide an adequate "assurance of due performance" in the form of an outgoing communication to Exim. The question is not whether Exim subsequently found out through discovery in this case that Bariven had decided on its own to stop performance before Exim formally demanded that performance. Any arguments that Bariven would not have responded with adequate assurances before the end of the 30-day window are pure speculation at this point. In any event, Exim should have given Bariven the full statutory period to reflect upon its demand letter and the amount of liability at stake before cutting off Bariven's opportunity to respond.

Even if Exim had satisfied its burden of giving Bariven a "reasonable" time to provide adequate assurances, Exim's claim for anticipatory repudiation as to shipments 24 onward would still fail. Exim has namely not established the other prerequisite of demonstrating that it was ready, willing, and [*148] able to perform with respect to any milk installments after number 23. *See Mori, 380 So. 2d at 465.* In fact, Mr. Salges never testified that he paid any of Exim's Chinese milk suppliers for goods beyond shipment 23. [Trial Tr. Mar. 15, 2011, at 40:2-41:9]. Likewise, Exim's counsel directly conceded during closing argument that Exim had no evidence that any of the milk for shipments 24 onward was ever manufactured or that Exim made any out-of-pocket expenses for those shipments.

THE COURT: Is there any evidence that any shipment post-23 was manufactured?

MR. O'NAGHTEN: No, Your Honor.

. . .

THE COURT: Right. And my second question was: Was there any out-of-pocket for 24 to the end? In other words—

MR. O'NAGHTEN: I don't believe so, Your Honor.

THE COURT: Okay.

MR. O'NAGHTEN: I don't believe so.

[Trial Tr. Mar. 31, 2011, at 151:2-153:17].

For all of these reasons, I hold that Exim has not satisfied its burden of proving that Bariven anticipatorily repudiated any of the milk shipments from 24 forward.

### e. Cancellation

In concluding my analysis about shipments 24 onward, I return to the concept of "cancellation" under the UCC one last time because the Parties have devoted significant attention concerning when and how their **[*149]** contractual relations formally ended and what legal effect that event should have on their claims. Cancellation generally occurs under the UCC when "either party puts an end to the contract for breach by the other and its effect is the same as that of 'termination.'" *Fla. Stat. § 672.106*. In other words, cancellation occurs when a party, who is in the right, puts an end to the contract. The UCC usually permits a buyer to cancel the remainder of a contract as a means to escape liability for anticipatory repudiation after the buyer learns of a breach by the seller or after it has become clear to the buyer that the seller will be unable to perform his or her future contractual obligations going forward. *See USA for Use & Benefit of Vulcan Materials v. Volpe Constr., 622 F.2d 880, 884 & n.7 (5th Cir. 1980)*; *Porkolab v. Smithbay Homes, Inc., 640 So. 2d 195, 196 (Fla. Dist. Ct. App. 1994)*.

Bariven was in breach of the Milk Agreement as of December 2009 when it stopped paying for the incoming milk shipments, starting with installment 18. This breach of Bariven's party gave Exim a right to cancel the remainder of the agreement. When Exim filed this lawsuit on April 7, 2009, Exim cancelled and terminated the Milk Agreement as a matter of law. I agree with Bariven that, as of that date, the final "curtain came down" between the Parties. [Trial Tr. Mar. 31, 2011, at 139:22-25]; *see also* **[*150]** *Surgical Sales Corp. v. Heyer-Schulte Neurocare, L.P., Case No. 98-5813, 1999 U.S. Dist. LEXIS 10549, 1999 WL 500020, at *4-*5 (E.D. Pa. July 15, 1999)* (determining that plaintiff's suit for breach of contract constituted a

cancellation as defined by the UCC).[99] As a legal matter, Exim took the outstanding milk installments and made them the subject matter of ongoing litigation. As a practical matter, Bariven had no expectation that Exim would actually make any more future shipments or that Bariven would have to make any more future payments after April 7, 2009.

Both Parties agree that Bariven did not try to cancel the Milk Agreement until long after April 2009. Bariven asserts that it cancelled on July 6, 2009, by filing its counterclaims. Exim argues that Bariven's notice of cancellation came later, such as when Bariven filed its summary judgment motion in August 2010. I decline to decide which side makes the more persuasive argument on this point because both of these dates fall after April 7, 2009. In other words, as long as Bariven tried to cancel the agreement after April 7, 2009, any such attempts were moot and irrelevant because Exim had already terminated the agreement before then. Neither Party cites any case law that cancellation must come from both sides of a contract or that one **[*151]** party must repeat or confirm the cancellation of another party in order to make cancellation complete. To the contrary, Exim's unilateral filing of this lawsuit concerning the Milk Agreement was sufficient to put an end to that agreement, and it relieved Bariven of any additional rights or obligations to cancel the contract.

To avoid confusion about how this legal conclusion relates to other portions of this Opinion, I must briefly return to my analysis of Bariven's claims that Exim breached the whole Milk Agreement under *Fla. Stat. § 672.612(3)*. I do so to make it clear that although Exim's termination of the contract relieved Bariven of its obligation to pay for shipments 24 onward under *§ 672.609(4)*, Exim's lawsuit did *not* relieve Bariven of its obligation to make "seasonable" notice of cancellation in order to recover under *§ 672.612(3)*.

---

[99] In the recent Eleventh Circuit case involving Bariven, the court suggested that where a buyer gives adequate assurances and does not anticipatorily breach a contract, then the seller may breach the contract by wrongfully terminating it. *Validsa, Inc. v. PDVSA Serv., Inc., 424 Fed. Appx. 862, 2011 WL 1519116, at *9 n.12 (11th Cir. Apr. 21, 2011)*. This aspect of *Validsa* has no application to our facts where Bariven has never argued that Exim breached the Milk Agreement by terminating the contract and filing action. In fact, all aspects of Bariven's conduct and legal arguments indicate that Bariven had no interest in receiving the remainder of Exim's powdered milk once the Parties' relationship had soured (for lack of a better word).

As discussed above, I agree with Exim that Bariven has no right to relief for the whole Milk Contract in large part because Bariven did not properly cancel the contract as required under *Fla. Stat. § 672.612(3)*. In arriving at that conclusion, I specifically found that Bariven only had until the first week of April 2009—at the very latest—to effect "seasonable" cancellation of the remainder of Exim's shipments and **[*152]** recover for the whole milk agreement. I decided on this date by noting that had Bariven tested all of Exim's milk shipments 1-16 at the time it tested installments 7 and 8, Bariven could have cancelled the contract by early April (at the same time that it revoked shipments 7 and 8). I recognized that this hypothetical situation presented the latest possible scenario under which Bariven would still be able to claim relief under *§ 672.612(3)*. It is undisputed that these hypothetical facts do not reflect reality, and Bariven never gave Exim any notice of cancellation by the first week of April. Thus, my inquiry as to Bariven's right to relief under *Fla. Stat. § 672.612(3)* ends there with the conclusion that Bariven failed to effect "seasonable" cancellation and may not obtain relief under the statute.

That Exim independently terminated the agreement on April 7, 2009, does not alter this conclusion. Bariven needed to effect proper cancellation *of its own accord on or before that date* in order to recover for the whole contract. It did not. Therefore, Bariven failed to establish a right to relief under *Fla. Stat. § 672.612(3)*. Put another way, Exim's lawsuit did not relieve Bariven of its obligation to make "seasonable" notice of cancellation under **[*153]** *§ 672.612(3)* because the time for Bariven's performance under that statute had just passed when Exim filed this action. That Bariven tried to follow Exim's cancellation with its own duplicative cancellation in July 2009 or August 2010 does not alter my conclusion either. Again, Bariven needed to effect proper cancellation on its own by the first week of April 2009. It did not. Therefore, Bariven failed to establish a right to relief under *Fla. Stat. § 672.612(3)*.

In sum, my analysis from these two different parts of this Opinion provides two separate and independent legal conclusions, which are both valid. First, Bariven's failure to cancel by the first week of April 2009 barred it from relief for Exim's breach of the entire contract under *Fla. Stat. § 672.612(3)*.[100] Second, Exim's cancellation on

April 7, 2009, relieved Bariven of liability for shipments 24 onward under *Fla. Stat. § 672.609(4)*.

For all of these reasons, I find that Exim properly established a right to relief for anticipatory repudiation with regard to shipment 23, but Exim failed to establish any such rights with regard to shipments 24 onward. I will address damages on these issues below after discussing the Rice Contract.

## D. The Rice Contract

Each Party brings one count under the Rice Agreement: Bariven **[*154]** asserts a claim for breach of contract, and Exim asserts a claim for anticipatory repudiation. I address each in turn.

### i. Bariven's Claim for Breach of Contract

Bariven's breach-of-contract claim is based on Exim's failure to provide original export documents with rice shipments 21, 23, and 24 until ten months after their delivery. The UCC provides standard terms for shipping documents. Among other things, a seller is required to "[f]orward and tender with commercial promptness all the documents in due form and with any indorsement necessary to perfect the buyer's rights." *Fla. Stat. § 672.320(2)(e)*. The text of the Rice Agreement itself also required that "[d]ocuments for all ocean shipments are required to be in possession of Bariven-Aduanas seven (07) working days prior to the arrival of the freight at the first Venezuelan Port of unlading." [JTX 24 at BVN000526]. It is well-settled that when the terms of a contract are clear and unambiguous, the contracting parties are bound to those terms. *Ernie Haire Ford, Inc. v. Ford Motor Co., 260 F.3d 1285, 1290-291 (11th Cir. 2001)* (citing *Emergency Assocs., P.A. v. Sassano, 664 So. 2d 1000, 1003 (Fla. Dist. Ct. App. 1995))*.

Exim does not dispute that it failed to supply Bariven with the corresponding documents for rice shipments 21, 23, and 24, which arrived in Venezuela in early January 2009, until ten months later in October 2009. **[*155]** Nor does Exim dispute that Bariven repeatedly requested those documents in the interim period. According to the unambiguous text of the Rice Agreement and Florida law, this provides Bariven with a right to relief under the theory of breach of contract. *See*

---

[100] To be clear, Bariven's failure to cancel provided one of several independent reasons why Bariven could not recover for Exim's breach of the entire agreement under *Fla. Stat. §*

*672.612(3)*. I decline to revisit the other reasons here. They may be found in Section II(C)(i) of this Opinion.

*Fla. Stat. § 672.320(2)(e)*; *Sharp, 19 So. at 480* ("Prevention or hindrance by a party to a contract of any occurrence or performance requisite under the contract for the creation or continuance of a right in favor of the other party, or the discharge of duty by him, is a breach of contract."). Exim seeks to avoid liability by relying on the affirmative defenses of waiver and mitigation of damages.

As discussed in several other sections of this Opinion, the doctrine of waiver under the UCC as adopted in Florida requires (1) the existence at the time of the waiver a right, privilege, advantage, or benefit which may be waived; (2) the actual constructive knowledge thereof; and (3) an intention to relinquish such right, privilege, advantage, or benefit. *See BMC Indus., Inc. v. Barth Indus., Inc., 160 F.3d 1322, 1332-33 (11th Cir. 1998)*. Again, Exim bears the burden of proving this affirmative defense. *See Fed. R. Civ. P. 8(c)*; *Legrande v. Emmanuel, 889 So. 2d 991, 996 (Fla. Dist. Ct. App. 2004)*. Exim relies primarily on the testimony elicited from Bariven's Customs official, Ms. Bello, who admitted during her deposition that on four occasions **[*156]** before January 2009, Exim's rice passed through Venezuelan customs even though the original shipping documents arrived up to two weeks after the goods themselves. [Bello Dep., p. 39:3-10]. Exim concludes that this evidence demonstrates that Bariven intended to relinquish its right to promptly receive original export documents for Exim's rice shipments.

I disagree. The evidence set forth in my factual findings above reveals no such intention on the part of Bariven. Ms. Bello took the witness stand at trial and explained that the Venezuelan legal procedure used to clear Exim's previous rice shipments without original documents through customs (called "legal abandonment") was entirely decided and controlled by the government—not by Bariven. [Trial Tr. Mar. 29, 2011, at 29:5-6 ("Bariven has no part in that decision. It belongs to Ceniat.")]. Thus, the previous nationalizations could not have indicated any "intent" on the part of Bariven to begin with because Bariven exercised no direction over those actions.[101]

Even assuming that Bariven's conduct somehow demonstrated an intention to waive its right to receive

original export documents, that waiver would, at most, constitute a partial waiver **[*157]** limited to delays of up to two weeks. By no means could the waiver stretch to include Exim's extreme holdup for shipments 21, 23, and 24, where it waited a full ten months before sending the relevant documents. Contemporaneous evidence corroborates Bariven's position on this point. The customs unit of the Venezuelan government only decided to nationalize Exim's rice on other occasions because the delay was "reasonable" and "acceptable." [*Id.* at 28:4-29:25, 52:25-53:1]. Once one or two weeks had passed after rice shipments 21, 23, and 24 arrived in Venezuela without accompanying documentation, PSI promptly began requesting the records with increasing urgency. [JTX 102-05, 143-44]; *see also BMC, 160 F.3d at 1335* ("When a delivery date passes without the seller's delivery, the buyer must object within a reasonable time and warn the seller that it is in breach.")].

For all of these reasons, I conclude that Bariven has established a right to affirmative judgment against Exim on its claim for breach of contract. I will address Exim's arguments concerning mitigation of damages along with the remainder of the damages issues below.

## ii. Exim's Claim for Anticipatory Repudiation

Exim brings a claim for anticipatory **[*158]** repudiation with respect to the last 3,000 metric tons of rice (with a contract price of $3,063,000) remaining under the Rice Contract. PSI sought to make a pre-shipment inspection on the product for those installments with Exim's supplier, Zaeli, in Brazil, but Zaeli did not permit the inspection because Exim had not yet paid Zaeli for that rice. [JTX 196; Trial Tr. Mar. 17, 2011, at 46:21-48:5]. It is undisputed that as of April 2009, the Parties' relationship had already become strained because of the difficulties posed by the Milk Contract. Exim asserts that Bariven's failure to perform the Milk Contract provided Exim with reasonable grounds for insecurity about Bariven's future performance under the Rice Contract. *See Fla. Stat. § 672.609* cmt. 3 ("A ground for insecurity need not arise from or be directly related to the contract in question."). Exim refers to its letter dated April 8, 2009, as a demand for adequate assurances, and it asserts that Bariven repudiated the remainder of the Rice Agreement by failing to adequately respond to the April 8 letter. [JTX 163].

Exim's position is legally insufficient for three reasons. First, Exim was already in breach of the Rice Agreement

---

[101] On the other hand, Bariven could have submitted a "letter of commitment" to the Venezuelan governmental agency of its own accord requesting that the agency nationalize Exim's rice. I address this procedure as part of Bariven's duty to mitigate damages below.

as of April 8, 2009, **[*159]** because it had failed to send the original export documents for the previous shipments 21, 23, and 24. Thus, Exim was prohibited from requesting adequate assurances from Bariven at that time. *See Advanced Bodycare, 615 F.3d at 1361*. Second, even if Exim had not already been in breach of the Rice Agreement, it had no grounds for insecurity about Bariven's performance *concerning that contract*. In fact, Bariven had paid for all rice shipments as of that date in accordance with the agreement, and Bariven had even attempted to inspect the unshipped goods but could not do so because Exim had not paid its Brazilian supplier.

While the UCC comments do provide that a party may properly demand assurances from his or her contractual counterpart based on behavior related to another agreement, Exim was not justified in doing so here. The Parties' difficulties regarding the Milk Contract stemmed from an independent global health crisis that had nothing to do with the Rice Agreement. The evidence indicates that Bariven stopped paying for Exim's milk shipments because of difficulties posed by the Venezuelan government, but those problems concerned the Venezuelan Health Ministry's efforts to ensure that all milk going into the country **[*160]** was not contaminated with melamine. None of these issues relate even remotely to the Parties' Rice Agreement.

Third, Exim's April 8 letter does not meet the criteria for a demand letter under *Fla. Stat. § 672.609*. The letter generally noted that Exim had failed to recover certain payments from Bariven and felt forced to stop delivering future goods, but it never referred to the Rice Agreement directly. [JTX 163]. Moreover, Exim sent the letter the day *after* it filed this lawsuit. [*Id.*].

For all of these reasons, Exim's claim for anticipatory repudiation of the Rice Contract must fail.

## III. DAMAGES

Because the Parties' arguments concerning damages differ for each of the two contracts in question, I will once again address each contract separately.

## A. The Milk Contract

As a preliminary matter, I decline to award attorney fees to either of the Parties based on Bariven's claim under FDUTPA. I deny Bariven an award of attorney fees because Bariven has not prevailed on its FDUTPA

claim, and I also deny Exim an award of attorney fees because I find that Bariven's FDUTPA counts, while ultimately unsuccessful, were brought in good faith and were not frivolous. *See Humane Soc. of Broward County, Inc. v. Fla. Humane Soc., 951 So. 2d 966, 969-72 (Fla. Dist. Ct. App. 2007)*; *Dart Indus., Inc. v. Acor, Case No. 06-cv-1864, 2010 U.S. Dist. LEXIS 18833, 2010 WL 746453, at *3 (M.D. Fla. Mar. 3, 2010)* ("The **[*161]** awarding of attorneys' fees under FDUTPA is not mandatory, and the entitlement to such an award is determined in the sound discretion of the trial court.").

### i. Shipments 1-6 & 9-22

Based on my conclusions of law, Bariven has no right to recover any damages from Exim relating to milk shipments 1-6 and 9-22. Therefore, I do not disturb the previous transfer of funds from Bariven to Exim for shipments 1-6 and 9-17. Nor do I require Exim to refund any of the money that it obtained for shipments 18-22 via the Girobank letter of credit. Likewise, Bariven is prohibited from obtaining any damages from Exim as reimbursement for the storage and demurrage fees it incurred for these shipments.[102]

### ii. Shipments 7 & 8

Bariven properly revoked milk shipments 7 and 8, so it was entitled to the same rights and duties with regard to those shipments as if it had rejected them. *See Fla. Stat. § 672.608(3)*.[103] Because Bariven accepted, paid for, and physically possessed installments 7 and 8, Bariven had a security interest in those goods for the total amount that it paid. *See id. §§ 672.602(2)(a), 672.711(3)*. Bariven was entitled to hold the goods with reasonable care at Exim's disposition for a time sufficient to permit Exim to remove them or to follow any reasonable **[*162]** instructions from Exim. *Id. §§*

---

[102] As discussed above, the Parties' disagreement about whether shipment 1 was stored or sold is irrelevant to my analysis because, either way, Bariven is not entitled to any damages from Exim for that shipment.

[103] Bariven's rights to damages under the theory of breach of warranty are the same as its rights under the theory of revocation. *See Fla. Stat. § 672.714(2)*. For simplicity, I only refer to revocation above and merely note that the analysis would be duplicative for its breach of warranty claim. [ECF No. 172, p. 85].

[672.602(2)(b)](), [672.603(1)](). The Parties have come forward with no evidence about resale or any requests from Exim to reclaim the milk after revocation. Given the contamination found throughout the milk, Bariven was under no duty to try to find a willing buyer on its own. [ECF No. 172, p. 84]. Therefore, Bariven is entitled to a refund for the full amounts it paid to Exim for shipments 7 and 8. The evidence is undisputed that Bariven paid Exim $3,828,000.00 for shipment 7 and $2,392,500.00 for shipment 8. [JTX 194].[104] Adding these two values together gives $6,220,500.00.

Florida law also provides Bariven, as an aggrieved buyer, with certain rights to incidental and consequential damages. *See* [Fla. Stat. §§ 672.711(3)](), [672.715](). Bariven seeks reimbursement for the amounts it incurred for demurrage, storage, and other costs that it sustained after accepting Exim's contaminated milk.[105] In particular, it seeks a total of $2,046,272.00 (or Bs.F 7,397,537.00) for these two shipments. [Bariven Exh. H;[106] Bariven's Closing Argument Slide 62].[107] To arrive at these figures, Bariven relied upon expert testimony from Dr. Miguel Herce, who, in turn, relied upon invoices relating to Exim's goods. [Trial Tr. Mar. 29, 2011, at 53:24-83:24]. **[*163]**

Exim criticizes Dr. Herce's methodology in which he

---

[104] Exim also conceded that it only disputed its liability for any of the milk shipments, but it did not dispute the exact value of Bariven's payments for any of those shipments. [ECF No. 174, p. 74].

[105] In this instance, the demurrage costs included the fees incurred for not returning containers at issue beyond a certain "grace period"; storage costs included those fees incurred for storing the containers, use of elevators, administrative fees, port fees, and deposits. [Trial Tr. Mar. 29, 2011, at 58:19-59:10].

[106] Bariven Exhibit H was received into evidence during trial. [Trial Tr. Mar. 29, 2011, at 21:4].

[107] This number is the sum of the following values: $860,741.00 in demurrage costs for shipment 7, $464,746.00 in storage fees for shipment 7, $537,963.00 in demurrage costs for shipment 8, and $182,822.00 in storage costs for shipment 8. [Bariven Exh. H; Bariven's Closing Argument Slide 62]. I have included the amount in Venezuelan Bolivares also because I will use that figure below when discussing mitigation of damages. In that currency, the total sum is made of the following: Bs.F 3,696,624.00 in demurrage costs for shipment 7, Bs.F 997,950.00 in storage fees for shipment 7, Bs.F 2,310,390.00 in demurrage costs for shipment 8, and Bs.F 392,573.00 in storage costs for shipment 8. [Bariven Exh. H; Bariven's Closing Argument Slide 62].

used preliminary invoices and rate schedules for certain calculations where he did not have actual invoices. [ECF No. 174, p. 75; Trial Tr. Mar. 29, 2011, at 70:5-74:2]. I found that Dr. Herce used sound methodology, and I am not persuaded by Exim's argument on this point.[108] Nor am I swayed by Exim's argument that Bariven deserves no damages for demurrage and storage costs merely because the invoices for those fees were addressed to Bariven's affiliate, PDVSA Petróleos (instead of to Bariven directly). The invoices themselves match up with the shipment and container numbers relating to Exim's milk, for which Bariven was ultimately responsible. [Bariven Exh. H]. Thus, I decline to deny Bariven any rights to these damages on the basis of the corporate name listed on the bill.

On the other hand, I find Exim's arguments regarding mitigation of damages compelling. Under Florida law, Bariven had a right to reimbursement for all expenses "*reasonably incurred*" for care and custody of the milk from installments 7 and 8. *See* [Fla. Stat. § 672.715(1)]() (emphasis added); *see also id.* cmt. 1. An aggrieved party should not be permitted to receive damages in the form of a "windfall." **[*164]** [Nobs Chem., U.S.A., Inc. v. Koppers Co., Inc., 616 F.2d 212, 215 (5th Cir. 1980)]() ("[T]he aggrieved party may be put in as good a position as if the other party had fully performed but not in a better posture.") (internal quotation marks omitted); *Sharick v. Se. Univ. of Health Scis., Inc.*, 780 So. 2d 136, 139 (Fla. Dist. Ct. App. 2000) ("The purpose of compensation for a breach of contract is to place the injured party in the position he or she would have been in had the breach not occurred.").

It is undisputed that both milk shipments 7 and 8 arrived in Venezuela on October 2, 2008. Based on my analysis above, Bariven properly revoked its acceptance of those shipments on April 2, 2009, shortly after it obtained definitive test results confirming the widespread presence of melamine in that milk. As of that moment, Bariven should have discarded the milk, which it admits was essentially worthless, and stopped incurring demurrage and storage fees. [ECF No. 172, p. 84; ECF

---

[108] Among other things, Dr. Herce's calculations based on actual invoices matched up to the shipments received from Exim. [ECF No. 179, p. 35; Bariven Exh. H, I]. I found his decision to base the remainder of his calculations on rate schedules and preliminary invoices was well-reasoned. Exim even admitted that it did not object to "how he added up the numbers." [Trial Tr. Mar. 29, 2011, at 61:22-62:21 ("His addition is better than mine. I am not going to question him on that kind of thing.")].

No. 174, p. 76].[109] But instead of computing those fees through April 2, 2009, Dr. Herce continued his calculations through June 8, 2010—a date that he selected without any particular reason. [Trial Tr. Mar. 29, 2011, at 74:25-75:18; ECF No. 179, p. 36]. Further, Herce testified that he did not consider the concept of mitigating damages at any point in his analysis. [Trial Tr. Mar. 29, 2011, **[*165]** at 81:17]. These fees are not "reasonable" under the statutory framework and case law cited above.

Instead of calculating demurrage and storage fees based on a period of twenty months like Dr. Herce (from October 2008 until June 2010), I have determined that it would be more fair and equitable to calculate those fees based on a period of six months (from October 2008 until early April 2009, when Bariven should have discarded the milk). In doing so, I will make the calculation in Venezuelan Bolivares first before converting that value into U.S. Dollars.[110] Following this method, I determine that Bariven is entitled to damages for demurrage and storage costs in the amount of Bs.F 2,219,261.10, which converts to U.S. $1,032,214.46.[111] Adding this number together with the total that Bariven spent to purchase milk shipments 7 and 8 provides the total damages that Bariven should receive for those two shipments:  $6,220,500.00  +  $1,032,214.46  = $7,252,714.46.

### iii. Shipment 23

_Section 672.708(2)_ of Florida's UCC applies to Exim's damages claim for shipment 23 because Exim is a "jobber" or middleman that never took direct possession of the milk it sold. _Nobs, 616 F.2d at 215_. According to that statutory provision, Exim as the aggrieved seller **[*166]** should be put in as good a position as if Bariven had fully performed. _Fla. Stat. § 672.708(2)_. Exim's damages will be equal to the profit (including reasonable overhead) that would have come from Bariven's full performance, plus incidental damages, minus costs reasonably incurred. _Id._

The gravamen of Exim's damages claim for anticipatory repudiation comes down to the profits that Exim lost as a result of Bariven's failure to perform. Florida case law provides that an aggrieved party must not prove lost profits with mathematical precision and may calculate the number "in any manner which is reasonable under the circumstances" using the "best evidence" available. _Sharick, 780 So. 2d at 140-41; Tech Corp. v. Permutit Co., 321 So. 2d 562, 563 (Fla. Dist. Ct. App. 1975)_ ("The proof of lost profits and the allocation of overhead to a specific job is at best difficult. The proof concerning the amount of lost profits need only be reasonably certain to permit recovery thereof.").

Exim's expert, Raymond Perez, employed a basic equation to calculate Exim's lost profits by taking the sale price of the repudiated shipment, minus the costs to Exim's suppliers, operating expenses, commissions, and freight and insurance. [Trial Tr. Mar. 16, 2011, at 30:17-32:9]. He then added the "liability with suppliers" into his equation. **[*167]** [_Id._ at 32:10-19]. As Mr. Perez admitted during his cross-examination, this last step was simply a roundabout way to bring the cost of goods sold, operating expenses, and commissions back into equation under a new label. [_Id._ at 40:5-41:16; ECF No. 179, pp. 30-33]. I found Mr. Perez's testimony generally credible, and I find the first part of his proposed equation logical, but I reject the last step of his analysis about "liabilities with suppliers" as unsound. _See Sav-A-Stop, Inc. v. Mayfair Super Markets, Inc. (In re Sav-A-Stop, Inc.), 119 B.R. 317, 322-23 (Bankr. M.D. Fla. 1990)_ (rejecting aggrieved party's "flawed" analytical math technique for calculating lost profits).[112]

Mr. Perez discussed his methodology to all of Exim's remaining shipments without singling out any particular one. Because I find Bariven liable for anticipatory repudiation only as to installment 23, I apply the

---

[109] Bariven argues that it failed to do so out of fear that Exim would have then claimed that Bariven had destroyed evidence during ongoing litigation. [ECF No. 179, p. 36]. I find this argument unpersuasive. At a minimum, Bariven could have discarded the milk after providing Exim with a chance to test the milk itself and after informing Exim that Bariven was incurring exorbitant fees to store contaminated milk, and that those fees would play a role in the ongoing lawsuit.

[110] I follow this method because the figures in U.S. Dollars provided by Dr. Herce had been converted using two different exchange rates—one rate before January 8, 2010, and another after that date. Considering that I only find the fees relevant before January 8, 2010, I only employ the rate before that date of 2.15 Bolivares per U.S. Dollar. [Trial Tr. Mar. 29, 2011, at 69:14-70:4, 82:18-83:16].

[111] Specifically, 6/20 multiplied by Bs.F 7,397,537.00 gives a total of Bs.F 2,219,261.10. This number divided by 2.15 gives U.S. $1,032,214.46.

---

[112] Among other things, this last step of Mr. Perez's analysis failed to take into account the value of any milk that Exim would have received from its suppliers. [Trial Tr. Mar. 16, 2011, at 49:11-50:20].

methodology to that shipment alone and adjust the numbers accordingly. Mr. Perez calculated Exim's lost profits based on the 13,220 metric tons of powdered milk remaining to be shipped under the Parties' agreement. [Exim Exh. 42, pp. 4-5 ("Since Bariven has not taken delivery of the remaining 13,220 MT of powdered milk, Exim Brickell has experienced lost profits of $13,675,408.")].[113] The record indicates that shipment 23 **[*168]** alone was made up of approximately 1,000 metric tons of milk for which Exim paid its Chinese suppliers an advancement of $1,320,000.00. [Trial Tr. Mar. 15, 2011 at 39:23-41:21; Trial Tr. Mar. 31, 2011, at 148:17-153:19]. Using these numbers, Exim should have obtained a gross profit for that shipment in the amount of $1,234,000.00.[114] After subtracting the relevant amounts for operating expenses, commissions, and freight and insurance, Exim would have ultimately wound up with $802,424.06.[115]

---

[113] The Parties did not directly address the admissibility of Mr. Perez's Revised Report listed as Exim's Exhibit 42 during the course of trial. As for Bariven's objections to the admissibility of the Report, I have discussed (and agree with) Bariven's primary objection to Mr. Perez's general methodology above.

[114] I arrived at the number in the following manner as suggested by Mr. Perez. [Exim Exh. 42, p. 5]. First, to calculate the sale price I multiplied 1,000 metric tons by Bariven's price per metric ton of $4,785.00, giving $4,785,000.00. Second, to find the cost of goods sold, I multiplied 1,000 metric tons with the Chinese milk suppliers' price per metric ton of $3,551.00, giving $3,551,000.00. Third, I subtracted the cost of goods sold from the sale price, resulting a gross profit of $1,234,000.00.

[115] I arrived at this conclusion by using the following numbers provided by Mr. Perez at trial: total remaining operating expenses of $467,000.00, total remaining commissions of $2,372,552.00, and total remaining freight and insurance of $2,865,882.00. [Trial Tr. Mar. 16, 2011, at 29:13-31:10]. These numbers differ slightly from those used in Mr. Perez's revised report. [Exim Exh. 42]. I use the numbers from trial because those are the most recent estimates (his revised report was dated May 28, 2010). To calculate the proper amount of operating expenses due for 1,000 metric tons of milk, I multiplied $467,000.00 by the ratio of 1,000/13,220, giving $35,325.26. To calculate the amount of commissions, I did the same, multiplying $2,372,552 by 1,000/13,220, giving $179,466.87. And to calculate the amount of freight and insurance, I multiplied $2,865,882 by 1,000/13,220, giving $216,783.81. Subtracting these three numbers from Exim's gross profit, gives the total profit that Exim should have earned for shipment 23: $1,234,000.00 - ($35,325.26 + $179,466.87 + $216,783.81) = $802,424.06.

In addition to this amount, Exim paid its supplier a deposit of roughly one third of the value of shipment 23 or $1,320,000.00 so that the supplier could prepare the milk for that shipment. The evidence shows that that was an out-of-pocket expense paid by Exim for which Exim received nothing because the manufacturer repossessed the milk when relations between Exim and Bariven came to a halt. [Trial Tr. Mar. 15, 2011 at 39:23-41:21; Trial Tr. Mar. 31, 2011, at 148:17-153:19]. Given that Bariven is responsible for this direct loss to Exim of $1,320,000.00, I add this amount to Exim's damages. Thus, Exim's total damages for shipment 23 comes to $2,122,424.06.[116]

### iv. Shipments 24 Onward

As set forth above, Exim **[*169]** has not established that Bariven was liable for anticipatorily repudiating the Milk Agreement as to any shipments past number 23. As such, Exim has no right to damages for shipments 24 onward. Even if Exim had established liability for those installments, it failed to offer any evidence of monetary injury. In fact, Exim's counsel directly conceded during closing argument that there is no evidence that any milk past shipment 23 was manufactured; or that any of Exim's Chinese suppliers had brought action against Exim in court or via arbitration; or that Exim was out of pocket for any expenses at all concerning shipments 24 and beyond. [Trial Tr. Mar. 31, 2011, at 151:5-153:17]. Clearly, Exim's claims for damages relating to those installments would independently fail for being too speculative and conjectural. *See HGI Assocs. v. Wetmore Printing Co., 427 F.3d 867, 878 (11th Cir. 2005)* ("[T]here is a general rule in Florida to avoid lost profit damages because they can be too speculative and conjectural.").

### B. The Rice Contract

### i. Shipments 21, 23, & 24

Based on my conclusions of law concerning rice shipments 21, 23, and 24, Exim is liable to Bariven for failing to send the relevant original export documents with those shipments. Because the goods in question **[*170]** were otherwise conforming, Bariven's

---

[116] In other words, $802,424.06+ $1,320,000.00 = $2,122,424.06.

request for damages focuses solely on the fees it incurred for demurrage and storage fees while it waited for Exim to send the export documents. Bariven requests $1,956,685.00 based on Exim's breach, which breaks down into $515,149.00 for demurrage costs and $1,441,536.00 for storage fees. [ECF No. 172, p. 87; Bariven Closing Slides 74-75].

Referring back to my damages analysis concerning milk shipments 7 and 8 above, I find that Bariven again failed to adequately mitigate its damages for these three rice shipments. It is undisputed that rice installments 21, 23, and 24 arrived in Venezuela between January 3 and January 7, 2009, and Exim never sent the original export documents relating to those shipments until October 2009. [JTX 195]. As he did with Bariven's claims for damages under the Milk Contract, Dr. Herce selected arbitrary dates as cut off points to determine Bariven's damages for the Rice Contract. Specifically, he determined that Bariven should be reimbursed for the fees it incurred for the rice until July 28 or August 13, 2009 (depending on the shipment). [Bariven Exh. I; Trial Tr. Mar. 29, 2011, at 75:16-76:5].[117] But it was already clear [*171] as of the first week in April when Exim filed action that any future cooperation from Exim was probably unlikely.[118] As such, Bariven should not have continued waiting for Exim to send the export documents after that time and instead should have either tried to nationalize the rice itself or had the rice sent back to Brazil. All fees incurred as of April were unreasonable under Florida law. *See Fla. Stat. § 672.715(1)*.

Given these circumstances, I would normally reduce Bariven's damages to the storage fees incurred from January through the beginning of April and conclude my analysis. But two factors require me to reduce Bariven's damages further. First, the amount of damages claimed by Bariven is out of proportion to the value of the Rice Agreement. Bariven paid a total of $1,735,700.00 for all of the rice contained in shipments 21, 23, and 24, yet it

has requested almost $300,000.00 more than that value in fees related to the same goods, which, besides the absence of accompanying documents, were otherwise conforming. [JTX 195]. This presents a textbook example of what an aggrieved party is not permitted to do: receive a "windfall" as a result of a minor contractual breach. *Nobs, 616 F.2d at 215*; *Sharick, 780 So. 2d at 139*.[119]

Second, although Bariven was ultimately [*172] subject to the decision-making authority of Venezuela's governmental agency concerning customs issues, Bariven did have a mechanism (the "letter of commitment") at its disposal that it could have at least tried to use to nationalize the rice. I decline to engage in any detailed analysis about the likelihood of Bariven's success in actually getting the rice through customs pursuant to this Venezuelan legal doctrine, but merely note that Bariven has come forward with no evidence that it was attempting to use this procedure to nationalize Exim's rice while awaiting the shipments documents Considering these factors, I find it most fair and equitable that Bariven only receive reimbursement for the demurrage and storage fees that it incurred for the months of January and February 2009. As such, I multiply the amount Bariven has requested for seven months, $1,956,685.00, by 2/7 and get $559,052.86.[120]

### ii. The Remainder of the Rice Contract

Exim is not entitled to any damages relating to the remainder of the Rice Contract because Exim failed to establish that Bariven was liable for anticipatorily repudiating the Rice Contract.

### C. Total Damages

In sum, the Parties have established a right to the following [*173] damages:

---

[117] Unlike with the Milk Contract, there is no need to convert Bariven's damage claims on the Rice Contract between Venezuelan Bolivares and U.S. Dollars because Dr. Herce stopped calculating fees for the rice before the change in currency valuation in January 2010.

[118] The Rice Contract itself was not subject to litigation as of Exim's initial Complaint, which was solely focused on the Milk Contract. [ECF No. 1]. This fact does not change the general conclusion that Bariven should have known Exim would not be willing to cooperate in promptly sending the original export documents as of April 2009.

[119] I refer back to my previous factual observation that the record is slightly unclear about which three rice shipments actually arrived without original export documents and note that regardless of which actual shipments were involved, the amount of demurrage and storage fees claimed by Bariven would be out of proportion to the actual value of the goods.

[120] As discussed above in my damages analysis for milk shipments 7 and 8, I again dismiss Exim's arguments concerning the identity of the corporate addressee for Bariven's rice demurrage and storage invoices.

Go to table1

## IV. CONCLUSION

For all of the reasons set forth above, it is **ORDERED AND ADJUDGED** as follows:

1. Exim's Motion in Limine concerning Bariven's melamine tests that occurred in February 2010 [ECF No. 150] is **DENIED**.

2. Under the Milk Contract:

> a. Bariven's claim the Exim breached the whole Milk Contract pursuant to *Fla. Stat. § 672.612(3)* is **DENIED**.
>
> b. As to shipments 1-16 of the Milk Contract:
>
> > i. Bariven's counts for breach of contract and breach of implied warranty of merchantability are **GRANTED** for shipments 7 and 8.
> >
> > ii. The remainder of Bariven's counts are **DENIED**.
>
> c. As to shipments 17-22 of the Milk Contract:
>
> > i. All of Bariven's counts are **DENIED**.
>
> d. As to shipment 23 of the Milk Contract:
>
> > i. Exim's count for anticipatory repudiation is **GRANTED**.
>
> e. As to the remainder of the Milk Contract (shipments 24 forward):
>
> > i. Exim's count for anticipatory repudiation is **DENIED**.

3. Under the Rice Contract:

> a. Bariven's count for breach of contract is **GRANTED**.
>
> b. Exim's count for anticipatory repudiation is **DENIED**.

4. Damages shall be awarded as follows: [*174]

> a. Bariven suffered total damages in the amount of **$7,811,767.32**.
>
> b. Exim suffered total damages in the amount of **$2,122,424.06**.
>
> c. Bariven's damages will be off-set by Exim's damages, so Bariven shall recover from Exim

Brickell, LLC the amount of **$5,689,343.26**.

5. Preliminary Final Judgment will be issued as a separate docket entry concurrently with this Opinion. The Parties are directed to file short submissions with the Court of 10 pages or less on or before **Friday, September 2, 2011**, in which they shall present arguments about how the Court shall apply pre-or post-judgment interest to its damage award. The Parties shall include their proposed calculations for such interest and provide legal support for their arguments. Final Judgment will be entered subject to the Parties' arguments on this issue.

6. Because both Parties have prevailed on some of their claims but not on others, I exercise the broad discretion afforded to this Court under *Federal Rule of Civil Procedure 54(d)* and prohibit either Party from filing a Motion for Bill of Costs on the basis of the Preliminary Final Judgment.[121] As explained in the Damages portion of this Opinion, I also decline to award any statutory attorney fees to either Party.

7. All other pending [*175] motions are **DENIED AS MOOT** and all hearings are **CANCELLED**.

8. This case is **CLOSED**.

DONE AND ORDERED in Chambers in Miami, Florida, this 16 day of August, 2011.

/s/ Alan S. Gold

**THE HONORABLE ALAN S. GOLD**

**UNITED STATES DISTRICT JUDGE**

## PRELIMINARY FINAL JUDGMENT

---

121 Fed. R. Civ. P. 54(d)(1) ("Unless a federal statute, these rules or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party.") (emphasis added); Walters v. Roadway Exp., Inc., 557 F.2d 521, 526-27 (5th Cir. 1977) (determining that trial court has "broad discretionary powers" in taxing post-judgment costs and may require a prevailing party to bear its own costs as long as it provides a reason for that decision); see also Johnson v. Nordstrom-Larpenteur Agency, Inc., 623 F.2d 1279, 1282 (8th Cir. 1980) ("Where each of the parties has prevailed on one or more of its claims, defenses or counterclaims, the district court has broad discretion in taxing costs. We cannot say that the district court abused its discretion in ordering each party to bear its own costs.") (citation omitted); All West Pet Supply Co. v. Hill's Pet Products Div., 153 F.R.D. 667, 669-70 (D. Kan. 1994) ("[T]he court in the exercise of its discretion pursuant to Fed. R. Civ. P. 54(d) declines to award costs to any of the parties, since each of them prevailed, at least in part, in this court.").

This action was tried by the Court without a jury. Based on the Findings of Fact and Conclusions of Law, preliminary final judgment is hereby entered in accordance with *Fed. R. Civ. P. 58(a)* in the following manner:

1. For the reasons stated in the Court's Findings of Fact and Conclusions of Law, Exim Brickell, LLC was found liable to Bariven, S.A. for Count I (breach of the Milk Agreement), Count A (breach of implied warranty of merchantability for the Milk Agreement), and Count II (breach of the Rice Agreement) of Bariven's Counterclaims. [ECF No. 33].

2. Bariven, S.A. suffered and is entitled to recover **$7,811,767.32** in damages awarded as follows:

    a. **$7,252,714.46** under Count I (breach of the Milk Agreement) and Count A (breach of implied warranty of merchantability for the Milk Agreement); and

    b. **$559,052.86** under Count II (breach of the Rice Agreement).

3. For the reasons stated in the Court's Findings of Fact and Conclusions of Law, Bariven, S.A. **[*176]** was found liable to Exim Brickell, LLC for Count I of its Second Amended Complaint (anticipatory repudiation of the Milk Contract). [ECF No. 24].

4. Exim Brickell, LLC suffered and is entitled to recover **$2,122,424.06** in damages for Count I of its Second Amended Complaint (anticipatory repudiation of the Milk Contract).

5. In the exercise of the Court's equitable powers, the sum of **$7,811,767.32** in damages suffered by Bariven, S.A. is off-set against **$2,122,424.06** in damages suffered by Exim Brickell, LLC, and Bariven, S.A. shall recover from Exim Brickell, LLC the amount of **$5,689,343.26**.

6. The Parties are directed to file short submissions with the Court of 10 pages or less on or before **Friday, September 2, 2011**, in which they shall present arguments about how the Court shall apply pre-or post-judgment interest to its damage award. The Parties shall include their proposed calculations for such interest and provide legal support for their arguments. Final Judgment will be entered subject to the Parties' arguments on this issue.

7 As explained in the Findings of Fact and Conclusions of Law, neither Party shall file a Motion for Bill of Costs pursuant to *Federal Rule of Civil Procedure 54(d)* on the basis of this Judgment. **[*177]**

DONE AND ORDERED in Chambers, in Miami, Florida, this 16 day of August 2011.

/s/ Alan S. Gold

THE HONORABLE ALAN S. GOLD

UNITED STATES DISTRICT JUDGE

## APPENDIX A

## TABLE OF CONTENTS

*Go to table2*

## APPENDIX B

*Go to table3*

**Table1 (***Return to related document text***)**

| Party | Relevant Shipment | Amount Due | Total |
|---|---|---|---|
| **Bariven** | Milk Shipments 7 & 8 | $7,252,714.46 | $7,811,767.32 |
| | Rice Shipments 21, 23, & 24 | $559,052.86 | |
| **Exim** | Milk Shipment 23 | $2,122,424.06 | $2,122,424.06 |

**Table1 (***Return to related document text***)**

---

**Table2 (***Return to related document text***)**

I. FINDINGS OF FACT — 2
A. The Parties — 2
B. The Milk Contract — 3
i. Exim Begins Milk Shipments — 5
ii. The Chinese Melamine Alert — 6
iii. Exim's Initial Conduct in Relation to the Melamine Alert — 8
iv. Bariven's Initial Conduct in Relation to the Melamine Alert — 13
v. Exim Restarts Milk Shipments — 15
vi. The January 21 Meeting — 20
vii. Bariven's Melamine Tests — 25
a. The Reliability of the Sampling and Testing — 25
b. The Timing of Bariven's Tests — 29
C. The Rice Contract — 34
i. Performance of the Rice Contract — 34
ii. Exim Fails to Send Original Export Documents — 35
iii. The Last Three Rice Shipments — 37
II. CONCLUSIONS OF LAW — 39
A. Jurisdiction and Governing Law — 39
B. Claims by the Parties — 41
C. The Milk Contract — 41
i. Bariven's Arguments Under Fla. Stat. § 672.612(3) — 41
a. "Substantial Impairment" of the Milk Agreement — 48
1. Exim's Motion in Limine — 51
2. Bariven's Melamine Tests — 53
b. Bariven's Right to Affirmative Relief Under Fla. Stat.
672.612(3) — 54
ii. Milk Shipments 1-16 — 63
a. Bariven's Claim for Breach of Contract — 63
1. Substantial Nonconformity — 65
2. Difficulty of Discovery & **[*178]** Exim's Assurances — 66
3. Notice of Revocation — 69
(A). Differences in Notice Standards Between
Revocation and Warranty — 70
(B). Bariven's Notice of Revocation — 76
(i). Shipment 1 — 76
(ii). January 2009 Tests — 77
(iii). April & May 2009 Tests — 83
(iv). February 2010 Tests — 85
b. Bariven's Claim for Breach of the Implied Warranty of
Merchantability — 87
c. Bariven's Claim for Breach of Implied Covenant of
Good Faith & Fair Dealing — 89

d. Bariven's Claim for Violation of FDUTPA                                        93

ii. Milk Shipments 17-22                                                          94

a. Bariven's Claim for Breach of Contract                                         95

1. Grounds for Rejection                                                          96

2. Waiver                                                                         97

3. Substantial Impairment                                                         10
                                                                                 1

b. Bariven's Claim for Breach of the Implied Warranty of

Merchantability                                                                  10
                                                                                 8

c. Bariven's Claims Under FDUTPA and Breach of Implied

Covenant of Good Faith & Fair Dealing                                            10
                                                                                 8

iii. Remainder of the Milk Contract (Shipments 23 Onward)                        11
                                                                                 0

a. Legal Standard for Anticipatory Repudiation                                   11
                                                                                 0

b. Exim's Prior Breach and the Advanced Bodycare Case                            11
                                                                                 3

c. Shipment 23                                                                   11
                                                                                 5

d. Shipments 24 Onward                                                           11
                                                                                 8

e. Cancellation                                                                  12
                                                                                 2

D. The Rice Contract                                                             12
                                                                                 6

i. Bariven's Claim for Breach of Contract                                        12
                                                                                 7

ii. Exim's Claim for Anticipatory Repudiation                                    13
                                                                                 0

III. DAMAGES                                                                     13
                                                                                 2

A. The Milk Contract                                                             13
                                                                                 2

i. Shipments 1-6 & 9-22                                                          13
                                                                                 2

ii. Shipments 7 & 8                                                              13
                                                                                 3

iii. Shipment 23                                                                 13
                                                                                 7

iv. Shipments [*179]  24 Onward                                                  14
                                                                                 0

B. The Rice Contract                                                             14
                                                                                 0

i. Shipments 21, 23, & 24                                                        14
                                                                                 0

ii. The Remainder of the Rice Contract                                           14
                                                                                 3

C. Total Damages                                                                 14
                                                                                 3

IV. CONCLUSION                                                                   14
                                                                                 4

APPENDIX A                                                                       14
                                                                                 7

APPENDIX B                                                                       15

**Table2 (**_Return to related document text_**)**

---

**Table3 (**_Return to related document text_**)**

| SHIPMENT No. | SUPPLIER | SHIPMENT DATE | ARRIVAL DATE | AMOUNT PAID | DATE OF PAYMENT | DATE OF BARIVEN TEST |
|---|---|---|---|---|---|---|
| 1 | Suncare | 6/22/08 | 8/3/08 | $2,392,500 | 7/1/08 | n/a |
| 2 | Suncare | 7/3/08 | 9/7/08 | $1,435,500 | 8/21/08 | 2/24/10-2/25/10 |
| 3 | Suncare | 7/14/08 | 9/7/08 | $3,349,500 | 7/16/08 | 5/5/09 |
| 4 | Dairygold | 7/17/08 | 9/7/08 | $2,440,350 | 7/23/08 | 2/23/10 |
| 5 | Suncare | 7/19/08 | 9/12/08 | $3,349,500 | 7/23/08 | 4/30/09-5/4/09 |
| 6 | Suncare | 7/25/08 | 9/24/08 | $3,110,250 | 8/7/08 | 2/25/10 |
| 7 | Suncare | 8/6/08 | 10/2/08 | $3,828,000 | 8/21/08 | 1/27/09-1/28/09 |
| 8 | Suncare | 8/7/08 | 10/2/08 | $2,392,500 | 8/21/08 | 1/27/09-1/28/09 |
| 9 | Suncare | 8/15/08 | 11/6/08 | $3,828,000 | 8/28/08 | 2/22/10 |
| 10 | Suncare | 8/22/08 | 10/20/08 | $3,349,500 | 8/28/08 | 2/23/10 |
| 11 | Dairygold | 8/29/08 | 11/6/08 | $2,440,350 | 9/5/08 | 2/22/10-2/29/10 |
| 12 | Dairygold | 8/22/08 | 11/10/08 | $2,440,350 | 9/5/08 | 2/22/10-2/23/10 |
| 13 | Dairygold | 8/29/08 | 11/6/08 | $2,392,500 | 9/5/08 | 2/23/10-2/24/10 |
| 14 | Suncare | 8/29/08 | 11/6/08 | $3,828,000 | 9/5/08 | 2/23/10-2/24/10 |
| 15 | Suncare | 9/10/08 | 10/26/08 | $2,392,500 | 9/18/08 | 2/10 |
| 16 | Suncare | 9/10/08 | 10/26/08 | $2,392,500 | 9/18/08 | 5/4/09-5/5/09 |
| 17 | Suncare | 12/11/08 | 1/25/09 | $1,435,500 | 12/11/08 | n/a |
| 18 | Dairygold | 12/13/08 | 1/22/09 | $2,392,500 | 9/18/09 | n/a |
| 19 | Suncare | 12/23/08 | 2/11/09 | $2,392,500 | 9/18/09 | n/a |
| 20 [*180] | Suncare | 1/8/09 | 2/20/09 | $2,392,500 | 9/18/09 | n/a |
| 21 | Beijing Reward | 1/10/09 | 2/20/09 | $957,000 | 9/18/09 | n/a |
| 22 | Beijing | 1/16/09 | 2/25/09 | $1,435,500 | 9/18/09 | n/a |

**Table3 (**_Return to related document text_**)**

---

**End of Document**

# Exhibit 8

# *F.M.W. Properties, Inc. v. Peoples First Financial Sav. & Loan Ass'n*

Court of Appeal of Florida, First District

August 12, 1992, Filed

CASE NO. 91-3077

**Reporter**

606 So. 2d 372 *; 1992 Fla. App. LEXIS 8922 **; 17 Fla. L. Weekly D 1918

F. M. W. PROPERTIES, INC., and FRED M. WEBB, Appellants, vs. PEOPLES FIRST FINANCIAL SAVINGS AND LOAN ASSOCIATION, a State Chartered Savings and Loan Association, Appellee.

**Subsequent History:** [**1] Rehearing Denied November 4, 1992. Released for Publication November 20, 1992.

**Prior History:** An Appeal from the Circuit Court for Bay County. Russell A. Cole, Jr., Judge.

**Disposition:** AFFIRMED.

## Core Terms

oral agreement, renewed, summary judgment, appellants', mortgage, affirmative defense, parol evidence rule, conversation, modification, loan documents, trial court, subdivision, maturity, parties

## Case Summary

**Procedural Posture**
Defendant borrowers appealed the partial summary judgment granted by the Circuit Court for Bay County (Florida) in favor of plaintiff lender on the issue of liability in its mortgage foreclosure action.

**Overview**
Defendant borrowers executed a promissory note and mortgage in favor of plaintiff lender. When defendants failed to make payment at maturity, plaintiff filed a foreclosure action that alleged default of payment. Defendants denied any default. Defendants raised additional defenses, alleging that it was contemplated that the loan would be repaid by selling property in the subdivision that was subject to the mortgage, and that defendants would not repay the loan from their separate funds. In opposition to plaintiff's motion for summary judgment, defendants also maintained that plaintiff's vice president of commercial lending promised that the loan would be renewed at the end of its term. The trial court granted partial summary judgment in favor of plaintiff on the issue of liability. The trial court rejected the parol evidence because it lacked independent proof. On appeal, the court affirmed the trial court's rejection of the oral agreement because defendants did not properly raise an affirmative defense that asserted the existence of a subsequent oral agreement.

**Outcome**
The court affirmed the partial summary judgment in favor of plaintiff lender on the issue of liability in its mortgage foreclosure action because it concluded that the trial court properly rejected defendant borrowers' proffered testimony regarding an oral agreement with plaintiff's vice president of commercial lending regarding renewal of the loan at maturity.

## LexisNexis® Headnotes

Contracts Law > Types of Contracts > Oral Agreements
Business & Corporate Compliance > Contracts > Types of Contracts > Oral Agreements

Contracts Law > ... > Affirmative Defenses > Fraud & Misrepresentation > General Overview

Evidence > Types of Evidence > Documentary Evidence > Parol Evidence

Contracts Law > Contract Interpretation > Parol Evidence > General Overview

Contracts Law > Types of Contracts > General

Overview

Evidence > Admissibility > Statements as
Evidence > Parol Evidence

### *HN1*[⬇] Types of Contracts, Oral Agreements

Neither the parol evidence rule nor the foundation for it can be obviated or obliterated by merely averring an oral promise, allegedly constituting part of an oral agreement made prior to or contemporaneously with a valid and unambiguous written agreement, is or constitutes a misrepresentation, fraudulent or otherwise. If such were the case, any alleged oral misrepresentation, constituting part of an oral agreement made prior to or contemporaneously with a clear written agreement, could be characterized as fraudulent to escape the very reason for the common law rule excluding the admission of parol evidence in contravention of an unambiguous written agreement. And if such alleged oral agreement cannot be proved by competent legal evidence, the agreement itself cannot be regarded as existing in fact or in law, since there can be no legal proof of it.

Contracts Law > Contract Conditions &
Provisions > Integration Clauses
Business & Corporate
Compliance > Contracts > Contract Conditions &
Provisions > Integration Clauses

Contracts Law > Contract Modifications > General
Overview

Contracts Law > Types of Contracts > Oral
Agreements
Business & Corporate
Compliance > Contracts > Types of
Contracts > Oral Agreements

### *HN2*[⬇] Contract Conditions & Provisions, Integration Clauses

Evidence of a subsequent oral modification is admissible even where a writing contains a merger clause.

Civil Procedure > Appeals > Appellate Briefs

Civil Procedure > Appeals > Reviewability of Lower
Court Decisions > General Overview

### *HN3*[⬇] Appeals, Appellate Briefs

*Fla. R. App. P. 9.210(b)(1)* requires all initial briefs to contain a table of contents listing the issues presented for review, with reference to pages. While assignments of error are no longer required in Florida appellate practice, it should be clear that each matter upon which an appellant relies for reversal must be argued under an appropriate issue presented for review. Argument which addresses a point not set out in the issue on appeal will not be considered. It is well settled that, in order to obtain appellate review, alleged errors relied upon for reversal must be raised clearly, concisely, and separately as points on appeal.

Civil Procedure > Appeals > Reviewability of Lower
Court Decisions > General Overview

Contracts Law > ... > Discharge &
Payment > Defenses > Failure of Consideration

### *HN4*[⬇] Appeals, Reviewability of Lower Court Decisions

The failure to organize arguments under cogent and distinct issues on appeal presents sufficient reason for an appellate court to decline consideration of a matter.

**Counsel:** David L. Fleming, Gulf Breeze; Bill R. Hutto of Hutto, Nabors, Bodiford & Warner, Panama City, for Appellants.

John L. Gioiello of Barr & Gioiello, Panama City; Les W. Burke, Panama City, for Appellee.

**Judges:** KAHN, SMITH, ERVIN

**Opinion by:** KAHN

# Opinion

[*372] KAHN, J.

This action arises from a mortgage foreclosure complaint filed by Peoples First Financial Savings and Loan Association (Peoples First) against F.M.W. Properties, Inc. (F.M.W.) and Fred M. Webb. The complaint alleges that on May 13, 1987, F.M.W. executed a promissory note and mortgage in favor of

Peoples First in the principal amount of $ 518,000.00. At the same time, Mr. Webb executed a guaranty agreement in favor of Peoples First, guaranteeing F.M.W.'s obligation under the note and mortgage. Under the terms of these loan documents, the obligation would mature on June 1, 1990. When F.M.W. and Webb did not make payment at maturity, Peoples First filed a foreclosure action alleging the default in payment of principal in the amount of $ 287,665.00 and interest in the amount of $ **[**2]** 8,566.85 through July 16, 1990.

F.M.W. and Webb answered the foreclosure complaint, admitting the execution and delivery of the promissory note and mortgage, as well as Webb's guaranty agreement. The defendants denied, however, any default under the note, mortgage and guaranty agreement, and denied that any overdue principal or interest was owed. F.M.W. and Webb also raised the following "additional defenses":

11. Since the inception of the subject loan in 1987, defendants have substantially reduced the principal balance thereof **[*373]** by selling property within the subdivision which is subject to Plaintiff's mortgage, and Plaintiff released lots from the mortgage on account of such sales. It was the intention of the parties at the time the subject loan was originated that the loan would be repaid from sales, and the maturity date of the loan was based upon a good faith estimate of the time needed to sell enough lots in order to satisfy the loan. It was never intended by either party that Defendants would be required to pay the indebtedness from their separate funds or that Plaintiff would, or could, demand immediate payment of the entire principal balance of the loan upon maturity. **[**3]** These understandings are typical of a longstanding relationship and course of dealing between Defendants and Plaintiff.

12. When the subject loan matured on June 1, 1990, Defendants sought a renewal consistent with their understandings. Plaintiff offered to renew the loan but, much to the surprise of Defendants, demanded that the subject property be pledged as additional security for another loan. A copy of Plaintiff's offer, by letter dated June 12, 1990, is attached hereto. [1] When Defendants refused to comply with Plaintiff's extortionate demand, the present action was initiated.

_____

[1] The letter here referenced does not appear as an attachment to the pleading, which is itself included as Item 2 in the appellant's appendix, filed in this appeal of a nonfinal order. See _Fla. R. App. P. 9.220_.

13. Based upon the understandings and course of dealing between the parties and Plaintiff's inequitable conduct, Plaintiff should be estopped and otherwise barred from obtaining the relief sought herein, and the instruments upon which this action is based should be reformed to renew the loan on the terms set forth in Plaintiff's June 12, 1990 letter but without the requirement of cross-collateralization of the other loan.

**[**4]** Peoples First then filed a motion for summary final judgment, accompanied by an affidavit of indebtedness executed by Raymond Powell, the Executive Vice-President of Peoples First. F.M.W. and Webb countered by filing the affidavit of Mr. Webb, making the following sworn averments:

2. When I made application with Plaintiff, Peoples First Financial Savings and Loan Association ("Peoples"), for the loan which is the subject of this action, I advised Peoples that the repayment of this loan would have to be from the sale of lots within the subdivision property which is subject to Peoples' mortgage, as is evidenced by the loan application signed by me and Produced from the files of Peoples, a true copy of which is attached hereto as Exhibit "1". In fact, I had a specific discussion with Raymond Powell, Peoples' Vice President of Commercial Lending, about the three-year term offered by Peoples and advised him that it would take at least five years to sell out the subject subdivision. Mr. Powell represented to me that: (1) Peoples did not like to have term loans for more than three years on its books, but (2) the loan would be renewed at the end of the present three-year term.

3. **[**5]** Approximately two years ago when a sewer moratorium was announced with respect to the area within which the subject subdivision was located, I was asked by Raymond Powell of Peoples what the impact of the moratorium would be on the marketing of the subject subdivision and my ability to repay. the subject loan. I advised the foregoing that the moratorium would, of course, slow down sales and that it would certainly not be possible to repay the loan within the present three-year term. I was again assured that the loan would be renewed at the end of such term.

The circuit court denied the motion for summary judgment, finding "that there are material facts in issue." Peoples First then proceeded to take Mr. Webb's deposition. In his deposition, Mr. Webb purported to describe two meetings with Mr. Powell of Peoples First. The first meeting, according to Webb, took place before the execution and delivery of the 1987 loan documents:

Case: 25-30743   Doc# 83   Filed: 01/08/26   Entered: 01/08/26 22:23:15   Page 158 of 261

[*374] Q. (By Mr. Burke, representing Peoples First): . . . In your affidavit you refer to a conversation had with representatives of People's First at least in part with a gentleman named Raymond Powell relative to a commitment or agreement received from [**6] Peoples that the loan would be renewed at the end of its original term of three years. Do you recall the circumstances surrounding such an agreement as that?

A. Yes, sir.

Q. Okay. Could you tell me please the conversations during which that agreement was discussed? Was there more than one conversation?

A. There was the initial conversation on the front end of the loan. We had an understanding that we would pay the loan from the sale of lots and of course while you may be optimistic about how long it takes to sell lots or sell any other merchandise you need to, you need to cover yourself with some alternate plans if things don't go like you want. And Mr. Powell and I discussed that. He said, as I have heard, you know, from other places and other people that the bank wants to try to keep the term of the loan on a short basis. That was not new to me. But I told him that was fine as long as they would work with me if sales did not go as planned and if I could get renewals, you know, if everything was okay, you know, if I wasn't behind on the interest or anything like that, they would work with me until the thing sold out substantially.

Q. Was that a conversation with [**7] Raymond Powell?

A. Yes.

Q. And is he an officer of Peoples First Financial?

A. Yes.

Q. And this was just in the weeks or days prior to the actual closing of the loan?

A. Yes.

Q. Okay. Was there anyone else present during that conversation?

A. Not that I remember.

Mr. Webb also testified of another meeting with Powell:

Q. Were there any subsequent meetings to that prior meeting which involved a discussion between Mr. Powell and you or any other representatives of Peoples First?

A. Yes, sir.

Q. When was that?

A. The county cut off the sewer all over Callaway approximately two, two and a half years ago. And I was in Mr. Powell's office on a, I believe on a renewal on the H & S loan and he asked me about the sewer shutdown in Callaway, what effect it was going to have on us. I told him it was, you know, I didn't know how long it was going to last, but if it lasted any length of time, it had already lasted some time, that it would, not only would we not be selling any lots during that time but it would ultimately throw a damper on all of Callaway which could take quite a while to recover. That of course turned out to be true. It's only now Callaway [**8] has begun to recover from the county's actions out there I think. And I told Mr. Powell that, you know, I reminded him that our loan would be coming up and that I certainly would not be able to have it all paid off by that Point and he assured me again, 'Don't worry, we'll work with you, we told you we would and we will.'

Q. And when did that conversation occur?

A. Sometime either during the time that the sewer was shut off, either right towards the end of it or close to the end of the moratorium. And I can't recite the days right offhand. I'm able to correlate these events with other events, but it's hard for me off the top of my head to quote dates.

After the Webb deposition, Peoples First renewed its motion for summary judgment, alleging that the only evidence advanced by F.M.W. and Webb to support their allegation of an oral agreement contrary to written contract terms of the loan documents is the testimony of Mr. Webb, set forth above. Peoples First asserted that such [*375] evidence did not meet the standard of "clear, precise, and indubitable," as required by Florida law to overcome the general prohibition against proving an oral agreement contrary to a written contract. [**9] *Mallard v. Ewing,* 121 Fla. 654, 164 So. 674 (Fla. 1935).

The circuit court entered partial summary judgment in favor of Peoples First, and supported its order by the following conclusions:

There is a conflict between the affidavit and testimony of the Defendant, Fred M. Webb, with the affidavit of Raymond Powell on behalf of the Plaintiff. This

discrepancy concerns whether or not oral representations were made, either before or at the signing of the loan documents. In support of the Defendant's position they cite *Mallard vs Ewing, 121 Fla. 654, 164 So. 674 (Fla. 1935)*.

In reviewing the Mallard case and its progeny [sic] it appears that most courts have required that there be additional independent proof to support the parol evidence. Here, there is no independent proof and lacking this, the Defendant does not have clear, precise and indubitable evidence of the contemporaneous oral agreement which induces the execution of the written instruments sufficient to make the parol evidence of the Defendant, Fred M. Webb, admissable to prove the agreement. *Chase Manhattan Bank v. Rood, 698 F.2d 435* (11 Cir. 1983).

From the court's order **[**10]** deciding the issue of liability in favor of Peoples First, F.M.W. and Webb bring this appeal.

Upon review of the briefs and the record, we conclude that the trial court properly rejected appellants' proffered testimony regarding an oral agreement between Webb and Powell. *Mallard v. Ewing, supra.* In *Venusa Development Corp. v. Southeast Mortgage Co., 297 So. 2d 86 (Fla. 3d DCA 1974)*, the court quoted at length from the order under review, entered by then Circuit Judge Schwartz:

*HN1*] Neither the Parol Evidence Rule nor the foundation for it can, in this Court's opinion, be obviated or obliterated by merely averring an oral promise, allegedly constituting part of an oral agreement made prior to or contemporaneously with a valid and unambiguous written agreement, was or constituted a misrepresentation, fraudulent or otherwise. If such were the case, any alleged oral misrepresentation, constituting part of an oral agreement made prior to or contemporaneously with a clear written agreement, could be characterized as fraudulent to escape the very reason for the common law rule excluding the admission of parol evidence in contravention of an unambiguous **[**11]** written agreement. And if such alleged oral agreement cannot be proved by competent legal evidence, the agreement itself cannot be regarded as existing in fact or in law, since there can be no legal proof of it.

*297 So. 2d at 89, n. 1.*

Since appellants offered no competent evidence, in the face of a legally sufficient summary judgment motion, the trial court properly rejected their attempt to avoid the loan documents by way of Mr. Webb's oral assertions.

We have not ignored appellants' contention in the amended initial brief that "there is evidence of a subsequent meeting between Mr. Webb and Mr. Powell wherein Mr. Powell reaffirmed the oral agreement. *HN2*] Evidence of a subsequent oral modification is admissible even where the writing contains a merger clause. *Linear Corp. v. Standard Hardware Co., 423 So. 2d 966 (Fla. 1st DCA 1982)*." Appellants have not properly raised a question of subsequent oral modification of the loan documents. As may be seen from our above recital of the peadings filed by F.M.W. and Webb, no affirmative defense raised by F.M.W. and Webb properly seeks to assert the existence of a subsequent oral agreement. See *Dober v. Worrell, 401 So. 2d 1322, 1323 (Fla. 1981)* **[**12]** ("Failure to raise an affirmative defense before a trial court considering a motion for summary judgment precludes raising that issue for the first time on **[*376]** appeal"). [2] **[**13]** Furthermore, as will be discussed in greater detail below, no issue in the brief addresses this. Cf. *The Race Inc. v. Lake & River Recreational Properties, Inc., 573 So. 2d 409 (Fla. 1st DCA 1991)* (admission of a subsequent oral agreement between lender and borrower would not be barred where a borrower properly raised affirmative defense of failure of consideration). It is noteworthy that in the present case

[2]

We have noted our earlier decision in *DeAtley v. McKinley, 497 So. 2d 962 (Fla. 1st DCA 1986)*. In that case this court reversed the summary judgment against the mortgagors with directions that the trial court allow the mortgagors to amend their answer so as to allege proper affirmative defenses. The opinion discloses that the DeAtleys incurred the debt initially by way of their agreement to pay $ 37,500 in return for a three-day investment seminar, and that they partially secured this sum by a mortgage note. Moreover, the DeAtleys attempted to represent themselves, and in so doing, failed to assert any affirmative defenses, and further failed to timely respond to two requests for admission served by the holders of the delinquent mortgage note. In the present case, F.M.W. and Webb have been represented from the start by competent counsel and possess in their own right a certain degree of financial sophistication. In view of Dober, we do not read DeAtley as excusing the need for timely defensive pleadings in mortgage foreclosure actions.

appellants do not even point to facts that would support a finding of a subsequent new agreement or modification. Webb's testimony that he was told by Powell, "don't worry, we'll work with you," hardly constitutes an agreement supported by consideration, and we decline to consider it as proper evidence of such. [3]

[**14] In view of the importance to litigants, and this court, of having legal issues properly presented for resolution, we feel that it is incumbent upon us to comment upon certain problems we have noted in our review of this case. [4] Appellants filed their initial brief on October 9, 1991. On October 11, 1991, this court struck appellant's brief because it contained no statement of facts. On October 28, 1991, appellants filed their amended initial brief.

Appellants' Table of Contents at page "i" contains a line reading: "ISSUES PRESENTED ON APPEAL . . . 4." Page four of the brief, entitled "ISSUES PRESENTED ON APPEAL" reads in its entirety as follows:

1. Whether the lower court properly entered an order granting partial summary final judgment based upon:

_____

[3] In those limited circumstances where parol changes are admissible to alter the terms of a previous and unambiguous written contract, the rule is clear that the proffered evidence must support a new contract, and not merely a gratuitous assertion by the alleged promisor, unsupported by consideration or detrimental reliance by the promisee. *Wilson v. McCleeny, 32 Fla. 363, 13 So. 873 (1893)* (parol evidence is admissible to establish a subsequent contract that alters, modifies, or changes former existing agreement between parties); *Vorzimer v. Kaplan, 362 So. 2d 451 (Fla. 3d DCA 1978)* (parol testimony must be sufficiently specific to establish a new meeting of the minds between the contracting parties which changed the terms of a written contract subsequent to its execution); *King Partitions & Drywall Inc. v. Donner Enterprises Inc., 464 So. 2d 715 (Fla. 4th DCA 1985)* (oral agreement which is accepted and acted upon by the parties in reliance thereon may create a new contractual undertaking where refusal to enforce subsequent oral agreement would work a fraud on either party). In light of these authorities, we are simply unable to conclude that a bank officer's statement, "don't worry, we'll work with you," without more, constitutes a new contract, so as to bring a collection matter to a screeching halt.

[4] We intend no criticism of appellants' counsel in this case, but use this case merely as an example to emphasize the need for greater attention on the part of appellate practitioners to the requirements of the appellate rules, and to urge greater efforts toward accuracy in form and content of briefs filed in this court.

(a) The application of the parol evidence rule to evidence of oral representations and agreements here involved; and

(b) A finding that the inducement and condition precedent exceptions to the parol evidence rule do not apply based upon the lack of clear, precise and indubitable evidence of the oral representations, to wit: The individual defendants' testimony that they were unaware of supporting evidence other than their [**15] own testimony.

2. Whether other issues are presented in the present case which preclude the granting of partial summary judgment, [*377] even if the evidence of oral representations and agreements is barred by the parol evidence rule.

3. Whether the trial court abused its discretion by ordering a consolidation of the present case with a case involving other parties and unrelated issues.

Turning back to the Table of Contents page of appellant's brief, the same contains a heading entitled "Argument," which prefaces five subheadings:

⊞ Go to table1

[**16] HN3⤒ Rule 9.210(b)(1), Florida Rules of Appellate Procedure, requires all initial briefs to contain a table of contents "listing the issues presented for review, with reference to pages." Appellants' brief does not comply with this rule. The "Issues" set out at page 4 do not comport with the five subheadings set out on the Table of Contents page underneath the "Argument" heading. While assignments of error are no longer required in Florida appellate practice, it should be clear that each matter upon which an appellant relies for reversal must be argued under an appropriate issue presented for review. Argument which addresses a point not set out in the issue on appeal will not be considered. *McClendon v. International House of Pancakes, 381 So. 2d 728 (Fla. 1st DCA 1980)*. "It is well settled that, in order to obtain appellate review, alleged errors relied upon for reversal must be raised clearly, concisely, and separately as points on appeal." *Singer v. Borbua, 497 So. 2d 279, 281 (Fla. 3d DCA 1986)*. [5]

_____

[5] The following string cite from the Singer case is helpful should one be interested in locating other authorities: "See Lynch v. Tennyson, 443 So. 2d 1017, 1019 (Fla. 5th DCA 1983); McClendon v. International House of Pancakes, 381 So. 2d 728, 728 (Fla. 1st DCA 1980); Anderson v. State, 215 So. 2d 618, 619 (Fla. 4th DCA 1968); see also Redditt v. State, 84 So. 2d 317, 321-22 n. 1 (Fla. 1955)

[**17] This court now experiences filings at an annualized rate of 4,485 cases per year. This translates to 345 cases annually per judge of this court, and approximately 1,000 cases per three-judge panel. We are dedicated to the proposition that each case and each litigant must receive full and fair consideration. Accordingly, proper organization of briefs pursuant to the Florida Rules of Appellate Procedure is not only desirable and convenient, it has become an absolute necessity. In this case, appellants' brief purports to raise' three issues on appeal, as set out at page 4. The argument section of the brief, however, does not track the issues appellants purport to raise. Recognizing that the courts have an obligation to lend finality to business transactions, we have refrained from striking appellant's amended initial brief, as we did their first brief. [6] We note, however, that *HN4*[↑] [*378] the failure to organize arguments under cogent and distinct issues on appeal presents sufficient reason for an appellate court to decline consideration of a matter. *McClendon, supra.*

[**18] Appellants' argument concerning Peoples First's grant of partial releases after the foreclosure is without merit, as is appellants' objection to the trial court's consolidation of this matter with another pending action between the same parties.

AFFIRMED.

SMITH, J., CONCURS; ERVIN, J., SPECIALLY CONCURS W/WRITTEN OPINION.

**Concur by:** ERVIN

# Concur

ERVIN, J., specially concurring:

Had appellant properly pled as an affirmative defense

that there was a subsequent oral modification of the parties' contract, I would conclude that the final order of summary judgment should be reversed. The parol evidence rule does not prohibit the admission of a subsequent oral agreement that modifies the previous agreement between the parties. *The Race Inc. v. Lake & River Recreational Properties, Inc., 573 So. 2d 409, 410-11 (Fla. 1st DCA 1991)*; *Linear Corp. v. Standard Hardware Co., 423 So. 2d 966, 968 (Fla. 1st DCA 1982).* I believe that appellants presented competent evidence which established this as a genuine issue of material fact. [7] Moreover, by generally denying the substance of appellants' allegations, [8] appellee demonstrated the existence of a factual issue. [**19] *Ton-Will Enters., Inc. v. T & J Losurdo, Inc., 440 So. 2d 621, 622 (Fla. 2d DCA 1983).*

Nevertheless, although the [**20] <u>evidence</u> in the record at the time of the summary judgment hearing demonstrated the existence of a disputed issue of fact, appellants waived this issue by failing to plead modification as an affirmative defense [9]. The supreme court has observed that at the summary judgment stage of a proceeding, the issues are defined "solely by the pleadings," even if evidence outside the pleadings, such as depositions and affidavits, shows that a proper cause of action or defense may exist. *Hart Properties, Inc. v. Slack, 159 So. 2d 236, 239-40 (Fla. 1963).* In *Dober v. Worrell, 401 So. 2d 1322 (Fla. 1981),* the court specifically held that a party may not raise, on appeal from an adverse summary judgment, an affirmative defense that was not raised before the trial court, even if the record shows that such defense was possible, and the appellate court may not remand to permit the party

---

7  In an affidavit, appellant Fred Webb stated that Raymond Powell, vice-president of appellee, "assured [Webb] that the loan would be renewed at the end of such term." In his deposition, Webb testified that sometime in 1989, Bay County cut off sewer services for the properties at issue. Webb testified that he discussed the matter with Powell, who asked what effect the shutdown would have on FMW Properties. Webb told him that it would put a damper on the sale of lots, and that he "certainly wouldn't be able to have it all paid off" by the time the loan came due, and that Powell "assured me again, 'Don't worry, we'll work with you, we told you we would and we will.'"

8  Powell refuted Webb's allegations in an affidavit, stating, "at no time subsequent to" the execution of the contract, "have I promised, guaranteed, or inferred that the Promissory Note would be renewed."

9  Although I have found no Florida case expressly stating that modification is an affirmative defense, other jurisdictions that have considered the question have determined that it is.  See, e.g., Counties of Warren & Washington Indus. Dev.  Agency v. Boychuck, 109 A.D.2d 1024, 487 N.Y.S.2d 139, 141 (N.Y.  App.  Div.), appeal denied, 482 N.E.2d 567 (N.Y. 1985); Danjee, Inc. v Addressograph Multigraph Corp., 44 N.C. App. 626, 262 S.E.2d 665, 671-72 (N.C. Ct. App.), review denied, 300 N.C. 196, 269 S.E.2d 623 (N.C. 1980); Carothers v. Carothers, 260 Ore. 99, 488 P.2d 1185, 1188 (Or. 1971); Metrocon Constr. Co. v. Gregory Constr. Co., 663 S.W.2d 460, 463 (Tex. Ct. App. 1983); Tennien v. Pittsford, 137 Vt. 326, 404 A.2d 111, 114 (Vt. 1979).

---

(emphasizes importance of points on appeal for proper judicial review), aff'd, 88 So. 2d 126 (Fla.  1956) (en banc); Fla.R.App.P. 9.210(b)(5) (Committee notes from 1977 revision of sections (b), (c), (d), (e)); cf. Carroll v. Hertz Corp., 132 So. 2d 624, 625 n. 1 (Fla. 3d DCA 1961) (disapproves of single 'double-barrelled' points addressing two issues), cert. denied, 138 So. 2d 333 (Fla. 1962)." 497 So. 2d 281.

6  The court similarly did not strike appellant's brief in Williams v. State, Department of Transportation, 579 So. 2d 226 (Fla. 1st DCA 1991), but cautioned: "We take this opportunity, however, to point out that as an appellate court we can only review specific action or rulings by the trial court; we do not review abstract questions of law.  Thus it is imperative that the appellate practitioner clearly identify in each point on appeal the specific ruling of which review is being sought . . . Failure to observe these points of good appellate practice may result in the court's failure to appreciate the merits of an otherwise reversible error." 579 So. 2d at 229, n. 1.

to amend unless a motion for leave to amend was made in the court below. *Id. at 1324.*

 **[\*\*21]** Thus, I believe the lower court's order must be affirmed, because it properly disposed of the issues raised by the pleadings (and consequently did not mention the issue of subsequent oral modification), and there is nothing in the record indicating that appellants  **[\*379]** sought leave to amend their affirmative defenses.

**Table1 (***Return to related document text***)**

| | A. | Introduction | 6 |
| | E | | |
| | B. | Whether the Proffered Testimony is | |
| | | Barred by the Parole Evidence Rule | |
| | | Absent an Exception | 9 |
| | C. | Whether the Testimony of an Oral | |
| | | Inducement is Admissible Even Were | |
| | | the Parol Evidence Rule to be Applied | 11 |
| | D. | Evidence of Acceptance of Post-Foreclosure | |
| | | Payments by the Plaintiff | |
| | | Precluded Summary Judgment | 14 |
| | E. | The Lower Court Abused Its | |
| | | Discretion by Ordering a | |
| | | Consolidation | 15 |

**Table1 (***Return to related document text***)**

---

**End of Document**

# Exhibit 9

# *Farmers State Bank v. Farmland Foods, Inc.*

Supreme Court of Nebraska

March 20, 1987, Filed

No. 85-250

## Reporter

225 Neb. 1 *; 402 N.W.2d 277 **; 1987 Neb. LEXIS 838 ***; 3 U.C.C. Rep. Serv. 2d (Callaghan) 902

Farmers State Bank, appellant, v. Farmland Foods, Inc., doing business as Farmland Industries, appellee

**Prior History:** [***1] Appeal from the District Court for Polk County: William H. Norton, Judge.

**Disposition:** Affirmed.

## Core Terms

sales, collateral, waived, farm, security agreement, written consent, proceeds, security interest, hogs, farmer, sale of collateral, purchaser, provisions, borrower, lender, authorization, occasions, deposit, parties, conversion, financing, livestock, prior written consent, rebuke, terms, express terms, trade usage, reprimanded, permission, consented

## Case Summary

### Procedural Posture

Appellant sought review of judgment of the District Court for Polk County (Nebraska) finding that appellee was not liable for conversion.

### Overview

Appellant brought action for conversion against appellee for damages based on appellee's purchase of hogs, which were subject to appellant's security interest. Appellee claimed it was not liable to appellant because appellant had impliedly consented to the sale of hogs and thus waived its security interest. The court found for appellee because, despite a requirement in the security agreement for written consent prior to any sale of collateral, appellee had sold his hogs on 130 occasions over a six-year period, without first obtaining appellant's consent. Appellant, by its long course of conduct of not requiring appellee to obtain its consent to sell collateral, had consented to such sales and thus waived its security interest in the collateral.

### Outcome

The judgment of the district court was affirmed. Appellant waived its security interest in the collateral by a course of conduct of not requiring appellee to obtain appellant's consent to sell collateral on more than 130 occasions over a six-year period.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review

Civil Procedure > ... > Standards of Review > Substantial Evidence > Sufficiency of Evidence

*HN1*[🔽] **Standards of Review, Clearly Erroneous Review**

A jury verdict will not be disturbed on appeal unless it is clearly erroneous and against the preponderance of the evidence and so clearly contrary to findings that it is the duty of the reviewing court to correct it. Further, a jury verdict is sufficient if there is any competent evidence presented to the jury upon which it could find for the successful party.

Contracts Law > ... > Default > Foreclosure & Repossession > Dispositions of Collateral
Business & Corporate Compliance > ... > Default > Foreclosure & Repossession > Dispositions of Collateral

Commercial Law (UCC) > Secured Transactions (Article 9) > Third Party Rights > Defenses

Contracts Law > Types of Commercial Transactions > Secured Transactions > General Overview

**HN2[⬇]** **Foreclosure & Repossession, Dispositions of Collateral**

Consent may be established by implication arising from a course of conduct as well as expressly, and such consent operates as a waiver of the security interest.

Commercial Law (UCC) > Secured Transactions (Article 9) > Third Party Rights > Defenses

**HN3[⬇]** **Third Party Rights, Defenses**

Waiver has been defined as a voluntary and intentional relinquishment or abandonment of a known existing legal right or such conduct as warrants an inference of the relinquishment of such right.

Commercial Law (UCC) > ... > Perfection > Methods of Perfection > Proceeds From Collateral

Commercial Law (UCC) > Bank Deposits & Collections (Article 4) > Collections > Security Interests

Commercial Law (UCC) > Secured Transactions (Article 9) > General Overview

**HN4[⬇]** **Methods of Perfection, Proceeds From Collateral**

See *Neb. U.C.C. § 9-306(2)*.

Contracts Law > Standards of Performance > Creditors & Debtors Business & Corporate Compliance > Contracts > Standards of Performance > Creditors & Debtors

Commercial Law (UCC) > Secured Transactions (Article 9) > Third Party Rights > Defenses

Contracts Law > ... > Perfections & Priorities > Priorities > General Overview

Contracts Law > ... > Secured

Transactions > Perfections & Priorities > General Overview

Contracts Law > ... > Priorities > Creditor Priorities > General Overview

**HN5[⬇]** **Standards of Performance, Creditors & Debtors**

It is a factual question whether a bank's prior course of dealing with the debtor might create an implied agreement amounting to a waiver of the security interest.

Contracts Law > Standards of Performance > Creditors & Debtors Business & Corporate Compliance > Contracts > Standards of Performance > Creditors & Debtors

Commercial Law (UCC) > General Provisions (Article 1) > Definitions & Interpretation > General Overview

Commercial Law (UCC) > General Provisions (Article 1)

Commercial Law (UCC) > General Provisions (Article 1) > General Provisions

Commercial Law (UCC) > ... > General Provisions > Policies & Purposes > General Overview

Commercial Law (UCC) > Secured Transactions (Article 9) > General Overview

Commercial Law (UCC) > ... > Default > Default & Enforcement of Security Interests > Agreements, Variances & Waivers

Contracts Law > ... > Default > Foreclosure & Repossession > Agreements, Variances & Waivers Business & Corporate Compliance > ... > Default > Foreclosure & Repossession > Agreements, Variances & Waivers

**HN6[⬇]** **Standards of Performance, Creditors & Debtors**

*Neb. U.C.C. § 1-205(4)* controls only the interpretation and construction of the written security agreement and

should not prevent the introduction of evidence to show that an express term of the agreement has been waived by the secured creditor.

Commercial Law (UCC) > General Provisions (Article 1) > Definitions & Interpretation > General Overview

Commercial Law (UCC) > General Provisions (Article 1)

Commercial Law (UCC) > General Provisions (Article 1) > General Provisions

Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment > General Overview

Commercial Law (UCC) > ... > Subject Matter > Definitions > General Overview

*HN7*[📥] **General Provisions (Article 1), Definitions & Interpretation**

*Neb. U. C. C. § 1-205*, comment 2, states: Course of dealing under subsection (1) is restricted, literally, to a sequence of conduct between the parties previous to the agreement. However, the provisions of the act on course of performance make it clear that a sequence of conduct after or under the agreement may have equivalent meaning.

Commercial Law (UCC) > General Provisions (Article 1) > Definitions & Interpretation > General Overview

Commercial Law (UCC) > General Provisions (Article 1)

Commercial Law (UCC) > General Provisions (Article 1) > General Provisions

Commercial Law (UCC) > Sales (Article 2) > General Overview

Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment > General Overview

Commercial Law (UCC) > ... > Subject Matter > Definitions > General Overview

Commercial Law (UCC) > ... > Definitions & General

Concepts > Definitions > General Overview

*HN8*[📥] **General Provisions (Article 1), Definitions & Interpretation**

"Agreement" means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this act. *Neb. U.C.C. §§ 1-205* and *2-208*. Whether an agreement has legal consequences is determined by the provisions of this act, if applicable; otherwise by the law of contracts. *Neb. U.C.C. § 1-103*.

Commercial Law (UCC) > ... > General Provisions > Policies & Purposes > Supplemental Principles of Law

Commercial Law (UCC) > General Provisions (Article 1)

Commercial Law (UCC) > General Provisions (Article 1) > General Provisions

*HN9*[📥] **Policies & Purposes, Supplemental Principles of Law**

*Neb. U.C.C. § 1-103* provides: Unless displaced by the particular provisions of this act, the principles of law and equity, including the law merchant and the law relative to capacity to contract shall supplement its provisions.

Commercial Law (UCC) > General Provisions (Article 1) > Definitions & Interpretation > General Overview

Commercial Law (UCC) > General Provisions (Article 1) > General Provisions

Commercial Law (UCC) > General Provisions (Article 1) > Application & Construction > General Overview

Commercial Law (UCC) > Sales (Article 2) > General Overview

Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment > General Overview

*HN10*[📥] **General Provisions (Article 1), Definitions & Interpretation**

*Neb. U.C.C. § 2-208(3)* provides: Subject to the provisions of the next section, *Neb. U.C.C. § 2-209*, on modification and waiver, such course of performance shall be relevant to show a waiver or modification of any term inconsistent with such course of performance.

Commercial Law (UCC) > Secured Transactions (Article 9) > Third Party Rights > Defenses

Contracts Law > ... > Methods of Perfection > Financing Statements > General Overview

Contracts Law > Types of Commercial Transactions > Secured Transactions > General Overview

Contracts Law > ... > Secured Transactions > Security Agreements > General Overview

*HN11*[⬇] **Third Party Rights, Defenses**

When a mortgagee under a chattel mortgage allows the mortgagor to retain possession of the property and to sell the same at will, the mortgagee waives his lien, and this is true whether the purchaser knew of the existence of the chattel mortgage or not. To the extent they hold otherwise, this court overrules the cases of *Garden City Production Credit Assn. v. Lannan, 186 Neb. 668, 186 N.W.2d 99 (1971)*, and *Farmers State Bank v. Edison Non-Stock Coop. Assn., 190 Neb. 789, 212 N.W.2d 625 (1973)*.

## Headnotes/Summary

**Headnotes**

1. **Verdicts: Appeal and Error.** A jury verdict will not be disturbed on appeal unless it is clearly erroneous and against the preponderance of the evidence.

2. **Waiver: Words and Phrases.** Waiver is a voluntary and intentional relinquishment or abandonment of a known existing legal right or such conduct as warrants an inference of the relinquishment of such right.

3. **Security Interests: Waiver: Estoppel.** Performance under a security agreement, including the failure of the secured party to rebuke the debtor or object to the debtor's conduct in selling collateral in violation of the

terms of the security agreement, may amount to a waiver of the lender's contractual right to require its written consent to a sale of collateral.

4. **Security Interests: Waiver: Estoppel.** Whether the secured party's conduct constitutes a waiver of its right to require written consent to a sale of collateral is a question of fact.

**Counsel:** Knudsen, Berkheimer, Richardson & Endacott, for appellant.

David R. Webb and Brian F. Beckner, for appellee.

**Judges:** Krivosha, C.J., Boslaugh, White, **[***2]** Hastings, Caporale, Shanahan, and Grant, JJ. Krivosha, C.J., dissenting.

**Opinion by:** GRANT

## Opinion

**[*1] [**278]** Plaintiff-appellant, Farmers State Bank (hereafter Bank), brought this action for conversion against the defendant-appellee, Farmland Foods, Inc. (Farmland), for damages **[*2]** based on Farmland's purchase of hogs which were subject to the Bank's security interest. Farmland answered, generally denying it was liable to the Bank in any amount and setting out various defenses to the Bank's action, including the defense that the Bank had impliedly consented to the sale of hogs to Farmland and thus waived the Bank's security interest in that collateral. The case was tried to a jury. At the close of all of the evidence, both the Bank and Farmland moved for a directed verdict. The trial court overruled Farmland's motion and sustained the Bank's motion in part, after finding that the acts of Farmland constituted a conversion for which Farmland could possibly be liable. The issue of Farmland's liability was submitted to the jury for its determination as to Farmland's defenses of waiver, consent, estoppel, and ratification. The jury returned a verdict for Farmland. The **[***3]** Bank timely appealed to this court.

Appellant Bank assigns as error the trial court's actions in submitting to the jury the issues of waiver, estoppel, consent, and ratification and in failing to properly instruct the jury on the issue of waiver by estoppel. For the reasons hereinafter set out, we affirm.

Evidence adduced at trial shows the following. For

approximately 15 years ending in the latter part of 1983, David Hopwood was engaged in a hog-raising operation described as a farrow-to-finish operation. The hogs would be raised from birth until they reached market weight, at approximately 5 to 6 months, and would then be sold at market.

In February of 1977 Hopwood approached appellant Bank to obtain financing for his operation. The Bank initially loaned Hopwood approximately $ 86,000. At that time Hopwood signed a security agreement with the Bank pledging his hogs, among other farm assets, as collateral. The security agreement contained various warranties. One such warranty stated "DEBTOR [Hopwood] WARRANTS AND COVENANTS: . . . (3) Not to sell, transfer or dispose of the Collateral . . . without the prior written consent of the Secured Party [the Bank]."

Despite **[***4]** this requirement for written consent prior to any sale of collateral, Hopwood sold his hogs on over 130 occasions between February 2, 1977, and February 1983, without first **[*3]** obtaining the Bank's consent. The president of the Bank testified that Hopwood was never questioned about his practice of selling the collateral **[**279]** without having obtained permission, nor did the Bank ever require Hopwood to obtain prior consent to any sale. The Bank president further testified that complying with the provision requiring written consent prior to the sale of the collateral was "humanly impossible" and "physically impossible." He explained the circumstances surrounding a typical sale of a farmer's collateral. The farmer would call the buyer for a quote of the current market price. Depending on the market condition, this quoted price was subject to change if not accepted immediately. Requiring the farmer to obtain permission from the secured party before a sale at the quoted price rather than immediately accepting the offer would require a great deal of the farmer's time and might result in a change in price before the intended sale would be completed. In order for the farmer **[***5]** to keep most of his time available for his farming work and to avoid this possible drop in prices, he must be able to accept the quoted price immediately.

Hopwood testified that between February 2, 1977, through February of 1983, he sold hogs to the defendant, Farmland, approximately 10 to 15 times a year. These sales ranged from 20 to 40 hogs per sale. Hopwood testified that he would check on the price Farmland was paying, and if this was satisfactory, Hopwood would immediately sell and deliver the hogs to

Farmland. Hopwood would then take the collateral sale proceeds to the Bank and have these proceeds applied against his loan. During all this time, the Bank was aware of Hopwood's sales to Farmland because Farmland checks were applied to Hopwood's loan with the Bank. Hopwood testified that he never sought permission to sell his collateral in this manner, nor was he ever reprimanded by the Bank for not having done so. After the proceeds were applied to his loan, Hopwood would usually borrow more money for his continuing operation.

On some occasions Hopwood was unable to speak with a loan officer. On these occasions he would deposit the proceeds directly into his farm account **[***6]** rather than giving the proceeds to the Bank for application to reduce the loan account balance. **[*4]** Then, a few days later, he would return to the Bank and have those proceeds applied to his loan. As an example, the testimony showed that such a procedure was followed in sales on October 25, November 8, and November 9, 1982. The proceeds of these sales were deposited in Hopwood's farm account. Hopwood returned to the Bank on November 16, 1982, and had these deposits applied toward his loan. While there was testimony that the Bank told Hopwood at this time that these direct deposits into his farm account were a violation of the security agreement, Hopwood testified that he did not recall there being any reprimand or censure by officials of the Bank, that, in fact, the November 16, 1982, incident was not isolated, and that on two or three other occasions when direct deposits to his farm account were made, there was no complaint.

The present case concerns six specific sales made by Hopwood to Farmland between April 30 and June 17, 1983. The six sales were of 155 hogs for a price of $ 16,612.01. The proceeds from these sales were deposited directly into Hopwood's farm account. **[***7]** Rather than returning to the Bank and having these proceeds applied to his loan balance and then borrowing additional funds from the Bank, Hopwood used the proceeds to pay for feed for the hogs and other farm operation expenses. The Bank became aware of these sales in July of 1983, after a state bank examiner noticed a lack of activity on Hopwood's loan sheet. Hopwood was called into the Bank to discuss this inactivity. At this time a plan for an orderly liquidation of the collateral was suggested. Additional funds were advanced by the Bank to Hopwood in order to keep the operation going until the liquidation could be complete. Hopwood continued to sell his hogs just as he had done before the plan for liquidation, until November of 1983,

when he filed for bankruptcy. At this point appellant Bank requested all future checks for the sale of collateral be issued jointly to Hopwood and the Bank. Farmland complied **[**280]** with this request on all sales after that time. The Bank then sought to recover the proceeds from the six disputed sales between April 30 and June 17, 1983, in an action for conversion against Farmland.

This court has often held that _HN1_[↑] a jury verdict will not **[***8]** be **[*5]** disturbed on appeal unless it is clearly erroneous and against the preponderance of the evidence and so clearly contrary to findings that it is the duty of the reviewing court to correct it. Further, a jury verdict is sufficient if there is any competent evidence presented to the jury upon which it could find for the successful party. _Mennonite Deaconess Home & Hosp. v. Gates Eng'g Co., 219 Neb. 303, 363 N.W.2d 155 (1985)_. The district court did not err in submitting to the jury the issue of waiver.

The controlling issue to be determined is whether the Bank, by its conduct over a long period of time, has consented to the sale of the Bank's collateral without its written consent and has thus, by implication, waived its rights in the collateral. The Bank contends that Hopwood did not have express consent to sell the collateral. _HN2_[↑] Consent, however, may be established by implication arising from a course of conduct as well as expressly, and such consent operates as a waiver of the security interest. See, _Hedrick Savings Bank v. Myers, 229 N.W.2d 252 (Iowa 1975)_; _United States v. Central Livestock Association, Inc., 349 F. Supp. 1033 (D.N.D. 1972)_; _Moffett_ **[***9]** _Bros. & Andrews Commission Co. v. Kent, 5 S.W.2d 395 (Mo. 1928)_.

_HN3_[↑] Waiver has been defined as a "voluntary and intentional relinquishment or abandonment of a known existing legal right . . . _or such conduct as warrants an inference of the relinquishment of such right_ . . . ." (Emphasis supplied.) _Five Points Bank v. Scoular-Bishop Grain Co., 217 Neb. 677, 681, 350 N.W.2d 549, 552 (1984)_.

We determine that the evidence as presented in this case was sufficient to support the finding of such conduct that would warrant an inference of the relinquishment of the Bank's right in the collateral in question. There was evidence from which the jury could have found that the Bank, by its long course of conduct of not requiring Hopwood to obtain the Bank's consent to sell collateral, had consented to such sales and thus

waived its security interest in the collateral. Despite the covenant not to sell the collateral without prior written consent, Hopwood sold his hogs on more than 130 occasions over a 6-year period without having first obtained the consent of the Bank. Testimony of the bank president showed the Bank was fully aware of these sales. Hopwood testified that the Bank **[*6]** **[***10]** never requested compliance with this provision of the security agreement. The Bank was also aware of the occasional deposit of the proceeds directly into Hopwood's farm expense account rather than immediate application toward the loan balance. While the evidence is conflicting, it was sufficient for the jury to determine "by clear and convincing evidence" that the Bank had never reprimanded or rebuked Hopwood for his actions. _Five Points Bank v. Scoular-Bishop Grain Co., supra at 682, 350 N.W.2d at 552_. The Bank was fully aware of its right to require the prior written consent for the sale of collateral, yet it so acted as to waive its right.

The appellant Bank argues the security interest continued in the proceeds, and relies on _HN4_[↑] _Neb. U.C.C. § 9-306(2)_ (Reissue 1980), which states:

> Except where this article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement _or otherwise_, and also continues in any identifiable proceeds including collections received by the debtor.

(Emphasis supplied.)

It is clear the security **[***11]** agreement involved in this controversy did not authorize the sale of collateral except by prior written consent. Farmland relies on the "_or otherwise_" language in its contention that the Bank had waived its security interest. That language, "or otherwise," was specifically **[**281]** before this court in _State Bank v. Scoular-Bishop Grain Co., 217 Neb. 379, 349 N.W.2d 912 (1984)_, and in _Five Points Bank v. Scoular-Bishop Grain Co., supra_. In _Five Points Bank at 680, 350 N.W.2d at 551_, we reaffirmed the holding in _State Bank v. Scoular-Bishop Grain Co., supra_, and stated that _HN5_[↑] "it was a factual question whether a bank's prior course of dealing with the debtor might create an implied agreement amounting to a waiver of the security interest . . . ."

In this case we hold that the Bank's performance under the Bank-Hopwood security agreement was such that

the Bank's conduct constituted, in effect, an amendment to the security agreement, in that the Bank waived its right to require its **[\*7]** written consent to any sale of collateral by Hopwood. On over 130 occasions over 6 years (or approximately twice each month during that time), the Bank acquiesced in Hopwood's method **[\*\*\*12]** of doing business and consented to it. On at least five occasions the Bank acquiesced not only in the sale of collateral but in Hopwood's failure to immediately apply the proceeds of such sales to the loan owing to the Bank. After 6 years of such conduct, the Bank would now have the courts hold that its business conduct in the marketplace is completely immaterial and that if such conduct results in a loss to the Bank, the Bank is entitled, as a matter of law, to point to the security agreement of 1977 and rely on the words of that agreement that there can be no waiver. We hold that the facts in this case were such as to permit the jury to find that the Bank, by its conduct, waived its contractual right with Hopwood to require that the Bank give written consent to any sale of collateral.

In so holding, we are cognizant of the Bank's contention that its practice of not enforcing the prior written consent provision cannot be construed as a waiver of that provision. The Bank argues that a course of dealing is not applicable to show waiver when it is inconsistent with the express terms in the agreement. _Neb. U.C.C. § 1-205(4)_ (Reissue 1980) provides:

> The express terms of an agreement **[\*\*\*13]** and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable express terms control both course of dealing and usage of trade and course of dealing controls usage of trade.

The Bank relies on this court's rulings in _Garden City Production Credit Assn. v. Lannan, 186 Neb. 668, 186 N.W.2d 99 (1971)_, and _Farmers State Bank v. Edison Non-Stock Coop. Assn., 190 Neb. 789, 212 N.W.2d 625 (1973)_, for support in its contention that mere acquiescence or failure to rebuke the seller is not sufficient to override the express terms of _§ 1-205(4)_. We hold that the Bank's reliance on this section is misplaced. _Section 1-205(4)_ deals with a course of dealing and trade usage. Under _§ 1-205(1)_, course of dealing is restricted to a sequence of conduct between the parties _previous to the agreement_. See _§ 1-205_, comment 2. See, also, Dugan, _Buyer-Secured Party_ **[\*8]** _Conflicts Under_ _Section 9-307(1) of the Uniform Commercial Code_, 46 U. Colo. L. Rev. 333, 340 (1975),

where the author states: "_Section 1-205_ simply does not attempt to deal with the legal consequences of **[\*\*\*14]** _post-agreement_ events such as those which the Code defines elsewhere as 'course of performance' [_Neb. U.C.C. § 2-208(1)_ and _(3)_ (Reissue 1980)] . . . ."

In the case at bar there was no need to know the conduct of the parties before the contract was entered into between Hopwood and the Bank to determine the meaning of that contract. The terms of that contract were clear. The question to be determined is whether the Bank's performance, after that contract was signed, operated to amend the contract. The conduct which might be found to be a waiver of the prior written consent provision occurred continuously _after_ this agreement was reached. Such postagreement course of performance is not governed by _§ 1-205(4)_. See Burke, _Secured Transactions_, 32 Bus. Law. 1133, 1146 (1977), where the author states: **HN6**[⬆] "_Section 1-205(4)_ controls only the **[\*\*282]** interpretation and construction of the written security agreement and should not prevent the introduction of evidence to show that an express term of the agreement has been waived by the secured creditor."

**HN7**[⬆] ] _Section 1-205_, comment 2, states:

> Course of dealing under subsection (1) is restricted, literally, to a sequence **[\*\*\*15]** of conduct between the parties previous to the agreement. However, the provisions of the act on course of performance make it clear that a sequence of conduct after or under the agreement may have equivalent meaning. (_Section 2-208_).

Although _§ 2-208_ generally deals with sales, its terms are made relevant to the security agreement of the parties by the terms of _Neb. U.C.C. § 1-201(3)_ (Reissue 1980), which sets out a general definition as follows: **HN8**[⬆]

> "Agreement" means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this act (_sections 1-205_ and _2-208_). Whether an agreement has legal consequences is determined by the provisions of this act, if applicable; otherwise by the law of contracts **[\*9]** (_section 1-103_).

The court may look to **HN9**[⬆] ] _Neb. U.C.C. § 1-103_ (Reissue 1980), which provides: "Unless displaced by

the particular provisions of this act, the principles of law and equity, including the law merchant and the law relative to capacity to contract . . . shall supplement its provisions."

The code has thus made provisions for dealing **[***16]** with preagreement dealing and postagreement performance. See, *Section 2-208(3)* has more relevant application to this situation than does *§ 1-205(4)*, which pertains to *preagreement* dealing between the parties. **HN10**[⬆] *Section 2-208(3)* provides: "Subject to the provisions of the next section [*Neb. U.C.C. § 2-209* (Reissue 1980)] on modification and waiver, such course of performance shall be relevant to show a waiver or modification of any term inconsistent with such course of performance."

We hold that performance under a security agreement, including the failure of the secured party to rebuke the debtor or object to the debtor's conduct in selling collateral in violation of the terms of the security agreement, may amount to a waiver of the lender's contractual right to require its written consent to a sale of collateral. Whether the secured party's conduct constitutes a waiver of its right to require written consent to a sale of collateral is a question of fact.

Under precode law, conduct such as that of the Bank in the case at bar could have been held to constitute a waiver of the security interest. See, *Charterbank Butler v. Central Cooperatives, 667 S.W.2d 463 (Mo. App. 1984)*; **[***17]** *Commercial Credit Corporation v. Blau, 393 S.W.2d 558 (Mo. 1965)*; *First Nat. Bank & Trust Co. v. Stock Yards Loan Co., 65 F.2d 226 (8th Cir. 1933)*, cert. denied 290 U.S. 648, 54 S. Ct. 87, 78 L. Ed. 576. Since this precode concept of waiver is not specifically displaced by the code, under *§ 1-103* it must be treated as supplementing the code. The Bank contends that before there can be a waiver, it must be shown that Farmland had knowledge of the Bank's conduct with respect to Hopwood's operations. However, in *First Nat. Bank & Trust Co. v. Stock Yards Loan Co., supra at 229*, the court states: **HN11**[⬆] "When a mortgagee under a chattel mortgage allows the mortgagor to retain possession of the property and to sell the same at will, the mortgagee waives **[*10]** his lien, and this is true whether the purchaser knew of the existence *of the chattel mortgage or not.*" (Emphasis supplied.) We agree with that concept where there is a long course of conduct. To the extent they hold otherwise, this court overrules the cases of *Garden City Production Credit Assn. v. Lannan, 186 Neb. 668, 186 N.W.2d 99 (1971)*, and *Farmers State Bank v. Edison Non-Stock Coop.*

*Assn., 190 Neb.* **[***18]** *789, 212 N.W.2d 625 (1973)*.

We hold, then, that the jury could have found by clear and convincing evidence that the course of performance between the Bank and Hopwood was a waiver of the **[**283]** security interest in the collateral sold to appellee on the six occasions between April 30 and June 17, 1983. The Bank was fully aware of its right to require written consent before the sale of collateral, yet it never exercised this right nor reprimanded the seller for failure to obtain written consent. The Bank was not concerned with this written consent provision and did not rely on it.

Since the issue of waiver is dispositive of this controversy, we need not consider the other assignment of error. The judgment of the district court is affirmed.

Affirmed.

**Dissent by:** KRIVOSHA

# Dissent

Krivosha, C.J., dissenting.

I must respectfully dissent from the majority in this case. I do so on two grounds. First, I believe we are in error to overrule *Garden City Production Credit Assn. v. Lannan, 186 Neb. 668, 186 N.W.2d 99 (1971)*, the leading case in the nation on this subject. Second, I believe that the result reached by the majority in this case is not supported by logic or reason.

While **[***19]** I recognize that there is some split of authority on this subject (see Annot., What Constitutes Secured Party's Authorization to Transfer Collateral Free of Lien Under UCC *§ 9-306(2)*, *37 A.L.R.4th 787 (1985))*, I believe that the position adopted by this court more than 15 years ago represents the better reasoned position on this subject. In view of the fact that most jurisdictions which follow our earlier longstanding rule cite *Garden City Production Credit Assn. v. Lannan, supra*, as the basis for their decisions, apparently many other jurisdictions agree. Furthermore, I do not believe that anything that we said in *State Bank v. Scoular-Bishop Grain Co., 217 Neb. 379,* **[*11]** *349 N.W.2d 912 (1984)*, or *Five Points Bank v. Scoular-Bishop Grain Co., 217 Neb. 677, 350 N.W.2d 549 (1984)*, is contrary to our earlier holding in *Garden City Production Credit Assn. v. Lannan, supra*, nor does it require us to overrule our holding in *Garden City Production Credit*

*Assn. v. Lannan.*

It is clear in this case, as noted by the majority, that there was no express waiver by Farmers State Bank. Nor, in my view, can there be said to be an implied waiver sufficient to cause us **[\*\*\*20]** to ignore the clear language of the security instrument. The majority makes much of the fact that between April 30 and June 17, 1983, a period of 49 days, six sales were effected by the debtor without the Bank's protest and without the Bank's knowledge. This is suggested by the majority to be sufficient evidence that the Bank had impliedly waived its security. Yet the record discloses that these six transactions were a part of some 60 to 90 sales to Farmland Foods, Inc., conducted over the previous 6-year period in which payment was always made to the Bank following the sale of the livestock. Furthermore, once the Bank learned of the six sales without payment, it did rebuke the debtor and take action. It is apparently the majority's view that the Bank's lien was waived long ago, even though it was being paid. It is simply difficult for me to conclude that six sales conducted without the Bank's actual knowledge within a 49-day period while the debtor is having severe financial difficulty should be the criteria by which we determine the intent of the lender and should be permitted to overshadow 10 times that number of sales where just the opposite result was effected.

The record **[\*\*\*21]** in this case is clear that the Bank had no knowledge of the six sales before they were made, nor did it learn of the sales until *all* six had been completed. The majority's suggestion that the Bank's failure to rebuke the debtor evidenced implied approval does not wash when the record discloses that the Bank did not know of these six sales until all were completed and, upon learning of the sales, took action.

In my view, the difficulty with the majority opinion is that it has confused an implied waiver of the lien on the security with a waiver by the Bank of a requirement that the lender obtain **[\*12]** permission to sell in writing before proceeding to sell the security. It appears to me that one might more effectively argue that the Bank obviously did not intend to waive its lien when it **[\*\*284]** waived its requirement that permission to sell be in writing, in view of the fact that everyone is presumed to know the law and the Bank knew that under the provisions of *Neb. U.C.C. § 9-306(2)* (Reissue 1980) and this court's consistent interpretation of that section more than 12 years earlier, as expressed in *Garden City Production Credit Assn. v. Lannan, 186 Neb. 668, 186* **[\*\*\*22]** *N.W.2d 99 (1971)*, the sales were all

subject to the Bank's lien. That is precisely what *§ 9-306(2)* provides and what it intends to accomplish. Section 9-306(2) does not prohibit the sale of property nor suggest that the mere sale of the property implies that the lien is to be waived. To the contrary, it provides that the security interest continues in the collateral, notwithstanding the sale. To therefore suggest that because the Bank waived a requirement that consent for the sale be in writing, it also waived its lien is not an accurate statement of the law generally recognized throughout the country.

While the records fail to disclose actual authorization by the Bank to sell, it seems to me that the most one can glean from the evidence is that the Bank impliedly consented to the sale of the livestock conditioned upon the debtor's delivering the proceeds of the sale to the Bank, as he had done in the previous 60 to 90 sales. This does not constitute evidence of an intent by the Bank to waive its lien on the security.

As I have suggested earlier, I do not believe that our decision in either *State Bank v. Scoular-Bishop Grain Co., 217 Neb. 379, 349 N.W.2d 912 (1984)*, or **[\*\*\*23]** *Five Points Bank v. Scoular-Bishop Grain Co., 217 Neb. 677, 350 N.W.2d 549 (1984)*, compels the result reached by the majority today. In *State Bank v. Scoular-Bishop, supra*, we reversed the decision of the district court and remanded the cause for a new trial because the district court had refused to permit the buyer to introduce evidence showing an express waiver and, instead, directed a verdict for the lender. What the purchaser intended to present by way of evidence were oral conversations with bank officers, bank records, checks, deposit slips, checking account summary, notes and renewal notes, other farm product sales, **[\*13]** disability ledger cards, and livestock inspection reports, which may have established that the Bank had in fact waived its lien. In reaching our conclusion in *State Bank v. Scoular-Bishop, supra at 388, 349 N.W.2d at 917*, we nevertheless said:

"[A]n implied agreement should be found with extreme hesitancy and should generally be limited to the situation of a prior course of dealing with the debtor permitting disposition. The issue is a question of fact, but the trial court should carefully consider the written prohibition against **[\*\*\*24]** disposition found in the security agreement as an important factor in the factual determination and should determine the matter in favor of the written

prohibition unless such conclusion is unreasonable under the circumstances."

The evidence in *State Bank v. Scoular-Bishop, supra*, was to the effect that there had been actual conversations between the debtor and the bank. Yet this court did not overrule *Garden City Production Credit Assn. v. Lannan, supra*, and, in fact, cautioned the trier of fact to find an implied waiver only with extreme hesitancy.

To the same extent, in *Five Points Bank v. Scoular-Bishop, supra*, we reversed and remanded the cause for a new trial because the evidence disclosed that the debtor was encouraged by the bank to minimize his operating loan by obtaining his fertilizer by credit on an open account. Moreover, the bank refused to lend the borrower money for repairs to his farm equipment, acknowledging that the debtor would have to have another advance on his corn crop from someone else. We simply concluded in *Five Points Bank v. Scoular-Bishop, supra*, that it was a question of fact whether the discussion and conduct between the bank [***25] and the borrower constituted authorization. Again, we did not suggest we should overrule *Garden City Production Credit Assn. v. Lannan, 186 Neb. 668, 186 N.W.2d 99 (1971)*, but, quite to the contrary, suggested that our position was consistent. [**285] We merely suggested that it was a question of fact as to whether there had been authorization. *State Bank v. Scoular-Bishop* and *Five Points Bank v. Scoular-Bishop* are not at all similar to the facts in this case.

The real difficulty with the majority opinion is that we are [*14] not writing on a clean slate. The law as declared by this court in *Garden City Production Credit Assn. v. Lannan, supra*, has been the law of this jurisdiction for more than 15 years. During all of that time, the Legislature has not seen fit to amend, in any substantive manner, the law, as did, for instance, the Legislature of the State of New Mexico after the New Mexico Supreme Court decided the case of *Clovis National Bank v. Thomas, 77 N.M. 554, 425 P.2d 726 (1967)*, contrary to our position in *Garden City Production Credit Assn. v. Lannan, supra*, and consistent with the majority opinion herein.

While the record does not [***26] disclose the fact, one may assume that multiple security agreements have been executed in this state, and farmers have been permitted to sell their livestock as they must, based upon the lender's understanding of our holding in *Garden City Production Credit Assn. v. Lannan, supra*.

Yet, with one stroke of the eraser, we now clean the slate and cause all of those security instruments to become invalid because of what we term to be a course of dealing and, therefore, implied consent.

I believe what we earlier said in *Garden City Production Credit Assn. v. Lannan* has even greater applicability today and continues, in my mind, to make good sense.

> The evidence reveals a typical farm-ranch operation contemplating a course of dealing in the sale of farm products, and the necessity of securing credit financing for such an operation. The Uniform Commercial Code, whatever else its objects may be, was designed to close the gap in the classic conflict between the lender and the innocent purchaser and furnish acceptable, certain, and suitable standards which would promote the necessity of and the fluidity of farm credit financing in the modern context, and at the same time facilitate [***27] the sale and exchange of collateral by furnishing a definable and ascertainable standard which purchasers could rely on. Case application is in its genesis, but an examination of the textual and court authority supports such an approach to an examination of cases in a specific factual context. See Uniform Commercial Code Bibliography, 1969 (published by the Joint Committee on Continuing Legal [*15] Education of the American Law Institute and the American Bar Association), "Article 9 -- Secured Transactions," pp. 87 to 101.

*186 Neb. at 671-72, 186 N.W.2d at 102*.

We went on further in *Garden City Production Credit Assn. v. Lannan, supra at 673, 186 N.W.2d at 102*, to say:

> We must assume that *section 9-306(2)*, U.C.C., was drafted with an awareness of the practical realities of farm credit financing, the market movement of chattel property, and the practical problems of a simultaneous sale and payment. This provision of the code must clearly have been designed to accommodate and to fit the practical realities of financing a farming and business operation contemplating the raising, feeding, and processing, and sale of livestock and tangible

chattel property. It is uncontested **[***28]** in the present case that there was strict compliance with the filing and notice provisions of the code. Lannan, the purchaser, was bound by the provisions of the code and must ordinarily take the risk of a failure to make the appropriate investigation contemplated by its provisions.

It appears to me that the language of *Garden City Production Credit Assn. v. Lannan, 186 Neb. 668, 186 N.W.2d 99 (1971)*, is even stronger today as it applies in the instant case where the purchaser testified that it was not even aware that a lien could be obtained on the farm commodities purchased or that such a filing had been made.

Some of our neighboring states which also have had occasion to examine this issue have, likewise, concluded that our earlier **[**286]** decision in *Garden City Production Credit Assn. v. Lannan* was the better rule. In *North Cent. Kan. Prod. Cred. Ass'n v. Washington Sales Co., 223 Kan. 689, 694, 577 P.2d 35, 39 (1978)*, the Supreme Court of Kansas said:

> We have carefully examined the cases and authorities cited by industrious counsel in the original briefs and those *amicus curiae* (all of whose briefs were most helpful), as well as others which our **[***29]** research uncovered. The division of authority is sharp. Some cases support the rationale of *Clovis National Bank v. Thomas, 77 N.M. 554, 425 P.2d* **[*16]** *726 (1967)*; others -- and most writers on the subject -- follow *Garden City Production Credit Assn. v. Lannan, 186 Neb. 668, 186 N.W.2d 99 (1971)*.

The Kansas Supreme Court then went on to point out that following the decision by the New Mexico Supreme Court in *Clovis National Bank v. Thomas, 77 N.M. 554, 425 P.2d 726 (1967)*, "the New Mexico legislature repudiated the *Clovis* doctrine" by amending the Uniform Commercial Code as it applied in New Mexico. *223 Kan. at 694, 577 P.2d at 39*. The Kansas Supreme Court then went on in *North Cent. Kan. Prod. Cred. Ass'n v. Washington Sales Co., supra at 696, 577 P.2d at 41*, to say:

> The *Clovis* decision, as we pointed out earlier, is no longer applicable in the jurisdiction where it was adopted. Be that as it may, we do not think its rationale follows the intent of the framers of the

Uniform Commercial Code, particularly as expressed in the sections of the code set forth above. We conclude that a ruling, following the *Clovis* doctrine, would hinder "the **[***30]** granting of credit to the capital-intensive agricultural industry" in this state; that such a holding is not in the spirit of the UCC, is not required by its terms, and would not be in the public interest. We therefore follow the rationale of *Lannan, supra*, and find no waiver of a security interest, and no consent to the sales here involved, by PCA's failure to remonstrate with Uffman, following his sales of milk and wheat.

Similarly, the Minnesota Supreme Court in *Wabasso State Bank v. Caldwell Packing Co., 308 Minn. 349, 350, 251 N.W.2d 321, 322 (1976)*, said:

> The question presented is whether one who finances farming operations and takes a security interest in cattle under an agreement which prohibits the sale of the collateral without the financier's prior written approval authorizes the borrower to sell the collateral by not objecting to a course of dealing in which the borrower has previously sold collateral without consent.

In concluding that a waiver did not occur, the Minnesota court said at 353, *251 N.W.2d at 323-24*: "Article 9 of the **[*17]** Uniform Commercial Code established a recording system which permits a creditor, by filing a financing statement, **[***31]** to rely upon the secured position set out in his written security agreement."

The Minnesota Supreme Court then discussed the argument raised by the purchaser to the effect that the bank could have easily protected itself by informing its farm loan debtors that it expected them to adhere to the terms of the security agreement and by reprimanding those who failed to do so, as now suggested by the majority herein. In rejecting that argument the Minnesota Supreme Court said at 354, *251 N.W.2d at 324*:

> The fallacy in this argument is that it ignores the realities of the situation. The bank was not made aware of the sales of collateral before they occurred. Farmers would simply notify the bank of the sales when they came in with the proceeds to pay off the loan. At this point, not only was the bank not harmed by the sale but it was presented with an accomplished fact.

Examining the options open to both the bank and the purchasers of the cattle, we have no difficulty in determining which party was in a better position to protect its interests. On the one hand, the bank had complied with all of the provisions of Article 9. It did not rebuke those farmers **[**287]** who sold collateral **[***32]** without authorization, since after the fact such action would have had little effect. It had no prior knowledge of Marczak's plans to sell his cattle. On the other hand, the defendants had constructive notice of the bank's security interest and after checking the records, a simple phone call would have determined whether the bank had authorized Marczak's sale. Alternatively, when paying Marczak for the cattle, defendants could have named Marczak and the bank as joint payees on their check. Either action would have fully protected the bank and defendants. In any event, this is not a case of detrimental reliance since defendants had no way of knowing whether or not the bank had reminded Marczak of the necessity for prior approval of sales.

The Minnesota court then concluded by quoting at length from our decision in *Garden City Production Credit Assn. v.* **[*18]** *Lannan, 186 Neb. 668, 186 N.W.2d 99 (1971)*.

As the majority observes, and as the record in this case establishes, requiring the borrower to obtain written consent from the Bank at 6 a.m. when livestock must be taken to market is not a realistic approach to the situation, nor does it permit the U.C.C., if so interpreted, **[***33]** to deal with the realities of life. We are here given two choices -- shall we grant to the lender the benefits of his security, or shall we protect the purchaser who is rewarded by his failure to check the records. As a matter of fact, our decision today would seem to indicate that there is greater benefit in refusing to be provided any information if one wishes to purchase free and clear. What did the purchaser rely upon in making its purchase, and how was it misled by the lender?

I have no difficulty in concluding that by permitting the farmer to sell his livestock without first obtaining written consent, the Bank has waived the requirement for written consent. I have greater difficulty, however, in concluding that by simply waiving one of the requirements for sale, the Bank has thereby impliedly waived its entire security in the property and the benefits of § 9-306(2).

By waiving the requirement that the borrower must obtain written consent, the Bank may not declare the loan in default for failure to obtain such written consent. Nor may the Bank sue the debtor for conversion. It does not necessarily follow, however, that by waiving its right to declare the loan in default **[***34]** by reason of the borrower's failing to obtain written consent before sale or its right to sue the debtor for conversion that the lender impliedly intended to give up its security.

In passing, I must further disagree with the majority's discussion in this case of the effect of *Neb. U.C.C. § 1-205* (Reissue 1980). While it may be true that *§ 1-205* is relevant only with regard to preagreement dealings between the parties, it is not true in this case that all of the dealings herein are postagreement. The transactions between the Bank and the debtor have gone on for nearly 6 years. During that time a host of agreements have been signed and a number of practices conducted. I fear that the majority opinion in this case may be misunderstood to mean that if the parties execute renewal **[*19]** documents or subsequent loan agreements, the evidence regarding the manner in which they dealt with each other prior to the execution of the last renewal agreement would not be relevant. Certainly that is not what *§ 1-205(4)* means, nor what it is intended to say.

I am not unmindful that the 1985 Legislature has amended *Neb. U.C.C. § 9-307* (Cum. Supp. 1986). I purposely make no comment with **[***35]** regard to that because it is not relevant to the instant case.

For all of these reasons, therefore, I would not have overruled our holding in *Garden City Production Credit Assn. v. Lannan, 186 Neb. 668, 186 N.W.2d 99 (1971)*, and I would have concluded that the evidence in this case was insufficient to submit to the jury the question of implied waiver. I would therefore have reversed and remanded.

**[**288]** I am authorized to state that Caporale and Shanahan, JJ., join in this dissent.

---

**End of Document**

# Exhibit 10

## *General Matters v. Paramount Canning Co.*

District Court of Appeal of Florida, Second District

April 9, 1980

No. 79-588

### Reporter

382 So. 2d 1262 *; 1980 Fla. App. LEXIS 15868 **; CCH Prod. Liab. Rep. P8747; 28 U.C.C. Rep. Serv. (Callaghan) 1031

GENERAL MATTERS, INC., d/b/a YORK ASSOCIATES, Appellants, v. PARAMOUNT CANNING COMPANY, GARDEN GOLD FOODS, INC., and SUNCOAST CANNING CORPORATION, Appellees

**Prior History: [**1]** Appeal from the Circuit Court for Hillsborough County; John G. Hodges, Judge.

## Core Terms

destruction, notice, grapefruit, destroyed, notifying, alleged breach, retailer, seller, requirement of notice, failure to notify, inspect, buyer, cases, food, breach of implied warranty, enter a judgment, reasonable time, trial court, merchantability, cross-appeal, indemnify, purchaser, contends, sections, damages, grocery, argues, losses

## Case Summary

### Procedural Posture

Appellants sought review from the Circuit Court for Hillsborough County (Florida) which entered a judgment in favor of appellees, to determine whether appellants could recover damages from appellees for breach of implied warranty of merchantability.

### Overview

Appellants sued appellee canning company seeking damages for breach of implied warranty of merchantability alleging that goods it had purchased did not have a reasonable shelf life. Appellee canning company filed a third-party complaint against its canning corporation, and the corporation agreed to defend and indemnify the canning company in the action by appellants. Appellees answered and asserted that appellant was barred from recovery because neither it nor its purchaser notified appellees of the alleged breach prior to destruction of the goods. The trial court entered judgment for appellant. On appeal, appellant argued that the judgment should have compensated it for the full amount of its assumed obligation. Appellees cross-appealed and argued that appellant was barred from any remedy under *Fla. Stat. Ann. § 672.607(3)(a)*(1979). On appeal, the court agreed with appellees' argument and vacated the judgment in favor of appellant. The court found that the failure by appellants to notify appellees of the alleged breach prior to destruction of the goods ran counter to § 672..607(3)(a), and that therefore appellants were barred from any remedy.

### Outcome

The judgment in favor of appellants was vacated because appellant's failure to notify appellees of an alleged breach prior to destruction ran counter to the purposes of the statute in question, and barred appellants from any remedy for the alleged breach.

## LexisNexis® Headnotes

Business & Corporate
Compliance > ... > Remedies > Buyer's Damages & Remedies > General Overview
Contracts Law > ... > Remedies > Buyer's Damages & Remedies > General Overview

Commercial Law (UCC) > ... > Standards of Performance & Liability > Breach, Excuse & Repudiation > General Overview

Contracts Law > ... > Sales of Goods > Breach, Excuse & Repudiation > General Overview

Business & Corporate
Compliance > Contracts > Sales of Goods > General Overview

Contracts Law > Types of Commercial Transactions > Sales of Goods > General Overview

*HN1*[⬇] **Remedies, Buyer's Damages & Remedies**

*Fla. Stat. Ann. § 672.607(3)(a)*(1979) provides that the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy. This notice requirement is a valid precondition of imposing liability on a seller of goods. The burden is on the plaintiff to show that he gave the required notice within a reasonable time.

**Counsel:** Charlie Luckie, Jr. and John W. Campbell of Macfarlane, Ferguson, Allison & Kelly, Tampa, for appellant.

John W. Frost, II, and Charles W. Dodson of Holland & Knight, Bartow, for appellees.

**Opinion by:** SCHEB

# Opinion

[*1263] SCHEB, Judge.

A grocery retailer destroyed a shipment of allegedly defective canned grapefruit sections which it had purchased from York Associates, a food broker. The grapefruit had been canned by Suncoast Cannery Corporation and distributed by Paramount Canning Company. Neither York nor the retailer gave Suncoast or Paramount any notice that the goods were defective prior to their destruction. York agreed to indemnify the retailer for its losses and then sued Paramount and obtained a judgment for damages.

Despite its failure to notify Paramount prior to destruction of the goods, can York recover damages from Paramount for breach of implied warranty of merchantability? We hold that York's failure to notify Paramount bars it from any remedy. We reverse the judgment for York entered by the trial court.

During 1974 Suncoast canned and stored 3500 cases of the grapefruit sections. In April [**2] 1976 Paramount's agent, Dingfelder, looking for canned grapefruit, contacted Suncoast. Suncoast's agent told Dingfelder of the grapefruit canned in 1974 explaining, however, that it was nearing two years old. Paramount purchased the lot and sold it to York shortly thereafter. York, in turn, sold the goods to Country Club Markets, a grocery

retailer in Minnesota, without informing Country Club of the age of the goods.

After Country Club had sold 1,675 cases of the canned grapefruit in its supermarkets, some of the cans developed swells. After several customer complaints, the Minnesota Department of Agriculture determined that "the product should not be sold for human food." [1] At this point, Country Club, without notifying either Paramount or Suncoast, destroyed the remaining 1,825 cases. Country Club, the retailer, then billed York for its cost of the destroyed merchandise plus the cost of destruction. In response, York agreed to discount future purchases by Country Club until it had absorbed Country Club's losses.

[**3] York sued Paramount seeking damages for breach of implied warranty of merchantability alleging that the goods did not have a reasonable shelf life. Paramount filed a third-party complaint against Suncoast. Prior to trial Suncoast agreed to defend and indemnify Paramount in the action by York. Paramount, through Suncoast, answered and asserted that York was barred from recovery because neither it nor its purchaser, Country Club, notified Paramount of the alleged breach prior to destruction of the goods.

Following a nonjury trial the court entered judgment for York. It found that Paramount had breached its implied warranty to York as to those cans which were swollen at the time they were destroyed. Nevertheless, it limited York's recovery to the amount that York had actually given as a credit to Country Club at the time of trial because York had not joined Country Club as an indispensable party. The court further reduced that recovery since York had failed to notify Country Club of the age of the product, and because a percentage of the product was still marketable when Country Club destroyed it without notice.

On appeal York contends that the judgment should have compensated it for [**4] the full amount of its assumed obligation to Country Club. Paramount cross-appeals and argues that because neither Country Club nor York gave notice of the alleged breach until after destruction of the goods, York is barred from any remedy under *Section 672.607(3)(a), Florida Statutes* (1979) (U.C.C. §

---

[1] The Department found that 12.7% of the cans in its sample of five and one-half cases were puffed. Of eleven cans submitted for laboratory analysis, nine showed slight corrosion on the inside, two were moderately corroded, five contained flat spores and two contained carbon dioxide gas.

Case: 25-30743   Doc# 83   Filed: 01/08/26   Entered: 01/08/26 22:23:15   Page 180 of 261

2–607[3] [a] [1972 version]).

We address the cross-appeal first because our disposition of it obviates discussion of the merits of York's appeal. HN1[↑] *Section 672.607(3)(a), Florida Statutes* (1979), provides that "[t]he buyer must within a reasonable time after he discovers or should **[*1264]** have discovered any breach notify the seller of breach or be barred from any remedy." This notice requirement is a valid precondition of imposing liability on a seller of goods. [2] *Eastern Airlines, Inc. v. McDonnell Douglas Corp., 532 F.2d 957 (5th Cir. 1976)*; see *Dunham-Bush, Inc. v. Thermo-Air Systems, Inc., 351 So.2d 351 (Fla. 4th DCA 1977)*; *Redman Industries v. Binkey, 49 Ala.App. 595, 274 So.2d 621 (1973)*; *L. A. Green Seed Co. of Arkansas v. Williams, 246 Ark. 463, 438 S.W.2d 717 (1969)*. Further, the burden is on the plaintiff to show that he gave the required notice within a reasonable time. **[**5]** *Standard Alliance Industries, Inc. v. Black Clawson Co., 587 F.2d 813 (6th Cir. 1978)*, cert. denied, 441 U.S. 923, 99 S. Ct. 2032, 60 L. Ed. 2d 396 (1979); *L. A. Green Seed Co. of Arkansas v. Williams, 246 Ark. 463, 438 S.W.2d 717 (1964)*. Here, the evidence disclosed that Country Club voluntarily destroyed the canned grapefruit in the latter part of July 1977. The first notice of the alleged breach to either Paramount or Suncoast was an August 1 letter from the president of York to Dingfelder of Paramount.

There are several important reasons for the notice requirement of *Section 672.607(3)(a)*. The notice enables "the seller to make adjustments or replacements or to suggest opportunities for cure to the end of minimizing the buyer's **[**6]** loss and reducing the sellers' own liability to the buyer." The notice requirement also protects the seller's right to inspect the goods. J. White & R. Summers, Uniform Commercial Code § 11-9 at 344 (1972); see Note, *Notice of Breach and the Uniform Commercial Code*, 25 U.Fla.L.Rev. 520 (1973). *Section 672.515, Florida Statutes* (1979) (U.C.C. § 2-515 [1972 version]), which codifies the inspection rationale, provides that either party may inspect, test and sample the goods including those in the possession or control of the other for the purpose of ascertaining the facts and preserving the evidence. See *Owen v. Sears, Roebuck & Co., 273 F.2d 140 (9th Cir. 1959)*. [3]

York contends that notice after destruction of the goods constituted reasonable notice under *Section 672.607(3)(a)*. It argues that notifying Paramount prior to destruction would **[**7]** have served no purpose since the Minnesota Department of Agriculture had stated that the food should not be sold for human consumption. We find York's argument unpersuasive. First, the Minnesota Department of Agriculture did not order destruction of the goods. [4] Moreover, while the findings of the Department were entitled to great weight, they were not conclusive, and Paramount was entitled to an opportunity to verify them. York's destruction of the goods prior to notifying Paramount prevented this and impeded any possible settlement of the controversy. It also impaired Paramount's ability to determine if the goods were, in fact, marketable and, consequently, hindered it in preparing its defense. [5]

**[**8]** Accordingly, York's failure to notify Paramount of the alleged breach prior to destruction ran counter to the purposes of *Section 672.607(3)(a), Florida Statutes* (1979), and barred York from any remedy for the alleged breach. Therefore, we vacate **[*1265]** the judgment in favor of York Associates and direct the trial court to enter judgment in favor of Paramount Canning Company and Suncoast Cannery Corporation.

HOBSON, Acting C. J., and DANAHY, J., concur.

---

**End of Document**

---

[2] We note that this suit does not involve the applicability of the notice provision when a consumer files a tort action. For a discussion of the applicability of the notice provision under those circumstances, see J. White & R. Summers Uniform Commercial Code § 11-9 at 345 (1972).

[3] Owen applied the notice provision of the Oregon Uniform Sales Act, *Ore.Rev.Stat. § 75.490*. This section is identical to *Section 672.607(3)(a), Florida Statutes* (1979).

[4] There are cases where summary destruction of contaminated items may be required. See *Conner v. Carlton, 223 So.2d 324 (Fla. 1969)*. This was not the case here, however, because the Department did not find that the canned goods, as such, were dangerous, but that their consumption was dangerous. Thus, there was no necessity to summarily destroy the goods.

[5] We note that although some courts have waived the notice requirement, they have done so only when failure to give notice resulted in no prejudice to the seller. See, e. g., *Pritchard v. Liggett & Myers Tobacco Co., 295 F.2d 292 (3d Cir. 1961)*; Note, *Notice of Breach and the Uniform Commercial Code*, 25 U.Fla.L.Rev. 520, 522 n. 15 (1973).

Exhibit 11

⊕ Positive
As of: December 23, 2025 6:06 PM Z

## *Glenn Distribs., Corp. v. Heckitt Benckiser, LLC*

Common Pleas Court of Philadelphia County, First Judicial District of Pennsylvania, Civil Trial Division

April 27, 2015, Decided

COMMERCE PROGRAM No. 1574

**Reporter**

2015 Phila. Ct. Com. Pl. LEXIS 113 *

GLENN DISTRIBUTORS, CORP., Plaintiff, v. HECKITT BENCKISER, LLC, Defendant.

**Subsequent History:** [*1] 140 EDA 2015

Affirmed by *Glenn Distribs. Corp. v. Reckitt Benckiser, LLC, 2015 Pa. Super. Unpub. LEXIS 4643 (2015)*

## Core Terms

purchase order, quantities, bid, invoices, products, modification, ship, summary judgment, closeout, cases, email, business relationship, action for breach, trade usage, memorializations, transactions, rescission, contracts, notifying, shipments, modified, amounts, binding, parties, retract, retail, waived, won

## Case Summary

### Overview

HOLDINGS: [1]-In support of an affirmance on appeal, the court noted that summary judgment was properly granted to a closeout goods purchaser in the retail product distributor's breach of contract action, arising from a business dispute regarding the correct amount of products involved in multiple transactions, as the contracts were clearly modified by the parties' course of performance and the distributor's behavior, such that it could not later assert that there was a breach based on modifications that it agreed to pursuant to *13 Pa.C.S. §§ 1303* and *2209*.

### Outcome

Affirmance recommended.

## LexisNexis® Headnotes

Commercial Law (UCC) > ... > Subject Matter > Definitions > Sales Agreements

**HN1**[ ] **Definitions, Sales Agreements**

Contracts for the sale of goods are governed by the Uniform Commercial Code. *13 Pa.C.S. § 1201(b)(3)* defines "agreement" as the bargain of the parties in fact, as found in their language or inferred from other circumstances, including **course of performance**, **course of dealing** or usage of trade as provided in *13 Pa.C.S. § 1303* (relating to **course of performance**, **course of dealing** and usage of trade).

Commercial Law (UCC) > ... > Breach, Excuse & Repudiation > Notice Requirements > General Overview

Evidence > Burdens of Proof > Allocation

Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment > Modifications, Rescissions & Waivers

**HN2**[ ] **Breach, Excuse & Repudiation, Notice Requirements**

Subject to *13 Pa.C.S. § 2209(f)* (relating to modification, rescission and waiver), a course of performance is relevant to show a waiver or modification of any term inconsistent with the course of performance. *Section 2209(d)* states that although an attempt at modification or rescission does not satisfy the requirements of *§ 2209(b)* or *(c)* it can operate as a waiver. Moreover, a party who has made a waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived,

Page 2 of 3

2015 Phila. Ct. Com. Pl. LEXIS 113, *1

unless the retraction would be unjust in view of a material change of position in reliance on the waiver. § 2209(e).

**Judges:** PATRICIA A. MCINERNEY, J.

**Opinion by:** PATRICIA A. MCINERNEY

# Opinion

### APPEAL OPINION

### I. Introduction and Procedural History.

This is an appeal taken from this Court's grant of summary judgment to defendant Reckitt Benckiser, LLC ("Reckitt"). Glenn filed this action for breach of contract on December 12, 2012. Glenn and Reckitt filed cross-motions for summary judgment on Glenn's claim for breach of contract. On December 11, 2014, after oral argument, the Court granted summary judgment to defendant Reckitt. Glenn filed the instant appeal on January 7, 2015.

Glenn and Reckitt had a business relationship between 2000 and 2012. Glenn purchased closeout goods from Reckitt, a distributor of various retail products. This is the process by which the goods were purchased: Reckitt would send an email to Glenn (and frequently to other would-be purchasers at the same time) notifying them of the availability of closeout products. Glenn would respond with a bid, including price and quantity. Reckitt would respond notifying Glenn that it won the bid, sometimes noting that the quantity available had changed. Glenn would then send a purchase order. Reckitt would then send Glenn an invoice or invoices (depending on **[*2]** whether the goods were to be sent in different shipments), Glenn would pay the amounts listed in the invoices, and Reckitt would ship the goods. The quantities listed on the invoices often did not match the quantities in the purchase orders. In dispute in the instant case are forty-six transactions between 2008 and 2012, in which Glenn argues that Reckitt shorted it products that it was contractually obligated to ship.

### I. Argument.

**HN1[**⬆**]** Contracts for the sale of goods are governed by the UCC. *Section 1201* defines "agreement" as "the

bargain of the parties in fact, as found in their language or inferred from other circumstances, including ***course of performance***, ***course of dealing*** or usage of trade as provided in *section 1303* (relating to ***course of performance***, ***course of dealing*** and usage of trade)."[1] Glenn argued that there were binding agreements to ship the goods; Reckitt argued that no such agreements existed, or alternatively that they were modified and/or waived by the parties course of dealing and course of performance.

Glenn argued that the purchase orders submitted by Glenn to Reckitt constitute memorializations of binding contracts. However, Glenn did not pay when it sent the purchase orders, but **[*3]** rather waited for the invoices and paid Reckitt in response to those. Some of the invoices had different quantities than the purchase orders; however, Glenn paid for those amounts and received those quantities. At times, Glenn submitted a purchase order, received less than the amount specified in that order, and paid for the amounts shipped. Glenn did not allege that it paid for product that it did not receive.

There are two general categories of agreements at issue in this matter. In some of the cases, after Reckitt offered its items for Glenn to bid on, and Glenn bid on a certain quantity at a certain price, Reckitt accepted that offer in its email to Glenn stating that Glenn has won the bid. There, a contract was formed with a definite price and quantity term, memorialized in the purchase order.

In the other cases, Glenn bid, and Reckitt responded by changing the quantity term. There, Reckitt's response was a counteroffer, and Glenn's purchase order constituted an acceptance.

However, in both cases, the contracts were clearly modified by the parties' course of performance. **HN2[**⬆**]** "Subject to *section 2209* (relating to modification, rescission and waiver), a course of performance is relevant to show a **[*4]** waiver or modification of any term inconsistent with the course of performance."[2] *Section 2209* states that "[a]lthough an attempt at modification or rescission does not satisfy the requirements of *subsection (b)* or *(c)* it can operate as a waiver."[3] Moreover, "[a] party who has made a waiver affecting an executory portion of the contract may

---

[1] Pa. Stat. Ann. § *13 Pa.C.S.A. §1201 (b)(3)*.

[2] *13 Pa. Cons. Stat. Ann. § 1303 (f)*.

[3] *13 Pa. Cons. Stat. Ann. § 2209 (d)*.

Page 3 of 3

2015 Phila. Ct. Com. Pl. LEXIS 113, *4

retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver."[4]

It is undisputed that over the parties' multi-year business relationship, Reckitt would sometimes remove some products from the list of products offered to Glenn as closeouts, after Glenn submitted purchase orders but before the products were shipped.

In the transactions at issue, many of the emails between Glenn's representative and Reckitt's representative show that Glenn never raised an objection to receiving less product in the shipments than were listed on the purchase orders. It did not respond with demands for fulfillment, merely with questions, acceptance, or mild expressions of disappointment. Glenn would sometimes offer to buy the same product [*5] in future bids, indicating that it did not believe it was owed the remainder listed in the purchase orders.

It is clear that this was the parties' course of performance, in which quantities may be pulled without warning to sell at retail. If Glenn were going to change the course of performance, it would have needed to give reasonable notice to Reckitt, which it did not do. Glenn's behavior constituted a modification of the agreements, and therefore it could not later maintain an action for breach of contract against Reckitt based on modifications that it agreed to.

**II. Conclusion**.

For the foregoing reasons, this court respectfully requests that its order of December 11, 2014, be affirmed.

**BY THE COURT**,

/s/ Patricia A. Mcinerney

**PATRICIA A. MCINERNEY, J.**

---

**End of Document**

---

4 *13 Pa. Cons, Stat. Ann. § 2209 (e)*.

# Exhibit 12

Ⓐ Neutral
As of: November 18, 2025 7:09 PM Z

# *In re Hall*

United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division

May 5, 2023, Decided

Case No. 3:22-bk-01326-BAJ, Case No. 3:22-bk-01341-BAJ, Chapter 11 (Jointly Administered Cases)

**Reporter**
650 B.R. 595 *; 2023 Bankr. LEXIS 1258 **; 30 Fla. L. Weekly Fed. B 40

In re: KAREN W. HALL, SPUDDOG FARM PROPERTIES, LLC, Debtors.

## Core Terms

summary judgment, liquidate, eligibility, unliquidated, guaranty, adversary proceedings, guarantor, owe, unsecured debt, moving party, individual capacity, filing date, noncontingent, collateral, genuine

## Case Summary

### Overview

HOLDINGS: [1]-Debtors were not eligible pursuant to *11 U.S.C.S. § 1182* to proceed under Subchapter V of Chapter 11 of the United States Code because their aggregate noncontingent liquidated secured and unsecured debts exceeded the $7,500,000 debt limit as the mere dispute as to liability on a debt did not automatically exclude that amount from the calculation, the schedules did not control the eligibility determination, the value of the collateral was immaterial to determining the debtors' eligibility, and a debtor signed an unlimited guaranty in her individual capacity.

### Outcome

Motion for summary judgment granted. Cross-motion for summary judgment denied.

## LexisNexis® Headnotes

Bankruptcy Law > Claims > Proof of Claim > Effects & Procedures

Bankruptcy Law > Claims > Proof of Claim > Content, Evidence & Form

*HN1*[⬇] If a creditor has filed a proof of claim, the proof of claim amount will control over the scheduled amount. *Fed. R. Bankr. P. 3003(c)(4)*.

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

*HN2*[⬇] Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. The court's role is not to try issues of fact, but to determine whether fact issues exist to be tried. The moving party bears the initial burden to show by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment. A moving party discharges its burden on a motion for summary judgment by demonstrating that there is an absence of evidence to support the nonmoving party's case. In determining whether the movant has met this initial burden, the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party. If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment.

Business & Corporate Compliance > Bankruptcy > Reorganizations > Eligibility

Page 2 of 6

650 B.R. 595, *595; 2023 Bankr. LEXIS 1258, **1258

Bankruptcy Law > Reorganizations > Eligibility

**HN3**[⬇] To qualify for Subchapter V of Chapter 11 of the United States Code, a debtor must have debts that do not exceed the ceiling established by *11 U.S.C.S. § 1182*. A debtor cannot qualify for Subchapter V if its aggregate non-contingent liquidated secured and unsecured debts as of the date of the filing of the petition exceed $7,500,000. *11 U.S.C.S. § 1182(1)(A)*.

Business & Corporate
Compliance > Bankruptcy > Reorganizations > Eligibility

Bankruptcy Law > Reorganizations > Eligibility

**HN4**[⬇] Courts have generally held that a debt is liquidated if its amount is readily and precisely determinable, when the claim is determinable by reference to an agreement. Ordinarily, debts of a contractual nature are subject to ready determination and precision in computation of the amount due and, therefore, are considered liquidated, even if subject to a substantial dispute. By contrast, tort claims are generally unliquidated if not reduced to judgment. The nature of the process for determining the claim dictates whether the claim is liquidated or unliquidated, not the magnitude of the dispute or the length of the trial required to resolve the dispute.

Business & Corporate
Compliance > Bankruptcy > Reorganizations > Eligibility

Bankruptcy Law > Reorganizations > Eligibility

**HN5**[⬇] The relevant debt levels are those existing as of the date of the filing of the petition. *11 U.S.C.S. § 1182(1)(A)*.

Bankruptcy Law > Debtor Benefits & Duties > Debtor Duties

Business & Corporate Compliance > Bankruptcy > Debtor Benefits & Duties > Debtor Duties

**HN6**[⬇] While the schedules offer some probative value, a bankruptcy court will not restrict its inquiry solely to the schedules. Eligibility is determined by what the debtors owe on the petition date, not by what the debtors think they owe.

Business & Corporate
Compliance > Bankruptcy > Reorganizations > Eligibility

Bankruptcy Law > Reorganizations > Eligibility

**HN7**[⬇] The Subchapter V of Chapter 11 of the United States Code debt limit includes secured and unsecured debts. *11 U.S.C.S. § 1182(1)(A)*. Therefore, the value of the collateral is immaterial to determine the debtors' eligibility under *11 U.S.C.S. § 1182*.

**Counsel:** **[**1]** For Karen W. Hall, aka Karen Willett Hall, Spuddog Farm Properties LLC, Debtors (3:22-bk-01326-BAJ): David S Jennis, Daniel E Etlinger, Michael A. Stavros, Jennis Morse Etlinger, Tampa, FL.

Trustee (3:22-bk-01326-BAJ): Spuddog Farm Properties LLC, Saint Augustine, FL.

For United States Trustee - JAX 11, U.S. Trustee (3:22-bk-01326-BAJ, 3:22-bk-01341-BAJ): Scott E Bomkamp, United States Trustee, Orlando, FL.

For Spuddog Farm Properties LLC, Debtor (3:22-bk-01341-BAJ): David S Jennis, Daniel E Etlinger, Jennis Morse Etlinger, Tampa, FL.

Trustee (3:22-bk-01341-BAJ): Aaron R. Cohen, Jacksonville, FL.

**Judges:** Jason A. Burgess, United States Bankruptcy Judge.

**Opinion by:** Jason A. Burgess

# Opinion

**[*596]** <u>ORDER GRANTING MOTION FOR SUMMARY JUDGMENT, AND DENYING CROSS-MOTION FOR SUMMARY JUDGMENT, ON OBJECTION TO SUBCHAPTER V ELIGIBILITY</u>

This Case is before the Court on the *Motion for Summary Judgment* (the "Motion") (Doc. 147) filed by WBL SPO II, LLC ("WBL"), the *Response and Cross-Motion for Summary Judgment* (the "Response") (Doc. 158) filed by Karen W. Hall **[*597]** ("Mrs. Hall") and Spuddog Farm Properties LLC ("Spuddog") (collectively the "Debtors"), the Objection to Debtors' Eligibility for Subchapter V (the "Objection to Eligibility") (Doc. **[**2]** 69) filed by WBL, and the Response to Objection to Eligibility (Doc. 74) filed by Nutrien Ag Solutions, Inc. ("Nutrien Ag"). By the Motion, WBL argues that the

Page 3 of 6

650 B.R. 595, *597; 2023 Bankr. LEXIS 1258, **2

Debtors "are not eligible to proceed under Subchapter V because their aggregate noncontingent liquidated secured and unsecured debts exceed the $7,500,000 [debt] limit." (Doc. 147, p. 1). In support, WBL argues that: (i) the proofs of claim, not the schedules, should control the eligibility calculation; (ii) the outcome of the pending adversary proceeding is not necessary to determine eligibility; (iii) Mrs. Hall's guaranty is noncontingent; and (iv) the WBL Claim is liquidated. Conversely, the Debtors seek summary judgment in their favor or, alternatively, denial of the Motion based on the existence of disputed material facts. In support, the Debtors argue that (i) the WBL Claim should be excluded from the eligibility calculation because it is not debt at all; (ii) the bankruptcy schedules, not proofs of claim, should control the eligibility determination; (iii) Mrs. Hall signed the WBL unlimited guaranty on behalf of Spuddog, and the WBL Claim as to her is contingent; and (iv) the WBL debt is unliquidated. (Doc. 158, pp. 10-17). **[**3]** Upon consideration of the parties' respective arguments and for the reasons set forth below, the Court will grant the Motion.

### Background

Mrs. Hall and Spuddog are affiliates that filed their Subchapter V cases in 2022. Mrs. Hall previously owned and operated farming and trucking businesses in Virginia with her husband, Benny F. Hall, Sr. ("Mr. Hall"). (Doc. 158, p. 2). Mrs. Hall now resides in Florida and works seasonally at Daytona Speedway. Id. In 2015, Benny F. Hall & Sons, LLC ("BFH"), an affiliated farming business owned and operated by Mr. and Mrs. Hall, lost its seasonal line of credit. Id. To fund operations, BFH and the Debtors obtained merchant cash advance ("MCA") loans. Id. at p. 3. Seeking to refinance the MCA loans and obtain additional operating capital, the Debtors discussed financing options with the Vice-President of Kwik Capital. Id. Those discussions led the Debtors to meet with a corporate officer of WBL, Mr. Michael John. Id. The Debtors allege that they relied on oral representations from Mr. John when they entered into multiple loan agreements with WBL. Id. at pp. 4-5. On May 11, 2016, the parties closed on an initial loan, by which WBL provided the Debtors with **[**4]** $350,000. Id. at p. 5. On June 24, 2016, the parties closed on a second loan, by which WBL provided the Debtors with $935,795. Id. On January 12, 2017, the parties closed on a third loan, by which WBL provided the Debtors with approximately $940,000. Id. at p. 6. In early 2017, WBL declared a payment default and alleged an indebtedness totaling $1,507,294.07. Id. at p.

7.

In July of 2022, each of the Debtors filed a voluntary petition seeking relief under Subchapter V. Id. The Court ordered joint administration of the two affiliated cases. Id. WBL filed a proof of claim in each case in the amount of $7,323,990.19. Id. at p. 8. WBL also filed the Objection to Eligibility, and the Debtors' filed the Response to Objection to Eligibility.

Based upon a review of the claims registers and the Debtors' schedules,[1] the Court surmises that the total claims against Mrs. **[*598]** Hall equal $9,505,522.09 and against Spuddog equal $7,478,968.64[2] as of the petition dates. The total aggregate claims equal $9,721,043.43. The parties did not debate the validity of claims of creditors other than WBL. Given the significant amount of the WBL Claim, whether the WBL claim is unliquidated or contingent largely controls **[**5]** the eligibility determination.

### Summary Judgment Standard

"[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)* (internal quotations omitted). The court's role is not to try issues of fact, but to determine whether fact issues exist to be tried. *Balderman v. U.S. Veterans Admin., 870 F.2d 57, 60 (2d Cir. 1989)*. "The moving party bears the initial burden to show . . . by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991)*. "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Id. A

---

[1] If a creditor has filed a proof of claim, the proof of claim amount will control over the scheduled amount. *Fed. R. Bankr. P. 3003(c)(4)*. Absent a proof of claim, the Court included the scheduled amount in its calculation. *11 U.S.C. § 1111*.

[2] Spuddog, standing alone, would qualify as a Subchapter V debtor under *§ 1182(1)(A)*. However, Spuddog is ineligible because it is "a member of a group of affiliated debtors under this title that has *aggregate*" debts greater than $7,500,000. *11 U.S.C. § 1182(1)(B)* (emphasis added).

Page 4 of 6

650 B.R. 595, *598; 2023 Bankr. LEXIS 1258, **5

moving party discharges its burden on a motion for summary judgment by demonstrating "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp., 477 U.S. at 325*. In determining whether the movant has met this initial burden, "the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving **[**6]** party." *Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997)*. "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir. 1992)*.

## Analysis

To qualify for Subchapter V, a debtor must have debts that do not exceed the ceiling established by *§ 1182*. A debtor cannot qualify for Subchapter V if its "aggregate noncontingent liquidated secured and unsecured debts as of the date of the filing of the petition" exceed $7,500,000. *11 U.S.C. § 1182(1)(A)*. Given the similar language in § 109(e), Chapter 13 case law offers useful guidance when interpreting *§ 1182*.

### A. Disputed Debts Count Toward Eligibility Under *11 U.S.C. § 1182* and the Mere Existence of a Dispute does not Render the Debt Unliquidated

The Debtors concede that "case law supports the proposition that the mere dispute as to liability on a debt does not automatically exclude that amount from the calculation" under *11 U.S.C. § 1182*. (Doc. 158, p. 11). Nevertheless, the Debtors attempt to differentiate "mere dispute" from "a bona fide dispute." Id. In support, the Debtors point to the pending adversary proceeding that they initiated against WBL (the "Adversary Proceeding"; 3:22-ap-00086-BAJ, Doc. 1). Through the Adversary Proceeding, the Debtors seek disallowance of the WBL claim in its entirety **[*599]** based **[**7]** on fraud in the inducement, intentional misrepresentation, negligent misrepresentation, and equitable subordination. Id. Based on the pendency of the Adversary Proceeding, the Debtors argue that there is a dispute as to whether "the WBL Claim is a 'debt' at all." (Doc. 158, p. 11). The Debtors further argue that the dispute renders the WBL claim unliquidated. (Doc. 158, p. 17). The Court disagrees.

Under the plain language of *11 U.S.C. § 1182*, disputed debts are not excluded from the $7.5 million debt limit. Furthermore, the Eleventh Circuit previously rejected an

argument very similar to that made by the Debtors. *U.S. v. Verdunn, 89 F.3d 799 (11th Cir. 1996)*. In *Verdunn*, the debtor argued that his tax debts were unliquidated because he "vigorously disputed" fraud penalties assessed by the Internal Revenue Service ("IRS") and substantial proceedings were necessary for the Tax Court to determine his tax liability. *Id. at 802*. The Eleventh Circuit rejected the debtor's argument and ruled in favor of the IRS Commissioner, who analogized the IRS notice of deficiency to a contract. *Id. at 802-03*. Very much like the debtor's argument in *Verdunn*, the Debtors argue that the magnitude of their dispute transforms the WBL Claim to an unliquidated debt. (Doc. 158, p. 16). The Debtors debate **[**8]** the existence of the WBL Claim, arguing it is not debt at all. Id. at p. 11. However, they do not debate that the amount of the WBL Claim is readily ascertainable. Id. at pp. 10, 14. Likewise, the Debtors do not argue that WBL miscalculated its claim, other than to argue that the WBL Claim should be treated as $0 or, at a minimum, that the Court should disallow the prepayment penalty.[3] Id. at pp. 10-12. This argument is unavailing because "the concept of a liquidated debt relates to the amount of liability, not the existence of liability." *Verdunn, 89 F. 3d at 802*.

"[C]ourts have generally held that a debt is liquidated if its amount is readily and precisely determinable, where the claim is determinable by reference to an agreement." *United States v. May, 211 B.R. 991, 996* (citing *Collier on Bankruptcy, 15th Ed. at 1109.06[2][c]* (March 1997)). Ordinarily, debts of a contractual nature are "subject to ready determination and precision in computation of the amount due" and, therefore, are considered liquidated, even if subject to a substantial dispute. *Barcal v. Laughlin (In re Barcal), 213 B.R. 1008, 1014 (B.A.P. 8th Cir. 1997)*. By contrast, tort claims are generally unliquidated if not reduced to judgment. Id. The nature of "the process for determining the claim" dictates whether the claim is liquidated or unliquidated, not the magnitude of the dispute or the length of **[**9]** the trial required to resolve the dispute. See id.; *Nicholes v. Johnny Appleseed (In re Nicholes), 184 B.R. 82, 91 (B.A.P. 9th Cir. 1995)* ("So long as a debt is subject to ready determination and precision in computation of the amount due, then it is considered liquidated and included for eligibility purposes under § 109(e), regardless of any dispute."); see also *In re*

---

[3] Even if the Court disallowed the prepayment penalty of $519,963.58, the Debtors' aggregate debts would still exceed $7.5 million.

Page 5 of 6

650 B.R. 595, *599; 2023 Bankr. LEXIS 1258, **9

*Robinson, 535 B.R. 437, 448 (Bankr. N.D. Ga. 2015)* ("Generally, when a debt is owed pursuant to a contractual obligation it is liquidated."). Therefore, the pendency of the Adversary Proceeding does not render the WBL Claim unliquidated.

Furthermore, even if the Debtors were to prevail in the Adversary Proceeding, the Debtors would still be ineligible in the pending cases. *In re Jerome, 112 B.R. 563, 566 [*600] (Bankr. S.D.N.Y. 1990)* (stating that eligibility is determined as of "the date of filing the petition and not after a hearing on the merits of the claims"). The relevant debt levels are those existing "as of the date of the filing of the petition." See *11 U.S.C. § 1182(1)(A)*.

In sum, the Debtors' arguments, which primarily focus on the extent of the dispute, are misplaced. The Court finds that the WBL Claim is liquidated.

### B. Schedules Do Not Control Eligibility Under *11 U.S.C. § 1182*

Next, the Debtors argue that the schedules should control the eligibility determination, absent an allegation of bad faith. (Doc. 158, p. 14) (relying on Emcyte Corp. v. Stahl [**10] (In re Stahl), 2021 Bankr. LEXIS 921, at *15 (B.A.P. 9th Cir. 2021)). The Court declines to adopt this view. While the schedules offer some probative value, the Court will not restrict its inquiry solely to the schedules. *In re Steffens, 343 B.R. 696, 698 (Bankr. M.D. Fla. 2005)* (determining eligibility based upon the claims filed). Eligibility is determined by what the Debtors owe on the petition date, not by what the Debtors think they owe. *In re Sullivan, 245 B.R. 416, 418 (N.D. Fla. 1999)*.

### C. Value of Collateral Immaterial for Eligibility Purposes

The Debtors also contend that the WBL Claim is unliquidated because the value of its collateral is unknown. (Doc. 158, p. 17). This is clearly erroneous. The Subchapter V debt limit includes "secured and unsecured debts." *11 U.S.C. § 1182(1)(A)*. Therefore, the value of the collateral is immaterial to determine the Debtors' eligibility under *§ 1182*.

### D. Mrs. Hall Signed the WBL Unlimited Guaranty in her Individual Capacity

The unlimited guaranty dated January 12, 2017, contains three signature blocks, one for Mr. Hall, one for Mrs. Hall, and one for Spuddog. (the "WBL Unlimited Guaranty"; Proof of Claim 7, pp. 14-18). Mrs. Hall

signed the WBL Unlimited Guaranty but claims to have signed only on behalf of Spuddog, not in her individual capacity. (Doc. 158, p. 15). Although [**11] the words "managing member" were added to each of the three signature blocks, the Court finds that Mrs. Hall signed the WBL Unlimited Guaranty in her individual capacity. First, each of the three signature blocks clearly identifies each of the three guarantors separately as follows: "(Guarantor Name) Benny Franklin Hall," "(Guarantor Name) Karen Willett Hall," and "(Guarantor Name) Spuddog Farm Properties LLC." Id. at p. 16. Mr. Hall signed twice, once on behalf of Spuddog and once individually. If the parties intended to obligate only Spuddog, then Mr. Hall did not need to sign twice. Second, the WBL Unlimited Guaranty includes an additional provision, which states "**For Married Residents Only**: Each Guarantor who signs below represents that this obligation is incurred in the interest of his or her marriage or family." Id. Mr. Hall and Mrs. Hall signed this additional provision, which undoubtedly was not necessary if the WBL Unlimited Guaranty applied to Spuddog alone. Third, the three guarantors also signed a jury waiver, which also clearly and separately identified each of the guarantors but did not include the words "managing member." Id. at p. 18. Taken together, these indisputable [**12] facts indicate that the WBL Unlimited Guaranty bound Mr. Hall, Mrs. Hall, and Spuddog. Based on the foregoing, the Court finds that Mrs. Hall signed the WBL Unlimited Guaranty [*601] in her individual capacity, and the WBL Claim as to both Debtors is noncontingent.

### Conclusion

The Court finds that that there is no genuine dispute as to any material fact, and WBL is entitled to judgment as a matter of law. The Debtors do not argue that WBL miscalculated its claim, rather they argue that the WBL Claim does not exist, should be reduced to $0, or converted to equity. The parties' dispute, albeit significant, does not render the WBL Claim unliquidated where the debt is based on alleged failure to pay pursuant to the terms of a contract. Further, the Court will not restrict its review solely to the schedules filed in the case. Eligibility should be determined by what the Debtors owe on the petition date, not by what the Debtors think they owe. Also, determining the value of the collateral is unnecessary based on the plain language of *§ 1182*, which includes secured and unsecured debts when considering eligibility limits. Finally, Mrs. Hall signed the WBL Unlimited Guaranty in her individual capacity, and [**13] the WBL Claim as to

Page 6 of 6

650 B.R. 595, *601; 2023 Bankr. LEXIS 1258, **13

both Debtors is noncontingent. Based on the foregoing, the Court will grant the Motion.

Accordingly, it is

**ORDERED**:

    1. The Motion is **GRANTED**.

    2. The Cross-Motion for Summary Judgment is **DENIED**.

    3. Within fourteen (14) days, each Debtor shall amend its voluntary petition to remove the Subchapter V election or file a motion to dismiss or convert.

Attorney Jonathan M. Sykes is directed to serve a copy of this order on interested parties who do not receive service by CM/ECF and file a proof of service within three days of entry of the order.

**ORDERED**.

**Dated: May 05, 2023**

/s/ Jason A. Burgess

Jason A. Burgess

United States Bankruptcy Judge

---

**End of Document**

# Exhibit 13

## *Kiwanis Club v. De Kalafe*

Court of Appeal of Florida, Third District

October 14, 1998, Opinion Filed

CASE NO. 97-419

**Reporter**
723 So. 2d 838 *; 1998 Fla. App. LEXIS 12827 **; 23 Fla. L. Weekly D 2299

KIWANIS CLUB OF LITTLE HAVANA, INC., Appellant, vs. DENISE DE KALAFE, Appellee.

**Subsequent History: [**1]** Rehearing Denied February 3, 1999. Released for Publication February 3, 1999.

**Prior History:** An Appeal from the Circuit Court for Dade County, Milton A. Friedman, Judge. LOWER TRIBUNAL NO. 89-18244.

**Disposition:** Judgment reversed; cause remanded for a new trial.

## Core Terms

defamation, veto, performers, modified

## Case Summary

### Procedural Posture
Appellant nonprofit service organization sought review of a judgment from the Circuit Court for Dade County (Florida), which entered judgment upon a jury verdict in favor of appellee entertainer in appellee's action for tortious interference with a contractual relationship and for defamation.

### Overview
Appellant nonprofit service organization hosted a festival and entered into a sponsorship agreement with a company that arranged for a performance by appellee entertainer. Appellant informed the company that appellee would not be permitted to perform because of security risks. Appellee sued appellant for tortious interference with her performance contract and for defamation. The jury returned a verdict in favor of appellee. The appellate court reversed the judgment and remanded for a new trial. Appellant unintentionally included in the agreement a waiver of its right to veto

performers sponsored by the company, but recanted the waiver the next day. The appellate court held that the trial court erred by excluding evidence showing that appellant recanted from the waiver and by instructing the jury that the agreement could only be modified by another written agreement signed by both parties. The court found that the cumulative effect of the trial court's rulings and jury instruction resulted in removing from the jury the issue of whether appellant and the sponsor modified the agreement to restore appellant's veto power.

### Outcome
The court reversed a jury verdict in favor of appellee entertainer in an action against appellant nonprofit service organization for tortious interference with contractual relationship and for defamation. The court remanded for new trial because the trial court's erroneous ruling and jury instructions resulted in removing from the jury the issue of whether appellant and a sponsor modified an agreement to restore appellant's performer veto power.

## LexisNexis® Headnotes

Contracts Law > Types of Contracts > Oral Agreements
Business & Corporate
Compliance > Contracts > Types of Contracts > Oral Agreements

Contracts Law > Contract Modifications > General Overview

*HN1*[⬇] **Types of Contracts, Oral Agreements**

A written contract can be modified by subsequent oral agreement between the parties or by the parties' course

of dealing.

Civil
Procedure > ... > Justiciability > Standing > General
Overview

Contracts Law > Third
Parties > Beneficiaries > Claims & Enforcement

## HN2[⬇]  Justiciability, Standing

A person who is not a party to an agreement has no standing to challenge the rights of the parties in the agreement.

Contracts Law > Types of Contracts > Oral
Agreements
Business & Corporate
Compliance > Contracts > Types of
Contracts > Oral Agreements

Civil Procedure > ... > Jury Trials > Jury
Instructions > General Overview

Contracts Law > Contract Modifications > General
Overview

Civil Procedure > Trials > Jury Trials > Province of
Court & Jury

## HN3[⬇]  Types of Contracts, Oral Agreements

Whether a written contract has been modified by subsequent oral agreement or by course of dealing is a question of fact for the jury.

Business & Corporate Law > Agency
Relationships > Duties & Liabilities > General
Overview

## HN4[⬇]  Agency Relationships, Duties & Liabilities

A principal cannot be held liable if the agent is exonerated.

Evidence > ... > Exceptions > Commercial
Publications & Market Reports > General Overview

## HN5[⬇]  Exceptions, Commercial Publications & Market Reports

Articles that are not being offered in evidence to prove the truth of the matter asserted are not hearsay. _Fla. Stat. ch. 90.801(1)(c)_ (1995).

Civil Procedure > Attorneys > General Overview

## HN6[⬇]  Civil Procedure, Attorneys

The Florida courts reject arguments that are nothing more than impassioned and prejudicial pleas intended to evoke a sense of community law through common duty and expectation. It is inappropriate for counsel to include appeals to "community conscience" and "civic responsibility" in closing argument.

**Counsel:** Cooney, Mattson, Lance, Blackburn, Richard & O'Conner; Hicks & Anderson and Gary Magnarini; Greenberg Traurig Hoffman Lipoff Rosen & Quentel and Elliot H. Scherker and Pedro J. Martinez-Fraga, for appellant.

Hardy, Bissett & Teichner and G. William Bissett, for appellee.

**Judges:** Before COPE, GERSTEN and SHEVIN, JJ.

**Opinion by:** SHEVIN

# Opinion

 **[*839]**  SHEVIN, Judge.

Kiwanis Club of Little Havana, Inc. ["Kiwanis"], appeals a final judgment in favor of Denise de Kalafe for tortious interference with a contractual relationship and for defamation. We reverse.

Kiwanis, a non-profit service organization, has hosted the annual Calle Ocho Festival in Miami since the late 1970's. The Festival features several stages with various performers sponsored by different corporations and organizations. On September 30, 1988, Rafael Licea, Kiwanis's Executive Director, signed an agreement confirming Proctor & Gamble's ["P&G"] sponsorship of a supersite at the 1989 **[**2]** Festival. The agreement waived Notes A and B in Kiwanis's _original proposal_: Note A granted Kiwanis the power to veto any co-sponsor P&G might select and imposed

surcharges for co-sponsors; Note B granted Kiwanis the right to veto any [*840] performers the sponsor proposed. Realizing that he had waived Note B *in error*, Licea sent P&G a letter on *October 4*, explaining the error and expressing that Kiwanis was still reserving the right to veto the entertainment at the site. Thereafter, P&G forwarded its deposit to Kiwanis.

It is also important to note that the record reflects that Licea had received a memo from P&G's Miami marketing representative, Alicia Martinez-Fons, *dated September 27, 1988*, reflecting a waiver of both Note A and B, and that the following day, September 28, Licea returned the memo to Martinez-Fons with a handwritten correction that Kiwanis was *not* waiving Note B.

P&G contracted with Telemundo of Florida, Inc., to co-sponsor the supersite and arrange for the performers. On February 10, 1989, Telemundo hired de Kalafe to perform at the supersite. De Kalafe is a Brazilian-born singer and composer who recorded in Brazil and in Mexico prior to 1988.

 [**3] On February 10, Licea met Telemundo's producer, Marie Peugot, at the supersite. Peugot showed Licea the list of performers. Upon noting de Kalafe's name on the list, Licea informed Peugot that de Kalafe would *not* be allowed to perform because it would pose *a security risk.* Licea also based his decision on the fact that Kiwanis had declined to invite de Kalafe to perform at the Festival some years earlier. [1]

On February 24, 1988, de Kalafe issued a press release to twenty-four media representatives regarding Kiwanis's decision to exclude her from the Festival. De Kalafe also held a press conference, four days later, to address what she felt were comments that she was sympathetic to the Castro regime. Kiwanis did *not* participate [**4] in the conference. Following the press conference, Leslie Pantin, Jr., as Kiwanis's representative, responded to questions from the press.

In her third amended complaint, de Kalafe sued Kiwanis and Pantin for tortious interference with her Telemundo contract; she also sued Kiwanis and Pantin for defamation based on assertions that Pantin called her a

Castro sympathizer. After a trial marked by extreme contention and antagonism, the jury returned a verdict in de Kalafe's favor against Kiwanis on *both* claims but returned a verdict in Pantin's favor on the defamation claim. The jury verdict in de Kalafe's favor was subsequently remitted, and a final judgment in favor of de Kalafe and against Kiwanis was entered by the trial court in the amount of *$ 2,130,000.*

Kiwanis appeals claiming error: in the court's rulings *excluding* from evidence both the October 4 Licea letter to P&G and the September 28 Licea corrected memo to Martinez-Fons, P&G's marketing representative, showing that Licea, on behalf of Kiwanis, *recanted* from the Note B waiver in the September 30, 1988, agreement; in the court's ruling and instructing the jury three times during trial that the September 30 [**5] agreement could *only* be modified by another written agreement signed by both parties; [2] and in the court instructing the jury that as a matter of law the terms of the September 30 agreement governed resolution of the issue of whether Kiwanis had the right to veto artists. [3] We agree with Kiwanis's position that the *cumulative effect* of the several rulings, [*841] compounded by the jury instruction, resulted in removing from the jury the issue of whether Kiwanis and P&G had modified the September 30 agreement to restore Kiwanis's ability to veto P&G's selection of performers.

 [**6] Kiwanis's defense to de Kalafe's lawsuit was based on Kiwanis's agreement with P&G that it *retained*

---

[2] On three separate occasions, the court addressed the jury as follows:

1. "You can't modify a written instrument without a written instrument."

2. "I made a ruling that you cannot change a written instrument except by another written instrument."

3. "Nothing could change the terms of the written agreement except for another written agreement."

[3] The record demonstrates that there was a dispute over whether Kiwanis timely objected to this instruction proposed by de Kalafe. The trial court did not rule on whether the objection was timely; it did remark, however, that the court itself had *not* noticed the proposed jury instruction during the charge conference. It is unnecessary to address this issue because any further objection by Kiwanis, in the face of the court's multiple prior instructions and rulings, would have been of no avail. *See Goff v. 392208 Ontario Ltd., 539 So. 2d 1158 (Fla. 3d DCA 1989).*

---

[1] In 1984, Leslie Pantin, Jr., a Kiwanis member and one of the Festival organizers, received a proposal for de Kalafe to perform at the 1985 Calle Ocho Festival. Pantin declined the proposal because de Kalafe had performed at the 1981

Varadero Music Festival in Cuba.

this veto power. As a threshold issue, we note that the court's statements to the jury were incorrect. **HN1**[↑] A written contract can be modified by subsequent oral agreement between the parties or by the parties' course of dealing. *Pathway Fin. v. Miami Int'l Realty Co., 588 So. 2d 1000, 1005 (Fla. 3d DCA 1991); Flagship Nat'l Bank v. Gray Distrib. Sys., Inc., 485 So. 2d 1336, 1340* (Fla. 3d DCA), *review denied, 497 So. 2d 1217 (Fla. 1986); Pan Am. Eng'g Co., Inc. v. Poncho's Constr. Co., 387 So. 2d 1052, 1053 (Fla. 5th DCA 1980); Wiener v. Wiener, 343 So. 2d 1319, 1322 (Fla. 3d DCA 1977).* Additionally, **HN2**[↑] as de Kalafe is not a party to the Kiwanis-P&G agreement she has no standing to challenge the rights of the parties in the agreement. *Genet Co. v. Annheuser-Busch, Inc., 498 So. 2d 683, 685 (Fla. 3d DCA 1986); see Lugassy v. Independent Fire Ins. Co., 636 So. 2d 1332, 1335 (Fla. 1994).* Hence, the court's rulings during trial were erroneous statements of law.

The court's error was compounded by failing to permit the jury to consider whether the agreement was modified. **HN3**[↑] **[\*\*7]** Whether a written contract has been modified by subsequent oral agreement or by course of dealing is a question of fact for the jury. *Halbert v. First Realty Serv., Inc., 504 So. 2d 431 (Fla. 1st DCA 1987).* The court's repeated erroneous instructions to the jury were tantamount to directing a verdict in de Kalafe's favor. *See Gencorp, Inc. v. Wolfe, 481 So. 2d 109, 112 (Fla. 1st DCA 1985), review denied, 491 So. 2d 281 (Fla. 1986).* These errors prejudiced Kiwanis's case to the extent that we are required to reverse and remand for a new trial.

In our view, these errors on the intentional interference issues adversely affected the defense of the defamation claim because of the implication that Kiwanis had undertaken action adverse to de Kalafe without proper contractual authorization. Therefore, we must reverse for a new trial on both causes of action because of the pervasive prejudice to Kiwanis caused by the court's erroneous instructions.

In addition, Kiwanis, as an organization, cannot be vicariously liable for defamation if its officers or representatives are *not* liable for defamation. [4] **HN4**[↑]

"[A] principal cannot be held liable if the agent is exonerated." **[\*\*8]** *Bankers Multiple Line Ins. Co. v. Farish, 464 So. 2d 530, 532 (Fla. 1985); see Walsingham v. Browning, 525 So. 2d 996, 997-8 (Fla. 1st DCA 1988); Rety v. Green, 546 So. 2d 410, 425-26* (Fla. 3d DCA), *review denied, 553 So. 2d 1165 (Fla. 1989).* The only logical interpretation of the jury verdict on the defamation claim is that the jury was swayed by the judge's rulings that Kiwanis had no right to exclude de Kalafe's performance. This result cannot be allowed to stand.

**[\*\*9]** Because this case will be retried, we feel compelled to address the following important issues raised in this appeal. Kiwanis argues that the trial court erred in permitting de Kalafe's counsel to exercise peremptory challenges in a discriminatory manner to *systematically exclude* Hispanic jurors. Although the argument here is not dispositive because it was not properly preserved for appellate review, *Milstein v. Mutual Sec. Life Ins. Co., 705 So. 2d 639 (Fla. 3d DCA 1998),* we are troubled that the trial court did **[\*842]** not follow the procedures outlined by the Florida Supreme Court in *Melbourne v. State, 679 So. 2d 759 (Fla. 1996).* The record demonstrates that despite Kiwanis's objections to de Kalafe's peremptory challenges, the court did not require de Kalafe's counsel to provide neutral reasons for the peremptory challenges and never ruled as to the genuineness of the explanations which de Kalafe volunteered. On retrial, the court must follow *Melbourne. See Johnson v. State, 706 So. 2d 401 (Fla. 3d DCA 1998).*

Additionally, the court erred in excluding, on hearsay grounds, the periodical articles Kiwanis sought to introduce into evidence. **HN5**[↑] The articles were not **[\*\*10]** hearsay because they were not being "offered in evidence to prove the truth of the matter asserted." *§ 90.801(1)(c), Fla. Stat.* (1995). The remarks quoted in the articles were being offered to impeach de Kalafe's trial testimony that she had never made favorable remarks regarding the Cuban government.

---

[4] De Kalafe asserted five counts in her third amended complaint against Kiwanis and various Kiwanis members. Count I asserted tortious interference against Kiwanis. Count II asserted defamation against Kiwanis, Emilio Cabrera and Pantin. Count III -- a breach of contract claim against Telemundo -- was settled prior to trial. As to count IV, which alleged a conspiracy between Pedro Menendez, Rafael Licea, Emilio Cabrera, and Pantin, the trial court entered summary judgment in Menendez's favor and de Kalafe declined to seek a verdict on this count against Pantin and Licea. De Kalafe dismissed count V, which alleged tortious interference against Menendez, Pantin, Cabrera and Licea. De Kalafe voluntarily dismissed her claims against Emilio Cabrera prior to trial. When the jury retired to deliberate, only two counts -- count I against Kiwanis, and count II, against Kiwanis and Pantin -- survived.

The articles were properly admissible for this purpose. *§ 90.614(2), Fla. Stat.* (1995); *see Hernandez v. Charles E. Virgin, M.D., P.A., 505 So. 2d 1369 (Fla. 3d DCA 1987)*.

The last issue we address is the impropriety of de Kalafe's counsel's remarks during closing argument. During the course of closing argument, counsel repeatedly appealed to the jury's "community conscience," continuously analogized Kiwanis's exclusion of de Kalafe to political methods in Cuba and repeatedly appealed to the jury's political and social interests. [5] *HN6*[↑] Florida courts have consistently rejected arguments that are nothing more than "impassioned and prejudicial pleas intended to evoke a sense of community law through common duty and expectation." *Norman v. Gloria Farms, Inc., 668 So. 2d 1016, 1021* (Fla. 4th DCA)(quoting *S.H. Inv. & Dev. Corp. v. Kincaid, 495 So. 2d 768 (Fla. 5th DCA 1986))*, [**11] *review denied*, 680 So. 2d 422 (Fla. 1996). It is inappropriate for counsel to include appeals to "community conscience" and "civic responsibility" in closing argument. *Superior Indus. Int'l, Inc. v. Faulk, 695 So. 2d 376* (Fla. 5th DCA), *review denied*, 700 So. 2d 685 (Fla. 1997); *see Blue Grass Shows, Inc. v. Collins, 614 So. 2d 626, 627* (Fla. 1st DCA), *review denied*, 624 So. 2d 264 (Fla. 1993). On retrial, counsel should avoid these impermissible references to community conscience. "The prejudicial conduct in its collective import is so extensive that its influence pervades the trial, gravely impairing a calm and dispassionate consideration of the evidence and the merits by the jury." *Superior Indus. Int'l, Inc., 695 So. 2d at 380* (quoting *Silva v. Nightingale, 619 So. 2d 4 (Fla. 5th DCA 1993))*. The comments in this case stray dangerously close to constituting reversible error.

[**12] It is unnecessary to reach the remaining issues raised by Kiwanis.

Judgment reversed; cause remanded for a new trial.

---

End of Document

---

[5] Among the objectionable closing argument comments were the following:

"What if in the past somebody was a Democrat or Brazilian, where do you draw the line? Use reason. Look at the evidence and realize this type of politics is uncalled for and shouldn't be used."

"Eighth Street belongs to all of us. It is not their home and your verdict should reflect . . . how you feel about this conduct."

"[P]eople of Cuba[] . . . haven't been too lucky with politics, with Battista [sic] and now Castro. The last thing in the world is that we should bring the type of politics here that causes the problems to begin with . . . ."

Case: 25-30743   Doc# 83   Filed: 01/08/26   Entered: 01/08/26 22:23:15   Page 198 of 261

Exhibit 14

# *Metal Seal Precision, Ltd. v. Good Time Outdoors, Inc.*

Court of Appeals of Ohio, Eleventh Appellate District, Lake County

December 31, 2018, Decided

CASE NO. 2017-L-142

**Reporter**

2018-Ohio-5326 *; 128 N.E.3d 678 **; 2018 Ohio App. LEXIS 5648 ***; 97 U.C.C. Rep. Serv. 2d (Callaghan) 749; 2018 WL 6840056

METAL SEAL PRECISION, LTD., AN OHIO LIMITED LIABILITY COMPANY, Plaintiff-Appellant, - vs - GOOD TIME OUTDOORS, INC., d.b.a. CORE15 RIFLE SYSTEMS, et al., Defendants-Appellees.

**Subsequent History:** Discretionary appeal not allowed by *Metal Seal Precision, Ltd. v. Good Time Outdoors, Inc., 155 Ohio St. 3d 1438, 2019-Ohio-1536, 2019 Ohio LEXIS 863, 121 N.E.3d 409 (Ohio, May 1, 2019)*

**Prior History:** [***1] Civil Appeal from the Lake County Court of Common Pleas, Case No. 2015 CV 000123.

**Disposition:** Affirmed.

## Core Terms

purchase order, Terms, trial court, parties, quantities, e-mail, Seller's, shipped, shipments, orders, pins, firing, suspended, manufacture, Purchaser, assigned error, Rifle, per unit, delivery, circumstances, Conditions, carrier, damages, bolt, promissory estoppel, date of delivery, trade usage, Products, invoices, promise

## Case Summary

### Overview

HOLDINGS: [1]-In a breach of contract action, the surrounding circumstances indicated the parties did not intend the General Terms agreement to be the complete and exclusive statement of their agreement because, without prior approval from the seller, the buyer sent purchase orders with different terms than those contained in the price quotes, and under *R.C. 1302.05*, the General Terms could be supplemented or explained by a course of dealing, usage of trade, course of performance, or by consistent additional terms; [2]-The buyer's suspension of the purchase orders was not a

breach of the General Terms agreement because the parties' course of performance evidenced the intent to be bound only from month-to-month, rather than to the multiple months and set quantity of parts covered by the purchase orders, *R.C. 1301.303(A)*.

### Outcome

Judgment affirmed.

## LexisNexis® Headnotes

Business & Corporate Compliance > Contracts > Breach > Breach of Contract Actions

Contracts Law > Breach > Breach of Contract Actions

Civil Procedure > Appeals > Standards of Review > De Novo Review

*HN1*[⤓] **Breach, Breach of Contract Actions**

The standard of review in a breach of contract action is whether the trial court erred as a matter of law. An appellate court must therefore determine whether the trial court's order is based on an erroneous standard or a misconstruction of the law. However, due deference must be given to the trial court's findings of fact if the findings are supported by competent, credible evidence.

Contracts Law > Contract Interpretation > Intent

*HN2*[⤓] **Contract Interpretation, Intent**

In construing the terms of any contract, the principal

objective is to determine the intention of the parties. Ohio courts presume the intent of the parties to a contract resides in the language used in the written instrument.

the complete and exclusive statement of their agreement, a court must look outside the four corners of the document and consider the surrounding facts and circumstances.

Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment > Parol Evidence Rule

Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem

Contracts Law > Contract Interpretation > Intent

Contracts Law > Contract Interpretation > Parol Evidence

### *HN3*[⬇] Form, Formation & Readjustment, Parol Evidence Rule

Generally, at common law, only where the language of a writing is unclear or ambiguous, or when the circumstances surrounding the agreement invest the language with a special meaning, will extrinsic evidence be considered in an effort to give effect to the parties' intentions. Ohio's Uniform Commercial Code, however, rejects the common law rule that extrinsic evidence is admissible only where the terms of a writing are ambiguous. *R.C. 1302.05*.

Contracts Law > Contract Interpretation > Parol Evidence > Course of Dealing

Contracts Law > Contract Interpretation > Parol Evidence > Custom & Usage

Contracts Law > Contract Interpretation > Intent

### *HN4*[⬇] Parol Evidence, Course of Dealing

Where the parties have reached a written agreement that is final with respect to the terms contained in the writing, evidence of prior agreements or contemporaneous oral agreements cannot be used to contradict those terms, but extrinsic evidence of trade usage, course of dealing, or course of performance may be used to explain or supplement the writing. Further, if the writing is not a complete and exclusive statement of the agreement, the writing may also be explained or supplemented by consistent additional terms. To determine whether the parties intended the writing to be

Contracts Law > Breach > Breach of Contract Actions > Elements of Contract Claims
Business & Corporate Compliance > ... > Breach > Breach of Contract Actions > Elements of Contract Claims

### *HN5*[⬇] Breach of Contract Actions, Elements of Contract Claims

A cause of action for a breach of contract requires the claimant to establish: (1) the existence of a contract; (2) the other party's failure without legal excuse to perform when performance is due; and (3) damages or loss resulting from the other party's breach.

Business & Corporate Compliance > ... > Sales of Goods > Performance > Delivery & Shipment by Seller
Contracts Law > ... > Sales of Goods > Performance > Delivery & Shipment by Seller

Business & Corporate Compliance > Contracts > Sales of Goods > Formation
Contracts Law > ... > Sales of Goods > Readjustments > Formation

### *HN6*[⬇] Performance, Delivery & Shipment by Seller

A contract is generally defined as a promise, or a set of promises, actionable upon breach. A contract for the sale of goods imposes on the seller the obligation to transfer and deliver the goods in accordance with the contract and imposes on the buyer the obligation to accept and pay in accordance with the contract.

Business & Corporate Compliance > ... > Contract Formation > Consideration > Promissory Estoppel
Contracts Law > Contract Formation > Consideration > Promissory Estoppel

### *HN7*[⬇] Consideration, Promissory Estoppel

The elements required to establish a claim of promissory estoppel are: (1) a clear and unambiguous promise; (2) reliance on the promise; (3) the reliance is reasonable and foreseeable; and (4) the party relying on the promise was injured by his or her reliance.

**Counsel:** For Plaintiff-Appellant: Grant J. Keating and JoAnna Tatarko, Dworken & Bernstein Co., L.P.A., Painesville, OH.

For Defendants-Appellees: Richard J. Marco, Jr., Marco & Marco, Medina, OH.

**Judges:** TIMOTHY P. CANNON, J. DIANE V. GRENDELL, J., CYNTHIA WESTCOTT RICE, J., concur.

**Opinion by:** TIMOTHY P. CANNON

# Opinion

[**680] TIMOTHY P. CANNON, J.

[*P1] Appellant, Metal Seal Precision, Limited ("Metal Seal"), appeals the October 3, 2017 judgment of the Lake County Court of Common Pleas. Following a bench trial, the trial court found in favor of appellees, Norman Clifton III and Good Time Outdoors, Inc., d.b.a. Core15 Rifle Systems ("Good Time Outdoors"). The trial court's judgment is affirmed for the following reasons.

## Procedural History

[*P2] This case stems from Metal Seal's business relationship with Good Time Outdoors. Metal Seal is a machine shop located in Mentor, Ohio. A portion of its business includes manufacturing machine parts for the firearms industry. Good Time Outdoors, Inc. is located in Ocala, Florida and conducts business under three divisions: Good Time Outdoors Airboats, Bluegrass Armory, and Core15 Rifle Systems. Core15 Rifle Systems [***2] assembles AR-15 rifles for sale to retailers and individuals.

[*P3] In early 2012, Metal Seal began supplying Good Time Outdoors with bolt carrier groups ("BCGs"), a critical component of AR-15 rifles. The parties engaged in business together until 2014.

[*P4] On January 23, 2015, Metal Seal filed in the Lake County Court of Common Pleas a complaint against Good Time Outdoors and its president, Norman

P. Clifton, III. The complaint alleged that the parties entered into a General Terms and Conditions of Sale agreement ("General Terms"), pursuant to which Metal Seal agreed to manufacture certain goods, and Good Time Outdoors agreed to purchase those goods. The complaint alleged Good Time Outdoors breached the General Terms, and Metal Seal was entitled to relief. In addition to breach of the General Terms, the complaint also raised claims for unjust enrichment, promissory estoppel, and action on account. With leave of court, Metal Seal filed an amended complaint.[1]

[*P5] Good Time Outdoors and Clifton filed an answer and counterclaim on March 20, 2015. The counterclaim was later withdrawn.

[*P6] [**681] Metal Seal filed a motion for summary judgment on December 18, 2015. Good Time Outdoors filed a brief in opposition, [***3] and Metal Seal filed a reply. The trial court denied the motion for summary judgment.

[*P7] The matter proceeded to a bench trial on January 31 through February 3, 2017. The following facts are summarized from the testimony and evidence presented at trial.

## Purchase Orders 11028 & 11139

[*P8] Metal Seal and Good Time Outdoors began conducting business together after meeting at a firearms convention in January 2012. In February 2012, David Blackburn, Metal Seal's salesman, exchanged several e-mails with Thomas Cistola, the purchasing and sales manager for Good Time Outdoors. They discussed pricing, quantity, and lead time for the manufacture of both manganese phosphate ("MagPhos") and nickel boron ("NiBr") BCGs. Per Cistola's request, Blackburn sent an e-mail on February 13, 2012, quoting $108.00 per unit for 100 NiBr BCGs per month for 12 months, with a lead time of 12 to 14 weeks to the first delivery. The next day, Cistola sent Purchase Order 11028 for the purchase of 100 NiBr BCGs per month, totaling $10,800.00 per month. The purchase order indicated the initial shipment would be sent May 15 to June 1, 2012, and ordered the same quantity be shipped once

---

[1] In the amended complaint, the date the General Terms were entered into by the parties was changed from "January of 2013" to "June, 2012," and the section of the General Terms regarding damages for breach was changed from "Section 16(c)" to "Section 15(c)."

per month, through December 2012, on the **[\*\*\*4]** 15th of each month.

**[\*P9]** On February 20, 2012, Blackburn and John Habe, the president of Metal Seal, met with Clifton and Cistola to persuade Good Time Outdoors to provide Metal Seal with a "request for quote" for MagPhos BCGs. During the meeting, they discussed quantities and pricing. On February 25, 2012, Blackburn sent Cistola an e-mail, quoting $73.00 per unit for MagPhos BCGs for a total of 2,300 units. The quote proposed components would be shipped June through December 2012 in the following quantities per month: 200 units in June and July 2012; 300 units in August and September 2012; 400 units in October and November 2012; and 500 units in December 2012. The lead time to the first delivery would be 12 to 14 weeks. Cistola replied to the quote, indicating he wanted to "bump up the quantities from Aug on out." Cistola e-mailed Purchase Order 11139 on March 13, 2012, for a total of 35,000 units of MagPhos BCGs at a unit price of $69.00 in the following quantities per month: 2,000 units in May and June 2012; 2,500 units in July through September 2012; 3,000 units in October and November 2012; and 3,500 units in December 2012 through February 2013. Cistola's e-mail stated: "If we can **[\*\*\*5]** get the first 500 shipped the second week of May and are on track with the PO by June 1 that would be fantastic." The next day, Cistola sent Blackburn an e-mail, stating: "Per our discussion earlier, here are the revisions." The revised purchase order added shipments for 3,500 units in March and April 2013. It also indicated "net 15 terms." Habe testified that meant Good Time Outdoors would pay Metal Seal "in 15 days after we shipped the parts."

**[\*P10]** Habe testified this was the "[l]argest firearms order Metal Seal had ever received." To manufacture the higher volume of parts, Metal Seal had to increase its capacity and purchased $2,168,735.00 in additional equipment and machinery. Metal Seal also spent additional sums on tooling, training, and set-up. Habe testified the cost to increase capacity was incorporated in Metal Seal's price quotes.

## General Terms and Conditions of Sale

**[\*P11]** On May 31, 2012, Blackburn sent an e-mail to Cistola offering to extend the payment terms to "net 30" if Clifton would **[\*\*682]** sign a "personal guarantee of payment." On June 7, 2012, a little more than three months after the first purchase order between the parties, Blackburn sent Cistola an e-mail with the General Terms **[\*\*\*6]** document attached. The last section of the document was titled "Personal Guaranty." On June 8, 2012, Cistola e-mailed the document back to Blackburn with Clifton's signature assenting to the terms and conditions and the personal guaranty.

**[\*P12]** Good Time Outdoors could not get parts fast enough to meet customer demand, and throughout the summer of 2012, Metal Seal's BCG shipments fell well below the ordered quantities. Metal Seal shipped the following quantities of parts from May through September 2012 under Purchase Order 11028: 0 of 100 units in May; 200 of 100 units in June; 0 of 100 units in July; 0 of 100 units in August; and 100 of 100 units in September. The following shipments were made May through September 2012 under Purchase Order 11139: 428 of 2,000 units in May; 975 of 2,000 units in June; 650 of 2,500 units in July; 2,000 of 2,500 units in August; 1,250 of 2,500 units in September.

## Purchase Order 11139 Revised

**[\*P13]** At the request of Metal Seal, in September 2012, Good Time Outdoors revised Purchase Order 11139 to reflect an increased price per unit for MagPhos BCGs. The increased unit price accounted for the additional capacity required to meet Good Time Outdoors' need for greater **[\*\*\*7]** quantities of parts.

**[\*P14]** On September 27, 2012, Cistola sent Blackburn revised Purchase Order 11139, reflecting 3,200 units of MagPhos BCGs at $70.36 per unit "[e]ffective 10/1/12 through 12/1/13." The purchase order further stated: "Core 15 retains the right to reduce quantities w/ 30 days notice. Any additional will be added to the end of the PO. Min qty per month of 2,000 pcs."

**[\*P15]** In October 2012, Metal Seal shipped 800 of 3,200 units that were ordered under Purchase Order 11139. No shipments were made under Purchase Order 11028 that month.

**[\*P16]** On November 8, 2012, Blackburn sent an e-mail to the bookkeeper for Good Time Outdoors, stating no payment had been made on a past due amount of $62,550.00. The e-mail indicated Good Time Outdoors was placed on a credit hold, and Metal Seal would suspend shipments of product until the account was current. Habe testified the parties communicated about payment on a "regular basis," and Good Time Outdoors requested continued shipments and made promises that the payments would be made.

**[*P17]** On November 19, 2012, Clifton sent an e-mail to Blackburn, requesting an immediate shipment of 400 BCGs. Clifton sent another e-mail on November 27, 2012, requesting "ETAs **[***8]** on shipments over the next 30 days." Clifton further explained: "We will be out of BCG by the end of this week. We are overnight a check for $33,421.00 on Invoice # 12091. If you can send us an Invoice for the 800 that we received on 11/16, I will get a check to you this week also. I will commit to paying Metal Seal on a 15 day bases going forward, But I need Product. [sic.]" The same day, Blackburn responded, stating 400 BCGs were being shipped that day and that Metal Seal planned on shipping 800 units per week going forward. Blackburn explained a two-day power outage at the plant caused a disruption in production. He further stated: "We want to keep Core 15 as a long term customer and are committed to do our best to get product to you when you need it. Our guys have been advised that you were running low on BCG inventory and to make Core 15 shipments a priority."

**[*P18] [**683]** Metal Seal's shipments continued to fall below the ordered quantities. In November 2012, Metal Seal shipped 100 of 100 units under Purchase Order 11028 and 1,200 of 3,200 units under Purchase Order 11139. Metal Seal shipped 0 of 100 units under Purchase Order 11028 in December 2012.

### New Arrangement with Slabe Machine Parts, Co. [***9]

**[*P19]** Habe testified that in December 2012, Cistola visited the Metal Seal facility to discuss delivery and quality control problems. One of the issues Metal Seal experienced was producing the "bolt carrier" for the MagPhos BCGs. Cistola learned that Slabe Machine Parts, Co. ("Slabe") manufactured bolt carriers. A new arrangement was made, pursuant to which Good Time Outdoors would purchase the bolt carrier component for the MagPhos BCGs directly from Slabe. It would continue to purchase the rest of the MagPhos BCG components and the complete NiBr BCGs from Metal Seal. Good Time Outdoors would assemble the MagPhos BCGs at its facility and absorb any extra costs for doing so.

**[*P20]** Good Time Outdoors issued new purchase orders to reflect the new arrangement. These purchase orders superseded Purchase Order 11139.

**[*P21]** On December 7, 2012, Cistola sent Purchase Order 12212, and on December 14, 2012, he sent Purchase Order 12253. The purchase orders reflected the different MagPhos BCG components Good Time Outdoors was ordering from Metal Seal and indicated different quantities and prices depending on the component. Metal Seal shipped the parts for those orders on the dates they were issued.

**[*P22]** On December **[***10]** 20, 2012, Purchase Orders 12270 through 12281 were issued for January through December 2013.

### Purchase and Supply Agreement

**[*P23]** On January 28, 2013, Blackburn sent Cistola a "Purchase and Supply Agreement" ("Purchase Agreement") for review and signature. The Purchase Agreement included an "Exhibit A." Good Time Outdoors refused to sign the Purchase Agreement.

**[*P24]** In June 2013, Good Time Outdoors issued Purchase Orders 13135 through 13146 for MagPhos BCG components to be shipped January through December 2014. It also issued Purchase Order 13167 for complete NiBr BCGs at a price of $108.00 per unit to be shipped June 2013 through May 2014 in the following quantities: 200 units per month in June and July 2013, and 500 units per month for August 2013 through May 2014. Under Purchase Order 13167, Good Time Outdoors also ordered uncoated MagPhos BCG components to be sent monthly from May 2013 through May 2014.

**[*P25]** Habe testified that in spite of the new purchase orders, Cistola indicated he would take as many parts Metal Seal could produce, and Purchase Order 11139 was left open for Metal Seal to send Good Time Outdoors the rest of its completed MagPhos inventory. Metal Seal shipped complete MagPhos BCGs **[***11]** under purchase order 11139 in the following quantities: 900 units in December 2012; 450 units in January 2013; 541 units in February 2013; and 900 units in March 2013. The complete MagPhos BCGs were shipped in addition to the components under the new arrangement.

### Purchase Orders Suspended

**[*P26]** Metal Seal made shipments pursuant to Purchase Orders 12270 through 12278 from January through September 2013. Of these purchase orders, the only month in which Metal Seal's shipments met the quantity of parts ordered was Purchase Order 12276 in July 2013. During **[**684]** the same time frame, under Purchase Order 13167, Metal Seal sent 200 of 200 units

in June 2013 and 200 of 200 units in July 2013.

[*P27] By mid-2013, Good Time Outdoors no longer needed a large quantity of parts. Douglas Gifford, Good Time Outdoors' Director of Operations, testified Good Time Outdoors was having cash flow issues. Good Time Outdoors became overdue to Metal Seal on several invoices. On August 27, 2013, Habe, Blackburn, Clifton, and Gifford met in Clifton's office in Florida to discuss past due balances and quantities. On August 30, 2013, Habe sent an e-mail to Gifford proposing a reduced shipping schedule and price adjustments for [***12] MagPhos BCG components and complete NiBr BCGs. After follow-up e-mails from Habe requesting a phone call, Gifford sent an e-mail response on September 5, 2013, indicating someone would be in touch with him. On September 6, 2013, Blackburn sent an e-mail to Good Time Outdoors' bookkeeper to follow up on Good Time Outdoors' past-due balance. The bookkeeper indicated Good Time Outdoors hoped to get a payment to Metal Seal in the next week. On September 9, 2013, Habe e-mailed Gifford and explained that Metal Seal was still producing MagPhos BCG components and complete NiBr BCGs and would be sending out shipments that day. Habe stated that Good Time Outdoors had an overdue balance of $317,686.00 and that Metal Seal's bank was involved.

[*P28] On September 12, 2013, Habe sent Clifton an e-mail with the General Terms attached. The parties talked by telephone the next day. Metal Seal indicated Good Time Outdoors had failed to pay on numerous invoices. Clifton sought to suspend the remaining purchase orders because Good Time Outdoors could not keep accepting product it could not use.

[*P29] On September 23, 2013, Gifford sent Habe an e-mail, stating:

> Per the teleconference of Tuesday, September 17th between [***13] Yourself, Mr. Blackburn, Mr. Clifton and myself, I am reconfirming that Core Rifle Systems has suspended all P.O.'s with Metal Seal Precision until further notice.
> Please feel free to contact me with any questions or concerns.
> We look forward to meeting with you on the 27th.

[*P30] Habe responded the same day. Habe stated that Metal Seal "purchased raw material, tooling, machines, etc. to build parts for your orders and have millions of dollars of inventory built or in the process of being built to fill your orders." The e-mail further stated that Metal Seal could not accept Good Time Outdoors'

position in suspending the purchase orders, and Metal Seal was looking to "negotiate a solution."

[*P31] On September 27, 2013, Habe sent Gifford an e-mail outlining a proposed solution that had been discussed by the parties. The e-mail proposed a new shipping and price schedule. The unit price for MagPhos components and complete NiBr BCGs was to increase with decreased monthly shipment quantities. It also indicated that Good Time Outdoors could request shorter lead times. The e-mail proposal further stated that Good Time Outdoors "will not purchase these parts from any other supplier unless [Metal Seal] cannot [***14] meet [Good Time Outdoors'] delivery dates and quantities. In this scenario Good Time Outdoors can purchase the quantity needed to subsidize the shortfall."

[*P32] Gifford responded by e-mail on October 1, 2013, with Purchase Orders 13905 through 13909 for October 2013 through February 2014, reflecting the proposed arrangement. Gifford indicated the [**685] new purchase orders would supersede the previous purchase orders for that time period. These purchase orders did not reflect that Good Time Outdoors would not purchase the parts from other suppliers unless Metal Seal failed to meet delivery dates and quantities.

[*P33] On October 8, 2013, Blackburn sent Gifford an e-mail with Metal Seal's own proposed purchase orders reflecting the proposed agreement. Blackburn indicated Gifford could use those purchase orders "as reference." Metal Seal's purchase orders included greater detail regarding the terms outlined in the September 27, 2013 e-mail and contained language that Good Time Outdoors would not purchase the parts from other suppliers unless Metal Seal failed to meet the delivery dates and quantities. Ultimately, no agreement was reached by the parties with regard to these new proposals.

[*P34] Habe testified [***15] that Metal Seal ceased shipments as of the September 23, 2013 e-mail from Good Time Outdoors. Metal Seal's last shipment went out on September 18, 2013. Habe affirmed that at the time the purchase orders were suspended Metal Seal was "sitting on finished product that had not yet been delivered." Habe explained: "We had a lot of product. We had nickel boron carrier groups and we had a bunch of components for the mag phos components that they asked us to deliver. We had those built. And we also had the ones that were not plated. We had some of those bolts as well." Habe further testified that Metal

Seal had 4,295 NiBr BCGs that were completed but never shipped to Good Time Outdoors. This amounted to over $400,000.00 in completed NiBr BCGs. Metal Seal was able to sell approximately 4,000 of those parts to a different customer at $105.00 per unit, $3.00 less per unit than what Good Time Outdoors had agreed to pay. Metal Seal also had to put "about five bucks into each part" because the new customer wanted the parts customized. Habe testified that Metal Seal lost a total of $8.00 per part and sustained a total loss of $32,000.00 for the parts sold. Habe further testified that Metal Seal **[***16]** had 295 NiBr BCGs remaining. Each part cost $102.00 to produce, totaling $30,090.00 to produce the 295 units. Habe explained the total cost for goods that were finished but never shipped to Good Time Outdoors was $62,090.00.

**[*P35]** Habe further testified that at the time the orders were suspended, Metal Seal had numerous purchase orders that were unfulfilled. Habe testified to 15 months of outstanding purchase orders for MagPhos BCG components: 12279 through 12281 and 13135 through 13146, each totaling $184,835.00. In addition to those purchase orders, Habe testified to a total unfulfilled order of 5,000 units for NiBr BCGs. Metal Seal had built 4,295 units, discussed above, leaving a balance of 705 units at $108.00 per unit for a total of $76,140.00. Habe further testified Good Time Outdoors also ordered $68,000.00 in uncoated parts. The total of unfulfilled orders was $2,916,665.00. Habe, however, testified that Metal Seal was not requesting the full amount in damages. Pursuant to the liquidation clause in the General Terms, Metal Seal was requesting 45% of the total unfulfilled orders, or $1,312,499.25.

### Firing Pins & Components Returned to Metal Seal

**[*P36]** By early 2014, Good Time Outdoors had **[***17]** made payments that reduced the amount it owed to Metal Seal for parts delivered to $84,606.00. However, in June 2014, Good Time Outdoors returned 1,545 chrome plated firing pins to Metal Seal claiming for the first time that they had defective coatings. The problem had not been noticed until Good Time Outdoors **[**686]** used up its inventory. Metal Seal took receipt of the returned firing pins and had them recoated. Blackburn retained the firing pins at the direction of Habe due to Good Time Outdoors' outstanding balance with Metal Seal. Good Time Outdoors repeatedly requested the return of the firing pins so it could complete orders for rifles and pay off the remaining arrears. Metal Seal did not return the firing pins, and

Good Time Outdoors returned the remainder of the BCG components in its inventory back to Metal Seal.

**[*P37]** Habe and Clifton met at the Las Vegas Shot Show in January 2015 and attempted to resolve the issues between the parties. They were unable to come to an agreement to settle their dispute.

**[*P38]** After a bench trial, the trial court entered judgment on October 3, 2017. The trial court concluded that the General Terms document signed in June 2012 was not an enforceable contract because **[***18]** it did not contain adequate terms. The trial court further concluded that the parties' conduct was not evidence of a contract, because, "[w]hile the parties clearly wanted to maintain their business relationship and were flexible, there was no meeting of the minds on the essential terms of a contract." The court found in favor of Good Time Outdoors on Metal Seal's breach of contract claim. The trial court further ruled in favor of Good Time Outdoors on Metal Seal's claims for unjust enrichment, promissory estoppel, and action on account.

**[*P39]** Metal Seal noticed a timely appeal and raises five assignments of error, which we review out of order.

### Extrinsic Evidence

**[*P40]** Metal Seal's second assignment of error states:

**[*P41]** "The Trial Court erred as a matter of law when it considered inadmissible evidence."

**[*P42]** Metal Seal argues the General Terms agreement is unambiguous, and it was therefore improper for the trial court to consider extrinsic evidence to interpret the General Terms agreement.

**[*P43]** *HN1*[↑] "The standard of review in a breach of contract action is whether the trial court erred as a matter of law." *Falcone Bros., Inc. v. Pawmew, Inc., 5th Dist. Stark No. 2016CA00209, 2017-Ohio-6958, ¶15,* citing *Unifund, CCR, L.L.C. v. Johnson, 8th Dist. Cuyahoga No. 100600, 2014-Ohio-4376, ¶7.* "We must therefore 'determine whether the trial court's order is based on an erroneous standard or **[***19]** a misconstruction of the law.'" *Id.,* quoting *Unifund, supra, at ¶7.* However, due deference must be given to the trial court's findings of fact if the findings are supported by competent, credible evidence. *Id.*(citation omitted).

**[*P44]** There is no dispute that the transaction at issue involves the sale of goods. Accordingly, Ohio's version

of the Uniform Commercial Code ("UCC"), found in _Revised Code Chapters 1301_ and _1302_, is applicable to this case. _See Tubelite Co., Inc. v. Original Sign Studio, Inc., 176 Ohio App.3d 241, 2008-Ohio-1905, ¶12, 891 N.E.2d 820 (10th Dist.)._

[*P45] **HN2**[⬆] "In construing the terms of any contract, the principal objective is to determine the intention of the parties." _Hamilton Ins., Inc. v. Nationwide Ins. Cos., 86 Ohio St.3d 270, 273, 1999-Ohio-162, 714 N.E.2d 898 (1999)_ (citation omitted). "We presume the intent of the parties to a contract resides in the language used in the written instrument." _Oryann, Ltd. v. SL & MB, LLC, 11th Dist. Lake No. 2014-L-119, 2015-Ohio-5461, ¶25,_ [**687] citing _Kelly v. Med. Life Ins. Co., 31 Ohio St.3d 130, 31 Ohio B. 289, 509 N.E.2d 411 (1987)_, paragraph one of the syllabus.

[*P46] **HN3**[⬆] Generally, at common law, only where the language of a writing "is unclear or ambiguous, or when the circumstances surrounding the agreement invest the language with a special meaning, will extrinsic evidence be considered in an effort to give effect to the parties' intentions." _Shifrin v. Forest City Ent., Inc., 64 Ohio St.3d 635, 1992-Ohio-28, 597 N.E.2d 499, (1992)_, at syllabus. Ohio's UCC, however, rejects the common law rule that extrinsic evidence is admissible only where the terms of a writing are ambiguous. _See R.C. 1302.05_ Official [***20] Comment 1(c). _R.C. 1302.05_ provides:

Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented:

(A) by **_course of performance_**, **_course of dealing_**, or usage of trade as provided in _section 1301.303 of the Revised Code_; and
(B) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

[*P47] **HN4**[⬆] Where the parties have reached a written agreement that is final with respect to the terms contained in the writing, evidence of prior agreements or contemporaneous oral agreements cannot be used to _contradict_ those terms, but extrinsic evidence of trade usage, course of dealing, or course of performance may be used to _explain or supplement_ the writing. _Camargo_

_Cadillac Co. v. Garfield Ents., Inc., 3 Ohio App.3d 435, 438, 3 Ohio B. 514, 445 N.E.2d 1141 (1st Dist.1982)_ (citations omitted). Further, if the writing is not "a complete and exclusive statement of the agreement," the writing may also be explained or supplemented by _consistent_ additional [***21] terms. _Id._ To determine whether the parties intended the writing to be the complete and exclusive statement of their agreement, the court must look outside the four corners of the document and consider the surrounding facts and circumstances. _Id. at 437-438_; _Abele v. Bayliner Marine Corp., 11 F.Supp.2d 955, 963 (N.D.Ohio 1997)_; _In re Manchester Steel, Inc., 156 B.R. 988, 993 (N.D.Ohio 1993)_; _see also Allapattah Servs., Inc. v. Exxon Corp., 61 F.Supp.2d 1308, 1315 (S.D.Fla. 1999)_, citing _Nanakuli Paving & Rock Co. v. Shell Oil Co., Inc., 664 F.2d 772, 796-797 (9th Cir.1981)_ and _Transamerica Oil Corp. v. Lynes, Inc., 723 F.2d 758, 765 (10th Cir.1983)_.

The General Terms agreement provides, in relevant part:

These General Terms and Conditions of Sale (this "Agreement") govern the manufacturing and sale of Products by Metal Seal Precision, Ltd., an Ohio limited liability company (the "Seller") to Core15Rifle Systems, Inc. (the "Purchaser"). Seller and Purchaser may herein be individually referred to as a "Party" or collectively as "Parties."

**1. CONTRACT SCOPE AND DOCUMENTS**

Absent a * * * contrary written agreement signed by both Parties, the contract between Seller and Purchaser shall be governed by Seller's written Quotation to Purchaser ("Quote"), Purchaser's written acceptance of the Quote ("Purchase Order"), and the terms stated in this Agreement (collectively the "Contract"). Absent Seller's prior written agreement, any term or provision stated [**688] in Purchaser's Purchase Order that is inconsistent with either the Quote and/or the within Agreement shall be ineffective [***22] and no part of the Contract. The Contract may not be modified except by a written agreement signed by both Parties. For purposes of the Contract, any notices or modifications that must be in writing may be satisfied by an exchange of e mail communications.

**2. DESCRIPTION OF PRODUCTS/AGREEMENT TO SELL AND PURCHASE**

The materials/parts/services covered under this Agreement ("the Products") are defined in Seller's Quote, which is incorporated by reference. * * * Seller agrees to manufacture and sell to Purchaser, and Purchaser agrees to purchase from Seller, the quantity of Products, at the prices and at the delivery dates stated in Seller's Quote. * * * * * *

9. ENTIRE AGREEMENT

The terms of the Contract represent the entire understanding of the Parties regarding the subject matter hereof, and supersedes all prior understandings whether written or oral. Further amendments or modifications may only be made in writing, and must be signed by an authorized representative of each Party. No waiver of the breach of any term or condition of this Agreement shall be deemed to constitute the waiver of any other breach of the same or any other term or condition.

**[*P48]** The trial court determined that although **[***23]** Good Time Outdoors denied a contract existed, "Clifton's signature on the [General Terms] agreement is valid." The trial court, however, concluded the General Terms agreement was not enforceable because it lacked "sufficient essential terms." In coming to this conclusion, the trial court compared the General Terms agreement to the later Purchase Agreement. The trial court noted the two documents were similar, but that the Purchase Agreement contained "substantive changes clearly establishing a requirements contract." The trial court stated the fact that no price quotation was included with the General Terms document was "unlike the later 'Purchase and Supply Agreement' that was proposed by Metal Seal in December 2012 and rejected by Good Time Outdoors in the first half of 2013. The latter agreement provided exhibit A that did provide [the essential terms] information." The trial court explained:

Exhibit A of the document specified delivery of components for 39,000 BCGs in 2013 with deliveries of 750 BCG components per week. The cost of the parts would be $51.31 per BCG. These components did not include the bolt carrier which was being manufactured by Slabe but included all of the other **[***24]** necessary parts for complete Mag Phos BCG. This exhibit also specified an annual quantity of complete (i.e. including the bolt carrier) Ni Br BCGs of 1,300 for 2013 for a unit cost of $109.00. 25 complete Ni Br BCGs were to be

shipped weekly from April 15, 2013 through April 14, 2014. As mentioned earlier, the earlier General Terms and Conditions of Sale agreement did not have a similar exhibit.

**[*P49]** Although the trial court determined the General Terms agreement was not an enforceable contract and concluded "the actual terms of their relationship was not formally documented in writing," it found the parties' conduct indicated they had an "arrangement." The trial court analyzed the parties' conduct to determine whether the "arrangement" established a contract. The trial court concluded that, "[w]hile the parties clearly wanted to maintain their business relationship and **[**689]** were flexible, there was no meeting of the minds on the essential terms of a contract."

**[*P50]** Whether the signed General Terms agreement expressed terms that were enforceable in the business relationship should be determined without regard to a comparison with the subsequent Purchase Agreement that was never signed. Because the **[***25]** Purchase Agreement was never signed by Good Time Outdoors, it cannot provide consistent additional terms and is not evidence of the parties' intent at the time the General Terms agreement was signed. The Purchase Agreement cannot be used to supplement or explain the General Terms agreement because it is not a usage of trade, course of dealing, or course of performance.

**[*P51]** Further, because the General Terms agreement was a writing that documented at least *a portion* of the parties' agreement, the trial court did not need to determine whether the parties' conduct created a contract independent of the writing. Their conduct, however, is relevant to explain or supplement the writing to the extent the conduct is a trade usage, a course of performance, or a course of dealing.

**[*P52]** We determine that the surrounding circumstances indicate the parties did not intend the General Terms agreement to be the complete and exclusive statement of their agreement. Although the General Terms agreement contains an integration clause, the agreement is unclear because the surrounding circumstances indicate the "Seller's Quote" and "Purchase Order" as defined in the General Terms agreement do not exist. The General **[***26]** Terms agreement states that the "Contract" is comprised of the General Terms agreement, "Seller's Quote", and "Purchase Order." The "Seller's Quote" operates as an offer, and the "Purchase Order" is the written acceptance of the "Seller's Quote" and must contain the

same terms as the "Seller's Quote." The General Terms agreement purports that the price, quantity, and delivery terms are included in the "Seller's Quote." However, the only price quotations exchanged between Metal Seal and Good Time Outdoors were those sent in e-mails from Blackburn to Cistola on February 13, 2012, and February 25, 2012. Those quotes, however, were not assented to by Good Time Outdoors as contemplated by the General Terms. Rather, without prior approval from Metal Seal, Good Time Outdoors sent purchase orders with different terms than those contained in the price quotes. The General Terms is therefore final as to some but not all the terms of the parties' agreement, and under *R.C. 1302.05*, the General Terms may be supplemented or explained by a course of dealing, usage of trade, course of performance, or by consistent additional terms.

**[\*P53]** Although it was error for the trial court to compare the General Terms agreement **[\*\*\*27]** with the later Purchase Agreement and to analyze the parties' conduct as a separate contract, this was harmless error. The trial court's findings pertaining to the parties' conduct are relevant to explain or supplement the writing.

**[\*P54]** Metal Seal's second assignment of error is without merit.

## Breach of Contract

**[\*P55]** We address Metal Seal's first and fifth assignments of error together. They state:

> [1.] The Trial Court Erred as a matter of law when it held no contract existed between the parties.
>
> [5.] The trial court's conclusion that Metal Seal never formally placed Good Time Outdoors in default was against the weight of the evidence.

**[\*P56] [\*\*690]**    Metal Seal argues it is entitled to judgment as a matter of law on its claim for breach of contract. Metal Seal contends that Good Time Outdoors had "no right to unilaterally walk away from its obligations" and that "suspension and refusal to accept delivery of Metal Seal's goods in September 2013" constituted a failure by Good Time Outdoors to perform its obligations under the General Terms agreement and purchase orders. Metal Seal further maintains that "[n]either the language in the General Terms nor the Suspended Purchase Orders permit Appellees to unilaterally **[\*\*\*28]** suspend their orders unless Metal Seal was in Default."

**[\*P57]** Metal Seal maintains the following purchase orders were unfulfilled due to the suspension: 12279 through 12281 for MagPhos BCG components to be delivered from October 2013 through December 2013; 13135 through 13146 for MagPhos BCG components to be delivered from January 2014 through November 2014; and 13167 for complete NiBr BCGs and uncoated parts to be delivered from August 2013 through May 2014. Metal Seal further maintains that under purchase order 12278, it only made a partial shipment in September 2013 and would have completely fulfilled that order if the purchase orders had not been suspended.

**[\*P58]**  *HN5*  A cause of action for a breach of contract requires the claimant to establish: (1) the existence of a contract, (2) the other party's failure without legal excuse to perform when performance is due, and (3) damages or loss resulting from the other party's breach. *Lucarell v. Nationwide Mutual Ins. Co., 152 Ohio St.3d 453, 2018-Ohio-15, ¶41, 97 N.E.3d 458* (citations omitted).

**[\*P59]**  *HN6*  "'A contract is generally defined as a promise, or a set of promises, actionable upon breach.'" *Kostelnik v. Helper, 96 Ohio St.3d 1, 2002-Ohio-2985, ¶16, 770 N.E.2d 58,* quoting *Perlmuter Printing Co. v. Strome, Inc., 436 F.Supp. 409, 414 (N.D.Ohio 1976).* "A contract for the sale of goods imposes on the seller the obligation to transfer and deliver the goods in accordance with the contract and **[\*\*\*29]** imposes on the buyer the obligation to accept and pay in accordance with the contract." *GJP Ents., Inc. v. Performance Contracting, Inc., N.D.Ohio No. 1:05CV0670, 2006 U.S. Dist. LEXIS 57351, 2006 WL 2381492, \*16 (Aug. 16, 2006),* citing *R.C. 1302.14*.

**[\*P60]** Under *R.C. 1301.201(B)(3),* "'[a]greement, as distinguished from 'contract', means the bargain of the parties in fact, as found in their language or inferred from other circumstances, including ***course of performance***, ***course of dealing***, or usage of trade[.]'" "'Contract', as distinguished from 'agreement', means the total legal obligation that results from the parties' agreement[.]" *R.C. 1301.201(B)(12)*.

**[\*P61]** The General Terms agreement was clearly intended to govern the relationship between Metal Seal and Good Time Outdoors and states that: "Seller agrees to manufacture and sell to Purchaser, and Purchaser agrees to purchase from Seller, the quantity of Products, at the prices and at the delivery dates stated in Seller's Quote." As discussed above, there was no

"Seller's Quote" as defined in the General Terms agreement. Instead, Good Time Outdoors sent Metal Seal purchase orders that contained price, quantity, delivery, and payment terms.

 **[P62]** However, the parties' course of performance further indicates they did not intend to manufacture and purchase exactly in **[***30]** accordance with the terms of the purchase orders. *R.C. 1301.303(A)* defines "course of performance" as

> a sequence of conduct between the parties to a particular transaction that exists if: (1) The agreement of the parties **[**691]** with respect to the transaction involves repeated occasions for performance by a party; and (2) The other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection.

 **[P63]** In considering the parties' conduct, the trial court found:

> The evidence shows that over time, the parties changed the unit prices of the components, the terms of payment, the amount of product ordered and the delivery date. The POs had minimal language that ordered certain products at a set price. The expectation was that if product is delivered, the buyer must pay for it. * * * Although [PO11139] considerably exceeded the capacity of Metal Seal to deliver, there was no formal or written correspondence addressing this problem. The purchase order was not rejected by Metal Seal nor did Good Time Outdoors declare a default when Metal Seal failed to timely deliver the desired quantities. Blackburn testified that everyone knew there **[***31]** would be no compliance with the PO. Cistola told him to just get him as much product as you can. Subsequent purchase orders followed the same pattern and in many cases replaced previous orders. * * * Rather than one cohesive, implied contract, the parties engaged in a series of separate POs, many of which replaced earlier ones. The terms were loosely defined and were based on the needs and circumstances of the parties at the time.

The parties modified the terms of the purchase orders on an almost monthly basis. Each party regularly failed to comply with the terms of the purchase orders due to their circumstances and market conditions. On multiple occasions, Metal Seal sent no product, and it regularly sent quantities below those stated in the purchase

orders; Good Time Outdoors was continually behind on payment. This course of performance evidences the parties' intent to be bound only from month-to-month, rather than to the multiple months and set quantity of parts covered by the purchase orders. Good Time Outdoors' suspension of the purchase orders at issue was consistent with the parties' conduct throughout their relationship. Further, after Good Time Outdoors suspended the purchase **[***32]** orders, the parties made attempts to resolve their issues but were unable to come to an agreement. We cannot conclude that suspension of the purchase orders was a breach of the General Terms agreement. Accordingly, the trial court did not err by finding in favor of Good Time Outdoors on Metal Seal's breach of contract claim.

 **[P64]** Metal Seal argues the trial court's findings regarding the parties' conduct and "flexible" relationship is evidence of a course of dealing. *R.C. 1301.303(B)* defines "course of dealing" as "a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." Here, the parties' transaction involves multiple purchase orders that encompass several months with performance due each month. Their conduct did not pertain to previous transactions. Further, the trial court made findings regarding each party's acquiescence to the other's nonconforming performance. Accordingly, the trial court's findings regarding the parties' "flexible" relationship are evidence of a "course of performance" and are relevant to explain or supplement **[***33]** the General Terms agreement and to "show a waiver or modification of any term inconsistent with the course of performance." *R.C. 1301.303(F)*. Metal Seal's argument is not well taken.

 **[P65] [**692]** The trial court did not err in determining Metal Seal was not entitled to judgment on its claim for breach of contract.

 **[P66]** Metal Seal's first and fifth assignments of error are without merit.


### Promissory Estoppel

 **[P67]** Metal Seal's fourth assignment of error states:

 **[P68]** "The trial court erred as a matter of law by concluding in the absence of an agreement, Metal Seal could not prove its claim for promissory estoppel."

**[\*P69]** Metal Seal claims that in response to Good Times Outdoors' purchase orders, it purchased more than $2.1 million of equipment and hired and trained additional personnel.

**[\*P70]** *HN7*[↑] The elements required to establish a claim of promissory estoppel are "(1) a clear and unambiguous promise; (2) reliance on the promise; (3) the reliance is reasonable and foreseeable; and (4) the party relying on the promise was injured by his or her reliance." *Connolly v Malkamaki, 11th Dist. Lake No. 2001-L-124, 2002-Ohio-6933, ¶16* (citation omitted). As noted by the trial court, this claim was not specifically addressed by either party during trial or in the closing **[\*\*\*34]** briefs. However, the trial court included findings of fact with regard to this claim in its October 3, 2017 judgment entry.

**[\*P71]** The trial court found that the initial General Terms never committed Good Times Outdoors to a contract that required it to purchase a set quantity of parts for a set price. However, when asked to sign the Purchase Agreement, which did contain such terms, Good Time Outdoors refused to sign. In addition, as stated above, the record supports the fact that contrary to a fixed requirement contract for a period of time, the parties modified the purchase orders almost on a monthly basis. Metal Seal did not deliver the quantities ordered on the dates required, and Good Times Outdoors did not pay invoices when due. Thus, there is support in the record for the trial court's finding that there was "no evidence the parties had a meeting of the minds on the requirement that Good Time Outdoors commit itself to purchasing a set quantity of parts regardless of market demand for assault rifles. Good Time Outdoors presented testimony it would never have agreed to such terms[.] Absent an agreement from Good Time Outdoors, the court cannot conclude that Metal Seal's reliance was **[\*\*\*35]** reasonable and foreseeable."

**[\*P72]** The trial court did not err in determining the elements of promissory estoppel had not been established.

**[\*P73]** Metal Seal's fourth assignment of error is without merit.

## Action On Account

**[\*P74]** Metal Seal's third assignment of error states:

**[\*P75]** "The Trial Court's refusal to award Metal Seal

damages on its claim on an account was against the manifest weight of the evidence."

**[\*P76]** In its judgment entry, the trial court noted that Metal Seal's claim for action on account was not specifically addressed by either party at trial or in their closing briefs. The trial court found the "Aged Receivables Report" attached to Metal Seal's amended complaint showed Good Time Outdoors owed Metal Seal $84,606.33 and was adequate to show an "account." The trial court found that the evidence at trial "showed that Good Time Outdoors caught up with its arrears with Metal Seal" except for the $84,606.33. However, the trial court determined that Good Time Outdoors returned the equivalent amount of parts in June and November **[\*\*693]** 2014. The trial court concluded the "return of the firing pins and other BCG components extinguished the remaining arrears owed by Good Time Outdoors."

**[\*P77]** On appeal, Metal Seal argues **[\*\*\*36]** it was improper for the trial court to determine the return of the parts to Metal Seal released Good Time Outdoors from its obligation to pay the past due account balance. Metal Seal maintains it never agreed to accept the return of parts in lieu of payment, and Good Time Outdoors had no right to return previously accepted conforming parts. In response, Good Time Outdoors does not dispute that it did have an outstanding unpaid balance of $84.606.33 on its account with Metal Seal or that it had accepted the parts at issue. Instead, Good Time Outdoors argues the trial court appropriately found that it had satisfied its obligation of payment when it returned the firing pins and other parts to Metal Seal.

**[\*P78]** *R.C. 1302.66(A)* provides, in pertinent part:
> The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it:
> (1) on the reasonable assumption that its non-conformity would be cured and it has not been seasonably cured; or
> (2) without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

**[\*P79]** The trial court found that the **[\*\*\*37]** remaining components could not be used by Good Time Outdoors after Metal Seal failed to return the allegedly defective firing pins, because "the firing pins are matched to the other components of BCGs and that even a slight variation in firing pin dimensions (presumably from firing

pins from another vendor) could result in a malfunctioning BCG." Thus, Metal Seal's failure to return the firing pins substantially impaired the value of the rest of the parts. However, Good Time Outdoors failed to establish that the firing pins it returned were defective and that its acceptance was properly revoked. The trial court stated it was "unable to resolve if the firing pins were defective." Accordingly, we determine that Good Time Outdoors' burden to establish proper revocation of its acceptance of the firing pins and other components was not met.

**[*P80]** However, in order to establish entitlement to recovery on the account, the seller cannot simply rely on the amount invoiced. *R.C. 1302.77*, titled "Seller's remedies in general," provides, in pertinent part: "Where the buyer wrongfully rejects or revokes acceptance of goods * * *, then with respect to any goods directly affected * * *, the aggrieved seller may: (D) **[***38]** resell and recover damages as provided in *section 1302.80 of the Revised Code*[.]" *R.C. 1302.80(A)* provides:

> Under the conditions stated in *section 1302.77 of the Revised Code* on seller's remedies, the seller may resell the goods concerned or the undelivered balance thereof. Where the resale is made in good faith and in a commercially reasonable manner the seller may recover the difference between the resale price and the contract price together with any incidental damages allowed under *section 1302.84 of the Revised Code*, but less expenses in consequences of the buyer's breach.

**[*P81]** The trial court determined "[t]he design of the AR 15 assault rifle has been in the public domain for years and presumably the Mag Phos BCG at issue can be resold to another party. Metal Seal, in fact, was able to resell 4,000 Ni Br BCGs to a third party in June 2016[.]" Metal Seal had **[**694]** the burden to establish that it attempted to resell the MagPhos BCG parts at issue in good faith and in a commercially reasonable manner. However, there is nothing in the record or in its argument that establishes what damages Metal Seal should be entitled to after the attempts to sell the parts in mitigation. As the trial court noted, this claim on account was not specifically addressed by the parties at trial or in their final argument.

**[*P82]** The trial **[***39]** court did not err in refusing to award Metal Seal damages on its claim on an account.

**[*P83]** Metal Seal's third assignment of error is without merit.

**[*P84]** The judgment of the Lake County Court of Common Pleas is affirmed.

DIANE V. GRENDELL, J.,

CYNTHIA WESTCOTT RICE, J.,

concur.

---

# Exhibit 15

A Neutral

As of: January 7, 2026 10:37 AM Z

## *Reser's Fine Foods, Inc. v. Bob Evans Farms, Inc.*

United States District Court for the District of Oregon

July 13, 2016, Decided; July 13, 2016, Filed

Case No. 3:13-cv-00098 AA

**Reporter**

2016 U.S. Dist. LEXIS 90732 *; 90 U.C.C. Rep. Serv. 2d (Callaghan) 367

RESER'S FINE FOODS, INC., a domestic business corporation, Plaintiff and Counterclaim Defendant, v. BOB EVANS FARMS, INC., a Delaware corporation; BOB EVANS FARMS LLC, an Ohio limited liability company; and BEF FOODS, INC., an Ohio-based corporation, Defendants and Counterclaim Plaintiffs.

**Prior History:** *Reser's Fine Foods, Inc. v. Bob Evans Farms, Inc., 2013 U.S. Dist. LEXIS 167948 (D. Or., Nov. 25, 2013)*

## Core Terms

pricing, termination, parties, email, quantity, products, orders, statute of frauds, formula, dishes, argues, co-packing, forecast, ongoing, modification, commodity, modified, promissory estoppel, summary judgment, hot-fill, intentional interference, promise, customers, holiday, terms, volume, food, industry standard, reasonable notice, increased price

**Counsel:** [*1] For Reser's Fine Foods, Inc., a domestic business corporation, Plaintiff, Counter Defendant: Cozette T. Tran-Caffee, Susan K. Eggum, LEAD ATTORNEYS, Lane Powell, PC, Portland, ORUSA; Peter D. Hawkes, Lane Powell, PC, Portland, ORUSA.

For Bob Evans Farms, Inc, a Delaware corporation, Defendant, Counter Claimant: Crystal S. Chase, Nathan C. Brunette, Steven T. Lovett, LEAD ATTORNEYS, Stoel Rives LLP, Portland, ORUSA.

For Bef Foods Inc, an Ohio corporation, Bob Evans Farms Llc, an Ohio limited liability corporation; Defendants: Steven T. Lovett, LEAD ATTORNEY, Stoel Rives LLP, Portland, ORUSA.

For Bob Evans Farm Foods, Inc, an Ohio limited liability corporation, Counter Claimant: Crystal S. Chase, Nathan C. Brunette, Steven T. Lovett, LEAD ATTORNEYS, Stoel Rives LLP, Portland, ORUSA.

**Judges:** Ann Aiken, United States District Judge.

**Opinion by:** Ann Aiken

## Opinion

OPINION AND ORDER

AIKEN, Judge:

In January 2013, plaintiff Reser's Fine Foods, Inc. (Reser's) filed suit against defendants alleging breach of a non-disclosure agreement, misappropriation of trade secrets, and conversion. Defendants subsequently brought counterclaims for intentional interference with economic relations, violations of the Lanham Act, unfair competition, [*2] breach of contract, fraud, and promissory estoppel. Ultimately, Reser's dismissed its claims, and defendants dismissed one intentional interference claim and their Lanham Act and unfair competition claims. The parties also agreed that BEF Foods, Inc. (BEF) was the sole party in interest asserting counterclaims.

Reser's now moves for summary judgment on BEF's remaining counterclaims for breach of contract, promissory estoppel, fraud, and intentional interference with economic relations, and BEF moves for partial summary judgment on a pricing contract counterclaim. Reser's also moves to exclude the opinion of BEF expert Robert Nardone.

For the reasons explained below, Reser's motion for summary judgment is granted on BEF's formula pricing promissory estoppel claim (Fourth Claim for Relief, Count 3) and BEF's implied-in-fact ongoing and holiday supply contract claims (Third Supplemental Claim for Relief, Counts 2 and 4). Reser's motion is denied in all other respects, as is BEF's motion for partial summary judgment. Reser's motion to exclude the expert testimony of Robert Nardone is granted in part and denied in part, with leave to renew prior to trial.

# I. BACKGROUND

Reser's is a family-owned **[*3]** and operated Oregon corporation that develops and manufactures refrigerated food products to sell to restaurants and grocery retailers across the United States. Reser's sells refrigerated side dishes under its own brand and also manufactures products to be sold under other companies' brands. Hawkes Decl. Ex. 1 (Mark Reser Decl. 3).[1]BEF is an Ohio-based corporation that operates full-service restaurants and sells retail food products under the Bob Evans brand to grocery retailers across the United States.

Until late 2013, Reser's and BEF had a long-standing business relationship in which Reser's developed, produced, and packaged a variety of food products, including "hot-fill" side dishes, for BEF to sell under the Bob Evans brand.[2] *See* Hawkes Decl. Ex. 12 at 2 (letter to BEF from Reser's noting that the parties' relationship began in the mid-1990s). The parties' business relationship is commonly known as a "co-packing" relationship, in which a manufacturer, or co-packer, manufactures and packages a food product under the brand of another **[*4]** company. The brand owner then markets and sells the product to retailers. Here, Reser's served as a co-packer for BEF by providing food items to be sold under the Bob Evans brand.

In 2005, the parties entered into a Master Supply Agreement (MSA) governing their co-packing relationship. Hawkes Decl. Ex. 3. The MSA required Reser's to manufacture and to sell to BEF, and BEF to order and purchase from Reser's, certain side dish products according to a fixed pricing schedule. *Id.* Ex. 3 at 4. The MSA also permitted BEF to purchase similar products from third parties "if, based on [Bob Evans'] reasonable determination, [Bob Evans] is purchasing Products [from Reser's] at a rate greater than eighteen (18) million annualized pounds." *Id.* Ex. 3 at 3. The MSA governed the time period from January 31, 2005 to July

31, 2008, and it specifically provided **[*5]** that it "may not be amended, superseded or altered except by an instrument in writing duly executed and delivered on behalf of each of the parties." *Id.* Ex. 3 at 10.

In 2006 and 2007, the parties negotiated a price increase at Reser's request, effectively modifying the pricing schedule of the MSA. Hall Decl. 3-4 & Exs. 3-6. BEF agreed to the price increase, which became effective on May 1, 2007.

As the termination date of the MSA approached, the parties discussed entering into another supply agreement. The parties could not agree on several terms, and no new written agreement was signed by Reser's. Nonetheless, in 2008 the parties negotiated and agreed to raise prices by a fixed increase per unit through May 1, 2010, allow Reser's to sell sides similar to BEF's in grocers' deli cases, end a rebate program included in the written MSA, and establish a new online auction program, Hall Decl. 4-11 & Exs. 11-17.

Beginning in 2006, Reser's had developed a process to create the browned topping that is characteristic of a baked casserole dish for some of its hot-fill side dishes (referred to as "baked side dishes"). Mark Reser Decl. 4. In 2009, Reser's launched its baked side dish products and **[*6]** offered to co-pack the new items for BEF, and BEF began ordering baked side dishes.

In 2010, as the end of the 2008 fixed pricing agreement approached, Reser's and BEF negotiated a formula-pricing arrangement for side dishes containing commodities such as butter, milk, or margarine (referred to as "commodity sides"). *See* Hall Decl. 13-18 & Exs. 24-31. For these products, Reser's would adjust prices quarterly to account for changes in the commodities market and would adjust prices annually to account for non-commodity factors. Hawkes Decl. Ex. 4 (Hall Dep. 100:23-103:21). The parties abided by this agreement until November 2012.

In May 2012, Reser's made an annual price adjustment for commodity and non-commodity sides, and, due to the amount of the price increase, BEF responded that it would order some of its side dish requirements from another supplier. Brunette Decl. Exs. 41-44; Hall Decl. 19. In June 2012, Reser's requested that BEF provide fall and winter supply forecasts to anticipate the reduced volume; BEF's forecast reflected a reduction in anticipated orders, though BEF maintains that the forecast increased orders for baked side dishes and "would have boosted" the total volume **[*7]** of orders "substantially." Gerber Decl. 2-6 & Ex. 6; Brunette Decl.

---

[1] Unless otherwise noted, cited declarations and exhibits are those submitted in support of, and in opposition to, Reser's motion for summary judgment.

[2] In the late 1990s, Reser's developed a process for preparing refrigerated side dishes with an extended shelf life. During this "hot-fill" process, food is cooked in large kettles at a high temperature to kill bacteria in the food, and the food is then poured into package containers, sealed while still hot, and immediately cooled. *See* Mark Reser Decl. 3.

Exs. 37-39, 48, 49, 68; Townsley Decl. 5 & Ex. 3. Reser's contends that the volume of BEF's forecast was higher than the amount it actually expected to order from Reser's. Hawkes Decl. Ex. 10.

In August 2012, BEF purchased Kettle Creations, a company also in the business of producing hot-fill side dishes. BEF did so to "vertically integrate" a portion of its supply chain rather than rely on outside sources for all of its supply needs. Townsley Decl. 4-5 & Ex. 1; Hawkes Decl. Ex. 8. After BEF purchased Kettle Creations, Reser's began to view BEF as a competitor rather than a client and suspected that BEF would begin to produce its own line of baked side dishes. In fact, BEF did so and began delivering its version of baked sides to retail customers in November 2012.

On August 23, 2012, as a result of BEF's acquisition of Kettle Creations, Reser's informed BEF that it would no longer supply baked side dish items as of October 19, 2012. Hawkes Decl. Ex. 12. Reser's assured BEF that it would continue to provide other types of hot-fill side dishes. *Id.* Ex. 12 at 2 ("To be clear, [Reser's] will continue to fill all other products **[*8]** orders with the quality and service you've come to expect from Reser's over the years.").

On September 21, 2012, BEF emailed a one-year supply forecast to Reser's and stated:

> In light of Resers' recent decision to cease providing Oven Bake products to BEF Foods Inc, by this e-mail we are requesting that Resers confirm that it will manufacture and supply the products listed on the attached Forecast materials for non Oven Bake products for the period as provided in the Forecast and under the same terms and conditions as Resers have [sic] previously supplied such products.

Hawkes Decl. Ex. 18. BEF also asked that Reser's confirm supply through September 2013 in writing. *Id.*Reser's did not provide the written commitment sought by BEF.

On November 1, 2012, Reser's sent BEF an email with new quarterly pricing for commodity sides. Hawkes Decl. Ex. 24. Between November 2 and November 12, 2012, BEF submitted orders for commodity items at the November 1 quoted prices, and Reser's apparently accepted those orders.

On November 14, 2012, Reser's informed BEF of another price increase for commodity sides, effective December 3, 2012, "due to the recent change in our relationship coupled with the competitive **[*9]** landscape." Hawkes Decl. Ex. 26 at 5. Apparently, Reser's increased its prices in response to BEF's decision to move some of its business to another supplier. Brunette Decl. Ex. 8 (Mark Reser Dep. 168:12-21) ("In mid summer of '12, we received verbal notification [from BEF] of significant volume declines or projections...They had very, very favorable pricing based on their book business. Half that book of business goes away, they do not receive the same favorable pricing they received previously."). BEF protested the November 14 price advance, asserting that Reser's was committed to the November 1, 2012 price quote for the remainder of the quarter, or through January 30, 2013. Hawkes Decl. Ex. 27. Reser's refused to reverse the November 14 price advance.

On November 27, 2012, BEF submitted purchase orders for commodity sides pursuant to the November 1, 2012 pricing. Reser's rejected those purchase orders. BEF revised its purchase orders to reflect the price increase of November 14, 2012 and continued to submit purchase orders pursuant to that pricing schedule. Gerber Decl. 8-19 & Exs. 9-10 (doc. 214).

During this time, BEF began developing contingency plans to find an alternative source **[*10]** of hot-fill sides or to produce its own side dishes at the Kettle Creations plant. *E.g.*, Hawkes Decl. Ex. 28. BEF continued to submit orders to Reser's for the supply of hot-fill side dishes, and Reser's continued to accept those orders.

On January 17, 2013, Reser's filed this suit alleging that BEF misappropriated trade secrets, breached the parties' Non-Disclosure Agreement, and committed conversion by allegedly using Reser's confidential and proprietary information and/or trade secrets to develop its baked side dish products. BEF filed counterclaims for intentional interference with economic relations, breach of contract, Lanham Act violations, and unfair competition.

During 2013, BEF attempted to obtain a commitment from Reser's to provide hot-fill side dishes through the 2013 holiday season. *E.g.*, Suppl. Hawkes Dec. Ex. 1 (Gerber Dep. at 175:16-176:10). Although Reser's did not provide formal confirmation, it contacted BEF in May 2013 and asked, "will we be producing for you or not? Got sleeves." Gerber Decl. Ex. 9. Shortly afterward, Reser's requested that BEF provide an order forecast for certain seasonal items. *Id.* Ex. 10. On June 25, 2013, Reser's stated it would review BEF's **[*11]** projected volume and inform BEF whether it would provide the

forecasted volume of side dishes. Hawkes Decl. Ex. 50.

On August 7, 2013, BEF again sought a commitment from Reser's to supply side dishes for the 2013 holiday season. Gerber Decl. Ex. 16. On August 14, 2013, BEF submitted orders for holiday sides for delivery in October 2013.

On August 19, 2013, Reser's informed BEF that it would no longer provide hot-fill products to BEF after the last shipments were delivered on or before Monday, September 9, 2013. Gerber Decl. Ex. 18.

After Reser's terminated the parties' co-packing relationship, BEF brought contract and tort counterclaims arising from Reser's termination of the parties' supply arrangement. *See* BEF's Suppl. Ans. (doc. 113).

In September 2013, Reser's moved to voluntarily dismiss its claims against BEF; the court ultimately granted the motion. In November 2014, BEF dismissed its Lanham Act and unfair competition counterclaims and one intentional interference counterclaim. Remaining are BEF's contract and tort counterclaims alleged in its Fourth Claim for Relief and its First, Second and Third Supplemental Claims for Relief.

## II. DISCUSSION

Reser's moves for summary judgment on **[\*12]** BEF's counterclaims for breach of contract, promissory estoppel, fraud, and intentional interference with economic relations. In turn, BEF moves for partial summary judgment on one breach of contract claim arising from Reser's November 2012 price increase for commodity sides.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of the non-moving party. *Clicks Billiards Inc. v. Sixshooters Inc., 251 F.3d 1252, 1257 (9th Cir. 2001)*.

A. Breach of Contract Claims

1. Supply and Formula Pricing Claims

BEF alleges that Reser's breached the MSA, or alternatively, the parties' implied supply agreements, by terminating the supply of hot-fill and seasonal sides without reasonable notice. BEF's Suppl. Ans. (doc. 113) at 49-54, 57-59 (Third Suppl. Claim for Relief, Counts 1, 2 and 4); *U.C.C. § 2-309(3)* (a contract for the sale of goods requires reasonable notice of termination "except on the happening of an agreed event"); *see also Ohio Rev. Code § 1302.22(C)*; *Or. Rev. Stat. § 72.3090(3)*. BEF maintains **[\*13]** that co-packing and supply chain businesses generally provide each other with advance notice of changes in pricing, order volumes, and availability of supply, and the approximately two weeks' notice given by Reser's was not reasonable under the circumstances. Hall Deck 20-21; Gerber Deck 15-16; Townsley Decl. 5-6; *see also* Brunette Decl. Ex. 9 (Sakie Dep. 158:18-159:18, 203:16-19) (testifying that Reser's generally gave BEF advance notice of price increases); Nardone Decl. Ex. 1. BEF also alleges that Reser's November 14, 2012 price adjustment breached the parties' 2010 formula pricing agreement by making non-commodity price adjustments to commodity sides before the beginning of the next annual term on May 1, 2013.[3] BEF's Suppl. Ans. at 24-25 (Fourth Claim for Relief, Count 2).

In moving for summary judgment, Reser's argues that BEF cannot rely on the MSA to support its breach of contract claims, because the MSA expired by its terms on July 31, 2008. Reser's further argues that the formula pricing agreement and the alleged implied supply agreements are unenforceable under the Statute of Frauds, given that none of the agreements was reduced to a writing with a quantity term. Hawkes Decl. Ex. 4 (Hall Dep. 103:22-104:25, 115:18-116:21) (pricing agreement was reached through oral negotiations and was independent of quantity), Ex. 5 (Gerber Dep. 57:12-25) (acknowledging that pricing agreements "were not tied to a tonnage, pound, or case — quantity amount").

An agreement for the sale of goods is subject to the Uniform Commercial Code (UCC) Statute of Frauds, which provides that "a contract for the sale of goods for the price of $500 or more is not enforceable...unless

---

[3] As BEF recognizes, its formula pricing claim is limited to the effective date of the price increase, December 3, 2012, through April 30, 2013, the end of the relevant annual period. *See* BEF's Opp'n at 36. No evidence suggests that the parties agreed to formula pricing indefinitely, and BEF does not contend that Reser's was obligated to comply with the formula pricing agreement beyond the quarterly and annual terms at issue. *E.g.* Hawkes **[\*14]** Decl. Ex. 4 (Hall Dep. 105:9-22).

there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought." *Ohio Rev. Code § 1302.04(A)*; *see also* *Or. Rev. Stat. § 72.2010(1)*.[4] The Statute of Frauds also requires that the writing include a quantity term. *Ohio Rev. Code § 1302.04* ("A writing **[\*15]** is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this subsection beyond the quantity of goods shown in such writing"); *Or. Rev. Stat. § 72.2010(1)* (accord); *see also* *U.C.C. § 2-201, cmt. 1* ("The only term which must appear is the quantity term.").

In response to Reser's motion, BEF argues that the parties extended and modified the MSA to include the formula pricing agreement, as evidenced by the continuation of their supply relationship and their course of performance consistent with the agreed modifications. It is undisputed that the MSA is a written agreement and includes a minimum quantity term. Hawkes Decl. Ex. 3 at 3; *UCC § 2-201*, cmt. 1 (quantity "need not be accurately stated"). BEF further emphasizes that the parties' modifications to the MSA are evidenced through their written email communications, **[\*16]** and, as modifications to a written contract, they need not include quantity terms to satisfy the Statute of Frauds. *See* *Copeland Corp. v. Choice Fabricators Inc., 345 Fed. App'x 74, 77 (6th Cir. Sept. 1, 2009)* ("Copeland cites no authority, and we are aware of none, requiring *all* written modifications to include a quantity term, Nor does *§ 1302.12(C)* mention any such requirement....In the absence of any modification to the quantity term, moreover, there *is* a writing that satisfies this aspect of the statute of frauds — namely, the original contract."). Thus, if the evidence raises an inference that the parties extended the MSA and modified it to include the formula pricing agreement, Reser's Statutes of Frauds defense does not defeat BEF's breach of MSA and formula pricing contract claims on summary judgment.

BEF contends that the parties modified the MSA both before and after the written termination date in July

2008, and that the parties intended to extend the MSA through their subsequent modifications. For example, BEF notes that in 2007, the parties agreed to modify the fixed pricing schedule of the MSA. Hawkes Decl. Ex. 3 at 4; Hall Decl. 3-4 & Exs. 3-5. Further, as the termination date of the MSA approached in 2008, the parties negotiated and ultimately agreed to another modification **[\*17]** of the fixed pricing schedule until May 2010, among other agreed terms. *See* BEF's Opp'n at 25-26; Hall Decl. at 4-11 & Ex. 11-17; Brunette Decl. Ex. 23-26. BEF emphasizes that these negotiations culminated in June 2008, immediately prior to the MSA's written expiration date, and that the parties complied with the 2008 fixed pricing modification for two years, as agreed. BEF contends that these facts raise the inference that the parties intended to continue their business relationship under the MSA's terms, as modified, beyond July 2008. *See* Hall Decl. 9.

BEF also cites the 2010 parties' formula pricing negotiations and agreement, arguing that this agreement further modified the existing MSA under which the parties were operating. Hall Decl. 13-18 & Exs. 23-24, 25 (Dec. 2009 Reser's email discussing items such as formula pricing and stating, "We look forward to continuing to strengthen our partnership in 2010"); 26-31. BEF points out that, as with the 2008 fixed pricing agreement, the parties acted in accordance with the 2010 formula pricing agreement until their relationship turned adversarial in the fall of 2012. Hall Decl. & Exs. 1-11 (doc. 215). BEF maintains that, aside from these **[\*18]** modified terms, the parties' co-packing relationship continued as it had under the original MSA. Hall Decl. 3, 5, 11, 18, 20[5]; Averill Decl 2; Brunette Decl. Ex. 4 (Hall Dep. 60:22-61:23, 62:15-67:21, 91:6-92:6).

Notably, as Reser's emphasizes, the express terms of the MSA require all modifications to be in writing, which necessarily would include an extension of the MSA.

---

[4] Although Ohio law applies to the MSA by its terms, Oregon's choice-of-law rules dictate which forum's law applies to the alleged implied contracts. *Atl. Marine Constr. Co., Inc. v. U.S. Dist. Ct., 134 S. Ct. 568, 582, 187 L. Ed. 2d 487 (2013)* ("A federal court sitting in diversity ordinarily must follow the choice-of-law rules of the State in which it sits."). Here, the UCC and the relevant laws of Ohio and Oregon do not differ in any significant respect.

[5] Reser's contends that Hall's declarations contradict his deposition testimony and should be disregarded as sham affidavits. *See* *Nelson v. City of Davis, 571 F.3d 924, 928 (9th Cir. 2009)* ("The rationale underlying the sham affidavit rule is that a party ought not to be allowed to manufacture a bogus dispute with *himself* to defeat summary judgment."). I do not find Hall's declarations to contradict his deposition testimony so as to warrant disregarding them entirely. Rather, Hall's declarations seek to clarify aspects of his deposition testimony and the basis for BEF's claims. *Scamihorn v. General Truck Drivers, 282 F.3d 1078, 1085 n.7 (9th Cir. 2002)*. Whether Hall's clarifications are persuasive is a matter for the trier of fact.

Hawkes Decl. Ex. 3 at 3 (the MSA "may not be amended, superseded or altered except by an instrument in writing"). BEF nonetheless argues that by continuing their existing co-packing relationship and performing in accordance [*19] with the agreed 2008 and 2010 modifications, the parties extended the MSA and waived its written modification requirement through their course of conduct. See Ohio Rev. Code § 1301.303(F) (course of performance inconsistent with written contract term is relevant to determine waiver or modification of the written term); id. § 1302.12(D) (attempt at modification or rescission of contract can act as a waiver of written requirement); Kwikcolor Sand v. Fairmount Minerals, Ltd., 2011-Ohio-6646, 2011 WL 6775580, at *4-5 (Ohio App. Dec. 22, 2011) (by performing under an oral modification of a pricing schedule, the parties "waived any right to enforce the stringent modification requirement"); Fields Excavating, Inc. v. McWane, Inc., 2009-Ohio-5925, 2009 WL 3721013, at *3 (Ohio App. Nov. 9, 2009) ("if the parties go on to make an oral modification after they agreed on a no-oral-modification clause, then their subsequent agreement must be taken as itself modifying, or at least waiving, the no-oral-modification clause"); Wright v. State Farm Mut. Auto. Ins. Co., 223 Or. App. 357, 371-72, 196 P.3d 1000 (2008) (conduct arguably inconsistent with a written contract term raises issue of fact as to waiver of that term). At minimum, BEF maintains that the evidence is sufficient to raise a genuine issue of material fact as to whether the parties intended to extend and modify the MSA.

As BEF acknowledges, the parties did not expressly extend the MSA, and their 2008 and 2010 negotiations do not reference the MSA or its terms. E.g., Hall Decl. [*20] Exs. 7-17. Further, evidence of written but unexecuted MSA amendments show that the parties attempted and failed to negotiate a new written MSA, suggesting that the parties would have executed a formal extension of the MSA had they so intended. Hall Decl. Exs. 18-22. Moreover, Reser's contends that BEF fails to present clear and convincing evidence to show that Reser's waived the written modification requirement of the MSA or agreed to an extension of the MSA. Star Leasing Co. v. G & S Metal Consultants, Inc., 2009-Ohio-1269, 2009 WL 714146, at *7 (Ohio App. Mar. 19, 2009) (waiver of no-oral-modification clause can be shown through clear and convincing evidence of modification); Frantz v. Van Gunten, 36 Ohio App. 3d 96, 521 N.E.2d 506, 510-11 (Ohio App. 1987) (accord). Reser's emphasizes that the parties' 2007 negotiations culminated in email confirmation of the agreement, contradicting any inference that Reser's previously waived the MSA's written modification requirement. Reser's further maintains that its conduct is consistent with the expiration of the MSA and the creation of a purchase-order-to-purchase-order relationship, and, therefore, cannot establish a clear and unequivocal waiver of a contractual right.

While I find Reser's argument and interpretation of the evidence persuasive, I must construe all inferences in favor of BEF on summary judgment. In doing so, I cannot [*21] ignore evidence of the parties' long-standing supply relationship, the parties' previous modification of the MSA, the parties' pricing and other agreements in 2008 and 2010, the parties' continued performance under the 2008 and 2010 pricing agreements, and the uninterrupted continuation of their supply arrangement after July 2008. Hall Decl. & Exhibits; Hawkes Decl. Ex. 4 (Hall Dep. 65:7-17) ("during the period from July 31, 2008, until 2013, we also had discussions with Reser's regarding price changes and changing from fixed prices to formulated price, and...business type discussion that you go through as business partners"). The nature and timing of the 2008 and 2010 negotiations and agreements, the parties' performance under the agreements] and their continued co-packing relationship support an inference that the parties modified the MSA and intended to extend its terms, as modified. See, e.g., High Concrete Technology, LLC v. Korolath of New England, Inc., 665 F. Supp. 2d 883, 889 (S.D. Ohio 2009) ("The Court agrees with Korolath that the parties' continued course of dealing over a twenty-year period shows they never mutually rescinded the 1986 agreement.").

In fact, Reser's acknowledged an "agreement" or "partnership" between the parties as late as 2012, furthering the inference that [*22] the MSA was extended. Brunette Decl. Ex. 7 (McCarthy Dep. 122:12-123:4) (testifying that an "agreement" referenced in a Dec. 2012 email related to a "general agreement" governing Reser's "manufacturing of products for Bob Evans"); id. Ex. 59 (Dec. 2012 email stating that the "only reason" Reser's did not "have more if not all distribution" in certain regions was "the BE agreement"); see also id. Ex. 54 (Reser's email on 9/20/2012 discussing "ridiculous contract" with BEF "that is going away"). Further, Reser's "Weekly Results" update from June 2012 indicates that Reser's was considering moving production of BEF mashed potatoes from one plant to another, and that Reser's would "require BEF approval to make the change." Brunette Ex. 69 at 4. If the parties had no ongoing supply agreement, as Reser's contends, it is questionable why Reser's would

need to obtain BEF's approval to move production of mashed potatoes.

Moreover, evidence suggests that the parties orally agreed to terms that were not part of the MSA, such as meat department exclusivity for BEF products. An agreement for BEF's meat department exclusivity existed as early as 2004, and Reser's acknowledged this agreement or "contract" [*23] with BEF as late as 2012. Hall Decl. 2-3 & Ex. 2 (2004 letter from Reser's acknowledging its meat department restriction); Ex. 7, Ex. 10 (Sirgy Dep. 87:17-88:11) (acknowledging BEF had "exclusivity" in meat departments in 2008), Ex. 24 (2009 email exchange identifying "meat dept. exclusivity" as a topic of discussion between the parties); Brunette Deck Ex. 25 (May 2008 letter from Reser's offering terms for agreement, including that "Bob Evans will retain Branded exclusivity in the Meat Dept."); Ex. 54 (Sept, 2012 email stating, "The reasons for the different [meat and deli] product lines has to do with the ridiculous contract we had with Bob Evans but now that is going away we can do things differently"), Ex. 70 at 3 (July 2012 meeting minutes indicating that Reser's must sell potatoes in the dairy section of stores within BEF territory), Ex. 104 (2008 email from BEF noting that Reser's products were displayed in meat departments and Reser's responding that it would "take care of it"), Ex. 108 (Jan. 2011 email discussing a dispute over the parties' "verbal" agreement regarding meat department exclusivity), Ex. 109 (Feb. 2012 email exchange recognizing meat case exclusivity for BEF [*24] products). In short, the parties acknowledged and performed in accordance with an oral exclusivity agreement before, during, and after the MSA's stated term, raising an interference that the parties had waived the MSA's written modification requirement. Combined with evidence of an "agreement" acknowledged by Reser's and the parties' performance of 2008 and 2010 pricing agreements, evidence of a prior waiver raises the inference that the parties again waived the written modification requirement in extending and modifying the MSA.

Reser's nonetheless maintains that this evidence fails to show, as a matter of law, "a clear, unequivocal, decisive act" on the part of Reser's to waive the written modification argument. *Monreal Funeral Home, Inc. v. Ohio Farmers Ins. Co., 189 Ohio App. 3d 1, 2010 Ohio 3805, 937 N.E.2d 159, 164 (Ohio App. 2010)* (citations omitted). While Reser's skillfully argues that its conduct and communications were not "unequivocal" and could be construed as consistent with a purchase-order relationship, I would need to make findings of fact and

evaluate deposition testimony to agree with Reser's and grant summary judgment.

Significantly, this case does not involve several purchase orders made over the course of a few months or even a few years; the relevant evidence must be considered as a [*25] whole, rather than in a vacuum, and in the context of the parties' course of conduct. Evidence of the parties' supply relationship and their ongoing negotiations and agreements is simply too extensive for the court to find, as a matter of law, that the MSA expired and the parties' long-term, chain-of-supply relationship was reduced to nothing more than a purchase-order-to-purchase-order arrangement. This is especially true in light of the volume of products manufactured by Reser's and purchased by BEF, and the value each party placed on the other's business; the parties essentially considered themselves business "partners." Hall Decl. Ex. 13 (letter from Reser's referring to BEF as its "business partner"), Ex. 17 at 3 (2008 email from Reser's stating that it looked forward to "many more successful years of a true partnership"), Ex. 24 (2009 email exchange referencing a "follow up to our partnership session"), Ex. 25 (Dec. 2009 email from Reser's stating, "We look forward to continuing to strengthen our partnership in 2010"); Brunette Decl. Ex. 25 (May 2008 letter from Reser's referring to itself as BEF's "business partner"); Ex. 34 (2012 letter from Reser's referring to BEF as its [*26] "strategic business partner"; Gerber Decl. 10 (doc. 214) (describing the volume of products ordered).

Ultimately, whether Reser's conduct constitutes a clear and convincing waiver requires sifting through and weighing facts and testimony in the context of the parties' co-packing relationship, and that task is reserved to the finder of fact. *Fields, 2009-Ohio-5925, 2009 WL 3721013, at *4* ("Ohio courts consistently treat the issue of whether a no-oral-modification clause is waived as a question for the trier of fact."); *Fahlgren & Swink, Inc. v. Impact Res., Inc., 1992 Ohio App. LEXIS 6766, 1992 WL 385941, at *5 (Ohio App. Dec. 24, 1992)*; *Wright, 223 Or. App. at 368-69*. Accordingly, I find that questions of fact exist as to whether the parties waived the written modification requirement and extended and modified the MSA, and whether Reser's was obligated to comply with the formula pricing agreement and to provide BEF with reasonable notice before terminating the MSA.[6]

---

[6] Reser's emphasizes that BEF executive Richard Hall testified that he was not aware of a contractual provision or email

Alternatively, BEF alleges that Reser's breached "implied-in-fact" ongoing and holiday supply agreements, and that sufficient evidence of the parties' agreements exists to defeat the Statutes of Frauds.[7] BEF's Third Suppl. Claim for Relief, Counts 2 and 4; *see also* BEF's Opp'n at 32-33. BEF relies on the parties' conduct and course of dealing to support its implied contract claims, *See Ohio Rev. Code § 1302.07* (recognizing that the parties' conduct can support the existence of a contract); *Or. Rev. Stat. § 72.2040*; *U.C.C. § 2-204*. BEF maintains that the parties' extensive communications and performance of the 2008 and 2010 pricing agreements support an inference of an ongoing supply agreement between the parties, as evidenced by their "placing and filling orders and arranging transportation, and extensive cooperation in research and development, scheduling, forecasting, and marketing." BEF's Opp'n at 33; Hall Decl. 11; Gerber Decl. 3-5 (doc. 214). BEF also emphasizes that the parties gave each other advance notice of anticipated changes in pricing, volume demand, and product discontinuations, which suggests an ongoing supply relationship. **[*28]** Brunette Decl. Ex. 6 (MacLennan Dep. 54:20-56:8); Ex. 9 (Sakie Dep. 52:2-53:23, 55:20-56:17, 57:3-17, 158:18-159:18, 203:6-19); *see also id.* Exs. 26, 37, 39, 63, 64; Gerber Decl. 15-16 & Exs. 1-8; Hall Decl. 20-21. Further, in October 2012 Reser's assured BEF that it would continue to supply hot-fill sides and arguably indicated a willingness to supply holiday sides. Hawkes Decl. Ex. 12 at 2 ("To be clear, [Reser's] will continue to fill all other products orders with the quality and service you've come to expect from Reser's over the years."); *see also* Brunette Decl. Ex. 79 (Feb. 2013 email from Reser's requesting that BEF provide a potato forecast for Aug. 2013 through Aug. 2014 and stating that Reser's "wants to be in a position to fill your needs"); Gerber Decl. Ex. 9 (email from

_____

agreement that required Reser's to give BEF any notice before terminating supply. Hawkes Decl. Ex 4 (Hall Dep. 97:3-11, 211:1-15). Regardless of whether the parties agreed to a specific notice provision in the MSA or in an email, the UCC requires reasonable notice before terminating a contract of **[*27]** indefinite duration. Whether Reser's gave reasonable notice of termination is obviously a question of fact.

[7] BEF also asserts that the parties formed an "implied in fact" agreement to modify and extend the MSA. *See* BEF's Opp'n at 31-32. I do not find this argument distinguishable from BEF's argument that the parties agreed, through their negotiations and conduct, to extend the provisions of the MSA and waive the written modification requirement. **[*29]** Therefore, I decline to address it separately. BEF does not allege an implied in fact formula pricing agreement.

Reser's stating, "will we be producing for you or not? Got sleeves").

I find that the evidence as a whole supports the inference of an implied ongoing supply contract and arguably an implied holiday supply agreement. At minimum, the parties' long-standing supply relationship, course of conduct, and Reser's August 2012 assurance create genuine issues of material fact. However, even if implied supply agreements existed between the parties, the question remains whether they are enforceable under the Statute of Frauds. *U.C.C. § 2-201*, cmt. 4 ("Failure to satisfy the requirements of this section does not render the contract void for all purposes, but merely prevents it from being judicially enforced in favor of a party to the contract."); *id. § 2-204*, cmt. (although parties' conduct may establish existence of a contract, the "legal effect of such an agreement is, of course, qualified by other provisions of this Article"); *Ohio Rev. Code § 1302.07* (accord); *Or. Rev. Stat. § 72.2040*; *e.g.*, *General Dynamics Corp. v. United States, 563 U.S. 478, 488, 131 S. Ct. 1900, 179 L. Ed. 2d 957 (2011)* (the Statute of Frauds "assumes a valid, enforceable agreement between the parties but nevertheless leaves them without a remedy").

As Reser's emphasizes, the Statute of Frauds precludes enforcement of a contract for the sale of **[*30]** goods that is not reflected in a writing with a stated quantity term. *U.C.C. § 2-201(1)*; *Ohio Rev. Code § 1302.04(A)*; *Or. Rev, Stat. § 72.2010(1)*. In fact, "[q]uantity is generally the only term that is required for contract formation." *H&M Landscaping Co., Inc. v. Abraxus Salt, LLC, 2010-Ohio-4138, 2010 WL 3441935, at *3 (Ohio App, Sept. 2, 2010)*; *see also GPL Treatment, Ltd. v. Louisiana-Pacific Corp., 323 Or. 116, 123, 914 P.2d 682 (1996)* (to satisfy the UCC statute of frauds, the writing must "include a quantity term"). Consequently, "if a contract lacks a quantity term, it runs afoul of the Statute of Frauds and is not enforceable." *Orchard Group, Inc. v. Konica Med. Corp., 135 F.3d 421, 428 (6th Cir. 1998)*; *see also Centro Nautico Representacoes Nauticas, LDA v. Int'l Marine Co-op, Ltd., 719 So.2d 967, 969 (Fla. App. 1998)*, *rev'd on other grounds*, *761 So. 2d 279 (Fla. 1999)* (holding that an oral contract fell within the Statute of Frauds and "as a matter of law there was no right to reasonable notice of termination because the agreement was unenforceable"). Here, BEF identifies no writing with quantity terms to support implied ongoing or holiday supply agreements, and, as Reser's points out, BEF cannot rely on the parties' course of dealing to supply a necessary quantity term. *Boydstun Metal Works, Inc. v. Cottrell, Inc., 519 F. Supp. 2d 1119, 1131*

(D. Or. 2007) ("A quantity may be ascertained from the parties' past course of dealing. However, course of dealing cannot supply a missing quantity term if the contract is completely silent as to quantity."); *H&M Landscaping, 2010-Ohio-4138, 2010 WL 3441935, at *4* (holding that "course of performance information does not help [the plaintiff] overcome the lack of a quantity term in the agreement").

BEF nonetheless insists that the lack of a quantity **[*31]** term does not preclude enforcement of contract obligations unrelated to quantity. BEF emphasizes that it seeks to enforce Reser's obligation to give reasonable notice before terminating the parties' supply agreements rather than a specific quantity obligation. However, the cases cited by BEF do not support its argument, *See* BEF Opp'n at 40-41. The cases of *Fuchs, O.N. Jonas Co.*, and *Pepsi-Cola Co.* involved requirements contracts, and *Kubik* dealt with a requirements and exclusive dealings contract.[8] In those situations, courts have held that a quantity term is not needed to comply with the Statute of Frauds. *O.N. Jonas Co., Inc. v. Badische Corp., 706 F.2d 1161, 1165 (11th Cir. 1983)*; *Pepsi-Cola Co. v. Steak'n Shade, Inc., 981 F. Supp. 1149, 1159, 981 F. Supp. 1348 (S.D. Ind. 1997)*; *Kubik v. J & R Foods of Or., Inc., 282 Ore. 179, 187, 577 P.2d 518, (1978)*; *Fuchs v. United Motor Stage Co., 135 Ohio St. 509, 21 N.E.2d 669, 672 (Ohio 1939)*.

In contrast, the parties here had a non-exclusive supply agreement. I recognize that the principles underlying the quantity exception for requirements and exclusive supply contracts arguably apply with equal force to non-exclusive supply contracts. *See Advent Sys., Ltd. v. Unisys Corp., 925 F.2d 670, 678 (3d Cir. 1991)* ("The same reasons that led courts to dispense with a specific and certain quantity term in the exclusive requirements **[*32]** context apply equally when a continuing relationship is non-exclusive. The same regulating factor—good faith performance by the parties—applies and prevents the contracts from being illusory."). Regardless, BEF cites no Ohio or Oregon case recognizing an exception to the quantity requirement when the parties' supply relationship is non-exclusive. *E.g., Orchard Group, Inc., 135 F.3d at 427, 429* (applying Ohio law). Therefore, any implied ongoing

or holiday supply agreement is unenforceable under the Statute of Frauds, and Reser's motion for summary judgment is granted on BEF's implied contract claims.

2. The November-January Pricing Claim

Finally, BEF alleges that Reser's November 14 price advance breached the parties' specific pricing agreement for commodity sides sold between November 1, 2012 and January 30, 2013. BEF Supp. Ans. at 23-24 (Fourth Claim for Relief, Count 1). Both parties move for summary judgment on this claim,

On November 1, 2012, Reser's sent an email to BEF with attached quarterly pricing for commodity sides; the subject line of the email stated "Updated formulation product pricing" and an attachment was entitled "Formulation pricing effective 11.01.12 thru 01.30.13.pdf." Hawkes Decl. Ex. 24.[9] For approximately ten days, BEF submitted **[*33]** orders for commodity sides at those prices, and Reser's accepted those orders. On November 14, Reser's informed BEF that it was raising prices for commodity sides due to "non-commodity based adjustments," with the price increase effective as of December 3, 2012. *Id.* Ex, 26. BEF objected to the price increase and asserted that Reser's was bound by the November 1 price quote through January 30, 2013. *Id.* Ex. 27. Reser's responded that it would accept orders only at the increased price for any supply to be delivered on or after December 3, 2012. Gerber Decl. Ex. 9 (doc. 214). BEF nonetheless attempted to submit orders for delivery of commodity sides on December 8 pursuant to the November 1 price quote. Reser's refused the orders, and BEF revised the orders to reflect the price increase of November 14. *Id.* at 8-9 & Ex. 9-10.

BEF argues that the parties' **[*34]** formula pricing agreement and performance in accordance with the agreement establishes that Reser's November 1 email served as a binding offer to supply commodity sides at the quoted price for the duration of the quarterly period ending on January 30, 2013. *E.g.*, Hall Decl. & Exs. 1-11 (doc. 215). Reser's maintains that the email was simply a price quote and lacked the necessarily detail, such as quantity terms, to constitute a binding offer. *Boydstun Metal Works, 519 F. Supp. 2d at 1129-30.*

---

[8] "A requirements contract is '[a] contract in which a buyer promises to buy and a seller to supply all the goods or services that a buyer needs during a specified period." *H&M Landscaping, 2010-Ohio-4138, 2010 WL 3441935, at *3* (quoting Black's Law Dictionary (8 Ed. 2004)).

[9] Another attachment was entitled "Formula pricing spreadsheet effective 11.12.12-01.20.12s.xls." The email stated: "Attached is the new formation pricing in detail as well as cover spreadsheet. Please note that we have moved the effective date of the price changes to deliveries of 11/12/12 to account for PO's already in our system." Hawkes Decl. Ex. 24.

I find that this claim, like BEF's MSA and formula pricing claims, depends on whether the parties extended the MSA and modified it to include the formula pricing agreement. If so, Reser's was obligated to comply with the November 1, 2012 price adjustment for the duration of the quarter. If the MSA was not so extended or modified, the email is not an enforceable contract and Reser's was not bound by the November 1 price quote.

Generally, a price quote is considered "an invitation for an offer, rather than an offer to form a binding contract," while "a buyer's purchase agreement submitted in response to a price quotation is usually deemed the offer." *Dyno Constr. Co. v. McWane, Inc.*, 198 F.3d 567, 572 (6th Cir. 1999) (citation omitted); *RPTS, Inc. v. FMC Tubular & Equipment Corp.*, 2012-Ohio-397, 2012 WL 366876, at *1 (Ohio App. 2012). Granted, a price quote can constitute an offer if it is sufficiently detailed [*35] so that the other party's assent forms a binding contract. *Id.*; *Boydstun Metal Works*, 519 F. Supp. 2d at 1129. Ultimately, whether a communication is an offer or a price quote "depends primarily upon the intention of the person communicating the quotation as demonstrated by all of the surrounding facts and circumstances." *Dyno Constr. Co.*, 198 F.3d at 572; *see also Boydstun Metal Works*, 519 F. Supp. at 1129.

If the Reser's was not bound by the alleged formula pricing modification of the MSA, Reser's email simply invited BEF for order commodity sides at the quoted prices. Reser's email did not include quantity terms or delivery information and is not sufficiently detailed enough to constitute a binding "offer." *Boydstun Metal Works*, 519 F. Supp. 2d at 1130-31 (a communication must include the price and the quantity of goods to constitute a binding offer). For the same reasons, the November 1 email does not comply with the Statute of Frauds due to the lack of a quantity term. *Id.*

BEF nonetheless argues that the parties' delivery and acceptance of side dishes establish the existence of a contract and fall within the State of Frauds exception "with respect to goods for which payment has been made and accepted or which have been received and accepted." *Ohio Rev. Code § 1302.04(C)*; *Or. Rev. Stat. § 72.2010(3).* However, any "meeting of the minds," or contract, between the parties covered only the goods delivered [*36] and received at the November 1 price quote; it did not extend to goods delivered and received at the November 14 price. This particularly true when Reser's refused to accept additional BEF orders submitted at the November 1 price. Similarly, the Statutes of Frauds exception applies to goods delivered

and accepted under the terms of the agreement sought to be enforced — in this case, the November 1 email. *E.g.*, *Howland v. Iron Fireman Mfg. Co.*, 188 Or. 230, 215 P.2d 380, 385 (1950) ("the receipt and acceptance of the goods or a part thereof relied on to render the parol contract enforceable must be done in pursuance of the particular contract which it is sought to establish"); *see also H&M Landscaping*, 2010-Ohio-4138, 2010 WL 3441935, at *4 ("The statute of frauds precludes H&M from arguing that additional amounts were also included in the agreement because they are not evident in the document that H&M asserts is a contract."). Therefore, unless the MSA remained in effect and was modified to include the formula pricing agreement, Reser's November 1 email did not create an enforceable contract.

Accordingly, the parties' motions for summary judgment on BEF's November-January pricing claim are denied, as genuine issues of material fact remain regarding the MSA.

B. Promissory Estoppel Claims

BEF also alleges promissory [*37] estoppel as alternatives to its formula pricing and supply contract claims. *See* BEF's Suppl. Ans. at 25-27, 55-57, 59-62 (Fourth Claim for Relief, Count 3; Third Suppl. Claim for Relief, Counts 3 and 5).

Both Oregon and Ohio recognize an affirmative claim of promissory estoppel to recover reliance damages. *See Olympic Holding Co. v. ACE Ltd.*, 122 Ohio St. 3d 89, 2009 Ohio 2057, 909 N.E.2d 93, 100 (Ohio 2009) ("a party may not use promissory estoppel to bar the opposing party from asserting the affirmative defense of the statute of frauds... but may pursue promissory estoppel as a separate remedy for damages"); *Filo v. Liberato*, 2013 Ohio 1014, 987 N.E.2d 707, 712-13 (Ohio Ct. App. 2013); *Potter v. Hatter Farms, Inc.*, 56 Or. App. 254, 260, 641 P.2d 628 (1982) ("promissory estoppel should be allowed to defeat reliance upon the UCC Statute of Frauds").[10] Under the doctrine of

---

[10] Reser's concedes that Oregon does not bar a claim [*38] of promissory estoppel when the Statute of Frauds precludes a contract claim; however, it argues that the law of Ohio should apply, and that Ohio does not allow a promissory estoppel claim to defeat the Statute of Frauds unless a party misrepresents compliance with the statute's requirements or a promise to execute a memorandum of the alleged agreement, *Huntington v. R.R. Wellington, Inc.*, 2012 Ohio 5935, 983 N.E.2d 941, 949 (Ohio App. 2012). I disagree. In *Olympic*

promissory estoppel, "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Cocchiara v. Lithia Motors, Inc., 353 Or. 282, 292, 297 P.3d 1277 (2013)* (citation omitted). The elements of promissory estoppel are: 1) a clear and unambiguous promise; 2) reasonable and foreseeable reliance on the promise; and 3) damages as a result of the reliance. *JPMorgan Chase Bank v. Dattilo, 2014-Ohio-5286, 2014 WL 6679575, at *2 (Ohio App. Nov. 26, 2014)*; *Moellering Indus., Inc. v. Nalagatla, 2013-Ohio-3995, 2013 WL 5230678, at *4 (Ohio App. Sept. 16, 2013)* (a "clear and unambiguous promise" is required for promissory estoppel); *Furrer v. Sw. Or. Cmty. Coll, 196 Or. App. 374, 382, 103 P.3d 118 (2004)*.

I find that BEF submits sufficient evidence to raise a genuine issue of fact as to whether Reser's promised to provide BEF with ongoing supply through 2013. In its August 23, 2012 letter to BEF, Reser's explicitly stated: "To be clear, [Reser's] will continue to fill all other products orders with the quality and service you've come to expect from **[\*39]** Reser's over the years." Hawkes Decl. Ex. 12 at 2. This letter alone raises the inference that Reser's promised ongoing supply, an inference made stronger in light of the parties' course of dealing. After August 2012, BEF continued to provide forecasts and submit purchase orders, and Reser's continued to fill those orders. *E.g.* Brunette Decl. 11 (Townsley Dep. at 183:1-12). Further, in February 2013, Reser's requested that BEF provide a potato forecast for August 2013 through August 2014, stating that Reser's "wants to be in a position to fill your needs." Brunette Decl. Ex. 79. It is a much closer call whether BEF presents sufficient evidence to show that it reasonably relied on a promise from Reser's to continue supply through 2013.

After the Kettle Creations purchase, it is undisputed that BEF became concerned that Reser's would terminate the parties' supply arrangement. *See, e.g.*, Hawkes

---

*Holding Co.*, the Ohio Supreme Court made clear that promissory estoppel does not create an exception to the Statute of Frauds, though it may be brought as an affirmative claim to recover reliance damages. *909 N.E.2d at 100*; *see also Filo, 987 N.E.2d at 712* ("Promissory estoppel, itself, does not operate as an exception to the statute of frauds. Instead,...promissory estoppel specifically exists to provide an action for damages to compensate a party injured due to his reliance on an unenforceable promise.")

Decl. Ex. 6 (Townsley Dep. 144:16-23) (testifying that after the Kettle Creations purchase, BEF recognized the risk that Reser's could terminate all supply); Ex. 14 (Klausing Dep 142:4-143:16 (testifying that Reser's potential termination of supply was one of BEF's "biggest concerns"); Ex. 15 (Mulhern **[\*40]** Dep. 124:12-23) (acknowledging the possibility that Reser's could terminate supply). After Reser's refused to provide a written supply commitment, BEF instructed its high level managers to "assume that as of January 1st Reser's cuts us off entirely" and to determine what sides BEF could produce at the Kettle Creations plant. Hawkes Decl. Ex. 21 at 2; *see also id.* Ex. 34 (Mar. 2013 email of BEF acknowledging "the real possibility that Reser's may throw us out in the next several months").

In November 2012, BEF launched Project XR ("Exit Reser's"), a plan to assess BEF's capability to produce its own side sides and to identify alternative co-packing arrangements. Hawkes Decl. Ex. 4 (Hall Dep. 158:1-159:17, 179:4-7), Ex. 6 (Townsley Dep. 124:19-25, 146:4-11, 188:1-12), Ex. 15 (Mulhern Dep. 143:7-144:4, 152:10-153:9, 172:13-173:3, 180:11-21), Ex. 17 (DeNunzio Dep. 28:2-7, Ex. 28. Throughout 2013, BEF expressed either the intent or the desire to "exit" its relationship with Reser's "as soon as possible" or by March, June, July, or ultimately August of 2013. Hawkes Decl. Ex. 14 (Klausing Dep. 96:12-22, 119:9-15) (testifying that BEF discussed a plan to reduce Reser's orders to "zero"); **[\*41]** *see also id.* Exs. 31, 32 at 2, 33, 34, 36 (Dec. 2012 email from BEF indicating that "all" production would be "shifting" from Reser's to Kettle); 37-41. In July 2013, BEF expressed heightened concern that Reser's "may cut us off sooner than expected or not fulfill what we have forecasted." *Id.* Ex. 53. Reser's emphasizes that BEF admitted that it "explored every option available" and "did everything that [it] could do" to increase its internal production capability and find other co-packers for all products produced by Reser's. Hawkes Decl. Ex. 47 (Nimmons Dep. 145:16-24), Ex. 15 (Mulhern Dep. 161:17-163:13). While BEF "didn't know if [Reser's was] going to continue to supply [sides] or not," "everyone assumed" that Reser's would eventually terminate supply "[b]ecause each party was suing each other, competitive in the marketplace, you had to figure something bad was going to happen." *Id.* Ex. 14 (Klausing Dep. 180:4-23).

Given this evidence, Reser's maintains that BEF did not rely on any promise by Reser's and instead made every effort to obtain an alternative source of supply, and that BEF's unsuccessful attempt to find a supplier should not

transform its conduct into actual reliance. In response, **[\*42]** BEF downplays the significance of Project XR, maintaining that it was nothing more than a "contingency plan" to address a myriad of "what if situations and to minimize potential damage in the event Reser's "breached" the parties' agreement and terminated all supply. *See* Brunette Decl. Ex. 4 (Hall Dep. 178:14-17, 183:1-184:4); Ex. 11 (Townsley Dep. 242:3-16, 285:18-286:1); Ex. 116 (Mulhern Dep. 21:6-22:19, 148:9-16, 152:7-153:9, 175:3-178:24, 251:7 253:9, 273:11-15); Ex. 117 (Nimmons Dep. 93:3-14). BEF notes that as of 2012, Reser's supplied BEF with approximately 50% of its refrigerated side dish requirements, and that BEF intended to maintain that percentage through 2013. *See* Brunette Decl. Ex. 11 (Townsley Dep. 137:21-23, 157:6-158:8). BEF further contends that it had no intention of abandoning its supply relationship with Reser's entirely, given that it had no other reliable source of supply for the products produced by Reser's. Brunette Decl Ex. 11 (Townsley Dep. 129:3-130:23, 131:13-20, 132:14-19, 133:14-134:2, 139:2-9, 146:12-147:1, 157:18-158:8, 183:1-12, 258:8-18, 280:10-14); Ex. 116 (Mulhern Dep. 53:21-25, 166:22-168:15, 180:20-21, 199:5-11).

I find this issue to be a very **[\*43]** close call. As Reser's argues, internal BEF documents seemingly reflect its all-out effort to replace Reser's as a supplier in 2013, negating BEF's claim that it relied on Reser's promise to provide ongoing supply. At the same time, the deposition testimony of BEF officers and employees paint a difference picture and place the internal documents and communications in a different, hypothetical context. Ultimately, I find that the credibility of witness testimony and the issue of BEF's reliance are questions for the trier of fact.

Reser's also argues that even if the evidence creates a genuine issue of material fact as to BEF's reliance, its reliance was not reasonable. Reser's points out that in September and October 2012, BEF pressed Reser's for a one-year commitment for continuing supply, and Reser's gave no commitment. *E.g.* Hawkes Decl. Ex. 19. In the summer of 2013, BEF again attempted to obtain a commitment from Reser's to provide holiday sides through December 2013 and again received no commitment. *Id.* Ex. 50. Despite the lack of commitment, BEF nonetheless offered holiday sides to its customers and indicated that they would be available in October 2013. Hawkes Decl. Ex. 13 (Lambrix **[\*44]** Dep. 158:18-21), Ex. 57. Reser's strenuously argues that BEF is a "highly sophisticated entity," and the reasonableness of its alleged reliance on Reser's should

be held to a higher standard. *E.g.,* Or. Pub. Employees' Retirement Bd. v. Simat, Helliesen & Eichner, 191 Or. App. 408, 428, 83 P.3d 350 (2004) (a party that "is a large and sophisticated organization that has at its disposal a small army of attorneys, accountants, and hired experts" may be "unjustified" in relying on another's representations); Miami Packaging, Inc. v. Processing Sys., Inc., 792 F. Supp. 560, 565 (S.D. Ohio 1991) (reliance was not reasonable as a matter of law when the party knew that the promise "might not come to fruition").

Granted, BEF's alleged reliance on Reser's promise to continue supply might have been unreasonable in light of Reser's August 2012 discontinuation of baked side dish supply, Reser' s alleged breach of the formula pricing agreement, Reser's 2013 lawsuit against BEF, and Reser's refusal to provide a firm supply commitment in 2013. At the same time, in October 2012 Reser's assured BEF that it would continue to supply BEF with side dishes, and, aside from the lack of commitment, Reser's acted in accordance with the parties' past dealings by filling orders and requesting forecasts. Further, BEF contends that Reser's concealed its intent to terminate supply for several months, leading **[\*45]** BEF to believe that it would provide supply throughout the 2013 holiday season. *E.g.,* Brunette Exs. 15-21. Whether BEF's alleged reliance was reasonable or even plausible in these circumstances remains a question of fact. Cocchiara, 353 Or. at 293, 297 P.3d 1277 ("reasonableness is an issue for the jury"). Accordingly, summary judgment is denied on BEF's promissory estoppel claims regarding ongoing and holiday supply.

However, no question of fact precludes summary judgment on BEF's promissory estoppel claim with respect to the parties' formula pricing agreement. As Reser's argues, BEF admitted that the formula pricing agreement had no established termination date, and that Reser's made no promise to continue the agreement indefinitely. Reser's Mem. in Support at 27-29; Hawkes Decl. Ex. 4 (Hall Dep. at 105:9-22, 109:7-110:7). Further, in response to Reser's motion, BEF cites no evidence to show that it reasonably relied on Reser's promise to make annual and quarterly price adjustments. BEF 's Opp'n at 41-43. Therefore, summary judgment is granted on BEF's promissory estoppel claim regarding the formula pricing agreement.

## C. Fraud Claim

In its Second Supplemental Claim for Relief, BEF asserts a claim for fraud and alleges that **[\*46]** Reser's

deceptively led BEF to believe that it would continue to provide hot-fill items through 2013. To establish a claim for fraud, a party must prove: 1) a false, material misrepresentation; 2) made with knowledge of its falsity; 3) an intention that the falsity be relied upon; 4) justifiable reliance on the misrepresentation; and 5) damages as a result of the reliance. *Strawn v. Farmers Ins. Co. of Or., 350 Or. 336, 352, 258 P.3d 1199 (2011)*. Reser's argues that BEF presents no facts to establish a false, material misrepresentation on its part, or justifiable reliance on any alleged misrepresentation. I disagree.

BEF maintains that Reser's knew in mid-2013 that it intended to terminate the parties' ongoing supply arrangement but nevertheless led BEF to believe that it would continue to provide hot-fill side dishes. BEF relies on Reser's communications in May 2013 directing Reser's employees to cease or reduce orders for raw materials, trays, boxes, and external packaging ("sleeves") for BEF products and to plan on ceasing production of BEF products by fall of 2013. Brunette Exs. 15-20, 21 (Aug. 2013 email stating Reser's had "been running down sleeve inventory for months in anticipation of a September cut-off date"). During the same time period, Reser's **[*47]** continued to request forecasts from BEF for products such as green beans and apples, for example, telling BEF that raw food suppliers needed "to get projections in ASAP." Gerber Decl. Ex. 10. However, Reser's admitted that raw food suppliers did not request projections and that the statement was false. Brunette Decl. Ex. 6 (MacLennan Dep. 168:14-169:6). In other words, BEF argues that from May through August 2013 — when BEF was making supply commitments to retailers — Reser's acted as if it would continue to supply BEF with sides while secretly preparing to terminate supply. BEF maintains that Reser's timed the termination of supply to coincide with the holiday season and the accompanying "spike" in side dish sales so that BEF could not fill its customers' orders.

Reser's counters that BEF's interpretation of the evidence is not plausible, and that it simply reduced the amount of BEF packaging and other materials in response to BEF's dramatic reduction in orders, an action which BEF recognized as "normal." *See* Hawkes Decl. Ex. 10 (July 2012 email indicating that BEF intended to order approximately 20% less volume than forecasted); Suppl. Hawkes Decl. Ex. 1 (Gerber Dep. 208:7-23), Ex. **[*48]** 2 (MacLennan Dep. 78:5-18, 111:17-25, 113:19-114:24, 117:7-15), Ex. 3 (Solvie Dep. 85:11-86:11) (testifying that Reser's expressed concern

about excess inventory if BEF's business went elsewhere). Reser's further argues that its alleged failure to notify BEF of a potential supply termination is not actionable as fraud. *See Gregory v. Novak, 121 Or. App. 651, 655, 855 P.2d 1142 (1993)* ("Silence in the absence of a duty to speak is not a representation").

"One species of a misimpression that will give rise to an actionable claim in fraud is a promise made with the knowledge that it will not be performed or with reckless disregard about whether it will be performed." *Estate of Schwarz v. Philip Morris, Inc., 206 Or. App. 20, 39, 135 P.3d 409 (2006)*; *see also Heise v. Pilot Rock Lumber Co., 222 Or. 78, 86, 352 P.2d 1072 (1960)* ("It is well settled that the suppression of a material fact which a party is bound in good faith to disclose is equivalent to a false representation.") (citation omitted); *Wieber v. FedEx Ground Package System, Inc., 231 Or. App. 469, 484, 220 P.3d 68(2009)* ("even in the absence of a duty to speak, actions by a defendant to actively conceal the truth can constitute fraud"). Given the evidence of record as discussed above, I find that questions of fact exist as to whether Reser's misrepresented its willingness to continue supply and whether BEF justifiably relied on that misrepresentation to its detriment.

## D. Intentional Interference With Economic Relations **[*49]** Claim

In its First Supplemental Claim for Relief; BEF's alleges that Reser's intentionally interfered with the economic relationship between BEF and its customers by discontinuing the supply of hot-fill and seasonal sides. To establish a claim for intentional interference with economic relationships, a party must show: 1) the existence of a professional or business relationship; 2) intentional interference with that relationship; 3) by a third party; 4) accomplished through improper means or for an improper purpose; 5) a causal effect between the interference and damage to the economic relationship; and 6) damages. *McGanty v. Staudenraus, 321 Or. 532, 535, 901 P.2d 841 (1995)*. Reser's contends that BEF cannot establish intentional interference or improper means or purpose.

Reser's argues that no facts suggest that it intended to interfere with BEF's business relationships or that it knew such interference was substantially certain to occur as a result of the termination of supply. *Straube v. Larson, 287 Or. 357, 361, 600 P.2d 371 (1979)* (element of intentional interference may be met if the defendant knew that interference was "substantially certain" to

occur); *Aylett v. Universal Frozen Foods Co., 124 Or. App. 146, 152-53, 861 P.2d 375 (1993)*. Aside from the fact that BEF sought a supply commitment during 2013, Reser's maintains that BEF provides no evidence that Reser's knew that **[\*50]** the termination of supply would interfere with BEF's other business relationships. Reser's emphasizes that it stopped supplying BEF almost one year after BEF announced its acquisition of Kettle Creations and the "nearly $27 million expansion" of the Kettle plant, and after BEF had reduced its total volume of purchases from Reser's by 83 percent. Hawkes Decl. Exs. 45, 46 (Mark Reser Dep. 95:3-16, 197:7-25), 62. Reser's also contends that BEF itself did not know whether Reser's termination of supply would interfere with its customer relations, because it did not notify customers of a supply problem until October 2013. *Id.* Ex. 13 (Lambrix Dep. 158:14-21, 188:7-15, 193:14-194:1) (testifying that BEF notified customers about the lack of supply when it "was certain" it had a supply issue). Given these facts, Reser's argues that it could not have known that BEF would be unable to meet its customers' demands as a result of Reser's decision.

I find that the evidence raises genuine issues of fact regarding Reser's intent and knowledge. For example, as Reser's emphasizes, BEF sought assurances from Reser's that it would continue to supply holiday and other hot-fill dishes, raising the inference **[\*51]** that BEF continued to rely on Reser's for its hot-fill sides and that Reser's was aware of BEF's reliance. Brunette Decl. Ex. 6 (MacLennan Dep. 205:1-17, 206:2-14), Ex. 9 (Sakie Dep. 193:17-195:6, 248:20-249:16); *see also id.* Exs. 12, 22, 51. BEF also presents evidence that Reser's took steps to terminate supply for months and failed to disclose this fact to BEF, even as BEF was seeking assurances from Reser's. Brunette Decl. Exs. 15-21. Notably, Reser's gave some indication to BEF that it would supply holiday sides and did not explicitly terminate supply until late August. Brunette Decl. Ex. 79; Gerber Decl. Ex. 9. These actions could raise the inference that Reser's deliberately terminated the supply relationship during the peak holiday season when BEF would suffer the most damage from its inability to meet customer side-dish demands.

Further, BEF points to evidence that Reser's knew BEF would be unable to obtain a sufficient source of supply for its holiday needs if Reser's discontinued supply. Brunette Ex. 6 (MacLennan Dep. 205:1-17, 206:2-15), Ex. 9 (Sakie Dep. 193:17-195:6, 248:20-249:16), Exs. 12, 22 (Reser's email in August 2013 stating that the Kettle Creations plant could **[\*52]** not meet all of BEF

needs and that "It will be interesting to hear what happens to BEF this fall"), Ex. 51. The fact that BEF did not inform customers of a supply problem until October 2013 does not necessarily mean that it did not realize it had a supply problem, or Reser's could not have known of a problem, at the time Reser's terminated supply. If, as BEF maintains, the parties were in the midst of settlement discussions, a potential resolution would have rendered any notice to BEF customers premature. *See* Townsley Decl. at 6-7. Finally, BEF presents evidence that Reser's sought to displace BEF products with its own and gain a greater share of the market, and that the termination of BEF's supply furthered this goal. *See* Brunette Decl. Exs. 28, 30, 55-57, 62, 71, 77, 82.

If construed in BEF's favor, these facts support the inference that Reser's intended to interfere with BEF's customer relationships to further its own business interests, and that Reser's knew interference with BEF customers was likely to occur if it refused to supply BEF with hot-fill and seasonal sides. While Reser's relies on the deposition testimony of its employees and its sleeve supplier to establish that it **[\*53]** had no nefarious plan to terminate supply and interfere with BEF's customer relationships, it is for the trier of fact to evaluate the credibility of witness testimony. *See* Reser's Reply Mem. at 29-30; Suppl. Hawkes Decl. & Exhibits.

Reser's also maintains that no evidence shows that Reser's acted through improper means or for an improper purpose. Though I find this argument more persuasive, genuine issues of material fact nonetheless preclude summary judgment.

If liability for intentional interference is based on an improper purpose, the purpose "must be to inflict injury"; if liability is based on improper means, the means "must violate some objective identifiable standard, such as a statute or other regulation, or a recognized rule of common law, or perhaps an established standard of a trade or profession." *Nw. Natural Gas Co. v. Chase Gardens, Inc., 328 Or. 487, 498, 982 P.2d 1117 (1999)*. "Commonly included among improper means are violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood." *Top Serv. Body Shop, Inc. v. Allstate Ins. Co., 283 Or. 201, 210 n.11, 582 P.2d 1365 (1978)*.

BEF contends that Reser's terminated supply in order to gain a competitive advantage over BEF and become a "national brand" at BEF's expense. BEF's Opp'n at 18-19; *see also* Brunette Decl. Exs. **[\*54]** 28, 31, 55-58,

62, 78. Generally, actions in furtherance of competitive business interests do not constitute improper means or an improper purpose to support a claim of intentional interference. *Robinson v. Charter Practices Int'l, LLC, 2015 U.S. Dist. LEXIS 49980, 2015 WL 1799833, at *15-16 (D. Or. Apr. 16, 2015)*; N *Pac. Lumber v. Moore, 275 Or. 359, 369, 551 P.2d 431 (1976)*. However, BEF's allegations go beyond the typical furtherance of a business interest; BEF asserts that Reser's breached the parties' supply agreement out of retribution, and that Reser's fraudulently and deceptively misrepresented its intent to terminate supply in order to cause greater ham to BEF. *See Wanke Cascade Dist. Ltd. v. Forbo Flooring, Inc., 2013 U.S. Dist. LEXIS 174062, 2013 WL 6493099, at *5-6 (D. Or. Aug. 20, 2013)* (business competitors' privilege does not apply if the competition uses improper means); *Restatement (Second) of Torts § 766, cmt. r (1979)* ("Satisfying one's spite or ill will is not an adequate basis to justify an interference and keep it from being improper."); *see also id.§ 767* (factors relevant to whether interference is improper include the defendant's motive and interests sought to be advanced).

BEF produces evidence that Reser's imposed sharp price increases, cut off supply and brought suit against BEF in retaliation for BEF's business decisions that negatively affected Reser's. *E.g.* Brunette Decl. Ex. 34, 52, 65, 115. The evidence supports an interference that Reser's motives were retaliatory, which is "sufficient to satisfy **[*55]** the improper motive requirement." *Aylett, 124 Or. App. at 153, 861 P.2d 375* (citing *Straube, 287 Or. at 368, 600 P.2d 371*). Whether Reser's ultimate decision to terminate supply was, in fact, motivated by retaliation is a question for the finder of fact.

Further, as noted above, BEF presents evidence suggesting that Reser's began taking steps to terminate supply months earlier and did not disclose this fact when BEF sought assurances from Reser's. Brunette Decl. Exs. 15-21; Gerber Decl. 7-14 & Exs. 10-15. BEF also submits evidence that Reser's pushed BEF to provide a forecast for holiday sides and falsely asserted that wholesale suppliers demanded projections, even as Reser's planned to terminate supply to BEF. Brunette Decl. Exs. 6 (MacLennan Dep. 168:2-169:11), 124, 128. BEF also presents evidence that Reser's shut down the recently-acquired Delphos manufacturing plant after determining that other Reser's facilities could accommodate the volume of side dishes produced at Delphos if Reser's no longer supplied BEF. Reser's then notified BEF that it no longer had capacity to meet BEF's supply needs. Brunette Decl. Exs. 32-33, 35, 53.

Although the evidence may support the inference that Reser's "was pursuing its legitimate business purposes, that is not necessarily **[*56]** the only conclusion that reasonably may be drawn from the evidence." *Aylett, 124 Or. App. at 153, 861 P.2d 375*.

BEF also argues that Reser's interfered through improper means by violating an industry standard of reasonable notice and collaboration before terminating an ongoing supply agreement. BEF relies on the UCC and the expert opinion of Robert Nardone to support an industry standard. The UCC provides that contracts for the sale of goods with no express duration may be terminated at will upon reasonable notice. *Or. Rev. Stat. § 72.3090*; *Ohio Rev. Code § 1302.22*. Mr. Nardone further opines that a well-recognized trade standard and expectation in the food supply industry requires a co-packer to cooperate and collaborate with its supply partner and determine what notice would be reasonable before terminating a supply agreement. Nardone Decl. Ex. I at 27. Mr. Nardone contends that nine months' notice would have been reasonable in the circumstances of this case. *Id.* Ex. 1 at 38.

Reser's maintains that the parties had no enforceable contract, and therefore the UCC standard does not apply to BEF's tort claim. However, as discussed above, it is a question of fact whether the parties extended the MSA. Further, the evidence supports the existence of an implied ongoing agreement; **[*57]** even the agreement is unenforceable under the Statute of Frauds, the UCC standard of reasonable notice remains relevant to the existence of an industry standard. *See Wanke, 2013 U.S. Dist. LEXIS 174062, 2013 WL 6493099, at *7* (recognizing UCC standards in context of intentional interference claim); *Or. Rev. Stat. § 72.3090*, cmt 8 ("the application of principles of good faith and sound commercial practice normally call for such notification of the termination of a going contract relationship as will give the other party reasonable time to seek a substitute arrangement"); *id.§ 72.2010*, cmt. 4 (contract unenforceable under the Statute of Frauds is not "void for all purposes").

Finally, Reser's argues that BEF cannot show an established or recognized industry standard that requires collaboration among co-packers or a specific notice of termination. *See Volt Servs. Group v. Adecco Employment Servs., Inc., 178 Or. App. 121, 131-32, 35 P.3d 329 (2001)* (finding that published industry guidelines established "recognized" industry standards). Reser's contends that Mr. Nardone's opinion is unreliable and should be excluded, because he failed to

identify any evidence supporting the existence of a true industry standard and no reliable methodology supports his subjective opinion. See *Fed. R. Evid. 702* (a witness "qualified as an expert by knowledge, skill, experience, training, or education may testify [*58] in the form of an opinion" if the testimony "will help the trier of fact," and the testimony is reliably supported by facts, principles, and methods).

I agree with Reser's that Mr. Nardone's opinion does not support the existence of an industry standard of co-packer collaboration or reasonable notice distinct from the UCC standard. Mr. Nardone does not cite data compilations, regulations, published guidelines, or any industry publication to support his opinion. Eggum Decl. Ex. 2 (Nardone Dep. 10:2-13, 53:3-19, 60:7-61:3) (doc. 243) (testifying that no publication discusses an industry notice-of-termination standard, and no regulation governs the termination of supply). Further, Nardone's opinion does not describe *specific* examples of collaboration in the industry that he has personally experienced or witnessed prior to the termination of a supply agreement. Nardone Decl. Ex. 1 at 27-28. "If an expert is relying solely or primarily on experience, then the expert 'must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" *Siring v. Or. State Bd. of Higher Ethic. ex rel. Eastern Oregon Univ., 927 F. Supp. 2d 1069, 1074 (D. Or. 2013)* (quoting *Fed. R. Evid. 702* Advisory Committee notes); *[*59] see also Arjangrad v. JP Morgan Chase Bank, N.A., 2012 U.S. Dist. LEXIS 71745, 2012 WL 1890372, at *5 (D. Or. May 23, 2012)* (finding expert testimony based on experience unreliable where the expert did not "offer any personal observations or data gathered from his experience demonstrating that large companies actually adhere to these standards"). Here, Mr. Nardone fails to explain how and why his experience supports the conclusion that food supply companies collaborate before terminating an ongoing supply agreement.

Rather, Mr. Nardone essentially opines that reasonable notice of termination in the food supply industry is "situational." Eggum Decl. Ex. 2 (Nardone Dep. 8:18-91) (doc. 243). Mr. Nardone's opinion is more relevant to the nature of the co-packing industry generally and the factors relevant to determine reasonable notice of termination in the context of an ongoing supply agreement; it does not support an "established" industry standard governing notice of termination. Therefore, Reser's motion to exclude is granted to the extent that Mr. Nardone may not testify about an industry standard

regarding the termination of supply agreements.

Reser's also argues that Mr. Nardone's opinion should be excluded in its entirety as irrelevant and unreliable, because it is not supported by reliable methodology, [*60] does not involve specialized knowledge, and fails to consider pertinent facts. However, in light of Mr. Nardone's experience in the industry, his testimony could be helpful to the jury in understanding the intricacies of supply chain relationships. *E.g.*, Nardone Decl. Ex. 1 at 6-10; *Fed. R. Evid 702, 703; Hangarter v. Provident Life Acc. Ins. Co., 373 F.3d 998, 1017-18 (9th Cir. 2004)* (no error in admitting expert testimony based on knowledge and experience rather than "a particular methodology or technical framework"); *United States v. Hankey, 203 F.3d 1160, 1169 (9th Cir. 2000)* (reliability factors such as peer review, publication, and potential error rate "simply are not applicable" to expert testimony based "on the knowledge and experience of the expert, rather than the methodology or theory behind it").

Regardless, aside from the industry standard issue, at this juncture I need not decide whether and to what extent Mr. Nardone will be allowed to testify at trial. For purposes of BEF's intentional interference claim, I find that his opinion fails to establish an industry standard of collaboration or reasonable notice and Reser's motion to exclude is granted on that basis. Reser's motion is otherwise denied, with leave to renew in pretrial motions.

## CONCLUSION

For the reasons explained above, Reser's Motion for Summary Judgment (does. 209, [*61] 211) is GRANTED in part, and BEF's Motion for Partial Summary Judgment (doe. 212) is DENIED. Count 3 of BEF's Fourth Claim for Relief and Counts 2 and 4 of BEF's Third Supplemental Claim for Relief are HEREBY DISMISSED. Reser's Motion for Summary Judgment is denied in all other respects. Reser's Motion to Exclude (doe. 242) is GRANTED in part. BEF expert Robert Nardone may not testify to the existence of an industry standard that requires collaboration between co-packers and a specific notice period before the termination of supply agreements. Reser's motion is otherwise denied with leave to renew prior to trial.

The Court strongly encourages the parties to contact Magistrate Judge Coffin's chambers to pursue additional settlement efforts to resolve this long and costly

litigation.

IT IS SO ORDERED.

Dated this 13 day of July, 2016.

/s/ Ann Aiken

Ann Aiken

United States District Judge

---

**End of Document**

# Exhibit 16

🛈 Cited
As of: January 7, 2026 11:07 AM Z

# *White v. Ocean Bay Marina, Inc.*

Court of Appeal of Florida, Third District

January 31, 2001, Opinion Filed

CASE NO. 3D00-1886

**Reporter**

2001 Fla. App. LEXIS 840 *; 778 So. 2d 412; 26 Fla. L. Weekly D 328

BRON WHITE, d/b/a CALYPSO CAFE & SEAFOOD GRILLE, Appellant, vs. OCEAN BAY MARINA, INC., a Florida corporation, as Assignee of LARGO LAKE ENTERPRISES, Appellee.

**Subsequent History: [*1]** Released for Publication March 16, 2001.

**Prior History:** An Appeal from the Circuit Court for Monroe County, Raymond J. Hare, Judge. LOWER TRIBUNAL NO. 99-552.

**Disposition:** Reversed and remanded.

## Core Terms

summary judgment, written contract, modification, modified, parties

**Counsel:** William K. Crispin, for appellant.

Russell H. Cullen, for appellee.

**Judges:** Before GERSTEN, SHEVIN and RAMIREZ, JJ.

## Opinion

PER CURIAM.

We reverse the final summary judgment in defendant's favor and remand for further proceedings. The record demonstrates that genuine issues of material fact remain unresolved regarding whether the parties orally modified the amount of rent due under the lease. *See Alan Simons Assoc., Inc. v. Deltareach Corp., 554 So. 2d 581 (Fla. 3d DCA 1989)*; *Boaters Paradise, Inc. v. Freburn Corp., 256 So. 2d 68 (Fla. 3d DCA 1971)*. Contrary to defendant's argument, it is of no moment that the written agreement is unambiguous and, hence,

cannot be rewritten by the court. "[A] written contract may be modified by a subsequent oral agreement or subsequent conduct of the parties, even though the written contract purports to prohibit such modification." *Beach Higher Power Corp. v. Granados, 717 So. 2d 563, 565 (Fla. 3d DCA 1998).*In view **[*2]** of the disputed evidence regarding the modification, summary judgment was improper.

Reversed and remanded.

---

**End of Document**

Ryan Wiithans

Exhibit 17

## *Wright v. State Farm Mut. Auto. Ins. Co.*

Court of Appeals of Oregon

May 8, 2008, Argued and Submitted; October 29, 2008, Filed

A132898

**Reporter**

223 Ore. App. 357 *; 196 P.3d 1000 **; 2008 Ore. App. LEXIS 1636 ***

LINDA WRIGHT, Guardian Ad Litem of Devin Wright, a Minor, Plaintiff-Appellant, v. STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Defendant-Respondent.

**Prior History:** [***1] Clackamas County Circuit Court. CV05080601. Thomas J. Rastetter, Judge.

**Disposition:** Reversed and remanded.

## Core Terms

insured, coverage, two-year, toll, accrued, cause of action, forfeiture, summary judgment, two year, arbitration, benefits, motorist, waived, underinsured, statute of limitations, uninsured motorist, trial court, time limit, conditions, commencement of the action, personal injury action, proceedings, date of the accident, limitation provision, material fact, commencing, disability, requisite

## Case Summary

### Procedural Posture

In an action seeking declaratory relief arising out of a car accident, plaintiff insured, as guardian ad litem for her minor son, sought review of the allowance of summary judgment by the Clackamas County Circuit Court (Oregon) in favor of defendant insurer, which provided the insured with underinsured motorist (UIM) coverage. The insured also appealed the denial of her cross-motion for summary judgment.

### Overview

The trial court determined that the statute of limitations to bring the underlying action had run. The court held that the trial court correctly determined that the minority tolling provisions of *Or. Rev. Stat. § 12.160* did not operate to extend the time limitation, predicated on *Or.*

*Rev. Stat. § 742.504(12)(a)*, that certain event had to occur within two years of the date of the accident. However, the trial court erred in granting summary judgment because the two-year limitation of *§ 742.504(12)(a)* could be waived by the insurer and there was a material issue of disputed facts as to whether the insurer did waive its right to rely on that time limitation. Such issue of disputed facts arose as a result of a letter sent by the insurer to the insured after the running of the time limitation stating that the insured did have coverage, that they would try to reach an agreement as to the amount of benefits due under the policy, and that the only remaining issues were liability and damages. Based on the letter, the court concluded that a reasonable trier of fact could find that the insurer intentionally relinquished its right to rely on the two-year limitation of *§ 742.504(12)(a)*.

### Outcome

The court reversed the trial court's judgment and remanded.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Standards of Review > General Overview

Civil Procedure > ... > Summary Judgment > Appellate Review > Standards of Review

*HN1*[⬆] **Appeals, Standards of Review**

An appellate court reviews a grant of summary judgment to determine whether any genuine issue of material fact exists and whether defendant is entitled to judgment as a matter of law. *Or. R. Civ. P. 47 C*. An appellate court views the evidence and make all

reasonable inferences in favor of the nonmoving party.

Insurance Law > ... > Coverage > Uninsured Motorists > General Overview

**HN2[↓] Coverage, Uninsured Motorists**

Under *Or. Rev. Stat. § 742.504*, insurance policies that include uninsured motorist benefits must provide coverage that is no less favorable to the insured or any beneficiary than the sample policy provisions set forth in *Or. Rev. Stat. § 742.504(1) to (12)*.

Governments > Legislation > Statute of Limitations > Time Limitations

Insurance Law > ... > Coverage > Uninsured Motorists > General Overview

Insurance Law > Claim, Contract & Practice Issues > Estoppel & Waiver > General Overview

**HN3[↓] Statute of Limitations, Time Limitations**

See *Or. Rev. Stat. § 742.504(12)(a)*.

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

**HN4[↓] Reviewability of Lower Court Decisions, Preservation for Review**

A claimed error must be preserved in trial court and assigned as error in opening brief to be considered on appeal.

Governments > Legislation > Statute of Limitations > Time Limitations

Governments > Legislation > Statute of Limitations > Tolling

**HN5[↓] Statute of Limitations, Time Limitations**

See *Or. Rev. Stat. § 12.160* (2005).

Contracts Law > ... > Affirmative Defenses > Statute of Limitations > Equitable Estoppel

Insurance Law > ... > Coverage > Underinsured Motorists > General Overview

**HN6[↓] Statute of Limitations, Equitable Estoppel**

With certain exceptions, *Or. Rev. Stat. § 12.080* establishes the time for commencing contract actions. Claims for underinsured motorist (UIM) benefits arise from contract. As a result, *Or. Rev. Stat. § 12.160* is potentially applicable in the context of an action concerning UIM coverage. *Or. Rev. Stat. § 12.160* does not apply to toll the two-year period set forth in *Or. Rev. Stat. § 742.504(12)(a)*.

Governments > Legislation > Statute of Limitations > Time Limitations

Insurance Law > ... > Coverage > Underinsured Motorists > General Overview

**HN7[↓] Statute of Limitations, Time Limitations**

*Or. Rev. Stat. § 12.160*, by its plain terms, applies only at the time the cause of action accrues. A cause of action accrues when it comes into existence as an enforceable claim. However, under *Or. Rev. Stat. § 742.504(12)(a)*, no cause of action shall accrue to the insured for underinsured motorist coverage unless one of the four events specified in the statute occurs within two years from the accident date. If none of the events occurs in the permitted time period, the cause of action never accrues.

Governments > Legislation > Statute of Limitations > Time Limitations

Insurance Law > ... > Coverage > Underinsured Motorists > General Overview

**HN8[↓] Statute of Limitations, Time Limitations**

*Or. Rev. Stat. § 12.160* provides that the time of the applicable disability shall not be a part of the time limited for the commencement of the action. *Or. Rev. Stat. § 742.504(12)(a)* establishes a time limitation for accrual of a cause of action, not for commencement of an action.

Governments > Legislation > Interpretation

### HN9[⬇] Legislation, Interpretation

In interpreting a statute, an appellate court's task is to determine the intent of the legislature. At the first level of that analysis, an appellate court examines the text and context of the statute. When one state borrows a statute from another state, the interpretation of the borrowed statute by the courts of the earlier enacting state ordinarily is persuasive.

Governments > Legislation > Statute of Limitations > Time Limitations

Insurance Law > ... > Coverage > Underinsured Motorists > General Overview

### HN10[⬇] Statute of Limitations, Time Limitations

The time limit established by *Or. Rev. Stat. § 742.504(12)(a)* is not a statute of limitation that establishes the time for commencing an action. Instead, it specifies how and when a underinsured motorist cause of action may accrue, and *Or. Rev. Stat. § 12.160* only applies to toll the time for commencing an action if the cause of action has accrued.

Governments > Legislation > Statute of Limitations > Tolling

Insurance Law > ... > Coverage > Underinsured Motorists > General Overview

Torts > ... > Statute of Limitations > Tolling > Disabilities

### HN11[⬇] Statute of Limitations, Tolling

*Or. Rev. Stat. § 12.110* establishes a two-year statute of limitations for most personal injury actions. In certain circumstances, such as when the injured insured is a minor at the time of the accident, *Or. Rev. Stat. § 12.160* will apply to extend the statute of limitations for commencing the personal injury action while, it does not apply to extend the period for seeking underinsured motorist benefits.

Insurance Law > ... > Coverage > Uninsured Motorists > General Overview

Torts > Negligence > Types of Negligence Actions > General Overview

Insurance Law > ... > Coverage > Underinsured Motorists > General Overview

### HN12[⬇] Coverage, Uninsured Motorists

Given the express language of *Or. Rev. Stat. § 742.504(12)(a)*, the requirements for prosecuting a personal injury action against the at-fault uninsured motorist (UM) or underinsured motorist (UIM) and an action against the UM/UIM insurer are not congruent.

Insurance Law > ... > Coverage > Uninsured Motorists > General Overview

Insurance Law > ... > Coverage > Underinsured Motorists > General Overview

### HN13[⬇] Coverage, Uninsured Motorists

*Or. Rev. Stat. § 742.504(12)(a)(D)* requires only that the action against the uninsured or underinsured motorist be filed within two years of the accident and not also that service of process be timely effected.

Governments > Legislation > Interpretation

### HN14[⬇] Legislation, Interpretation

An appellate court's task is to discern the intention of the legislature from the language of the statute. Only if that language is unclear, is an appellate court authorized to go beyond the first level of text and context to discern legislative intent.

Governments > Legislation > Enactment

Governments > Legislation > Interpretation

### HN15[⬇] Legislation, Enactment

If the Oregon Legislature has chosen language that creates unexpected and unintended results, the Legislature can amend the statute to express its actual

intent. It is not the function of a court to insert language that should have been added and ignore language that should have been omitted. *Or. Rev. Stat. § 174.010*.

Governments > Legislation > Statute of Limitations > Time Limitations

Insurance Law > ... > Coverage > Uninsured Motorists > General Overview

Torts > ... > Statute of Limitations > Tolling > Disabilities

Governments > Legislation > Statute of Limitations > Tolling

Insurance Law > ... > Coverage > Underinsured Motorists > General Overview

*HN16*[⤓] **Statute of Limitations, Time Limitations**

*Or. Rev. Stat. § 12.160* does not apply to, extend, or toll the two-year limitation of *Or. Rev. Stat. § 742.504(12)(a)*.

Contracts Law > Contract Conditions & Provisions > Waivers > General Overview

Insurance Law > Claim, Contract & Practice Issues > Estoppel & Waiver > General Overview

*HN17*[⤓] **Contract Conditions & Provisions, Waivers**

Waiver is the intentional relinquishment of a known right, either in terms or by such conduct as clearly indicates an intention to renounce a known privilege or power.

Contracts Law > Contract Conditions & Provisions > Waivers > General Overview

Insurance Law > Claim, Contract & Practice Issues > Estoppel & Waiver > General Overview

*HN18*[⤓] **Contract Conditions & Provisions, Waivers**

The doctrine of waiver applies broadly to any contract term. As a general rule, a party to a contract may waive performance of any provision of the contract that is for its benefit. In the context of an insurance contract specifically, conduct of an insurer after a loss has occurred that is inconsistent with a particular defense, especially where the insured has been led to believe there is coverage, will constitute a waiver of the defense.

Insurance Law > ... > Coverage > Uninsured Motorists > General Overview

Insurance Law > ... > Coverage > Underinsured Motorists > General Overview

*HN19*[⤓] **Coverage, Uninsured Motorists**

The two-year limitation of *Or. Rev. Stat. § 742.504(12)(a)* is not a condition of forfeiture.

Insurance Law > Claim, Contract & Practice Issues > Estoppel & Waiver > General Overview

*HN20*[⤓] **Claim, Contract & Practice Issues, Estoppel & Waiver**

An insurer can waive limitations, other than conditions of forfeiture, so long as they are not conditions of coverage.

Insurance Law > Claim, Contract & Practice Issues > Estoppel & Waiver > General Overview

*HN21*[⤓] **Claim, Contract & Practice Issues, Estoppel & Waiver**

A condition of forfeiture exists when there is insurance coverage for the loss in the first place, but acts of the insured nullify the coverage. A condition of forfeiture disallows claims that otherwise are covered under a policy. A suit limitation provision, by contrast, does not nullify insurance coverage. Rather, it precludes an insured from starting an action against its insurer once the limitation period has passed, regardless of the extent of coverage.

Business & Corporate

Compliance > Contracts > Contract Conditions & Provisions > Conditions Precedent

Contracts Law > Contract Conditions & Provisions > Conditions Precedent

### HN22[⏷] Contract Conditions & Provisions, Conditions Precedent

A contractual condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due.

Insurance Law > Claim, Contract & Practice Issues > Estoppel & Waiver > General Overview

### HN23[⏷] Claim, Contract & Practice Issues, Estoppel & Waiver

An insurer may be estopped from asserting a suit limitation provision as a defense to liability on an insurance policy, whether or not the provision is characterized as a condition of forfeiture. There is no principled distinction as to why, if a suit limitation provision is susceptible to estoppel, it is not similarly susceptible to waiver.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

### HN24[⏷] Entitlement as Matter of Law, Genuine Disputes

There is no genuine issue as to any material fact if, based upon the record before the court viewed in a manner most favorable to the adverse party, no objectively reasonable juror could return a verdict for the adverse party on the matter that is the subject of the motion for summary judgment.

**Counsel:** Kathryn H. Clarke argued the cause for appellant. With her on the brief was Gideon D. Caron. R. Daniel Lindahl argued the cause for respondent. With him on the brief were John R. Bachofner and Bullivant Houser Bailey, PC.

**Judges:** Before Haselton, Presiding Judge, and Armstrong, Judge, and Rosenblum, Judge.

**Opinion by:** HASELTON

# Opinion

[**1001] [*359] HASELTON, P.J.

The plaintiff insured, as guardian ad litem for her minor son, appeals, challenging the allowance of summary judgment in favor of defendant, plaintiff's underinsured motorist (UIM) insurance carrier, as well as the trial court's denial of plaintiff's cross-motion for summary judgment. The underlying accident occurred in January 2000, and this action for declaratory relief was filed in August 2005. The trial court agreed with defendant that the "minority tolling" provisions of *ORS 12.160* did not operate to extend the time limitation provision, predicated on *ORS 742.504(12)(a)*, that certain events occur within two years of the date of the accident. The court further determined that plaintiff, in opposing summary judgment, had failed to adduce evidence raising a disputed issue of [***2] material fact as to whether defendant had waived the two-year limitation. On appeal, plaintiff challenges both of those determinations. As amplified below, we conclude that (1) the trial court correctly determined that the time limitation provision was not tolled, but (2) the court erred in granting summary judgment because (a) the two-year limitation of *ORS 742.504(12)(a)* can be waived by the UIM insurer and (b) there is a material issue of disputed fact as to whether defendant waived its right to rely on that time limitation. Accordingly, we reverse and remand.

HN1[⏶] We review a grant of summary judgment "to determine whether any genuine issue of material fact exists and whether defendant is entitled to judgment as a matter [**1002] of law." *Herman v. Valley Ins. Co., 145 Ore. App. 124, 127-28, 928 P.2d 985 (1996)*, rev den, 325 Ore. 438, 939 P.2d 621 (1997). See also *ORCP 47 C*. We view the evidence and make all reasonable inferences in favor of the nonmoving party. *Moore v. Mutual of Enumclaw Ins. Co., 317 Ore. 235, 237, 855 P.2d 626 (1993)*.

Here, the historical facts are not disputed. [1] On January 18, 2000, plaintiff and her minor son, D, were involved in an auto accident involving another motorist, Watts, in which D [***3] was allegedly injured. Watts had liability

---

[1] However, as noted below, with respect to the question of defendant's purported waiver, the reasonable inferences that can be drawn from defendant's statements and conduct *are* disputed.

insurance with limits of $ 25,000 per person and $ 50,000 per **[*360]** accident. At the time of the accident, defendant provided UIM coverage to plaintiff with limits of $ 50,000 per person and $ 100,000 per accident.

Plaintiff's UIM policy with defendant, in general conformance with _ORS 742.504(12)(a)_, which we address in detail below, included the following provision:

"c. nor shall we have to make any payment under uninsured motor vehicle coverage _unless within two years from the date of the accident:_

"(1) the insured and we agree to the amount due;

"(2) the insured or we have formally instituted arbitration proceedings;

"(3) _the insured has filed an action against us in a court of competent jurisdiction;_ or

"(4) a suit for bodily injury has been filed against the uninsured motorist in a court of competent jurisdiction and, within two years from the date of settlement or final judgment against the uninsured motorist, the insured has formally instituted arbitration proceedings **[***4]** or filed an action against us in a court of competent jurisdiction."

(Original emphasis omitted; emphasis added.) There were some preliminary communications between plaintiff and defendant regarding a potential claim, but plaintiff did not take any of the requisite actions within two years of the accident.

On March 19, 2005, plaintiff's attorney contacted defendant, informing defendant that he had been retained to represent D's interests and requesting information pertaining to defendant's personal injury protection (PIP) coverage. [2] Defendant responded, by letter, on April 26, 2005. That letter, which was signed by one of defendant's "claim representatives," identified plaintiff as the insured and the "date of loss" as January 18, 2000. After replying to plaintiff's attorney's request for PIP-related information, the letter then proceeded to address plaintiff's potential UIM claim:

**[*361]** "We understand that your client is interested in pursuing an underinsured motorist claim regarding [the] motor vehicle accident. We have determined that our insured, [plaintiff], does have coverage under her policy for such a claim and _we will make every attempt, once we have_

_adequate information supporting_ **[***5]** _[D's] claim, to reach an agreement with you as to the amount of benefits due under the policy. The only remaining issues are liability and damages due to your client._ If for some reason we are not able to reach an agreement as to the amount of benefits due under [plaintiff's] coverage, then please be advised that [we do] hereby consent to submit your client's underinsured motorist claim to arbitration as provided by the policy and that the arbitration be binding."

(Emphasis added.)

On April 28, 2005, plaintiff filed a personal injury action on D's behalf against Watts. [3]

On July 22, 2005, defendant notified plaintiff that it was withdrawing its offer of UIM arbitration because it had determined that none of the requisite events had occurred within the two-year period allowed in the policy. Plaintiff then brought this action, seeking a declaration of UIM coverage under the policy.

**[**1003]** The parties filed cross-motions for summary judgment, with their dispute centering on two issues: (1) Did the "minority tolling" provisions of _ORS 12.160_ apply to and, **[***6]** thus, extend the UIM policy's two-year limitation period, as specified in _ORS 742.504(12)(a)_? (2) Even if _ORS 12.160_ did not apply, was the two-year limitation waivable, and, if so, had plaintiff adduced evidence raising a disputed issue of material fact as to whether defendant had waived that limitation? The trial court resolved both of those questions adversely to plaintiff and, consequently, allowed defendant's motion for summary judgment and denied plaintiff's cross-motion.

On appeal, the parties essentially reprise their arguments to the trial court. We address the tolling and waiver arguments in turn.

**[*362]** _HN2_[⬆] Under _ORS 742.504_, insurance policies that include uninsured motorist benefits must provide coverage that is no less favorable to the insured or any beneficiary than the sample policy provisions set forth in _ORS 742.504(1) to (12)_. [4] _ORS 742.504(12)(a)_

---

[2] Defendant provided PIP coverage, as well as UIM coverage, to plaintiff.

[3] That claim was subsequently settled for Watts's liability policy limits.

[4] UIM policies are subject to the same requirement by virtue of _ORS 742.502(4)_ ("Underinsurance coverage is subject to _ORS 742.504_[.]".)

provides:

> **HN3**[↑] "The parties to this coverage agree that *no cause of action shall accrue* to the insured under this coverage unless within two years from the date of the accident:
>
> "(A) Agreement as to the amount due under the policy has been concluded;
>
> "(B) The insured or the insurer has formally instituted arbitration proceedings;
>
> "(C) The insured **[***7]** has filed an action against the insurer; or
>
> "(D) Suit for bodily injury has been filed against the uninsured motorist and, within two years from the date of settlement or final judgment against the uninsured motorist, the insured has formally instituted arbitration proceedings or filed an action against the insurer."

(Emphasis added.) [5] Plaintiff concedes that none of the four requisites, *(A) - (D)*, was satisfied within two years of the date of the accident. She argues, however, that defendant was obligated to provide UIM benefits because the two-year period was tolled by *ORS 12.160*. [6]

*ORS 12.160* (2005) provides, in part:

> **HN5**[↑] "If, *at the time the cause of action accrues,* any person entitled to bring an action mentioned in *ORS 12.010 to* **[*363]** *12.050*, *12.070 to 12.250* and *12.276* is within the age of 18 years * * * the time of such disability shall not be a part of *the time limited for the commencement of the action* * * *."

_____

[5] As relevant to the issues raised in this appeal, there is no substantive difference between the version of *ORS 742.504(12)(a)* in effect at the time of the accident and the current version of the statute.

[6] At oral argument, for the first time, plaintiff suggested that there was a substantive difference between the statutory and policy language. We decline to address that argument. *See ORAP 5.45(1)* (**HN4**[↑]) claimed error must be preserved in trial court and assigned as error in opening **[***8]** brief to be considered on appeal). Plaintiff stated in her memorandum in support of her motion for summary judgment that the policy provision set out above is consistent with *ORS 742.504(12)(a)*. In addition, she did not argue in her appellate brief that the two provisions are substantively different.

(Emphasis added.) [7] **HN6**[↑]] With certain exceptions not applicable here, *ORS 12.080* establishes the time for commencing contract actions. Claims for UIM benefits arise from contract. As a result, *ORS 12.160* is potentially applicable in the context of an action concerning UIM coverage. We conclude, however, that *ORS 12.160* does not apply to toll the two-year period set forth in *ORS 742.504(12)(a)* for two related reasons.

First, **HN7**[↑]] *ORS 12.160*, by its plain terms, applies only "at the time the cause of action accrues." A cause of action "accrues" when **[**1004]** it "come[s] into existence as an enforceable claim[.]" *Webster's Third New Int'l Dictionary* 13 (unabridged ed 2002). However, under *ORS 742.504(12)(a)*, "no cause of action shall accrue to the insured" for UIM coverage unless one of the four events specified in the statute occurs within two years from the accident date. If none of the events occurs in the permitted time period, the cause of action never accrues.

In this case, plaintiff's cause of action against defendant *never accrued* because none of the events specified in *ORS 742.504(12)(a)(A) to (D)* occurred within two years from the date of the accident. Because the cause of action did not accrue, the **[***10]** disability tolling provision set forth in *ORS 12.160* cannot apply. *See also ORS 12.170* ("No person shall make use of a disability unless it existed when the right of action of the person *accrued."* (Emphasis added.)).

Second, **HN8**[↑]] *ORS 12.160* provides that the time of the applicable disability "shall not be a part of the time limited for the *commencement* of the action." (Emphasis added.) *ORS 742.504(12)(a)* establishes a time limitation for accrual of a **[*364]** cause of action, not for commencement of an action. Therefore, *ORS 12.160* has no application.

The context of *ORS 742.504(12)(a)* corroborates our

_____

[7] We refer to the version of *ORS 12.160* in effect when plaintiff filed her complaint. Effective January 1, 2007, *ORS 12.160* provides, in part:

> "(1) Subject **[***9]** to subsection (2) of this section, if a person is entitled to bring an action that is subject to the statutes of limitation prescribed by *ORS 12.010 to 12.050*, *12.070 to 12.250* or *12.276*, and at the time the cause of action accrues the person is a child who is younger than 18 years of age, the statute of limitation for commencing the action is tolled for so long as the person is younger than 18 years of age."

construction. *HN9*[↑] In interpreting a statute, our task is to determine the intent of the legislature. *PGE v. Bureau of Labor and Industries, 317 Ore. 606, 610, 859 P2d 1143 (1993)*. At the first level of that analysis, we examine the text and context of the statute. *Id.* *ORS 742.504(12)(a)*, which was enacted in Oregon in 1967, was modeled on a California statute. [8] Minutes, Subcommittee on Reserve, Surplus and Capital Requirements of Insurance Companies Engaged in the Business of Casualty or Disability Insurance, Feb 15, 1964, 4. "When one state borrows a statute from another state, the interpretation of the **[***11]** borrowed statute by the courts of the earlier enacting state ordinarily is persuasive." *State ex rel Western Seed v. Campbell, 250 Ore. 262, 270-71, 442 P2d 215 (1968)*, *cert den, 393 U.S. 1093, 89 S. Ct. 862, 21 L. Ed. 2d 784 (1969)*. At the time Oregon enacted *ORS 742.504(12)(a)*, California courts had held that the time limitation described in its version of that statute was not tolled during an insured's minority. *See Pacific Indemnity Company v. Superior Court, 246 Cal App 2d 63, 72, 54 Cal Rptr 470 (1966)*; *State Farm Mutual Automobile Ins. Co. v. Superior Court, 232 Cal App 2d 808, 810, 43 Cal Rptr 209 (1965)*.

Plaintiff invokes *Bradford v. Davis, 290 Ore. 855, 626 P2d 1376 (1981)*, and *Kearney v. Montgomery Ward & Co., 55 Ore. App. 641, 639 P2d 682 (1982)*, as supporting her position. However, neither case assists her. In *Bradford,* the Supreme Court held that *ORS 12.160* tolled a two-year statute of limitation **[***12]** found in *ORS 30.275* for commencing a cause of action under the Tort Claims Act during the plaintiff's minority. *290 Ore. at 861.* In *Kearney,* we followed the reasoning of *Bradford* and held that the statute of limitations for commencing a product liability action under *ORS 30.905* was tolled during the plaintiff's minority by *ORS 12.160*. *55 Ore. App. at 645.*

**[*365]** The facts of *Bradford* and *Kearney* are distinguishable from those of this case because both of those cases involve statutes of limitations for commencing actions. *HN10*[↑] The time limit established by *ORS 742.504(12)(a)* is not a statute of limitation that establishes the time for commencing an action. Instead, it specifies how and when a UIM cause of action may *accrue*--and, as noted, *ORS 12.160* only applies to toll the time for commencing an action if the cause of action has accrued. In both *Bradford* and *Kearney,* the cause of action had accrued and, thus, *ORS 12.160* could apply to toll the pertinent statutes of limitation. Conversely, in this case, *ORS 12.160* has no application because plaintiff's cause of action never accrued given that none of the requisite events occurred within the two-year period allowed under *ORS 742.504(12)(a)*.

**[**1005]** Finally, plaintiff **[***13]** argues that *ORS 12.160* must toll the two-year period set forth in *ORS 742.504(12)(a)* because, if it does not, there will be a temporal disconnect between the time during which a minor injured can commence a personal injury action against an at-fault motorist and the time during which he or she must act to secure UIM benefits. *HN11*[↑] *ORS 12.110* establishes a two-year statute of limitations for most personal injury actions. In certain circumstances, such as when the injured insured is a minor at the time of the accident, *ORS 12.160* will apply to extend the statute of limitations for commencing the personal injury action while, under our holding, it does not apply to extend the period for seeking UIM benefits.

The fundamental problem with plaintiff's argument is that we have previously indicated that, *HN12*[↑] given the express language of *ORS 742.504(12)(a)*, the requirements for prosecuting a personal injury action against the at-fault uninsured motorist (UM) or underinsured motorist and an action against the UM/UIM insurer are not congruent. *See Lindsey v. Farmers Ins. Co., 170 Ore. App. 458, 12 P3d 571 (2000)*.

In *Lindsey,* the plaintiff filed a personal injury action against the tortfeasor uninsured motorist **[***14]** within the two-year period permitted under *ORS 742.504(12)(a)(D)*. *170 Ore.* **[*366]** *App. at 460.* The plaintiff did not, however, effect proper service of process and, consequently, her action against the uninsured motorist was dismissed. *Id.* The plaintiff subsequently requested arbitration of her UM claim against the defendant UM insurer, which refused to arbitrate on the ground that the request was untimely. *Id.* The plaintiff then brought an action against the defendant UM insurer, which moved for summary judgment, arguing that the plaintiff had failed to satisfy the requisites of *ORS 742.504(12)*. *Id.* The trial court granted that motion, concluding, *inter alia,* that the plaintiff had failed to satisfy the time limitation of *ORS*

---

[8] As originally enacted, *ORS 742.504(12)(a)* included three alternate ways in which a UIM claim could accrue. Those three alternatives were substantively equivalent to the methods specified in *ORS 742.504(12)(a)(A)*, *(B)*, and *(D)*. The fourth provision at issue in this appeal, (C), was added by the Oregon legislature in 1997.

*742.504(12)(a)(D)*. *Id.*

On appeal, we reversed. We concluded that *HN13*[⬆] *ORS 742.504(12)(a)(D)* requires only that the action against the uninsured or underinsured motorist be "*filed*" within two years of the accident and not also that service of process be timely effected. *Id. at 467*. In so holding, we emphasized the distinction between the term "filed" and the term "commenced" employed in other statutes, including those pertaining to statutes of limitation. *Id. at 463-65*. We also **[***15]** rejected the defendant insurer's argument that the plaintiff's construction of the statute could yield practically incongruous results because, if the third-party liability action was merely filed without timely service, the effect would be that UM (or UIM) insureds would be able to maintain claims under UM (or UIM) coverage even when there was no viable claim (and, thus, no potential reimbursement) against the tortfeasor uninsured (or underinsured) driver. In rejecting that contention, we observed:

> "Regardless of the merit of defendant's argument about how an insurer has little protection from stale claims under plaintiff's interpretations of *ORS 742.504(12)(a)(D)*, *HN14*[⬆] our task is to discern the intention of the legislature from the language of the statute. Only if that language is unclear, are we authorized to go beyond the first level of text and context to discern legislative intent."

*Id. at 466*.

So too here. Although the circumstances here are, in many ways, the obverse of those in *Lindsey,* [9] we fully appreciate that the temporal disconnect that can obtain under *ORS 12.110*, **[*367]** as extended pursuant to *ORS 12.160*, and *ORS 742.504(12)(a)(D)*, can yield incongruous results. Most obviously, as **[***16]** a practical matter, the determination of the amount recovered from the underinsured tortfeasor might well, logically, precede ultimate recovery against the UIM insurer. It may be that a more rational statutory

_____

[9] Here, unlike in *Lindsey*, given the operation of *ORS 12.160*, plaintiff's filing (and service) of the personal injury liability action against Watts more than two years after the accident comported with *ORS 12.110*--but, nevertheless, did not satisfy *ORS 742.504(12)(a)(D)*. Conversely, in *Lindsey*, the plaintiff's filing of the personal injury action within two years of the accident, coupled with failure to effect timely service, did not comport with *ORS 12.110*--but did satisfy *ORS 742.504(12)(a)(D)*.

approach **[**1006]** could be constructed. But that is not our constitutional role:

> *HN15*[⬆] "If the legislature has chosen language that creates unexpected and unintended results, the legislature can amend the statute to express its actual intent. It is not the function of a court to insert language that should have been added and ignore language that should have been omitted. *ORS 174.010*."

*Cole v. Farmers Ins. Co., 108 Ore. App. 277, 280, 814 P2d 188 (1991)*.

The trial court correctly concluded that *HN16*[⬆] *ORS 12.160* **[***17]** does not apply to, extend, or toll the two-year limitation of *ORS 742.504(12)(a)*. We turn, then, to plaintiff's alternative, waiver-based argument.

*HN17*[⬆] "Waiver is 'the intentional relinquishment of a known right, either in terms or by such conduct as clearly indicates an intention to renounce a known privilege or power.'" *Day-Towne v. Progressive Halcyon Ins. Co., 214 Ore. App. 372, 382, 164 P3d 1205 (2007)* (quoting *Great American Ins. v. General Ins., 257 Ore. 62, 72, 475 P2d 415 (1970))*.

As noted, in 2005, plaintiff's attorney sent a letter to defendant informing defendant that he had "been retained to represent the interests of [D], a minor" with regard to the accident. Further, as noted, defendant responded by letter, on April 26, 2005, expressly acknowledging a "date of loss" of January 18, 2000, and stating:

> "We understand that your client is interested in pursuing an underinsured motorist claim regarding [the] motor vehicle accident. We have determined that our insured, [plaintiff], does have coverage under her policy for such a claim and *we will make every attempt, once we have adequate **[*368]** information supporting [D's] claim, to reach an agreement with you as to the amount of benefits due **[***18]** under the policy. The only remaining issues are liability and damages due to your client.* If for some reason we are not able to reach an agreement as to the amount of benefits due under [plaintiff's] coverage, then please be advised that [we do] hereby consent to submit your client's underinsured motorist claim to arbitration as provided by the policy and that the arbitration be binding."

(Emphasis added.) Roughly three months later, on July 22, 2005, defendant first asserted that *ORS 742.504(12)(a)* precluded recovery under the UIM policy.

Plaintiff contends that defendant's conduct antedating July 22, 2005--and, particularly, the language of the April 26, 2005 letter--effected a waiver of any reliance on *ORS 742.504(12)(a)*. In that regard, plaintiff emphasizes that that letter explicitly cross-referenced a "date of loss" more than two years before the letter and then, without any reference to *ORS 742.504(12)(a)* or any other temporal limitation, proceeded to acknowledge that "[t]he *only* remaining issues are liability and damages due to your client." (Emphasis added.) Plaintiff contends that, from those circumstances and reasonably related inferences, a trier of fact could properly find **[***19]** waiver.

Defendant counters with two arguments. First, as a matter of law, the limitation described in *ORS 742.504(12)(a)* is not subject to waiver. [10] Second, in all events, defendant's conduct before July 22, 2005, including the language of the April 26, 2005 letter, does not raise a triable issue of material fact as to waiver. We begin by addressing the first assertion--which, logically, precedes the second--and reject both.

Defendant argues that the two-year limitation of *ORS 742.504(12)(a)* "is not the type of policy provision that can be waived." We disagree. **HN18[↑]** The doctrine of waiver applies broadly to any contract term. *Bennett v. Farmers Ins. Co., 332 Ore. 138, 156, 26 P3d 785 (2001)*. As a general rule, "[a] party to a contract may waive performance of any provision of the **[*369]** contract that is for its benefit." *South Lake Center v. Waker Associates, Inc., 129 Ore. App. 581, 589, 879 P2d 1342 (1994)*. In the context of an insurance contract specifically, "[c]onduct of an insurer after a loss has occurred that is inconsistent **[***20]** with a particular defense, especially **[**1007]** where the insured has been * * * led to believe there is coverage, will constitute a waiver of the defense." Richard A. Lord, 14 *Williston on Contracts* § 41:26 (4th ed 2000).

Defendant cites no case law supporting its assertion that the UIM policy's two-year limitation, predicated on *ORS 742.504(12)(a)*, is not waivable. However, defendant contends generally that the limitation is not

waivable because it is not a "condition of forfeiture." As support for that general proposition, defendant invokes *Farmers Ins. Co. v. Munson, 127 Ore. App. 413, 418, 873 P2d 370*, *rev den, 320 Ore. 109, 881 P.2d 141 (1994)*, where we stated that "[w]aiver may be available to prevent an insurer from asserting a policy defense if the defense is a condition of forfeiture, but not if it is a condition of coverage."

Defendant is correct that **HN19[↑]** the two-year limitation of *ORS 742.504(12)(a)* is not a condition of forfeiture. [11] But defendant is wrong in its reading, and application, of *Munson*. In *Munson* we did not say that the universe of insurance-related limitations is bifurcated, exclusively, into "conditions of coverage" or "conditions of forfeiture." Nor did we say that an insurer can waive *only* **[***21]** conditions of forfeiture. Rather, **HN20[↑]** an insurer can waive limitations, other than conditions of forfeiture, so long as they are not conditions of coverage< [12]--and, here, there is no suggestion that the two-year limitation is a condition of coverage. [13]

*Herman v. Valley Ins. Co., 145 Ore. App. 124, 928 P2d 985 (1996)*, *rev den, 325 Ore. 438, 939 P.2d 621 (1997)*, highlights the flaws in defendant's reasoning. *Herman* involved a provision analogous to *ORS 742.504(12)(a)*, *ORS 742.240*, which requires that a fire insurance policy contain the following provision:

> **[*370]** "No suit or action on this policy for the recovery of any claim shall be sustainable in any court of law or equity unless all the requirements of this policy shall have been complied with, and unless commenced within 24 months next after **[***22]** inception of the loss."

There, the insured filed a complaint within 24 months of the loss but failed to properly name the insurer as a defendant--and her amended complaint that did properly name the defendant did not relate back to the original filing. *145 Ore. App. at 127-29*. The trial court granted

---

[10] Defendant, at times in its brief, refers only to *ORS 742.504(12)(a)(C)*. We understand defendant to argue that *ORS 742.504(12)(a)*, in its entirety, is not subject to waiver.

[11] See our discussion below, *145 Ore. App. at 130-31* ), of *Herman v. Valley Ins. Co., 145 Ore. App. 124, 928 P2d 985 (1996)*, *rev den, **325 Ore. 438, 939 P.2d 621 (1997)**.

[12] *See, e.g., Munson, 127 Ore. App. at 417* (doctrine of waiver cannot be applied to expand the scope of insurance coverage beyond that bargained for by the parties).

[13] Rather, as noted, defendant merely contends that the two-year limitation is not a condition of forfeiture.

summary judgment, based on the plaintiff's noncompliance with the policy provision incorporating the requirements of *ORS 742.240*. *Id. at 127*.

On appeal, we affirmed. In so doing, we held that the provision required under *ORS 742.240* "is a contract condition rather than a statute of limitations." [14] *145 Ore. App. at 130*. At the same time, we rejected the plaintiff's argument that limitation was a condition of forfeiture, [15] concluding that it was, instead, a "suit limitation provision":

> *HN21*[⬆] "A condition of forfeiture exists when 'there is insurance coverage for the loss in the first place, but acts of the insured nullify the coverage * * *.' *ABCD…* *Vision v. Fireman's Fund Ins. Companies, 304 Ore. 301, 307, 744 P2d 998 (1987)*. A condition of forfeiture disallows claims that otherwise are covered under a policy. A suit limitation provision, by contrast, does not nullify insurance coverage. Rather, [***23] it precludes an insured from starting an action [**1008] against its insurer once the limitation period has passed, regardless of the extent of coverage."

*Id. at 130-31*.

Because the "suit limitation provision" in *Herman* was a contract condition, but neither a condition of forfeiture [*371] nor a condition of coverage, *Herman* illustrates that the universe of contract conditions is comprised of more than just conditions of coverage and forfeiture. In addition, we held in *Herman* that *HN23*[⬆] "an insurer may be estopped from asserting a suit limitation provision as a defense to liability on an insurance policy, whether or not the provision is characterized as [***24] a condition of forfeiture." *Id. at 133*. We perceive no principled distinction as to why, if a "suit limitation provision" is susceptible to estoppel, it is not similarly susceptible to waiver. Thus, by close analogy, *Herman* demonstrates that the two-year limitation at issue here

---

[14] *HN22*[⬆] A contractual condition "'is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due.'" *Hill v. Oland, 61 Ore. App. 85, 90, 655 P2d 1088 (1982)* (quoting **Restatement (Second) of Contracts § 224** (1981)).

[15] The plaintiff in *Herman* argued that, if the provision embodied a condition of forfeiture, the defendant insurer, to prevail, would have to show both that her failure to comply with that condition was unreasonable and that her noncompliance prejudiced the insurer. *145 Ore. App. at 130*.

can be waived by the insurer.

Given that conclusion, we address, finally, whether plaintiff has raised disputed issues of material fact as to defendant's purported waiver, precluding summary judgment.

> *HN24*[⬆] "There is no genuine issue as to any material fact if, 'based upon the record before the court viewed in a manner most favorable to the adverse party, no objectively reasonable juror could return a verdict for the adverse party on the matter that is the subject of the motion for summary judgment.'"

*Schaff v. Ray's Land & Sea Food Co., Inc., 334 Ore. 94, 99, 45 P3d 936 (2002)* (quoting *ORCP 47 C*). Applying that standard, we conclude that a reasonable trier of fact could find that defendant intentionally relinquished its right to rely on the two-year limitation of *ORS 742.504(12)(a)*, as incorporated into the UIM policy.

On April 26, 2005--over five years after the accident and three years after expiration of the two-year [***25] limitation--defendant sent plaintiff's attorney a letter that explicitly identified the accident date. In that letter, defendant acknowledged that plaintiff sought UIM benefits for her son and stated that it had "determined that [plaintiff] *does have coverage under her policy for such a claim * * *.*" (Emphasis added.) The letter went on to state that "[t]he *only* remaining issues are liability and damages due to" plaintiff. (Emphasis added.) That letter was signed by a "claim representative"--and we do not understand defendant to dispute, for purposes of our review, that the representations in the letter were [*372] within that agent's authority and, thus, potentially were binding on defendant. [16]

It may be, as [***26] defendant contended in oral argument on appeal, that, in the totality of the UIM insurance claim processing context, defendant's statements in the letter were not intended to effect a waiver and were made for other reasons. But that is a

---

[16] At oral argument, defendant suggested, for the first time, that the policy includes a nonwaiver provision that would prevent the April 2005 letter from effecting a waiver. We decline to address this argument as an alternative basis for affirmance because it could potentially implicate development of the factual record, *see Outdoor Media Dimensions Inc. v. State of Oregon, 331 Ore. 634, 659-60, 20 P3d 180 (2001)*, and because defendant did not cogently develop the argument in its briefs.

matter to be resolved by a trier of fact, and not by an appellate court. On this record, a trier of fact could find that defendant, with full knowledge, voluntarily waived its ability to assert the defense afforded by *ORS 742.504(12)(a)*.

Reversed and remanded.

---

**End of Document**

# Exhibit 18

## *Fla. Stat. § 671.201*

***Current through the 2025 Regular Session.***

*LexisNexis® Florida Annotated Statutes  >  Title XXXIX. Commercial Relations. (Chs. 668 — 688) >  Chapter 671. Uniform Commercial Code: General Provisions. (Art. I)  >  Article I (Pts. I — IV)  > Part II. General Definitions and Principles of Interpretation. (§§ 671.201 — 671.213)*

# § 671.201. General definitions.

Unless the context otherwise requires, words or phrases defined in this section, or in the additional definitions contained in other chapters of this code which apply to particular chapters or parts thereof, have the meanings stated. Subject to definitions contained in other chapters of this code which apply to particular chapters or parts thereof, the term:

**(1)** "Action," in the sense of a judicial proceeding, includes recoupment, counterclaim, setoff, suit in equity, and any other proceedings in which rights are determined.

**(2)** "Aggrieved party" means a party entitled to pursue a remedy.

**(3)** "Agreement," as distinguished from "contract," means the bargain of the parties in fact, as found in their language or inferred from other circumstances, including course of dealing, usage of trade, or course of performance as provided in *ss. 671.205* and *672.208*.

**(4)** "Bank" means a person engaged in the business of banking and includes a savings bank, a savings and loan association, a credit union, and a trust company.

**(5)** "Bearer" means a person in control of a negotiable electronic document of title or a person in possession of a negotiable instrument, a negotiable tangible document of title, or a certificated security that is payable to bearer or indorsed in blank.

**(6)** "Bill of lading" means a document of title evidencing the receipt of goods for shipment issued by a person engaged in the business of directly or indirectly transporting or forwarding goods. The term does not include a warehouse receipt.

**(7)** "Branch" includes a separately incorporated foreign branch of a bank.

**(8)** "Burden of establishing" a fact means the burden of persuading the triers of fact that the existence of the fact is more probable than its nonexistence.

**(9)** "Buyer in ordinary course of business" means a person who, in ordinary course, buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods, from a person, other than a pawnbroker, in the business of selling goods of that kind. A person buys goods in ordinary course if the sale to the person comports with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices. A person who sells oil, gas, or other minerals at the wellhead or minehead is a person in the business of selling goods of that kind. A buyer in ordinary course of business may buy for cash, by exchange of other property, or on secured or unsecured credit and may acquire goods or documents of title under a preexisting contract for sale. Only a buyer who takes possession of the goods or has a right to recover the goods from the seller under chapter 672 may be a buyer in ordinary course of business. "Buyer in ordinary course of business" does not include a person who acquires goods in a transfer in bulk or as security for or in total or partial satisfaction of a money debt.

**(10)** "Central bank digital currency" means a digital currency, a digital medium of exchange, or a digital monetary unit of account issued by the United States Federal Reserve System, a federal agency, a

Ryan Witthans

foreign government, a foreign central bank, or a foreign reserve system, that is made directly available to a consumer by such entities. The term includes a digital currency, a digital medium of exchange, or a digital monetary unit of account issued by the United States Federal Reserve System, a federal agency, a foreign government, a foreign central bank, or a foreign reserve system, that is processed or validated directly by such entities.

**(11)** "Conspicuous," with reference to a term, means so written, displayed, or presented that, based on the totality of the circumstances, a reasonable person against which it is to operate ought to have noticed it. Whether a term is "conspicuous" is a decision for the court.

**(12)** "Consumer" means an individual who enters into a transaction primarily for personal, family, or household purposes.

**(13)** "Contract," as distinguished from "agreement," means the total legal obligation that results from the parties' agreement as determined by this code and as supplemented by any other applicable laws.

**(14)** "Creditor" includes a general creditor, a secured creditor, a lien creditor, and any representative of creditors, including an assignee for the benefit of creditors, a trustee in bankruptcy, a receiver in equity, and an executor or administrator of an insolvent debtor's or assignor's estate.

**(15)** "Defendant" includes a person in the position of defendant in a counterclaim, cross-claim, or third-party claim.

**(16)** "Delivery," with respect to an electronic document of title, means voluntary transfer of control and, with respect to instruments, tangible document of title, or an authoritative tangible copy of a record evidencing chattel paper, means voluntary transfer of possession.

**(17)** "Document of title" means a record:

    **(a)** That in the regular course of business or financing is treated as adequately evidencing that the person in possession or control of the record is entitled to receive, control, hold, and dispose of the record and the goods the record covers; and

    **(b)** That purports to be issued by or addressed to a bailee and to cover goods in the bailee's possession which are either identified or are fungible portions of an identified mass. The term includes a bill of lading, transport document, dock warrant, dock receipt, warehouse receipt, and order for delivery of goods. An electronic document of title means a document of title evidenced by a record consisting of information stored in an electronic medium. A tangible document of title means a document of title evidenced by a record consisting of information that is inscribed on a tangible medium.

**(18)** "Electronic" means relating to technology having electrical, digital, magnetic, wireless, optical, electromagnetic, or similar capabilities.

**(19)** "Fault" means a default, breach, or wrongful act or omission.

**(20)** "Fungible goods" means:

    **(a)** Goods of which any unit, by nature or usage of trade, is the equivalent of any other like unit; or

    **(b)** Goods that, by agreement, are treated as equivalents.

**(21)** "Genuine" means free of forgery or counterfeiting.

**(22)** "Good faith," except as otherwise provided in this code, means honesty in fact and the observance of reasonable commercial standards of fair dealing.

**(23)** "Holder" means:

    **(a)** The person in possession of a negotiable instrument that is payable either to bearer or to an identified person that is the person in possession;

**(b)** The person in possession of a negotiable tangible document of title if the goods are deliverable either to bearer or to the order of the person in possession; or

**(c)** The person in control, other than pursuant to *s. 677.106(7)*, of a negotiable electronic document of title.

**(24)** "Insolvency proceeding" includes an assignment for the benefit of creditors or other proceeding intended to liquidate or rehabilitate the estate of the person involved.

**(25)** "Insolvent" means:

**(a)** Having ceased to pay debts in the ordinary course of business other than as a result of a bona fide dispute;

**(b)** Being unable to pay debts as they become due; or

**(c)** Being insolvent within the meaning of the Federal Bankruptcy Law.

**(26)** "Money" means a medium of exchange that is currently authorized or adopted by a domestic or foreign government. The term includes a monetary unit of account established by an intergovernmental organization or by agreement between two or more countries. The term does not include a central bank digital currency.

**(27)** Subject to subsection (29), a person has "notice" of a fact if the person:

**(a)** Has actual knowledge of it;

**(b)** Has received a notice or notification of it; or

**(c)** From all the facts and circumstances known to the person at the time in question, has reason to know that it exists. A person "knows" or has "knowledge" of a fact when the person has actual knowledge of it. "Discover" or "learn" or a word or phrase of similar import refers to knowledge rather than to reason to know. The time and circumstances under which a notice or notification may cease to be effective are not determined by this section.

**(28)** A person "notifies" or "gives" a notice or notification to another person by taking such steps as may be reasonably required to inform the other person in ordinary course, whether or not the other person actually comes to know of it. Subject to subsection (29), a person "receives" a notice or notification when:

**(a)** It comes to that person's attention; or

**(b)** It is duly delivered in a form reasonable under the circumstances at the place of business through which the contract was made or at another location held out by that person as the place for receipt of such communications.

**(29)** Notice, knowledge, or a notice or notification received by an organization is effective for a particular transaction from the time when it is brought to the attention of the individual conducting that transaction, and, in any event, from the time when it would have been brought to the individual's attention if the organization had exercised due diligence. An organization exercises due diligence if it maintains reasonable routines for communicating significant information to the person conducting the transaction and there is reasonable compliance with the routines. Due diligence does not require an individual acting for the organization to communicate information unless such communication is part of the individual's regular duties or the individual has reason to know of the transaction and that the transaction would be materially affected by the information.

**(30)** "Organization" means a person other than an individual.

**(31)** "Party," as distinguished from "third party," means a person who has engaged in a transaction or made an agreement subject to this code.

**(32)** "Person" means an individual; corporation; business trust; estate; trust; partnership; limited liability company; association; joint venture; government; governmental subdivision, agency, or instrumentality;

or any other legal or commercial entity. The term includes a protected series, however denominated, of an entity if the protected series is established under law other than the Uniform Commercial Code which limits, or conditionally limits if conditions specified under the law are satisfied, the ability of a creditor of the entity or of any other protected series of the entity to satisfy a claim from assets of the protected series.

**(33)** "Present value" means the amount as of a date certain of one or more sums payable in the future, discounted to the date certain by use of either an interest rate specified by the parties if that rate is not manifestly unreasonable at the time the transaction is entered into or, if an interest rate is not so specified, a commercially reasonable rate that takes into account the facts and circumstances at the time the transaction is entered into.

**(34)** "Purchase" means taking by sale, lease, discount, negotiation, mortgage, pledge, lien, security interest, issue or reissue, gift, or any other voluntary transaction creating an interest in property.

**(35)** "Purchaser" means a person who takes by purchase.

**(36)** "Record" means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

**(37)** "Remedy" means any remedial right to which an aggrieved party is entitled with or without resort to a tribunal.

**(38)** "Representative" means a person empowered to act for another, including an agent, an officer of a corporation or association, and a trustee, executor, or administrator of an estate.

**(39)** "Right" includes "remedy."

**(40)** "Security interest" means an interest in personal property or fixtures which secures payment or performance of an obligation. "Security interest" includes any interest of a consignor and a buyer of accounts, chattel paper, a payment intangible, or a promissory note in a transaction that is subject to chapter 679. "Security interest" does not include the special property interest of a buyer of goods on identification of those goods to a contract for sale under *s. 672.401*, but a buyer may also acquire a security interest by complying with chapter 679. Except as otherwise provided in *s. 672.505*, the right of a seller or lessor of goods under chapter 672 or chapter 680 to retain or acquire possession of the goods is not a security interest, but a seller or lessor may also acquire a security interest by complying with chapter 679. The retention or reservation of title by a seller of goods, notwithstanding shipment or delivery to the buyer under *s. 672.401*, is limited in effect to a reservation of a security interest. Whether a transaction in the form of a lease creates a security interest is determined by the facts of each case; however:

**(a)** A transaction in the form of a lease creates a security interest if the consideration that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee and:

**1.** The original term of the lease is equal to or greater than the remaining economic life of the goods;

**2.** The lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;

**3.** The lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement; or

**4.** The lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

**(b)** A transaction does not create a security interest merely because:

**1.** The present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is greater than the fair market value of the goods at the time the lease is entered into;

**2.** The lessee assumes the risk of loss of the goods;

**3.** The lessee agrees to pay, with respect to the goods, taxes; insurance; filing, recording, or registration fees; or service or maintenance costs;

**4.** The lessee has an option to renew the lease or to become the owner of the goods;

**5.** The lessee has an option to renew the lease for a fixed rent that is equal to or greater than the reasonably predictable fair market rent for the use of the goods for the term of the renewal at the time the option is to be performed; or

**6.** The lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods at the time the option is to be performed.

**(c)** Additional consideration is nominal if it is less than the lessee's reasonably predictable cost of performing under the lease agreement if the option is not exercised. Additional consideration is not nominal if:

**1.** When the option to renew the lease is granted to the lessee, the rent is stated to be the fair market rent for the use of the goods for the term of the renewal determined at the time the option is to be performed; or

**2.** When the option to become the owner of the goods is granted to the lessee, the price is stated to be the fair market value of the goods determined at the time the option is to be performed.

**(d)** The "remaining economic life of the goods" and "reasonably predictable" fair market rent, fair market value, or cost of performing under the lease agreement must be determined with reference to the facts and circumstances at the time the transaction is entered into.

**(41)** "Send," in connection with a record or notification, means:

**(a)** To deposit in the mail, deliver for transmission, or transmit by any other usual means of communication, with postage or cost of transmission provided for, addressed to any address reasonable under the circumstances; or

**(b)** To cause the record or notification to be received within the time it would have been received if properly sent under paragraph (a).

**(42)** "Sign," "signing," "signed," or "signature" means, with present intent to authenticate or adopt a record, to:

**(a)** Execute or adopt a tangible symbol; or

**(b)** Attach to or logically associate with the record an electronic symbol, sound, or process.

**(43)** "State" means a state of the United States, the District of Columbia, Puerto Rico, the United States Virgin Islands, or any territory or insular possession subject to the jurisdiction of the United States.

**(44)** "Surety" includes a guarantor or other secondary obligor.

**(45)** "Term" means a portion of an agreement which relates to a particular matter.

**(46)** "Unauthorized signature" means a signature made without actual, implied, or apparent authority. The term includes a forgery.

**(47)** "Warehouse receipt" means a document of title issued by a person engaged in the business of storing goods for hire.

**(48)** "Writing" includes printing, typewriting, or any other intentional reduction to tangible form. "Written" has a corresponding meaning.

## History

S. 1, ch. 65-254; s. 1, ch. 78-222; s. 2, ch. 79-398; s. 2, *ch. 87-275*; s. 4, *ch. 90-278*; s. 3, *ch. 92-82*; s. 552, *ch. 97-102*; s. 1, *ch. 2000-112*; s. 10, *ch. 2001-198*; s. 8, *ch. 2007-134*, eff. Jan. 1, 2008; s. 3, *ch. 2010-131*, eff. July 1, 2010; s. 1, *ch. 2023-80*, effective July 1, 2023; s. 36, *ch. 2025-92*, effective July 1, 2025.

LexisNexis® Florida Annotated Statutes
Copyright © 2026 All rights reserved.

**End of Document**

Exhibit 19

## *Fla. Stat. § 671.205*

***Current through the 2025 Regular Session.***

***LexisNexis® Florida Annotated Statutes > Title XXXIX. Commercial Relations. (Chs. 668 — 688) > Chapter 671. Uniform Commercial Code: General Provisions. (Art. I) > Article I (Pts. I — IV) > Part II. General Definitions and Principles of Interpretation. (§§ 671.201 — 671.213)***

## § 671.205. Course of performance; course of dealing; usage of trade.

**(1)** A "course of performance" is a sequence of conduct between the parties to a particular transaction that exists if:

> **(a)** The agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and

> **(b)** The other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection.

**(2)** A "course of dealing" is a sequence of conduct concerning previous transactions between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

**(3)** A "usage of trade" is any practice or method of dealing having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts. If it is established that such a usage is embodied in a written trade code or similar record, the interpretation of the record is a question of law.

**(4)** A course of performance or a course of dealing between the parties or usage of trade in the vocation or trade in which they are engaged or of which they are or should be aware is relevant in ascertaining the meaning of the parties' agreement, may give particular meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement. A usage of trade applicable in the place in which part of the performance under the agreement is to occur may be so utilized as to that part of the performance.

**(5)** Except as otherwise provided in subsection (6), the express terms of an agreement and any applicable course of performance, course of dealing, or usage of trade must be construed whenever reasonable as consistent with each other. If such a construction is unreasonable:

> **(a)** Express terms prevail over course of performance, course of dealing, and usage of trade;

> **(b)** Course of performance prevails over course of dealing and usage of trade; and

> **(c)** Course of dealing prevails over usage of trade.

**(6)** A course of performance is relevant to show a waiver or modification of any term inconsistent with the course of performance.

**(7)** Evidence of a relevant usage of trade offered by one party is not admissible unless that party has given the other party notice that the court finds sufficient to prevent unfair surprise to the other party.

## History

Fla. Stat. § 671.205

S. 1, ch. 65-254; s. 553, *ch. 97-102*; s. 12, *ch. 2007-134*, eff. Jan. 1, 2008.

LexisNexis® Florida Annotated Statutes
Copyright © 2026 All rights reserved.

---

**End of Document**

# Exhibit 20

## Fla. Stat. § 672.201

***Current through the 2025 Regular Session.***

***LexisNexis® Florida Annotated Statutes > Title XXXIX. Commercial Relations. (Chs. 668 — 688) > Chapter 672. Uniform Commercial Code: Sales. (Art. II) > Article II (Pts. I — VIII) > Part II. Form, Formation, and Readjustment of Contract. (§§ 672.201 — 672.210)***

# § 672.201. Formal requirements; statute of frauds.

**(1)** Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is a record sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by the party's authorized agent or broker. A record is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this subsection beyond the quantity of goods shown in the record.

**(2)** Between merchants if within a reasonable time a record in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against the party unless notice in a record of objection to its contents is given within 10 days after it is received.

**(3)** A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable:

**(a)** If the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement; or

**(b)** If the party against whom enforcement is sought admits in his or her pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted; or

**(c)** With respect to goods for which payment has been made and accepted or which have been received and accepted (*s. 672.606*).

## History

S. 1, ch. 65-254; s. 557, *ch. 97-102*; s. 42, *ch. 2025-92*, effective July 1, 2025.

LexisNexis® Florida Annotated Statutes
Copyright © 2026 All rights reserved.

**End of Document**

# Exhibit 21

**_LexisNexis® Florida Annotated Statutes  >  Title XXXIX. Commercial Relations. (Chs. 668 — 688) >  Chapter 672. Uniform Commercial Code: Sales. (Art. II)  >  Article II (Pts. I — VIII)  >  Part II. Form, Formation, and Readjustment of Contract. (§§ 672.201 — 672.210)_**

## § 672.209. Modification, rescission, and waiver.

**(1)**  An agreement modifying a contract within this chapter needs no consideration to be binding.

**(2)**  A signed agreement which excludes modification or rescission except by a signed writing or other signed record cannot be otherwise modified or rescinded, but except as between merchants such a requirement on a form supplied by the merchant must be separately signed by the other party.

**(3)**  The requirements of the statute of frauds section of this chapter (_s. 672.201_) must be satisfied if the contract as modified is within its provisions.

**(4)**  Although an attempt at modification or rescission does not satisfy the requirements of subsection (2) or (3) it can operate as a waiver.

**(5)**  A party who has made a waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver.

## History

S. 1, ch. 65-254; s. 46, _ch. 2025-92_, effective July 1, 2025.

LexisNexis® Florida Annotated Statutes
Copyright © 2026 All rights reserved.

**End of Document**

# Exhibit 22

***LexisNexis® Florida Annotated Statutes  >  Title VII. Evidence. (Chs. 90 — 92)  >  Chapter 90. Evidence Code. (§§ 90.101 — 90.958)***

## § 90.408. Compromise and offers to compromise.

Evidence of an offer to compromise a claim which was disputed as to validity or amount, as well as any relevant conduct or statements made in negotiations concerning a compromise, is inadmissible to prove liability or absence of liability for the claim or its value.

## History

S. 1, ch. 76-237; s. 1, ch. 77-77; s. 22, ch. 78-361; s. 1, ch. 78-379.

LexisNexis® Florida Annotated Statutes
Copyright © 2026 All rights reserved.

**End of Document**